# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
 2                  WESTERN DIVISION
 3

 4

 5   SHIRDENIA BRYANT, et al.,         :

 6           PLAINTIFFS,               :

 7                                     :
                                       : Case No.: C-1-02-006
 8       vs.
                                       :
 9   PRESCOTT BIGELOW, IV, et al.,     :

10           DEFENDANTS.               :

11

12
                       * * * * * * * *
13

14   DEPONENT:       HARRY CURTIS

15   DATE:           AUGUST 29, 2003
                       * * * * * * * *
16

17

18   TERESA A. MOORE,

19   COURT REPORTER

20

21

22

23        BARLOW REPORTING & VIDEO SERVICES

             333 Madison Avenue
24
           Covington, Kentucky  41011

              (859) 261-8440

25
```

Page 34

1  Q  What was that for? Was that for unpaid
2  taxes?
3  A  Well, they said it was for unpaid taxes
4  for years past. But they are all paid.
5  Q  Well, we'll get to that.
6  A  Yeah.
7  Q  So, when the judgment was put on, on
8  June 30th of 1994, what type of taxes were they?
9  A  They were on the house taxes. They were
10  on -- I think they were for state taxes for
11  something or other. I don't know for what. I don't
12  know for what. I can't remember.
13  Q  Are you saying they were real estate
14  taxes?
15  A  No, they were state taxes either on
16  property or the -- on the property or for -- they
17  had made a mistake in my salary, or something like
18  that, and they said that I underpaid taxes and they
19  were charging the taxes.
20  Q  So, were these income taxes?
21  A  Yes, state taxes.
22  Q  State income taxes?
23  A  Yes.
24  Q  That judgment was entered against you on
25  June 30th of 1994, for $2,265; correct?

Page 35

1  A  I think -- I think, yes.
2  Q  Right?
3  A  Yes.
4  Q  That's what the public record shows.
5  A  Yeah.
6  Q  You're not disputing that, are you?
7  A  No.
8  Q  Then that was -- that judgment was paid
9  off October 10th of 1996, two plus years later;
10  correct?
11  A  Right.
12  Q  Now, were there two income tax -- or were
13  there two tax judgments, June 30th of 1994?
14  A  Well, I think I actually paid the tax
15  twice. Because they came back the next year and
16  they said it was the same thing, so I ended up
17  paying them again.
18  Q  Right. Because the public record
19  indicates that on June 30th, 1994, there were two
20  judgments entered in the identical amount,
21  $2,265.76.
22  A  Yeah, that's what I'm saying. I think I
23  actually paid it twice.
24  Q  So, it was really one obligation of yours
25  for the income tax, but it went into their judgment

Page 36

1  books as two different judgments; right?
2  A  I think so, right.
3  Q  I do, too. Now, there was another
4  judgment lien, a Tax Commission lien, in July of
5  2000, against you, wasn't there?
6  A  I think so.
7  Q  That was for $359.38?
8  A  Um-hmm, I think so.
9  Q  Yes?
10  A  Yes.
11  Q  Was that for tax, also?
12  A  Yes.
13  Q  What type of tax was that?
14  A  I think that was also state taxes. And it
15  was paid.
16  Q  It says, personal income tax account.
17  A  Yeah, it was paid.
18  Q  That was paid on March 31 of 2003, wasn't
19  it?
20  A  Yes.
21  Q  So, the judgment was entered July of 2000.
22  Does that sound right to you?
23  A  I guess. I'm not sure about that.
24  Q  If that's what the public record shows,
25  you wouldn't dispute that, would you?

Page 37

1  A  I guess so, yes -- I mean, yes, if that's
2  what the record shows. I can't remember when it
3  was.
4  Q  If that's what the record shows, you're
5  not going to say that's inaccurate, are you?
6  A  I can't, you know.
7  Q  So, the judgment was entered, according to
8  this, July of 2000, and for $359 and change. And
9  then that wasn't paid until March 31 of 2003;
10  correct?
11  A  I paid it, yes. I guess, um-hmm.
12  Q  In March of 2003?
13  A  I guess, yeah.
14  Q  If that's what the record shows, you won't
15  dispute that, will you, sir?
16  A  Not really, no.
17  Q  Now, there was another tax judgment
18  entered on March 19th of 1992; correct?
19  A  Um-hmm.
20  Q  Yes?
21  A  Yes.
22  Q  You need to try not say uh-huh.
23  A  Yes, I think. I think, yes.
24  Q  That was also from the State of Ohio Tax
25  Commission, for $1,935.17. Does that sound right to

Page 86

1  was the $15.18.
2     Q   And 350 was not paid?
3     A   $350 was not owed. He paid him $15.18.
4        MR. LEWIS: Off the record.
5        (Off-record discussion.)
6  BY MR. LEWIS:
7     Q   I want to talk to you now about your first
8  contact with Roseanne Christian.
9     A   Um-hmm.
10    Q   Tell me how that came about.
11    A   Well, basically, he -- I mean, I was in my
12 house on a Saturday. And I looked downstairs, and
13 she was standing in my kitchen.
14    Q   About what time of the day was it?
15    A   I guess it was maybe between the morning
16 and maybe between -- maybe between 10:00 and 12:00,
17 something like that. It was -- it was in the
18 morning or early afternoon.
19    Q   Was Patricia home then --
20    A   Yes, she was.
21    Q   -- that day? So, what was Roseanne doing
22 in your kitchen?
23    A   I had no idea.
24    Q   No. But, I mean, what, was she -- was she
25 walking around --

Page 87

1     A   She was just --
2     Q   -- or was she making lunch or --
3     A   She was standing there. And I asked her
4  what she was doing there.
5     Q   What did she tell you?
6     A   She said she didn't know anybody lived
7  there. But we had laundry out in the backyard. And
8  I also had a dog in the backyard, so -- and the back
9  door was open. So, you know, I don't know how she
10 made that assumption.
11    Q   So, this surprised you, to see somebody in
12 your kitchen?
13    A   Absolutely.
14    Q   But you knew Roseanne before that, didn't
15 you?
16    A   Yes.
17    Q   In what context had you known her?
18    A   Well, her mother was the organist at my
19 church.
20    Q   But had you met Roseanne before then?
21    A   Well, we -- we grew up in the same church.
22    Q   When you saw her, did you recognize her as
23 Roseanne Christian?
24    A   She was familiar and -- but I wasn't
25 quite -- you know.

Page 88

1     Q   You didn't know her name?
2     A   I knew her name was -- you know, after she
3  gave me her name, then I realized who it was.
4     Q   Then you recognized her, when you saw her?
5     A   Yeah.
6     Q   So, what was discussed then? Did she
7  start talking to you? Well, what did you say to
8  her, first?
9     A   I asked her what she was doing in my
10 kitchen.
11    Q   What did she say?
12    A   She said that she was there -- she thought
13 that the property was getting ready to get
14 foreclosed on, and she didn't know if anybody lived
15 there, and she was there looking at the property.
16    Q   You do remember this was a Saturday?
17    A   I'm pretty sure it was a Saturday, because
18 both of us were home.
19    Q   Do you remember what month it was?
20    A   I'm not sure about that.
21    Q   Do you know --
22    A   I knew it was -- I knew it was either -- I
23 knew it was either the early -- it was either the
24 summer or early autumn months --
25    Q   Well, if I ask you --

Page 89

1     A   -- because it was still hot outside, so --
2     Q   If I asked you whether it was June, July,
3  or August, would you be able to differentiate?
4     A   I would say, between one of those three.
5  It was in that time period.
6     Q   But you can't be more specific?
7     A   I can't be sure, no.
8     Q   So, Roseanne talked to you about the
9  foreclosure?
10    A   Well, she said that the property was going
11 into fore -- would be going into foreclosure. And
12 she said that -- she showed me the amount of taxes
13 that were due on it. And she said it was
14 probably -- she probably could have somebody -- she
15 knew somebody that could probably help me out with
16 it.
17    Q   These papers that -- she showed you
18 papers?
19    A   No, not at that time, she didn't show me
20 any papers.
21    Q   That's what I want to know.
22    A   She just talked to me about it --
23    Q   All right.
24    A   -- and wanted to know if I would be
25 interested. Well, I told her, at that time, that I

Page 90

1  wouldn't be interested in selling the property, but
2  I would be interested in finding some kind of
3  resolution to the problem, if it were possible.
4     Q  Did she give you any papers that day, the
5  first day that she was there?
6     A  Maybe one of her cards. Maybe a card.
7  Whether I -- or she said --
8     Q  Are we in the maybe/probably?
9     A  Well, I'm saying, I think she gave me one
10 of her cards --
11    Q  Other --
12    A  -- and --
13    Q  I'm sorry.
14    A  -- and then she said that she would be
15 contacting me later. She got -- she took our
16 number. And then she said that we -- you know, she
17 would be contacting me later.
18    Q  So, you believe she gave you a card?
19    A  Um-hmm.
20    Q  Yes?
21    A  Yes.
22    Q  Did she give you any other papers that
23 first day?
24    A  No.
25    Q  No?

Page 91

1     A  No, not that I can recall.
2     Q  How many times -- between that day and the
3  time that you closed at John Meckstroth's office on
4  the sale, how many times did you meet Roseanne
5  Christian?
6     A  She came there several times. Several
7  times. More than -- more than -- more than three.
8  More than three, I know.
9     Q  The times that she came back --
10    A  Um-hmm.
11    Q  -- did she call you ahead of time?
12    A  Sometimes, sometimes not.
13    Q  Did she come in your house uninvited
14 another time?
15    A  No. I mean, she usually rang the doorbell
16 after that point.
17    Q  At any point, did she give you any papers
18 other than a card?
19    A  Yes.
20    Q  Tell me about that. What did she give
21 you?
22    A  Well, first -- I think, at first she gave
23 me a -- information on who, you know -- who may be
24 involved with what's going on. She gave me
25 information on Mr. Bigelow.

Page 92

1     Q  I'm talking about papers she gave you.
2  What did she give you?
3     A  She gave me some estimates on what -- you
4  know, the amount of money I could get -- or she gave
5  me some information on what I might have to pay, I
6  think. And then she said that Mr. --
7     Q  Can I --
8     A  I mean, I don't know --
9     Q  Just answer the question. I don't want to
10 interrupt you.
11    A  She gave me -- she gave me certain papers.
12 I don't know exactly what they were. Okay?
13 Because, after that time, I was given other papers.
14 After I met Mr. Bigelow, I was given other papers.
15 Now, I don't know what the papers were that she gave
16 me and what the papers were that Mr. Bigelow talked
17 to -- me and Mr. Bigelow discussed.
18    Q  Do you still have any of these papers?
19    A  No. They were given to my lawyer.
20    Q  So they've all -- you don't have anything
21 that hasn't been given to your attorney, in terms of
22 papers?
23    A  Not that I can recall. If I do, you know,
24 he -- he would let he know.
25    Q  Did Ms. Christian make any specific

Page 93

1  proposals to you about what you could do to get out
2  of this problem?
3     A  She talked about a friend. And she
4  brought a proposal from him to me. That being that
5  I would enter into a land contract and then pay that
6  land contract back --
7     Q  This was in writing?
8     A  -- at the end of the two years.
9     Q  This was in writing, what you're talking
10 about?
11    A  Well, that was a proposal, not only with
12 Roseanne, but also with Mr. Bigelow.
13             (Defendants' Exhibit 11 marked
14             for identification.)
15 BY MR. LEWIS:
16    Q  Mr. Curtis, I want to show you what's been
17 marked for identification as Exhibit 11. Do you see
18 that?
19    A  Uh-huh.
20    Q  Is that your signature down there at the
21 bottom?
22    A  Yes, it is.
23    Q  Did you sign this document?
24    A  Yes, it is. Yes, I did.
25    Q  Now, where were you when you signed this?

Page 94

1  A  I'm pretty sure that I -- I was at my
2  dining room table.
3  Q  Okay. So, you were at home?
4  A  Yes.
5  Q  Was it signed by you on August 2nd of
6  1999?
7  A  I don't know. I know I was -- I signed
8  it. Because we didn't put a date there, I don't
9  know when we signed it.
10  Q  Well, how -- tell me approximately how
11  long it was between the time that Roseanne Christian
12  was first at your house --
13  A  Um-hmm.
14  Q  -- you with me -- until the time that
15  Exhibit 11 was signed by you?
16  A  I can't say, because it was several times.
17  So I can't say --
18  Q  Uh-huh.
19  A  -- when it was. I know it was signed, but
20  I can't say how long that was because it was -- it
21  was a period of time, and a lot of things transpired
22  within that time.
23  Q  Are you able to approximate it, at all, in
24  terms of the time frame?
25  A  No, I wouldn't do that. I'm not sure.

Page 95

1  I'm not sure.
2  Q  Do you believe it was more than six
3  months?
4  A  No, I don't think it was that long. I
5  don't think it was that long.
6  Q  Do you believe it was more than a month?
7  A  I'm not sure. I'm not sure.
8  Q  In terms of where you were when this
9  contract was signed, do you remember being asked
10  about that when you gave your prior deposition?
11  A  Yeah.
12  Q  If you would, turn to page 44. At line 6,
13  a question is asked: Is that a document that you
14  signed on, what is it, August 2nd or 3rd of 1999?
15     Do you see that question?
16  A  Um-hmm.
17  Q  You were asked that question?
18  A  Yes.
19  Q  You were being asked about this contract,
20  weren't you?
21  A  I guess. I guess. I'm not sure. I guess
22  it was.
23  Q  Was there some other document you signed
24  on August 2nd or 3rd, 1999, sir?
25  A  No. No --

Page 96

1  Q  All right.
2  A  -- not that I know of.
3  Q  So, you believe you were talking -- you
4  were being asked about this document, Exhibit 11?
5     MR. BLESSING: Well, I mean, you've marked
6  this one. This is Exhibit 1, looks like, to
7  the Curtis deposition. And on the previous
8  page, and going over to page 44, the reference
9  is to Exhibit 1. So, it --
10     MR. LEWIS: Okay.
11     MR. BLESSING: -- we won't have to guess
12  about what was being talked about.
13     MR. LEWIS: Thank you. I appreciate that.
14  BY MR. LEWIS:
15  Q  So, we've established that you were being
16  asked about Exhibit 1; right?
17  A  Right.
18  Q  Then, do you remember being asked, at line
19  10: Would that have been signed at your home?
20     Do you see that question?
21  A  Um-hmm.
22  Q  Yes?
23  A  Um-hmm.
24  Q  It's -- I'm having -- the uh-huh doesn't
25  translate.

Page 97

1  A  Yes. Yes.
2  Q  Your answer was: I don't know. I don't
3  know if it was signed at my home or was it signed
4  down there with the other things that were signed.
5  I'm not sure. It could have all been signed
6  together. I'm not sure.
7  A  Um-hmm.
8  Q  Right? That was your testimony then?
9  A  Right.
10  Q  Then the question was: So it could have
11  been signed at the closing is what you're saying?
12     And then your answer was: It could have
13  been.
14  A  Um-hmm.
15  Q  That was your testimony then, wasn't it?
16  A  Um-hmm.
17  Q  Yes?
18  A  Yes.
19  Q  Now, who prepared this document,
20  Exhibit 11?
21  A  Well, I don't know who prepared it. It
22  was already pretty well put together when I got it,
23  that -- as far as I know of. We -- I think certain
24  things were put on there afterwards. I'm not sure
25  about that. But I know, you know, it was -- most --

Page 98

1  some of these things were already written in.
2  Q   Are you claiming that things were added to
3  this contract after you signed it?
4  A   Oh, no. I don't know. I don't mean that.
5  I don't know if it was, or not. I don't -- I can't
6  say that or say it -- no.
7      But what I'm saying is, as far as I know,
8  certain things were there -- were already -- you
9  know, when I got the contract, certain things were
10 already on it. That's what I'm saying. When I --
11 when I received the contract, like, certain things
12 were already on it, certain things were already
13 filled in.
14 Q   When you signed the contract on
15 August 2nd of 1999, this is how it was -- all --
16 this is how the contract was, all of these terms
17 were in there; is that correct, sir?
18 A   I'm not sure. I'm not sure. I'm not
19 sure.
20 Q   But you're not claiming anything was added
21 after you signed this, are you, sir?
22 A   I'm not saying anything. I'm not sure all
23 these things were there. I'm not sure.
24 Q   Well, what do you think wasn't there?
25 A   That's what I'm saying. I'm not sure.

Page 99

1  Q   Did you read the contract before you
2  signed it?
3  A   Yes. But that was then. And I don't
4  remember if all these things were there.
5  Q   Who was in the room with you when this
6  contract was signed?
7  A   My wife and -- I can't remember -- I don't
8  know if Roseanne was there, or not. I'm -- I think
9  she was. I'm not sure. I'm not sure of all the
10 people that were there.
11 Q   Was Mr. Bigelow in the room when you
12 signed this contract?
13 A   I don't think so. I'm not sure.
14 Q   Had you met Mr. Bigelow, before this
15 contract was signed?
16 A   Yes.
17 Q   How many times had you met him?
18 A   At least once. At least once. I'm not
19 sure how many more times. But I met him in walking
20 around the property. And, at that time, I told him
21 I wasn't interested in selling the property. In
22 fact, we shook hands on that, as agreement.
23 Q   So, you told Mr. Bigelow, before
24 August 2nd of 1999, that you didn't want to sell the
25 property?

Page 100

1  A   Right.
2  Q   Then, you understand, don't you, sir, that
3  on August 2nd, 1999, you signed a contract to sell
4  the property?
5  A   Well, that --
6      MR. BLESSING: Objection.
7      MR. LEWIS: I'm asking for his
8  understanding.
9      MR. BLESSING: Objection to the form and
10     to the characterization of his testimony that
11     he signed this document on August 2nd, 1999.
12     MR. LEWIS: Okay. Let me rephrase it.
13 BY MR. LEWIS:
14 Q   When you signed this contract to purchase,
15 Exhibit 11 --
16 A   Right.
17 Q   -- did you understand that you were
18 selling the property?
19 A   Well, what I understood, that it was a
20 formality that had to be done so he could get the
21 taxes and all those things done. But as far as me
22 actually losing the property, no, I did not have
23 that understanding.
24 Q   Did you understand, when you signed this
25 contract to purchase, that you were selling the

Page 101

1  property to Mr. Bigelow?
2  A   What I understood is that this was a
3  formality for him to go ahead and get the taxes paid
4  and do the work so I could get the money for the
5  property, but I would be able to continue to have
6  the property and re -- and get the property
7  reinstated to me. That was my understanding.
8  Q   So, what you understood was that you were
9  selling the property to him, but that you could
10 continue to live there, and then later you could get
11 the property reinstated to you; is that accurate?
12 A   Yes. In other words, I would not lose the
13 property.
14 Q   But you did understand, when you signed
15 this contract, that at that time you were selling
16 the property to him; correct?
17 A   Well, what I -- just like I said --
18 Q   Could you answer the question? Then you
19 can explain.
20     MR. BLESSING: Excuse me. Excuse me. I
21     think he is answering the question. Please
22     don't interrupt.
23 A   What I was saying to you is that I was
24 under -- my understanding to this was that it was a
25 transfer, okay, of the property from myself to him,

Page 106

1  contract to purchase, did you understand that a
2  lease was different than a land contract?
3     A   I can't say. I don't -- what I'm saying
4  is, is that this, what I understood, had nothing to
5  do with what I was supposed to be doing with
6  Mr. Bigelow.
7     Q   I'm not asking that. I'm asking you what
8  you understood at the time. At the time you signed
9  this, was it your understanding that a lease was
10 different than a land contract?
11    A   Okay. What I'm saying to you is that,
12 even though I knew the difference --
13    Q   That's what I'm asking you. Can you --
14    A   It had -- it had nothing to do with what I
15 was actually supposed to be going into with
16 Mr. Bigelow.
17    Q   But you knew there was a difference
18 between a lease and a land contract; correct?
19    A   I knew that there was a difference, but it
20 had --
21    Q   Thank you.
22    A   -- no bearing on what I was supposed to be
23 doing with Mr. Bigelow.
24    Q   All right. We'll get to that. Okay.
25        Now, if you take a look at Exhibit 11

Page 107

1  here, is it your understanding that you were to
2  receive $10,000 cash at closing?
3     A   Yes.
4         MR. BLESSING: Are you asking, when, was
5  it his understanding? When he signed it?
6         MR. LEWIS: Yeah, as of -- yeah, as of,
7  you know, when you signed the contract, okay,
8  your understanding of the transaction, then,
9  August 2nd, 1999. Okay?
10        THE WITNESS: Um-hmm.
11 BY MR. LEWIS:
12    Q   Was that your agreement, that you were to
13 receive 10,000 as cash at closing?
14    A   Yes.
15    Q   Yes? And buyer -- and you knew
16 Mr. Bigelow was the buyer; right?
17    A   Well, yes.
18    Q   Buyer to repair roof and porch after
19 closing. Buyer to pay all costs. Was that your
20 agreement?
21    A   That was my -- what I understood.
22    Q   Also cost and attorney fees.
23    A   That's correct.
24    Q   That was your agreement?
25    A   That was my agreement.

Page 108

1     Q   Buyer to satisfy back taxes.
2     A   Yes.
3     Q   That was your part of the agreement;
4  right?
5     A   Right.
6     Q   Then, Seller to lease option property for
7  2 years to repurchase for 37,000 at end of 2 years
8  from this date of closing. Was that part of your
9  agreement?
10    A   Well, my agreement -- see, that's what I'm
11 saying. I initialed this here, up here. So, I
12 can't remember if I -- that was the agreement here,
13 or when this agreement was. I initialed it. But I
14 didn't know whether I initialed it above here, to
15 agree to the seller/buyer situation, or this other
16 stuff. That's what I'm saying.
17    Q   When you signed Exhibit 11 --
18    A   Yes.
19    Q   -- was the sentence in there that I just
20 read to you, seller to lease option --
21    A   I can't --
22    Q   Let me finish, okay?
23        MR. BLESSING: You've asked that question
24 twice already --
25        MR. LEWIS: Well --

Page 109

1         MR. BLESSING: -- and he answered.
2         MR. LEWIS: He's talking about initials
3  now. Is that correct?
4         MR. BLESSING: Excuse me. He answered
5  both times that he is not certain.
6         MR. LEWIS: Okay.
7         MR. BLESSING: It's the previous question
8  asked, same answer given both times.
9         MR. LEWIS: Could you just please make an
10 objection and not be -- I got chastised for
11 coaching a couple times the other day, so --
12 BY MR. LEWIS:
13    Q   Is it your testimony that you don't know
14 whether that sentence was in this contract at the
15 time that you signed it?
16    A   I do not remember. That's what I'm
17 saying.
18    Q   Was that your understanding of the
19 transaction, that you were going to have an option
20 to lease for two years and then you could repurchase
21 for 37,000 at the end of two years?
22    A   My understanding was that I was supposed
23 to be entering into a land contract. That was my
24 understanding.
25    Q   Then, that was your understanding before

28 (Pages 106 to 109)

Page 110

1  you signed this contract on August 2nd?
2  A   That was my understanding.
3  Q   Why didn't you request that language be in
4  that contract, saying that a land contract would be
5  prepared?
6  A   Well, because that was my understanding,
7  that a land contract would be prepared.
8  Q   So, why didn't you request that that
9  language be inserted in this contract?
10 A   Because that was my assumption, that the
11 land contract would be done.
12 Q   Did you request, before you signed this
13 contract, that language about a land contract be
14 included in the contract?
15 A   Well, that was my understanding.
16     MR. BLESSING:  That's not his question.
17     MR. LEWIS:  Listen to my question.
18     MR. BLESSING:  He said, did you request
19 inclusion of that language?
20 A   Oh, not on here --
21 Q   All right.
22 A   -- no, because that was my
23 understanding --
24 Q   So, you had --
25 A   -- that that would be prepared at closing.

Page 111

1  Q   So you had an understanding, in your mind,
2  that that was going to be a separate document, that
3  a land contract would be signed --
4  A   Yes.
5  Q   -- later --
6  A   Yes.
7  Q   -- is that right?
8  A   Yes.  That was -- that was the agreement,
9  for me to go ahead and transfer the property and
10 everything at this time.  That was the agreement.
11 Q   According to you, that was a verbal
12 agreement between you and Mr. Bigelow, that a land
13 contract would be signed later; right?
14 A   That was at -- before -- yes, at the
15 closing, that was the agreement.
16 Q   Okay.  That was a verbal agreement between
17 you and Mr. Bigelow; right?
18 A   Well, that was the understanding.  And
19 that was the reason why I even got involved with
20 this.  Because I had no intention of relinquishing
21 my property.  So, this was supposed to be a paper
22 thing to go ahead and transfer the property into
23 Mr. Bigelow's name so I could go ahead and get the
24 taxes and everything paid on it, so that I would
25 still remain in the property and be able to go ahead

Page 112

1  and keep the property.  That was the understanding.
2  Q   You had, according to you, a verbal
3  agreement -- you know what verbal means, don't
4  you --
5  A   Yes.
6  Q   -- not written, verbal agreement with
7  Mr. Bigelow --
8      MR. BLESSING:  Objection.
9  Q   -- that a land contract would be signed
10 later?
11 A   Well, we -- we shook hands on it.
12 Q   Okay.  Could you --
13 A   That was -- that was the agreement.
14 Q   Mr. Curtis --
15 A   Okay, that --
16 Q   -- try and listen to my question and
17 answer it.  You can explain, if you want.  But it's
18 a simple question.
19     Did you have a verbal agreement with
20 Mr. --
21 A   Yes.
22 Q   -- Bigelow that a land contract would be
23 signed later?
24 A   Yes --
25 Q   All right.

Page 113

1  A   -- at the closing.  That was the
2  agreement.
3  Q   Was it your understanding that this land
4  contract would allow you to stay in the premises?
5  A   That's correct.
6  Q   Right?  And that you were going to pay
7  $350 a month; was that your agreement?
8  A   That was agreed.
9  Q   Okay.  And that, according to you, this
10 was -- was the land contract going to say that at
11 the end of two years, you could repurchase the
12 property for $37,000?  Was that your agreement?
13 A   That's what -- that's what was my
14 understanding.
15 Q   All right.  So, you're saying, that's what
16 the land contract was supposed to say?
17 A   Absolutely.
18 Q   All right.  But it's the same thing that
19 this contract to purchase says.
20 A   Okay.  But I -- like I'm saying, I don't
21 remember these things.  I don't know what -- whether
22 I signed my signature, the initials, to the above or
23 the below.
24 Q   But that provision, that's what you agreed
25 to and that's what you thought was going to be in

Page 118

1  the porch be repaired?
2  A  We talked about it, yes. He said he would
3  do that.
4  Q  Is it your recollection that he was the
5  one who first suggested that?
6  A  Well, I can't say who was first. Okay?
7  Q  All right. You can't recall?
8  A  I can't recall.
9  Q  Also, we talked about this lease option
10 property for two years to repurchase for 37,000.
11 Same question, who first suggested the number of
12 $37,000 at the end of two years?
13 A  Well, that's what I was told by
14 Mr. Bigelow that I would have to settle with -- I
15 mean, have to do to get my property --
16 Q  So, your recollection is --
17 A  -- to get the property back to my name.
18 Q  So, your recollection is that Mr. Bigelow
19 was the one that initiated that number, the $37,000?
20 A  To my best of my knowledge, yes.
21 Q  Was it also Mr. Bigelow that was the one
22 that initiated this concept of there would be a
23 two-year term?
24 A  Yes.
25 Q  Was it your understanding that the $10,000

Page 119

1  and the $37,000 corresponded to some other number or
2  that there was some relationship between those two
3  numbers?
4  A  Well, I don't remember about that. I
5  don't remember about that.
6  Q  Do you recall Mr. Bigelow explaining to
7  you why he thought $37,000 would be an appropriate
8  number?
9  A  No, I don't remember that.
10 Q  Did you ever ask him --
11 A  I can't remember.
12 Q  -- about that?
13 A  I can't remember if we -- you know, I
14 can't remember whether or not we --
15 Q  Now, we discussed earlier that this issue
16 about the land contract -- and I'm not going to go
17 back through what the discussions were. Why was it
18 that a land contract was important to you?
19 A  Well, from what my understanding of what
20 Mr. Bigelow told me is that this would assure the
21 property being returned to me.
22 Q  Did you understand that you could not be
23 evicted if you failed to make monthly payments under
24 a land contract?
25 A  That was my understanding. But that's

Page 120

1  what my understanding was.
2  Q  Who told you that you could not be evicted
3  for failure to make --
4  A  No one.
5  Q  Now, wait, wait. Let me finish. Who told
6  you that you could not be evicted for failure to
7  make monthly payments under a land contract?
8  A  Nobody told me that.
9  Q  But that was your understanding?
10 A  That was my understanding.
11 Q  Now, what did you believe the fair market
12 value of Fairfax Avenue was as of 1999?
13 A  I didn't know.
14 Q  Do you have Exhibit 2 in front of you,
15 sir?
16 A  Yes.
17 Q  If you would, please, turn to
18 Interrogatory No. 15. The pages aren't numbered,
19 but it's the fifth page in. You with me?
20 A  Um-hmm.
21 Q  Actually, the prior page. Interrogatory
22 15 says: Identify all damages which you claim in
23 this action and identify the precise manner when
24 which said damages were calculated.
25    Do you see that? No. 15, just the page

Page 121

1  before it.
2  A  Oh, I'm sorry.
3  Q  Got it?
4  A  Okay.
5  Q  Down at the bottom.
6  A  Okay.
7  Q  Okay? These are the interrogatories we
8  talked about before, you signed these, that
9  verification page. Remember?
10 A  Um-hmm.
11 Q  Your response is: Curtis lost 92,473 in
12 equity in the home at 1966 Fairfax. This figure is
13 arrived at by taking the value of the home, 97,000,
14 minus the amount paid by Bigelow for delinquent real
15 estate taxes.
16    Do you see that?
17 A  Um-hmm.
18 Q  Yes?
19 A  Yes.
20 Q  How did you arrive at that -- at the
21 number of the value of the home, 97,000?
22 A  I'm not sure. I'm not sure. I'm not
23 sure.
24 Q  Do you know what the --
25 A  I think it was at the -- I'm not sure. I

31 (Pages 118 to 121)

Page 122

1  think it's from -- I think -- I'm not sure, but I
2  think it's from the actual sale price of the house.
3      Q   The actual sale price by who?
4      A   Of Mr. Bigelow.
5      Q   At the time that you transferred title to
6  Mr. Bigelow --
7      A   Um-hmm.
8      Q   -- in 1999 --
9      A   Um-hmm.
10     Q   -- what is your understanding of what the
11 fair market value of the property was?
12     A   I have no idea. I have no idea.
13     Q   Do you know what the Hamilton County
14 Auditor -- what the tax valuation was?
15     A   No.
16         (Defendants' Exhibit 12 marked
17          for identification.)
18 BY MR. LEWIS:
19     Q   Mr. Curtis, I want to show you what's been
20 marked for identification as Exhibit 12. I'm going
21 to represent to you, this is a document I obtained
22 off the Hamilton County Auditor's website.
23     A   Um-hmm.
24     Q   Do you see 1966 Fairfax Avenue --
25     A   Um-hmm.

Page 123

1      Q   -- there? If you look down toward the
2  right, for 1998 --
3      A   Um-hmm.
4      Q   -- you see that --
5      A   Um-hmm.
6      Q   -- it says, 100 percent total 1998,
7  46,400.
8      A   Um-hmm.
9      Q   All right? Do you see that?
10     A   Um-hmm.
11     Q   You don't have any reason to doubt that
12 that's how the Hamilton County Auditor valued the
13 property as of 1998, do you?
14         MR. BLESSING: Objection. You may answer.
15     A   Yeah. I have no idea. You know. I don't
16 even know how they came to that figure. It looks
17 like they got it from the taxes, though.
18     Q   At any time before you transferred --
19 before you signed the deed transferring the property
20 to Mr. Bigelow, did you request that someone do an
21 appraisal of the home?
22     A   No. Because -- because of what
23 Mr. Bigelow told me, the property was still going to
24 be mine. So, you know, I -- no.
25     Q   Now, after this purchase contract was

Page 124

1  signed, Exhibit 11, there was a closing schedule,
2  wasn't there?
3      A   Yes, there was.
4      Q   You became aware, at some point, that
5  Attorney John Meckstroth was going to do the
6  closing?
7      A   Yes, I was.
8      Q   Did you have any contact with
9  Mr. Meckstroth, before the closing on this
10 transaction?
11     A   Yes.
12     Q   Tell me about that.
13     A   He --
14     Q   Tell me about that.
15     A   He was calling to get a transfer of title
16 or find out how to get one, or find out -- do a
17 title search, or something like that. But I also
18 called to find out when the closing was.
19     Q   What's your recollection of when the
20 closing was, in relation to when the contract of
21 purchase was signed?
22     A   Oh, I can't remember that. I can't -- I
23 can't remember.
24     Q   Do you have any ballpark, at all?
25     A   Huh-uh, no. I can't even remember. I

Page 125

1  just can't -- went down when they asked me to come
2  down.
3      Q   Between the time that the contract of
4  purchase was signed and the time of the closing, did
5  you receive any documents from Mr. Meckstroth?
6      A   Not that I can remember, no.
7          (Defendants' Exhibit 13 marked
8           for identification.)
9  BY MR. LEWIS:
10     Q   Mr. Curtis, you have in front of you
11 Exhibit No. 13. This is a phone slip dated
12 August 18th, and it's got, Harry Curtis, Buyer, up
13 there. Do you see that?
14     A   Um-hmm.
15     Q   Yes?
16     A   Um-hmm.
17     Q   You can't --
18     A   Yes.
19     Q   We're having problems --
20     A   Yes.
21     Q   Oh, there you go. That phone number.
22 861-3927, was that your phone number?
23     A   Yes, it was.
24     Q   Did you call Mr. Meckstroth on
25 August 18th of 1999?

32 (Pages 122 to 125)

Page 126

1   A   Yes.
2   Q   Did you leave a message for him about land
3   contract closing, when is it closing?
4   A   Well, I wanted to know when was it
5   closing.
6       MR. BLESSING: Excuse me. He just asked
7   you a question.
8   A   Oh. Yes.
9   Q   Okay. Thank you. So, this Exhibit 13,
10  that's an accurate recitation of the date that you
11  called and the message that you left for
12  Mr. Meckstroth?
13      MR. BLESSING: He wants to know whether
14  you remember it from here.
15  A   I don't remember the date, but I remember
16  calling him.
17  Q   Okay. Then, when you did call, do you
18  believe that you left a message, land contract
19  closing, when is it closing?
20  A   Oh, I don't know about that. I don't
21  remember the message. But I remember calling him.
22  Q   You're not saying you didn't make this
23  call and leave this message, you're just saying you
24  can't remember exactly what you said; is that
25  correct?

Page 127

1   A   Yes, it was just something about the
2   closing.
3   Q   Sir, if you would, I'm going to be
4   referring you to some documents in Exhibit 4. Could
5   you get that, please? Do you have it in front of
6   you?
7   A   Yes, I do.
8   Q   If you would, these are all -- the pages
9   are numbered down at the bottom.
10  A   Um-hmm.
11  Q   See? Go to page number 697, if you would.
12  You there?
13  A   Yes.
14  Q   Can you identify that document? That's
15  the settlement statement, isn't it, from your
16  closing at Fairfax?
17  A   I -- that's what it says. I -- that's
18  what it says.
19  Q   Okay. Page 2 of that document.
20  A   Um-hmm.
21  Q   Would you turn the page, please? Is that
22  your signature?
23  A   Yes.
24  Q   Did you sign this settlement statement?
25  A   Assuming that's what it was, yes.

Page 128

1   Q   Well, I mean, did you or didn't you?
2   A   Yeah, I signed it. Yes, I did.
3   Q   Does this accurately reflect the
4   transaction that occurred at the closing of this
5   sale?
6   A   I don't know if it does, or not. I know
7   it was supposed to have, yes. It was supposed to
8   have.
9   Q   Well, can you --
10  A   I don't know, because I don't know
11  exactly -- you know, I took their word for it. So,
12  I don't know -- you know, I took their word for it.
13  Q   Well, is there anything on here -- and
14  take your time, if you need to look through it. But
15  is there anything on here that you believe is
16  inaccurate?
17  A   Well, like I said, certain things I don't
18  know about. I don't know what these -- yeah, these
19  attorney's fees or -- I don't know about this here.
20  Q   What don't you know about?
21  A   About the -- these attorney's fees.
22  Because I ended up paying Mr. Meckstroth for the --
23  the -- what do you call it -- the land contract, for
24  doing the land contract. So, I don't know if that's
25  correct, or not.

Page 129

1   Q   Anything else here, that you don't know
2   whether or not it's correct?
3   A   Not that I know of. But I don't know if
4   that's correct, or not, because I paid him for that.
5   Q   Separately, you mean?
6   A   Yeah, I wrote a check. It came out of the
7   money that I was supposed to be given.
8   Q   All right. Well, were the delinquent real
9   estate taxes paid after the closing?
10  A   Yes -- no, they were paid before.
11  Q   Well, were the delinquent real estate
12  taxes of $4,527 -- were they paid?
13  A   Yes.
14  Q   It says, balance due to seller, here,
15  $9,871.32. Do you see that?
16  A   Um-hmm.
17  Q   Yes?
18  A   Yes, I do.
19  Q   The reason I'm asking you to say yes is,
20  you keep giving --
21  A   Yes, I do.
22  Q   -- saying uh-huh.
23  A   Yes, I do.
24  Q   Did you receive $9,871.32 after the
25  closing?

Page 134

1  A  No.
2  Q  Who prepared this land installment
3  contract?
4  A  It was there with Mr. -- the attorney that
5  was there. So, he prepared it, I guess. I mean --
6  Q  That guessing stuff --
7  A  Well, he prepared it. I mean, I was
8  charged for it. So, he prepared it.
9  Q  Do you know who prepared it?
10  A  He prepared it, I assume. I assume. I
11  mean, he prepared all the other documents, so I
12  would have said he prepared it.
13  Q  Tell me what was discussed about this land
14  installment contract at the closing.
15  A  Well, really, nothing was discussed. I
16  was -- it is my assumption that all these things
17  were taken care of. Nothing was discussed there.
18  Q  So, are you telling me the land
19  installment contract was not discussed at the
20  closing?
21  A  Oh, all of them were discussed, yes. I
22  mean, he went through it. He went through it.
23  Q  Okay. Try to --
24  A  What I'm saying is, he went through the
25  contract, just like he went through all the other

Page 135

1  paperwork.
2  Q  So, are you saying that -- when you say --
3  who -- he, Mr. Meckstroth?
4  A  Right.
5  Q  So, Mr. Meckstroth went through this land
6  installment contract at the closing?
7  A  I'm pretty sure he went through
8  everything. He was just --
9  Q  I'm just asking -- try to -- Mr. Curtis,
10  try to focus on my question, please.
11  A  Okay. What I'm saying to you is that a
12  number of papers were discussed.
13  Q  I'm asking about this one right now.
14  Okay?
15  A  Oh, I'm pretty -- I'm sure that all
16  things -- all the things were discussed.
17  MR. BLESSING: Can we take just a break?
18  MR. LEWIS: Sure.
19  (Brief recess taken.)
20  MR. LEWIS: Back on the record.
21  BY MR. LEWIS:
22  Q  We're back to the land installment
23  contract.
24  A  Um-hmm.
25  Q  Was the land installment contract

Page 136

1  discussed at the closing?
2  A  Okay. Basically, what was involved was
3  that all the paperwork was there. I can't really
4  remember whether this was discussed with all the
5  others, or not. I assumed that when all the papers
6  were presented to me, that I was signing everything
7  that needed to be signed.
8  Q  So, you can't recall whether the land
9  installment contract was discussed at the closing;
10  is that correct?
11  A  That is correct.
12  Q  At any time prior to you signing the deed
13  transferring title to Mr. Bigelow --
14  A  Um-hmm.
15  Q  -- did you request that the land
16  installment contract be signed by everybody?
17  A  No, I assumed it would be at the closing.
18  Q  But you didn't make that request before
19  you signed the deed?
20  A  No, because all the things were supposed
21  to be signed together.
22  Q  You thought everything was supposed to be
23  signed together, when you came to the closing;
24  right?
25  A  That is correct.

Page 137

1  Q  So, why didn't you request, at the
2  closing, that the land installment contract be
3  signed?
4  A  Well, I assumed, with everything else, it
5  was being signed. I mean, they -- what I did --
6  what was going on is that a lot of things were being
7  presented to me and I was signing a lot of things.
8  So, I assumed this was one of those things that I
9  was signing.
10  Q  That was a really important issue to you,
11  though, as part of this transaction, wasn't it, the
12  land installment contract?
13  A  Well, I mean, all these things were given
14  to me. So, when I was signing, it was my assumption
15  that everything was being signed.
16  Q  But, getting back to the question, wasn't
17  this land installment contract an important issue to
18  you when you came to that closing?
19  A  Well, all the things were. All -- I mean,
20  not -- I wasn't picking any particular thing. When
21  we went to the signing, I assumed all these things
22  were being signed.
23  Q  Was the land installment contract an
24  important issue to you, when you came to the
25  closing?

35 (Pages 134 to 137)

Page 142

```
1    A    Yes, um-hmm. Yes.
2    Q    Then there was felt paper put on; right?
3    A    I think so, yes.
4    Q    I mean, you were home all the time this
5    work was going on; right?
6    A    Yes. Yes.
7    Q    You were coming out and you'd periodically
8    talk to these guys; right?
9    A    That is true.
10   Q    You remember thanking them and telling
11   them what a great job they were doing?
12   A    Yes, they did a decent job.
13   Q    You were happy with the job, weren't you?
14   A    Well, yes. But the problem wasn't with
15   the roof.
16   Q    We'll get to that. I'm talking about the
17   roof.
18   A    Yes.
19   Q    You were happy with the work they did on
20   the roof; right?
21   A    Right.
22   Q    So, they put the felt paper down; right?
23   A    Yes.
24   Q    And then asphalt shingles --
25   A    Yes.
```

Page 143

```
1    Q    -- right?
2    A    Um-hmm.
3    Q    And, also, there was work done on the
4    porch --
5    A    Yes.
6    Q    -- right?
7    A    Um-hmm.
8    Q    That was another company that did that;
9    right?
10   A    I didn't know if it was another company,
11   or not. I didn't know if they were all associated
12   or what was going on with that.
13   Q    But there was some vinyl material put on
14   the -- I don't know what you call it -- the roof of
15   the porch --
16   A    Right.
17   Q    -- right?
18   A    Right.
19   Q    Were you happy with that?
20   A    Well, the problem with that is, that they
21   were supposed to do another part of it and they
22   didn't complete it.
23   Q    Okay. The part --
24   A    And, so that --
25   Q    We'll get to --
```

Page 144

```
1    A    See, I was looking at -- and then, one
2    time, they put some pieces on that were uneven. So
3    they had to take those off and, you know, even them
4    up and stuff. But, for what they did, I was okay
5    with, yes.
6    Q    Now, at some point you had some
7    discussions with Mr. Bigelow about there is a
8    problem with the roof --
9    A    Yes.
10   Q    -- correct?
11   A    Yes.
12   Q    Tell me about that. What --
13   A    Well, I -- I don't really remember
14   discussing it with him. I remember leaving messages
15   on his answering service.
16   Q    What was the problem?
17   A    That part of the roof wasn't finished. I
18   mean, part of the under -- not the roof, but the
19   undersection wasn't finished. It's the part that's
20   not on that picture.
21   Q    That figures.
22   A    Yeah.
23   Q    Okay.
24   A    It's on the other side of the house.
25   Q    Can you just describe --
```

Page 145

```
1    A    Yes. It was -- it was right up underneath
2    the roof, itself. There are some boards that
3    weren't there and replaced. It's not on that side
4    of the house. It's on the other side.
5         MR. BIGELOW:  Underneath here.
6         MR. LEWIS:  Okay.
7    A    And there were -- there was still a hole
8    there.
9    Q    Was it in the back of the house?
10   A    No, it was in the front. It was in the
11   front, right in the -- right on the other side of
12   the roof.
13   Q    Are you sure it doesn't appear there?
14   A    No. It's all the way over here, on the
15   other side of the tree.
16   Q    Oh, all right.
17   A    On that side of the house.
18        MR. BIGELOW:  It was on the other side.
19   A    It was on the other side of the house.
20   Q    Well, maybe we could still use this. On
21   Exhibit 7, does the other side of the house -- does
22   it have a similar construction as this?
23   A    No, it's a different construction.
24   Q    So, tell me exactly what wasn't finished.
25   What was the problem?
```

Page 146

1  A  Underneath the roof on the other side,
2  there were boards that were not replaced and it was
3  a hole there.
4  Q  How big a hole?
5  A  Oh, I'd say, large enough for an animal to
6  get in there.
7  Q  Was there some discussion -- did you think
8  a squirrel got in there?
9  A  Well, there was a squirrel or raccoon,
10 because I hear them in the ceiling.
11 Q  So, you did hear some -- at some point you
12 heard an animal --
13 A  Right.
14 Q  -- in the ceiling?
15 A  Right.
16 Q  Is that when you called Mr. Bigelow?
17 A  Yes.
18 Q  So, this hole was approximately --
19 A  Large -- it was large enough for a
20 squirrel or a raccoon to get in.
21 Q  Did you ever actually have conversation
22 with Mr. Bigelow about --
23 A  Well --
24 Q  -- wait, wait --
25 A  Okay.

Page 147

1  Q  -- you know, about fixing this problem?
2  A  Well, I talked with -- I called his
3  office. And I really never talked with him. I
4  talked on -- I left an answering -- an answer --
5  answers on his answering machine. Okay? I never
6  got a reply from Mr. Bigelow.
7  Q  All right.
8  A  What happened was, after so long, I left
9  another message on there and I held the rent up.
10 Q  We'll get to that. How many messages did
11 you leave for Mr. --
12 A  Several.
13 Q  You need to let me finish my question.
14 A  Oh, I'm sorry.
15 Q  How many messages did you leave for
16 Mr. Bigelow about this problem?
17 A  Several. I can't say how many, but it was
18 more than one.
19 Q  Was it more than three?
20 A  It was more than two. I can't say if it
21 was more than three or four, but it was more than
22 one or two.
23 Q  You believe it's somewhere in the two to
24 four range? Would that be your best recollection?
25 A  As far as I can remember.

Page 148

1  Q  Over what period of time were you
2  leaving -- did you leave these messages?
3  A  Well, this is over about a two-month
4  period.
5  Q  Are you saying you never got a phone call
6  back from Mr. Bigelow?
7  A  No, I never talked to Mr. Bigelow.
8  Q  So, in terms of this problem, this hole
9  where the animal had gotten in your home --
10 A  Right.
11 Q  -- you never discussed that with
12 Mr. Bigelow?
13 A  Not at all.
14 Q  So, the two of you never had any words
15 about whether he was going to fix it or whether he
16 wasn't going to fix it?
17 A  No.
18 Q  So, then you decided to hold your rent?
19 A  Correct.
20 Q  That's the reason you didn't make the rent
21 payments for November and December of 1999; is that
22 correct?
23 A  That is correct. That is correct.
24 Q  Now, did you let Mr. Bigelow know -- did
25 you leave him a message to that effect, that unless

Page 149

1  he fixed this, that you're going to withhold rent?
2  A  Oh, I can't remember if I did, or not.
3  Q  Did you talk to a lawyer, before you made
4  the decision to withhold rent for November and
5  December of '99?
6  A  No, I can't recall about that. No, I
7  don't think I did.
8       (Defendants' Exhibit 14 marked
9        for identification.)
10 BY MR. LEWIS:
11 Q  Mr. Curtis, you have Exhibit 14 in front
12 of you --
13 A  Um-hmm.
14 Q  -- correct?
15 A  Um-hmm.
16 Q  Yes?
17 A  Yes.
18 Q  This is a notice to leave the premises.
19 Did you receive this?
20 A  It was on my door.
21 Q  This is dated -- if you look down on the
22 left side, about three-quarters of the way down,
23 it's dated December 20th, 1999. Do you see that?
24 A  Um-hmm. Yes, I do.
25 Q  Does that sound like the date that you --

38 (Pages 146 to 149)

Page 166

1  BY MR. LEWIS:
2    Q  Mr. Curtis, you have Exhibit 17 in front
3  of you, do you?
4    A  Yes.
5    Q  That is an order for forcible entry and
6  detainer. If you look down at the bottom, it's
7  dated February 1, 2000. Do you see that?
8    A  Um-hmm.
9    Q  Yes?
10   A  Yes.
11   Q  Does that refresh your recollection, in
12 terms of when you were in court next?
13   A  Not really. But I understand this -- I
14 understand the document. I don't understand --
15   Q  I mean, that would have been about two
16 weeks after January 18th --
17   A  Okay.
18   Q  -- right? Does that sound about right to
19 you, that the case was continued for a couple of
20 weeks, approximately?
21   A  I think so.
22   Q  So this is your second -- February 1 is
23 your -- is the second appearance on the eviction;
24 correct?
25   A  That's correct.

Page 167

1    Q  This is the time you're talking about you
2  remember talking to the magistrate about the land
3  installment contract?
4    A  That is correct.
5    Q  You're sure you had the contract with you
6  on February 1?
7    A  Yes.
8    Q  Now, it says up there -- see that top
9  column, where it's checked, EO23?
10   A  Um-hmm.
11   Q  Yes?
12   A  Yes.
13   Q  It says, Case called: Trial had.
14   A  Yes.
15   Q  Do you see that? Now, was there -- well,
16 first of all, who was there? Who do you remember
17 being there on February 1?
18   A  Mr. Bigelow and myself.
19   Q  What about Mr. Meckstroth, was he there?
20   A  No.
21   Q  Was it the same magistrate as you had the
22 first time?
23   A  No.
24   Q  Different magistrate?
25   A  Yes.

Page 168

1    Q  Was there testimony taken?
2    A  Yes, there was.
3    Q  So, Mr. Bigelow testified?
4    A  Yes.
5    Q  And you testified?
6    A  Yes.
7    Q  Both of you were put under oath; right?
8    A  Yes.
9    Q  Did anybody else testify other than the
10 two of you?
11   A  Not that I know of.
12   Q  You explained to the magistrate that you
13 had this land installment contract --
14   A  Correct.
15   Q  -- right --
16   A  Correct.
17   Q  -- and that you didn't feel you should be
18 evicted --
19   A  That is correct.
20   Q  -- because of that?
21   A  Correct.
22   Q  Did you also talk about the animals in
23 your home and the roof hadn't been fixed?
24   A  I'm pretty sure, yes, I did.
25   Q  So, all the issues -- the issues that you

Page 169

1  had with Mr. Bigelow --
2    A  Yes.
3    Q  -- the problems that you had with him --
4    A  Yes.
5    Q  -- you raised those at that hearing,
6  didn't you?
7    A  Pretty -- I think so. I think so.
8  Um-hmm.
9    Q  Well, were there any issues or problems
10 that you had with Mr. Bigelow that you didn't tell
11 the magistrate about at that hearing?
12   A  I can't remember. I -- basically, I
13 was -- my whole thing was that I assumed -- my
14 assumption was with the land contract. And that --
15 I'm pretty sure I told her that I had the money with
16 me, you know, and what the problems were.
17   Q  Right. You knew that was your day in
18 court, right, that was the time that you were going
19 to tell the court what the dispute was about --
20   A  Pretty much so, yes.
21   Q  -- right? As you sit here today, can you
22 think of any problems or issues that you had with
23 Mr. Bigelow, that you didn't tell the magistrate
24 about on February 1?
25   A  I can't remember by -- I mean, at that