1               UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                   WESTERN DIVISION

4

5   SHIRDENIA BRYANT, et al.,       :

6           PLAINTIFFS,             :

7                                   :

8      vs.                         : Case No.: C-1-02-006

9   PRESCOTT BIGELOW, IV, et al., :

10           DEFENDANTS.            :

11

12

13               * * * * * * * *

14   DEPONENT:       SHIRDENIA BRYANT

15   DATE:           SEPTEMBER 3, 2003

16               * * * * * * * * *

17

18   TERESA A. MOORE,

19   COURT REPORTER

20

21

22

23        *BARLOW REPORTING & VIDEO SERVICES*
              *333 Madison Avenue*
24         *Covington, Kentucky  41011*
                *(859) 261-8440*
25



Bryant, et al. v. Bigelow, et al.    Condense It!    Depo of Shirdenia Bryant

Case 1:02-cv-00006-SAS    Document 38-2    Filed 10/01/2003    Page 2 of 21

Page 5

1  just let us know.  We can accommodate that.  If you
2  need to talk to your counsel, that's fine.  But
3  please don't do that while a question is pending.
4  Do you understand?
5    A  Yes.
6    Q  What is your current address, ma'am?
7    A  I have a PO box.  I don't have a
8  residence, per se.
9    Q  Well, let's start with PO box.  What's
10 that?
11   A  12772.
12   Q  Cincinnati, Ohio?
13   A  Yes.
14   Q  Where do you spend your evenings?
15   A  I stay with my boyfriend.
16   Q  What is your boyfriend's name?
17   A  Vincent Carter.
18   Q  Vincent Carter.
19   A  Yes.
20   Q  Where does Mr. Carter live?
21   A  Beechmont.
22   Q  What's his address?
23   A  6347.
24   Q  6347 Beechmont?
25   A  Yes.

Page 6

1    Q  How long have you been staying with
2  Mr. Carter at that address?
3    A  Since the foreclosure in September of last
4  year.
5    Q  What is your marital status now, ma'am?
6    A  Single.
7    Q  You had been married once before, hadn't
8  you?
9    A  Yes.  Yes.
10   Q  You were divorced in 1987; is that
11 accurate?
12   A  I believe so.
13   Q  Does that sound about right to you?
14   A  Yes.
15   Q  Your date of birth is April 2nd, 1947; is
16 that right?
17   A  Yes.
18        (Defendants' Exhibit 1 marked
19        for identification.)
20 BY MR. LEWIS:
21   Q  Ma'am, I'm showing you what's been marked
22 for identification as Defendants' Exhibit No. 1.
23 I'm going to represent to you, this is a transcript
24 of testimony that we obtained, a deposition of
25 Shirdenia Bryant.  Do you see that on the cover

Page 7

1  page, ma'am?
2    A  Yes.
3    Q  You did give deposition testimony on
4  December 18th, 2001, in Mr. Blessing's office.  Do
5  you recall that?
6    A  Yes.
7    Q  It was like this.  It was a deposition.
8    A  Yes.
9    Q  You were put under oath at the time,
10 weren't you, ma'am?
11   A  Yes.
12   Q  You gave testimony in that deposition?
13   A  Yes.
14   Q  The answers that you gave at that time
15 were --
16   A  Yes.
17   Q  Ma'am, you need to let me finish my
18 question.  The testimony that you gave at that time
19 was truthful, wasn't it?
20   A  Yes.
21        (Defendants' Exhibit 2 marked
22        for identification.)
23 BY MR. LEWIS:
24   Q  Ma'am, I'm showing you what's been marked
25 for identification as Exhibit No. 2.  Have you seen

Page 8

1  that document before?  Let me try to save us some
2  time here.  Let me ask you another question.
3        Why don't you look at the second to last
4  page of Exhibit No. 2.  Second to last page, ma'am.
5  Is that your signature, under Verification?
6    A  Yes.
7    Q  Did you sign this document on June 27th of
8  2003?
9    A  Yes.
10   Q  Were you in front of Mr. Schwantes and put
11 under oath by him on that date?
12   A  Yes.
13   Q  So, did you review these answers?  These
14 are written questions, ma'am, we submitted to you to
15 answer for this lawsuit.  Before you signed that
16 verification page, had you read through these
17 answers?
18   A  Yes.
19   Q  So, these answers are true and correct to
20 the best of your knowledge and belief --
21   A  Yes.
22   Q  -- is that correct?  Yes?
23   A  Yes.
24        (Defendants' Exhibit 3 marked
25        for identification.)

Page 9

1  BY MR. LEWIS:
2    Q  Ma'am, you have in front of you Exhibit
3  No. 3. This is similar to Exhibit No. 2. This is
4  also a set of questions that we sent to you for
5  answer. And if you look at the verification page,
6  second to last page -- do you see that --
7    A  Yes.
8    Q  -- is that your signature, ma'am?
9    A  Yes.
10   Q  Did you review the information in these
11  interrogatories before you signed these answers?
12   A  Yes.
13   Q  So, these answers are true and correct to
14  the best of your knowledge and belief; correct?
15   A  Yes.
16         (Defendants' Exhibit 4 marked
17          for identification.)
18  BY MR. LEWIS:
19   Q  Ma'am, I'm showing you what's been marked
20  for identification as Defendants' Exhibit No. 4.
21  I'm going to represent to you that these were the
22  documents that were sent along with Exhibits 2 and
23  3 --
24   A  Yes.
25   Q  -- okay?

Page 10

1    A  Yes.
2    Q  You with me? Did you review the documents
3  that are identified here as Exhibit No. 4, before
4  they were submitted by your counsel?
5    A  Yes.
6    Q  You've seen these documents before,
7  haven't you, ma'am?
8    A  Yes.
9    Q  All right. Are those the documents that
10  were referenced in your answers to interrogatories,
11  Exhibits 2 and 3? A number of them say, See
12  attached documents. These documents that are marked
13  as Exhibit 4, are those the documents you were
14  referring to?
15   A  Yes.
16   Q  Ma'am, tell me about your educational
17  background, please.
18   A  I completed the eleventh grade.
19   Q  Where did you complete the eleventh grade?
20   A  Withrow.
21   Q  What year was that, ma'am, approximately?
22   A  Approximately '65 -- '6 --
23   Q  Then, did you -- I'm sorry.
24   A  '64-65.
25   Q  Did you have any further educational --

Page 11

1  any formal education beyond the eleventh grade?
2    A  Explain what you mean by --
3    Q  Did you go on to twelfth grade anywhere?
4    A  No.
5    Q  Did you attend college anywhere?
6    A  No.
7    Q  Did you attend any vocational or trade
8  schools?
9    A  Yes.
10   Q  What schools were those?
11   A  At that time, it was called Southern Ohio
12  College. I went to nurse's aide training.
13   Q  When were you in nurse's aide training at
14  Southern Ohio College?
15   A  The year was probably 19 -- 1979 and '80,
16  somewhere in there.
17   Q  Did you receive a degree from Southern
18  Ohio College?
19   A  I have a nurse's aide certificate.
20   Q  So you completed their program?
21   A  Yes.
22   Q  Did you receive that nurse's aide
23  certificate in approximately 1980?
24   A  I don't remember exactly.
25   Q  Did you receive your certificate

Page 12

1  approximately -- upon completion of your education
2  at Southern Ohio College?
3    A  Yes.
4    Q  So, once you finished the program, they
5  gave you a certificate?
6    A  Yes.
7    Q  Are you currently employed?
8    A  Yes.
9    Q  Where are you working now?
10   A  I work at Interim Healthcare.
11   Q  Interim Healthcare?
12   A  Yes.
13   Q  What do you do for Interim Healthcare?
14   A  I'm a home health aide.
15   Q  Is that a full-time job?
16   A  Yes.
17   Q  How long have you worked for Interim
18  Healthcare?
19   A  A year.
20   Q  Before you worked for Interim
21  Healthcare --
22   A  I worked at Montgomery Care Center.
23   Q  Okay. I know you know where I'm going,
24  but try to let me finish my question. Okay? And
25  I'll try to let you finish your answer.

| Page 13 | Page 15 |
|---|---|
| 1      So, before Interim Healthcare, you worked | 1    Q   How many times have you been married, |
| 2 where, Montgomery? | 2 ma'am? |
| 3    A   Yes. | 3    A   Twice. |
| 4    Q   What was the full name of it, Montgomery | 4    Q   Twice?   Did both of those marriages end in |
| 5 Healthcare? | 5 divorce? |
| 6    A   Yes. | 6    A   Yes. |
| 7    Q   How long did you work for Montgomery | 7    Q   What were the names of your former |
| 8 Healthcare? | 8 husbands? |
| 9    A   12 years. | 9    A   Benjamin Anthony Dorsey. |
| 10    Q   So, would that have been from | 10    Q   Benjamin Dorsey.   When were you divorced |
| 11 approximately 1990 or so, Montgomery Healthcare? | 11 from Mr. Dorsey, approximately? |
| 12    A   It would have been approximately 1989. | 12    A   Approximately '70 -- early part of '78, I |
| 13    Q   Then, before Montgomery Healthcare, | 13 believe. |
| 14 where'd you work? | 14    Q   Was that divorce in Hamilton County, Ohio? |
| 15    A   American Nursing. | 15    A   Yes. |
| 16    Q   How long did you work for American | 16    Q   Then you were -- this divorce we touched |
| 17 Nursing? | 17 on earlier, 1987, what was your husband's name, that |
| 18    A   Five years. | 18 second marriage? |
| 19    Q   Would that be from approximately '84 to | 19    A   Paul Richard Bryant. |
| 20 '89? | 20    Q   Paul Bryant? |
| 21    A   Approximately.   Approximately. | 21    A   Yes. |
| 22    Q   Approximately? | 22    Q   You haven't been married since your |
| 23    A   (Nodding.) | 23 divorce from Mr. Bryant, have you, ma'am? |
| 24    Q   What about before American Nursing, did | 24    A   No. |
| 25 you have a job? | 25    Q   When you were married to Paul Bryant, you |

| Page 14 | Page 16 |
|---|---|
| 1    A   Yeah. | 1 were residing at 1112 Regent; is that correct? |
| 2    Q   Where did you work? | 2    A   Yes. |
| 3    A   I don't remember which -- where I was | 3    Q   Then, when you were divorced from |
| 4 working at then.   I believe it was a nursing home. | 4 Mr. Bryant, then you moved into an apartment after |
| 5 But I don't remember officially. | 5 that, after 1112 Regent; is that accurate? |
| 6    Q   Well, we talked earlier, you were at | 6    A   After I was divorced, I was at 1112 |
| 7 Southern Ohio College and you thought you finished | 7 Regent.   Then the house went into foreclosure and I |
| 8 around 1980 or so -- | 8 sold it. |
| 9    A   Yes. | 9    Q   Right.   After you lived at 1112 Regent -- |
| 10    Q   -- right?   So, do you remember what your | 10    A   I went to an apartment. |
| 11 first job was, after you finished at Southern Ohio | 11    Q   -- you went to an apartment?   That was my |
| 12 College?   Does that refresh your recollection? | 12 question. |
| 13    A   I worked at a doctor's home. | 13    A   Yes. |
| 14    Q   Are you finished?   What was the name of -- | 14    Q   Where was that apartment, what address, |
| 15 who was the doctor that you worked for? | 15 what street? |
| 16    A   Alvin Darden. | 16    A   Garden Lane. |
| 17    Q   Darden? | 17    Q   How long did you live on Garden Lane? |
| 18    A   Yes. | 18    A   Until '95. |
| 19    Q   How long did you work for Dr. Darden? | 19    Q   Then, in 1995, did you move into Laidlaw? |
| 20    A   I don't remember exactly how long it was. | 20    A   Yes. |
| 21    Q   Well -- and then after you worked for | 21    Q   Have you ever resided in any other states, |
| 22 Dr. Darden, then did you go to work for this nursing | 22 ma'am, other than Ohio? |
| 23 home you couldn't recall what the name of it was? | 23    A   Yes. |
| 24    A   I -- I can't remember which -- it's been a | 24    Q   What other states have you lived in? |
| 25 while.   I can't remember which one. | 25    A   I lived in Detroit. |

Bryant, et al. v. Bigelow, et al.                    Condenseit!                    Depo of Shirdenia Bryant

Case 1:02-cv-00061-SAS    Document 39-2    Filed 10/01/2003    Page 5 of 21

Page 17

1    Q  For what period of time did you live in
2  Detroit?
3    A  A couple months.
4    Q  When, approximately, was that, ma'am?
5    A  I have no idea.
6    Q  No idea?  Have you lived in any other
7  states, other than Ohio and Michigan?
8    A  No.
9    Q  Have you ever been known by any other
10  names?
11    A  My legal names.
12    Q  Pardon?
13    A  My legal names.
14    Q  Well, the name that appears on all these
15  documents is Shirdenia Bryant.
16    A  Yes.
17    Q  That's your legal name; right?
18    A  Yes.
19    Q  My question is, have you ever gone by any
20  other names other than Shirdenia Bryant?
21    A  Dorsey and Worthy, my legal names.  My
22  maiden name was Worthy.
23    Q  Okay.  That's --
24    A  Then, my married name was Dorsey, until
25  when I got a divorce.  Then my name was Bryant.

Page 18

1    Q  Have you ever been convicted of any
2  crimes, ma'am?
3    A  No.
4    Q  We talked about you lived on Garden Lane.
5  The address -- does 1733 Garden Lane -- does that
6  sound familiar to you?
7    A  I can't remember the address.  That's
8  possibly it.
9    Q  Does that sound familiar to you, 1733
10  Garden Lane, as your address at that time?
11    A  It's -- possibly.
12    Q  Possibly?  You've been sued for money
13  before, haven't you, ma'am, by creditors?
14    A  Yes.
15    Q  Approximately how many times do you recall
16  that happening, where you've been named as a
17  defendant in a lawsuit for money?
18    A  Maybe three times.
19    Q  Three?
20    A  Four.
21    Q  Three or four?  Does JLS Realty -- does
22  that sound familiar to you?
23    A  No.
24    Q  Never heard of them?  Were you sued by JLS
25  Realty Management in 1988, in the Hamilton County

Page 19

1  Municipal Court?
2    A  I don't recollect that name.
3    Q  Was there some sort of an eviction filed
4  against you in 1988, in Hamilton County?
5    A  No.
6    Q  Well, I'm going to represent to you that
7  the Hamilton County Municipal records show that
8  there was a lawsuit filed by JLS Realty Management
9  against Shirdenia Bryant, and it was filed
10  February 16th, 1988.  You're saying, you don't know
11  anything about that?
12    A  I've never been evicted.
13    Q  All right.  Do you know anything about
14  this lawsuit --
15    A  No.
16    Q  -- that I just described to you, ma'am?
17  What about Reliable Finance Company, were you sued
18  by them in 1989?
19    A  The name sounds familiar.  It's a
20  possibility.
21    Q  Let me see if I can refresh your
22  recollection.  The Hamilton County Municipal
23  document, it shows that on February 24th of 1989,
24  Reliable Finance Company sued Shirdenia Bryant for
25  $1,326.18.  Does that refresh your recollection?

Page 20

1    A  I don't remember that.
2    Q  Don't remember that?
3    A  Nope.
4    Q  Did you owe Reliable Finance Company
5  $1,326, as of 1989, ma'am?
6    A  I owed them.  And I remember paying them.
7  But I don't remember no 13 --
8    Q  Okay.  So, you remember doing business
9  with Reliable Finance Company?
10    A  Yes.
11    Q  You remember owing them some money?
12    A  Yes.
13    Q  Yes?  Do you remember them filing a
14  lawsuit against you?
15    A  No.
16    Q  You don't remember that?  Do you know what
17  garnishments are?
18    A  Yes.
19    Q  There were garnishments filed against you
20  by Reliable Finance Company at American Nursing,
21  weren't there, ma'am?
22    A  That's been so long.  It's possible, yeah.
23    Q  That's possible?
24    A  Yeah.
25    Q  Do you remember money being taken out of

Page 21

1 your paycheck at American Nursing, to pay off
2 Reliable Finance Company?
3    A  I remember money being taken, yeah.
4    Q  Those were -- the reason that money was
5 being taken was to pay off Reliable Finance Company,
6 wasn't it, ma'am?
7    A  I'm not for sure.  I don't remember.
8    Q  But you remember money was being taken out
9 of your paycheck at American Nursing?
10    A  Yes.
11    Q  You're just saying you don't remember why?
12    A  I don't remember for sure whether it was
13 for that or what it was for.  I don't remember.
14    Q  Might have been some other creditor?
15    A  Possibility.
16    Q  Do you still owe Reliable Finance Company
17 money --
18    A  Not --
19    Q  -- as of today?
20    A  Not that I know of.
21    Q  Now, what about Cincinnati Gas & Electric
22 Company, do you ever remember owing them money?
23    A  Yes.
24    Q  Do you remember being sued by them?
25    A  Yes.

Page 22

1    Q  CG&E filed suit against you in August of
2 1991; is that right, ma'am?
3    A  Yes.
4    Q  At the time, did you owe them $1,870.32?
5    A  Yes.
6    Q  Why'd you owe them that amount of money?
7    A  I got behind in the gas bill.
8    Q  So, you weren't current with your gas
9 bills; right?
10    A  Yes.
11    Q  There were garnishments filed against you
12 when you were working at Bethesda Hospital, weren't
13 there, ma'am?
14    A  I never worked at Bethesda Hospital.
15    Q  Well, were there garnishments filed by
16 Cincinnati Gas & Electric Company on this $1,800
17 judgment?
18    A  Yes.
19    Q  How many garnishments do you remember
20 there being filed?
21    A  Until it was paid.
22    Q  Where were you working at the time those
23 garnishments were filed?
24    A  Bethesda Montgomery Care Center.
25    Q  Oh, Bethesda Care Center, not Bethesda

Page 23

1 Hospital?
2    A  Yes.
3    Q  So, has that been paid off, the debt to
4 Cincinnati Gas & Electric?
5    A  That one, yes.
6    Q  That was paid by 1996; right?  Does that
7 sound right to you, ma'am?
8    A  I don't know when it was paid off.
9    Q  Well, the public record shows that there
10 was a garnishment filed as of January 25th of 1996;
11 then the lawsuit was resolved, meaning entry of
12 satisfaction, lawsuit's over, as of February 5th,
13 1996.  Does that refresh your recollection?
14    A  May I see that?
15       MR. LEWIS:  Sure.  Just let the record
16    reflect, she's looking at a printout from the
17    Hamilton County Municipal docket on this
18    Cincinnati Gas & Electric case that we're
19    talking about.
20       MR. SCHWANTES:  Hand it back to him.
21 BY MR. LEWIS:
22    Q  Are you finished looking at it, ma'am?
23    A  Yes.
24    Q  Does this refresh your recollection, now,
25 about the lawsuit between you and Cincinnati Gas &

Page 24

1 Electric Company?
2    A  I remember that they had done a sheet by
3 then, yes.
4    Q  Do you remember that the lawsuit was filed
5 in '91, and then they weren't paid in full until
6 1996?  Does that sound right to you?
7    A  I didn't realize it -- I knew it was
8 filed, and I remember signing the garnish sheet
9 because I had to sign it.  But I didn't remember
10 when it was paid in full.
11    Q  All right.  Well, you're not saying that
12 anything in this case docket that you've just looked
13 at page by page -- you're not saying that anything
14 is inaccurate here, are you, ma'am?
15    A  No.
16    Q  Now, what about Discover Card Services,
17 were you ever sued by them?
18    A  I don't remember being sued by them.
19    Q  You don't recall, in August of 1989, being
20 sued in Hamilton County Municipal by Discover Card
21 Services for $2,728.91?  You don't recall that?
22    A  No.
23    Q  No?
24       MR. SCHWANTES:  Could we have the
25    document, to refresh her recollection?  That

Page 25

1    may speed us along.
2    BY MR. LEWIS:
3        Q    Is there a judgment, ma'am, filed against
4    you by Discover Card Services in the Hamilton County
5    Municipal?
6        A    Not that I know of.
7        Q    Do you owe Discover Card Services
8    $2,728.91?
9        A    No.
10       Q    You don't?
11       A    No.
12       Q    Did you have a Discover Card?
13       A    Yes.
14       Q    Do you still have it?
15       A    No.
16       Q    Were you using it in the 1980s?
17       A    Possibly so.
18       Q    Possibly?  So, ma'am, I'm going to
19   represent to you that the Hamilton County -- and
20   I'll show you this document, if you want -- but the
21   Hamilton County Municipal records show that there is
22   a judgment filed against Shirdenia Bryant as of
23   November 14th, 1988, for $2,728.91.
24       Now, do you owe them that money?
25       A    No, because I have not seen or heard of a

Page 26

1    judgment being against me.
2        Q    Okay.  So, you don't know anything about
3    this?
4        A    No.  Can I see that?
5        Q    Sure.
6        THE WITNESS:  Can I talk to Jeff for a
7    minute?
8        MR. LEWIS:  Yes, you can.  Go ahead.
9        (Off-record discussion.)
10   BY MR. LEWIS:
11       Q    Did you have something you wanted to say
12   about this Discover Card issue, ma'am?
13       A    Yeah.
14       Q    Go ahead.
15       A    Okay.  Well, looking at this -- okay, when
16   my house was sold on Regent, Discovery was supposed
17   to have put like a lien on the house and they were
18   supposed to have taken so much money for the loan of
19   the house.  That's the reason I didn't hear anything
20   else about it.  I didn't know that it said it was
21   covered -- it was paid when the house was sold.
22       Q    Okay.  You think that debt was paid when
23   the Regent property went into foreclosure?
24       A    The house didn't go in foreclosure.  It
25   was sold.

Page 27

1        Q    All right.  Well, there was -- we'll get
2    to that.
3        A    There was a foreclosure on it, but it was
4    sold.
5        Q    We will get to that.  Let me see that
6    again.  Discover Card Services was named as a party
7    in that Regent lawsuit, weren't they?  Do you
8    remember that?
9        A    I remember them saying that they had a
10   lien on the house.
11       Q    All right.  So, does this refresh your
12   recollection?  At the time that the complaint was
13   filed over Regent, did you owe Discover Card
14   Services $2,728?
15       A    Yes.
16       Q    Yes?  But you think they were paid as part
17   of this sale of Regent; is that what you're saying?
18       A    I was told they was paid.
19       Q    All right.  What about American States
20   Preferred Insurance Company, ma'am?  Did they ever
21   file a suit against you?
22       A    May I see that?  I don't recall that.
23       Q    Sure.  For the record, let me show you a
24   printout from American States Preferred Insurance
25   versus Shirdenia Bryant, Case No. 96 CD 02882.  And

Page 28

1    since this is an old case, ma'am, I don't have all
2    the underlying documents.  But this is what I was
3    able to printout from the Hamilton County Clerk of
4    Court's website.
5        A    (Examining document.)
6        Q    Okay.  You've seen this --
7        A    Yeah, I believe --
8        Q    -- case inquiry?
9        A    I believe that's for a car accident I had,
10   and I'm paying on it.
11       Q    Okay.  So, this car accident -- were you
12   involved in some sort of a collision, before
13   February of 1996?
14       A    Yeah, I believe that's about then.
15       Q    All right.  So, why is there a debt here
16   arising out of this accident, as you've called it,
17   for $6,306.79?
18       A    That's not what the debt is.
19       Q    What is it?
20       A    That's old.  The debt is not that high.
21   I'm paying on it.
22       Q    I understand.  We'll get to that.  But, at
23   the time, was there a claim asserted against you?
24   There was a lawsuit filed for $6,306.79, wasn't
25   there, ma'am?

## Page 29

1  A  Yes.
2  Q  And a judgment was taken against you
3  originally for that amount, wasn't there?
4  A  Yes.
5  Q  You're saying, you've been paying on that
6  judgment --
7  A  Yes.
8  Q  -- since then; right?
9  A  Yes.
10  Q  How much have you paid on it?
11  A  It's down to like -- I believe it's maybe
12  3,000.
13  Q  Who are you making your payments to?
14  A  The lawyer.
15  Q  Edward Bilsky.  Does that name sound
16  familiar to you?
17  A  No.
18  Q  What lawyer are you making the payments
19  to?
20  A  I can't say his name.  And I don't have it
21  with me.
22  Q  How often do you make these payments?
23  A  Once a month.
24  Q  How much a month are you paying?
25  A  $50.

## Page 30

1  Q  Over what period of time have you been
2  making the payments?  Since 1996?
3  A  It's been a while.  I don't remember
4  how -- exactly how long.
5  Q  But you send these monthly payments -- you
6  send these $50 payments every month?
7  A  Yes, if I have it.  And if I don't, I
8  double up on it.
9  Q  You're telling me you can't remember where
10  you send them to?
11  A  I send them to Columbus, but --
12  Q  You send them to the Bureau of Motor
13  Vehicles; is that what you're saying, ma'am?
14  A  No, I send them to a lawyer.  He has a
15  funny name.  I don't know it.  If I see it on a
16  piece of paper, I know what it is.  But as far as me
17  knowing his name, I don't know.
18  Q  At the time of this collision, were you
19  found to be the at-fault driver?
20  A  Yes.
21  Q  Did you have liability insurance at the
22  time, automobile insurance?
23  A  Yes.
24  Q  So, why didn't your insurance cover this
25  $6,300?

## Page 31

1  A  They said my insurance had -- at the time
2  of the accident, they said my insurance was lapsed.
3  I hadn't been notified it had lapsed.  I had paid
4  it.  And they said they got the check late.
5  Q  Your insurance company told you, you
6  didn't have insurance, and they wouldn't cover it;
7  right?
8  A  Yes.
9  Q  Was your driver's license suspended by the
10  BMV, as a result of that incident?
11  A  No, not until later.
12  Q  It was suspended though, later, though,
13  wasn't it, ma'am?
14  A  Yes.
15  Q  Because you didn't have insurance at the
16  time?
17  A  No.
18  Q  Why did the BMV suspend your license?
19  A  When they -- the lawyer's office had it
20  suspended.
21  Q  Because you didn't have insurance; right?
22  A  No.
23  Q  So, some lawyer's office just had your
24  license suspended?
25  A  They had it suspended because of me not

## Page 32

1  making the payments at the time.
2  Q  I see.  So, you entered into an
3  installment agreement --
4  A  Yes.
5  Q  -- so your license wouldn't be suspended;
6  right?
7  A  Yes.
8  Q  You defaulted on that agreement --
9  A  Yes.
10  Q  -- and your license was suspended --
11  A  Yes.
12  Q  -- right?  Is your license back in effect?
13  A  Yes.
14  Q  Have we talked about all the lawsuits that
15  you can recall being involved in as a defendant,
16  other than Regent -- we'll get to that -- and
17  Laidlaw?  Anything else?
18  A  Not that I can remember.
19  Q  All right.  Let's talk about Regent Avenue
20  now.  You were involved in a lawsuit, in 1990, over
21  Regent Avenue, weren't you?
22  A  Yes.
23  Q  The complaint that was filed, initially it
24  was filed as a foreclosure?
25  A  Yes.

Page 33

1  Q  This was for 1112 Regent; correct?
2  A  Yes.
3  Q  Now, there was a Paul Bryant who was also
4  a defendant in that action --
5  A  Yes.
6  Q  -- right?  Refresh my recollection.  Who
7  was he, in relation to you?
8  A  My husband.
9  Q  He was your husband at the time?  Now, was
10 this foreclosure -- was this a mortgage foreclosure?
11 A  Yes.
12 Q  Had you signed the promissory note and
13 mortgage?
14 A  We both had.
15 Q  The Regent property, was this a property
16 that the two of you bought as husband and wife?
17 A  Yes.
18 Q  All right.  So, then the two of you took
19 out a loan when you bought the property; right?
20 A  Yes.
21 Q  Then the two of you got behind in your
22 monthly payments; right?
23 A  Yes.
24 Q  Then there was a foreclosure complaint
25 filed; correct?

Page 34

1  A  Yes.
2  Q  How far behind were you when that
3  foreclosure complaint was filed?
4  A  I don't remember how far.
5  Q  Can you ballpark it for me?  How many --
6  how much money was owed to the --
7  A  I don't know.
8  Q  Ma'am, you need to let me finish my
9  question.  How much money was owed by you and
10 Mr. Bryant when that mortgage foreclosure was filed?
11 A  I don't remember.  I don't remember what
12 the payments was.
13 Q  How many monthly payments were the two of
14 you behind when that foreclosure action was filed?
15 A  I don't remember.  We were divorced.
16 Q  But you can't remember how many monthly
17 payments you were behind?
18 A  No.
19 Q  You don't have any idea?
20 A  I can't remember.
21 Q  Now, was that property sold as part of the
22 foreclosure?
23 A  The property was sold before the fore --
24 the foreclosure was up, and the property was sold
25 before they actually went into foreclosure.

Page 35

1  Q  So, it didn't go -- you know what a
2  sheriff's sale is, don't you, ma'am?
3  A  It didn't go into that.
4  Q  Tell me what happened.  Who bought the
5  property before the sheriff's sale?
6  A  I don't remember the couple's name that
7  bought the property.  It went through Domicile
8  Realtors.  I know that.
9  Q  Did you ever file an answer, in that
10 foreclosure lawsuit, with the court, file an answer?
11 A  I don't understand what you're talking
12 about.
13 Q  Okay.  You understand you were named as a
14 defendant in that foreclosure action?
15 A  Yes.
16 Q  You got a summons, didn't you, ma'am, from
17 the court, a copy of the complaint along with a --
18 what's called a summons?
19 A  I got a paper stating that the house was
20 going in foreclosure.
21 Q  Okay.  You got some papers from the court
22 saying that a complaint had been filed; right?
23 A  Yes.
24 Q  Here's a copy of the complaint.  You got
25 those papers?

Page 36

1  A  Yes.
2  Q  You were personally served with them by
3  somebody from the court, weren't you, ma'am?
4  A  I don't remember.  I remember getting some
5  papers, like, maybe in the mail.
6  Q  Well, the court's docket shows that on May
7  9th of 1990, you were personally served by a court
8  representative with the complaint and summons.
9     Does that refresh your recollection?
10 A  It's possible.
11 Q  Now, what did you -- did you hire a
12 lawyer, as part of that lawsuit?
13 A  No.
14 Q  Did you file any papers with the court?
15 A  I don't remember doing so.
16 Q  Do you still owe Ameritrust Company money,
17 as part of that promissory note, for Regent Avenue?
18 A  Not that I know of.
19 Q  When that lawsuit was filed on Regent
20 Avenue, did you ever get in touch with the mortgage
21 company and try to work out a payment plan?
22 A  No.
23 Q  I want to talk to you now, ma'am, about
24 this lawsuit that you filed against my clients.
25    What was your -- describe your first

Page 37

1 contact with Mr. Blessing's office for me.
2    A  What do you mean, I describe -- what do
3 you mean?
4    Q  How did you first come into contact with
5 Mr. Blessing?
6    A  I received a letter.
7    Q  Before you received that letter, had you
8 known Mr. Blessing?
9    A  No.
10    Q  Had you known Mr. Schwantes?
11    A  No.
12    Q  Ballpark for me about when you received
13 that letter.
14    A  I don't exactly remember when I -- it was
15 either in 2000 -- and I don't know whether it was in
16 April or -- or when.
17    Q  Was it after you repurchased the Laidlaw
18 property --
19    A  Yeah.
20    Q  -- that you got this letter --
21    A  Yeah.
22    Q  -- from Mr. Blessing?  Yes?
23    A  (Nodding.)
24    Q  And the letter was -- referenced
25 Mr. Bigelow, didn't it, ma'am?

Page 38

1       MR. SCHWANTES:  Object, to the extent that
2 you're getting into substantive things with
3 work product.
4       MR. LEWIS:  Go ahead.
5       MR. SCHWANTES:  To the extent he's asking
6 you for the substance of conversations between
7 Mr. Blessing or communications between our
8 office and you, I'd instruct you not to answer
9 that.
10       MR. LEWIS:  Ma'am, I'm not asking you what
11 the words -- what the letter said.  I'm asking
12 you what the letter was about.
13 BY MR. LEWIS:
14    Q  Was the letter from Mr. Blessing, his
15 first letter to you, was it about Mr. Bigelow?
16    A  I don't remember, for sure, whether it
17 stated his -- his name, or -- or -- I forgot what
18 the contents was.
19       THE WITNESS:  Excuse me.  May I go to the
20 restroom, please?
21       MR. LEWIS:  Absolutely.
22          (Brief recess taken.)
23 BY MR. LEWIS:
24    Q  Let's talk about Laidlaw Avenue now,
25 ma'am.  It's my understanding that you moved into

Page 39

1 Laidlaw in approximately 1995.
2    A  Yes.
3    Q  Does that sound accurate?
4    A  That is accurate.
5    Q  That is accurate?  Your father's name was
6 Charles Worthy; correct?
7    A  Yes.
8    Q  He died November 5th of 1995.  Does that
9 sound accurate?
10    A  Yes.
11    Q  Then, in -- when your father passed away
12 in '95, was he living at Laidlaw with your mother?
13    A  Yes.
14    Q  Were you living there, also, at that time?
15    A  No.
16    Q  Then, after your father passed away, then
17 your mother continued to live at Laidlaw Avenue;
18 correct?
19    A  Yes.
20    Q  Your mother lived there until she passed
21 away in 1996; correct?
22    A  Yes.
23    Q  Your mother passed away May 31, 1996.
24 Does that sound right?
25    A  Yes.

Page 40

1    Q  Before your parents passed away, was there
2 a mortgage on the Laidlaw property?
3    A  Yes.
4    Q  Who was making the monthly mortgage
5 payments while your parents were alive?
6    A  They were.
7    Q  They were?  Do you know how much the
8 mortgage payments were at that time?
9    A  I believe around 200, or something, a
10 month, I think.  I'm not for sure.  I done forgot
11 the amount.
12    Q  I'm sorry?
13    A  I believe it was around 200 something a
14 month.
15    Q  Then, your mother's name was Johnnie
16 Worthy; correct?
17    A  Yeah.
18    Q  Then, after her death, you acquired title
19 to Laidlaw Avenue; is that correct?
20    A  Yes.
21          (Defendants' Exhibit 5 marked
22          for identification.)
23 BY MR. LEWIS:
24    Q  Ma'am, I want to show you what's been
25 marked for identification as Defendants' Exhibit 5.

Page 41

1  Do you see a signature down there?
2      A  Yes.
3      Q  Yes?  Is that your signature?
4      A  Yes.
5      Q  You signed this affidavit; right?
6      A  Yes.
7      Q  The file stamp in the Hamilton County
8  records indicate that this was filed January 28th,
9  1998.  Do you see that up at the top?
10     A  Yes.
11     Q  Yes?  Then it also indicates that you
12  signed this document on January 27th, 1998.  Do you
13  see that?
14     A  Yes.
15     Q  This was prepared by John Meckstroth,
16  Attorney at Law; correct?
17     A  Yes.
18     Q  This affidavit says that you hold title
19  with your mother.  Do you see that, up in the first
20  sentence?
21     A  Yes.
22     Q  Tell me what you know about that.  Were
23  you on a deed with her?
24     A  Yes.
25     Q  Was that a deed from your father to you

Page 42

1  and your mother?
2      A  No, it was my mother and father's name was
3  on the deed.  When my father passed away, my mother
4  called the loan place and had me talk to them
5  because she had had a stroke, and told them that my
6  father had died and that she added my name to the
7  house with hers.
8      Q  So, is it your understanding, then, that
9  after your -- well, while your dad was still alive,
10  did he sign a deed with your name and your mom's
11  name on it?
12     A  No.
13     Q  No?
14     A  Not that I know of.
15     Q  Well, the sentence -- it says that you
16  hold title with Johnnie Worthy.  Tell me what you
17  know about that.  How'd you take title with her?
18     A  From -- from my understanding, when I took
19  title with my mother was when they took my father's
20  name off and she had my name added that me and her
21  were the owners of the house.
22     Q  So, do you think your name was added --
23  you know what a deed is; right?
24     A  Yes.
25     Q  Do you think your name was added, at some

Page 43

1  point, on a deed to 1107 Laidlaw?
2      A  That was my understanding.
3      Q  Now, when your mom passed away in 1996,
4  there wasn't any probate estate opened at that time,
5  was there?
6      A  No.
7      Q  Were there any other assets in your
8  mother's estate?  Assets is property.  And if I --
9  you know, if I ask you a question you don't
10  understand or I'm using a word, tell me.  Okay?
11     A  Um-hmm.
12     Q  When your mom passed away, were you the
13  beneficiary of her estate?
14     A  When my mother passed, I was the executor
15  of her estate.
16     Q  Did your mom have a will?
17     A  Yes.
18     Q  You were named in that will, weren't you?
19     A  Yes.
20     Q  You know what a beneficiary is?
21     A  Um-hmm.
22     Q  Somebody who's going to inherit property?
23  Yes?
24     A  Yes.
25     Q  You were a beneficiary of your mother's

Page 44

1  estate?
2      A  Yes.
3      Q  Were there any other beneficiaries?
4      A  My brother and my daughter.
5      Q  So, did they take property from your mom's
6  estate, also?
7      A  The only property was the house, and it
8  was heir property.  It went to my daughter.
9      Q  Laidlaw?
10     A  Yes.
11     Q  So, you're saying, title to the Laidlaw
12  property went to your daughter?
13     A  Yeah, it -- we wasn't supposed to have
14  been able to sell it.  It went to her.  So, her
15  name -- I don't -- I don't believe her name was
16  added to -- for the deed, or anything like that.  I
17  don't know.  My mother didn't make any changes, as
18  far as I know of.  But the will stated, heir
19  property.
20     Q  Well, when you signed the deed to
21  Mr. Bigelow transferring the property to him --
22  we'll get to the deed -- are you saying you didn't
23  own the property?
24     A  No, I'm not saying that.
25     Q  All right.  That's what I'm trying to get

Page 45

1  to. As part of your mom's estate, was the real
2  estate transferred to you?
3      A  When she passed, my name was the only one
4  on the deed.
5      Q  All right. So, after she passed away, you
6  were the owner of Laidlaw?
7      A  Yes.
8      Q  The real estate, that was the only
9  asset --
10      A  Yes.
11      Q  -- in the probate estate; right?
12      A  Well, there was a pickup truck, but that
13  had already been signed over to me.
14            (Defendants' Exhibit 6 marked
15            for identification.)
16  BY MR. LEWIS:
17      Q  Ma'am, I'm showing you what's been marked
18  for identification as Exhibit No. 6. These are --
19  basically, they're estate tax documents and an
20  estate tax return. You've seen these documents
21  before, haven't you, ma'am? And take your time, if
22  you need to review them.
23        MR. LEWIS: I'll be right back (leaving
24        room briefly).
25        Do you still need some time to look

Page 46

1  through them?
2        THE WITNESS: You can come on.
3        MR. LEWIS: Well, I know I can, but I
4  don't want to ask you questions until you're
5  ready.
6        THE WITNESS: I'm ready.
7  BY MR. LEWIS:
8      Q  You're ready? Ma'am, you've had the
9  chance, now, to look at Exhibit 6; correct?
10      A  Yes.
11      Q  Yes? Do you remember, in January of 1998,
12  signing some estate tax forms reference the Laidlaw
13  property?
14      A  Yeah.
15      Q  On page 2 of Exhibit 6 -- there you go --
16  is that your signature, ma'am?
17      A  Yes.
18      Q  Did you sign that on January 27th of 1998?
19      A  Yes.
20      Q  Who prepared these documents?
21      A  Meckstroth.
22      Q  Mr. Meckstroth?
23      A  Yeah.
24      Q  Yes?
25      A  Yes.

Page 47

1      Q  If you look at the fifth page in, ma'am --
2  there you go -- you see your signature, also, on --
3      A  Yes.
4      Q  -- this estate tax return?
5      A  Yes.
6      Q  Did you sign that on January 27th, 1998?
7      A  Yes.
8      Q  When you signed this return, you knew this
9  document was going to be filed with the Ohio Estate
10  Tax Department, didn't you, ma'am?
11      A  Yes.
12      Q  It was required to be filed as part of
13  your mother's estate; correct?
14      A  Yes.
15      Q  The information in here -- there is a
16  declaration -- stay on that same page. Do you see
17  where it says "Declaration" there?
18      A  Yes.
19      Q  It says, Under penalties of perjury, I
20  declare I've examined this return, including
21  accompanying schedules and statements, et cetera, et
22  cetera, and to the best of my knowledge and belief
23  it is true, correct and complete.
24        Do you see that?
25      A  Yes.

Page 48

1      Q  So, you reviewed this return before you
2  signed it, didn't you, ma'am?
3      A  Yes.
4      Q  Is the information in here that you filed
5  with the estate tax return, was it true, correct and
6  complete, as you verified?
7      A  Yes.
8      Q  Then, if you look at -- look at just the
9  following page. You're there. The -- under
10  Recapitulation of Assets, Section E, do you see
11  that? There you go.
12      A  Um-hmm.
13      Q  There is a number there, $48,000. Do you
14  see that?
15      A  Yes.
16      Q  What's that represent, ma'am?
17      A  The value of the property.
18      Q  Right. If you go to page -- well, before
19  we go to page 9, if you -- that $48,000 -- it says,
20  See joint and survivorship property part 2; right?
21      A  Right.
22      Q  Are you with me? Then it's got $48,000
23  across there; right?
24      A  Right.
25      Q  Okay. Now go to page 9. You there?

Page 49

1    A   Yes.
2    Q   That has Joint Survivorship Assets; right?
3    A   Right.
4    Q   That's the section that's being referred
5 to back on that page we just talked about, right,
6 page 2?
7    A   Right.
8    Q   Right?  So the value, at the date of
9 death, on this return that you filed of 1107
10 Laidlaw, you're declaring it's $48,000; right?
11    A   Yes.
12    Q   Then, if you look at page 14 -- are you
13 there --
14    A   Yes.
15    Q   -- this schedule J indicates that
16 Nationsbanc Mortgage Company mortgage -- there is a
17 number on there for $14,884.88.  Do you see that?
18    A   Yes.
19    Q   Was that the mortgage that was outstanding
20 as of the date that you signed this tax return,
21 ma'am?
22    A   No.
23    Q   It wasn't?
24    A   No.
25    Q   Well, what was the mortgage balance as of

Page 50

1 the date that you signed this return?
2    A   When I -- when I signed this, from what I
3 was told from the mortgage company, it was 12,000.
4    Q   So, you're saying this number is
5 inaccurate?
6    A   As far as I know, I was told it was
7 12,000, from the mortgage company.
8    Q   Were you told that before you signed this
9 estate tax return?
10    A   Yes.
11    Q   So, why did you sign an estate tax return
12 with an inaccurate -- with a number that you were
13 told was inaccurate?
14    A   I didn't see this amount.
15    Q   Oh, you didn't review page 14?
16    A   I didn't see this amount.  This amount was
17 not -- when I signed this tax thing, this amount was
18 not shown to me.
19    Q   So, what are you telling us the
20 outstanding mortgage from Nationsbanc on Laidlaw
21 was, as of January 27th, 1998?
22    A   I was told by the mortgage company that it
23 was 12,000.  That was all.  That was it.  I --
24 they -- it wasn't told to me that any extra charges,
25 or anything, was added to it.  That's what the

Page 51

1 mortgage company told me over the phone.
2    Q   12,000 what?  Do you remember anything
3 more, other than 12,000?
4    A   No, I don't remember any more.  I remember
5 12,000.  I don't remember any more dollars or cents.
6    Q   Well, at that time, January 27th, 1998,
7 the foreclosure action was pending, wasn't it?
8    A   Yeah.
9    Q   So, did the number that you were getting
10 from the mortgage company, did it include the extra
11 attorney's fees and costs and all that, that it
12 would take to bring the mortgage completely current?
13    A   No.
14    Q   It didn't include that?
15    A   No.  They just told me I owed 12,000.
16    Q   Do you know if that 12,000 number was the
17 principal on the mortgage exclusive of the
18 foreclosure costs?
19    A   I don't know.
20    Q   Well, you're saying you didn't see this
21 Schedule J at the time --
22    A   No.
23    Q   -- you signed it?
24    A   No, I did not.
25    Q   Are you telling me it wasn't attached to

Page 52

1 the return when you signed it?
2    A   I did not see any of this, not even with
3 this $19,164.34.  I did not see it.
4    Q   All right.  That's really not my question,
5 ma'am.  Was Schedule J, that page 14 --
6    A   I did not see it.
7    Q   -- was it attached at the time that you
8 signed it?
9    A   I -- not that I know of.  I don't remember
10 seeing it.
11    Q   Go back to that fourth page in, would you,
12 ma'am.  Do you see where it says "Declaration"
13 there?
14    A   Yes.
15    Q   We touched on that earlier.  But you read
16 that paragraph before you signed this, didn't you,
17 ma'am?
18    A   Yes, I read it.
19    Q   It says, Under penalties of perjury, I
20 declare I have examined this return, including
21 accompanying schedules and statements.
22        Do you see that?
23    A   Yes.
24    Q   So, you're saying, today, that you didn't
25 review any accompanying schedules; is that what

Bryant, et al. v. Bigelow, et al.      CondenseIt!      Depo of Shardenia Bryant

Case 1:03-cv-00006-SAS      Document 39-2      Filed 10/01/2003      Page 14 of 21

Page 53

1 you're saying today?
2    A  I remember seeing this paper when I signed
3 it.  I do not remember seeing this one back here, J,
4 with this on it.  I do not remember seeing it.
5    Q  Well, you saw the -- on that same page
6 that you signed, you saw the 48,000 under Total
7 Gross Estate, didn't you, ma'am?
8    A  Yes.
9    Q  Then you saw the $19,164.34 on line 2;
10 right?
11    A  Yes.
12    Q  Did you question Mr. Meckstroth about how
13 that number was arrived at?
14    A  No.
15          (Defendants' Exhibit 7 marked
16          for identification.)
17 BY MR. LEWIS:
18    Q  Ma'am, you have Exhibit No. 7 in front of
19 you.  Do you see that?
20    A  Yeah.
21    Q  Can you identify your signature on there?
22    A  Yes.
23    Q  Did you sign this document on
24 January 27th of 1998?
25    A  Yes.

Page 54

1    Q  This was a document that was used to
2 report this transaction to the Internal Revenue
3 Service, wasn't it, ma'am?
4    A  Yes.
5    Q  You understood that, at the time that you
6 signed this document?
7    A  Yes.
8    Q  This has the gross sale price listed as
9 $36,154.98.  Do you see that?
10    A  Yes.
11    Q  How was that number arrived at?
12    A  I don't know.
13    Q  So, you signed this document; you
14 understood it was going to be submitted to the IRS;
15 and you don't have any idea how that gross sale
16 price was arrived at?
17    A  No.
18    Q  Did you ask -- was this prepared by
19 Mr. Meckstroth, also, this document, No. 7?
20    A  I believe so.  I'm not for sure.
21    Q  Well, whoever prepared it, did you ask
22 that person any questions about that number, about
23 that gross sales price?
24    A  No.
25    Q  Now, ma'am, according to you, at the time

Page 55

1 the property went into foreclosure -- Laidlaw, I
2 mean -- what was the fair market value of the
3 property?
4    A  I don't know.
5    Q  The records from the Hamilton County
6 Auditor indicate that as of January 1, 1998, the
7 property was assessed at $44,900 total.  I'm going
8 to represent to you, that's what the records show.
9 You with me?
10    A  Yeah.
11    Q  Do you have any reason to believe that
12 that's not an accurate figure, as to fair market
13 value at that time?
14    A  No.
15    Q  You wouldn't quarrel with that number,
16 would you, in terms of valuation at that time?
17    A  No.
18    Q  Now, after your mom passed away in 1996,
19 then you moved into Laidlaw.  Then, did you begin to
20 make -- I'm sorry, you're shaking your head.  I'm
21 not trying to say something inaccurate.  What did I
22 say wrong?
23    A  I'm trying -- I want to -- okay, rephrase
24 what you were saying.
25    Q  After your mom passed away --

Page 56

1    A  Um-hmm.
2    Q  -- May 31, '96, right --
3    A  Um-hmm.
4    Q  -- my understanding, you then moved into
5 Laidlaw.
6    A  No.
7    Q  Is that wrong?
8    A  Yes.
9    Q  Okay.  Well, when did you move into
10 Laidlaw?
11    A  November the 5th, 1995.
12    Q  All right.  After your dad passed away?
13    A  The same day he passed away.
14    Q  All right.  So, between November of '95
15 and May 31 of '96, was your mom making the mortgage
16 payments?
17    A  I was writing the checks for them.
18    Q  Where was the money coming from?
19    A  Her money.
20    Q  Her money?  So, then, your mom passed
21 away, May 31, '96; right?
22    A  Right.
23    Q  And you're still living at Laidlaw?
24    A  Yeah.
25    Q  You're the only one living at Laidlaw, or

Bryant, et al. v. Bigelow, et al.                    Condenselt!                    Depo of Shardenia Bryant

Case 1:02-cv-00006-SAS    Document 39-2    Filed 10/01/2003    Page 15 of 21

Page 57

1 did you have a child living with you?
2    A  Yes.
3    Q  Yes?  How old?
4    A  At that time, she would have been about 17
5 or 18.
6    Q  All right.  Was she making money?
7    A  No, she was in school.
8    Q  So, after May 31, 1996, who was making the
9 mortgage payments at Laidlaw?
10    A  I was.
11    Q  Then, how much -- what was the amount of
12 those mortgage payments?
13    A  Approximately 200 and something.  I don't
14 know exactly.
15    Q  200 and -- was it closer to 3 or closer to
16 200?
17    A  It was 200, closer to 300.  It was 200 and
18 some more dollars.
19    Q  Do you think it was more than 250?
20    A  Yeah.
21    Q  How many mortgage payments did you make,
22 before the property went into foreclosure?
23    A  I don't remember.
24    Q  Well, the court documents, Hamilton County
25 Court documents, indicate that the complaint for

Page 58

1 foreclosure was filed July of 1997.  Does that sound
2 about right to you?
3    A  Approximately, yes.
4    Q  So, that would have been about 13 months
5 or so after your mom passed away; right?
6    A  Um hmm.
7    Q  So, of those 13 months, how many months do
8 you believe you made a mortgage payment?
9    A  Maybe five -- four or five.
10    Q  Four or five out of the 13?  Yes?
11    A  Yes.
12    Q  Were you working then, ma'am, in May of
13 1996, when your mom passed away?
14    A  Yes.
15    Q  What was your gross income at the time?
16    A  Maybe about -- I don't know.  I think
17 about 800 a month.
18    Q  Did you file a tax return for the year
19 1997?
20    A  Yes.
21    Q  And '98?
22    A  Yes.
23    Q  Do you still have copies of those tax
24 returns?
25    A  Yes, I should have.

Page 59

1    Q  Did you prepare them yourself, or did you
2 have an accountant prepare them?
3    A  I didn't have an accountant prepare them.
4    Q  So, did you prepare them yourself, ma'am?
5    A  I believe my girlfriend up -- did them.
6 My girlfriend did them.
7    Q  But you think you've still got copies of
8 them?
9    A  I believe so.
10    Q  All right.  I'll send a letter to your
11 attorney, but I'm going to -- we're going to make
12 the request for copies of those tax returns.
13    A  I don't know how you're going to get them.
14 I can't get in my storage shed.
15    Q  How come you can't get in your storage
16 shed?
17    A  Because I don't make enough money to pay
18 the full storage, and I'm locked out.
19    Q  I see.  So, you fell behind on payments
20 for your storage shed, also?
21    A  I'm not, what you call it, totally behind,
22 but yes.
23    Q  You're behind enough that they won't let
24 you in until you get current; right?
25    A  Right.

Page 60

1    Q  How much do you owe them?
2    A  If you add the taxes to it, oh,
3 approximately, maybe 300.
4    Q  What's the name of that company?
5    A  Easy.
6    Q  Easy what?
7    A  Storage.
8    Q  Easy Storage?
9    A  Um-hmm.
10    Q  Yes?  Where are they located?
11    A  North Bend.
12    Q  North Bend Road?
13    A  Yes.
14    Q  You're saying that's where your tax
15 returns are and you can't get them because they
16 won't let you in; right?
17    A  Right.
18    Q  Let's talk about the foreclosure action,
19 the lawsuit involving Laidlaw.
20       Before the lawsuit -- the complaint was
21 filed with the court, did you receive some letters
22 from the mortgage company about being behind?
23       MR. SCHWANTES:  Just so we're talking --
24 we're talking about the foreclosure in 1997?
25       MR. LEWIS:  Yes.

Bryant, et al. v. Bigelow, et al.
Case 1:02-cv-00006-SAS    Document 39-2    Filed 10/01/2003    Page 16 of 21
Condensclt!    Depo of Shardenia Bryant

Page 61

1   A  Yeah.
2   Q  You with me?
3   A  Yes.
4   Q  How many letters do you think you got from
5  the mortgage company, before the complaint was
6  actually filed?
7   A  I don't know.  Quite a few.
8   Q  Quite a few.  What did you do in response
9  to those letters?
10   A  I called the mortgage company and talked
11  with them.
12   Q  Do you remember who you talked to at the
13  mortgage company?
14   A  No.
15   Q  What were you talking about?
16   A  Trying to get the money to catch the
17  mortgage up.
18   Q  You weren't able to do that, were you?
19   A  No.
20   Q  At the time, did you have the money to get
21  the mortgage current?
22   A  If I had had the money, it wouldn't have
23  been in foreclosure.
24   Q  Right.  That's sort of what I was getting
25  at.  So, at the time that you were getting these

Page 62

1  letters from the bank that you were behind, you
2  didn't have enough money --
3   A  No.
4   Q  -- to get it current, did you?
5   A  No.
6   Q  Did you have any assets, like a retirement
7  account or money sitting somewhere that you could
8  have used to get the mortgage current?
9   A  Not at that time.
10   Q  So, you basically didn't have any options,
11  you didn't have the resources to get that mortgage
12  current, did you, ma'am?
13   A  No.
14   Q  So, then there was a foreclosure complaint
15  filed in '97, reference Laidlaw; right?
16   A  Yes.
17   Q  You were living there at the time?
18   A  Yes.
19   Q  The court record indicates that on
20  July 16th of 1997 -- and I'll be happy to show you
21  this docket, if you want -- but it shows that you
22  were personally served with a summons, a copy of the
23  complaint and summons.
24   A  Yes.
25   Q  Is that accurate?

Page 63

1   A  Yes.
2   Q  So, after you were personally served,
3  what -- did you take any action?  Well, first of
4  all, did you contact a lawyer?
5   A  No.
6   Q  After the lawsuit was filed in July of
7  '97, did you have any further contact with the
8  mortgage company?
9   A  I don't believe so.
10   Q  What about the attorney who was
11  representing the mortgage company?  Did you attempt
12  to contact that lawyer?
13   A  I don't remember.
14   Q  After the complaint was filed, did you
15  make any further payments to the mortgage company?
16   A  No.
17         (Defendants' Exhibit 8 marked
18         for identification.)
19  BY MR. LEWIS:
20   Q  Ma'am, I want to show you what's been
21  marked for identification as Defendants' Exhibit 8.
22  That indicates that as of January 16th, 1998, that
23  top number says, Total Payment Amount, $3,084.66.
24  Do you see that?
25   A  Yes.

Page 64

1   Q  Does that sound like the number, to you,
2  that the monthly payments, mortgage payments, would
3  be behind, as of that date?
4   A  Possibly it is.
5   Q  Possibly?  Do you have any reason to doubt
6  that this is what the bank was claiming as of
7  January 16th, 1998, for what it would take to get
8  the mortgage current and reinstated?
9   A  It's possible.
10   Q  You don't have any reason to doubt the
11  accuracy of these numbers, do you, ma'am?
12   A  No.  I never seen them before, but --
13   Q  Well, you never contacted the lawyers
14  representing the bank to get this information, did
15  you, ma'am?
16   A  I don't -- I remember seeing this -- these
17  names on the top -- all this in there (indicating),
18  but I don't remember getting any mail from them, or
19  anything.  I remember calling a number.  But I don't
20  remember anything else about that.
21   Q  At -- I'm sorry, I didn't mean to
22  interrupt you.
23   A  Because I remember being told that I
24  could -- the house payment, if I get the house back
25  before foreclosure, it would cost me like close to

Bryant, et al. v. Bigelow, et al.    Case 1:02-cv-00006-SAS    Document 39-2    Filed 10/01/2003    Depo of Shizenia Bryant

Condenseit!

**Page 65**

1 like 9,000, if not more. And then I would have
2 to -- and then my monthly payments, then, would be
3 like 500 or 700, or something like that.
4    Q  As you sit here today, do you have a
5 recollection of contacting the attorneys for the
6 bank to get a number as to what it would take to get
7 this property out of foreclosure?
8    A  I'm not for sure. I don't remember.
9    Q  As of -- you see Exhibit 8? As of
10 January 16th of 1998, did you have $5,800 that you
11 could use to pay the bank and get this property out
12 of foreclosure?
13    A  Nope.
14    Q  What do you remember about your first
15 contact, ma'am, with Roseanne Christian?
16    A  I remember her coming to the house. She
17 was -- she stated that she saw that I was having
18 trouble with my house, and she told me to think
19 about selling it, she had someone that would help
20 me.
21    Q  That first contact with Ms. Christian, the
22 foreclosure complaint had been filed with the court,
23 hadn't it?
24    A  Yeah.
25       MR. LEWIS: Let's take about a five-minute

**Page 66**

1    break. It's a good time to take a break.
2    Okay?
3       (Brief recess taken.)
4 BY MR. LEWIS:
5    Q  Ma'am, we're back on the record. Now, we
6 were talking about the first time you met Roseanne
7 Christian. At the time you first met Ms. Christian,
8 did you have a plan to get your property out of
9 foreclosure?
10    A  Yes.
11    Q  What was your plan?
12    A  Well, I had -- I was talking with a friend
13 of mine at work that said that they could help me at
14 that time. But it fell through. It didn't fall
15 through.
16    Q  It did fall through?
17    A  It didn't fall through. They couldn't
18 help me.
19    Q  So, who was this friend you had spoken to?
20    A  His name was Jerry.
21    Q  Jerry who?
22    A  Brown.
23    Q  Jerry Brown. Had you spoken to Jerry
24 Brown before you met Roseanne Christian?
25    A  Yes.

**Page 67**

1    Q  When you first met with Ms. Christian, had
2 Mr. Brown already told you that he wouldn't be able
3 to help you?
4    A  No, he hadn't.
5    Q  He hadn't?
6    A  Huh-uh.
7    Q  Did you have any further contact with
8 Mr. Brown, after you met with Ms. Christian?
9    A  Yes.
10    Q  What was Mr. Brown going to do for you?
11    A  He was trying to help me figure out a way
12 to get the money that would bring the house out of
13 foreclosure.
14    Q  Was Mr. Brown going to give you this
15 money, ma'am?
16    A  Yes.
17    Q  Did he?
18    A  No.
19    Q  Why not?
20    A  He couldn't get it together.
21    Q  When did you know that Mr. Brown wouldn't
22 be able to get this money together?
23    A  About the second time Roseanne Christian
24 come to visit me.
25    Q  So, before you met with Ms. Christian the

**Page 68**

1 second time, you knew that Mr. Brown wouldn't be
2 able to help you; right?
3    A  Yes.
4    Q  Did you have any other options or any
5 other plan, at that time, to get your property out
6 of foreclosure?
7    A  No.
8    Q  Now, this first contact with Roseanne
9 Christian, did she call you before she came to your
10 home?
11    A  No.
12    Q  Do you remember what day of the week it
13 was?
14    A  No.
15    Q  Was it a weekday?
16    A  Yes.
17    Q  Were you home at the time?
18    A  Yes.
19    Q  So, was this a day that you were -- was
20 this an ordinary workday for you?
21    A  I was off.
22    Q  It was an off day?
23    A  Off. Yeah.
24    Q  So, Ms. Christian just came to your
25 home --

Page 69

1  A  Yes.
2  Q  -- right?  Tell me about the first
3  conversation you remember with Roseanne Christian.
4  A  She came and she introduced herself, and
5  she stated that she had saw at the courthouse that
6  my house was in foreclosure and wanted to know if I
7  wanted to sell it.  And I told her no.
8  Q  You told her no --
9  A  Um-hmm.
10  Q  -- that you did not want to sell it?
11  A  Yes.
12  Q  Did Ms. Christian mention to you, at this
13  first meeting, that she had a partner that she could
14  bring into a transaction?
15  A  I don't quite remember whether she had --
16  told me about her partner on the first transaction,
17  or whether it was on the second one.  I -- I don't
18  remember.
19  Q  Ma'am, take a look at Exhibit 1.  That's
20  your deposition transcript that you identified
21  earlier.  Do you have that?  Go to page 22, would
22  you?  Do you have page 22 in front of you?
23  A  Um-hmm.
24  Q  Yes?
25  A  Yes.

Page 70

1  Q  If you look at line 10, you were asked a
2  question by Mr. Laber, weren't you:  And what did
3  Ms. Christian say to you when she came to your
4  house, if you recall?
5      Do you remember being asked that question,
6  ma'am?
7  A  Yeah.
8  Q  Then you said:  She stated that there was
9  a way that she could get me out of foreclosure.
10      That was your answer, wasn't it?
11  A  Yes.
12  Q  And then Mr. Laber asked:  Did she talk to
13  you any more than that?
14      And your answer was:  She just told me
15  that she had a partner that would -- she would bring
16  to see me.
17      That was your answer then, wasn't it,
18  ma'am?
19  A  Yes.
20  Q  Does that refresh your recollection about
21  whether Ms. Christian told you, in that first
22  meeting, that she had a partner?
23  A  Yes.
24  Q  She told you -- at the first meeting, she
25  mentioned a partner, didn't she?

Page 71

1  A  Yes.
2  Q  But what you're saying now is that you
3  told Ms. Christian that you wouldn't be interested
4  in selling the property?
5  A  I remember telling her that at the -- when
6  she came the first time, that I wouldn't be
7  interested.  And I know she came back the second
8  time, and that's when she brought her partner.
9  Q  Well --
10  A  I think it was.
11  Q  If you told Ms. Christian, at the first
12  meeting, that you weren't interested in selling, why
13  did she come back a second time?
14  A  To -- she said she came back to see if
15  there had been any changes.  Because when she first
16  came, that was when I was trying to get the money
17  together to save it.
18  Q  The Mr. Brown issue --
19  A  Um-hmm.
20  Q  -- right?
21  A  Right.
22  Q  So, then, after -- well, when
23  Ms. Christian left after this first meeting, did you
24  know she was going to come back?
25  A  No.

Page 72

1  Q  No?  So, as far as you knew, that was the
2  end of the discussions with Ms. Christian; right?
3  A  Um-hmm.
4  Q  Yes?
5  A  Yes.
6  Q  So then, when she -- at the first meeting,
7  the first time you met her, did she present you with
8  any documents?
9  A  No.  She just came and sat down on the
10  porch and just talked.
11  Q  Had you known her before that first
12  meeting?
13  A  I never seen the lady before in my life.
14  Q  She didn't give you any papers or business
15  cards that first meeting, did she?
16  A  No.
17  Q  No?  So, then Ms. Christian came back a
18  second time.  What was the time lapse between the
19  first time she was there and the second time?
20  A  I don't know.  I don't remember whether it
21  was a couple of weeks or a month.  I don't remember.
22  Q  Then, that second meeting, did she come
23  back by herself?
24  A  Yes.
25  Q  At the second meeting, did Ms. Christian

Bryant, et al. v. Bigelow, et al.    Condense It!    Depo of Shizdenia Bryant

Case 1:03-cv-00006-SAS    Document 39-2    Filed 10/01/2003    Page 19 of 21

Page 73

1 present you with any documents?
2    A No.
3    Q No? She didn't give you any business
4 cards, or anything like that --
5    A No cards.
6    Q -- at that second meeting, did she?
7    A No cards. No cards.
8    Q This was all at the second meeting, when
9 she came to your home; right?
10    A Yes.
11    Q At the second meeting, she also mentioned
12 that she had a partner, didn't she?
13    A Yes.
14    Q At the second meeting, didn't she say
15 something to the effect that her partner had had a
16 stroke?
17    A Yes.
18    Q By that time, Mr. Marfisi's name had been
19 mentioned to you by Ms. Christian, hadn't it?
20    A I don't remember whether she told me his
21 name then or when she brought him in and introduced
22 him to me.
23    Q Well, take a look, if you would, ma'am, at
24 page 23 of your deposition transcript. Actually, on
25 page 22, at line 23. You with me?

Page 74

1    A Um-hmm.
2    Q The question was asked: What happened the
3 second time she came?
4      Do you see that?
5    A Yeah.
6    Q Answer: She just kept talking to me about
7 the foreclosure.
8    A Um-hmm.
9    Q Right?
10    A Yes.
11    Q That was your testimony then; right?
12    A Right.
13    Q You were asked: What was she saying?
14      And your answer: How that her partner had
15 just had a stroke and she was going to bring him by.
16    A Um-hmm.
17    Q Right?
18    A Right.
19    Q So, we're talking about the second time
20 Ms. Christian is at your home; right?
21    A Right.
22    Q Then you were asked: And did she come by
23 a third time?
24      Answer: I believe she did with him, with
25 her partner.

Page 75

1    A Yeah.
2    Q That was your testimony; right?
3    A Right.
4    Q Question: Who was her partner?
5      And your answer was: John Marfisi.
6    A Right.
7    Q Right? Now, do you recall whether you --
8 whether you had this understanding that Marfisi was
9 her partner, as of the second meeting, or was it at
10 the third meeting?
11    A Well, I believe, at the third meeting,
12 when she brought him. Because all she did was talk
13 about a partner. I never saw him until she came
14 with him the third time.
15    Q Okay. Do you recall, though, the third
16 meeting, she came with Mr. Marfisi; right?
17    A Right.
18    Q The question is, as of -- did you -- had
19 you heard Mr. Marfisi's name, as of your second
20 meeting with Ms. Christian?
21    A No.
22    Q Again, at this second meeting, it was just
23 you and Ms. Christian --
24    A Right.
25    Q -- right? Then, nothing was signed by --

Page 76

1    A No.
2    Q -- either one of you at the second
3 meeting; right?
4    A No.
5    Q Let's talk about the third visit now, of
6 Ms. Christian -- well, actually, after the second
7 visit, how was it left between the two of you? What
8 was the plan?
9    A She was just going to bring -- she was
10 bringing her partner by to talk with me.
11    Q You understood that she was going to bring
12 her partner by to talk to you about what, ma'am?
13    A About the house and how I could possibly
14 save it.
15    Q How long do you think that it was between
16 the second visit by Ms. Christian and the third
17 visit?
18    A It wasn't long. It wasn't a month -- it
19 wasn't a month -- or it could have been a few days
20 or a week. It wasn't that long.
21    Q What was going on with the foreclosure
22 suit, by the time of the third visit by Ms.
23 Christian? What was the progress of that lawsuit?
24    A It was still moving forward.
25    Q Had it been scheduled for sheriff's sale,

Page 77

1 by the time of the third visit by Ms. Christian?
2    A  I believe -- I believe so.  I'm not for
3 sure.
4    Q  Now, this third visit, Ms. Christian
5 brought John Marfisi --
6    A  Yes.
7    Q  -- with her; right?
8    A  Right.
9    Q  Then you knew, at that time, that he was
10 the person she had referred to as a partner --
11   A  Right.
12   Q  -- right?  This third visit, was that the
13 first time that you had met Mr. Marfisi?
14   A  Yes.
15   Q  Now, this third visit, then, there was a
16 proposal presented to you; isn't that accurate?
17   A  Yes.
18   Q  The proposal involved, you would sell the
19 house --
20   A  Right.
21   Q  -- right?  And then you would lease the
22 house back --
23   A  Right.
24   Q  -- correct?  And you would pay rent?
25   A  Right.

Page 78

1    Q  And then, after so long, you could buy
2 your house back?
3    A  Right.
4    Q  That was the proposal that was presented;
5 right?
6    A  Right.
7    Q  At this third visit, you were told,
8 weren't you, that Mr. Bigelow would be purchasing
9 the house?
10   A  No.
11   Q  Are you sure, ma'am?
12   A  I'm -- I don't remember being told he was
13 going to purchase the house.
14   Q  All right.  Look at page 24, would you?
15 Actually, go to page 23, line 23.  Okay?
16     The question was:  Did they say they would
17 purchase the house?
18     Do you see that?
19   A  Yes.
20   Q  Then your answer was:  No.
21   A  No.
22   Q  Right?
23   A  Um-hmm.
24   Q  Then, the next page, 24:  Did they say who
25 would purchase the house?

Page 79

1     Do you see that?
2    A  Yeah.
3    Q  And your answer at that time was:  They
4 mentioned Bigelow's name.
5     That was your testimony then, wasn't it,
6 ma'am?
7    A  Yes.
8    Q  So, does this refresh your recollection
9 about whether you were told, at the third meeting,
10 that Mr. Bigelow would be purchasing the house?
11   A  Yes.
12   Q  You were told that at that third meeting,
13 weren't you, ma'am?
14   A  I believe so, yes.
15   Q  Then, at this third meeting you signed a
16 document with Mr. Marfisi, didn't you?
17   A  Yes.
18   Q  You understood, at that time, when you
19 signed that document, that you were selling your
20 property and that you were going to lease it back?
21 That was your understanding, wasn't it?
22   A  Yes.
23   Q  You also understood, when you signed that
24 document, that at the end of that lease period you
25 could buy your house back --

Page 80

1    A  Right.
2    Q  -- correct?
3    A  Right.
4    Q  When you signed that document with
5 Mr. Marfisi -- and we'll get to it in a minute, the
6 contract to purchase -- what do you believe you owed
7 on the house?
8    A  12,000.
9    Q  Then, the way that you -- well, actually,
10 look at page 28, would you, ma'am, in your prior
11 deposition?  If you look at line 1, there, the
12 question is:  How much were you selling the house
13 for?
14     Do you see that?
15   A  Um-hmm.
16   Q  Yes?
17   A  Yes.
18   Q  And your answer was:  What I owed on it
19 was 11,000.
20     Do you see that?
21   A  Yes.
22   Q  Does that refresh your recollection, in
23 terms of what you believed you owed?
24   A  Well, 11 or 12, yes.
25   Q  All right.  Well, I -- you know, it's --

Page 81

1 what you said then was 11.
2   A  Yes.
3   Q  Is -- was it 11 or was it 12?
4   A  Well, 11.
5   Q  11?
6   A  Could be here or there, but --
7   Q  Now, the way this proposal was presented
8 to you by Mr. Marfisi and Ms. Christian -- actually,
9 who did the talking, at this third meeting, about
10 the transaction?  Who was doing the talking?
11   A  Marfisi.
12   Q  So, in terms of the person that was
13 explaining the transaction, it was Marfisi --
14   A  Right.
15   Q  -- right?  Was Roseanne doing any talking
16 at the third meeting?
17   A  I don't remember.  I think she told -- I
18 know she told me something about -- she was talking
19 about the money, and told me don't spend it because
20 most people take the money and buy new cars and
21 things.
22   Q  You mean, the money you were going to get
23 out of the sale?
24   A  Um-hmm.
25   Q  Yes?

Page 82

1   A  Yes.
2   Q  But in terms of how the proposal was
3 presented and the sale price and the lease, et
4 cetera, was it Mr. Marfisi who was presenting that
5 to you?
6   A  Yes.
7   Q  Yes?  Mr. Marfisi told you that the
8 mortgage would be -- as part of this transaction,
9 the mortgage would be paid off; right?
10   A  Um-hmm.
11   Q  Yes?
12   A  Yes.
13   Q  And that you would receive $20,000 --
14   A  Yes.
15   Q  -- correct?
16   A  Yes.
17   Q  Then you agreed to that, as part of the
18 sale?
19   A  Yes.
20   Q  Then, did you discuss with Mr. Marfisi how
21 much the monthly payments would be that you were
22 going to make?
23   A  He told me $200.
24   Q  But didn't he tell you that the monthly
25 payments, initially, would be $200?

Page 83

1   A  Well, he told me I'd make $200 a month.
2 That's what I would pay for rent.
3   Q  But did Mr. Marfisi also tell you that at
4 a certain later point, that you would be paying
5 $250?
6   A  No.
7   Q  He didn't say that?
8   A  No.
9   Q  Look at page 30 of your deposition, would
10 you, ma'am?  If you look at line 20 --
11   A  Um-hmm.
12   Q  -- do you see that?
13   A  Yeah.
14   Q  The question:  That's for $200, a two-year
15 lease for $200 a month?
16       That question was asked to you; right?
17   A  Yes.
18   Q  And you said:  Yes.
19       Right?
20   A  Yes.
21   Q  Now, look at page 29, line 23.
22   A  Um-hmm.
23   Q  The question is asked:  And you said the
24 monthly payments were $250?
25       Do you see that?

Page 84

1   A  Yes.
2   Q  And then you said:  At first.
3       Right?
4   A  Yes.
5   Q  Then, if you look at page 30, line 1:  Did
6 they go up under the lease?
7       See that question?
8   A  Yes.
9   Q  And you answered:  Yes.
10   A  Yes.
11   Q  So, did you have an understanding, ma'am,
12 that the monthly payments would be lower at first,
13 and then they would be slightly higher once a lease
14 was signed?
15   A  That's not the way it was presented.  Can
16 I explain?
17   Q  Sure.
18   A  What happened was, when I signed the paper
19 for my rent to be $200 a month, that was before we
20 went and had -- before we went to Meckstroth's
21 office.  When we went there, it was 200 a month.
22 So, there was no mention of it until later, when it
23 went up to 250.
24   Q  So, are you saying that the lease that you
25 signed --