Page 85

1    A  With Marfisi was just for $200 a month.
2  He said, whatever difference it was, he would make
3  it up. That's my understanding.
4    Q  So, you had an agreement with Marfisi that
5  the rent was going to be $250 a month --
6    A  No, 200 a month.
7    Q  I'm sorry, you're right. 200 a month --
8    A  Right.
9    Q  -- right? Then, did Marfisi say to you
10 that the rent would probably go up --
11   A  No.
12   Q  -- later on?
13   A  No.
14   Q  Well, why is Marfisi talking to you about
15 making up the difference? What do you mean?
16   A  I don't know where he -- where it came --
17 where he got that from, or what. But he just told
18 me, if it was any difference, he would make up the
19 difference. And that was the end of it.
20   Q  Okay. So, you're telling me that
21 Mr. Marfisi, at this third meeting with Roseanne
22 Christian, the two of you agreed upon a $200 a month
23 rent?
24   A  Right.
25   Q  And Mr. Marfisi told you, if that rent

Page 86

1  ever went up over 200, he would make up the
2  difference; correct?
3    A  No, he didn't say, if it ever went up. He
4  said, if it was a difference in it, he would make it
5  up.
6    Q  Well -- and did you understand that to
7  mean, if it was increased he would make it up?
8    A  No. I understood him -- what I -- my
9  understanding of it was that if it was more than 250
10 at the time of me signing that lease -- 200,
11 rather -- at the time of me signing that lease, that
12 he would make up the difference. That's my
13 understanding of it. It wasn't no, it was going to
14 go up, or anything. I was just under the impression
15 I was selling the house for a year, not going --
16   Q  All right. We'll get to that. We'll get
17 to the lease. I'll show it to you. I'm trying to
18 understand what Mr. Marfisi said to you.
19       So, he told you, at the time, that if the
20 rent was more than 200, at some point --
21   A  Yeah.
22   Q  -- that he would make it up?
23   A  Yeah.
24   Q  All right. That was a verbal -- that was
25 a statement that Mr. Marfisi made to you; right?

Page 87

1    A  Right.
2    Q  Did he ever put that in writing to you?
3    A  Not -- not that I --
4    Q  No? What was your answer? Yes, no?
5    A  No.
6    Q  There was some discussion -- I think you
7  indicated that Roseanne Christian suggested to you
8  that you take the $20,000 and not spend it?
9    A  When the 20,000 came up, that that's what
10 I would be getting, it was -- that's when she -- she
11 was -- told me, at that time, she says, don't -- she
12 told me, don't spend it. She said, a lot of people
13 spend the money on cars or something. That was the
14 only statement that she had actually made.
15   Q  Was it suggested to you that you should
16 put that money aside, so you could use it to buy
17 your house back?
18   A  Yes.
19   Q  Did you do that, ma'am?
20   A  Put the money aside?
21   Q  Right.
22   A  I never did receive the money.
23        (Defendants' Exhibit 9 marked
24        for identification.)
25 BY MR. LEWIS:

Page 88

1    Q  Ma'am, I'd like to show you what's been
2  marked for identification as Exhibit 9. Can you
3  identify that?
4    A  Contract of Purchase.
5    Q  Is this the document that you signed on
6  that third meeting that we've been talking about,
7  when Mr. Marfisi was present?
8    A  Yes.
9    Q  So, the people that were there when this
10 was signed, it was Ms. Christian, you, and
11 Mr. Marfisi; right?
12   A  Right.
13   Q  It was signed by you on January 7th, 1998;
14 right?
15   A  Right.
16   Q  Now, above Marfisi's signature, it's got,
17 January 7th, 1997. That's a mistake in the date;
18 right?
19   A  Right.
20   Q  He signed it the same day you signed it,
21 didn't he?
22   A  Right.
23   Q  Did you read this contract before you
24 signed it?
25   A  Yes.

Case 1:02-cv-00006-SAS    Document 39-9    Filed 10/01/2003    Page 2 of 22

Page 89

1    Q  Up at the top, very top, it says: This is
2  a legally binding contract. If not understood seek
3  legal advice.
4        Do you see that?
5    A  Yes.
6    Q  Did you feel like you understood this
7  contract when you signed it?
8    A  I understood what I read.
9    Q  Okay. Did you seek legal advice before
10  you signed it?
11    A  No.
12    Q  You knew you had that option, didn't you,
13  ma'am?
14    A  Yes.
15    Q  The phone numbers up at the top of
16  Exhibit 9 --
17    A  Yes.
18    Q  -- whose phone numbers are those?
19    A  At that time, it was my pager and my home
20  phone number.
21    Q  Was that your Social Security number
22  that's up there, in the upper right?
23    A  Yes.
24    Q  Now, this contract, Exhibit 9 --
25    A  Um-hmm.

Page 90

1    Q  -- says that $20,000 cash to seller, buyer
2  will satisfy lien with Nationsbanc. Do you see
3  that?
4    A  Yes.
5    Q  You understood, at that point, the
6  buyer -- Buyer is Johnnie Marfisi; right?
7    A  Yes.
8    Q  Then, Buyer will pay attorney's fees,
9  court costs, taxes, et cetera. Is that your
10  understanding of what was going to happen as part of
11  this transaction?
12    A  Yes.
13    Q  Yes? Then, it says, Seller will
14  lease-option property for 200 a month for one year.
15    A  Yeah.
16    Q  That's your understanding of what was
17  going to occur?
18    A  Right.
19    Q  Then, Buyer will help seller to purchase
20  property at 100 percent financing. Right?
21    A  Right.
22    Q  Now, did you discuss with Mr. Marfisi, at
23  the time, what the purchase price would be if, at
24  the end of one year, you wanted to repurchase it?
25    A  No.

Page 91

1    Q  You understood, didn't you, ma'am, that
2  you had the option to repurchase at the end of a
3  year --
4    A  Yes.
5    Q  -- right? You weren't going to be
6  required to repurchase your property at the end of a
7  year; correct?
8    A  Right.
9    Q  That it was going to be your choice;
10  right?
11    A  Right.
12    Q  But you did not discuss with Mr. Marfisi
13  on the day this contract was signed, what a
14  repurchase price for you would be; correct?
15    A  Correct.
16    Q  As a matter of fact, that was never
17  discussed at the time this contract was signed,
18  right, what the repurchase price would be?
19    A  Right.
20    Q  Did you meet Mr. Bigelow before the
21  closing on this transaction?
22    A  I didn't meet him until I went to
23  Meckstroth's office.
24    Q  Are you sure about that?
25    A  I think I'm pretty sure.

Page 92

1    Q  Actually, ma'am, Mr. Bigelow came out
2  about a month before the closing, didn't he, to your
3  property?
4    A  He might have. I don't remember.
5    Q  Do you remember Mr. Bigelow coming out
6  with an appraiser?
7    A  I remember the appraiser coming. I -- I
8  could have swore he was by his self. I'm not for
9  sure.
10    Q  All right. Why don't you take a look at
11  page 36 of your deposition. You there?
12    A  Yes.
13    Q  Look at line 13, ma'am. And the question
14  was asked: What were the circumstances you meeting
15  Mr. Bigelow?
16        Do you see that?
17    A  Yes.
18    Q  And your answer was: He came out and he
19  had got the paper from Marfisi and he came out and
20  he went through the house and he was having the
21  appraiser come and so that he could get the
22  appraisal on the house.
23        That was your answer at the time, wasn't
24  it, ma'am?
25    A  Yes.

Page 93

1 Q Then, the next question: Do you recall
2 about when that was with respect to the closing, was
3 it a week before, a couple weeks before, a month
4 before?
5      Answer: It might have been a month before
6 because the closing was, I think, January.
7      Was that your answer?
8 A Yes.
9 Q Does that refresh your recollection as to
10 what -- let me finish -- as to whether you met
11 Mr. Bigelow before the closing?
12 A It's possible. I -- this has been like
13 '98. It's 2004. I don't quite remember what was
14 what. That sounds, from reading it, yes.
15 Q What I'm trying to determine is, what was
16 what, today. Okay?
17 A I understand. But what I'm trying to
18 explain is, I -- I don't recollect things that
19 happened four or five years ago. I'm trying to
20 remember all that I can remember. It's possible --
21 I do remember him coming to the house, because he
22 went in my freezer.
23 Q What we're asking for, ma'am, is your best
24 recollection. Okay? So, does this refresh your
25 recollection about whether Mr. Bigelow -- whether

Page 94

1 you met him before the closing?
2 A Yes. He came out -- he -- that's when he
3 told me about the appraisal.
4      THE REPORTER: I need to change paper,
5 please.
6      MR. SCHWANTES: Let's take a quick break.
7      (Brief recess taken.)
8 BY MR. LEWIS:
9 Q You did remember him going in your
10 freezer?
11 A Yeah. Because I had two of them in the
12 basement, and he opened one of them.
13 Q But that was before the closing; is that
14 right, ma'am?
15 A I believe so, yes.
16 Q A couple -- I forgot to ask you a couple
17 questions about Exhibit 9. The $20,000 number
18 there, do you see that?
19 A Yes.
20 Q Who came up with that number?
21 A I didn't. Marfisi.
22 Q Marfisi came up with that number?
23 A (Nodding.)
24 Q Yes?
25 A Yes.

Page 95

1 Q Was that a negotiated number between you
2 and Marfisi?
3 A No.
4 Q Was that number explained to you by
5 Marfisi?
6 A He just told me that it was a cash amount
7 that I would be getting.
8 Q He didn't explain to you how he arrived at
9 that number, ma'am?
10 A No.
11 Q Did you ask Marfisi how he arrived at that
12 number?
13 A No.
14 Q At the end of that paragraph on Exhibit 9,
15 it says, 100 percent financing.
16 A Yes.
17 Q What did you understand that to mean?
18 A That they -- that he was going to help me
19 get my house back with -- to finance the property.
20 Q All right. So, it was your understanding
21 that Marfisi would help you repurchase your property
22 at 100 percent financing?
23 A Um-hmm.
24 Q Yes?
25 A Yes.

Page 96

1 Q When we're talking about 100 percent
2 financing, what was your understanding of what that
3 meant?
4 A I really don't get that.
5 Q You didn't have an understanding, at the
6 time, of what that is?
7 A No.
8 Q Did you ask Mr. Marfisi what that meant?
9 A When I -- when I talked to him about this
10 financing, I told him that my credit wasn't that
11 good for financing. And he told me he would
12 straighten it all out.
13 Q Marfisi told you he would straighten all
14 your credit out?
15 A Yes.
16 Q Well, I want to get back to this
17 100 percent financing a minute. So, are you saying
18 you really didn't understand what the 100 percent
19 financing meant?
20 A No.
21 Q You did not understand that?
22 A No.
23 Q Did you ask Marfisi to explain it to you?
24 A I don't think I did.
25 Q Now, when Mr. Bigelow came out to your

Bryant, et al. v. Bigelow, et al.   CondenseIt!   Dept. of Shardenia Bryant

Case 1:02-cv-00006-SAS   Document 38-9   Filed 10/01/2003   Page 4 of 22

Page 97

1  property, he had this contract with him, didn't he,
2  ma'am, Exhibit 9?
3     A  I believe so.
4     Q  What was your understanding, at that
5  point, in terms of what Mr. Bigelow's involvement
6  would be in this transaction?
7     A  That he -- I really don't know.
8     Q  You didn't know what his role would be --
9     A  Not --
10    Q  -- as of that point?
11    A  Not at that point.
12    Q  Did you understand that you would be
13 paying rent to Mr. Bigelow?
14    A  I understood I would be paying rent, but I
15 didn't -- at the moment, I didn't know to who.
16    Q  Now, this $20,000 that's mentioned in the
17 contract for purchase --
18    A  Um-hmm.
19    Q  -- yes --
20    A  Yes.
21    Q  -- did you have discussions with
22 Mr. Marfisi about when that 20,000 was going to be
23 paid to you?
24    A  I -- I don't believe so.
25    Q  You understood, though, didn't you, ma'am,

Page 98

1  that the 20,000 wasn't going to be paid to you at
2  the closing?  You understood that, didn't you?
3     A  I wasn't told that until we got to the
4  closing.
5     Q  Are you saying that you had an
6  understanding, before the closing, that $20,000 was
7  going to be paid to you at the closing?
8     A  Well, that was my assumption.  I wasn't
9  told anything any different, that I recollect.
10    Q  So, are you saying that you assumed, after
11 you signed Exhibit 9, that 20,000 would be paid to
12 you at the closing?
13    A  To my assumption.
14    Q  Okay.  You assumed that?
15    A  Yes.
16    Q  But nobody told you that?
17    A  No.
18    Q  Did you understand that Mr. Marfisi was
19 the one that was going to pay you that $20,000 cash
20 at the closing?
21    A  He didn't mention anybody else paying it
22 to me.
23    Q  He's the one that you had the contract
24 with; right?
25    A  Right.

Page 99

1     Q  So, was it your understanding, then, that
2  Mr. Marfisi was going to pay you the 20,000 at the
3  closing?
4     A  At that time.
5     Q  At the time you signed this contract;
6  right?
7     A  Yes, with him.
8     Q  Pardon?
9     A  With him.
10    Q  Yes?
11    A  Yes.
12    Q  Now, the closing on this transaction took
13 place on January 27th, 1998.  Does that sound right
14 to you?
15    A  Yes.
16    Q  Mr. Marfisi picked you up and took you to
17 the closing, didn't he?
18    A  Yes.
19    Q  Ma'am, if you look at Exhibit 4 that is in
20 front of you, it's a set of documents.  Do you have
21 that in front of you?
22    A  Yes.
23    Q  The very top page, which is marked, Bryant
24 622, down at the bottom, do you see that?
25    A  Yes.

Page 100

1     Q  Can you identify that promissory note?
2     A  Yes.
3     Q  That's a promissory note that Mr. Bigelow
4  signed; correct?
5     A  Yes.
6     Q  Were you given that promissory note on
7  January 27th, 1998?
8     A  Yes.
9     Q  It says, here, that -- well, you
10 understand that Mr. Bigelow, at that point, was
11 promising to pay you $19,000 without interest;
12 correct?
13    A  Yes.
14    Q  It also says that that amount shall be due
15 and payable within 60 days of the date of the note
16 or when the borrower has paid the amount due under a
17 note and mortgage, et cetera.  Do you see that?
18    A  Yes.
19    Q  So, as of the date of closing, was it
20 explained to you that the $19,000 would be paid
21 later?
22    A  Yes, when I got to this date.
23    Q  Then, who was explaining that to you?
24    A  The lawyer.
25    Q  Mr. Meckstroth?

Bryant, et al. v. Bigelow, et al.    Condenselt!™    Depo of Shirdenia Bryant

Case 1:02-cv-00006-SAS    Document 39-9    Filed 10/01/2003    Page 5 of 22

Page 101

1    A   Yes.
2    Q   Who was at the closing?
3    A   Pete, myself and Marfisi, and Meckstroth.
4    Q   Okay.  Was there some reason given to you
5  for why the $19,000 wasn't being paid that day?
6    A   Not that I recall.
7    Q   Well, did you ask Mr. Meckstroth why it
8  wasn't being paid that day?
9    A   No.
10   Q   Was that agreeable with you?
11   A   That I would receive it in 60 days?
12   Q   Yes.
13   A   Yes.
14       (Defendants' Exhibit 10 marked
15       for identification.)
16  BY MR. LEWIS:
17   Q   Ma'am, can you identify Exhibit No. 10,
18  please?
19   A   It's the seller's purchase list.
20   Q   That's a settlement statement; right?
21   A   Yeah.
22   Q   On page 2, did you sign that?
23   A   Yes.
24   Q   Was this document given to you on
25  January 27th, 1998?

Page 102

1    A   Yes.
2    Q   You signed this document at the closing;
3  right?
4    A   Yes.
5    Q   As far as you know, the transactions that
6  are itemized here, principal balance of mortgage
7  assumed, real estate taxes, fee paid, et cetera,
8  were those numbers -- do they accurately reflect the
9  transaction that occurred on January 27th, 1998?
10   A   It looks like the paper that I received.
11   Q   As far as you know --
12   A   Yes.
13   Q   -- it's accurate, isn't it --
14   A   Yes.
15   Q   -- ma'am?
16   A   Yes.
17   Q   Before you signed these documents at the
18  closing, Mr. Meckstroth explained all of these
19  documents to you, didn't he?
20   A   Yes.
21   Q   They were all explained by Mr. Meckstroth
22  to your satisfaction?
23   A   Yes.
24   Q   You didn't ask for any changes in any of
25  the documents that were presented to you, did you?

Page 103

1    A   No.
2    Q   As of the closing, then, you knew that you
3  were selling the property to Mr. Bigelow?
4    A   Yes.
5    Q   You understood that you would be leasing
6  the property back from Mr. Bigelow?
7    A   Yes.
8    Q   You received $1,000 -- a check for $1,000
9  at the closing, didn't you, ma'am?
10   A   Yes.
11       (Defendants' Exhibit 11 marked
12       for identification.)
13  BY MR. LEWIS:
14   Q   Ma'am, if you can identify Exhibit No. 11,
15  that's the check that you got at the closing;
16  correct?
17   A   Yes.
18   Q   Then the settlement statement, Exhibit 10,
19  that we talked about a minute before --
20   A   Yeah.
21   Q   -- refers to principal of promissory note,
22  19,000.  Do you see that?
23   A   Yes.
24   Q   That's the promissory note you received
25  from Mr. Bigelow; right?

Page 104

1    A   Yes.
2        (Defendants' Exhibit 12 marked
3        for identification.)
4  BY MR. LEWIS:
5    Q   Ma'am, can you identify Exhibit No. 12?
6    A   A deed.
7    Q   Right.  Is that the general warranty deed
8  that you signed on January 27th, 1998?
9    A   Yes.
10   Q   That's the deed that you signed at the
11  closing, isn't it, ma'am?
12   A   Yes.
13   Q   The witnesses there that -- Johnny Marfisi
14  and John Meckstroth?
15   A   Yes.
16   Q   You understood, by signing that deed, that
17  you were transferring ownership of the property to
18  Mr. Bigelow, didn't you?
19   A   Yes.
20       (Defendants' Exhibit 13 marked
21       for identification.)
22  BY MR. LEWIS:
23   Q   Ma'am, Exhibit 13, can you identify that?
24   A   This is a legal representation.
25   Q   Right.  Is that your signature on

Case 1:02-cv-00061SAS   Document 39-9   Filed 10/01/2003   Page 6 of 22

Page 105

1 Exhibit 13?

2   A  Yes.

3   Q  Did you sign this document at the closing?

4   A  Yes.

5   Q  This is one of the documents that was

6 explained to you, wasn't it, ma'am?

7   A  Yes.

8   Q  By signing this, didn't you understand

9 that Mr. Meckstroth solely represented Mr. Bigelow

10 and not you?

11   A  Yes.

12   Q  You also understood, as it says in that

13 last paragraph, that you were aware of your right to

14 seek your own lawyer and you've elected to proceed

15 without doing that; right?

16   A  Yes.

17   Q  Correct?

18   A  Yes.

19   Q  Now, after the closing, you had some

20 discussions with Mr. Marfisi, didn't you, about your

21 $19,000?

22   A  I didn't receive it.

23   Q  Try to listen to my question --

24     MR. SCHWANTES: That's not his question.

25   Q  -- ma'am. After the closing, you had some

Page 106

1 discussions with Mr. Marfisi about the $19,000,

2 didn't you?

3   A  It is -- I'm not getting what he's saying.

4   Q  I'll try to rephrase it. Maybe I'm not

5 being clear.

6     As of the closing, you received a

7 promissory note from Mr. Bigelow, right --

8   A  Right.

9   Q  -- promising to pay you $19,000?

10   A  Right.

11   Q  Right? You got that note?

12   A  Right.

13   Q  After that closing, after you got that

14 note, did you talk to Mr. Marfisi about that $19,000

15 and maybe Mr. Marfisi could help you invest it? You

16 with me now?

17   A  I'm with you now.

18   Q  That's what I'm asking you about.

19   A  All right. Let me explain this.

20   Q  Just try to answer my question.

21   A  I'm going to answer it.

22   Q  Okay.

23   A  Just, can I do it my way? It will come

24 out to your answer, though.

25   Q  The question is, did you have some

Page 107

1 discussions with Mr. Marfisi --

2   A  I had the discussions.

3   Q  -- about the $19,000? Yes, you did;

4 right?

5   A  (Nodding.)

6   Q  Now go ahead and explain.

7   A  Okay. I talked to him about the -- we

8 talked. I was saying that I wanted to invest the

9 19,000, because I wanted to open up a day care, a

10 senior day-care center. And that was -- I asked,

11 did he know how I could get a building to put the

12 day care in.

13   Q  Tell me when -- well, who initiated these

14 discussions about this day-care center and investing

15 in it?

16   A  The conversation came up in the car, on

17 the way down to Meckstroth's office.

18   Q  Oh.

19   A  We were talking. He asked me what I did.

20 And I told him I worked as a nurse's aide and that I

21 wanted to open up my own business as a -- with a

22 senior day-care center.

23   Q  Um-hmm.

24   A  That's how the conversation got started.

25   Q  So, Marfisi started the conversation on

Page 108

1 the drive down to the closing?

2   A  Yeah.

3   Q  Did he tell you, then, that you were going

4 to get a promissory note from Mr. Bigelow --

5   A  No.

6   Q  -- for 19,000?

7   A  No.

8   Q  Was Marfisi saying, well, you're going to

9 be getting this $20,000, let's talk about how to

10 invest it?

11   A  No.

12   Q  Well, tell me what you remember him

13 saying.

14   A  He just said he could -- what I remember

15 him saying is that he could help me, because there

16 was one of his family members was in the nursing

17 business. And that's where we went from there.

18   Q  So, you told Mr. Marfisi that you were

19 interested in, what, investing in a nursing home?

20   A  No, I wanted a day-care center.

21   Q  A day-care center. What, you wanted to

22 buy a day-care center?

23   A  No, I wanted to open up my own day-care

24 center.

25   Q  Okay. I think that's the same thing. I'm

Page 109

1  not -- you know --
2      A  No, I'm not -- you -- you buy -- if you
3  buy a day care, that's a different thing.  I'm not
4  buying a day care.  My center is where, if you got
5  your parents at home, or something, and you want
6  to -- you want some reprieve time --
7      Q  I see.
8      A  -- or some time to yourself, I would have
9  a bus or something come pick them up, they would
10  bring them to this building that I have -- or that
11  I'm renting, leasing, or whatever -- they would
12  bring the person there.  They would stay all day,
13  they would get a meal -- they would get two meals
14  there.  Then, in the evening, they will go back home
15  to you; or, if you're at work, they will come home.
16      Q  So, did you want to lease a building to
17  start that business?
18      A  Yes.
19      Q  So, you would need some money to do that?
20      A  Yes.
21      Q  Yes?  So, you told Mr. Marfisi that you
22  were interested in doing that?
23      A  Yes.
24      Q  Did you tell him you were interested in
25  doing that with the money you were going to receive

Page 110

1  from the sale of Laidlaw?
2      A  Yes.
3      Q  Then, Mr. Marfisi told you that he could
4  help you somehow?
5      A  In a sense, yes.
6      Q  Well, what do you remember -- what did
7  Marfisi tell you?
8      A  I can't remember, word for word, what he
9  said.  But, you know, he -- he talked -- when he
10  said that he had family members that was in that
11  type of work, that he would be -- that he could help
12  me probably get, you know, get started.  And that
13  was it.
14      Q  All right.  What did you understand that
15  to mean, when he said he could help you get started?
16      A  That since he knew somebody that was in
17  that business -- type of business, it -- you know,
18  it meant that there was a nurse available that could
19  help me.  That's the only thing I looked at it as.
20      Q  Well, at some point, did you start to have
21  discussions with Mr. Marfisi about him investing
22  your money for you?
23      A  I had mentioned that, you know, at the
24  closing, that I wanted to invest it.  I didn't say
25  turn it over to him.  I said I wanted to invest it

Page 111

1  and maybe he could help me invest it.
2      Q  You and Mr. Marfisi discussed a number of
3  ways to potentially invest your $19,000, didn't you?
4      A  Right.
5      Q  You did?
6      A  Yes.
7      Q  How many times do you think you talked to
8  Mr. Marfisi about ways to invest your $19,000?
9      A  We mainly talked about it that one day.
10      Q  Actually, didn't you talk to Mr. Marfisi
11  more than five times about ways to invest your
12  $19,000, ma'am?
13      A  I don't remember talking to him more
14  than -- I remember talking to him, but I don't know
15  if it was five times --
16      Q  Why don't you look at page 58 of your
17  deposition.  Actually, start at page 57, would you?
18  If you start at page (sic) 22, you're being asked
19  about Marfisi's discussions here.
20          Line 22:  Marfisi invested my money, okay,
21  but I did not say turn my check over to him.
22          Do you see that answer?
23      A  Yes.
24      Q  Then, question:  And so you discussed with
25  Mr. Marfisi that one occasion.  What other occasions

Page 112

1  did you discuss Mr. Marfisi about how to invest your
2  money?
3          Answer:  There were a number of times we
4  had talked on the phone about him doing investments
5  and things, but I don't know exactly what month
6  or --
7          Question:  Sure.
8          Answer:  -- or the dates but it was a
9  number of times that we talked.
10          Do you see that?
11      A  Yes.
12      Q  Then you were asked:  More than five?
13          Answer:  Yeah.
14      A  Well, that could be.  I don't remember.
15      Q  Well, is it --
16      A  This one -- this deposition was taken in
17  2000.  This happened in '98.  I don't remember for
18  sure.
19          I know I did -- we talked about him
20  investing money, but I still didn't say give him my
21  check.
22      Q  Well, we'll get to that.  All right,
23  ma'am?  This was your testimony at the time, wasn't
24  it?
25      A  Yes, at the time.

Page 113

1    Q  This was closer to the events than now.
2  Your recollection would have been better then,
3  wouldn't it, ma'am?
4    A  It would have been.  But when you think
5  about things like -- when you think something is
6  gone, then you just try -- you try to go ahead on
7  and put it out your mind.  And I thought it was
8  gone, so that's what I did.
9    Q  Okay.  So, in terms of what your testimony
10  was then, though, the number of times you talked to
11  Mr. Marfisi about doing investments for you, you
12  said then that it was somewhere between five and ten
13  times; correct?  If you look at line 16.
14    A  It says I doubted about the 10.
15    Q  Right.  It says:  More than ten?
16       Answer:  I doubt that.
17       So somewhere between five and ten times --
18       Answer:  Yes.
19    Q  Now, it's possible, but I -- it could have
20  been.  I'm not for sure.
21    Q  Was that your testimony then, ma'am?
22    A  Yes, but I wasn't for sure then.
23    Q  That's what you said then, though, when
24  you were asked about this, isn't it?
25    A  That's what I said then, but I wasn't for

Page 114

1  sure.
2           (Defendants' Exhibit 14 marked
3           for identification.)
4  BY MR. LEWIS:
5    Q  Ma'am, if you would, look at Exhibit 14.
6  Can you identify that?
7    A  Yeah, it's a promissory note.
8    Q  That's a promissory note signed by John
9  Marfisi; right?
10    A  All right.
11    Q  It's an identical note, same thing as what
12  Mr. Bigelow signed, but this one has got John
13  Marfisi's signature instead of Mr. Bigelow's; right?
14    A  Right.
15    Q  Were you given this promissory note?
16    A  No.
17    Q  You were not given this promissory note?
18    A  No.
19    Q  Would you look at page 48 of your
20  deposition transcript, ma'am?  Actually, go to page
21  47, line 18.  And you said something about a note
22  signed by Marfisi?  Do you see that question?
23    A  Yes.
24    Q  You answered:  Yes.
25       Question:  Explain that to me.

Page 115

1       Answer:  It was a promissory note that was
2  presented to me.
3       Is that what you said then, ma'am?
4    A  Yes.
5    Q  So, this note was presented to you?
6    A  It was presented to me at Meckstroth's
7  office.
8    Q  All right.  It was signed by John Marfisi?
9    A  Yes.
10    Q  The next question:  Mr. Marfisi gave you a
11  promissory note?
12       (Witness nods head.)
13       She has to take down your answer.
14       The answer is:  Yes.
15       And that was for $19,000?
16       Yes.
17       That was your testimony then?
18    A  The promissory note, I did not -- I did
19  not have a copy of this promissory note from John
20  Marfisi.  I didn't see this promissory note until I
21  got to Meckstroth's office.  That's the first time I
22  ever seen it.
23    Q  So, are you saying, ma'am, that you got
24  promissory notes from Mr. Bigelow and from
25  Mr. Marfisi, at the closing?

Page 116

1    A  I did not get this at the closing.  I did
2  not see this at the closing.  The only note --
3  promissory note that I got at the closing is the one
4  that I got from Pete Bigelow.  That's the only one.
5    Q  Okay.
6    A  This one, I didn't know anything about
7  until I went down to Meckstroth's office, because I
8  kept complaining because I did not get my money and
9  I was not informed of my money.
10    Q  We need to be clear on what you're saying.
11  So, you're telling us that you got the promissory
12  note from Mr. Bigelow on the date of the closing --
13    A  That's right.
14    Q  -- right?  Okay.  We already talked about
15  that.  Now, I'm asking you about Exhibit No. 14.
16    A  And I'm telling you about Exhibit 14.
17    Q  Did you --
18    A  I did not see this note until I got to
19  Meckstroth's office.
20    Q  Okay.  That's what I want to talk to you
21  about.  Did you ever receive Exhibit 14, ma'am, the
22  note signed by John Marfisi?
23    A  You're saying that I received it.  No, I
24  did not receive it.  I -- they showed it to me at
25  Meckstroth's office.

Page 117

1  Q  Did you get Exhibit 14 at Meckstroth's
2  office?
3  A  Yes.
4  Q  Yes.  When?
5  A  Some months later.
6  Q  All right.  That's what I'm getting to.
7  Tell me -- so, tell me --
8  A  You didn't -- you need to explain it more
9  better.
10  Q  All right.  I'm trying.  Really, I want to
11  be clear.  If I'm not clear, you need to ask me.
12  So, Exhibit 14, you received at John
13  Meckstroth's office some months after the closing?
14  A  Yes.
15  Q  At the time that Exhibit 14 was given to
16  you, was it signed by John Marfisi?
17  A  When I seen it, yes.
18  Q  Who was there when you got Exhibit 14?
19  A  I believe my daughter, Pete, and
20  Meckstroth.
21  Q  Was Marfisi there?
22  A  No.
23  Q  Who was explaining to you why you were
24  getting this promissory note?
25  A  Meckstroth explained that Pete didn't owe

Page 118

1  me that, Marfisi did.
2  Q  Had you had some discussions with
3  Mr. Bigelow -- now, between the time of the closing
4  and the time you got Exhibit 14 -- you with me --
5  there is a period of time there.
6  A  Yes.
7  Q  During that time, had you talked to
8  Mr. Bigelow about the promissory note?
9  A  I called him and was asking him about my
10  money because I didn't receive it.
11  Q  What did Mr. Bigelow tell you?
12  A  He told me he didn't have it.  He told me
13  to talk to Marfisi -- to Marfisi, because he had
14  gave Marfisi the check for some amount.  I don't
15  know.
16  Q  Well, actually, before you got this
17  promissory note, Exhibit 14, from Mr. Marfisi,
18  didn't you tell Mr. Bigelow that Marfisi was going
19  to invest your money for you and that Bigelow should
20  pay the money to Marfisi?
21  A  No, I did not.
22  Q  You did not say that?
23  A  If I had did that, why would I call him
24  and ask him where's my check.  I was not informed
25  that he had gave my check to Marfisi.

Page 119

1  Q  Did you tell Mr. Marfisi that he could
2  invest your money for you?
3  A  I don't remember him saying, point blank,
4  that he was going to invest it.
5  Q  Ma'am, if you look at page 57 of your
6  deposition --
7  A  I just looked at it.
8  Q  Okay.
9  A  But I don't remember saying, point blank
10  -- the answer says:  Marfisi invest my money, okay,
11  but I did not say turn my check over to him.
12  Q  All right.  And then, if you look at the
13  questions up at the line 17:  We were at the what?
14  Answer:  We were at the lawyer's office
15  and I talked about investing in.  I said, I would,
16  you know, let him invest my money.
17  Was that your answer then, ma'am?
18  MR. SCHWANTES:  Where are you reading
19  from?
20  THE WITNESS:  Line --
21  MR. LEWIS:  Page 57, lines 18 through 20.
22  BY MR. LEWIS:
23  Q  Was that your answer then, ma'am?
24  A  Yeah.
25  Q  That was your answer then --

Page 120

1  A  Yeah.
2  Q  -- wasn't it, ma'am?
3  A  But did it say I said give him the check?
4  No.
5  Q  Didn't you have an understanding, ma'am,
6  after talking to Mr. Marfisi, that it was Marfisi
7  that was going to pay you the $19,000 instead of
8  Mr. Bigelow?
9  A  No.
10  Q  Look at page 53 of your deposition, at
11  line 19.  Question:  You were showed a promissory
12  note?
13  Answer:  A promissory note that I had
14  signed that the money went to Marfisi, that he would
15  pay me.
16  Question:  That Marfisi would pay you the
17  19,000 instead of Mr. Bigelow?
18  Answer:  Yes.
19  Was that your testimony then, ma'am?
20  A  That's what I was shown.
21  Q  That's what your testimony was then,
22  ma'am, wasn't it, that Marfisi would pay you the
23  19,000 instead of Mr. Bigelow?
24  Answer:  Yes.
25  That's what you said, isn't it, ma'am?

Page 121

1    A  Yes.  Can I explain that?

2    Q  Sure.

3    A  Okay.  They showed me a note at the
4  office.  They showed me this (Exhibit 14).  Then
5  they showed me -- I had this one (Exhibit 4).
6  Then -- since you haven't got to it, I'm going to
7  get it -- they showed me this.  I did not -- they
8  had me -- Marfisi had me sign a piece of paper.  He
9  just said, write your signature here.  It wasn't --
10 it wasn't -- it was blank up here (indicating).  I
11 signed -- I just signed my name.

12         It did not say, paid in full, to release
13 Pete Bigelow from the 19,000.  I didn't find out
14 nothing about none of this until I went to
15 Meckstroth's office.  That's when I found out all
16 this.

17   Q  All right.  So, you're talking about the
18 period of time which you thought was a couple months
19 or so after the closing; right?

20   A  Yeah.

21   Q  That's what we're talking about here,
22 ma'am.  So, as of that time, then, you --

23   A  I was under the impression he was paying
24 me 19,000.

25   Q  Before then, right.  But then, that second

Page 122

1  time you went to Meckstroth's office, these
2  additional documents got signed, didn't they?

3    A  That's when I was shown this (Exhibit 14)
4  paper here.

5      MR. SCHWANTES:  Which is Plaintiffs'
6  Exhibit 14, for the record.

7      MR. LEWIS:  Right.

8    A  I was shown this paper here.  That's when
9  I was showed that.  And that's when I said I didn't
10 know anything about it, nobody gave me a copy of it,
11 nobody even mentioned it to me.  I was not called or
12 informed that my check was given to Marfisi.  Which
13 that's when I raised sin about it in the lawyer's
14 office.  Why wasn't I told or why wasn't I asked
15 about whether to give him my check or not.

16   Q  Well, before then, ma'am, you had told --
17 before you went down to that -- the second visit --
18 let's call this the second visit to Mr. Meckstroth's
19 office -- you had told Marfisi to invest your money,
20 hadn't you?

21   A  I told him I wanted him to invest it.  I
22 didn't tell him to take the check.  Wanting and
23 giving him the check is two different things.  If I
24 wanted to invest it, I could have gave him the check
25 myself or I would have went with him to see what he

Page 123

1  was investing my money in, not just hand him over my
2  19,000.  We don't flow like that.

3    Q  Did you tell Mr. Bigelow that, that you
4  had told Mr. Marfisi to invest your money?

5    A  No.

6    Q  You didn't tell him that?

7    A  No.

8    Q  But it's clear, you had told Mr. Marfisi
9  that you wanted him --

10   A  We were sitting there --

11   Q  -- ma'am, you need to let me finish.  It's
12 clear, you had told Mr. Marfisi that you wanted him
13 to invest your money; we can agree on that, right?

14   A  The answer to your question, again, is, we
15 discussed all this sitting right there in the
16 lawyer's office.  And I told him I wanted him to
17 invest it.  I didn't say to give him my check.

18   Q  Okay.  So, you had told Mr. Marfisi you
19 wanted him to invest your money; right?

20   A  I told him I wanted him to invest.

21   Q  Thank you.  Now, did you tell -- did you
22 tell Mr. Bigelow that?

23   A  No.  He was sitting right there in the
24 office.

25   Q  Well, these five to ten conversations that

Page 124

1  you had with Mr. Marfisi about investing your money,
2  when did those take place?

3    A  It was in between waiting on the check.  I
4  didn't even know the check had been issued, or
5  anything.

6    Q  Did you instruct Mr. Bigelow to pay your
7  $19,000 to Mr --

8    A  No.

9    Q  I didn't even finish that question, ma'am.
10 Ma'am?

11     MR. SCHWANTES:  Let him finish his
12  question.

13   Q  Did you instruct Mr. Bigelow to pay your
14 $19,000 to Mr. Marfisi?

15   A  No.

16         (Defendants' Exhibit 15 marked
17          for identification.)

18 BY MR. LEWIS:

19   Q  Ma'am, you have Exhibit 15 in front of
20 you.  Can you identify that?

21   A  It's a lease agreement.

22   Q  That's your signature, isn't it, ma'am --

23   A  Yeah.

24   Q  -- at page 5?  Now, this shows
25 January 6th, 1999 as -- on page 1 -- as the date

Page 125

1 that it was entered into. Do you see that?
2    A  Yeah.
3    Q  Is that date accurate?
4    A  I guess that's the 6th. Yeah. It look
5 like a 4 to me.
6    Q  This is the lease agreement that you
7 entered into with Mr. Bigelow; correct?
8    A  Yes.
9          (Defendants' Exhibit 16 marked
10          for identification.)
11 BY MR. LEWIS:
12    Q  Ma'am, can you identify Exhibit No. 16?
13    A  It's a release.
14    Q  That has your signature on it, doesn't it,
15 ma'am, page 2?
16    A  Yes.
17    Q  This is also dated January 6th, 1999?
18    A  Yes.
19    Q  Who prepared this document?
20    A  Meckstroth.
21    Q  Is this one of the documents that he
22 explained to you before you signed it, ma'am?
23    A  Yes.
24    Q  You understood what this document meant
25 when you signed it, didn't you?

Page 126

1    A  Yes. Now, can I explain why I signed it?
2    Q  Yes, you can.
3    A  Okay. Let's go to the lease agreement
4 first, 15. All right. With the lease, I was -- on
5 the lease -- and since I had kept calling him about
6 my money which I did not receive and was not
7 informed that it was issued, I had to agree to go up
8 -- go up under a lease with him for the rent on the
9 house that I was leasing to be raised to $500 a
10 month, where I had to pay 250 every two weeks. So,
11 I had to sign this or either be put out my house.
12 So, I went ahead and agreed to it and signed it, to
13 keep from having to move. That was on 15.
14        The release was also along with that,
15 because I had got behind $600. So, he gave me a
16 check for $2,000, and I had to sign this release
17 that would -- releasing him from owing me the
18 19,000, which, like I explained to them down at the
19 office, I was not informed that the check was
20 issued, that it had been transferred over to
21 Marfisi. I did not sign a promissory note, paid in
22 full, and that I was hoodwinked out of my money. I
23 was also -- I also told him that it was not fair,
24 because I did not even get the equity that was in my
25 house at the time.

Page 127

1    Q  Okay, we'll get to that.
2    A  So -- I --
3    Q  Ma'am, the release, Exhibit No. 16?
4    A  I'm --
5    Q  Go ahead. Let me know when you're
6 finished.
7    A  I had to pay -- I gave him $600 -- I wrote
8 him a check for $600 that day, when he gave me that
9 $2,000, because he was going to take the 600 out of
10 the 2,000. I wrote him a check for $600 that day
11 that I got the 2,000. I gave him 6 -- a check for
12 $600, which was paid -- that brought my -- paid my
13 back. And then all I had to start paying was $250
14 every two weeks for rent, up until the time I bought
15 the house back.
16    Q  Are you finished?
17    A  Um-hmm.
18    Q  On Exhibit 16 --
19    A  Yes.
20    Q  -- it says, in paragraph 3, Bigelow's
21 responsibility under said promissory note has been
22 previously transferred to John Marfisi and the
23 original promissory note was marked paid in full.
24 Do you see that?
25    A  Yes.

Page 128

1    Q  That's how this document read when you
2 signed it; right, ma'am?
3    A  Yes.
4    Q  You understood what that meant, at the
5 time you signed this release?
6    A  Like I just said, I had a choice, either
7 sign it or either get put out of my house, or the --
8 I wasn't about to be evicted. And since they had a
9 promissory note which they claimed that I signed,
10 paid in full, and couldn't nobody prove that I
11 signed, paid in full, I had no other choice. And I
12 didn't want to be put out of my house. I didn't
13 want to be evicted.
14    Q  You're saying somebody forced you to sign
15 Exhibit 16?
16    A  I'm not saying I was -- I was forced. But
17 it was the way it was put to me.
18    Q  So, you made a choice --
19    A  Yes.
20    Q  to sign Exhibit 16 --
21    A  Yes.
22    Q  -- right? At that point, when you signed
23 Exhibit 16, you had Exhibit 14, which is a
24 promissory note from John Marfisi; right?
25    A  No, I didn't have it. Bigelow had it.

Page 129

1  Q  Well, was that -- was this given to you
2  Exhibit 14 given to you at the same time Exhibit 16
3  was given to you?
4  A  Yes.
5  Q  All right.
6  A  It was presented to me. It wasn't given
7  to me, because I never had a copy of it or seen it
8  until then.
9          (Defendants' Exhibit 17 marked
10         for identification.)
11 BY MR. LEWIS:
12  Q  Ma'am, Exhibit 17 is in front of you. Is
13 that your signature?
14  A  Yes.
15  Q  Are you testifying that when you signed
16 that, that, Paid in Full, wasn't written in there
17 when you signed it?
18  A  Yes, I am.
19  Q  That's what you're saying?
20  A  I swear on a stack of bibles, it was not
21 there.
22  Q  So, why are you signing a promissory note
23 that Mr. Big -- now, let me finish. You're getting
24 ready to interrupt me. We've already talked about
25 this promissory note. The original was signed by

Page 130

1  Mr. Bigelow on January 27th of 1998, right --
2  A  Right.
3  Q  -- at the closing?
4  A  Right.
5  Q  Now you're saying, you signed it at some
6  point later. What, was it January 6th?
7  A  No. I did not sign this on January the
8  6th.
9  Q  When did you sign Exhibit 17, ma'am?
10  A  The paper I signed was not a promissory
11 note.
12  Q  Ma'am, Exhibit 17 has your signature. You
13 with me?
14  A  Sir, are you with me right now?
15  Q  I'm really not.
16  A  I'm not -- I did not sign a promissory
17 note. I -- it has my signature, but I did not sign
18 a promissory note paid in full.
19  Q  Did you sign Exhibit 17?
20  A  I signed a paper. It was not a promissory
21 note.
22  Q  Did you sign Exhibit 17, ma'am?
23  A  No.
24  Q  You did not?
25  A  No.

Page 131

1  Q  So that's not your signature on
2  Exhibit 17?
3  A  That's my signature. I did not sign a
4  promissory note.
5  Q  You need to listen to my question. Okay?
6  A  You're asking me, did I sign this. Right?
7  Q  I'm asking you, did you sign that
8  document --
9  A  I didn't --
10  Q  -- Exhibit 17?
11  A  I signed a paper. It was not a promissory
12 note.
13  Q  Okay. I think you're getting hung up on
14 the language here of legal characterization. You've
15 got a document in front of you, ma'am, Exhibit 17,
16 that's got your signature on it; right?
17  A  Yes.
18  Q  Did you sign Exhibit 17?
19  A  No.
20  Q  So, you're claiming somebody else put your
21 signature on that document; is that right?
22  A  I signed a paper, like I'm trying to
23 explain. I signed a paper. It was not a paper
24 like -- that said this across it. I was told to
25 sign a paper. I signed the paper. When I signed

Page 132

1  the paper, next thing I know I'm seeing this paper
2  that says it was a promissory note from Pete, paid
3  in full.
4  Q  So, you're saying that signature on
5  Exhibit 17, you didn't put your signature there?
6  A  I didn't put it on this.
7  Q  You didn't put it on Exhibit 17; right?
8  A  Right.
9  Q  Somebody else did?
10  A  Yes. It could be transferred.
11  Q  Ma'am, look at page 50 of your deposition
12 transcript. You're being asked there about
13 Exhibit 2, which is the promissory note that we're
14 talking about here. It's the same note, Exhibit 14.
15 You with me?
16  A  (Nodding.)
17  Q  Yes?
18  A  Yes.
19  Q  All right. So you're being asked about
20 that note in your deposition. The question, if you
21 start at page 49: Showing you what's been marked as
22 Plaintiffs' Exhibit 2, do you recognize that?
23      And your answer was: Yes.
24      Right?
25  A  Yeah.

## Page 133

1  Q  Then it goes on, there are some more
2 questions about that.  It says:  Does that look like
3 the promissory note that you received on the closing
4 on the 27th?
5      Answer:  Yes.
6      And written on there is paid in full; is
7 that correct, is that right?
8      Answer:  Yes.
9      And underneath that is a signature?
10     Answer:  Yes.
11     Whose signature is that?
12     Answer:  That's my signature.
13  A  Yes.
14  Q  That's what you said at that time, isn't
15 that, ma'am?
16  A  Yes.
17  Q  So, you identified that as your signature
18 in your prior -- let me finish -- you identified
19 that as your signature in your prior deposition,
20 didn't you, ma'am?
21  A  Yes.
22  Q  Then the next question:  And when did you
23 sign paid in full on that document?
24     Answer:  I have no idea.
25     Was that your prior testimony?

## Page 134

1  A  Yes.
2  Q  Then you were asked:  But you did sign
3 paid in full on that document?
4      Answer:  I signed it.  I did not write
5 paid in full.
6      Is that what you said then, ma'am?
7  A  Yeah, that's probably -- that's what I
8 said.
9  Q  Right.  So, you admitted signing that
10 document in your prior deposition --
11  A  I -- I admit --
12  Q  -- didn't you, ma'am?
13  A  I said I signed a paper --
14     MR. SCHWANTES:  I'm going to object.
15  A  -- but I didn't say it was -- they said
16 the document, I didn't.
17     MR. SCHWANTES:  I'm going to object, just
18     to the extent that, at page 52, adds to your
19     answer on page 51, as to what you signed.
20     MR. LEWIS:  Right.
21  Q  And, ma'am, and further on page 51, you
22 were asked the question:  You are saying that
23 someone wrote paid in full above that when you
24 signed it?
25     Answer:  When I signed this, paid in full

## Page 135

1 was not on there.  That was your testimony then,
2 wasn't it, ma'am?
3  A  Yes.
4  Q  Now, let's get back to Exhibit 17.  What's
5 your understanding of why you signed that document,
6 ma'am?
7      MR. SCHWANTES:  Objection.  She's
8      testified she did not sign that document.
9      MR. LEWIS:  Well, she's testified -- she
10     has contradictory testimony.  And I'm asking
11     her, what's her understanding of why she signed
12     it, because she said in her prior deposition
13     she did.
14 BY MR. LEWIS:
15  Q  Based on that testimony, ma'am, what's
16 your understanding of why you signed Exhibit 17?
17     MR. SCHWANTES:  Objection.
18  A  I was asked to sign a paper.  I did not
19 see that part of the paper.  I was just asked to
20 sign it.  It was just presented to me like this, and
21 said sign that -- would you sign your name here.  I
22 did not see none of this part.
23  Q  So, you were asked to sign a piece of
24 paper, and then part of Exhibit 17 was hidden from
25 you; is that what you're saying?

## Page 136

1  A  Yes.
2  Q  Who was hiding it from you?
3  A  Marfisi had me sign the paper.
4  Q  So, Mr. Marfisi presented Exhibit 17 to
5 you, and he had -- he had a piece of paper over it
6 so you couldn't see what was written on it; is that
7 right?
8  A  He just asked me to sign -- he just asked
9 me to sign my name.  So, I just signed my name.  And
10 what it was -- it was like a blank piece of paper.
11 And I said, sign it where?  He says, anywhere, just
12 sign.  I did not see promissory note.  I wouldn't
13 have signed no notes.
14  Q  All right.  So, you didn't see what the
15 writing was on Exhibit 17, when you signed it?
16  A  No.
17  Q  Marfisi said to you, here, just sign this
18 piece of paper?
19  A  It was just a piece of paper that he asked
20 me to sign.
21  Q  And you did, without asking any questions?
22  A  A blank piece of paper.  I didn't think
23 nothing of a blank piece of paper.
24  Q  Why did you think Marfisi was asking you
25 to sign a blank piece of paper?

Page 137

1  A  I don't know.
2  Q  Don't know?  You understand, now, ma'am,
3  don't you, that Marfisi was paid the $19,000 that
4  originally was going to come from Mr. Bigelow?
5  A  Yes.
6  Q  You understand that now, don't you?
7  A  Yes.
8  Q  You've alleged in this lawsuit that there
9  is a scheme that was perpetrated against you.  The
10  scheme that you're alleging is that you weren't paid
11  that $19,000; is that correct?
12  A  Yes.
13  Q  Why didn't you sue Mr. Marfisi in this
14  lawsuit?
15  A  If I could find him, I would.
16  Q  What have you done to try to find him,
17  ma'am?
18  A  Well, at first, when I couldn't get my
19  money and I had -- end up signing this promissory
20  note, I asked around for people who knew him.  I
21  asked Roscanne Christian if she knew where to find
22  him at, and she didn't know.
23  Q  Well, he's got the $19,000, and you didn't
24  sue him.  That's the bottom line, isn't it, ma'am?
25  A  Yes.  But the thing about it is, the

Page 138

1  19,000 shouldn't have went to him.  I should have
2  been informed.
3  Q  Now, let's talk about when you purchased
4  your property back from Mr. Bigelow.  You did buy
5  the property back from Mr. Bigelow; right?
6  A  Yes.
7  Q  That was in about June of 2000.  Does that
8  sound about right to you?
9  A  Yes.
10  Q  The reason that it was done -- was there
11  some reason that it occurred about a year after the
12  lease agreement was entered into?
13  A  No.
14  Q  That was just coincidence?
15  A  Yes.
16  Q  Well, the contract of purchase says,
17  Seller will lease option property for $200 a month
18  for one year.
19  A  Yes.
20  Q  Does that refresh your recollection about
21  why you would have been buying the property after
22  about a year?
23  A  Yes.
24  Q  Because that's what the contract to
25  purchase said; right?

Page 139

1  A  Yes.
2  Q  So, when you got ready to do this
3  transaction with Mr. Bigelow, did you talk to a
4  lawyer?
5  A  No.
6  Q  So, when you purchased the property, you
7  had to finance the property, didn't you?
8  A  Yes.
9  Q  You got financing --
10  A  Yes.
11  Q  -- right?
12      (Defendants' Exhibit 18 marked
13      for identification.)
14  BY MR. LEWIS:
15  Q  Ma'am, I'm showing you what's been marked
16  for identification as Defendants' Exhibit 18.  Can
17  you identify that?
18  A  That's the papers.
19  Q  That's the foreclosure --
20  A  Foreclosure.
21  Q  That's the foreclosure complaint that was
22  filed in 2001 against you, wasn't it --
23  A  Yes.
24  Q  -- by Wells Fargo Bank?
25  A  Yes.

Page 140

1  Q  Attached to Exhibit 18, there is a
2  promissory note.  Do you see that adjustable rate
3  note?  It's the last 3 pages.
4  A  Yes.
5  Q  Is that your signature at page 3 of that
6  note?
7  A  Yes.
8  Q  Forgive me if I asked you before.  But you
9  didn't consult a lawyer before you signed that
10  promissory note, did you, ma'am?
11  A  No.
12  Q  Now, after you signed the note, what were
13  your monthly payments supposed to be?
14  A  $597.43.
15  Q  597?
16  A  Yes.
17  Q  What were your monthly payments under the
18  lease agreement?
19  A  500 a month.
20  Q  You were able to make those monthly
21  payments to Mr. Bigelow, weren't you, the $500 a
22  month?
23  A  Yes.
24  Q  You were current --
25  A  Yes.

Page 141

1  Q  -- as of the time you bought the property
2 back; right?
3  A  Yes.
4  Q  So, the monthly payments, then, to the
5 bank were going to be 597 --
6  A  Yes.
7  Q  -- right?  How many payments did you make
8 to the bank, before they filed the foreclosure?
9  A  It's almost a year, I think it was.
10  Q  Well, this was filed in November of 2001.
11  A  No, not quite a year -- yeah, a little
12 over a year.
13  Q  Well, when did you start falling behind on
14 your mortgage payments?
15  A  Just about the time I lost my job.
16  Q  When did you lose your job, ma'am?
17  A  A little before I lost it -- I lost my job
18 in October of -- was it October of 2001 -- October
19 of 2001.  So, just before I lost my job, I got
20 behind.
21  Q  Well, that was --
22  A  About October.
23  Q  You probably lost your job just trying to
24 put this together in 2000, didn't you?
25  A  Yes.

Page 142

1  Q  Not 2001?
2  A  Yes.
3  Q  Because this complaint was filed in
4 November of 2001.  So, there would have been a
5 period of time when this problem was developing;
6 right?
7  A  Yes.
8  Q  So, does that make more sense to you, that
9 you would have lost your job in October of 2000?
10  A  Yeah.
11  Q  That would have been about four months
12 after you bought the property?
13  A  No.  I didn't lose my job, actually, until
14 October.  It was just trying to make the -- make the
15 payments plus the gas and electric and --
16  Q  But you were able to do all that until you
17 lost your job; right?
18  A  Yeah.
19  Q  Then, the reason you couldn't make the
20 mortgage payments to Wells Fargo Bank was because
21 you lost your job --
22  A  Yes.
23  Q  -- right?
24  A  Right.
25  Q  Then, how long were you out of work?  Were

Page 143

1 you out of work until this property got sold in
2 foreclosure?
3  A  I was out of work until -- well, I had --
4 let's see -- I had surgery in 2001.
5  Q  I'm sorry.  What?
6  A  I had surgery in 2001.  I was out of work
7 until -- let me back up.  No, I lost my job October
8 the 2nd, 2001.  I was out of work from then until I
9 had surgery in January of 2002.  And then I went
10 back to work in April of 2002.
11  Q  When this complaint for foreclosure got
12 filed, which was November of 2001, okay, how long
13 had you been out of work?
14  A  About a month.  I was still working.
15  Q  Well, before the bank filed a complaint,
16 they must have been sending you letters about the
17 mortgage isn't current, weren't they?
18  A  Yes.
19  Q  So, when did that start?  You bought the
20 property in June of 2000; right?
21  A  Yes.
22  Q  We can agree on that?
23  A  It started like the early part of 2000 --
24 I guess, 2001.
25  Q  All right.  So, you started having

Page 144

1 problems making the mortgage payments in early
2 2001 --
3  A  Yes.
4  Q  -- right?  Now, were you working at that
5 time --
6  A  Yes.
7  Q  -- early 2001?
8  A  Yes.
9  Q  So, why were you having problems making
10 the mortgage payment?
11  A  Because I had -- I was trying to catch --
12 I had to try and catch up on my gas and electric
13 bill -- I had got behind in it -- and trying to pay
14 other bills that I owed to keep from getting either
15 bankrupts or having -- getting sued.
16  Q  So, you were having some other financial
17 problems, some other financial difficulties?
18  A  Yes.
19  Q  So, that caused you to be unable to make
20 your mortgage payment; right?
21  A  Yes.
22  Q  Now, once this lawsuit got filed, you
23 didn't go talk to a lawyer; right?
24  A  No.
25  Q  You didn't hire a lawyer --

Page 145

1   A  No.
2   Q  -- right?  You didn't file any papers with
3  the court, did you?
4   A  I -- I tried to get -- I tried to draw my
5  pension money down to get the house back, but I
6  think, by the time I got the pension check, it was
7  too late to buy the house back out of foreclosure.
8   Q  So, you didn't file any papers with
9  the court, did you --
10   A  No.
11   Q  -- on this foreclosure complaint?  Do you
12  know that a default judgment was entered against
13  you, ma'am?
14   A  Yes.
15   Q  You understand that, don't you?
16   A  Yes.
17   Q  So, then, after that default judgment, the
18  property was sold, wasn't it, through sheriff's
19  sale?
20   A  Yeah.
21   Q  Were you physically evicted from this
22  property?
23   A  No.
24   Q  At what point did you move out, what
25  period of time?

Page 146

1   A  I moved out around the 5th of September.
2   Q  Of 2002?
3   A  Yes.
4   Q  That was about -- well, the court had
5  issued an order that the new owners could take
6  possession August 5th, 2002.  Does that sound about
7  right to you?
8   A  I guess.  I don't know.
9   Q  Well, when you moved out, you knew
10  somebody else had bought the property out of
11  sheriff's sale and you were going to have to leave;
12  right?
13   A  Yeah.
14   Q  Had you made any payments, at all, to the
15  bank, between November of 2001 and when you moved
16  out?
17   A  No.
18   Q  No?  So, you still -- is there a judgment,
19  a money judgment, taken against you by Wells Fargo
20  Bank?
21   A  Not that I know of.  I don't know.  I
22  haven't received any mail.
23   Q  Well, do you owe them money for unpaid
24  mortgage payments?
25   A  I don't know.

Page 147

1   Q  Okay.  You believe you do?
2   A  Probably so.
3   Q  Probably?
4   A  I don't think I should pay it, if I do owe
5  it.
6   Q  Why don't you think you should pay them?
7   A  Because I didn't take the loan out on the
8  house for 54,000.  I got hoodwinked into paying
9  another loan that wasn't mine.
10   Q  So, somebody -- you mean, that promissory
11  note -- take a look at Exhibit 18, would you?  You
12  have -- it's right there on top.  That's a
13  promissory note for 64,000.  Do you see that?
14   A  Yes.
15   Q  So, somebody hoodwinked you into signing
16  that note?
17   A  No.
18   Q  So, why don't you think you owe the bank
19  money on that note?
20   A  Okay.  Because, if my house was appraised
21  at 44,000, the price was jacked up to 64,000, it was
22  a loan taken out for 50 some thousand which I ended
23  up paying -- which I think this 64,000 is part of
24  the loan that I ended up paying, plus another
25  thousand that I was supposed to pay -- I don't think

Page 148

1  I should pay it.
2   Q  Well, somebody at the bank prepared that
3  promissory note, didn't they, ma'am?
4   A  Yeah, somebody at the bank, which I think
5  was probably in with the mortgage company.
6   Q  You think -- so, you think Wells Fargo
7  Bank was part of this scheme?
8   A  I think -- I think -- could have been.
9   Q  You know you're part of this lawsuit, you
10  asserting fraud claims against my client,
11  Mr. Bigelow?  Do you understand that?
12   A  Yes.
13   Q  Tell me what he did to defraud you as part
14  of this transaction?
15   A  My house had equity in it.  I did not
16  receive none of the equity that was in my house.  I
17  did not get notified of the 19,000, which I think
18  him and Marfisi hoodwinked me out of, which I should
19  have been notified to whether to give him a check
20  for me or to see if I wanted to come and pick up my
21  check, or what, or have it mailed to me or
22  deposited, or whatever.  I was not notified.  I was
23  not called.  There's not a letter.  They could
24  called me and tell me that I'm behind in the rent,
25  why can't they do that?

Page 149

1      I was hoodwinked into -- if you own a
2  property and I know you're supposed to be the
3  landlord, if I tell you the roof is leaking, why
4  should I pay you $800?  You're supposed to fix that
5  because it's your property now, not mine.  So, I
6  think I was hoodwinked into that.
7      Q  Into what, signing the lease agreement?
8      A  No, not being paid -- having to pay $800
9  for a roof repair, which they only repaired a little
10  corner and it was charged $800, which I had to pay.
11  Now, why should I have to pay a roofer $800 and you
12  own the property?
13      Q  That was -- that $800, that was in one of
14  the documents we talked about before, that was in
15  the lease agreement, wasn't it, ma'am, or the
16  release?
17      A  Well, I don't -- no.
18      Q  Take a look at Exhibit 16.  Do you have
19  that in front of you, the release?
20      A  Um-hmm.
21      Q  It says, Bigelow shall pay to Bryant the
22  sum of $2,000.
23      A  Yes.  But that had --
24      Q  Did you get the 2,000?
25      A  Yes.

Page 150

1      Q  Then, Bigelow shall release Bryant of the
2  responsibility to pay 600 which remains due for
3  rent.
4          Were you released of that responsibility?
5      A  No.
6      Q  You weren't?  You sure?
7      A  I wrote him a check for $600.  I know I
8  wasn't released.  And he knows I wasn't released.
9      Q  So, you're complaining about this $800
10  that you shouldn't have had to pay.  What was that
11  for, exactly, the 800?
12      A  A roof.  When I bought the house back, the
13  roof was leaking.  I went -- when I was at the
14  mortgage company that he sent me to, I told him, I
15  says, I'm not buying the house back until the roof
16  is fixed and everything that's broken in there that
17  needs to be repaired.  Okay, the water main in the
18  front yard had a hole in it.  Okay, they patched it
19  up.  That was a botched job, because it ended up --
20  I ended up having to have it hoed and redid.  Okay.
21  I told him I needed a roof.  He says, all right.
22  Well, I thought something was funny when he says,
23  I'll call Pete about having the roof fixed on the
24  house.  I didn't think -- I says, you know, you're
25  on a first-name basis with a person that I'm buying

Page 151

1  a house for, not knowing that he's part-owner at
2  that time.
3          Okay.  I get the roof -- he has somebody
4  come out and fix this little patch on the roof.  And
5  then he informs me that I have to pay him $800 for
6  having the roof fixed.  Why would I pay the landlord
7  $800 for having the roof fixed, if that's his house?
8      Q  All right.  So, you paid Mr. Bigelow
9  $800 --
10      A  Yes.
11      Q  -- to have the roof fixed?
12      A  Yes.
13      Q  You think that was -- that's part of the
14  fraud?
15      A  Yeah.
16      Q  Okay.  You lost the equity in your house?
17      A  Yeah.
18      Q  That equity would have been covered by the
19  19,000 that Marfisi got; right?
20      A  No.
21      Q  It wouldn't have been?
22      A  No.
23      Q  How much -- you had more equity than that
24  in your house, ma'am?
25      A  If the -- the house had been purchased

Page 152

1  in -- my parents bought that house in '86 -- no, I
2  forgot exactly when they purchased the house.  But
3  it had more than that, in equity, in it.
4      Q  Well, how much equity did you have in it
5  in January of 1998, ma'am?
6      A  I can't recall offhand.
7      Q  Do you recall?  You don't know, do you?
8      A  I can't recall offhand.
9      Q  So, getting back to these claims against
10  my client, these fraud claims, you claim you got
11  hoodwinked out of the $800 that you had to pay to
12  fix the roof; right?
13      A  Yes.
14      Q  Mr. Bigelow caused you to lose the equity
15  in your house; right?
16      A  Yes.
17      Q  You don't know how much that is?
18      A  I don't know offhand.  I done forgot what
19  it was.
20      Q  What else?  What else do you claim he
21  defrauded you out of?
22      A  My 19,000.
23      Q  That's the 19,000 that Marfisi's got;
24  right?
25      A  Yes.

Page 153

1   Q  We've already talked about all that,
2  haven't we?
3   A  Yes.  But I still didn't tell him to give
4  it to Marfisi.  He should have called me or sent a
5  letter.  Mail runs every day except Sunday.  And I
6  should have been informed.  I was not informed, I
7  was not called, I was not sent a letter or nothing.
8   Q  Well, you were advised in writing, on
9  Exhibit No. 16, weren't you, ma'am, that Bigelow's
10  responsibility under that note had been previously
11  transferred to Marfisi?  We already talked about
12  that --
13   A  Yeah, I was --
14   Q  -- right?
15   A  I was advised, but then I had no choice.
16  Either get evicted and -- why, I'd rather sign this
17  than to be evicted and put out.  Because he had told
18  me once before that I could get more money for this
19  house, so you want to move in one of my other
20  properties?  And I said, no, why should I leave my
21  house?
22   Q  So you were advised, before you signed
23  Exhibit 16, that that obligation had been
24  transferred to Marfisi; right?
25   A  Yes.

Page 154

1   Q  Okay.
2   A  But he still hoodwinked me.
3   Q  What about Roseanne Christian?  You sued
4  her for fraud.  How did she hoodwink you?
5   A  Roseanne Christian, she was under false
6  pretense.
7   Q  Like what, ma'am?  What did she do to
8  cause to you sue her for fraud?
9   A  Because of the way she -- she did not come
10  out -- she came as a nice person.  But instead of
11  sitting down and explaining the whole thing, she
12  gets your confidence and everything, but she doesn't
13  tell you how her counterpart is, where he goes
14  around stealing people's monies, until later.  It's
15  like she was in on it.
16   Q  How did Roseanne Christian defraud you,
17  ma'am?
18   A  By being partners with Marfisi.  I believe
19  they split my money.
20   Q  What evidence do you have to indicate that
21  Roseanne Christian split your money with Marfisi?
22   A  None.
23   Q  None.
24    MR. LEWIS:  Give me just a minute, please.
25    (Brief recess taken.)

Page 155

1    MR. LEWIS:  Just a few more questions,
2  ma'am.
3  BY MR. LEWIS:
4   Q  You indicated that you had went through a
5  period of time where you were ill and had some
6  surgery --
7   A  Yes.
8   Q  -- right?  Now, were you off a period of
9  time, off work a period of time, because you had the
10  surgery?
11   A  Yes.
12   Q  How long were you off work?
13   A  About six weeks --
14   Q  Then, after --
15   A  -- to eight weeks.
16   Q  I'm sorry?
17   A  Six to eight weeks.
18   Q  After the surgery, did you go back to
19  work?
20   A  Yes.
21   Q  Full time?
22   A  Yes.
23   Q  And then, at some point after you went
24  back to work, did you lose that job?
25   A  Yes.

Page 156

1   Q  Why'd you lose that job?
2   A  Because I wasn't able to do the work that
3  they wanted me to do.
4   Q  I see.  After your surgery, how long were
5  you back to work before they let you go?
6   A  I'm going to say, I was back to work,
7  maybe, almost a year.
8   Q  After your surgery, you were back to work
9  a year --
10   A  I would say.
11   Q  -- before they let you go?
12   A  Yeah.
13   Q  You understand, don't you, ma'am, that
14  Mr. Bigelow wrote a check to Mr. Marfisi that
15  included that $19,000 that you were supposed to get?
16  You know that now, don't you?
17   A  Now I do.
18   Q  So, you know that Marfisi has the 19,000?
19   A  That's what I've been told so far.
20   Q  You understand that, though, as you sit
21  here today; right?
22   A  Yeah.
23   Q  So, what you're saying is, is that you
24  should have been advised that that money was being
25  paid to Marfisi, before it was?

Page 157

1    A  What I'm saying is, I should have been
2  asked if I wanted my money given to him.
3    Q  Don't you remember Mr. Bigelow calling you
4  up and saying -- let me finish now.  You're getting
5  ready to interrupt me here.
6        Don't you remember Mr. Bigelow calling you
7  up and asking you to confirm that you wanted that
8  19,000 paid to Marfisi?
9    A  I swear on my dead mother's grave, he
10  never called me and asked me that.
11    Q  Mr. Bigelow never called you --
12    A  He never called me --
13    Q  -- and told you that?
14    A  -- and asked me that.  Because, if he had,
15  I would have told him, I will pick up the check or
16  either mail it to me.
17    Q  But you're saying you should have been
18  consulted about that before that happened --
19    A  That's right.
20    Q  -- right?  But you have no reason to
21  believe that Mr. Bigelow's got any of that $19,000,
22  do you?
23    A  I don't know what he might have.
24    Q  But as far as what you do know, you don't
25  have any information to indicate that Mr. Bigelow

Page 158

1  has any of that $19,000, do you?
2    A  I have a promissory note at home that says
3  he owe me 19,000.
4    Q  Do you have any information to indicate
5  that Mr. Bigelow has got any of that $19,000?
6    A  I don't have any information saying that
7  he has it.  I just have a promissory note at home
8  saying he owes me.
9    Q  But you also have a release at home, that
10  we've talked about, Exhibit 16, that you signed that
11  says he doesn't owe you, don't you?
12    A  Yeah, I have that, too.
13    Q  This Exhibit 16 was signed after the
14  promissory note was signed by Mr. Bigelow, wasn't
15  it?
16    A  Yes.  But if you had a choice of being put
17  out in the street or signing a promissory note, what
18  would you take?  The release.
19    MR. LEWIS:  Give me just a minute.
20        (Brief recess taken.)
21    MR. LEWIS:  No further questions.
22        (Reporter advising witness as to
23        rights of review and signature
24        of transcript and/or waiver
25        thereof.)

Page 159

1    THE WITNESS:  Sign.
2    (Deposition concluded at 1:06 p.m.)
3
4
5
6  Shirdenia Bryant                DATE
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 160

1        CERTIFICATE
2  )
3  )STATE OF OHIO
4  )
5        I, Teresa A. Moore, Notary Public for the
6  State of Ohio, do hereby certify:
7        That the witness named in the deposition,
8  prior to being examined, was by me duly sworn;
9        That said deposition was taken before me
10  at the time and place therein set forth and was
11  taken down by me in shorthand and thereafter
12  transcribed into typewriting under my direction and
13  supervision;
14        That said deposition is a true record of
15  the testimony given by the witness and of all
16  objections made at the time of the examination.
17        I further certify that I am neither
18  counsel for nor related to any party to said action,
19  nor in any way interested in the outcome thereof.
20        IN WITNESS WHEREOF I have subscribed my
21  name and affixed my seal this 15th day of September,
22  2003.
23        TERESA A. MOORE
24        Notary Public
25  My Commission expires: 6/19/2006

## **AFFIDAVIT**

STATE OF OHIO                          :
                                       :        SS
STATE AT LARGE                         :

        I, Teresa A. Moore, Notary Public, for the State of Ohio, do hereby state that the

transcript of the deposition of Shirdenia Bryant, deponent herein having been submitted

said deposition for review and signature, has not been signed within the seven day period

allowed under the Ohio Rules of Civil Procedure; said deposition to now have the same

force and effect as though signed.


                    Teresa A. Moore
                    Court Reporter


      Sworn to before me this 26th day of September, 2003.


                    Tina M. Barlow
                    Notary Public - State of Ohio


Commission Expires: May 17, 2004

1

1                  COMMON PLEAS COURT OF

2                  HAMILTON COUNTY, OHIO

3      ------------------------------------------

4    PETE BIGELOW                    :

5              Plaintiff            :

6         -vs-                       :

7                                    :  CASE NO. A0005052

8    MARK W. BURBRINK, ET AL.   :

9              Defendants           :

10     ------------------------------------------

11

12             Deposition of SHIRDENIA BRYANT, a

13    witness herein, taken by the Plaintiff as upon

14    cross examination and pursuant to the Ohio

15    Rules of Civil Procedure as to the time and

16    place and stipulations hereinafter set forth,

17    at the offices of William H. Blessing, 119 E.

18    Court Street, Suite 500, Cincinnati, Ohio at

19    3:50 p.m. on Tuesday, December 18, 2001, before

20    Paula A. Blosser, a Registered Professional

21    Reporter and notary public within and for the

22    State of Ohio.

23

24                  *  *  *  *  *  *

25

DEFENDANT'S
EXHIBIT NO. 1
FOR IDENTIFICATION
Bryant
DATE 9-3-03  RPTR

1                    QUICK REFERENCE INDEX

2              WITNESS: SHIRDENIA BRYANT

3              APPEARANCES: PAGE 3

4

5                          DX    CX    RDX    RCX

6        BY: MR. LABER        -     4     -      65

7        BY: MR. SCHWANTES   64     -     -      -

8

9

10                        EXHIBITS

11              MARKED                        PAGE

12      PLF'S:      1                           39

13      PLF'S:      2                           49

14      PLF'S:      3                           54

15

16               INFORMATION REQUESTED

17               NOT APPLICABLE

18

19                 *  *  *  *  *

20

21

22

23

24

25

WWW.BRITTONANDASSOCIATES.COM

DAYTON - (937) 228-3370   CINCINNATI - (513) 651-3370