3

```
 1       APPEARANCES:

 2


 3       ON BEHALF OF PLAINTIFF

 4             Mr. Christopher Laber
               Attorney at Law
 5             22 W. Ninth Street
               Cincinnati, Ohio  45202
 6
         ON BEHALF OF DEFENDANTS
 7
               Mr. James E. Schwantes
 8             Attorney at Law
               Law Offices of William H. Blessing
 9             119 E. Court Street, Suite 500
               Cincinnati, Ohio  45202
10
         ALSO PRESENT:
11
               Mr. Pete Bigelow
12

13

14

15                      *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25
```

WWW.BRITTONANDASSOCIATES.COM

DAYTON - (937) 228-3370   CINCINNATI - (513) 651-3370

1       WHEREUPON:

2                       SHIRDENIA BRYANT,

3       of lawful age, a witness herein, being first

4       duly sworn as hereinafter certified, was

5       examined and deposed as follows:

6                       CROSS EXAMINATION

7       BY MR. LABER:

8               Q.    Mrs. Bryant, my name is Chris Laber

9       and I represent Pete Bigelow in a lawsuit

10      between him and Mark and Michael Burbrink, and

11      I thank you for coming down today for your

12      deposition without the burden of a subpoena.

13      Would you state your name and address.

14              A.    Shirdenia Bryant, 1107 Laidlaw

15      Avenue.

16              Q.    And you want to spell your first

17      name.

18              A.    S-H-I-R-D-E-N-I-A.

19              Q.    Shirdenia, have you ever had your

20      deposition taken before?

21              A.    No.

22              Q.    What I'm going to do is just ask you

23      some questions and what I expect from you is

24      just an answer.  If you don't understand the

25      question that I'm asking or you don't

1   understand what I'm trying to do in asking a

2   question, tell me to repeat it or you don't

3   understand and I'll be glad to repeat.

4              It's helpful to answer the

5   question if you say yes or no so the court

6   reporter can take it down.  It's difficult for

7   her to spell uh-huh and huh-uh and for us to

8   read it later on.  If at any time you need to

9   take a break for any reason, just let me know

10  and we'll stop and you can take a break and

11  we'll come back when you are ready.  Are you

12  currently employed, Ms. Bryant?

13       A.    No.

14       Q.    When was the last time that you

15  worked?

16       A.    October 2, 2001.

17       Q.    And what's your normal occupation?

18       A.    Certified nurse's aide.

19       Q.    And you are not working now as a

20  CNA?

21       A.    Yes.

22       Q.    Is that what you were doing back in

23  October, your last job?

24       A.    I was working as unit clerk at the

25  nursing home.

1          Q.    You are going to have to speak up a
2     little louder.
3          A.    An unit clerk.
4          Q.    At a nursing home?
5          A.    Yes.
6          Q.    And how is that different than a
7     CNA?
8          A.    The unit clerk makes transportation
9     arrangements for the patients to go to the
10    doctors and they put calls out to the nurses,
11    for the nurses.
12         Q.    It's more clerical job than physical
13    hands-on job?
14         A.    Yes.
15         Q.    What nursing home did you work
16    for?
17         A.    Montgomery Care Center.
18         Q.    And how was that job terminated?
19         A.    They wanted to move me back on the
20    floor as a CNA.
21         Q.    So you just voluntarily left at that
22    point?
23         A.    No, I can't do nurse's aide work.
24         Q.    Physically unable at this point?
25         A.    Yes.

1      Q.    How old are you?

2      A.    54.

3      Q.    And how long had you worked for

4   Montgomery Care Center?

5      A.    12 years.

6      Q.    Was that consistent for the last 12

7   years?

8      A.    Yes.

9      Q.    And when you left there in October,

10   I didn't understand, did you leave voluntarily

11   or did they tell you you had to leave?

12      A.    They didn't have a position for me

13   to go into so with me not being able to do

14   nurse's aide work, there was no other jobs that

15   I could do with the restrictions that I have.

16      Q.    Physical restrictions?

17      A.    Yes.

18      Q.    Are you represented by an attorney

19   at this point in time?

20      A.    Yes.

21      Q.    And who would that be?

22      A.    Bill Blessing.

23      Q.    And with respect to what does Mr.

24   Blessing represent you?

25      A.    A legal matter that was discussed.

1    Q.    I'm sorry, I'm still having trouble

2    hearing you over here.  I know --

3         A.    It was a legal problem that I had.

4         Q.    And what was that?

5              MR. SCHWANTES:  I don't think,

6    I'm going to interrupt if we are getting into

7    discussions she had with Mr. Blessing as far as

8    attorney/client conversations.

9              MR. LABER:  Yes, sir, I'm just

10   asking what subject that was.

11             MR. SCHWANTES:  And I think

12   that's getting into discussions she had with

13   her attorney, and I'd instruct her not to

14   answer any questions about the substantive

15   things that you discuss with your attorney.

16   BY MR. LABER:

17        Q.    Does this gentleman represent you?

18        A.    Yes.

19        Q.    Does he represent you in anything

20   that has to do with Mr. Bigelow?

21             MR. SCHWANTES:  Again, I'm going

22   to advise her not to answer if you are going to

23   get into anything that you've discussed with

24   your attorney, be it Mr. Blessing or myself,

25   regarding any substantive matter.

1          MR. LABER:  I'm not asking for

2    substantive, I'm asking for what he's

3    representing her for.

4          MR. SCHWANTES:  I think that's

5    getting into the substantive of the

6    conversations that she's having with her

7    attorney and I object on the basis of

8    attorney/client privilege.

9    BY MR. LABER:

10         Q.   When did you retain Mr. Blessing to

11    represent you?

12         MR. SCHWANTES:  You can answer

13    as to when.

14         THE WITNESS:  I'm trying to

15    think --

16    BY MR. LABER:

17         Q.   I can't hear a word that you are

18    saying.

19         A.   I'm trying to think of the month it

20    was.  I forget the month it was.  It was this

21    year.  I can't remember exactly what month.

22         Q.   Would it have been in the early part

23    of the year?

24         A.   Are you saying around January or

25    sometime or another?

1         Q.    Would it have been within the last

2  six months or first six months of the year?

3         A.    I can't exactly remember.

4         Q.    Would it have been during the

5  summer?

6         A.    Possible.

7         Q.    Do you recall how you came about

8  learning about Mr. Blessing as an attorney?

9         A.    How did I find out about him?

10         Q.    Yes, ma'am.  What brought you to Mr.

11  Blessing, did you read an ad in the yellow

12  pages, a letter in the mail, somebody call you

13  up, how did you get in contact with Mr.

14  Blessing to represent you?

15         A.    I received a letter.

16         Q.    You received a letter and was Mr.

17  Blessing your attorney at the time that you

18  received that letter?

19         A.    Yes.

20         Q.    So you engaged Mr. Blessing before

21  you received that letter?

22         A.    No.

23         Q.    So he wasn't your attorney at the

24  time that you received that letter?

25         A.    No.

1    Q.    What did that letter say?

2    A.    I cannot remember.

3    Q.    What was the topic of that letter?

4         MR. SCHWANTES:  I think you are

5    going to have to be more, a little more

6    specific on what type of letter are you getting

7    at?

8    BY MR. LABER:

9    Q.    What was the topic of the letter?

10        MR. SCHWANTES:  And I'm going to

11   advise the witness that if she's getting into

12   anything regarding representation, that those

13   matters are privileged and that you should not

14   discuss any letters you've had from Mr.

15   Blessing regarding representation or

16   substantive matters.

17   BY MR. LABER:

18   Q.    The question deals with the letter

19   she received prior to the representation, what

20   was the subject of that letter.

21   A.    To be honest and truthful, I do not

22   remember.

23   Q.    Did it have to do with, do you want

24   to buy a house on the beach, did it have to be

25   do with a problem that you had with Mr.

1    Bigelow?

2         A.    I don't remember.

3         Q.    Nothing at all you remember about

4    that letter?

5         A.    I don't remember what the letter was

6    stating.  I have enough trouble trying to

7    remember what you are saying because it's not

8    making too much sense.  So I have to scoot up a

9    little closer.

10        Q.    I'm sorry, the question was, what

11   was the subject matter or the topic of the

12   letter?  What about that question do you not

13   understand, Ms. Bryant?

14              MR. SCHWANTES:  I think that

15   question has been asked and answered.  And if

16   your answer is any different say so, if not, I

17   think that you have, that question has been

18   asked and you've answered it.

19              THE WITNESS:  I don't remember.

20   BY MR. LABER:

21        Q.    Did you attend a meeting with other

22   people at Mr. Blessing's, do you know Mr.

23   Hopkins?

24        A.    No.

25        Q.    An attorney Rick Hopkins?

1    A. No.

2    Q. Did you ever receive a letter from

3 an attorney by the name of Rick Hopkins?

4    A. His name don't sound familiar.

5    Q. So Rick Hopkins doesn't represent

6 you?

7    A. No.

8      MR. SCHWANTES:  She's answered

9 that she doesn't know Rick Hopkins.

10     MR. LABER:  This is going to

11 take forever in a day if you comment on every

12 question I ask.

13     MR. SCHWANTES:  If a privileged

14 question is asked I'm going to instruct her.

15 It's badgering a little bit when you ask her

16 the same question when she says she doesn't

17 know somebody and the question is did you

18 receive a letter, I think that's badgering her

19 a little bit and I'll object to that.

20 BY MR. LABER:

21    Q. I guess we are going to have to slow

22 this down a little bit, Ms. Bryant, have you

23 ever attended a meeting as a result of a letter

24 you received from Mr. Blessing say back in

25 April of this year?

1         A.   Yes.

2         Q.   And were there other people there

3   who attended that meeting who received a

4   similar letter from Mr. Blessing?

5         A.   No.

6         Q.   Was it just you at that meeting?

7         A.   Yes.

8         Q.   And that was as a result of a letter

9   that Mr. Blessing had sent to you prior to him

10   becoming your attorney?

11         A.   Yes.

12         Q.   And what did you talk to Mr.

13   Blessing about at that time?

14           MR. SCHWANTES:  And I'm going to

15   object.  If you are getting into anything that,

16   at some point Mr. Blessing becomes your

17   attorney, you enter into an attorney/client

18   relationship, you cannot or you do not have to

19   answer that question.

20   BY MR. LABER:

21         Q.   Go ahead.

22         A.   That's lawyer/client

23   confidentiality.

24         Q.   No, I'm asking what you talked about

25   before he was representing you.

1    A.    Before?

2    Q.    When you responded to that letter.

3    A.    Before what we talked about was the

4    letter.

5    Q.    Yes, ma'am.  So what was it in the

6    letter that you talked about?

7    A.    That I can't reveal, that's patient,

8    that's between my lawyer and myself.

9    Q.    Do you still have a copy of the

10   letter that Mr. Blessing sent you?

11   A.    Probably in some papers at home.

12   Q.    And Mr. Blessing would have a copy

13   of that letter, would he not?

14   A.    I believe so.

15   Q.    Have you ever attended a meeting

16   with people who received a similar letter from

17   Mr. Blessing?

18   A.    No.

19   Q.    That letter was about Mr. Bigelow,

20   was it not?

21   A.    Possibly.

22   Q.    Possibly?

23             MR. SCHWANTES:  Again, Chris,

24   I'm going to object if you are getting close to

25   the line.  I don't think we've established

1    enough as to what letters, you know, we are

2    really talking about here.  If you want to go

3    off the record --

4              MR. LABER:  No, we don't.

5              MR. SCHWANTES:  I can --

6              MR. LABER:  I'm asking --

7              MR. SCHWANTES:  I think we are

8    getting real close to a line.  We haven't

9    established when she's represented by Mr.

10    Blessing and when she isn't and I'm going to

11    object to anytime it even gets close to that

12    line.

13    BY MR. LABER:

14        Q.   My questions were with respect to a

15    letter she received from Mr. Blessing prior to

16    his representation and about discussions she

17    had with Mr. Blessing prior to his

18    representation, and she's telling me that she

19    doesn't have a clue as to what that letter was

20    or about that discussion, is that right?

21        A.   I don't remember.

22        Q.   When did you retain Mr. Blessing?

23        A.   It was this year, I don't exactly

24    remember what month.

25        Q.   Did you have a conversations with

1     Mr. Blessing prior to retaining Mr. Blessing?

2          A.    No.

3          Q.    No?

4          A.    No.

5          Q.    So you retained Mr. Blessing the

6     minute you walked into his office?

7          A.    What are you trying to say?

8          Q.    I'm trying to get at what he sent

9     you a letter about?

10          A.    I told you I do not exactly remember

11     what the letter was about.

12          Q.    You are involved in a foreclosure at

13     this time, ma'am?

14          A.    Yes.

15          Q.    Does Mr. Blessing represent you with

16     respect to the foreclosure?

17          A.    No.

18          Q.    That foreclosure was filed against

19     you in maybe November?

20          A.    Yes.

21          Q.    November 9 of this year?

22          A.    Yes.

23          Q.    And Mr. Blessing doesn't represent

24     you with respect to that but with respect to

25     something else?

1          A.    Yes.

2          Q.    Have you told Mr. Blessing about the

3    -- never mind, he's going to object to that.

4              MR. SCHWANTES:    You withdraw

5    that part of the question?

6              MR. LABER:    Yes, I do.

7    BY MR. LABER:

8          Q.    The foreclosure that you are

9    involved with now indicates that you've not

10   paid your mortgage since July of this year; is

11   that correct?

12         A.    I've paid it since July, it was

13   after July.

14         Q.    I'm sorry, I didn't hear you?

15         A.    It was after July.

16         Q.    So you've not paid your mortgage

17   since after July?

18         A.    No.

19         Q.    That's a correct statement?

20         A.    Yes.

21         Q.    And this is the Laidlaw property

22   where you are living at?

23         A.    Yes.

24         Q.    And you were involved in a

25   foreclosure also back in 1997; is that

1    correct?

2         A.    Yes.

3         Q.    Was that for the same property on

4    Laidlaw?

5         A.    Yes.

6         Q.    You were involved in a foreclosure

7    back in 1990; is that correct?

8         A.    Yes.

9         Q.    And that was also for the property

10   on Laidlaw?

11        A.    '90?

12        Q.    Yes, ma'am.

13        A.    No.

14        Q.    What property was that for?

15        A.    In '90 I didn't live on Laidlaw.

16        Q.    Were you involved in a foreclosure

17   back in 1990?

18        A.    Yes.

19        Q.    What property was that for?

20        A.    It was on Regent Avenue.

21        Q.    Did you lose that property in that

22   foreclosure?

23        A.    No.

24        Q.    Did you redeem that property?

25        A.    No.

1          Q.    How was that foreclosure worked

2     out?

3          A.    It wasn't a foreclosure, I sold the

4     house.

5          Q.    What was that address?

6          A.    I think it was 1112 Regent,

7     R-E-G-E-N-T.

8          Q.    And was that your marital residence

9     when you were married?

10         A.    Yes.

11         Q.    And you were divorced in '87?

12         A.    Yes.

13         Q.    And then from that property, did you

14    move to the Laidlaw property?

15         A.    No.

16         Q.    What property did you move to after

17    the Regent property?

18         A.    I moved in an apartment.

19         Q.    When did you next move into a

20    home?   Excuse me, a house that you owned?

21         A.    I moved in with my parents in '95

22    when my dad died.

23         Q.    Would that be the Laidlaw

24    property?

25         A.    Yes.

1             Q.    You say your dad died, had your mom

2    already deceased?

3             A.    No.

4             Q.    So you lived there with your mom?

5             A.    Yes.

6             Q.    When did your mother die?

7             A.    May 31, '96.

8             Q.    '96?

9             A.    Yes.

10            Q.    Was there a mortgage on the property

11   when your mother died?

12           A.    Yes.

13           Q.    And did you pay on that mortgage?

14           A.    Yes.

15           Q.    Was that the mortgage that went into

16   foreclosure in '97?

17           A.    Yes.

18           Q.    Do you know Roseann Christian?

19           A.    Yes.

20           Q.    How did you first meet Roseann

21   Christian?

22           A.    She came to my house.

23           Q.    Do you know when that was?

24           A.    During the summer of, I think it was

25   '97.

1          Q.    Summer of '97?

2          A.    I think it was.  It may have been

3     the summer of '96, one of the two.

4          Q.    Would it have been during the time

5     of the '97 foreclosure?

6          A.    Yes.

7          Q.    So it probably would have been the

8     summer of '97 then?

9          A.    Yes.

10         Q.    And what did Ms. Christian say to

11    you when she came to your house, if you

12    recall?

13         A.    She stated that there was a way that

14    she could get me out of foreclosure.

15         Q.    Did she talk to you anymore than

16    that?

17         A.    She just told me that she had a

18    partner that would, she would bring to see me.

19         Q.    Then what happened next?

20         A.    She came twice.  The second time,

21    the third time she came, she brought her

22    partner with her.

23         Q.    What happened the second time she

24    came?

25         A.    She just kept talking to me about

1    the foreclosure.

2        Q.    What was she saying?

3        A.    How that her partner had just had a

4    stroke and she was going to bring him by.

5        Q.    And did she come by a third time?

6        A.    I believe she did with him, with her

7    partner.

8        Q.    Who was her partner?

9        A.    John Marfisi.

10       Q.    And did you talk with Mr. Marfisi

11   and Ms. Christian at that time?

12       A.    Yes.

13       Q.    And what did you two talk about or

14   three talk about?

15       A.    They was telling me how to go about,

16   that I could continue to live in the house and

17   that I would just, I would pay rent and after

18   so long I would be able to buy the house back.

19       Q.    So they talked to you about them

20   purchasing the house or someone purchasing the

21   house and then leasing it back to you?

22       A.    Yes.

23       Q.    Did they say they would purchase the

24   house?

25       A.    No.

1      Q.    Did they say who would purchase the

2   house?

3      A.    They mentioned Bigelow's name.

4      Q.    You remember that at that time?

5      A.    Yes.

6      Q.    Yet you can't remember the contents

7   of a letter that you received six months ago?

8      A.    Yes.

9      Q.    So did Ms. Christian or Mr. Marfisi

10   come back to your place?

11      A.    Marfisi came back.

12      Q.    When did Marfisi come back?

13      A.    I don't know exactly how many weeks

14   or months it was before he came back.

15      Q.    So it could have been months before

16   Marfisi came back?

17      A.    It could have been, it was weeks, I

18   don't remember exactly how many weeks it was

19   when he came back.

20      Q.    Were there any papers signed at the

21   first meeting with Ms. Christian?

22      A.    Like, I didn't sign any papers for

23   her at all.

24      Q.    Were there any papers signed at the

25   second meeting?