1          A.    No.

2          Q.    Were there any papers signed at the

3     third meeting?

4          A.    There was a paper signed with

5     Marfisi.

6          Q.    You signed a paper with Mr.

7     Marfisi?

8          A.    Yes.

9          Q.    Do you remember what that paper

10    was?

11         A.    If I'm not mistaken it was a paper

12    that was stated that I could, when I sold the

13    property, I could still live there and he told

14    me what the amount of the rent was going to be.

15         Q.    I'm sorry, I'm having trouble

16    hearing you.  I know the court reporter is,

17    too, you said it was a piece of paper that said

18    what --

19         A.    Paper that was stating amount of

20    rent that I would pay and I was told that I'd

21    pay a certain amount of rent and that he would

22    pay whatever the difference was in the rent

23    because I was renting the house back for, I

24    think it was like 250.

25         Q.    Are you suggesting that the paper

1    said Marfisi would purchase the property and

2    lease it back to you?

3          A.    It wasn't that he was purchasing

4    it.

5          Q.    Who was purchasing the property?

6          A.    Because the way it was stated that

7    it was, that there was another party involved

8    in buying the property and that's when they

9    brought up Bigelow's name.

10         Q.    They being Marfisi and Christian?

11         A.    Yes.

12         Q.    This piece of paper that you signed

13   that we are talking about now, who was

14   purchasing the property according to that piece

15   of paper?

16         A.    The only two people that signed that

17   paper was myself and Marfisi at that time.  We

18   signed it at the house that day, that was it.

19         Q.    Do you still have a copy of that

20   piece of paper?

21         A.    I'll have to check my papers and see

22   because I don't remember what I did with it.

23              MR. SCHWANTES:  You do have to

24   speak up, Ms. Bryant.  It is very difficult to

25   hear you.

1          THE WITNESS:  I don't remember

2    what I did with that paper.  I think I still

3    have it, I have to go through some papers and

4    see.

5    BY MR. LABER:

6          Q.   So at the time that you signed this

7    piece of paper you had not met Mr. Bigelow?

8          A.   No.

9          Q.   Do you recall Mr. Bigelow's name

10   being on that piece of paper?

11         A.   I'm trying to think.  He had a stack

12   of papers, I don't remember if it was, I'm not

13   for sure whether it was Bigelow Property on

14   that paper or not, I'm not for sure.

15         Q.   But you understood that you were

16   selling the property to somebody?

17         A.   Yes.

18         Q.   And that you were leasing the

19   property back from somebody?

20         A.   Yes.

21         Q.   Yes?

22         A.   Yes.

23         Q.   And then what happens at the end of

24   the lease?

25         A.   I bought the house back.

1          Q.    How much were you selling the house

2     for?

3          A.    What I owed on it was 11,000.

4          Q.    Is that what you were selling the

5     property for?

6          A.    I was supposed to have been getting

7     like 20,000 for the house.

8          Q.    I'm trying to get at what the

9     purchase price was on this piece of paper.

10         A.    They were giving me 20,000,

11    according to the paper.

12         Q.    They were giving you $20,000 cash in

13    addition to --

14         A.    At the closing.

15         Q.    So they would pay off the mortgage

16    and give you $20,000 cash?

17         A.    (Witness nods head.)

18         Q.    You have --

19         A.    Check or --

20         Q.    I'm just indicating that you have to

21    say yes or no.  She can't take down a

22    non-verbal response.

23         A.    Yes.

24         Q.    So you negotiated this purchase

25    price; is that correct?

1          A.    There wasn't really a negotiation.

2          Q.    How was this purchase price arrived

3    at?

4          A.    That was the price that they quoted

5    me and told me that I can put that aside to buy

6    my house back with.

7          Q.    So that's the price that they told

8    you that they were willing to pay you for the

9    house?

10         A.    Yes.

11         Q.    And you agreed to accept that

12   price?

13         A.    Yes.

14         Q.    And also as part of that they were

15   leasing the property back to you?

16         A.    Yes.

17         Q.    Whomever it was that was purchasing

18   the property back?

19         A.    Yes.

20         Q.    They were leasing it back to you for

21   how long of a period of time?

22         A.    For two years, I think it was.

23         Q.    And you said the monthly payments

24   were $250?

25         A.    At first.

1          Q.    Did they go up under the lease?

2          A.    Yes.

3          Q.    When did they go up?

4          A.    I think it was either in, it was in

5    '99, I think it was, ''98 or '99.  I'm not for

6    sure.

7          Q.    Was it written in the lease at that

8    particular time the rent would go up?

9          A.    No, it wasn't.

10         Q.    So the lease was for two years at

11   $250 a month?

12         A.    It wasn't, at first it was just on

13   the paper that I could rent it for 200 then

14   later I got a lease where it was 500.

15         Q.    I'm talking about this piece of

16   paper that you signed with Ms. Christian and

17   Mr. Marfisi at the third visit that Ms.

18   Christian made to your home.

19         A.    That was for 200.

20         Q.    That's for $200, a two year lease

21   for $200 a month?

22         A.    Yes.

23         Q.    So you are buying, you are selling

24   the property to them for $20,000, money that

25   you receive at closing plus they take care of

1    the mortgage but they gave you a two year lease

2    for $200 a month, yes?

3          A.    Go through that one more time.

4          Q.    Okay.   This piece of paper that you

5    are signing with Mr. Marfisi and Ms. Christian

6    that you are selling the property to somebody,

7    suggests that you are selling the property for

8    $20,000, that you'll receive at closing plus

9    they take care of the mortgage which you

10   believe to be about $11,000?

11         A.    Yes.

12         Q.    Plus they'll lease the property back

13   to you for a period of two years at $200 a

14   month?

15         A.    That's what I was told.

16         Q.    And was there any other terms in

17   this writing that you entered into with Ms.

18   Christian and Mr. Marfisi?

19         A.    No.

20         Q.    You said something about an option

21   to purchase the property back?

22         A.    Yes, I could do it in two years.

23         Q.    And what was the option to purchase,

24   how much was it, the purchase price?

25         A.    There was no purchase price.

1                    (Mr. Bigelow leaves the room.)

2        BY MR. LABER:

3              Q.   How did you know how much you were

4        going to purchase the property back for in two

5        years?

6              A.   I didn't know.

7              Q.   Did you discuss that with them?

8              A.   No.

9              Q.   But it's going to have this option

10       to purchase the property, to purchase it back

11       written in this contract that we are talking

12       about?

13             A.   Yes.

14             Q.   And you believe you have a copy of

15       this contract at home?

16             A.   I'd have to go through my papers to

17       see.  I should have the paper that I signed

18       with them.

19             Q.   Have you given a copy of that paper

20       to anybody?

21             A.   No.

22             Q.   These papers that you have at home,

23       what papers, are they kept in a file, do you

24       have like a file folder or drawer or something

25       where you keep these papers?

1          A.    I have a vanilla envelope that I
2    keep them in.
3          Q.    All of the papers with respect to
4    this deal should be in that vanilla envelope?
5          A.    They should be.
6          Q.    And you believe this option to
7    purchase the property back would be in this
8    written contract that you signed?
9          A.    I have to check my papers to see.
10         Q.    So you are not sure if there's a
11   written option to purchase back?
12         A.    I was told that I could purchase the
13   property back by Marfisi and Rose Christian.
14         Q.    I'm sorry, I thought you negotiated
15   the deal with Mr. Marfisi?  Did you negotiate
16   the deal with Mr. Marfisi and Ms. Christian or
17   just Mr. Marfisi?
18         A.    Both of them were there at the time
19   when I was told that I could buy the property
20   back.
21         Q.    But who did the negotiation, did Ms.
22   Christian and Mr. Marfisi or just one or the
23   other?
24         A.    Well, both of them were talking.
25         Q.    But it's your recollection that

1    neither of them were purchasing the property

2    from you?

3         A.    True.

4         Q.    So you signed this piece of paper,

5    do you recall about when that was?

6         A.    I don't know whether it was in

7    November or December.

8         Q.    Late in the year of '97?

9         A.    Yes.

10         Q.    And who was present when you signed

11    it?

12         A.    Marfisi and Christian.

13         Q.    Did you at any time discuss with

14    them a purchase price when they were going to

15    buy the property back?

16         A.    No.

17         Q.    Did you at any time discuss how to

18    calculate that purchase price when you were

19    going to buy the property back?

20         A.    No.

21         Q.    So it was left open whether or not

22    you are going to purchase the property back for

23    $10 or a hundred thousand dollars?

24         A.    We didn't discuss a purchasing

25    price.

1        Q.    When was your next contact with Ms.

2    Christian or Mr. Marfisi?

3        A.    I didn't, the only time I talked to

4    Christian was one time on the telephone, she

5    had called.

6        Q.    And what was that about?

7        A.    Because I hadn't, this was after the

8    closing because I hadn't received any money or

9    anything and she told me, she had me call John

10   Marfisi.

11       Q.    I don't want to interrupt you, I

12   don't want to get beyond the closing at this

13   point in time.  After you signed that purchase

14   contract with Ms. Christian and Mr. Marfisi,

15   was the next contact that you had with anybody

16   the closing?

17       A.    The next, the only person I had

18   contact with was to go down to the lawyer's

19   office when Marfisi took me to the lawyer's

20   office to sign the papers for the house.

21       Q.    So between the time that you signed

22   this piece of paper in November or December of

23   '97 and the time of the closing on the

24   property, there was no communication between

25   you and anyone else regarding this property?

1              A.    The only person I talked to was

2      Marfisi.  We went down --

3              Q.    So the answer would be yes, there

4      was no other person, no other communication in

5      between the time that you signed this piece of

6      paper and the closing?

7              A.    The appraisal came and appraised the

8      house.

9              Q.    Do you remember who that was?

10             A.    No, I don't remember his name, and

11     I'm trying to think.  That's when I met Pete

12     before we closed.

13             Q.    What were the circumstances you

14     meeting Mr. Bigelow?

15             A.    He came out and he had got the paper

16     from Marfisi and he came out and he went

17     through the house and he was having the

18     appraiser come and so that he could get the

19     appraisal on the house.

20             Q.    Do you recall about when that was

21     with respect to the closing, was it a week

22     before, a couple of weeks before, a month

23     before?

24             A.    It might have been a month before

25     because the closing was in, I think, January.

1          Q.    January 27, 1998, does that sound

2     correct?

3          A.    Yes.

4          Q.    Did you and Mr. Bigelow discuss the

5     terms of the deal at that time?

6          A.    The only thing we talked about was

7     the rent that I would be paying and I don't

8     remember for sure if it came up about the

9     20,000 or not.

10         Q.    But you didn't discuss any specifics

11    of the deal with respect to the purchase price

12    or the lease or the option to purchase back?

13         A.    I don't remember if we brought, if

14    that was brought up or not.  It might have

15    been.

16         Q.    Is that the only time that you met

17    Mr. Bigelow before the closing?

18         A.    Yes.

19         Q.    And you said Mr. Marfisi took you to

20    the closing?

21         A.    Yes.

22         Q.    And the closing would have been with

23    attorney John Meckstroth?

24         A.    Yes.

25         Q.    Did you sign papers at the closing

1      with Mr. Meckstroth?

2             A.    Yes.

3             Q.    Did he hand you those papers and

4      explain each one of those two you before you

5      signed it?

6             A.    Yes.

7             Q.    Did you have any questions about the

8      papers before you signed it?

9             A.    Yes.

10            Q.    Did you ask those questions of Mr.

11     Meckstroth?

12            A.    Yes.

13            Q.    Did he explain them to your

14     satisfaction?

15            A.    Yes.

16            Q.    Did you require any changes in the

17     paperwork that Mr. Meckstroth presented to

18     you?

19            A.    No.

20            Q.    Did you ask for any changes to be

21     made?

22            A.    No.

23            Q.    Do you recall what papers you signed

24     at the closing?

25            A.    There was a paper for 20,000, there

1    was another paper that had the price list.

2            Q.    Settlement statement?

3            A.    Yes.

4            Q.    Tell you what you purchased the

5    house for, what deductions were being made from

6    your part and what payments were being made

7    from the other part?

8            A.    I think that's it, if I see the

9    paper I'd know it.

10           Q.    I think it was used in a couple of

11   different depositions here.  Showing you what

12   was marked as Exhibit No. 7 to Ms. Christian's

13   deposition.

14                   MR. SCHWANTES:  Are you offering

15   this as an exhibit in this one or just to

16   refresh her recollection?  I don't object

17   either way.

18                   THE WITNESS:  This is one of

19   them.

20                   MR. LABER:  Let's mark it, I'm

21   sorry.

22                   (WHEREUPON, Plaintiff's Exhibit

23   1 was marked for identification.)

24   BY MR. LABER:

25           Q.    Plaintiff's Exhibit 1 for your

1    deposition, you believe that to be the

2    settlement statement that you received from Mr.

3    Meckstroth on January 27, 1998?

4         A.   Yes.

5         Q.   And this document was presented to

6    Ms. Christian by Attorney Schwantes, do you

7    know how he got ahold of this copy?

8         A.   Yes.

9         Q.   Is this a document that you

10   presented to him?

11        A.   Yes.

12        Q.   Did this come from that manila

13   envelope that you have at home?

14        A.   Yes.

15        Q.   Did you present him with other

16   documents from that manila envelope?

17        A.   Yes.

18        Q.   Does he have a copy of all of the

19   documents from the manila envelope?

20             MR. SCHWANTES:   I'm going to

21   object to the extent that you are getting into

22   anything produced in the attorney/client

23   relationship.

24   BY MR. LABER:

25        Q.   Did you give him a copy of all of

1      the documents from the manila file?

2                     MR. SCHWANTES:  Again, I caution

3      you on that one.  If you are getting into

4      anything that you produced in our

5      attorney/client relationship that's privileged

6      information, but to the extent that it's not,

7      you can answer the question.

8                     (Mr. Bigelow returns to the

9      room.)

10                    THE WITNESS:  I gave him like

11     the papers that you have.

12     BY MR. LABER:

13         Q.    That wasn't my question, ma'am.

14         A.    Yes.

15         Q.    You gave him a copy of all of the

16     documents that are in that file?

17         A.    All of them that I had.

18         Q.    So that would include the purchase

19     contract that Mr. Marfisi wrote out?

20         A.    No.

21         Q.    At the closing did you sign a deed

22     to the property?

23         A.    I don't remember.

24         Q.    Did you know that you were selling

25     the property to someone at the closing?

1          A.    Yes.

2          Q.    That was explained to you?

3          A.    Yes.

4          Q.    Do you know who you were selling the

5    property to at the closing?

6          A.    Bigelow.

7          Q.    And were you leasing the property

8    back at that time?

9          A.    Yes.

10         Q.    And did you sign a lease with Mr.

11   Bigelow at the closing?

12         A.    I think there was one in there.

13         Q.    I'm sorry, you think you did sign

14   the lease at the closing?

15         A.    I think so.

16         Q.    Do you remember how long the lease

17   was for?

18         A.    I believe two years.

19         Q.    Do you still have that lease in the

20   manila envelope that you have at home?

21         A.    It should be in there.

22         Q.    Other than the deed and the lease

23   and the closing statement, do you recall any

24   other papers that you would have signed at the

25   closing?

1          A.    Paper for 20,000.

2          Q.    Paper that you had received

3     $20,000?

4          A.    That I was supposed to receive

5     $20,000.

6          Q.    Explain that to me.  What do you

7     mean a paper that you were supposed to

8     receive?

9          A.    It was supposed, I was supposed to

10    receive $20,000 at the closing and I signed

11    that, but that was the paper that was stating

12    that I would receive $20,000.  I received a

13    thousand and then that left 19,000.

14         Q.    And did someone sign a promissory

15    note to you for the balance of that?

16         A.    That's it.

17         Q.    And that was explained to you at the

18    closing?

19         A.    That was the paper that I signed was

20    for 19,000 I was supposed to receive at the

21    closing.

22         Q.    The question was, that was explained

23    to you at the closing and your response was

24    yes?

25         A.    Yes.

1    Q.    So you accepted the $19,000

2    promissory note at the closing?

3    A.    I'm trying to make sure it was

4    either at the closing or just before the

5    closing.  I know one of them I was supposed to

6    receive 19,000 and I think it was supposed to

7    be at the closing that I was supposed to

8    receive 19,000.

9    Q.    When you received the promissory

10    note instead of, promissory note for $19,000

11    instead of $19,000 check or cash, did you

12    question that at the closing?

13    A.    Yes.

14    Q.    And to whom did you make that

15    question to?

16    A.    The lawyer.

17    Q.    And what was the response?

18    A.    That they, that I was told I would

19    get 19,000, okay?  Then they showed me another

20    promissory note that I was supposed to have

21    signed.  The money went to Marfisi.

22    Q.    At the closing they showed you a

23    promissory note that you signed.  The 19,000

24    goes to Marfisi, is that what you said?

25    A.    Yes.

1          Q.    Pardon me, I'm just real confused

2    right now.  At the closing, you received a

3    promissory note that someone is promising to

4    pay you $19,000.  Who is that someone?

5          A.    Bigelow.

6          Q.    Pete Bigelow?

7          A.    Yeah.

8          Q.    And did Mr. Bigelow actually sign

9    that promissory note and was it actually

10   delivered to you?

11         A.    Yes.

12         Q.    Was that at the closing?

13         A.    That's when we signed that paper,

14   yeah.

15         Q.    Being Exhibit No. 1?

16         A.    Yes.

17         Q.    And you signed this at the

18   closing?

19         A.    We signed that, yeah.

20         Q.    So Mr. Bigelow gave you a promissory

21   note for $19,000 at the closing?

22         A.    I know it was January 27.  I don't

23   know exactly if that was the closing date or

24   when it was, but that's when I signed the

25   promissory note.

1    Q.    Is that the same day that you signed

2    the lease and the deed to the property and got

3    the thousand dollar check?

4    A.    Yes, because that was the day that

5    Marfisi took me and I got a thousand dollar

6    check that day.

7    Q.    So at the closing you received a

8    thousand dollar check plus a promissory note

9    for $19,000 from Mr. Bigelow payable to you?

10    A.    Yes.

11    Q.    And did you accept that at the

12    closing as payment for the $20,000?

13    A.    What do you mean did I accept?    Are

14    you saying did I accept the promissory note?

15    Q.    Yes.

16    A.    Or the thousand?

17    Q.    Did you accept the promissory note

18    as payment in terms of the contract that you

19    had signed with Mr. Marfisi?

20    A.    I accepted the one from Bigelow,

21    yes.

22    Q.    Now, you said something about Mr.

23    Marfisi getting involved in the promissory

24    note, what was that?

25    A.    When I went to see Metcalf, I was