1      presented with another promissory note that was

2      signed by me and Marfisi for 19,000.

3              Q.    You went to see Metcalf?

4              A.    Yes, whatever his lawyer's name is.

5              Q.    Meckstroth?

6              A.    Yeah.

7              Q.    When was this?

8              A.    I don't remember.

9              Q.    Was it the same day as the

10     closing?

11             A.    No.

12             Q.    Was it the same month?

13             A.    No, months later.

14             Q.    Months later?

15             A.    Yeah.

16             Q.    You went to Mr. Meckstroth's office?

17             A.    Yes.

18             Q.    And you said something about a note

19     signed by Marfisi?

20             A.    Yes.

21             Q.    Explain that to me.

22             A.    It was a promissory note that was

23     presented to me.

24             Q.    Mr. Marfisi gave you a promissory

25     note?

```
1              A.    (Witness nods head.)

2              Q.    She has to take down your answer.

3                    MR. SCHWANTES:  You have to

4       answer.

5                    THE WITNESS:  Yes.

6       BY MR. LABER:

7              Q.    And that was for $19,000?

8              A.    Yes.

9              Q.    And was that in exchange for Mr.

10      Bigelow's note to you?

11             A.    I don't understand what you are

12      saying.

13             Q.    Did you accept Mr. Marfisi's note as

14      satisfaction of Mr. Bigelow's note, as payment

15      of Mr. Bigelow's note?

16             A.    No.

17             Q.    So Mr. Marfisi was giving you

18      $19,000 and Mr. Bigelow was giving you $19,000?

19             A.    No.

20             Q.    Why was Mr. Marfisi giving you a

21      promissory note for $19,000 then?

22             A.    Because I was under the, for some

23      reason he was under the impression that the

24      19,000 was going to him and that he would pay

25      me.
```

1      Q.    I'm sorry, you lost me on the
2  pronouns.  He being who?
3      A.    Marfisi.
4      Q.    Marfisi was under the impression
5  that $19,000 promissory note from Mr. Bigelow
6  was going to him?
7      A.    (Witness nods head.)
8      Q.    Yes?
9      A.    Yes.
10     Q.    And then that he would pay you that
11  $19,000?
12     A.    Yes.
13     Q.    And then you wrote on Mr. Bigelow's
14  promissory note at that time, paid in full?
15     A.    No.
16          MR. SCHWANTES:  Chris, whenever
17  you get to a convenient stopping point I'm
18  going to need to take a break.
19          MR. LABER:  Let's take a break.
20          (WHEREUPON, a recess was taken.)
21          (WHEREUPON, Plaintiff's Exhibit
22  2 was marked for identification.)
23  BY MR. LABER:
24     Q.    Showing you what's been marked as
25  Plaintiff's Exhibit 2, do you recognize that?

1          A.    Yes.

2          Q.    And what is that?

3          A.    It's a promissory note.

4          Q.    And in particular is that a

5     promissory note from Mr. Bigelow to you in the

6     amount of $19,000?

7          A.    Yes.

8          Q.    Does that bear the date of 27th of

9     January of 1998?

10         A.    Yes.

11         Q.    That would have been the date that

12    you received the promissory note for $19,000

13    from Mr. Bigelow?

14         A.    Yes.

15         Q.    Does that look like the promissory

16    note that you received on the closing on the

17    27th?

18         A.    Yes.

19         Q.    And written on there is paid in

20    full; is that correct, is that right?

21         A.    Yes.

22         Q.    And underneath that is a signature?

23         A.    Yes.

24         Q.    Whose signature is that?

25         A.    That's my signature.

1          Q.    And when did you sign paid in full

2    on that document?

3          A.    I have no idea.

4          Q.    But you did sign paid in full on

5    that document?

6          A.    I signed it, I did not write paid in

7    full.

8          Q.    Paid in full was written above that

9    and then you signed it?

10         A.    No.

11         Q.    You are saying that someone wrote

12   paid in full above that when you signed it?

13         A.    When I signed this, paid in full was

14   not on there.

15         Q.    What was the purpose in signing

16   that?

17         A.    I was told to sign it.  I signed

18   it.  I was told that I would receive from

19   Bigelow $19,000.

20         Q.    So you signed that on the date of

21   closing?

22         A.    And I signed it, paid in full was

23   not on there.

24         Q.    I'm asking you when you signed it,

25   Ms. Bryant?

1          A.   I don't exactly remember the date
2     that I signed this.
3          Q.   Did you sign it at closing?
4          A.   I might have signed it at the
5     closing date, but I did not write paid in full
6     on there.  Paid in full was not on there.
7          Q.   I'm sorry, you say you might have
8     signed it on the closing date?
9          A.   I might have.
10         Q.   Would there have been some other
11    person in possession of the note when you
12    signed it?
13         A.   I have a copy of it at home.
14         Q.   Is it marked with your signature on
15    it?
16         A.   It might be, it might not be, I
17    don't know.  I don't remember.  I don't
18    remember if this is the one -- Marfisi had gave
19    me a paper to sign and this, with something
20    else over the top of it and I signed it but I
21    did not sign anything paid in full.
22         Q.   So you are saying Marfisi tricked
23    you in signing this as if it was something
24    else?
25         A.   Yes.

1          Q.    So when you said before that you

2     might have signed it at the closing or some

3     later date, then that was incorrect?

4          A.    Yes.

5          Q.    Then why did you say that?

6          A.    I'm trying to remember if it was on

7     the closing, I'm trying to see mine, I have a

8     copy of this and I'm trying to see in my mind,

9     in my head to see if my signature is on it and

10     I don't think I signed it.  I think I just

11     received it from him, but I can't place whether

12     I signed it or not.  I might have, but I did

13     not sign anything paid in full on it, I know

14     that.

15          Q.    Now, you say you received another

16     note from Mr. Marfisi for $19,000?

17          A.    I didn't say I received it, I told

18     you that I was showed one.

19          Q.    You were showed a promissory note --

20          A.    A promissory note that I had signed

21     that the money went to Marfisi, that he would

22     pay me.

23          Q.    That Marfisi would pay you the

24     $19,000 instead of Mr. Bigelow?

25          A.    Yes.

1          Q.    And you signed that piece of

2     paper?

3          A.    I do not remember signing it.  I

4     might have, I don't remember.  I told you,

5     that's all I remember.

6          Q.    Did you agree to have Mr. Marfisi

7     pay you instead of Mr. Bigelow?

8          A.    No, I did not.

9          Q.    You did not.

10                    (WHEREUPON, Plaintiff's Exhibit

11     3 was marked for identification.)

12     BY MR. LABER:

13          Q.    Showing you what's been marked as

14     Exhibit No. 3, can you identify that?

15          A.    This is the paper that is releasing

16     Bigelow for the 19,000 and that I owe $600 in

17     rent.

18          Q.    Now, if you look down at

19     paragraph --

20          A.    And he gave me a check for 2000.

21          Q.    Look down at paragraph three.  Can

22     you read paragraph three for me?

23          A.    The parties agree to enter into a

24     lease agreement --

25          Q.    No, Whereas Bigelow's

1    responsibility.

2                      MR. SCHWANTES:  He's talking

3    about here.  (Indicating.)

4    BY MR. LABER:

5          Q.    Under said promissory note has been

6    previously transferred to John Marfisi?

7          A.    And the original promissory note was

8    marked paid in full.

9          Q.    Original promissory note was marked

10    paid in full and you signed off on this

11    document No. 3; is that correct?

12          A.    Yes.

13          Q.    And that's your signature on the

14    second page of this document?

15          A.    Yes.

16          Q.    And did it say that at the time you

17    said it, at the time that you wrote it, at the

18    time that you signed it, did it have that

19    sentence in it at the time that you signed this

20    document entitled release?

21          A.    Yes.

22          Q.    After you signed this document,

23    well, was that signed in Mr. Meckstroth's

24    office?

25          A.    Yes.

1          Q.    Did Mr. Meckstroth prepare that to

2    your knowledge?

3          A.    Yes.

4          Q.    Did you have any question of Mr.

5    Meckstroth before you' signed off on that?

6          A.    Yes.

7          Q.    What was the question?

8          A.    Why my money was given to Marfisi

9    without my knowledge.

10         Q.    Without your knowledge?

11         A.    Yes.

12         Q.    You were talking about a promissory

13   note from Marfisi to you?

14         A.    I was talking about I was supposed

15   to receive the 19,000, okay?  It was given to

16   Marfisi.  Nobody informed me that the check was

17   ready or that was transferred over to Marfisi.

18         Q.    Then what was the occasion that you

19   were shown the promissory note from Marfisi to

20   you that you say you signed off on?

21         A.    I signed a paper, I didn't know it

22   was a promissory note to Marfisi.  I said it

23   was covered with something.  It was something

24   about a house because we had talked about a lot

25   of different things.  We had talked about

1    trying to get a house to open up a daycare

2    center and everything, but it was not about me

3    giving him my money because I didn't know it

4    was paid to him.

5        Q.    We being you and Mr. Marfisi?

6        A.    Yes.

7        Q.    So you and Mr. Marfisi discussed

8    different ways of investing your $19,000?

9        A.    Yes.

10        Q.    Mr. Bigelow wasn't in on that

11    conversation, was he?

12        A.    No.

13        Q.    How many times did you and Mr.

14    Marfisi discuss how to invest the $19,000?

15        A.    The first time that we discussed it

16    we were in the office and Pete was in there --

17        Q.    We were at the what?

18        A.    We were at the lawyer's office and I

19    talked about investing it.  I said, I would,

20    you know, let him invest my money.

21        Q.    Him --

22        A.    Marfisi invest my money, okay, but I

23    did not say turn my check over to him.

24        Q.    And so you discussed with Mr.

25    Marfisi that one occasion.  What other

1    occasions did you discuss Mr. Marfisi about how

2    to invest your money?

3         A.    There were a number of times we had

4    talked on the phone about him doing investments

5    and things, but I don't know exactly what month

6    or --

7         Q.    Sure.

8         A.    -- or the dates but it was a number

9    of times that we had talked.

10        Q.    More than five?

11        A.    Yeah.

12        Q.    More than ten?

13        A.    I doubt that.

14        Q.    So somewhere between five and ten

15   times --

16        A.    Yes.

17        Q.    -- you and Mr. Marfisi discussed

18   what to do with your $19,000?

19        A.    Yes.

20        Q.    Do you still live at the Laidlaw

21   Avenue address?

22        A.    Yes.

23        Q.    Do you own that property now or are

24   you still leasing it?

25        A.    No, it's in my name.

1          Q.    When did you purchase that
2    property?
3          A.    June of last year.
4          Q.    June of 2000?
5          A.    Yes.
6          Q.    Were you current in your rent at the
7    time that you purchased the property?
8          A.    Yes.
9          Q.    Had there been an eviction filed
10   against you at any time between the closing and
11   June of 2000?
12         A.    No.
13         Q.    Had you always kept up with your
14   rent payments between the closing and June of
15   2000?
16         A.    No.
17         Q.    Was there any time that you were
18   more than one month in default of rent?
19         A.    Yes, I got behind $600.
20         Q.    How many months would that be, three
21   months?
22         A.    Three.
23         Q.    And no eviction was filed against
24   you at that time?
25         A.    No.

1           Q.    You worked that out with Mr.

2      Bigelow?

3           A.    Yes.

4           Q.    And then in June of 2000 you

5      purchased the property.  How did you come about

6      doing that?

7           A.    He gave me the, Bigelow gave me the

8      name of McKinley Mortgage that talked to them.

9           Q.    How did you determine a purchase

10     price for the property?

11          A.    The purchase price came up with the

12     appraisal that whatever, whatever appraisal

13     price of the house.

14          Q.    How much did you purchase the

15     property for?

16          A.    I think it was like 65,000.

17          Q.    And you financed it through McKinley

18     Mortgage?

19          A.    I went through McKinley Mortgage,

20     the bank is First Franklin, it's called, Option

21     One.

22          Q.    Ms. Bryant, I have received some

23     responses to interrogatories from the Burbrinks

24     and I'm going to read a response from the

25     interrogatories that refers to you in your

1    testimony.

2         A.    From who?

3         Q.    From the Burbrinks.

4         A.    Who are they?

5         Q.    Do you know Mark and Michael

6    Burbrink?

7         A.    No.  I'm asking who they are.

8              MR. SCHWANTES:  He asks the

9    question, you get to answer.

10   BY MR. LABER:

11        Q.    Those are the people that are

12   involved in the lawsuit with Mr. Bigelow whose

13   deposition you are involved with today, for

14   which your deposition is being taken today.

15        A.    Okay.

16        Q.    Now, do you know who they are?

17        A.    Huh-uh.

18        Q.    And what I'm suggesting to you,

19   ma'am, is that I have an eye disorder and I

20   read with a speed and accuracy of a first

21   grader.  I'm going to read it to you, but it's

22   going to be disjointed and slow when I read out

23   loud.  Please bear with me, all right?

24              The question is asking the

25   Burbrinks to identify the witnesses that they

1    are going to have at trial and talk about the

2    subject matter and it lists Shirley Bryant and

3    it says this witness who was victimized by the

4    same scheme as that perpetrated against the

5    defendants.  Do you know what scheme that you

6    were victimized by?

7        A.    (Indicating.) Not receiving 19,000.

8        Q.    Not receiving the $19,000?   So you

9    believe the Burbrinks were also victims of not

10   receiving payment on a promissory note?

11       A.    I don't know about them.  I've never

12   met them.

13       Q.    It also says, will describe her

14   solicitation by Roseann Christian, you've done

15   that, correct?

16       A.    Yes.

17       Q.    The scheme and its impact on her.

18   So can you describe the scheme and its impact

19   on you?

20       A.    The only scheme that I think I had

21   is I did not receive 19,000.  I got the

22   run-around from the lawyer, from John Marfisi,

23   about who was going to pay me 19,000.

24       Q.    So it would have nothing to do with

25   the original transaction for the purchase of

1    the property by Mr. Bigelow and the lease back

2    to you and all of that?   You don't consider

3    victimized by all of that; is that correct?

4          A.   The other thing is that at that time

5    my house had equity in it.  Now my house has no

6    equity in it.  I only owed 11,000 on it and I

7    didn't get anything.

8          Q.   And is that as a result of that

9    $19,000 not being paid to you?

10          A.   Well, for my thinking, I should have

11    gotten more than 19,000.  The equity that was

12    in my house with me only owing 11,000 on it.

13          Q.   So, again, when we talk about you

14    being victimized by the same scheme and the

15    impact of this scheme, what are we referring to

16    as this scheme?

17          A.   I have, that was the only scheme

18    that I had was not being paid the money that

19    was --

20          Q.   She's leaning forward and so am I

21    waiting for you to finish your sentence.  That

22    was?

23          A.   -- owed to me.

24          Q.   The $19,000 that was owed on the

25    promissory note?

1          A.    Yeah.

2                    MR. LABER:  If I could just have

3     a second with Pete.

4                    (WHEREUPON, a recess was taken.)

5                    MR. LABER:  I have no more

6     questions, thank you.

7                    THE WITNESS:  I'd like to

8     clarify one thing.

9                    MR. LABER:  I have no more

10    questions.

11                    MR. SCHWANTES:  I have a

12    question.  Are we back on the record?

13                    DIRECT EXAMINATION

14    BY MR. SCHWANTES:

15          Q.    We talked a lot about the 19,000.

16    Did Pete Bigelow ever pay you the 19,000?

17          A.    No.

18          Q.    Did John Marfisi ever pay you the

19    19,000?

20          A.    No.

21          Q.    Did you lose, you talked about

22    equity in your house, did you lose equity in

23    your house?

24          A.    Yes.

25          Q.    Was that as a result of the

1    transaction with Pete Bigelow?

2            A.    Yes.

3                    MR. LABER:  I'm going to

4    object.  She's your witness and I'm objecting

5    to the leading questions.  If you are going to

6    testify you are going to have to raise your

7    right hand and swear to testify.  You can't

8    lead your own witness.

9    BY MR. SCHWANTES:

10           Q.    What was the scheme that you were

11   victimized by?

12           A.    Not receiving the 19,000.  I didn't

13   get the equity on my house when I sold it to

14   Bigelow by me only owing 11,000 on it and that

15   I put a roof on my house and I had to pay for

16   it when Bigelow owned it, which cost $800, and

17   I don't think that should have been on me by

18   him being the owner at the time and I was just

19   renting.

20                   MR. SCHWANTES:  I don't have any

21   other questions.

22                   MR. LABER:  I do.

23                   RECROSS EXAMINATION

24   BY MR. LABER:

25           Q.    Before you just gave that new

1    answer, did you talk with your attorney?

2          A.    (Witness shakes head.) Not about

3    this.

4          Q.    You didn't discuss this at all with

5    your attorney?

6          A.    No.

7          Q.    Just now?

8          A.    No.

9          Q.    Just out of the clear blue sky you

10   remember this stuff off the top of your head

11   and he brought this up?

12         A.    No, I was going to tell you about

13   that in the beginning because I didn't think it

14   was right.  You didn't say anything about what

15   was it or what wasn't it.  It is like why

16   should I buy a house from somebody and I tell

17   them, he's the landlord and I'm paying him

18   rent, that the roof is leaking, okay, now, the

19   roof leaking, why do I have to pay $800.

20              He owns the house, I haven't

21   bought it back.  If I hadn't bought the house

22   back then the roof would have been on me.  It's

23   just like if you buy a house from me you come

24   and tell me that the roof is leaking, then you

25   want me to fix it before you purchase it.

1    Q.   What time did you ask Mr. Bigelow to

2    fix the roof on your house?

3    A.   It had to be just, I think we closed

4    in June.  So it had to be around April or May,

5    somewhere in there.

6    Q.   April or May of 2000?

7    A.   Yes.

8    Q.   And how did you communicate that to

9    him?

10   A.   I called him on the phone and told

11   him that the roof was leaking and that at the

12   closing I had handed him $800.

13   Q.   At what closing?

14   A.   The closing for the house when I

15   bought the house back.

16   Q.   You notified him in May of 2000 that

17   the roof was leaking and then in June of 2000

18   you bought the house back?

19   A.   Yes.

20   Q.   And were you paid to have the roof

21   fixed out of that closing?

22   A.   No.

23   Q.   You said something --

24   A.   I paid for it.

25   Q.   You said something about $800?

1          A.    I paid him $800.

2          Q.    You paid him $800?

3          A.    I paid Bigelow $800.

4          Q.    For what?

5          A.    The roof to be fixed on my house.

6          Q.    When did you do that?

7          A.    Just before the closing in 2000, in

8    May.  When the mens came out they fixed the

9    roof.  They fixed the pipe that was broke in my

10   front yard which is costing me $900.  Now

11   that's broke again.

12         Q.    Did you bring this up at the

13   closing?

14         A.    Yeah, it was brought up I had to pay

15   him $800.

16         Q.    Who did the closing for this

17   property?

18         A.    We did it at McKinley Mortgage with

19   the lady from First Franklin or Option One or

20   whatever they call it.

21         Q.    And did you sign off on the

22   settlement statement that said that you were

23   paying him $800?

24         A.    I can't remember if that's in the

25   paper that was put in or not.