**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **SHIRDENIA BRYANT, et al.** | : | **Civil Action No. C-1-02-006** |
| **Plaintiffs** | : | **(Judge Spiegel)** |
| | | **(Magistrate Judge Sherman)** |
| **vs.** | : | |
| | | **CONSOLIDATED** |
| **PRESCOTT BIGELOW, IV, et al.** | : | **MOTION OF DEFENDANTS** |
| | | **PRESCOTT BIGELOW IV** |
| **Defendants** | : | **AND ROSEANNE CHRISTIAN** |
| | | **FOR SUMMARY JUDGMENT** |

\*     \*     \*     \*     \*

Now come the Defendants, Prescott Bigelow, IV ("Bigelow") and Roseanne Christian ("Christian"), by and through counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby move this court for summary judgment as to all claims asserted by Plaintiffs Shirdenia Bryant ("Bryant") and Harry Curtis ("Curtis"). Defendants submit that there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law. In support of this motion, Defendants submit the deposition transcripts of Bryant and Curtis, separately filed with the Court, and the affidavits of Roseanne Christian (App. A) and Prescott Bigelow, IV (App. B). In further support of this motion, Defendants submit the following memorandum.

**MEMORANDUM IN SUPPORT OF MOTION**

**I       INTRODUCTION**

The Amended Complaint of Plaintiffs Bryant and Curtis alleges RICO violations by Defendants Bigelow and Christian. Count I of the Amended Complaint alleges that Bigelow

engaged in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Count II

alleges that Bigelow and Christian conspired to violate 18 U.S.C. § 1962(c), in violation of 18

U.S.C. § 1962(d). Count III alleges common law fraud and Count IV alleges conspiracy against

Bigelow and Christian. Count V alleges breach of a fiduciary duty against Bigelow.

    The allegations of the Amended Complaint are based on fraud. Plaintiffs assert that the

Defendants "perpetrated a number of separate related schemes to swindle and defraud financially

distressed homeowners out of the equity in their real estate." (Amended Complaint, ¶ 7).

Plaintiffs allege that Christian would outline a "plan" to the homeowner whereby the property

would be sold by the homeowner; the liability or tax deficiency which gave rise to the

foreclosure action would be satisfied; the homeowner would rent the property back from the new

owner; and the property would later be sold back to the homeowner at the original purchase

price. (Amended Complaint ¶ 10).

    Plaintiffs allege that Christian and Bigelow "intended and planned to acquire the property,

to draw all of the equity from the acquired property, to extract so-called rental payments from the

homeowner through use of the U.S. mails, to encumber the property, and then to eject the

unsuspecting homeowner from his or her residence." (Amended Complaint ¶ 12).

    There is no factual support in the record for these allegations of fraud. The depositions of

the Plaintiffs have been filed with the Court. Curtis has produced no evidence of fraudulent

misrepresentations by Bigelow or Christian. Curtis' primary contention is that a land contract

was not signed and recorded by Bigelow, which Curtis alleges would have prevented him from

being evicted and losing his property. Curtis also alleges a verbal agreement with Bigelow to

enter into a land contract, which is not actionable under Ohio law. In fact, a land contract would

not have made any difference, as Curtis would have also been evicted for non payment of rent under a land contract, pursuant to Ohio law. Curtis chose to withhold rent payments from Bigelow, because of a dispute over work to be done under the purchase contract. This dispute was heard and determined in the Hamilton County Municipal Court. Curtis lost his property because he failed to pay rent, and the court ordered him evicted. Res Judicata bars Curtis' claims, as well as Ohio law relating to parol evidence and the statutes of frauds.

Bryant entered into a purchase contract with John Marfisi, who is not a defendant. Bryant also has failed to produce evidence of material misrepresentations of fact by either Bigelow or Christian. Bryant's primary claim is that she was "hoodwinked" out of 19,000.00 she was to receive from Marfisi under the contract to purchase. Bigelow paid this money to Marfisi, upon instruction from Bryant, after Bigelow's promissory note was signed "Paid in Full" by Bryant. Bryant subsequently signed a full and complete release in favor of Bigelow , releasing him from any liability for the 19,000.00 or incident to her tenancy before signing the lease agreement with Bigelow. Bryant then voluntarily repurchased her property from Bigelow, financing her purchase with a loan and mortgage. When Bryant lost her job and experienced financial difficulties which have nothing to do with the defendants, Bryant defaulted on the mortgage and lost her property through foreclosure. Bryant's losses were not caused by the defendants.

## II    <u>STATEMENT OF FACTS</u>

### A.  <u>Shirdenia Bryant</u>

Bryant's claims concern the sale of her property at 1107 Laidlaw. Bryant inherited the Laidlaw Avenue property from her mother's estate. (Bryant depo. p. 39). After May, 1996, Bryant became responsible for making the mortgage payments at Laidlaw. (Bryant depo. p. 57).

Bryant soon became delinquent in the mortgage payments.  A complaint for foreclosure of the mortgage was filed in Hamilton County in July of 1997.  (Bryant depo. pp. 57-58).

While the foreclosure action was pending, Bryant had her first contact with Christian. (Bryant depo. p. 65).  According to Bryant, Christian stated that she knew Bryant was having trouble with the house and that she knew someone who could help Bryant.  (Bryant depo. p. 65). By the time of Christian's second visit to Bryant, she had no options to avoid foreclosure. (Bryant depo. p. 68).  When Christian met with Bryant the third time, Christian came with John Marfisi ("Marfisi").  (Bryant depo. p. 75). By then, Bryant's property had been scheduled for sheriff's sale.  (Bryant depo. p. 76).

When Christian and Marfisi met with Bryant, a proposal was presented by Marfisi. (Bryant depo. p. 77, 81).   The proposal was that Bryant would sell the house, she would lease the house back and she would pay rent.  After several months she could buy the house back.  (Bryant depo. p. 77).    The only statement that Bryant can recall being made by Christian about the sale was not to spend the $20,000.00 she was about to receive.  Christian suggested to Bryant that she put the money aside so she could use it to buy her house back.  (Bryant depo. p. 87).

The contract to purchase Bryant's property was between Bryant and Marfisi.  Marfisi prepared the contract.  Christian Affidavit  ¶ 6).  The contract was signed on January 7, 1998. (Bryant depo. p. 88, exhibit 9).  Bryant read and understood the contract before she signed it. (Bryant depo. pp. 88-89).   Bryant understood that the buyer was John Marfisi.  (Bryant depo. p. 90).  Bryant understood that she was selling her property and that at the end of the lease period she could buy her house back.  (Bryant depo. p. 79).  The purchase contract provided that $20,000.00 cash would be paid to Bryant, and Bryant understood that Marfisi was going to pay

her the $20,000.00. (Bryant depo. p. 99). Marfisi would satisfy the lien with Nations Banc.

Bryant had an option to lease the property from Marfisi for $200.00 a month for one year.

Bryant understood that she had the option to repurchase at the end of a year but she would not be

required to repurchase. (Bryant depo. p. 91). The contract also provided that Marfisi would help

Bryant purchase the property at 100% financing. (Bryant depo. p. 90). Bryant did not

understand what the 100% financing meant and she did not ask Marfisi to explain it to her.

(Bryant depo. p. 96). Bryant did not discuss with Marfisi what the purchase price for the

property would be at the end of the one year period. (Bryant depo. p. 91).

Prior to the closing, Bigelow came out to the property. (Bryant depo. pp. 93-94). When

Bigelow came to the Laidlaw property, he had the purchase contract with him. (Bryant depo. p.

97). Bryant did not know what Bigelow's involvement would be in the transaction at that time.

Bryant understood that she would be paying rent but she did not know to whom. (Bryant depo. p.

97).

The closing was on January 27, 1998 at attorney John Meckstroth's office. Bigelow

purchased the property from Bryant. Bigelow signed and delivered a promissory note for

$19,000.00 to Bryant. (Bigelow Affidavit ¶ 3). The terms of Bigelow's promissory note were

explained by Meckstroth. (Bryant depo. p. 100). Bryant cannot recall any reason given to her

why the $19,000.00 was not being paid at closing, and she did not ask. Bryant agreed that she

could receive the money within sixty (60) days, as stated in the promissory note. (Bryant depo. p.

101).

At the closing, Bryant signed a settlement statement which accurately reflects the

transaction. (Bryant depo. pp. 101-02; Bigelow Affidavit ¶ 2). Before Bryant signed the

documents at closing, attorney Meckstroth explained them all,  to her satisfaction.  (Bryant depo. p. 102).  At the closing, Bryant knew she was selling the property to Bigelow.  (Bryant depo. p. 102).  She understood she would be leasing the property back from Bigelow, and she received a $1,000.00 check at the closing.  (Bryant depo. pp. 102-103).  The settlement statement refers to the principal of a promissory note for $19,000.00, which coincides with the promissory note Bryant received from Bigelow at the closing.  (Bryant depo. p. 103).

On January 27, 1998, Bryant signed a deed transferring ownership of the property to Bigelow.  (Bryant depo. p. 104, exhibit 12).   Bryant understood that by signing the deed she was transferring ownership of the property to Bigelow.  (Bryant depo. p. 104).

 Both before and after the closing, Bryant and Marfisi discussed ways that Bryant could invest her $19,000.00.  (Bryant depo. p. 111).  Bryant gave deposition testimony in another case that she had between five to ten discussions with Marfisi reference investing her $19,000.00.  (Bryant depo. p. 113, Ex. 1, at pp. 57-58).   Bryant told Marfisi she was interested in using the $19,000.00 to start a daycare business.  (Bryant depo. p. 109).  Marfisi told Bryant he could help in this regard.  (Bryant depo. p. 110).

After the closing, Bryant told Marfisi she wanted him to invest the $19,000.00.  (Bryant depo. p. 123). Bryant confirmed in her prior deposition she told Marfisi she would let him invest her money.  (Bryant depo. p. 119, exhibit 1, p. 57).  Shortly after the closing, Bigelow received a call from Marfisi requesting that the $19,000.00 be paid to Marfisi.  (Bigelow Affidavit ¶ 5).  Bigelow contacted Bryant to confirm her authorization to pay the 19,000.00 to Marfisi.  (Bigelow Affidavit ¶ 6).   Bryant instructed Bigelow to pay the $19,000.00 to Marfisi.  (Bigelow Affidavit ¶ 6).  Bryant denies instructing Bigelow to pay the $19,000.00 to Marfisi.  (Bryant depo. p.

124). Before the $19,000.00 was paid to Marfisi by Bigelow, Marfisi signed and delivered a promissory note to Bryant for $19,000.00. (Bryant depo. pp. 113-114, exhibit 14; Bigelow Affidavit ¶ 8). Before the $19,000.00 was paid to Marfisi by Bigelow, the promissory note originally given to Bryant from Bigelow was marked "Paid in Full" and signed by Bryant. (Bigelow Affidavit ¶ 7). Bryant confirmed that she signed the promissory note acknowledging that her $19,000.00 would be paid to Marfisi; that Marfisi would pay her and not Bigelow. (Bryant depo. p. 120, exhibit 1, pg. 53). Bigelow paid the $19,000.00 to Marfisi. (Bigelow Affidavit ¶ 9)

On January 6, 1999, Bryant signed a release of claims against Bigelow. (Bigelow Affidavit ¶ 10). Bryant also signed a lease with Bigelow. (Bryant depo. pp. 124-125, exhibit 15 and 16; (Bigelow Affidavit ¶ 12). The release was prepared by attorney Meckstroth. The release is one of the documents Meckstroth explained to Bryant before she signed it. She understood what the document meant when she signed it. (Bryant depo. p. 125). As stated in the release, Bigelow paid Bryant $2,000.00. Bryant was released from a rent obligation of $600.00. Bryant released Bigelow from all claims regarding Bigelow's promissory note to Bryant and all claims regarding Bryant's tenancy, prior to execution of the lease. (Bryant depo. p. 126).

Marfisi received the $19,000.00 that was originally going to be paid to Bryant by Bigelow. (Bryant depo. p. 137). The "scheme" which Bryant is alleging in this lawsuit is that she was not paid her $19,000.00. (Bryant depo. p. 137). Bryant alleges that the $19,000.00 should not have gone to Marfisi, and she should have been informed. (Bryant depo. pp. 137-138).

In June of 2000, Bryant repurchased the property from Bigelow. (Bryant depo. p. 138).

In order to finance the purchase, Bryant signed a promissory note to Wells Fargo Bank for

$64,000.00.  (Bryant depo. p. 140, 147, exhibit 18).  Bryant's monthly payments upon her

repurchase and financing of the property were $597.43.  (Bryant depo. p. 140, exhibit 18).

Bryant's monthly payments to Bigelow under the lease agreement were $500.00 a month.  Bryant

was current with Bigelow as of the time that she repurchased the property (Bryant depo. p. 140).

Shortly after repurchasing the property in June of 2000, Bryant started falling behind on the

mortgage payments because she lost her job.  (Bryant depo. p. 141).   As a result of her financial

problems, she was unable to make her mortgage payments (Bryant depo. p. 143).  A second

foreclosure complaint was filed and a default judgment was entered against Bryant. (Bryant depo.

p. 143).   After the default judgment the property was sold through sheriff's sale.  (Bryant depo.

p. 145).

Regarding Bryant's fraud claims against Bigelow, Bryant claims that she was

"hoodwinked" out of the $19,000.00 that Bigelow paid to Marfisi.  (Bryant depo. p. 148).  Bryant

acknowledges she was advised before she signed the release that the obligation for the

$19,000.00 had been transferred to Marfisi.  (Bryant depo. p. 153, exhibit 16).   Bryant claims

she should have been advised that the money was being paid to Marfisi before it was.  (Bryant

depo. pp. 156-157).  She has no reason to believe that Bigelow received any part of the

$19,000.00.  (Bryant depo. pp. 156-157).  Bryant also claims that Bigelow caused her to lose the

equity in her house, although she cannot quantify the amount lost.  (Bryant depo. p. 152)

Regarding claims against Christian, Bryant claims that Christian was under "false

pretense".  (Bryant depo. p. 154).  Christian defrauded Bryant by "being friends with Marfisi".

(Bryant depo. p. 154).  Bryant believes that Christian split the money with Marfisi.  Bryant

8

acknowledges that she has no evidence to indicate that Christian split her money with Marfisi. (Bryant depo. p. 154).

## B.  Harry Curtis

The claims of Harry Curtis ("Curtis") concern the property at 1966 Fairfax Avenue.  At the time Curtis initially had contact with Christian and Bigelow, the Fairfax property was in foreclosure for the delinquent real estate taxes.  (Curtis depo. p. 52, 67).

Christian came to Curtis' house and told him about the foreclosure.  (Curtis depo. p.86, 89).  Curtis believes that Christian came to the house more than three times, and at some point Christian gave him information about Bigelow.  (Curtis depo. p. 91).

Christian talked to Curtis  about a friend and she brought a proposal from the friend to Curtis.  (Curtis depo. p. 93).  Curtis described the proposal as a land contract and he would pay the land contract back at the end of two years.  On August 2, 1999, Curtis signed a contract to purchase.  (Curtis depo. p. 93, exhibit 11).   Regarding the contract to purchase, Curtis understood the contract to be a formality that had to be done so he could get the taxes current. He did not have an understanding that he could lose the property.  (Curtis depo. p. 100).  Curtis understood that he was selling the property to Bigelow, but that he could continue to live there and later get the property reinstated to him.  Curtis understood that he was transferring the property to Bigelow.  (Curtis depo. p. 101).  Curtis understood that the property would be in Bigelow's name and after Curtis fulfilled the contract the property would be reinstated to him. (Curtis depo. p. 102).  Curtis cannot recall why his initials were put on the contract.  (Curtis depo. p. 103).  Christian was present when Curtis and his wife signed the contract and initialed the lease option language.  (Christian Affidavit ¶ 8).  Curtis requested that the lease option

provision be added to the contract. (Christian Affidavit ¶ 8). The contract provided that Curtis would lease the option property for two years to repurchase at $37,000.00 at the end of two years from the date of closing. (Curtis depo. p. 103). At the time Curtis signed the document, he knew there was a difference between a lease and a contract to purchase. Curtis claims that he was involving himself in a "land contract" (Curtis depo. p. 105), and that the contract to purchase had "nothing to do" with what he was actually supposed to be doing with Bigelow. (Curtis depo. p. 106, Ex.11).

Curtis understood that a land contract would be prepared and would be signed later. (Curtis depo. p. 110-111). Curtis did not request that land contract language be inserted in the contract, because he assumed the land contract would be done. (Curtis depo. p. 110). Curtis claims there was a verbal agreement between Curtis and Bigelow that a land contract would be signed later. (Curtis depo. pp. 111-112).

According to Curtis, the land contract to be prepared would allow him to stay in the premises and he was going to pay $350.00 a month. The land contract would provide the same terms as the contract to purchase. (Curtis depo. p. 113). The property was going to be transferred into Bigelow's name, but then they would have a land contract so Bigelow could not sell the property. Curtis could retain the property until the land contract agreement was fulfilled. (Curtis depo. p. 114). The land contract would include a provision he could repurchase the property for $37,000.00 at the end of two years. (Curtis depo. p. 114). Curtis believed that signing a land contract would ensure that the property was returned to him. (Curtis depo. p. 119, 209). No one represented to Curtis that he could not be evicted for failure to make monthly payments under the land contract, but that was his understanding. (Curtis depo. p. 120).

At the closing, as reflected on the settlement statement, delinquent real estate taxes of $4,527.00 were paid. (Curtis depo. p. 127, 129; Bigelow Affidavit ¶ 14). Curtis received approximately $9,871.32 at the closing. (Curtis depo. p. 130). Curtis also signed a general warranty deed to Bigelow at the closing. (Curtis depo. p. 130 ; Bigelow Affidavit ¶ 13).

Prior to the closing, a land contract had been prepared by John Meckstroth. At the closing the land contract was there. (Curtis depo. p. 133, exhibit 3, p. 699). Curtis had seen the land contract before the closing. (Curtis depo. p. 133). Curtis assumed that the land contract was to be signed at closing. (Curtis depo. p. 136). Before Curtis signed the deed transferring title to Bigelow he did not request that the land contract be signed. (Curtis depo. p. 136). After the closing, Curtis did not have any further discussions with Bigelow or with attorney Meckstroth about the land installment contract. (Curtis depo. p. 139).

Curtis was obligated to make rent payments of $350.00 per month to Bigelow. (Curtis depo. p. 139). Curtis made payments in September and October to Bigelow. (Curtis depo. p. 140). The contract to purchase required Bigelow to repair the roof. Curtis believed that part of the roof which required repair had not been finished. (Curtis depo. p. 146). Curtis began calling Bigelow and left messages about this problem. Although Curtis never actually discussed the roof problem with Bigelow, Curtis decided to hold his rent. (Curtis depo. p. 148). Curtis did not make rent payments to Bigelow for November and December 1999, because of the unfinished roof work. (Curtis depo. p. 148).

When Curtis failed to make his rent payments for November and December of 1999, Bigelow served a three day notice to leave the premises on December 20, 1999. (Curtis depo. p. 149, exhibit 14). Shortly thereafter, Curtis received a complaint for eviction and damages.

11

(Curtis depo. p. 151).

The first court hearing was on January 18, 2000. (Curtis depo. 162). Curtis told the Magistrate about the land contract and stated that he did not know he could be evicted under the contract to purchase. (Curtis depo. p. 163). He brought the land contract to court with him on January 18, 2000. Curtis believes he showed it to the magistrate on that date. (Curtis depo. p. 163). The case was continued because Curtis did not have legal counsel. (Curtis depo. p. 163). The second time Curtis appeared before the court they also talked about the land contract. Curtis is sure that he had the land contract with him at the second court appearance. (Curtis depo. p. 163).

On February 1, 2000, Curtis and Bigelow were back in court on the eviction case. (Curtis depo. p. 167). Testimony was taken from Bigelow and from Curtis. (Curtis depo. p. 168). Curtis explained to the magistrate that he had a land installment contract and he did not feel he should be evicted. (Curtis depo. p. 168, 170). Curtis also told the magistrate about the hole in the roof and that it had not been fixed. (Curtis depo. p. 168). Curtis told the magistrate that Bigelow had not done the work on the roof and that he had withheld the money for that reason. (Curtis depo. p. 170). Curtis told the magistrate that he had the rent money with him. (Curtis depo. p. 169). Curtis told the magistrate there was a dispute about the land contract. Bigelow told the magistrate there was no dispute. (Curtis depo. p. 170). The magistrate had questions about whether the land contract was valid. (Curtis depo. p. 171).

On February 1, 2000, the court ordered that Curtis be evicted. (Curtis depo. p. 178). Curtis understood that the eviction was scheduled for February 9, 2000. (Curtis depo. pp. 178-179). Between February 1 and February 9, 2000 Curtis did not remove any of his property from

the premises.  (Curtis depo. p. 181).  On the morning of February 9, 2000, before the court bailiff

arrived, Curtis started a fire at the premises.  (Curtis depo. p. 181).  Curtis started the fire at

Fairfax because he was upset.  (Curtis depo. p. 182).

Curtis was indicted by the Hamilton County Grand Jury for aggravated arson.  (Curtis

depo. p. 199).  Curtis entered a guilty plea to attempted aggravated arson, and was sentenced to

serve six months in the Justice Center.  The restitution order from the Hamilton County

Probation Department was determined to be $68,000.00, based on the fire damage to the Fairfax

property.  (Curtis depo. p. 202).

## III    LEGAL ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. 56(c), summary judgment is proper "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  When reviewing such a motion, the court must consider the evidence, and the

reasonable inferences therefrom, in the light most favorable to the nonmoving party.  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of

material fact as to an essential element of the non-movant's case.  Celotex v. Catrett, 477 U.S.

317, 321, 106 S.Ct. 2548 (1986). If the moving party meets this burden, then the non-moving

party "must set forth specific facts showing there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).

The non-moving party must then "designate" specific facts showing there is a genuine issue for

trial.  Id. at 324.  As the Supreme Court explained in Anderson v. Liberty Lobby, Inc., 477 U.S.

242,106 S.Ct. 2505 (1986), the central issue in resolving motions for summary judgment is

"whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-252.

### B.    THE MUNICIPAL COURT DETERMINED THAT CURTIS BREACHED THE PURCHASE CONTRACT AND BIGELOW WAS ENTITLED TO POSSESSION

Curtis knowingly and voluntarily signed a purchase contract.   The purchase contract

provided that Curtis would pay $350.00 per month to Bigelow.  The contract also provided that

Curtis would "lease option property for 2 years to repurchase for $37,000.00 at end of 2 years

from this date of closing."  Curtis paid $350.00 for two months to Bigelow (September and

October, 1999) then Curtis decided not to pay rent for November and December, 1999.  On

December 20, 1999, Bigelow served a notice to vacate the premises on Curtis, for nonpayment of

rent (Curtis depo., exhibit 14).  On December 27, 1999, Bigelow filed a complaint in the

Hamilton County Municipal Court for forcible entry, detainer and money against Curtis and his

wife, Patricia Curtis.  (Curtis depo., exhibit 15).  The first cause of action in Bigelow's complaint

was for restitution of the premises.  The second cause of action claimed damages in the amount

of 2,000.00.  Curtis failed to answer the complaint, and failed to file any counterclaims against

Bigelow.

On February 1, 2000, the case was called for trial in the Hamilton County Municipal

Court.  Curtis, Bigelow and Bigelow's attorney were present, and the court took testimony.

Curtis gave testimony regarding his land contract claim, and the dispute with Bigelow.  On that

date, a writ of restitution against Curtis was entered.   Judge Kenney of the Hamilton County

Municipal Court entered the following order:

"Defendant(s) found guilty as charged, whereupon it is considered that the plaintiff have restitution of the premises as described in the statement of claims. The claim for money is continued for filing of an answer or default judgment."

The order for forcible entry and detainer was signed by the attorney for Bigelow and by Curtis.  (Curtis depo., exhibit 17).   Also on February 1, 2000, Judge Kenney entered a writ of execution concerning 1966 Fairfax Avenue directed to the Bailiff of the Hamilton County Municipal Court, as follows:

"Judgment was rendered on February 1, 2000 that the Plaintiff have restitution of said premises; ***

You are therefore hereby commanded to cause the Defendant(s) to be removed from said premises and the said Plaintiff(s) to have restitution of the same; also, that you levy of the good and chattels of said Defendant(s), and make the costs aforesaid and all accruing costs."

(Curtis depo., exhibit 18).

Pursuant to the writ of execution, Curtis was evicted from the premises.

## C.    THIS COURT MUST GIVE RES JUDICATA EFFECT TO THE PRIOR STATE COURT JUDGMENT AGAINST CURTIS

Claim preclusion, or res judicata, bars a subsequent action between the same parties based upon the same claims or causes of action that were or could have been raised in the prior action.  City of Canton, Ohio v. Maynard, 766 F. 2d 236, 238 (6th Cir. 1985).  Under the doctrine of res judicata, once a final judgment on the merits is entered by a court of competent jurisdiction, the judgment operates as a bar to further claims by parties or their privies based on the same subject matter.  Montana v. United States, 440 U.S. 147, 153, 59 L.Ed. 2d 210, 99 S. Ct. 910 (1979); Anchor Motor Freight Inc. v. International Brotherhood of Teamsters, 700 F. 2d 1067, 1069 (6th Cir.), cert denied 464 U.S. 819, 104 S. Ct. 81 (1983).  Even though a subsequent

15

lawsuit based upon the same injury advances a different legal theory, a prior judgment on the merits bars the subsequent suit.  Harrington v. Vandalia-Butler Bd. Of Education, 649 F. 2d 434, 437 (6th Cir. 1981).

This court must, under the full faith and credit provisions of the Constitution of the United States and 28 U.S.C. § 1738, apply Ohio's res judicata principles.  Marrese v. American Academy of Orthopedic Surgeons, 470 U.S. 373, 84 L.Ed. 2d 274, 105 S.Ct. 1237 (1985). Federal courts must give the same preclusive effect to a previous state court judgment that such judgment would receive in the courts of rendering state.  Hapgood v. City of Warren, 127 F. 3d 490, 493 (6th Cir. 1997), (quoting Hospital Underwriting Group, Inc. v. Summit Health Ltd., 63 F.3d 486, 494 (6th Cir. 1995)), cert. denied, 523 U.S. 1046 (1998);  Migra v. Warren Cty. Sch. Dist. Bd. Of Educ., 465 U.S. 75, 79 L.Ed. 2d 56, 104 S.Ct. 892 (1984);  Nilavar v. Mercy Health Sys., 142 F. Supp. 2d 859  (S.D. Ohio 2000).

**D.     RES JUDICATA APPLIES TO CURTIS' CLAIMS BASED ON THE JUDGMENT ENTRY AND THE WRIT OF RESTITUTION ENTERED IN THE MUNICIPAL COURT ACTION**

All of Curtis' claims against Bigelow are based on claims arising out of ownership of the property, and an alleged "scheme" by which Curtis was unlawfully deprived of his ownership interest, and evicted from the premises.   After a trial on the eviction claim, the municipal court judge entered a judgment which determined that Bigelow owned the property, that Bigelow had the immediate right to possession of the property, and that Curtis was unlawfully withholding possession of the property from Bigelow.    That judgment entry and the resulting writ of execution must be given res judicata effect by this Court.  Res judicata bars all of Curtis' claims in this action.

16

Under Ohio law, res judicata applies when there is "(1) a prior final valid decision on the merits by a court of competent jurisdiction; (2) a second action involving the same parties, or their privies, as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the transaction or occurrence that was the subject matter of the previous action." Hapgood v. City of Warren, 127 F. 3d 490, 493 (6th Cir. 1997). Claim preclusion exists when "a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." Grava v. Parkman Township, 73 Ohio St. 3d 379, 653 N.E. 2d 226, 229 (1995), cited in Stuhlruier v. Armco, Inc., 12 F. 3d 75, 77 (6th Cir. 1993). The Ohio law of res judicata, or claim preclusion, "requires a plaintiff to present every ground for relief in the first action, or be forever barred from asserting it." Hapgood, at 494, (quoting National Amusements, Inc. v. City of Springdale, 53 Ohio St. 3d 60, 558 N.E. 2d 1178, 1180 (1990), cert. denied, 498 U.S. 1120, 111 S. Ct. 1075 (1991).   In National Amusements, Inc. v. Springdale, Id., the Supreme Court of Ohio stated: "It has long been the law of Ohio that "an existing final judgment or decree between the parties to litigation is conclusive as to all claims which were or might have been litigated in a first lawsuit" (quoting Rogers v. Whitehall, 25 Ohio St. 3d 67, 69, 494 N.E. 2d 1387, 1388 (1986)).

In Grava v. Parkman Township,  73 Ohio St. 3d 379, 653 N.E.2d 226 (1995), the Supreme Court of Ohio adopted the modern application of the doctrine of res judicata, as stated in 1 RESTATEMENT OF THE LAW (SECOND) JUDGMENTS §§ 24-25 (1982). [1]  Ohio

---

[1]  The Restatement subsection 24(1) provides that when a valid and final judgment is rendered, the "claim extinguished includes all rights of the plaintiff to render these against the defendant with respect to any part of the transaction out of which the action arose."  Section

courts have consistently recognized and applied the doctrine of claim preclusion not only "to issues that could have been raised by the plaintiff in the prior proceeding but also to issues that could have been raised as defenses to the plaintiff's claim in the earlier case." City of Canton, Ohio v. Maynard, 766 F.2d 236, 238 (6th Cir. 1985) (per curiam) (citing Johnson's Island, Inc. v. Board of Township Trustees, 69 Ohio St. 2d 241, 431 N.E.2d 672, 674-75 (1982)). Res judicata under Ohio law "applies not only to what was determined but also every question which might properly have been litigated," Stromberg v. Board of Education, 64 Ohio St. 2d 98, 100, 413 N.E. 2d 1184 (1980). Res judicata may apply if the second lawsuit states a different cause of action. Johnson's Island, Id., at 244. It is also irrelevant that the party, in the second action, is prepared to present evidence or theories of the case not offered in the first action, or that the plaintiff seeks remedies not previously demanded. Grava v. Parkman Township, Id.; National Amusements, Inc. v. City of Springdale, 53 Ohio St. 3d 60, 558 N.E. 2d 1178 (1990). An Ohio judgment has res judicata effect even when the case is pending on appeal. Ashley v. Ashley, 118 Ohio App. 155, 193 N.E.2d 535 (1962).

     E.    **THE ORDER AND THE WRIT OF RESTITUTION ENTERED ON FEBRUARY 1, 2000 IN THE MUNICIPAL COURT ACTION ARE FINAL JUDGMENTS UNDER OHIO LAW.**

The order for Forcible Entry and Detainer was entered by the municipal court on February 1, 2000, granting Bigelow restitution of the premises. On February 1, 2000, the court also entered a writ of execution. On February 9, 2000, the physical eviction was executed. The municipal

---

25(2) states that the claim is extinguished even though the plaintiff later seeks "remedies or forms of relief if not demanded in the first action." Id. § 25(2).

court action was pending from December 27, 1999, when the complaint was filed by Bigelow, until December 29, 2000, when the court dismissed Bigelow's remaining claims without prejudice for want of prosecution. Bigelow's claim for money damages (unpaid rent) against Curtis was dismissed on December 29, 2000, over ten months after entry of judgment in favor of Bigelow against Curtis on February 1, 2000.

Curtis did not file an answer nor any counterclaims in the municipal court action. Curtis elected to proceed to trial on the eviction count. Testimony was taken, which resulted in a judgment adverse to Curtis. Still, after the eviction, Curtis had more than ten months in which to assert his claims against Bigelow in the municipal court. The fact that Bigelow chose not to pursue his claim for unpaid rent does not excuse Curtis' failure to assert counterclaims. The judgment entry and the order of restitution against Curtis bar this action against Bigelow based on res judicata.

The Ohio forcible entry and detainer statutes in Chapter 1923 of the Ohio Revised Code provide a summary method for obtaining restitution of possession of the property. Haas v. Gerski (1963), 175 Ohio St. 327, 330, 194 N.E. 2d 765, 767; Ruebeno v. Showalter (1985), 24 Ohio App. 3d 232, 233, 495 N.E. 2d 31, 32. Forcible entry and detainer is a summary proceeding in which any judge of a county court may make inquiry into disputes between landlords and tenants, and, where appropriate, order restitution of the premises to the landlord. Cuyahago Metro. Hous. Auth. v. Jackson, (1981), 67 Ohio St. 2d 129, 130, 423 N.E. 2d 177, 178. Pursuant to R.C. 1923.01(A), an order of restitution is based on a finding that the landlord is entitled to immediate possession of the property, and that the tenant is in possession unlawfully.

19

Under Ohio law, a judgment entry in a forcible entry in detainer action which contains an order relating to the right of possession of the property is a final appealable order. This is true even absent a specific ruling on the issue of damages, because a proceeding for forcible entry and detainer is a special proceeding which affects a substantial right. Skillman v. Browne, (1990), 68 Ohio App. 3d 615, 619, 589 N.E. 2d 407 (citing Cuyahoga Metropolitan Housing Authority v. Jackson (1981), 67 Ohio St. 2d 129, 423 N.E. 2d 177): An eviction order entered against a defendant in a forcible entry and detainer action is a judgment entry and is a final appealable order pursuant to R.C. 2505.02. Skillman v. Browne, (1990), 68 Ohio 3d 615, 619, 589 N.E. 2d 407. The defendant's remedy is the filing of a timely appeal pursuant to the Ohio Rules of Appellate Procedure and by posting an appeal bond. Colonial American Development Co. dba Georgetown Village Apartments v. Griffith, 48 Ohio St. 3d 72, 549 N.E. 2d 513 (1990).

The Hamilton County Municipal Court had jurisdiction to hear all of Curtis' claims. R.C. 1923.081 provides that a trial on the Plaintiff's claims in a forcible entry and detainer action may also include a trial on any counter-claims filed by the Defendant. A Defendant in a forcible entry and detainer action has a right to a trial by jury provided that any necessary bond is posted. See R.C. 1923.10; 1923.08.

Judge Kenney, after a trial in the municipal court, entered the order in favor of Bigelow on Bigelow's claim for eviction and restitution of the premises, the first claim in Bigelow's complaint. When Judge Kenney ordered that the writ of restitution be issued and entered judgment in favor of Bigelow, the court found that Bigelow was the owner of the property, that Curtis was Bigelow's tenant, that Curtis' tenancy had expired, and that Curtis was unlawfully and forcibly detaining Bigelow from possession of the premises. R.C. 1923.01(A).

It is also clear that under Ohio law writs of restitution have res judicata effect.  In

Tillimon v. Rideout 2001 Ohio App. LEXIS 5308 (6th Dist. 2001) (App. C), a writ of restitution

was issued in favor of the landlord in an eviction action.  Approximately 8 days later, the

Defendant tenants filed a counterclaim against the landlord for damages, alleging that the parties

had entered into a land installment contract, and that the landlord had breached the land contract.

 The trial court agreed and ruled that the Plaintiff should have initiated a forfeiture action

pursuant to R.C. 5313.05 rather than an eviction complaint pursuant to R.C. Chapter 1923.  The

trial court also proceeded to find for the Defendant tenants on their counterclaim for damages.

On appeal by the landlord, the court of appeals reversed the judgment of the municipal court on

the basis of res judicata. The court held that the writ of restitution in the eviction matter barred

the tenants claim against the landlord.  Specifically, the court found that the tenants' counterclaim

for breach of an alleged land contract was barred by res judicata, because the writ of restitution

had been previously granted.  The Tillimon holding confirms that Curtis' claims in this action are

barred by res judicata.

**F.    UNDER RULE 13(A) OF THE OHIO RULES OF CIVIL PROCEDURE, THE FAILURE OF CURTIS TO RAISE HIS CLAIMS AGAINST BIGELOW AS COMPULSORY COUNTERCLAIMS IN THE PRIOR STATE ACTION BARS THE CLAIMS AS RES JUDICATA IN THIS ACTION AND THE OHIO ACTION**

Rule 13(A) of the Ohio Rules of Civil Procedure provides:

(A) Compulsory counterclaims.  A pleading shall state as a counterclaim any
claim which at the time of service of the pleading the pleader has against any
opposing party, if it arises out of the transaction or occurrence that is the subject
matter of the opposing parties' claim and does not require for its adjudication the
presence of third parties of whom the court cannot acquire jurisdiction.
In Rettig Enterprises, Inc. v. Koehler, 68 Ohio St. 3d 274, 278, 626 N.E. 2d 99 (1994), the

21

Ohio Supreme Court stated that Rule 13(A) of the Ohio Rules of Civil Procedure "requires all existing claims between opposing parties that arise out of the same transaction or occurrence to be litigated in the single lawsuit." To determine whether claims "arise out of the same transaction" depends on whether they have a "logical relation." Multiple claims are thus compulsory counterclaims "where they involve many of same factual issues, or ... where they are offshoots of the same basic controversy between the parties." Id. The two-prong test to apply to Ohio Civ. R. 13(A) is: (1) does the claim exist at the time of serving the pleading in the original action, and (2) does the claim arise out of the transaction or occurrence that is the subject matter of the opposing claim. Geuga Truck and Implement Co. v. Juskiewicz, 9 Ohio St. 3d 12, 14, 457 N.E. 2d 827 (1984).

The Ohio Supreme Court has defined "transaction" as a "common nucleus of operative facts." In Grava v. Parkman Township, 73 Ohio St. 3d 379, 653 N.E. 2d 226, 229 (1995) 653 N.E. 2d at 229, the court explained:

> "That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims. This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief. Id. (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24 comment (c) (1982)."

In determining whether the claim arises out of the same "transaction or occurrence" under Ohio Civ. R. 13(A), courts give a broad interpretation to this phrase. Hershman's Inc. v. Sachs-Dolmar Div., 89 Ohio App. 3d 74, 623 N.E. 2d 617 (1993). There is a "flexible test of reviewing the transaction to determine whether there is any logical relationship between the claim and the counterclaim." Id., quoting Eastman v. Benchmark Minerals, Inc., 34 Ohio App. 3d 255, 257,

518 N.E. 2d 23 (1986).  Claims have been deemed to be compulsory when they arise out of the

parties' former relationship, such as principal and agent or employer and employee.  <u>See</u>, <u>Keisser</u>

<u>v. Nationwide Mutual Insurance Co.</u>, 246 F. Supp.  2d 833 (N.D. Ohio 2003).

        Applying these standards test to Curtis' claims against Bigelow, all of the claims are

barred by res judicata.  When a landlord in an eviction action also asserts a claim for damages,

the tenant must assert all of the tenant's claims against the landlord as compulsory counterclaims

under Ohio Civ. R. 13(A).  Whether Civ.R. 13(A) applies to forcible entry and detainer cases is

determined by Civ. R. 1(C), which states that "these rules, to the extent that they would by their

nature be clearly inapplicable, shall not apply to procedure *** in forcible entry and detainer

(actions) *** ."  The Ohio Supreme Court has stated that Civ. R. 13 is not "'clearly inapplicable'

to procedure in forcible entry and detainer" cases. <u>Jemo Assoc., Inc. v. Garman</u>, 70 Ohio St. 2d

267, 270, 436 N.E.2d 1353 (1982).  While <u>Jemo</u> determined that a counterclaim may be asserted

in a forcible entry and detainer action, <u>Jemo</u> did not address whether compulsory counterclaims

must be asserted.  Consistent with the <u>Jemo</u> decision, if a landlord files an action for forcible

entry and detainer and does not join that action with any other claim, the tenant need not file any

counterclaims.  <u>Haney v. Roberts</u>, 130 Ohio App. 3d 293, 720 N.E. 2d 101 (1998).  If, however,

the landlord joins a claim for money damages with the forcible entry and detainer cause of action,

(as Bigelow did), Ohio Civ. R. 13(A) does apply and, consequently, the tenant must assert

compulsory counter-claims or be forever barred from asserting them.  <u>Maduka v. Parries</u>, 14

Ohio App. 3d 191, 192, 470 N.E.2d 464  (1984) (citing <u>Jemo</u> for the proposition); <u>Sherman v.</u>

<u>Pearson</u>, 110 Ohio App. 3d 70, 72, 673 N.E.2d 643 (1996).   The rules includes Curtis' RICO

claims as state courts have concurrent jurisdiction over RICO claims under 18 U.S.C. § 1961 <u>et</u>

seq., Tafflin v. Levitt, 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed. 2d 887 (1990).

In Maduka v. Parries, Id., the tenant filed suit against the landlord in the court of common pleas, after an eviction action had been filed by the landlord in the Cleveland Municipal Court. The landlord had also included a claim for back rent. The defendant vacated the premises, and later filed suit against the landlord in the court of common pleas, alleging numerous tort claims stemming directly from issues involved in the municipal court proceedings. The tenant included a claim that the landlord interfered with the tenant's United States mail.[2] The trial court granted the landlord's motion to dismiss the tenant's action for lack of subject matter jurisdiction pursuant to Civ. R. 13(A). The judgment was affirmed on appeal.

In Sherman v. Pearson, 110 Ohio App. 3d 70, 673 N.E. 2d 643 (1996), the Hamilton County Court of Appeals affirmed a summary judgment against a tenant under Civ. R. 13(A). The court held that since the tenant's personal injury claim should have been asserted as a compulsory counterclaim in a prior eviction action filed by the landlord, the tenant's claim was barred.

Regarding fraud claims, where the facts alleged to support plaintiff's claim of fraud were available to him at the time the state court suit was filed, and were involved in the state court claim, res judicata bars assertion of the fraud claim for the first time in subsequent federal litigation. Wunderle v. Central Trust Co., N.A., 829 F. 2d 1127 (6th Cir. 1987), citing Brick Processors, Inc. v. Culbertson, 2 Ohio App. 3d 478, 442 N.E. 2d 1313 (1981).

---

[2] Curtis asserts, as a predicate act under his RICO claims that Bigelow used the U.S. mails as part of a scheme to defraud him. (Amended Complaint, ¶ 35).

### G.    PLAINTIFFS HAVE PRODUCED NO EVIDENCE OF FRAUD TO SUPPORT THE ALLEGATIONS OF THE AMENDED COMPLAINT

In order for the plaintiffs amended complaint to survive summary judgment, it  is incumbent upon plaintiffs to produce evidence of a false statement of fact reasonably relied upon by them, to their damage.  Bryant's vague claim that she was "hoodwinked" is clearly not sufficient to sustain her burden of proof.  Neither Curtis or Bryant have produced evidence of specific misrepresentations of fact by either Defendant upon which they reasonably relied. Vague assertions that the Defendants were acting under "false pretense" or that was a "scheme" are insufficient as a matter of law.  The defendants have committed no predicate acts of fraud under RICO, nor any acts of common law fraud.

In order to recover under RICO plaintiffs must successfully prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.D.P.R.L. v. Impex Company, Inc., 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The elements of mail fraud are (1) a scheme to defraud and (2) a mailing for the purpose of executing the scheme." Hofstetter v. Fletcher, 905 F.2d 897, 902 (6th Cir. 1988).

The elements of common law fraud are: "1) a material false representation or concealment; 2) knowingly made or concealed; 3) with the intent of misleading another into relying upon it; 4) reliance, with a right to do so, upon the representation or concealment by the party claiming injury; and 5) injury resulting from the reliance." Finimore v. Epstein, 18 Ohio App.3d 88, 90, 481 N.E.2d 1193 (Cuyahoga Cty. 1984).

Plaintiffs also must prove reasonable reliance on defendants fraudulent misrepresentations. Plaintiffs must show that the defendants made a material misrepresentation

of fact that was calculated or intended to deceive persons of reasonable prudence and comprehension, and must also show that plaintiffs in fact relied upon that material misrepresentation. U.S. v. VanDyke, 605 F.2d 220, 225 (6th Cir. 1979); Watkins & Son Pet Supplies v. Iams Co., 254 F.3d 607 (6th Cir. 2001). Daup v. Tower Cellular, Inc., 136 Ohio App. 3d 555, 568, 737 N.E.2d 128, 138 (2000). The Sixth Circuit requires in a criminal mail fraud case that the scheme must involve "some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir. 1979), cert. denied 444 U.S. 994 (1979). This requirement equally applies in a civil RICO case premised upon alleged mail fraud. Blount Financial Services, Ins. v. Walter E. Heller and Company, 819 F.2d 151, 153 (6th Cir. 1987) (quoting Van Dyke). In the civil context, in fact, the following rule applies:

> Fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant which the plaintiff relied on and the facts showing the plaintiff's reliance on defendant's false statement of fact.

Id., 819 F.2d at 152. A scheme to defraud is defined as "'intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end.'" Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 389-390 (6th Cir. 1996). Plaintiffs must allege and prove the facts which demonstrate detrimental reliance upon the fraudulent conduct. VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 699, 701 (6th Cir. 2000).

In Blount Financial Services, Inc., et al. v. Walter E. Heller and Company, et al., 819 F.2d 151 (6th Cir.1987), the plaintiff alleged violations of the Sherman Act and the RICO Act. The

26

plaintiff alleged that he was driven out of business because he was charged an interest rate which was in violation of the contract between the parties.  Id.  The court of appeals affirmed the district court's dismissal of the complaint, finding there may have been a breach of contract, but not a RICO cause of action.  Id. at 153.  The Sixth Circuit stated that the defendant's  decision could not have been reasonably calculated to deceive a business entity "of ordinary prudence and comprehension."  Id. at 153.   As a result, the Sixth Circuit found the plaintiff's reliance and inaction were unreasonable, and that plaintiff could not establish that defendant's conduct was "reasonably calculated" to deceive the ordinary business person.  Id.

**H.    PLAINTIFFS HAVE FAILED TO PRODUCE EVIDENCE OF A PATTERN OF RACKETEERING ACTIVITY**

In addition to the failure of the plaintiffs to produce evidence of predicate acts under RICO,  the plaintiffs have failed to produce evidence of a pattern of racketeering activity.   In order to comprise a "pattern," there must be "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Further, the pattern requirement also demands that the RICO plaintiffs establish a relationship between the predicate acts and a threat of continuing activity. H. J. Inc. v. Northwestern Bell Telephone Company, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) Pursuant to § 1964(c),  a RICO plaintiff must establish that the injury occurred "by reason of" the claimed violation of § 1962, which in this case is alleged mail and/or wire fraud. Grantham and Mann, Inc. v. American Safety Products, Inc., 831 F.2d 596, 605 (6th Cir. 1987) "The criminal conduct in violation of section 1962 must, directly or indirectly, have injured the plaintiff's business or

property." Id., 606 quoting <u>Haroco, Inc. v. American National Bank & Trust Co.</u>, 747 F.2d 384, 398 (7th Cir. 1984),  aff'd 473 U.S. 606 (1985).

In civil RICO actions where the predicate acts are mail fraud and wire fraud, the Sixth Circuit has repeatedly held that the continuity requirement is not met by proof that the defendants defrauded the plaintiff over a short period of time, such as six or seven months.  <u>Vild v. Visconsi</u>, 956 F.2d 560, 569 (6th Cir. 1992); <u>American Eagle Credit Corp. v. Gaskins</u>, 920 F.2d 352 (6th Cir. 1990)  .

The plaintiffs have failed to produce evidence that any predicate act committed by either defendant caused an injury, as required by the RICO statute.  Further, there is no proof of a pattern of racketeering activity, involving isolated transactions over a short period of time.

**I.  PLAINTIFFS HAVE FAILED TO PRODUCE EVIDENCE OF THE EXISTENCE OF A RICO ENTERPRISE, SEPARATE FROM THE RICO DEFENDANTS**

The Plaintiffs have failed to establish the existence of an enterprise within the meaning of RICO.   Under RICO, an enterprise is "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. Section 1961(4).  To satisfy the enterprise element, an association-in-fact must be demonstrated, which evidences an ongoing organization with its members functioning as a continuing unit.  <u>Frank v. D'Ambrosi</u>, 4 F.3d 1378 (6th Cir. 1993).    An association-in-fact can be proven by showing 1) that the associated person formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged.  <u>Frank v. D'Ambrosi</u>, 4 F.3d 1378,

1386 (6th Cir. 1993). In order to meet this requirement, the plaintiff must allege some minimal

level of organizational structure between the entities involved. VanDenBroeck v. CommonPoint

 Mortgage Co., 210 F.3d 696, 699 (6th Cir. 2000). The entity constituting the enterprise must be

separate from the "person" committing harm under RICO. Puckett v. Tennessee Eastman Co.,

889 F.2d 1481, 1489 (6th Cir. 1989).

**J.    THE CLAIMS OF BRYANT AND CURTIS ARE BARRED BY THE OHIO STATUTES OF FRAUDS**

Curtis alleges there was a verbal agreement with Bigelow that a land contract would be

signed after the purchase contract. (Curtis depo. pp. 111-112). However, the land contract

would provide the same terms as the purchase contract. (Curtis depo. p. 113). Curtis mistakenly

believed that signing the land contract would ensure that the property was transferred back to

him. (Curtis depo. p. 119, 209). The verbal agreement upon which Curtis relies is barred by the

statutes of frauds.

As to Bryant, neither Bigelow or Christian were parties to the purchase contract which

Bryant signed with Marfisi. To the extent that Bryant relies upon this contract in support of any

damages claims against the Defendants, Bryant's claims are barred by the statutes of frauds. Any

claims of Bryant which are not based on a writing signed by the Defendants are barred.

Ohio's statutes of frauds apply to Plaintiffs' claims. A state statute can not change or

diminish a substantive right created by a federal statute, but a state statute is applicable where it

deals with the remedy rather than with the substantive right. Hamilton Foundry & Machine Co. v.

International Molders Union, 193 F.2d 209 (6th Cir. 1991). The Ohio statute of frauds affects

the remedy only. Id.

In <u>American Int'l Enters v. FDIC</u>, 3 F.3d 1263 (9th Cir. 1993), the Ninth Circuit noted

that the Sixth Circuit was one of the courts which had accepted the application of state statute of

frauds. <u>BML Invs. v. FDIC</u>, 732 F. Supp. 828, 829 (E.D. Tenn.) (applying Tennessee statute of

frauds), aff'd, 894 F.2d 1336 (6th Cir. 1989).

Ohio has two statute of frauds that pertain to real estate.

R.C. Section § 1335.05, states:

Certain Agreements to be in writing.

No action shall be brought whereby to charge the defendant . . . upon a special promise,
to answer for the debt, default, or miscarriage of another person . . . or a contract or sale
of lands, tenements, ... or interest in or concerning them, . . . unless the agreement upon
which such action is brought, or some memorandum or note thereof, is in writing and
signed by the party to be charged therewith or some other person thereunto by him or her
lawfully authorized.

Quoting a leading Ohio Supreme Court case on the requirements of a writing to satisfy

the Statute of Frauds, the Ohio Court of Appeals in <u>Beggin v. Fort Worth Mortgage Corp.</u> stated:

The memorandum in writing which is required by the statute of frauds [R.C.
1335.05] is a memorandum of the agreement between parties, and it is not
sufficient unless it contains the essential terms of the agreement expressed
with such clearness and certainty that they may be understood from the
memorandum itself, or some other writing to which it refers, without the
necessity of resorting to parole proof.

638 N.E.2d 604, 608 (Ohio App.), appeal not allowed, 637 N.E.2d 11 (1994), quoting

<u>Kling v. Bordner</u>, 65 Ohio St. 86, 61 N.E.2d 148, 148 (1901). This statute serves to

ensure that transactions involving a transfer of realty interests are commemorated with

sufficient solemnity. <u>North Coast Cookies, Inc. v. Sweet Temptations, Inc.</u>, 16 Ohio

App.3d 342, 348, 476 N.E.2d 388 (1984). A signed writing provides greater assurance

that the parties and the public can reliably know when such a transaction occurs.  Id. It

supports the public policy favoring clarity in determining real estate interests and

discourages indefinite or fraudulent claims about such interests. Id.

Second, the statute that deals specifically with interests in real estate provides as

follows:

> No lease, estate, or interest, either of freehold or term of
> years, or any uncertain interest of, in, or out of lands,
> tenements, or hereditaments, shall be assigned or
> granted except by deed, or note in writing, signed by the
> party assigning or granting it, or his agent thereunto
> lawfully authorized, by writing, or by act and operation
> of law.

R.C. § 1335.04. Real estate transactions are usually formal undertakings involving

significant sums of money.   The statute of frauds is thus necessary:

> "to ensure that transactions involving a transfer of realty interests are
> commemorated with sufficient solemnity. A signed writing provides
> greater assurance that the parties and the public can reliably know
> when such a transactions occurs. It supports the public policy favoring
> clarity in determining real estate interests and discourages indefinite or
> fraudulent claims about such interests."

North Coast Cookies, Inc. v. Sweet Temptations, Inc., 16 Ohio App.3d 342, 348, 476

N.E.2d 388 (1984).

Claims of fraud, and fraud in the inducement may be barred by the Statute of

Frauds. In Marion Production Credit Assn. v. Cochran (1988), 40 Ohio St.3d 265, 274,

533 N.E.2d 325, the Ohio Supreme Court held that an alleged misrepresentation of a

then-present fact or a promise of future performance would not defeat the operation of the

Statute of Frauds unless the inducement is premised upon matters which are wholly

extrinsic to the writing, and that an oral agreement cannot prevail over a signed writing

pertaining to exactly the same subject matter but with different terms.

### K.   THE CLAIMS OF BRYANT AND CURTIS ARE BARRED BY THE PAROL EVIDENCE RULE

To the extent that the obligations of the parties have been reduced to writing and

signed by the parties to be charged, the parol evidence rule also bars claims which

contradict the terms of those writings.  Christian is not a party to any contract or lease.

Documents which were signed by Bigelow as to Bryant are the settlement statement and

the lease agreement dated January 6, 1999.   Bryant signed a contract to purchase with

John Marfisi, and she is bound by the terms of that agreement.  Bryant signed a lease

agreement with Bigelow and she is bound by those terms.  Bryant also signed the deed

transferring ownership of the property to Bigelow.  Bryant subsequently signed a release

in which Bigelow was released of all claims by Bryant relating to the $19,000.00 and the

tenancy under which she took possession after transfer of title.  Bryant cannot modify or

contradict the terms of these agreements.

Similarly, Curtis cannot rely on an alleged verbal agreement to contradict the

terms of the purchase contract.

The Statute of Frauds and the parol evidence rule both protect the same interest:

the

integrity of written agreements. The parol evidence rule is a rule of substantive law

designed to protect the integrity of final, written agreements. <u>Charles A. Burton, Inc. v. Durkee</u> (1952), 158 Ohio St. 313, 109 N.E.2d 265 at paragraph one of the syllabus.   The parole evidence rule precludes admission of prior or contemporaneous evidence that would serve to modify or contradict the terms of a final written agreement.   <u>Columbia Gas Transmission Corp. v. Ogle</u>, 51 F. Supp. 2d 866, 871 (S.D. Ohio 1997). Under Ohio law, if contracting parties integrate their negotiations and promises into an unambiguous, final, written agreement, then evidence of prior or contemporaneous negotiations, understandings, promises, representations, or the like pertaining to the terms of the final agreement are generally excluded from consideration by the court. <u>Charles A. Burton, Inc. v. Durkee</u> (1952), 158 Ohio St. 313, 109 N.E.2d 265 at paragraph two of the syllabus. <u>Gerwin v. Clark</u> (1977), 50 Ohio App.2d 331, 363 N.E.2d 602 (noting that "the parol evidence rule precludes the introduction of evidence of conversations or declarations which occur prior to or contemporaneous with a written contract and which attempt to vary or contradict terms contained in the writing").

In <u>Harris v. Equilon Enters., L.L.C.</u>, 107 F. Supp. 2d 921, 936 (S.D. Ohio 2000) , the district court stated that the parol evidence rule may exclude evidence of fraudulent inducement in certain cases. <u>Id.</u> at 936.  The law has not allowed parties to prove fraud by claiming that the inducement to enter into an agreement was a promise within the scope of the integrated agreement but which was not ultimately included in it. <u>Id.</u>; <u>Lincoln Elec. Co. v. St. Paul & Fire Marine Ins. Co.</u> 10 F. Supp.2d 856, 878 (N.D. Oh. 1998) ("A party to a contract containing an integration clause may not assert a claim for fraud based upon promises extrinsic to the contract.").

Ohio law does not allow a party to prove fraud by claiming that the inducement to enter into an agreement was a promise which is squarely contradicted by the written terms of that agreement. Columbia Gas Transmission Corp. v. Ogle, 51 F. Supp. 2d 866, 871 (S.D. Ohio 1997), citing AmeriTrust Co. v. Murray, 20 Ohio App. 3d 333, 335, 486 N.E.2d 180 (1984). Where the terms of the writing itself directly contradict the parol agreement, then the party alleging the parol agreement cannot be heard to say that he relied on it. Maust v. Bank One Columbus, N.A., 83 Ohio App. 3d 103, 108, 614 N.E.2d 765 (1992).

**L.    CURTIS HAS NO CLAIMS AGAINST THE DEFENDANTS BASED ON A LAND CONTRACT THAT WAS NOT SIGNED**

As previously noted, Curtis mistakenly believed that the land installment contract, if signed, would prevent him from being evicted.  Curtis' belief was simply erroneous under Ohio law.  At the closing, as reflected on the settlement statement, delinquent real estate taxes of $4,527.00 were paid on Curtis' behalf.  (Bigelow Aff. ¶ 14).  Curtis received approximately $9,871.32 at the closing.  (Curtis depo. p. 130).

Curtis then elected to withhold his rent based on a dispute with Bigelow.  At the time Curtis went to Court, he had not made sufficient payments under R.C. 5313.07.  Accordingly, Curtis would have been evicted whether or not a land contract had been executed.

R.C. Section 5313.07 provides as follows:

If the vendee of a land installment contract has paid in accordance with the terms of the contract for a period of five years or more from the date of the first payment or has paid toward the purchase price a total sum equal to or in excess of twenty per cent thereof, the vendor may

34

> recover possession of his property only by use of a proceeding for
> foreclosure and judicial sale of the foreclosed property as provided in
> section 2323.07 of the Revised Code.
> Foreclosure and judicial sale are not the exclusive remedies for breach of a land

installment contract. Where a vendee is in default under a land installment contract and

has paid in excess of twenty percent of the purchase price, the vendor under RC §§

5313.07 may seek (1) possession of his property only by use of a foreclosure and judicial

sale or (2) total payment of the contract price by a money only action for "unpaid

installments."Cuyahoga Met. Housing Auth. v. Watkins (1984), 23 Ohio App.3d 20, 491

N.E.2d 701; Dalton v. Acker (1981), 5 Ohio App.3d 150, 450 N.E.2d 288. However, if

the vendee is in default under a land installment contract and has not paid in excess of

twenty percent of the purchase price, pursuant to RC Section 5313.07, a forcible entry

and detainer action will lie against a vendee of a land installment contract.  Sattler v.

Sattler (1986), 30 Ohio App. 243, 507 N.E.2d 430.

    13.    BRYANT IS BOUND BY THE TERMS OF THE RELEASE SIGNED IN FAVOR OF BIGELOW

On January 6, 1999, Bryant signed a Release of All Claims against Bigelow

relating to the $19,000.00 due under the purchase contract.  Bryant also released Bigelow

from any claims arising out of the tenancy under which she took possession after transfer

of ownership to Bigelow.

In McCluskey v. Rob San Services, Inc., 443 F. Supp. 65, 68 (S.D. Ohio 1977),

this Court stated that ". . . a release is a contract, the validity of which is determined by

reference top the principles of contract law. 9 O.Jur.2d Compromise and Settlement,

Section 10. The validity and interpretation of a contract is governed in Ohio courts by the

laws of the state where the contract is made or is to be performed." Id. at 68. Under well-established law, courts construe releases consistent with general state law contract principles, with the intent of the parties controlling the scope of the release.   Barden Detroit Casino, LLC v. City of Detroit 59 F. Supp. 641, 659 (E.D. MI 1999).

A release ordinarily operates to extinguish a right which is the subject thereof in exchange for some consideration and effectively operates as an estoppel or a defense to an action by the releasor. 15 Ohio Jur. 3d, *Compromise, Accord, and Release*, §§ 43 (1979). As such, it is a contract between two parties enforceable at law subject to the rules governing the construction of contracts. *Id.* Whether a release operates upon a certain liability depends entirely upon the intention of the parties, which is to be gathered from the language of the release and the state of facts then existing.   Whit v. Huchinson (1975), 43 Ohio St.2d 53, 58, 330 N.E.2d 678, 682.

## N.    BIGELOW OWED NO FIDUCIARY DUTY TO THE PLAINTIFFS

Plaintiffs allege in Count V of the amended complaint that Bigelow breached fiduciary duties.  The transactions at issue in this case were arms lengths real estate transactions.  No fiduciary relationship arose under Ohio law.

Breach of fiduciary duty is a state-law claim.  Smith v. Provident Bank, 170 F.3d 609 (6th Cir. 1999). Ohio law provides that when parties act to protect their own interests and operate at arm's-length from one another, their relationship is generally not fiduciary in nature. In business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the

other.  It is well-established that no fiduciary relationship applies to arm's length real

estate transactions between the buyer and seller of real estate.  <u>Layman v. Binns</u> (1988),

35 Ohio St.3d 176, 519 N.E.2d 642.

**IV      CONCLUSION**

The Plaintiffs have failed to produce evidence in support of their claims, such that

there is no genuine issue of material fact as to any claims herein.  The Defendants

respectfully request summary judgment as to all claims of the Plaintiffs amended

complaint, and that this action be dismissed at the Plaintiffs' costs.

Respectfully Submitted,

Gary R. Lewis Co., L.P.A.

<u>/s/ Gary R. Lewis</u>

GARY R. LEWIS, #0017697
Attorney for Defendant Prescott Bigelow IV

and

Defendant Roseanne Christian
Cincinnati Club Building, Suite 915
30 Garfield Place
Cincinnati, Ohio 45202
(513) 665-9222/(513) 721-7008 (FAX)

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Consolidated Motion of Defendants

37

Prescott Bigelow IV And Roseanne Christian's Motion For Summary Judgment was served upon William H. Blessing, Esq., and James Schwantes, Esq., Attorneys for Plaintiffs, 119 East Court Street, Suite 500, Cincinnati, Ohio 45202 by regular U.S. Mail, postage pre-paid this 1st day of October, 2003.

_____                                   /s/ Gary R.  Lewis
                                        Gary R. Lewis
and                                     **Attorney for Defendant Prescott Bigelow**

                                        **Defendant Roseanne Christian**