1                    UNITED STATES DISTRICT COURT

2                     SOUTHERN DISTRICT OF OHIO

3                         WESTERN DIVISION

4

5    SHIRDENIA BRYANT, et al.,        :

6              PLAINTIFFS,            :

7                                     :

8      vs.                           : Case No.: C-1-02-006

9    PRESCOTT BIGELOW, IV, et al., :

10             DEFENDANTS.           :

11

12

13                * * * * * * * *

14   DEPONENT:      HARRY CURTIS

15   DATE:          AUGUST 29, 2003

16                * * * * * * * *

17

18   TERESA A. MOORE,

19   COURT REPORTER

20

21

22

23         *BARLOW REPORTING & VIDEO SERVICES*
                   *333 Madison Avenue*
24           *Covington, Kentucky  41011*
                   *(859) 261-8440*
25



```
                                    Page 1
 1            UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF OHIO

 3                 WESTERN DIVISION

 4

 5   SHIRDENIA BRYANT, et al.,      :

 6        PLAINTIFFS,               :

 7                                  :

 8   vs.                            : Case No.: C-1-02-006

 9   PRESCOTT BIGELOW, IV, et al., :

10        DEFENDANTS.               :

11

12

13            * * * * * * * *

14   DEPONENT:    HARRY CURTIS

15   DATE:        AUGUST 29, 2003

16            * * * * * * * *

17

18   TERESA A. MOORE,

19   COURT REPORTER

20

21

22

23        BARLOW REPORTING & VIDEO SERVICES
               333 Madison Avenue
24          Covington, Kentucky  41011
                 (859) 261-8440
25
```

```
                                    Page 3
 1        The deposition of HARRY CURTIS, taken for

 2   the purpose of discovery and/or use as evidence in

 3   the within action, pursuant to notice, heretofore

 4   taken at the offices of Gary R. Lewis Co., L.P.A.,

 5   30 Garfield Place, Suite 915, Cincinnati, Ohio

 6   45202, on August 29, 2003, at 9:51 a.m., upon oral

 7   examination, and to be used in accordance with the

 8   Ohio Rules of Civil Procedure.

 9

10            * * * * * * * *

11            APPEARANCES

12   REPRESENTING THE PLAINTIFFS:

13   WILLIAM H. BLESSING, ESQ.

14

15   REPRESENTING THE DEFENDANTS:

16   LEWIS: GARY R. LEWIS, ESQ.

17

18   ALSO PRESENT:  Prescott Bigelow, IV

19

20            * * * * * * * *

21

22

23        HARRY CURTIS, called on behalf of the

24   Defendants, after having been first duly sworn, was

25   examined and deposed as follows:
```

```
                                    Page 2
 1              INDEX

 2                                        Page

 3   Cross-Examination By Mr. Lewis          4
     Examination By Mr. Blessing           211
 4

 5              EXHIBITS

 6                                        Page

 7   Defendants' Exhibit 1                  23
     Defendants' Exhibit 2                  38
 8   Defendants' Exhibit 3                  40
     Defendants' Exhibit 4                  43
 9   Defendants' Exhibit 5                  54
     Defendants' Exhibit 6                  67
10   Defendants' Exhibit 7                  71
     Defendants' Exhibit 8                  75
11   Defendants' Exhibit 9                  77
     Defendants' Exhibit 10                 83
12   Defendants' Exhibit 11                 93
     Defendants' Exhibit 12                122
13   Defendants' Exhibit 13                125
     Defendants' Exhibit 14                149
14   Defendants' Exhibit 15                150
     Defendants' Exhibit 16                154
15   Defendants' Exhibit 17                165
     Defendants' Exhibit 18                176
16   Defendants' Exhibit 19                199
     Defendants' Exhibit 20                203
17

18                            Page Line

19   Certified Question          50   17

20

21

22

23

24

25
```

```
                                    Page 4
 1            CROSS-EXAMINATION

 2   BY MR. LEWIS:

 3      Q  Sir, would you state your name for the

 4   record, please?

 5      A  My name is Harry Curtis.

 6      Q  Mr. Curtis, my name is Gary Lewis, and I

 7   represent the defendants in this case.  And you

 8   filed a lawsuit against Mr. Bigelow and Roseanne

 9   Christian.  We're here today to talk to you about

10   that case and your claims.

11         It's important that you and I are

12   communicating, that you understand my questions, and

13   that your answers are responsive to those questions.

14   If you don't understand one of my questions, please

15   ask me to clarify it.  Understood?

16      A  I will.

17      Q  Please do not guess.  Please do not base

18   an answer on probably --

19      A  Okay.

20      Q  -- all right, or possibly.

21      A  Okay.

22      Q  Okay?  And you sat through Mr. Bigelow's

23   deposition a couple days ago, so you're familiar

24   with the format, et cetera.  Correct?

25      A  Yes, I am.  Yes, I am.
```

Bryant, et al. v. Bigelow, et al.    Condensed!!    Depo of Harry Curtis

Case 1:03-cv-00006-SAS    Document 42-2    Filed 10/01/2003    Page 3 of 23

Page 5

1 Q If you need to take a break at any time,
2 please let me know. We can accommodate that. We
3 have soft drinks here, coffee, water. If you need
4 that, that's no problem.
5 A Okay.
6 Q What is your current address?
7 A My current address is 2660 Dehl, D-E-H-L,
8 Road. And it's Cincinnati, Ohio 45211.
9 Q Who do you live there with, sir?
10 A It's a shelter. It's a homeless shelter.
11 Q I see. Your current marital status,
12 please?
13 A I am separated from my wife.
14 Q Are you still married to Patricia?
15 A Yes, I am.
16 Q Is there a divorce proceeding pending?
17 A Not yet.
18 Q Do you anticipate there will be one?
19 A I don't really know.
20 Q What is Patricia's current address?
21 A I really don't know.
22 Q Did she ever live -- or has she lived
23 recently on Continental Street? Does that ring a
24 bell with you?
25 A I don't know. I haven't been to her home.

Page 6

1 I have no idea.
2 Q How long have the two of you been
3 separated?
4 A Oh, several months. I guess, about, I
5 would say, maybe six months.
6 Q You and Patricia lived together at Fairfax
7 Avenue; correct?
8 A Yes, we did.
9 Q Now, after the eviction proceeding --
10 A Um-hmm.
11 Q -- the Fairfax eviction, were you and
12 Patricia living together --
13 A Yes.
14 Q -- after that?
15 A Yes, we were.
16 Q What address was that?
17 A 3913 Vine Street.
18 Q Do you know if Patricia still lives at
19 3913 Vine Street?
20 A I don't think so. I don't think so.
21 Q You believe she moved?
22 A Yes.
23 Q But you don't know where she moved to?
24 A No.
25 Q Do you know if she still lives in the

Page 7

1 Cincinnati area?
2 A Yes.
3 Q When's the last contact you had with
4 Patricia?
5 A Approximately, I would say, about two
6 months ago. Two months ago.
7 Q Before you resided at 1966 Fairfax, where
8 did you live?
9 A We lived at -- on, I think it was,
10 Glenridge. I'm pretty sure that's it. I don't
11 know. Can't remember the address.
12 Q Well, after you lived on Glenridge, you
13 lived at North Crescent, didn't you?
14 A Yeah, that's it, North Crescent. That was
15 the address.
16 Q Did you live at 731 North Crescent?
17 A I don't know. I'm not sure.
18 Q Does that sound familiar to you?
19 A I know I lived on North Crescent.
20 Q Does Apartment number 5 on North Crescent
21 sound familiar to you?
22 A I can't remember that.
23 Q Was that the address that you and Patricia
24 resided at just before you moved into Fairfax -- the
25 North Crescent address, I mean?

Page 8

1 A I know I lived on North Crescent, but I
2 can't remember the exact address or the apartment
3 number.
4 Q I understand. I'm not asking you that.
5 You know you lived on North Crescent?
6 A Yes.
7 Q The question is, between the time that you
8 lived at North Crescent and the time that you moved
9 into Fairfax --
10 A Um-hmm.
11 Q -- did you and Patricia live anywhere
12 else?
13 A Not that I know of.
14 Q So, you believe you moved from North
15 Crescent into the Fairfax Avenue residence?
16 A Yes.
17 Q Then, before you lived at North Crescent,
18 you lived on Glenridge, didn't you?
19 A Glenridge? I don't -- well, now, I don't
20 think Patricia and I -- North Crescent and south --
21 no, Patricia and I didn't live on North Crescent. I
22 don't think we did. I think we lived on -- let's
23 see -- I don't know if it was Glenridge, or not. I
24 really can't remember Glenridge. Glenridge --
25 Glenridge. I don't know. I can't remember that. I

Bryant, et al. v. Bigelow, et al.    Condenselt!    Depo of Harry Curtis

Case 1:03-cv-00006-SAS    Document 42-2    Filed 10/01/2003    Page 4 of 23

Page 9

1 can't remember. Because I think, on North Crescent,
2 I think I lived with another -- with another person,
3 with another wife. I'm not sure we lived on North
4 Crescent.
5    Q You recall that you lived on North
6 Crescent, you just can't remember --
7    A Yeah.
8    Q -- the address; correct?
9    A I remember that I lived there --
10    Q I understand.
11    A -- but I don't remember if Patricia and I
12 lived there.
13    Q Can you give me an approximate time frame
14 for when you lived -- you lived on North Crescent,
15 what years?
16    A I guess it would be -- I'm not sure about
17 that. I think it was in the '80s.
18    Q I don't mean to interrupt you, but that
19 guess/probably stuff is going to be a problem.
20    A I'm saying, I'm not sure. I'm not sure.
21 I think it was in the '80s.
22    Q Now, let's get back to Glenridge. Do you
23 recall living at 126 Glenridge?
24    A Yes.
25    Q You?

Page 10

1    A Me and Patricia.
2    Q Did you live in Apartment D at 126
3 Glenridge?
4    A I'm not sure about the number, or anything
5 like that. I know we lived on Glenridge.
6    Q What period of time, approximately, did
7 you and Patricia live at 126 Glenridge?
8    A Oh, I think it was the late '80s, early
9 '90s, I think.
10    Q So, you believe you lived at Glenridge
11 after you lived at North Crescent?
12    A Yes, I did.
13    Q So, you didn't move from the residence at
14 North Crescent into Fairfax?
15    A No. No, I moved from Glenridge.
16    Q You moved from Glenridge to Fairfax?
17    A Right.
18    Q Have you ever resided in any other states
19 other than Ohio?
20    A When I was in the military, but not -- not
21 after I was in the military.
22    Q Where'd you grow up?
23    A Here.
24    Q Here in Cincinnati?
25    A Yes.

Page 11

1    Q Did you go to elementary school --
2    A Yes.
3    Q -- high school in Cincinnati?
4    A Yes.
5    Q Have you ever been known by any other name
6 other than Harry Curtis?
7    A No.
8    Q Tell me briefly your educational
9 background, sir.
10    A Well, I went to Hoffman Heights -- Hoffman
11 Elementary. I went to Withrow High School. I
12 attended Southern Ohio -- Southern Ohio College.
13    Q So, you graduated from Withrow High
14 School?
15    A Yes, I did.
16    Q When?
17    A 1966.
18    Q Then you went to Southern Ohio?
19    A No, I went to the Service.
20    Q Into the Service?
21    A Um-hmm.
22    Q Which branch of the Service, sir?
23    A The Army.
24    Q How long were you in the Army?
25    A I was there for about approximately

Page 12

1 two-and-a-half years.
2    Q Were you honorably discharged?
3    A Yes, I was.
4    Q After your Army service?
5    A Then I came back and I started to work and
6 I went to Southern Ohio college.
7    Q What is the Southern Ohio College?
8    A Well, it was -- at the time, it was an
9 associate degree college. And my majors were
10 computer science and robotics.
11    Q Did you receive a degree from Southern
12 Ohio College?
13    A No, I did not.
14    Q Then, after leaving Southern Ohio College,
15 then what did you do after that?
16    A I attended Xavier, also, Xavier
17 University, as an accounting major. I didn't
18 complete that.
19    Q How long did you attend Xavier?
20    A Approximately one year.
21    Q Do you remember what year that was?
22    A It was in the early '70s. I can't
23 remember what year.
24    Q After Xavier, did you attend any other
25 schools?

Page 13

1    A  Yes, I -- well, I attended, like, Scarlet
2  Oaks.  It was a certification program.  I received
3  certifications in metallurgical technology,
4  marketing and management, and metals forming.
5    Q  And what was that last one?
6    A  Metals forming.
7    Q  So, when you say you received
8  certifications, is that different than a degree that
9  would be conferred?
10    A  Well, from my understanding, I -- for the
11  metallurgical technology field, I had to take a --
12  what they consider a state exam, and that -- this
13  gave me a certification in that field, and then it
14  also gave me college credits for that particular
15  course.
16    Q  With the combination of your schooling,
17  the schools that you talked about, do you have a
18  college degree?
19    A  No.
20    Q  Scarlet Oaks, can you tell me what year
21  you were there, or years?
22    A  I was there, I guess, in the -- probably
23  mid '80s.
24    Q  Now I'd like to talk to you about your
25  employment background.

Page 14

1    A  Okay.
2    Q  I think I'd like to do this after you left
3  Xavier --
4    A  Um-hmm.
5    Q  -- which, you indicated, was in the early
6  '70s, approximately.
7    A  Um-hmm.
8    Q  Just describe for me where you've been
9  employed and what you've done.
10    A  I've worked at a company called Hertz
11  Celanese.
12    Q  Hertz?
13    A  Celanese.
14    Q  What did you do for them?
15    A  I was a chemical technician there.
16    Q  Are they in Cincinnati?
17    A  They are in Kentucky.
18    Q  How long did you work for them?
19    A  I worked for them approximately, I guess,
20  two, two-and-a-half years, I think.
21    Q  Ballpark for me when that was.
22    A  That was approximately -- I guess, it was
23  around, let's say -- let's say, the '70s.
24    Q  To the best of your knowledge and belief.
25    A  I would say, the '70s.

Page 15

1    Q  Then, after Hertz Celanese, where did you
2  work?
3    A  I also worked for Cincinnati Postal
4  Service.
5    Q  U.S. Postal Service?
6    A  Yes, U.S. Postal Service.
7    Q  How long did you work for them?
8    A  I worked there approximately two years, or
9  so.
10    Q  I know it's tough, but when you start to
11  say guess and probably, try --
12    A  Well, I would say, two years.
13    Q  All right.  Then, after -- why'd you leave
14  the U.S. Postal Service?
15    A  I got injured there.  I had a hernia
16  injury, and we had some complications with that.
17    Q  After the U.S. Postal Service, where did
18  you work?
19    A  Let's see, it might have been the Postal
20  Service and then Hertz Celanese.  It was around that
21  time.  I worked for a company called -- let me
22  think -- Hertz Celanese -- I worked for an air
23  freight company.  It was over in Kentucky.  I can't
24  remember the name.  I was a driver.  And I worked
25  for them until they -- they were sold out, the

Page 16

1  company was actually sold out.
2    Q  You can't recall the name of that company?
3    A  No, I can't.
4    Q  Approximately how many years did you work
5  for that air freight company?
6    A  About a year.  I would say a year.
7    Q  When was it?
8    A  That was in the late '80s.
9    Q  After this air freight company, did you
10  have other employment?
11    A  Yes, uh-huh.  I recently worked for the
12  IRS.
13    Q  In?
14    A  That was within the last year, last two
15  years.
16    Q  So, between the late '80s, when you
17  were --
18    A  Well, I worked with several other
19  companies.  I worked as a bus driver for Settle
20  Service.
21    Q  I'm trying to do this chronologically.
22    A  I'm trying to remember, because it's been
23  so many -- I worked as a bus driver for Settle
24  Service.
25    Q  After the air freight company in the late

Page 17

1 '80s, what's the next job you remember?
2    A  I worked for a bus driving company, Settle
3 Service.
4    Q  Settle?
5    A  Um-hmm.
6    Q  How long did you work for them?
7    A  I worked for them for, I'd say, two years.
8    Q  Why'd you leave the Settle Service
9 Company?
10    A  Because I was working with them the same
11 time I was working with the post office.  And so I
12 had problems as far as, I was working for the post
13 office at night and I was working for them at the
14 daytime.  So, I decided to leave them to go with the
15 post office.
16    Q  Then, after Settle Service Company, the
17 next job you can remember?
18    A  Let me think.  Oh, I worked for -- let's
19 see -- Mike Albert.  I was a driver for them.
20    Q  When was that, please?
21    A  That was just before I went to the IRS.
22 I'm just trying to get that --
23    Q  I understand.
24    A  -- fill that gap between the IRS and those
25 other jobs.  I could have brought a resume.  I've

Page 18

1 forgotten it.
2    Q  Do you have a resume?
3    A  Yes, I do, but I don't have it with me.
4    Q  I understand.  If you would -- this will
5 save us some time, and I'll send your attorney a
6 letter -- would you please retrieve that resume --
7    A  Sure.
8    Q  -- and give it to Mr. Blessing?  And then
9 we'll request it.
10        THE WITNESS:  Is that okay?
11        MR. BLESSING:  We cooperate.
12 BY MR. LEWIS:
13    Q  Does your resume -- is it current?
14    A  Yes.
15    Q  It includes your employment --
16    A  Yes.
17    Q  -- all your employment on it?
18    A  It should, yes.
19    Q  You have been divorced previously, haven't
20 you, sir?
21    A  Yes, I have.
22    Q  How many times?
23    A  Twice.
24    Q  Once in 1977; does that sound about right?
25    A  I think so, yes.

Page 19

1    Q  And once in 1981?
2    A  Yes.
3    Q  Do you have any children?
4    A  No, I do not -- oh, I have -- I was paying
5 for a child, but I never knew whether it was mine,
6 or not.  It was outside of the marriage.  So, I
7 would say yes.
8    Q  Is there a child-support order entered in
9 some court in reference to that child?
10    A  Yes.
11    Q  What court is that, that issued that
12 order?
13    A  Hamilton County.
14    Q  Hamilton County?
15    A  Um-hmm.
16    Q  Who was -- so, the way that child support
17 order came about, did the mother of that child
18 initiate some action against you for child support?
19    A  Well, that was in the early -- the late
20 '60s.  And I claimed the child and I paid support.
21 And it's paid.
22    Q  I'm just asking how the proceedings
23 started.
24    A  That's basically -- she said it was mine.
25 I went down to the court and I agreed that the child

Page 20

1 was mine --
2    Q  So, there was --
3    A  -- and started making payments.
4    Q  There was a complaint for paternity filed;
5 does that sound familiar to you?
6    A  I don't know.
7    Q  What was that woman's name that is
8 involved in this proceeding?
9    A  Armentha Robinson.
10        THE REPORTER:  Can you spell her first
11 name?
12        THE WITNESS:  No, but it's Armentha
13    Robinson.
14 BY MR. LEWIS:
15    Q  Are you still making child support
16 payments?
17    A  Oh, no, that's paid.
18    Q  The child's no longer a minor?
19    A  No.  No, I completed the payments, I mean,
20 until they were proper age.
21    Q  Until they reached 18?  That's what I
22 meant.
23    A  Um-hmm.
24    Q  The child's no longer a minor?
25    A  No.

**Page 21**

1  Q  Other than the arson conviction that we're
2  going to be talking about later in this
3  deposition --
4  A  Um-hmm.
5  Q  -- do you have any other criminal
6  convictions, sir?
7  A  Wait a minute. Can I talk with my lawyer
8  on this?
9  MR. LEWIS: Um-hmm.
10  (Brief recess taken.)
11  MR. LEWIS: Back on the record. Sir, just
12  for the rest of this proceeding, I didn't have
13  a problem with you consulting with your
14  attorney. But I'm going to ask you, from now
15  on, when there is a question pending, not to go
16  out and talk to your lawyer.
17  THE WITNESS: Okay.
18  MR. LEWIS: If you need to take a break at
19  some time to talk to him, when there is not a
20  question pending, I don't have a problem with
21  it.
22  THE WITNESS: Okay.
23  MR. LEWIS: But please don't do it when
24  I've asked you a question.
25  MR. BLESSING: There may be a privilege

**Page 22**

1  issue that comes up that we may need to consult
2  before we answer the question. So, that can't
3  be a rule.
4  MR. LEWIS: I understand. I'm just making
5  the request. We'll deal it with a step at a
6  time, if it happens again.
7  MR. BLESSING: Okay.
8  BY MR. LEWIS:
9  Q  So, the question was, have you ever been
10  convicted of a criminal offense, other than the
11  arson conviction?
12  A  No.
13  Q  No. Are you sure?
14  A  Yes.
15  Q  Do you remember your deposition being
16  taken in the case of Bigelow versus Burbrink?
17  A  Yes, I do.
18  Q  Your deposition was taken before, and it
19  was taken by an attorney by the name of Chris Laber;
20  right?
21  A  Yes, um-hmm.
22  Q  Right? That deposition was at
23  Mr. Blessing's office?
24  A  Right.
25  Q  It was taken on December 18th, 2001; do

**Page 23**

1  you recall that?
2  A  Um-hmm.
3  Q  Yes?
4  A  Yes.
5  Q  You were put under oath before that
6  deposition, weren't you?
7  A  Yes.
8  Q  The testimony that you gave that day was
9  truthful, wasn't it?
10  A  To my belief, yes.
11  Q  You told the truth when you were asked
12  questions that day; correct?
13  A  Right. Right.
14  (Defendants' Exhibit 1 marked
15  for identification.)
16  Q  I want to show you what's been marked as
17  Defendants' Exhibit No. 1. Can you identify that,
18  sir?
19  A  It looks like the deposition.
20  Q  After your deposition was taken, did you
21  review the transcript of your deposition?
22  A  No, not today -- or, I may have.
23  Q  I don't mean today. I'm talking about,
24  after the deposition was taken on December 18th,
25  2001, was it submitted to you for review?

**Page 24**

1  A  Yes.
2  Q  Did you review it?
3  A  Yes.
4  Q  Did you determine that it was an accurate
5  statement of the testimony that you gave on
6  December 18th, 2001?
7  A  Pretty well, I guess. Yes.
8  Q  Yes? Look at -- if you look at page 61,
9  please, sir, of Exhibit No. 1 -- actually, look at
10  page 60, first, please. Do you have it in front of
11  you?
12  A  Yes.
13  Q  On page 60, at line 21, you were asked:
14  What type of misdemeanors have you been convicted
15  of? Do you see that question? Page 60 --
16  A  Um-hmm.
17  Q  -- line 21.
18  A  Um-hmm.
19  Q  Do you see that?
20  A  Um-hmm.
21  Q  Right?
22  A  Yes.
23  Q  Then, the answer you gave was: I think a
24  long, long time ago, I'm not sure.
25  That was your answer then, wasn't it?

Page 25

```
1    A  Yes.
2       MR. BLESSING:  Excuse me, that's not the
3    complete answer.
4       MR. LEWIS:  I'm not going to read the
5    whole thing, but that -- that was --
6    BY MR. LEWIS:
7    Q  You responded to that question that way,
8    didn't you, sir.
9    A  Yes.
10   Q  That was your answer --
11   A  Um-hmm.
12   Q  -- right?
13   A  Um-hmm.
14   Q  Yes?
15   A  On 61?
16   Q  I'm still on page 60, sir.  In response to
17   the question, What type of misdemeanors have you
18   been convicted of?  You said, I think a long, long
19   time ago, I'm not sure.
20      You said that, didn't you?
21   A  Yes.
22   Q  Then you said:  I know I didn't have
23   anything, I think I had a long, maybe 20 years ago,
24   I got --
25      Question:  Then I'm not interested in 20
```

Page 26

```
1    years ago.
2       Answer:  That's what I'm talking about.
3    A  Um-hmm.
4    Q  That was your answer, wasn't it?
5    A  Right.
6    Q  Then, if you go down to line 14 on page
7    61 -- do you see that --
8    A  Um-hmm.
9    Q  -- the question is:  There are convictions
10   on your record that are not yours?
11      Do you see that question?
12   A  Yes.
13   Q  Then the answer was:  Yes, there are.
14   A  Yes.  But they're not -- yes, I know,
15   exactly.  But they're not mine.
16   Q  What are those convictions?
17   A  I have no idea.  This is what I was
18   saying.  This -- basically, this was something that
19   they said about theft, or something, and it had to
20   do with the fire.  And they weren't mine.
21   Q  All right.  That's what I'm trying to get
22   at.  You believe that there -- that you have a
23   criminal record for theft and you were not convicted
24   of theft; is that what you're saying?
25   A  No.  They were not my charges.  That's
```

Page 27

```
1    what I'm saying.
2    Q  Did somebody tell you that you had a
3    criminal record for theft?
4    A  No.  When I was there for the attempted
5    arson, they appeared on my record --
6    Q  I see.
7    A  -- and they were not my charges.
8    Q  So, when you were being interviewed by law
9    enforcement reference the arson at Fairfax, someone
10   showed you a criminal record, did they?
11   A  No.  They told me that there was a charge
12   of theft on my record for this fire.  And it was not
13   my charge.
14   Q  I see.  Who told you that, a member of the
15   Cincinnati Police Department?
16   A  That is correct.
17   Q  Did they give you any more information
18   about where this theft offense allegedly occurred?
19   A  No.  But it was not mine.
20   Q  Because you know you've never been
21   convicted of theft?
22   A  I had never stole anything.  That's what
23   I'm saying.  And the charge was not mine.
24   Q  Other than this aggravated -- attempted
25   aggravated arson conviction, have you ever been
```

Page 28

```
1    convicted of any other criminal offense?
2    A  No.
3    Q  Now, let's talk about -- you know the
4    difference between a civil suit and a criminal
5    action, don't you, sir?
6    A  I think so.
7    Q  Civil suits generally are suits for money
8    damages, criminal actions would be State of Ohio
9    versus an individual --
10   A  Okay.
11   Q  -- where there is a charge that a criminal
12   law was violated --
13   A  Okay.
14   Q  -- right?  We've already talked about the
15   criminal matters.  What I'm asking you now is, have
16   you ever been sued as a defendant?  Have you ever
17   been a defendant in a civil suit for money?
18   A  I can't remember.  I can't recall.
19   Q  Let me see if I can refresh your
20   recollection.  Do you recall being sued by a John
21   Willers, in 1994, for eviction?
22   A  Oh, yes.
23   Q  You remember that now?
24   A  Um-hmm.
25   Q  Yes?
```

Page 29

1    A  Yes.

2    Q  You need to -- you can't say uh-huh or
3  huh-uh.

4    A  Yes.

5    Q  That involved the premises at 126
6  Glenridge, Apartment D, didn't it, sir?

7    A  Oh, I think so.

8    Q  Right.  Was John Willers your landlord
9  then?

10    A  Yes.

11    Q  Mr. Willers filed an eviction action
12  against you at that location, didn't he?

13    A  Well, that -- basically, that involved me
14  moving into the house.  I said that I was going to
15  be moving, but because of my aunt not leaving the
16  premises of the house, I told him I was going to
17  leave that month, and I stayed shortly more than
18  that month.

19    Q  Right.  But an eviction action was filed
20  by Mr. Willers against you and your wife,
21  Patricia --

22    A  Right.

23    Q  -- correct --

24    A  Yes.

25    Q  -- in the Hamilton County Municipal Court?

Page 30

1    A  Right.

2    Q  You know what a writ of restitution is,
3  don't you, sir --

4    A  Yes.

5    Q  -- from being involved -- well, you know
6  what one is?  Wasn't it -- isn't it accurate that a
7  writ of restitution was issued against you in that
8  suit by Mr. Willers?

9    A  I think so, yes.

10    Q  Also, Mr. Willers obtained a judgment
11  against you for $390; is that accurate?

12    A  I think so.

13    Q  Right.  Was that $390 for unpaid rent?

14    A  Yes.

15    Q  Subsequent to that, there were
16  garnishments filed against you, weren't there?

17    A  Oh, I don't know about that.

18    Q  Well, did you ever -- did you ever pay
19  Mr. Willers that $390?

20    A  I don't know if I have, or not.

21    Q  So, you know there was a judgment taken
22  against you for the 390, but you don't know whether
23  you've ever paid it?

24    A  Yes.

25    Q  Yes, you don't know?

Page 31

1    A  Yes, I do not know.

2    Q  What about General Motors Acceptance
3  Corporation, did they ever file suit against you,
4  sir?

5    A  No, they did not.

6    Q  Do you remember being involved in a --
7  well, was there a suit filed by GMAC against
8  Patricia Curtis and Harry Curtis, in April of 1991?

9    A  Oh, I don't know about that.  That had to
10  do with my wife.  I had nothing to do with that.

11    Q  Did your -- was there some problem with
12  car payments, where either you or your wife fell
13  behind the payments to GMAC?

14    A  I don't know about that, because I don't
15  handle that.  I think my wife had some problems.
16  But I never handled that.  I was just a cosigner on
17  that.

18    Q  So, you were a cosigner on what?

19    A  I think, a car.

20    Q  A car?

21    A  For her, yes.

22    Q  Right.  What car was that; do you
23  remember?

24    A  I don't know.

25    Q  Did she fall behind on payments to GMAC

Page 32

1  reference that car?

2    A  Well, I don't know about that, because I
3  didn't handle those.  I just found out that's what
4  she did.  She decided to do that.

5    Q  You just found out what?

6    A  I mean, she decided to handle that.  So, I
7  really am not familiar with that, at all.

8    Q  But she asked you to cosign --

9    A  Initial for it.

10    Q  -- the promissory note?

11    A  Well, when she got the car, the dealer
12  asked us both to sign on the car.

13    Q  Which you did --

14    A  Yes.

15    Q  -- right?  Then, did the loan go into
16  default?

17    A  I don't think so.  I think she got behind
18  a couple payments, or something like that.  I think
19  that's what it was.

20    Q  Then there was a lawsuit filed.  You're
21  not disputing that, are you?

22    A  I don't know about the lawsuit.

23    Q  Don't know?  Was the car picked up?  Do
24  you remember that?

25    A  No.

Page 33

1  Q  It wasn't?
2  A  No.
3  Q  How was that issue resolved?  Was GMAC
4  ever paid?
5  A  I think it was, yes.
6  Q  By who?
7  A  Probably by her.
8  Q  We're into the probablies again.
9  A  I think, by her.  I'm not sure.  But they
10  were paid.
11  Q  Now, there have been some Tax Commission
12  judgments entered against you, also, haven't there
13  sir, some tax judgments?
14  A  As far as what?
15  Q  Do you remember, have there ever been tax
16  judgments entered against you?
17  A  Yes, I think so.
18  Q  Do you remember, in 1994, that there
19  was -- the State of Ohio filed a tax judgment
20  against you for $2,265?
21  A  Um-hmm.
22  Q  Do you recall that?
23  A  Yes.
24  Q  Yes?
25  A  Yes.

Page 34

1  Q  What was that for?  Was that for unpaid
2  taxes?
3  A  Well, they said it was for unpaid taxes
4  for years past.  But they are all paid.
5  Q  Well, we'll get to that.
6  A  Yeah.
7  Q  So, when the judgment was put on, on
8  June 30th of 1994, what type of taxes were they?
9  A  They were on the house taxes.  They were
10  on -- I think they were for state taxes for
11  something or other.  I don't know for what.  I don't
12  know for what.  I can't remember.
13  Q  Are you saying they were real estate
14  taxes?
15  A  No, they were state taxes either on
16  property or the -- on the property or for -- they
17  had made a mistake in my salary, or something like
18  that, and they said that I underpaid taxes and they
19  were charging the taxes.
20  Q  So, were those income taxes?
21  A  Yes, state taxes.
22  Q  State income taxes?
23  A  Yes.
24  Q  That judgment was entered against you on
25  June 30th of 1994, for $2,265; correct?

Page 35

1  A  I think -- I think, yes.
2  Q  Right?
3  A  Yes.
4  Q  That's what the public record shows.
5  A  Yeah.
6  Q  You're not disputing that, are you?
7  A  No.
8  Q  Then that was -- that judgment was paid
9  off October 10th of 1996, two plus years later;
10  correct?
11  A  Right.
12  Q  Now, were there two income tax -- or were
13  there two tax judgments, June 30th of 1994?
14  A  Well, I think I actually paid the tax
15  twice.  Because they came back the next year and
16  they said it was the same thing, so I ended up
17  paying them again.
18  Q  Right.  Because the public record
19  indicates that on June 30th, 1994, there were two
20  judgments entered in the identical amount,
21  $2,265.76.
22  A  Yeah, that's what I'm saying.  I think I
23  actually paid it twice.
24  Q  So, it was really one obligation of yours
25  for the income tax, but it went into their judgment

Page 36

1  books as two different judgments; right?
2  A  I think so, right.
3  Q  I do, too.  Now, there was another
4  judgment lien, a Tax Commission lien, in July of
5  2000, against you, wasn't there?
6  A  I think so.
7  Q  That was for $359.38?
8  A  Um-hmm, I think so.
9  Q  Yes?
10  A  Yes.
11  Q  Was that for tax, also?
12  A  Yes.
13  Q  What type of tax was that?
14  A  I think that was also state taxes.  And it
15  was paid.
16  Q  It says, personal income tax account.
17  A  Yeah, it was paid.
18  Q  That was paid on March 31 of 2003, wasn't
19  it?
20  A  Yes.
21  Q  So, the judgment was entered July of 2000.
22  Does that sound right to you?
23  A  I guess.  I'm not sure about that.
24  Q  If that's what the public record shows,
25  you wouldn't dispute that, would you?

Page 37

1    A  I guess so, yes -- I mean, yes, if that's
2  what the record shows.  I can't remember when it
3  was.
4    Q  If that's what the record shows, you're
5  not going to say that's inaccurate, are you?
6    A  I can't, you know.
7    Q  So, the judgment was entered, according to
8  this, July of 2000, and for $359 and change.  And
9  then that wasn't paid until March 31 of 2003;
10 correct?
11   A  I paid it, yes.  I guess, um-hmm.
12   Q  In March of 2003?
13   A  I guess, yeah.
14   Q  If that's what the record shows, you won't
15 dispute that, will you, sir?
16   A  Not really, no.
17   Q  Now, there was another tax judgment
18 entered on March 19th of 1992; correct?
19   A  Um-hmm.
20   Q  Yes?
21   A  Yes.
22   Q  You need to try not say uh-huh.
23   A  Yes, I think.  I think, yes.
24   Q  That was also from the State of Ohio Tax
25 Commission, for $1,935.17.  Does that sound right to

Page 38

1  you?
2    A  I think so.
3    Q  Yes?  What type of tax was that for?
4    A  That was basically -- I think it was for
5  state tax, I think.
6    Q  State income tax?
7    A  Um-hmm.
8    Q  Yes?
9    A  Yes.
10   Q  So, that judgment was entered in 1992.
11 And that wasn't -- that's been paid; right?
12   A  Yes.
13   Q  That wasn't paid until October 10th of
14 1996; correct?
15   A  Right.  I think so, if that's what the
16 record shows.
17   Q  About four-and-a-half years later?
18   A  Well, I paid on it a period of time.
19   Q  Okay.  But it was paid off by
20 October 10th -- it wasn't paid in full until
21 October 10th of '96; right?
22   A  Yes.
23        (Defendants' Exhibit 2 marked
24         for identification.)
25 BY MR. LEWIS:

Page 39

1    Q  Sir, I want to show you what's been marked
2  for identification as Defendants' Exhibit number 2.
3  These were written questions that we sent to your
4  counsel.  You've seen these before, haven't you,
5  sir?
6    A  I think so, yes.
7    Q  Well, we asked you questions, and then
8  there were answers given.  Then, if you look at the
9  last page of Exhibit 2, the very last page -- are
10 you with me?
11   A  On 23?
12   Q  The very last page.
13   A  Oh.
14   Q  It's got, Verification.
15   A  Oh, the very last page.  Yes.
16   Q  Is that your signature?
17   A  Yes, it is.
18   Q  Were you put under oath by Mr. Schwantes,
19 when you signed these interrogatories, these
20 answers?
21   A  Yes, I think so.
22   Q  Well, were you in Mr. Schwantes' presence
23 when you signed this document?
24   A  Yes.
25   Q  These answers are true and correct, to the

Page 40

1  best of your knowledge and belief; correct?
2    A  I'm pretty sure, yes, I --
3    Q  Well, are they or aren't they?
4    A  Yes, they should be.  Yes.
5    Q  I know they should be.  But are they or
6  aren't they?
7    A  I would say they are.
8    Q  Did you read these answers before you
9  signed that verification page?
10   A  At the time, I believe I did, yeah.
11        (Defendants' Exhibit 3 marked
12         for identification.)
13   MR. LEWIS:  Just let me know when you're
14 ready.
15      THE WITNESS:  Yes.
16 BY MR. SCHWANTES:
17   Q  Sir, I want to show you what's been marked
18 for identification as Exhibit No. 3.  Can you
19 identify that document?
20   A  Yes.
21   Q  Again we have a verification page attached
22 at the very end.  Is that your signature?
23   A  Yes, it is.
24   Q  The answers that are in Exhibit 3, are
25 those true and correct, to the best of your

Page 41

1 knowledge and belief?
2     A  I would say they are, yes.
3     Q  Were you put under oath before you signed
4 that verification page?
5     A  I can't remember that.  I can't remember
6 whether I did, or was or wasn't.
7     Q  How many verification pages did you sign
8 in front of Mr. Schwantes, for these
9 interrogatories?
10     A  Oh, I can't remember.  I can't remember.
11     Q  So you're telling me, you can't remember
12 if with you were put under oath before you signed
13 this verification page?
14     A  No, I can't.
15     Q  This is the second set of interrogatories.
16 These are questions that were sent on behalf of my
17 client, Roseanne Christian.  Do you see that?
18     A  Um-hmm.
19         MR. BLESSING:  Excuse me.  I'm missing --
20         MR. LEWIS:  Exhibit 3.
21         MR. BLESSING:  It says, First Set.  You
22 said the second set.
23         MR. LEWIS:  Exhibit 3.
24         MR. BLESSING:  Mine says, First Set.
25         MR. LEWIS:  Right, First Set of

Page 42

1 Interrogatories --
2         MR. BLESSING:  I thought you said second
3 set.
4         MR. LEWIS:  -- on Behalf of Roseanne
5 Christian.  Okay, if I misstated, I apologize.
6 I don't think I did, though.
7 BY MR. LEWIS:
8     Q  This Exhibit 3 was sent -- this is a
9 different set -- these were sent on behalf of
10 Roseanne Christian.  You with me?
11     A  Um-hmm.
12     Q  These aren't the same interrogatories as
13 Exhibit 2; right?
14     A  Right.
15     Q  Now, did you review these answers before
16 you signed that verification page?
17     A  I'm pretty sure I did, yes.
18     Q  Do you have some doubt about whether you
19 did, sir?
20     A  I don't think so.  I think I was asked to
21 read them.
22     Q  Did you read them?
23     A  Yes, I did.  I'm pretty sure I did.
24     Q  You're pretty sure you did?
25     A  Yes, I am.

Page 43

1     Q  How long did you spend -- where was
2 this -- where were these verification pages signed?
3 Were you in Mr. Schwantes' office?
4     A  Oh, I can't remember that.
5     Q  You can't remember?
6     A  Huh-uh.
7     Q  Were they sent to you for signature, to be
8 returned?
9     A  I can't remember.  I can't remember.
10     Q  So, you can't remember whether you were in
11 Mr. Schwantes's presence when you signed that
12 verification page?
13     A  No, I can't remember.
14     Q  Can't recall?
15     A  Huh-uh.
16         (Defendants' Exhibit 4 marked
17         for identification.)
18 BY MR. LEWIS:
19     Q  Sir, I want to show you what's been marked
20 as Defendants' Exhibit No. 4.  I'm going to
21 represent to you that these were the documents
22 provided by Mr. Blessing's office attached to
23 Exhibits 2 and 3.  They are stamped, down at the
24 bottom, Bryant 692 through Bryant 716.  Do you see
25 that?

Page 44

1     A  Um-hmm.
2     Q  Yes?
3     A  Yes, I do.
4     Q  Have you reviewed these documents?
5     A  Yes, I have.
6     Q  Were these the documents that were
7 attached to Exhibits 2 and 3 when you signed off on
8 those interrogatories?
9     A  Yes, I think so.  Yes.
10     Q  They are referenced by number, in your
11 answers to interrogatories.
12     A  Oh, I don't -- I don't know, as far as --
13 that's what I'm saying.  I don't know by number.
14     Q  You believe they were --
15     A  All together.
16     Q  -- all together?  That's what I was
17 asking.
18     A  Yes.
19     Q  I forgot to ask you before.  You indicated
20 you are living at a homeless shelter now?
21     A  Yes.
22     Q  Where exactly is that?
23     A  That's in Mt. Airy.
24     Q  What's the address?
25     A  It's 2660 D-I-E-H-L Road.

Page 45

1  Q  Are you currently employed?
2  A  No, I'm not.
3  Q  How long have you been living at that
4  homeless shelter?
5  A  Oh, I've been there maybe two,
6  two-and-a-half months.
7  Q  I don't think I asked you before.  After
8  Fairfax, after the Fairfax eviction --
9  A  Um-hmm.
10  Q  -- where did you live after that?
11  A  I lived at 3913 Vine Street.
12  Q  Forgive me.  I'm not trying to just repeat
13  myself for the sake of it.  How long did you live at
14  3913 Vine?
15  A  I'm not quite sure.  It was several years,
16  though.
17  Q  Then, did you have an address after 3913
18  Vine?
19  A  No.  I -- well, I stayed at my uncle's for
20  a couple of months.
21  Q  Was that after you lived at Vine Street?
22  A  Yes.
23  Q  Why did you leave -- was 3913 Vine an
24  apartment?
25  A  Yes.

Page 46

1  Q  Why did you leave there?
2  A  Because that's when Patricia and I started
3  having problems.
4  Q  So, she stayed and you left the Vine
5  Street address?
6  A  Oh, we both left.
7  Q  Then you moved to your uncle's --
8  A  Yes.
9  Q  -- for a while --
10  A  Yes.
11  Q  -- temporarily?
12  A  Yes.
13  Q  Then how long did you stay with your
14  uncle?
15  A  Oh, approximately, I guess, a couple
16  months.  Just about a couple months or so.
17  Q  When you left the Vine Street address,
18  were you and Patricia current on your rent?
19  A  Yes, we were.
20  Q  Then, when you lived with your uncle, did
21  you pay him any rent?
22  A  I gave him just a nominal fee of like
23  50 -- something like $50, or something, like, a
24  week, or something like that.
25  Q  Then, after staying at your uncle's, where

Page 47

1  have you stayed?
2  A  I stayed down at the Gospel Mission
3  downtown.
4  Q  How long did you stay at the Gospel
5  Mission?
6  A  I stayed there about a month, about a
7  month or so.  About a month, maybe two.
8  Q  When you were living at your uncle's, were
9  you employed?
10  A  Yes.  I worked at a company called Labor
11  Solutions.  I was a driver there.
12  Q  When's the -- you're unemployed now?
13  A  Yes.
14  Q  When's the last time you were employed?
15  A  Oh, it's -- it's been a good -- oh, I
16  would say, maybe three to four months.  About three
17  months or so.
18  Q  What was your last job?
19  A  That was it.  I worked at Labor
20  Solutions --
21  Q  Labor Solutions?
22  A  -- as a driver.
23  Q  Was that a full-time job?
24  A  Well, it was less than 30 hours, so it had
25  to be -- I mean, less than 40 hours, so it would be

Page 48

1  considered a part-time job.
2  Q  Why'd you leave Labor Solutions?
3  A  Because I wanted to go ahead and enter
4  these programs, enter programs.
5  Q  What type of programs are these?
6  A  Well, they are programs with the Veterans
7  for homeless -- homeless and indigent veterans and
8  people.
9  Q  Well, when you went -- what was the name
10  of the shelter before the shelter you're in now?
11  A  Gospel Mission.
12  Q  Gospel Mission?
13  A  Um-hmm.
14  Q  So, are you saying you were indigent at
15  the time you moved in there?
16  A  Yes.
17  Q  But you had just left a job; right?
18  A  Well, no.  What it was is, they were
19  homeless people.  They were for homeless people.
20  And I paid them $10 a week to live there.
21  Q  Well, if you were working, was there some
22  reason that you couldn't find a residence and pay
23  rent?
24  A  Well, no, not that.  It's that I -- I got
25  that job while I was homeless.  I didn't work long

Page 49

1 enough to really acquire enough money to go ahead
2 and do that. I didn't work that long. I only
3 worked there a couple months.
4    Q So you left that job voluntarily?
5    A I left there to go to get involved with
6 the VA. I was trying to -- I got ill. I also was
7 supposed to go and get a hernia operation. There
8 were some things that wouldn't allow me to work.
9    Q What is that? Is there some reason that
10 you can't work?
11    A Yeah -- no -- well, I was involved with a
12 hernia operation, and I just had some matters that I
13 had to get straight because of my going through my
14 divorce and stuff like that.
15    Q I want to talk to you now about this
16 lawsuit and how this lawsuit came to be filed
17 against my clients.
18        Tell me how you first met either
19 Mr. Schwantes or Mr. Blessing.
20    A I met them when we were going through
21 matters of -- well, I don't know if, in fact -- I'm
22 not sure about this now -- we were involved in
23 another case, I think. And I ended up as a witness
24 because of some things that they felt were similar
25 with another case and my case, and they came to my

Page 50

1 home.
2    Q Right. Mr. Schwantes called you up one
3 day, didn't he?
4    A Um-hmm.
5    Q Yes?
6    A Yes.
7    Q You had never met him or you hadn't known
8 him before then, had you?
9    A No, I did not.
10    Q You hadn't called Mr. Blessing's office or
11 Mr. Schwantes before you got that call from them,
12 had you?
13    A Well, no, I hadn't. But I did -- I did
14 want to involve myself in a -- some type of suit or
15 something against Mr. Bigelow. I just didn't know
16 how to go about it.
17    Q (CQ) All right. Well, we'll get to that.
18 But what I'm asking now is about this first contact.
19 Mr. Schwantes called you up and he said he wanted to
20 talk to you about Mr. Bigelow, didn't he?
21        MR. BLESSING: Objection. That's attorney
22    work product. And I instruct you not to answer
23    the question about what Mr. Schwantes said to
24    you or what you said to him.
25        MR. LEWIS: Okay. Well, just for the

Page 51

1    record, this has already been testified to in a
2    prior deposition, the deposition Mr. Curtis
3    gave in Bigelow versus Burbrink. That
4    deposition transcript of the testimony has
5    already been given. So, I'm going to ask him
6    the question again. There was no -- well, the
7    testimony has already been given, it's a matter
8    of record. Do you want to talk to him a
9    minute?
10        MR. BLESSING: No.
11        MR. LEWIS: You're instructing him not to
12    answer?
13        MR. BLESSING: I'm instructing him not to
14    answer.
15 BY MR. LEWIS:
16    Q Do you remember, sir, in your prior
17 deposition, being asked questions about how
18 Mr. Schwantes contacted you and what was said? Do
19 you remember those questions?
20    A No, I don't. I'm not saying they don't
21 exist, but I don't remember them. That was some
22 time ago. I don't remember.
23    Q You were represented by counsel then, at
24 that deposition, weren't you, sir?
25    A Yes, I was.

Page 52

1        MR. LEWIS: Well, you've already
2    instructed him not to answer. Are you willing
3    to waive the formalities of having the court
4    reporter tell him to answer the question?
5        MR. BLESSING: Certainly.
6        MR. LEWIS: I'm going to need that
7    question certified in court. Just for the
8    record, that prior deposition testimony is on
9    page 31 of that transcript, where those
10    questions were asked, and there was no
11    objection.
12 BY MR. LEWIS:
13    Q So, Mr. Schwantes then came out to your
14 residence, didn't he, sir?
15    A That is correct.
16    Q That's the first time that you had met
17 him?
18    A Yes.
19    Q Right?
20    A Um-hmm.
21    Q Now, at the time that you had contact with
22 Roseanne Christian and Mr. Bigelow, the Fairfax
23 property was in foreclosure; correct?
24    A What I found is that we were behind in
25 taxes. We were behind in taxes.

Bryant, et al. v. Bigelow, et al.          Condenselt!          Depo of Harry Curtis

Case 1:02-cv-00006-SAS          Document 42-2          Filed 10/01/2003          Page 15 of 23

Page 53

1    Q There was a foreclosure action pending,
2 wasn't there, sir?
3    A Well, I had received things from
4 foreclosure, yeah. But I knew I was behind in
5 taxes.
6    Q Well, didn't you know that there was a
7 foreclosure suit pending in the Hamilton County
8 Court in 1999?
9    A Well, I --
10    MR. BLESSING: Excuse me. Are you asking
11    him if he knew that in '99, or --
12    MR. LEWIS: Right.
13    MR. BLESSING: -- he knew that at some
14    other time?
15 BY MR. LEWIS:
16    Q I'm asking him, in 1999, when you first
17 met Roseanne Christian, when she came to your
18 house -- you with me?
19    A I --
20    Q Let me finish my question. 1999, was
21 there a foreclosure action pending against you
22 reference unpaid taxes at Fairfax?
23    A Yeah. I knew I was behind in taxes. I
24 wasn't quite sure if I had a foreclosure pending, or
25 not.

Page 54

1    Q Well, that wasn't the first foreclosure
2 action that had been filed against you with
3 reference Fairfax, was it, sir?
4    A No. But I had paid the other taxes.
5 Yeah, I paid those taxes.
6         (Defendants' Exhibit 5 marked
7         for identification.)
8 BY MR. LEWIS:
9    Q Sir, I'm showing you what's been marked as
10 Exhibit No. 5. Can you identify that?
11    A I'm not sure about this. I think this was
12 the -- I'm not sure about this one. I -- I do
13 remember that there was -- and we paid taxes -- we
14 paid money on one.
15    Q Well, do you remember that there was a
16 lawsuit filed in 1998 -- you see your name on
17 Exhibit 5 as a defendant? Did you see that, Harry
18 Curtis --
19    A Right.
20    Q -- down there, name number three?
21    A Right.
22    Q This complaint's alleging that the taxes
23 were delinquent and unpaid; correct?
24    A Yes, that's what it says.
25    Q Does this refresh your recollection about

Page 55

1 whether or not there was a foreclosure action filed
2 against you in 1998, reference taxes at Fairfax?
3    A Well, I don't know if it was a foreclosure
4 action, or not. I just knew that we were behind on
5 the taxes. And I went down and paid money on the
6 taxes.
7    Q So, you're not disputing that there was a
8 lawsuit filed and you're not disputing that you were
9 behind in taxes --
10    A Yes.
11    Q -- right?
12    A Yes.
13    Q As of the date of this filing -- this
14 appears this was filed, looks like -- well, sometime
15 in 1998 -- it alleges that $3,299.81 in real estate
16 taxes were due, in paragraph 2. Do you see that?
17    A Yes.
18    Q Is that accurate?
19    A I guess so.
20    Q Well, let's please not get into --
21    A I would say it is.
22    Q You don't dispute that, do you, sir?
23    A No.
24    Q So, what happened? Once this delinquency
25 arose, then what did you do to resolve this problem?

Page 56

1    A I'm pretty sure -- I'm pretty sure we went
2 down and paid some money on the taxes. I'm not
3 sure. I know we did at one time. I don't know if
4 this is it, or not.
5    Q So you don't know what the resolution of
6 this lawsuit was in 1998?
7    A No.
8    Q Did you go to court?
9    A No.
10    Q Did you hire a lawyer?
11    A No.
12    Q But you don't know if you got the taxes
13 current --
14    A I --
15    Q -- let me finish, okay? You don't know if
16 you got the taxes current after this complaint was
17 filed?
18    A I don't know.
19    Q Were you working in 1998?
20    A I'm pretty sure I was. I think I was.
21    Q Where were you working in 1998?
22    A If I was working, I was working as --
23 either at the Post Office -- I don't know. I can't
24 say. I can't remember.
25    Q Did you have a source of income in 1998?

Page 57

1  A  I'm trying to remember. I'm pretty sure I
2  worked either part-time or temporary service, or
3  something like that. I'm not sure.
4    Q  What do you believe your gross income was
5  for 1998?
6    A  It was minimum. It was minimum.
7    Q  Did you file a tax return for 1998?
8    A  I'm pretty sure I did.
9    Q  Do you still have copies of your tax
10 returns?
11   A  Oh, all those things were put in the file.
12 I'm pretty sure I do, though. I'm pretty sure. I'm
13 not -- I'm not no -- I'm not sure if I do have them
14 or not, because we've been moved around quite a bit.
15   Q  Who would have prepared your tax return in
16 1998?
17   A  Probably I did.
18   Q  So, you don't know if you still have it,
19 or not?
20   A  I don't know if I still have it, or not.
21     MR. LEWIS: Again, I'll make a written
22   request to your attorney. I'm interested in
23   your tax returns for 1998 and 1999, if you can
24   locate them.
25     THE WITNESS: Okay.

Page 58

1     MR. LEWIS: Please don't dispose of them.
2  And we'll make a written request to your
3  lawyer.
4     THE WITNESS: I wouldn't do that.
5     MR. LEWIS: All right?
6     THE WITNESS: Sure.
7  BY MR. LEWIS:
8    Q  What about Patricia, was she working in
9  1998 and 1999?
10   A  Yes.
11   Q  Where was she working?
12   A  She was working for a company called
13 Amano -- well, it was Cincinnati Time. Then it was
14 sold to a company and it was called Amano
15 Cincinnati.
16   Q  A what?
17   A  Amano Cincinnati.
18   Q  Approximately, what was her gross income
19 for 1998, do you believe?
20   A  I don't know. I guess, between 15 and --
21 between 15 and $20,000, I guess. I don't -- I'm not
22 quite sure.
23   Q  Well, why did the real estate -- why
24 weren't the real estate taxes paid in 1998?
25   A  Well, she had several other obligations

Page 59

1  for -- she had other properties and other things
2  that she had to pay. So, basically -- I think this
3  is when we had just gotten the property, too, we had
4  just inherited it from her grandmother.
5    Q  Well, actually, you inherited it from your
6  grandmother in 1975, didn't you, sir?
7    A  No, I inherited it from my mother in 1975.
8  My grandmother had a life estate, so she was still
9  there.
10   Q  Well, that's right. You inherited it from
11 your grandmother -- or, your mother, in 1975. Title
12 passed to you in '75 --
13   A  In '75.
14   Q  -- is that right?
15   A  Yes. But my grandmother was living, had a
16 life estate there, and she was responsible for those
17 things while she stayed there.
18   Q  Okay. Well -- but your grandma passed
19 away in '84, didn't she?
20   A  I can't remember. I think so.
21   Q  Does that sound about right to you?
22   A  I think -- I don't know.
23   Q  But let's get back to the taxes now. So,
24 the reason that the real estate taxes weren't paid
25 in '98 and '99 was, you and your wife didn't have

Page 60

1  enough money to cover the taxes; is that correct?
2    A  That's correct.
3     MR. BLESSING: Could we take about a
4    two-minute break?
5     MR. LEWIS: Sure.
6        (Brief recess taken.)
7     MR. LEWIS: Back on the record.
8  BY MR. LEWIS:
9    Q  Mr. Curtis, a couple of more questions
10 about your current status. You indicated you're at
11 a homeless shelter and you referred to some programs
12 that you're involved in?
13   A  Yes.
14   Q  Yes?
15   A  Yes.
16   Q  Tell me how you spend your -- a typical
17 day. What do you do?
18   A  Well, I usually go to the VA and attend
19 these programs for alcohol abuse and substance
20 abuse. And I've gotten into these programs and I've
21 been involving myself with them.
22   Q  So, you're being treated for alcohol and
23 substance abuse?
24   A  Yes.
25   Q  How long have you had an alcohol abuse

Page 61

1 problem?
2    A  These things didn't occur until after the
3 problems with the property.
4    Q  After Fairfax?
5    A  Yes.
6    Q  Had you ever been treated for alcohol
7 abuse, prior to being evicted from the Fairfax
8 premises?
9    A  No.
10   Q  What about drug abuse, had you ever
11 been --
12   A  No.
13   Q  You hadn't been treated for drug abuse --
14   A  No.
15   Q  -- before the eviction?
16   A  No.
17   Q  So, your -- and you receive medical
18 treatment at the Veterans for these problems, do
19 you?
20   A  Yes.
21   Q  Had you received medical treatment at the
22 Veterans, before you sought the treatment for the
23 alcohol and drug abuse?
24   A  No, not other than -- I cannot say that.
25 No, I -- a cold -- maybe I went there for a cold or

Page 62

1 some kind of medication like that, for a cold or
2 sinus, you know, flu, something like that.
3    Q  Where'd you get your routine medical care
4 prior to 1999?
5    A  That's what I'm saying.  I basically went
6 there for colds or something like that.
7    Q  So, routine medical care, before '99, you
8 got at the Veterans?
9    A  There, and also we had a -- I had my own
10 physician.
11   Q  Who was that physician?
12   A  It was just a primary care through -- at
13 that time, I was going -- dealing with my -- my
14 wife -- I mean, it was my wife's insurance.  So, I
15 think I had -- I really didn't attend -- I really
16 didn't go to the hospital that much, so I can't
17 remember who it was.  I just had a primary care I
18 had, like, for, oh, ankle sprains or something like
19 that.  But --
20   Q  What's that doctor's name?  Who was your
21 doctor?
22   A  I can't remember.  I can't remember,
23 because I never really attended it -- went to him
24 that much.
25   Q  How long have you been going to the VA for

Page 63

1 medical care?
2    A  I would say, for the last -- intensively,
3 for the last six months or so.  I would say, for the
4 last six months or so.
5    Q  I'm not asking about the intensity part.
6 Did you get medical care at the VA before 19 --
7    A  Oh, yeah.  Yeah.
8    Q  -- before 1999?
9    A  Yeah.  But I just -- I went there for
10 sprains, you know, ankle injuries, something like
11 that.
12   Q  That's what I want to know.
13   A  Yeah, I started going to the VA, because I
14 realized I was a Veteran --
15   Q  Right.
16   A  -- and I could get those services.
17   Q  When did you start getting medical
18 services at the VA?  And I'm including the ankle
19 sprains and pulls --
20   A  Well, that's what I'm saying, I can't
21 remember.
22   Q  Can you just ballpark it for me?
23   A  It's been a couple years.  Two or three
24 years, I would say.  Two or three years, at least.
25   Q  Before you lived on Fairfax?

Page 64

1    A  No.  No, I started getting services from
2 the VA while I was living there.  But that was, like
3 I said, ankle sprains, things like that.
4    Q  The drug abuse, what drug are you being
5 treated for?
6    A  I was being treated for cocaine abuse.
7    Q  How long had you been using cocaine?
8    A  I hadn't really gotten involved with
9 anything like that, except for a period after --
10 after -- after Fairfax.  And I really started
11 getting involved while I was going through
12 separation with my wife and other things.
13   Q  So, you started using cocaine after you
14 separated from your wife?
15   A  No, as a result of the problems that
16 evolved going through the separation and, you know,
17 going through the property and everything.
18   Q  So, how long had you been using the
19 cocaine?
20   A  I'd say, less than these last six months.
21 Less than the last six months.
22   Q  Within the last six months, you started
23 using cocaine?
24   A  Yeah.  But I had a problem with alcohol, I
25 would say -- well, maybe a year.  I'll say a year.

Page 65

1  Q  What, for using cocaine?

2  A  Maybe a year.

3  Q  Uh-huh.  How long do you think you've had

4  an alcohol problem?

5  A  I started having problems with alcohol

6  while -- after the property.  After the property, I

7  was drinking.  But, I mean, within the last --

8  within the last year, maybe two, it started

9  escalating.

10  Q  Was there ever a situation where you

11  were -- you had been drinking and had a physical

12  altercation with your wife?

13  A  I pushed my wife one time.

14  Q  Right.  She filed a domestic violence

15  charge against you, didn't she?

16  A  I don't know if she did, or not.

17  Q  You don't remember?

18  A  Huh-uh.

19  Q  Do you remember -- have you ever been

20  arrested for domestic violence?

21  A  No.

22  Q  You weren't taken into custody by the

23  police on a domestic violence charge?

24  A  Not that I remember.

25  MR. LEWIS:  All right.  Give me a minute.

Page 66

1  I'll be right back.

2  (Brief recess taken.)

3  MR. LEWIS:  Back on the record.

4  BY MR. LEWIS:

5  Q  Sir, do you remember an incident on

6  December 31st of 2002, involving you and Patricia?

7  A  Yeah, I pushed her.

8  Q  You pushed her?

9  A  Um-hmm.

10  Q  She filed a petition for domestic violence

11  against you, didn't she?

12  A  I didn't know if she had, or not.

13  Q  You didn't?

14  A  No.

15  Q  Did you go to court?

16  A  No, I did not.

17  Q  Were you drinking as a result -- is that

18  why you pushed her?  Were you under the influence

19  when that occurred?

20  A  No.  I was under medication, and we were

21  going through some things about her having a man in

22  the house.

23  Q  When you've been buying this cocaine in

24  the last six months, where were you getting the

25  money for it?

Page 67

1  A  I was working.  I was working.

2  Q  How much were you spending a day for your

3  cocaine habit?

4  A  Oh, I wasn't doing it on a daily basis.

5  Q  Well, how much were you spending a week?

6  A  I don't know.  I guess, a hundred bucks,

7  two hundred bucks.

8  (Defendants' Exhibit 6 marked

9  for identification.)

10  BY MR. LEWIS:

11  Q  Sir, I want to show you what has been

12  marked for identification as Exhibit 6.  Have you

13  seen this before?

14  A  No, I don't know if I have, or not.  I

15  can't remember this.

16  Q  Well, I'm going to represent to you, this

17  was a foreclosure complaint that was filed in 1999.

18  You see, in paragraph 2, it states that -- you see

19  you're a defendant here, don't you?

20  A  Yes, I do.

21  Q  See that?  It says that, as of the filing

22  of this complaint, that taxes were owed, 4,275.96.

23  Do you see that in paragraph 2?  Is that accurate?

24  A  I guess I see it here, yes.

25  Q  Well, do you have any reason to doubt

Page 68

1  that, sir?

2  A  I see it here.  I wouldn't doubt it.

3  Q  Then, this is the foreclosure complaint

4  that was pending at the time that you had the

5  dealings with Ms. Christian and Mr. Bigelow; is that

6  accurate?

7  A  I don't know if it was, or not.  I would

8  assume that's what it was.

9  Q  You knew your property was in foreclosure,

10  didn't you, sir, when you had the transaction with

11  Mr. Bigelow?

12  A  I knew that we were behind in our taxes.

13  I didn't -- wasn't informed, until Roseanne came to

14  me and told me it was a foreclosure.  I knew we were

15  behind in taxes.  I knew we had tax problems.

16  Q  Exhibit 6, had you been served with a copy

17  of this complaint, sir, before you met Roseanne

18  Christian?

19  A  I hadn't been served anything then, to my

20  knowledge.  I hadn't seen anything.  I knew that we

21  were behind in taxes.  We had received a letter from

22  the City saying that we owed taxes.

23  Q  Well, it actually would have been from the

24  County, right --

25  A  Yeah, I --

Bryant, et al. v. Bigelow, et al.    Document 42-2    Condenselt!    Filed 10/01/2003    Page 19 of 23    Depo of Harry Curtis

Case 1:02-cv-00006-SAS

Page 69

1    Q    -- a letter from the County? How many
2    letters from the County did you receive about these
3    tax problems?
4    A    Oh, I can't remember.
5    Q    Was it more than a couple?
6    A    I don't know. I don't remember that, at
7    all. I don't remember that, at all.
8    Q    You don't remember how many?
9    A    No.
10    Q    But you knew --
11    A    I knew I received -- but I don't think it
12    was in this form. It was just a --
13    Q    A letter?
14    A    Yeah.
15    Q    The letter said you owed taxes?
16    A    Right.
17    Q    What did you do about it, after you got
18    that letter?
19    A    Well, I just hadn't done anything at the
20    time.
21    Q    So, are you telling me that the first time
22    you became aware that there was a foreclosure
23    proceeding pending was when Roseanne Christian told
24    you?
25    A    That's what I thought. I knew we were

Page 70

1    behind in taxes, but I can't -- I can't say that --
2    I can't say whether I -- because I don't really
3    know. Like I said, I knew that we were behind in
4    taxes.
5    Q    But you don't recall how you first found
6    out there was a foreclosure action pending?
7    A    No.
8    Q    Did you know -- when you first met
9    Roseanne Christian, did you understand that if you
10    didn't take care of this tax problem, that your
11    property could be sold?
12    A    Well, that was my understanding from what
13    she said, yes.
14    Q    You didn't have that understanding before
15    Roseanne Christian told you that; is that what
16    you're saying?
17    A    No, I didn't, not under those -- I mean,
18    not for that amount of money, no.
19    Q    This Exhibit 6 says it was filed -- down
20    at the bottom, you see the file stamp --
21    A    Um-hmm.
22    Q    -- July 30th of 1999? Do you see that?
23    A    Yes.
24    Q    Did you get a copy of this served at your
25    home, before you met with Roseanne Christian?

Page 71

1    A    No, I never got anything served to me.
2    That's what I'm saying. Not that I know of.
3    Q    This Exhibit 6, is this the first time
4    you've seen this document today?
5    A    No. But I -- I -- I saw it when -- she
6    came, I think she had a copy of it, or something
7    like that. But I don't remember seeing it or
8    actually having it sent to me.
9    Q    How long a period of time, before
10    July 30th of 1999, do you think it was when you were
11    getting this letter or letters from the County?
12    A    I can't recall. I -- I -- I cannot
13    recall. I was -- I can't recall.
14    Q    Well, do you believe it was months prior?
15    A    I can't say.
16         (Defendants' Exhibit 7 marked
17         for identification.)
18    BY MR. LEWIS:
19    Q    Sir, you have in front of you Defendants'
20    Exhibit 7. Do you recognize that property?
21    A    Um-hmm.
22    Q    Yes?
23    A    Yes.
24    Q    That's 1966 Fairfax, isn't it?
25    A    Yes.

Page 72

1    Q    I'm going to represent to you that that's
2    a photo that's on the Hamilton County Auditor's
3    website.
4    A    I wouldn't know that.
5    Q    Well, I'm telling you it is --
6    A    Okay.
7    Q    -- because it is.
8    A    Well, I would have no idea.
9    Q    According to their records, that photo was
10    taken November 18th of 1993.
11    A    Okay.
12    Q    All right? Now, does that -- is that a
13    fair and accurate representation of how the property
14    looked November 18th of 1993?
15    A    Well, that's only one side of it, so I
16    can't really say.
17    Q    Well, let's just talk about that side.
18    Okay?
19    A    Um-hmm.
20    Q    Is that a fair and accurate representation
21    of how that side looked on November 18th, 1993?
22    A    I guess.
23    Q    Well --
24    A    I guess.
25    Q    I mean, is that the front of the house, or

| Page 73 | Page 75 |
|---|---|
| 1 not, sir? | 1 you moved in until the time that you were evicted. |
| 2    A  Yes. | 2    A  I can't say.  I cannot say. |
| 3    Q  All right. | 3    Q  I want to talk to you now about how you |
| 4    A  Well, it's not the front of the house, | 4 got the house and how you got title.  Your mom's |
| 5 it's the side of the house. | 5 name was Betty Lou Pringle; correct? |
| 6    Q  Okay.  Whatever it is, that's the house? | 6    A  That is correct. |
| 7    A  Right. | 7    Q  She owned this home? |
| 8    Q  That's a picture of 1966 Fairfax, isn't | 8    A  That is correct. |
| 9 it? | 9    Q  She died October 16th of 1975; does that |
| 10    A  Um-hmm. | 10 sound right to you? |
| 11    Q  But it's not a picture of the whole thing? | 11    A  I would -- yes, I think so, yes. |
| 12    A  Right. | 12    Q  Okay.  When she passed away, she was |
| 13    Q  All right.  Now, did you -- after you | 13 living at 1966 Fairfax, wasn't she? |
| 14 moved in -- you were living there by 1993, weren't | 14    A  Well, yes.  She was at the hospital.  But |
| 15 you, sir?  Actually, you weren't.  You moved in | 15 she had been at the hospital -- but, yes, that |
| 16 about 1994; right? | 16 was -- |
| 17    A  I think so. | 17    Q  That was her residence address? |
| 18    Q  Okay. | 18    A  Yes. |
| 19    A  I can't remember. | 19         (Defendants' Exhibit 8 marked |
| 20    Q  After you moved in, just assuming it was | 20         for identification.) |
| 21 about 1994, for purposes of this question -- | 21 BY MR. LEWIS: |
| 22    A  Right. | 22    Q  Mr. Curtis, you have Exhibit 8 in front of |
| 23    Q  -- whenever it was, did you and your wife | 23 you.  Do you see that? |
| 24 make any improvements to the property? | 24    A  Um-hmm. |
| 25    A  Well, we -- I think we did some painting | 25    Q  Yes?  Try to remember to do the yes and no |

| Page 74 | Page 76 |
|---|---|
| 1 inside and we changed the refrigerators.  We, you | 1 instead of uh-huh. |
| 2 know, cleaned up the grass and cut the yard and all | 2    A  Yes. |
| 3 that kind of stuff. | 3    Q  Now, this is a Certificate of Transfer |
| 4    Q  I'm talking about improvements to the | 4 that's been filed with the Hamilton County Courts. |
| 5 structure of the home.  Remodeling -- did you do any | 5 And it indicates that Betty Lou Pringle died on |
| 6 remodeling? | 6 October 16th, 1975.  Do you see that? |
| 7    A  No, not really. | 7    A  Um-hmm. |
| 8    Q  You remember painting? | 8    Q  Yes? |
| 9    A  Yes. | 9    A  Yes.  Yes. |
| 10    Q  Did you do anything else, in terms of | 10    Q  At the time she passed away, Viola |
| 11 improvements to the property?  I don't mean | 11 Pringle, her mother, was still alive; right? |
| 12 maintenance like cutting the grass. | 12    A  Yes. |
| 13    A  Um-hmm. | 13    Q  That was your grandmother? |
| 14    Q  Any other improvements other than | 14    A  Yes. |
| 15 painting? | 15    Q  Now -- so you -- is it your understanding |
| 16    A  Not really -- oh, yeah, we put a new water | 16 that this certificate of transfer -- I know you're |
| 17 heater -- there was a new water heater put in, | 17 not a lawyer.  I'm not asking you for legal |
| 18 right. | 18 conclusions.  But is it your understanding that when |
| 19    Q  So, you replaced the water heater -- | 19 the certificate of transfer was filed, that you |
| 20    A  Right. | 20 became the owner of this property? |
| 21    Q  -- and painted? | 21    A  No.  My understanding is that my |
| 22    A  Right. | 22 grandmother was in charge of the property and I |
| 23    Q  Anything else? | 23 wouldn't get ownership until she passed. |
| 24    A  Not that I can remember. | 24    Q  Well, do you know what a life estate |
| 25    Q  Now, I'm talking about from the time that | 25 means?  Anybody ever talk to you about that? |

Page 77

1    A  No.  No.
2    Q  Do you know what a remainder interest was?
3    A  No.
4    Q  Wasn't it your understanding that your
5  grandmother would be allowed to live in the property
6  until she passed away?
7    A  I understood that.
8    Q  You understood that?
9    A  Yes.
10    Q  Is that what happened?  Did your grandma
11  live in the property until she passed away?
12    A  Yes, she did.
13        (Defendants' Exhibit 9 marked
14        for identification.)
15  BY MR. LEWIS:
16    Q  Sir, I want to show you what's been marked
17  for identification as Exhibit No. 9.  You see your
18  signature there?
19    A  Yes.
20    Q  Did you sign this document?
21    A  Yes, I did.
22    Q  This document says that Viola Pringle, who
23  held a life estate -- I'm down at about paragraph 3
24  here.  You with me?  Viola Pringle, who held a life
25  estate in said property, died on September 14th,

Page 78

1  1994.  Do you see that?
2    A  Um-hmm.
3    Q  Yes?
4    A  Yes.
5    Q  Is that accurate?
6    A  I would assume it is, yes.
7    Q  You have no reason to doubt that date, do
8  you, sir?
9    A  Right.
10    Q  As a matter of fact, this is an affidavit
11  that you signed --
12    A  Right.
13    Q  -- certifying that; right?  So, your
14  grandma passed away -- I'm sorry, your grandmother
15  passed away September 14th of 1994 --
16    A  Okay.
17    Q  -- right?  Now, does that date correspond
18  to approximately when you and Patricia moved into
19  Fairfax Avenue?
20    A  No.  My aunt was living there, also.
21    Q  Okay.  What's her name?
22    A  Her name is Katherine Thomas.
23    Q  Katherine with a K?
24    A  Um-hmm.  She was living there and taking
25  care of my grandmother and everything.

Page 79

1    Q  So, your grandmother and Katherine were
2  living there together when your grandmother passed
3  away?
4    A  Right.
5    Q  Now, how long did Katherine Thomas live
6  there, after your grandmother passed away?
7    A  Oh -- oh, I guess it was about -- I guess,
8  I would say, maybe a month or two.  Maybe a month or
9  two.  I --
10    Q  That guessing stuff --
11    A  I would say, around that time or -- I'm
12  not sure.
13    Q  Approximately a month or two?
14    A  I would say.  I'm not sure.
15    Q  Then, after Katherine moved out, did you
16  and Patricia move in?
17    A  Yes.
18    Q  So, do you believe that you and Patricia
19  would have moved in sometime in late fall --
20    A  Late '94 --
21    Q  Late '94?
22    A  -- early '95, right.
23    Q  Right.  Okay.  At the time that you moved
24  in, there wasn't any mortgage on the house, was
25  there?

Page 80

1    A  No.
2    Q  There hadn't been -- how long had it been
3  since any mortgage payments had to have been made on
4  the home?
5    A  I'm not quite sure.  But I know the house
6  was paid for.
7    Q  Free and clear?
8    A  Yes.
9    Q  Before you and Patricia moved in, who had
10  been making the payments for the real estate taxes?
11    A  My grandmother and my aunt.
12    Q  Now, when your mom passed away in 1975 --
13    A  Um-hmm.
14    Q  -- there was a probate estate, wasn't
15  there?  There was some probate court proceedings?
16    A  Yes, I think so.  Yes.
17    Q  At that point -- did your mom have a will?
18    A  Yes, she did.
19    Q  Who were the beneficiaries in that will?
20  Who inherited her property?
21    A  I was.  I think I got the -- my
22  grandmother got, I think -- now, I'm not sure about
23  this -- I'm not quite sure, but I -- she got life
24  estate.  And then I got the remainder.  I think
25  that's the way it was.

Page 81

1  Q  Did anybody else inherit property from
2  your mom's estate, other than you and your
3  grandmother?
4  A  Not that I can remember.
5  Q  You got the house; right?
6  A  Well, I got -- my grandmother got life
7  estate.
8  Q  Yeah, we've already talked about that.
9  And I'm not talking about the legal niceties here.
10  In terms of what you got from the estate, you
11  inherited the house?
12  MR. BLESSING:  Haven't we covered that?
13  MR. LEWIS:  Well, we're going to -- yeah.
14  A  Well, basically, that -- the arrangement
15  was, my grandmother had life estate.
16  Q  We've covered that.  That's not what I'm
17  asking you.
18  A  Well, that -- but that's what the
19  arrangement was.
20  Q  Other than the house, did you get any
21  other assets from your mom's probate estate?
22  A  No, just a car, her car.
23  Q  Her car?
24  A  Um-hmm.
25  Q  Yes?

Page 82

1  A  Yes.
2  Q  How much was that worth, approximately?
3  A  I don't know.  It was a older car.
4  Q  Did you sell it?
5  A  No.
6  Q  Did you use it?
7  A  Yes.
8  Q  So, you inherited the house and a car.
9  Anything else?
10  A  No, that -- not that I know of, other than
11  the property inside.  There was a lot of property
12  inside the house.
13  Q  Now, there was an attorney for the estate,
14  wasn't there?
15  A  Yes, there was.
16  Q  Steve Kurlansky --
17  A  Yes.
18  Q  -- do you remember that name?
19  A  I think so, yes.
20  Q  Who hired Mr. Kurlansky?  Did you?
21  A  No.  No, my mother -- that was my mother's
22  attorney.
23  Q  Mr. Kurlansky charged some fees, didn't
24  he, for doing some probate work?
25  A  Well, he really didn't probate the will, I

Page 83

1  did.  I took it down there and transferred it.  So,
2  he charged fees for things that he didn't do.  I
3  didn't -- no, he didn't get those fees, because he
4  didn't do the work.  I did the work.  I went down
5  and probated the will and everything.
6  Q  Right.  But you recall, don't you, that
7  the probate court approved payment to Mr. Kurlansky
8  of $350 for his services?
9  A  I don't know anything about that.
10  (Defendants' Exhibit 10 marked
11  for identification.)
12  BY MR. LEWIS:
13  Q  Sir, I've shown you Exhibit No. 10.  This
14  is a fax from Steve Kurlansky to John Meckstroth,
15  dated August 19th, 1999.  Do you see that?
16  A  Yes.  I have no idea about this.
17  Q  You've never seen this document before?
18  A  No, I have not.
19  Q  It says in this fax, at line 3, Hereto is
20  a copy of the order allowing attorneys fees from
21  January 29th, 1979.  Both Mr. Curtis and his aunt
22  Katherine Thomas ignored requests for payment of
23  this modest allowed fee.  However, this fee accrued
24  20 years of interest at the rate of $35 per year for
25  a total of $700.00 in interest for a total due of

Page 84

1  $1,050.00.  Do you see that?
2  A  Yes.  But I have no idea about it.  And,
3  first and foremost, this had nothing to do with me.
4  I did not agree with it.  I had nothing -- no
5  knowledge of it, whatsoever.
6  Q  Well, he's saying in here that you and
7  Aunt Katherine ignored requests for payment.
8  A  Well, he --
9  Q  Let me finish, okay?  He's saying that you
10  and Aunt Katherine ignored requests for fees.  Is
11  that true, or not?
12  A  Well, no, it's not.
13  MR. BLESSING:  Excuse me. Objection as to
14  form.  You may answer.
15  A  Yes.  I never knew anything about it.  He
16  never asked me for anything.  The real reason behind
17  this is that I already showed him that -- he gave
18  me a -- this was for a will that -- after my mother
19  had already probated a will.  And I already had
20  title to the property.  He took the title and never
21  returned it to me.  I know nothing about this and I
22  have no idea what this was about.
23  Q  So, you're saying that statement's
24  inaccurate?
25  A  I had -- I don't know anything about it.

Page 85

1  Q  That you didn't ignore his requests for
2  payments?
3  A  I never -- I never got a request from him.
4  Q  Well, that $350 was paid to Mr. Kurlansky
5  when you closed on the Fairfax property, wasn't it?
6  A  I have no idea. I have no idea. I
7  thought that -- I was told by the other lawyer that
8  the $15.80 was paid.
9  Q  So, you don't know whether the $350 --
10  A  No --
11  Q  -- let me finish. We cannot talk at the
12  same time. Okay?
13  A  Okay.
14  Q  You don't know whether the $350 was paid
15  to Mr. Kurlansky at the settlement of the Fairfax
16  property?
17  A  The lawyer told me he paid $15.18, I
18  think.
19  Q  Do you know whether the $350 was paid to
20  Mr. Kurlansky at the closing of the Fairfax
21  property?
22  A  No, he paid the $15.18.
23  Q  You're saying it wasn't paid to
24  Mr. Kurlansky?
25  A  I don't know. The amount that was paid

Page 86

1  was the $15.18.
2  Q  And 350 was not paid?
3  A  $350 was not owed. He paid him $15.18.
4  MR. LEWIS: Off the record.
5  (Off-record discussion.)
6  BY MR. LEWIS:
7  Q  I want to talk to you now about your first
8  contact with Roseanne Christian.
9  A  Um-hmm.
10  Q  Tell me how that came about.
11  A  Well, basically, he -- I mean, I was in my
12  house on a Saturday. And I looked downstairs, and
13  she was standing in my kitchen.
14  Q  About what time of the day was it?
15  A  I guess it was maybe between the morning
16  and maybe between -- maybe between 10:00 and 12:00,
17  something like that. It was -- it was in the
18  morning or early afternoon.
19  Q  Was Patricia home then --
20  A  Yes, she was.
21  Q  -- that day? So, what was Roseanne doing
22  in your kitchen?
23  A  I had no idea.
24  Q  No. But, I mean, what, was she -- was she
25  walking around --

Page 87

1  A  She was just --
2  Q  -- or was she making lunch or --
3  A  She was standing there. And I asked her
4  what she was doing there.
5  Q  What did she tell you?
6  A  She said she didn't know anybody lived
7  there. But we had laundry out in the backyard. And
8  I also had a dog in the backyard, so -- and the back
9  door was open. So, you know, I don't know how she
10  made that assumption.
11  Q  So, this surprised you, to see somebody in
12  your kitchen?
13  A  Absolutely.
14  Q  But you knew Roseanne before that, didn't
15  you?
16  A  Yes.
17  Q  In what context had you known her?
18  A  Well, her mother was the organist at my
19  church.
20  Q  But had you met Roseanne before then?
21  A  Well, we -- we grew up in the same church.
22  Q  When you saw her, did you recognize her as
23  Roseanne Christian?
24  A  She was familiar and -- but I wasn't
25  quite -- you know.

Page 88

1  Q  You didn't know her name?
2  A  I knew her name was -- you know, after she
3  gave me her name, then I realized who it was.
4  Q  Then you recognized her, when you saw her?
5  A  Yeah.
6  Q  So, what was discussed then? Did she
7  start talking to you? Well, what did you say to
8  her, first?
9  A  I asked her what she was doing in my
10  kitchen.
11  Q  What did she say?
12  A  She said that she was there -- she thought
13  that the property was getting ready to get
14  foreclosed on, and she didn't know if anybody lived
15  there, and she was there looking at the property.
16  Q  You do remember this was a Saturday?
17  A  I'm pretty sure it was a Saturday, because
18  both of us were home.
19  Q  Do you remember what month it was?
20  A  I'm not sure about that.
21  Q  Do you know --
22  A  I knew it was -- I knew it was either -- I
23  knew it was either the early -- it was either the
24  summer or early autumn months --
25  Q  Well, if I ask you --