1    closing?

2        A.    Okay, I don't understand your

3    question. The work that was done was supposed

4    to be, the work that was --

5        Q.    Let me rephrase the question --

6        A.    Was there some work done --

7        Q.    Excuse me, you said some work was

8    done on the porch and done on the roof. Was

9    that done shortly after the closing?

10        A.    I don't know if it was done before

11    or after, I'm not sure. It could have been,

12    some of it could have been done before.

13        Q.    Before the closing?

14        A.    Some of it could have been done, I

15    don't know. I don't know.

16        Q.    Did you pay rent to Mr. Bigelow?

17        A.    No, I did not pay rent to Mr.

18    Bigelow. I paid payments on the land contract

19    and the moneys that I sent to him were clearly

20    marked first payment on land contract, second

21    payment on land contract, those were, that

22    statement was on the check.

23        Q.    Do you have copies of these canceled

24    checks?

25        A.    No, but I probably can get them.

1       I'm quite sure the bank has them.

2               Q.      These were bank checks?

3               A.      They were on my account.

4               Q.      What bank account?

5               A.      I was with, I think I was with Fifth

6       Third, I'm not quite sure.  I'm not sure.

7               Q.      And how much were your payments each

8       month?

9               A.      The payments were 300 a month.

10              Q.      And when did those payments start,

11      do you recall?

12              A.      I can't say.  Shortly, I think it

13      was shortly after the contract, I think.

14              Q.      Shortly after the closing so maybe

15      September of '99?

16              A.      I'm sure, I think so, I'm not sure,

17      I'm not sure.

18              Q.      Did you make a payment in September

19      of '99?

20              A.      I'm not sure.  That's what I'm

21      saying.  I would have to look at the checks to

22      see.  That's been too long and too much has

23      transpired since.  I'm not sure about that.

24              Q.      At some point did you become in

25      default of payment?

1          A.    I held the payment because the work

2     on the roof was not completed.

3          Q.    At what point did you withhold the

4     payments?

5          A.    I don't know, I'm not sure.  It was

6     after I paid at least two, maybe three months

7     into the payments and I waited and nothing was

8     being done about the roof.

9          Q.    So you withheld the payments after

10    the first two or three months?

11         A.    I think so, I'm not sure.  I think

12    so.

13         Q.    And how many payments did you

14    withhold?

15         A.    I think it was, I think it was

16    two. .  I was sent, when we received an

17    eviction notice, I think it was $700 that had

18    to be withheld or, you know, that was supposed

19    to be owed, I think, I think it was that much.

20    I don't know how it got to be $700, but I think

21    it was around that much, but every time that we

22    went to court, I had the money with me, I

23    brought the money to court and I told Mr.

24    Bigelow that.

25         Q.    Did you pay the money into the

1    court?

2         A.    No, I kept the money.

3         Q.    Did the magistrate explain to you

4    the escrow procedure in municipal where you pay

5    the money into the court as a bond during the

6    time that you argue your case?

7         A.    I was not sent that at all.  I was

8    sent a letter which I didn't read.  I brought

9    the money to court.

10         Q.    You were sent a letter that you did

11    not read?

12         A.    No, I was sent a letter that said I

13    could put $700 in escrow but I didn't, I

14    brought the money to court.

15         Q.    Did you file an answer to the

16    eviction?

17         A.    I didn't know that I could.  I

18    didn't know that I could, file an answer,, what

19    do you mean?

20         Q.    There is a piece of paper that comes

21    with the eviction.  There is a summons that

22    tells you what you need to do and the time

23    period to do that.

24         A.    I never saw that, I never paid

25    attention.

1          Q.    Did you come to court when the case

2     was called?

3          A.    Yes, I did.

4          Q.    Did you have a hearing?

5          A.    Yes.

6          Q.    Was there testimony given?

7          A.    As far as by who?

8          Q.    By you, by Mr. Bigelow, anybody?

9          A.    Yes, there was testimony given.

10         Q.    Did you testify?

11         A.    Yes, I did.

12         Q.    What did you testify about?

13         A.    I testified that I didn't realize

14    that I was actually a renter, that I assumed

15    that I was doing these things by land

16    contract.  That's the way that I was paying

17    him.  I'm pretty sure that's what I said, and

18    then at that time, I presented the land

19    contract to the judge and, in fact, the first

20    judge granted a continuance on that fact.

21         Q.    And allowed you the opportunity to

22    pay the rent in the court?

23         A.    No, that happened, I think, either

24    the second or third, if I can remember

25    properly, I announced in court that I had his

1    money.  I even talked to his lawyer and told

2    him that I had his money.

3          Q.    Who was his lawyer?

4          A.    He rejected his money, he didn't

5    want his money.

6          Q.    Who was his lawyer?

7          A.    The same man that I went down and

8    did these contracts with, if I'm correct.

9          Q.    There was a hearing where you were

10   ordered out of the house?

11         A.    That's correct.

12         Q.    So you were evicted?

13         A.    That is correct.

14         Q.    Did you hire a lawyer to contest the

15   conviction?

16         A.    I didn't have the money.  I had the

17   $700 that I owed and at that point, I asked

18   him, I announced in court that I had his money.

19         Q.    Sir, it's late and the simple

20   question was, did you contact a lawyer to

21   appeal that?

22         A.    No.  No, I didn't know that I could

23   appeal it.  At that particular point, I did not

24   know that I could appeal it.

25         Q.    So the magistrate didn't tell you

1   that you had ten days to appeal the ruling to

2   the judge?

3        A.   No, he did not.  He told me that I

4   had specific amount of time to get out of the

5   house.

6        Q.   Did you leave the house

7   voluntarily?

8        A.   I left the house voluntarily.  I

9   didn't have to be forcibly put out, no.

10        Q.   Did you do anything to the house

11   before you left?

12        A.   Yes, I did.

13        Q.   What did you do?

14        A.   In my frustration I threw a match

15   into a set of boxes in the basement which

16   created a small fire.

17        Q.   And were your belongings still in

18   the house at that time?

19        A.   Yes, they were.

20        Q.   Were any family members still in the

21   house at that time?

22        A.   No, there were not.

23        Q.   How much damage did that fire do?

24        A.   Well, I talked to the fire marshal,

25   I'm not sure but he said that all of my

1    belongings were still in the house.

2           Q.    Did it do damage to the first

3    floor?

4           A.    Not that I know of.

5           Q.    You left the house?

6           A.    I left the house.  I didn't know if

7    it had caught.  I had no idea of anything about

8    it.

9           Q.    Did you do this during the daytime

10   or nighttime?

11          A.    This happened during the day.

12          Q.    Were you convicted of arson or

13   aggravated arson?

14          A.    I pleaded guilty to arson.

15          Q.    Did you do any time?

16          A.    I did six months.

17          Q.    Is that the first time that you had

18   ever been found guilty of anything?

19          A.    That's the first time that I've been

20   found guilty of any type of felony.

21          Q.    What type of misdemeanors have you

22   been convicted of?

23          A.    I think a long, long time ago, I'm

24   not sure.  I know I didn't have anything, I

25   think I had a long, maybe 20 years ago, I

1    got --

2         Q.    Then I'm not interested in 20 years

3    ago.

4         A.    That's what I'm talking about.

5    Other than that I have haven't been convicted

6    of anything other than that.  I saw other

7    things on my record but if you investigated,

8    they are not mine.  I didn't have anything but

9    a parking ticket.  No, I haven't been in

10   trouble with the law and I've been here like 53

11   years.  So I basically never, I basically --

12   not as far as I know, I've never been involved

13   with the law or any type of law at the time.

14        Q.    There are convictions on your record

15   that are not yours?

16        A.    Yes, there are.

17        Q.    What are those convictions that are

18   not yours?

19        A.    Yes, what I can see, there was a

20   theft on charge that I didn't know anything

21   about.

22        Q.    From when?

23        A.    I don't know.

24        Q.    From the last ten years?

25        A.    I think, I don't know.  I just saw

1    some things on my record but I don't know, I

2    know for a fact when I got out, they had a

3    Harry Curtis on Fox Avenue or something like

4    that and that's not me.  I never lived on any

5    street like that.

6         Q.    Now, your lawyers has answered some

7    interrogatories in this lawsuit that identifies

8    you as a witness, and it talks about what the

9    subject matter of your testimony is expected to

10   be, and it says Harry and Patricia Curtis,

11   these witnesses who were victimized by the same

12   scheme as that perpetrated against the

13   defendants.  What scheme were you victimized

14   by?

15        A.    Well, basically I can't involve

16   myself with anything like that.  That was

17   discussed with my lawyer and --

18        Q.    Yes, sir, you can involve yourself

19   with something like that.  It says this is what

20   the subject of your testimony is going to be.

21   So what scheme were you victimized by?

22        A.    Well, all I know is that basically

23   somebody came to my house I was familiar with,

24   they brought somebody in my house that I was

25   led to believe that I could trust these people

1    and then before, when it was all over I had

2    lost property and I had lost belongings within

3    that house that had been there for over 33

4    years.  That's what I know.

5                    I was not allowed to get my

6    property.  The police were called in, they were

7    not allowed to let me go in there and get my

8    property.  I was told that those things had

9    been destroyed.  He was told all kinds of lies

10   and then I ended up not getting anything, but I

11   do know that people saw them taking stuff out

12   of there for a week.

13        Q.    Now, you said you left your house

14   voluntarily, you didn't have to be forced out

15   by the sheriff?

16        A.    Well, I wasn't there.  I wasn't

17   there.  Basically that's what happened, I

18   wasn't there.  When I came back, I was not

19   allowed to go in.  I was told that the property

20   was being held that way for, how can you say

21   it --

22        Q.    Arson investigation?

23        A.    For arson investigation.

24        Q.    All right.

25        A.    Not arson investigation, that it was

1    being held as a crime scene and I couldn't get

2    in, but in talking with the fire marshal, he

3    told me that was not the case; and the house

4    was boarded up.  I mean, there was boards put

5    on the doors and the windows and everything

6    else and those things were not broken.

7         Q.    So you lost property because the

8    house was sealed up as a crime scene?

9         A.    No, I was, no, not at all.  Because

10   it wasn't sealed up as a crime scene, that's

11   what I was told.  But the fire marshal told me

12   different and he told me that's not what he

13   told anybody.

14        Q.    All right.  So you lost property

15   because you weren't allowed back in the home

16   after being told it was a crime scene?

17        A.    No, I lost property because I was

18   not allowed into the house because people was

19   being told it was being used for a crime scene

20   as a reason for not letting me in the house.

21        Q.    Okay.

22        A.    But that was not the reason.

23        Q.    So I don't understand what scheme

24   you were victimized by involving Mr. Bigelow.

25        A.    Well, like I said, what I said is

1    basically that I don't know about the scheme or

2    all of that type of situation.  I know these

3    things.  I know that basically people came into

4    my home uninvited, they built up a trust in me

5    and brought a person that I knew something

6    about into the house.

7                    They promised me certain things,

8    those things were not fulfilled.  When I

9    rebutted those things, I ended up being a

10   tenant and I was put out of my home and the

11   property within my home was taken.

12       Q.    All right, so certain things were

13   promised to you that were not fulfilled.  The

14   only thing I've heard about is your roof wasn't

15   fully repaired.

16       A.    Well, that's one, that's the thing

17   that I'm speaking of, I think, right now; but

18   I'm not sure, there may have been others.

19       Q.    Well, take a second to think.  We've

20   been here this long, you might as well get it

21   all out.

22       A.    I'm not sure about that.  I'm not

23   sure about that.  First of all, I'm just not

24   sure.  I'm not going to get myself into, I'm

25   not sure about that.  I'm not sure about that.

1          Q.    Anything else would be of lesser

2     importance than fixing the roof?

3          A.    I'm not saying that.

4          Q.    What else would there have been that

5     wasn't fulfilled?

6          A.    Well, I think basically there are

7     some other things.  So I'm not sure of them at

8     this time and I'm not quite sure of them at

9     this time, and I have to go back, look things

10    over and deal with them there.  I'm not sure.

11         Q.    Okay.  So we'll continue your

12    deposition until tomorrow afternoon to give you

13    a chance to go home and look at them.

14         A.    I may not even have that stuff with

15    me.  That stuff has been passed on to my

16    attorney and I think that would involve asking

17    him because --

18         Q.    That's fine, I don't mind if you ask

19    him.

20         A.    I mean as far as --

21              MR. SCHWANTES:  We can take a

22    five minute break.  If there is anything that

23    you'd like to go over, why don't we take a

24    break here and I think we can wrap this up

25    quicker.

1                    THE WITNESS:  That sounds good.

2                    MR. SCHWANTES:  Okay.

3                    (WHEREUPON, a recess was taken.)

4                    MR. LABER:  Let the record

5     reflect that we are back on the record after

6     Mr. Curtis and Mr. Schwantes left the room and

7     came back.

8                    MR. SCHWANTES:  You need to have

9     the question read back or if Mr. Laber would

10    like to repeat it.

11    BY MR. LABER:

12        Q.    I do.  You said there were matters

13    that were not fulfilled and the only thing that

14    you've come up with is the roof, matters that

15    were promised to you that were not fulfilled.

16        A.    Well, basically I never expected to

17    be a renter.  I assumed that I would be able to

18    be under a land contract.  I never assumed that

19    I would lose all of my property or my home.

20        Q.    So you think that at that point in

21    time where you were being evicted, if it had

22    been a land contract as opposed to a lease or a

23    renter's agreement, there would have been a

24    different consequence other than the

25    eviction?

1          A.    I don't know, I'm not sure.  I'm not

2     sure, but it was my assumption that in either,

3     I'm not sure about this, but I assumed that in

4     either, you were supposed to get your property

5     which I did not get.

6          Q.    After the all of this took place,

7     did you contact an attorney to help you undue

8     this mess, to get your property back?

9          A.    Well, I had already made several, I

10    had already made several attempts through the

11    police, otherwise --

12         Q.    I'm sorry, I'm talking about the

13    house.

14         A.    Well, I didn't have, I was

15    incarcerated.  You have to realize I was

16    incarcerated.  So I didn't have an opportunity

17    to do much of anything.  I talked with Mr.

18    Bigelow at, before the eviction took place and

19    told him I had the money and that I was willing

20    to give him the money.  I talked to his lawyer

21    that day.  He would not allow it.

22         Q.    Again, sir, it's awful late and the

23    question is, did you contact a lawyer to help

24    you get title back to the property or to get

25    this land contract versus lease things

1    straightened out?

2         A.   I was incarcerated, I had no

3    opportunity at that time.  I was incarcerated

4    for six months.

5         Q.   For six months, yes, sir, when was

6    those six months started?

7         A.   Those six months started, oh, I

8    guess, I'm not sure, I'm not sure.  It's a

9    matter of record, I'm not sure.

10         Q.   You were not incarcerated for

11    several months after the eviction; is that

12    right?

13         A.   Yeah, I had to find us somewhere to

14    live and try to get, you know, clothes and

15    things like that along those lines because I

16    was not allowed to get my property.

17              MR. LABER:  I don't think I have

18    anything else.

19              MR. SCHWANTES:  I don't have any

20    questions.  I guess we'll request signature.

21              (Deposition concluded at 6:50

22    p.m.)

23

24    _____

                         HARRY CURTIS
25         *  *  *  *  *

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **SHIRDENIA BRYANT** | : | **Civil Action No. C-1-02-006** |
| | | **(Judge Spiegel)** |
| **Plaintiff,** | : . | **(Magistrate Judge Sherman)** |
| **vs.** | : | |
| **PRESCOTT BIGELOW, IV, et al.** | : | **PLAINTIFF HARRY CURTIS'** |
| | | **RESPONSES TO DEFENDANT** |
| | : | **PRESCOTT BIGELOW'S FIRST** |
| **Defendants.** | | **SET OF INTERROGATORIES** |
| | : | **AND REQUESTS FOR** |
| | | **PRODUCTION OF DOCUMENTS** |

## <u>INTERROGATORIES</u>

1. State the full name and address of every individual who assisted in any manner in the answering of these Interrogatories and/or Request for Production of Documents.

RESPONSE:  Harry Curtis
3913 Vine Street, Apt. 2
Cincinnati, OH 45217

James E. Schwantes, Attorney
Angela Vaught, Legal Assistant
119 East Court Street, Suite 500
Cincinnati, OH 45202

2. Identify all individuals with knowledge of the transactions with Defendant Bigelow alleged in the Amended and Supplemental Complaint.

RESPONSE:  In addition to Plaintiffs Harry Curtis and Shirdenia Bryant and Defendants Roseanne Christian, and Prescott Bigelow, IV, persons with knowledge include John Meckstroth, Walter Ellis, Patricia Curtis, and Dan Rottmiller of the Cincinnati Fire Division.

3. For each person identifies in interrogatory number 2 state the facts of which they have knowledge.



PENGAD-Bayonne, N.J.
DEFENDANT'S
EXHIBIT NO. 2
FOR IDENTIFICATION
DATE: 8-29-03  RPTR: THM

RESPONSE:  For Walter Ellis, see Shirdenia Bryant's response to Defendant Prescott Bigelow IV's document request no. 3.

John Meckstroth has knowledge of the documents he prepared for Harry Curtis, including a settlement statement, land contract, and rental agreement.  John Meckstroth billed Harry Curtis for preparation of the land contract.  Meckstroth has knowledge of the eviction proceeding against Harry Curtis in Hamilton County municipal court, particularly, Prescott Bigelow's testimony that no land contract existed between Bigelow and Harry Curtis.  Meckstroth has knowledge of the contents of the contract to purchase executed by Harry and Patricia Curtis on August 2, 1999.  Meckstroth has knowledge of Prescott Bigelow's entities Tri State Mortgage Assistance, the Keene Group, and Bigelow Properties.

Patricia Curtis has knowledge of the transactions that her husband entered into with Prescott Bigelow in August 1999.  Mrs. Curtis was present at the home at 1966 Fairfax in July 1999 when Roseanne Christian entered the home uninvited.  She was also present on August 2, 1999 when Roseanne Christian and Prescott Bigelow prepared a contract to purchase for her and her husband to sign.  In addition, Mrs. Curtis has knowledge of the repairs that Prescott Bigelow promised to make to the home but did not provide.  She has knowledge of the eviction proceeding filed by Prescott Bigelow; the land contract that her husband received from John Meckstroth; and the payments made by Harry Curtis to Prescott Bigelow under the terms of the land contract.  She knows about the emotional and financial damage that Harry Curtis suffered as a result of losing the family home to Prescott Bigelow.  She knows the history of the home as it relates to Harry Curtis family.  She knows the type and amount of personal property that was removed from the house by Prescott Bigelow after Bigelow evicted the Curtises.  She knows about the fire started by her husband in the home, and the criminal prosecution that followed.  She knows the extent of the damage to the home as a result of the fire.

Dan Rottmiller, Cincinnati Fire Division, Fire Investigation Unit has knowledge of the extent of damage at 1966 Fairfax following the fire started by Harry Curtis.  He has knowledge of the statement made by Harry Curtis to him following the fire.

4. Identify all individuals with knowledge of any misrepresentation of material fact by Defendant Bigelow as alleged in the Amended and Supplemental Complaint.

RESPONSE:  In addition to Plaintiffs, persons with knowledge include Roseanne Christian, and the persons identified in Interrogatory number 3, above.

5. For each person identified in interrogatory number 4 state the facts at which they have knowledge.

RESPONSE:  For John Meckstroth and Patricia Curtis, see answer to Interrogatory number 3, above.

For Roseanne Christian, see Plaintiff Harry Curtis' response to Defendant Roseanne Christian's interrogatory number 5 and 9, and Plaintiff's RICO case statement at § 2(b).

6. Identify all of the other victims referred to in paragraph 29 of the Amended and Supplemental Complaint.

RESPONSE:  Other victims include Shirdenia Bryant and Mark and Michael Burbrink.

7. Identify every misrepresentation of material fact, with specificity, which you allege was made by Defendant Bigelow.

RESPONSE:  On August 2, 1999, Bigelow induced Curtis to sign a contract in which Curtis sold his home to Bigelow for a purchase price of $0.00. Bigelow falsely represented to Harry Curtis that Bigelow's proposed arrangement was better than any arrangement Harry Curtis could receive from a bank. Bigelow misrepresented the nature of the transaction to Harry Curtis by assuring Curtis that Curtis was not selling his home to Bigelow. Bigelow falsely represented to Curtis he would make repairs on the 1966 Fairfax property. Bigelow induced Harry Curtis into closing on the transaction by deceiving Harry Curtis into believing that he was entering into a land contract. During a hearing in Hamilton County Case No. B0001276, Bigelow claimed that he did not have land contract agreement with Curtis and that Curtis was strictly a tenant at 1966 Fairfax Avenue. Defendant Bigelow falsely informed local authorities of the extent and nature of the fire that Harry Curtis started at 1966 Fairfax Avenue.

8. Identify, with specificity, the manner in which you claim that Defendant Bigelow induced use of the U.S. Mails as alleged in paragraph 35 of the Amended and Supplemental Complaint.

RESPONSE:  Defendant Bigelow established a system by which he was paid rent through the U.S. Mails. For information on each individual usage of the U.S. Mails by Defendant Bigelow please see the chart in Plaintiff's RICO Case Statement, pages 6-13.

9. Identify each fact upon which you rely support of the allegation that defendant Bigelow conducted affairs through a pattern of racketing activity as alleged in paragraph 34 of the Amended and Supplemental Complaint.

RESPONSE:  See Plaintiff's RICO case statement at pages 1-17.

10. Identify each fact upon which you rely in support of the allegation that Defendant Bigelow participated in the management and control of the enterprises identified in paragraph 34 of the Amended and Supplemental Complaint.

RESPONSE:   See Plaintiff's RICO case statement at pages 17-19.  Defendant Bigelow is the sole member and owner of the Keene Group, LLC, Bigelow Properties, and Tri-state Mortgage Assistance.  This information is public record through the Ohio Secretary of State, was stated by the Defendant in his deposition under case number A0005052, and is supported by statements from Walter Ellis.

      11.  Identify every violation of the Federal Mail Fraud Statute by Defendant Bigelow which you allege in paragraph 35 of the Amended Supplemental Complaint.

RESPONSE:   Please see Plaintiff's RICO Case Statement, pages 6-13.

      12.  Identify every violation of the Federal Wire Fraud Statute by Defendant Bigelow which you allege in paragraph 35 of the Amended and Supplemental Complaint.

RESPONSE:   Please see Plaintiff's RICO Case Statement, pages 6-13.

      13.  Identify every false statement, misinformation and material omission referenced in paragraph 38 of the Amended and Supplemental Complaint.

RESPONSE:   In addition to the information stated in Interrogatory number 7 and Plaintiff's RICO case statement § 4(b), Defendant Bigelow deceived Harry Curtis as to the fact that by entering into the real estate transaction, Curtis would lose all rights he had previously had as the owner of 1966 Fairfax Avenue.  Bigelow also failed to tell Curtis that John Meckstroth was serving as Bigelow's attorney at the closing and Meckstroth was not representing Harry Curtis.  Bigelow failed to tell Harry Curtis that he would evict him if Curtis missed a payment on the purported land contract.  Bigelow failed to tell Curtis of his intention to encumber Curtis' property with mortgages and drain the equity from the property.  Bigelow deceived Harry Curtis into believing that he and Christian helped property owners who were in financial distress.  Bigelow failed to disclose that he paid Roseanne Christian to target homeowners like Harry Curtis who were in foreclosure and who had a large amount of equity in their homes.  Bigelow also misrepresented the nature of the fire at 1966 Fairfax Avenue.

      14.  For each false statement, misinformation and material omission identified in the answer to interrogatory number 13, identify the specific manner in which said statements, misinformation or material omission deceived you into parting with your property.

RESPONSE:   All misrepresentations made by Bigelow as to the nature of the transaction deceived Harry Curtis into parting with his property.

      15.  Identify all damages which you claim in this action, and identify the precise manner win which said damages were calculated.

RESPONSE:  Curtis lost $92,473.00 in equity in his home at 1966 Fairfax.  This figure is arrived at by taking the value of the home ($97,000.00) minus the amount paid by Bigelow for delinquent real estate taxes ($4,527.00).  In addition, Harry Curtis paid Bigelow $700.00 in payments under the terms of the land contract.  Harry Curtis also lost personal property that was in his home at the time Bigelow evicted him, and which Bigelow failed to return to Curtis.  The total amount of personal property lost is to be determined.  A parcel list of items of the personal property in the home that Bigelow did not return, is attached in response to document request number 5, below.

Curtis' damages are offset by $9,800.00 which he received from Bigelow on August 25, 1999.

Curtis also seeks punitive damages.

16.  Identify each fact upon which you rely in support of the allegation that you have been injured in your business and property as alleged in paragraph 40 of the Amended and Supplemental Complaint.

RESPONSE:  See Responses to Interrogatory Nos. 3, 7, 15, and 17 and RICO Case Statement at 4(a) and 5(c).  Response will be supplemented as facts are discovered.

17.  Identify, with specificity, the manner in which you have suffered damage to your personal and financial reputation, suffered financial loss and emotional distress, as alleged in paragraph 48 of the Amended and Supplemental Complaint.  For each alleged item of damages in paragraph 48, identify the amount of damages you claim.

RESPONSE:  Harry Curtis suffered financial loss by losing his family home and the personal property inside of it.  He suffered emotional distress as a result of being evicted from his home.

18.  Identify every fact upon which you rely support of the allegation that Defendant Bigelow entered into a relationship of trust and confidence with you, and assumed fiduciary duties with respect to you, as alleged in paragraph 50 of the Amended and Supplemental Complaint.

RESPONSE:  Discovery is ongoing.  Facts will be identified as determined.

19.  State the name and location of every person, other than experts, who may be called by you as a witness at trial.

RESPONSE:  Plaintiff will supplement his witness list as witnesses become known.  In addition to his own testimony and the expert testimony of Donald Lerner, Plaintiff expects to call Shirdenia Bryant, Mark and Michael Burbrink, Walter Ellis, John Meckstroth, Patricia Curtis, and Dan Rottmiller.

20. For each person identified in interrogatory number 19, state the substance of their expected testimony.

RESPONSE: See response to interrogatory number 3, above, and Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's interrogatory number 20.

21. State the name and address of every expert witness whom you expect to call as a witness at trial.

RESPONSE: Mr. Donald Lerner, Mercantile Center, Suite 800, 120 East Fourth Street, Cincinnati, Ohio 45202.

22. For each expert identified in interrogatory number 21,

A. state the qualifications of such expert;

RESPONSE: See Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's interrogatory number 22(A).

B. subject matter on which said expert will testify;

RESPONSE: See Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's interrogatory number 22(B).

C. the facts known and opinions held by each expert related to this civil action.

RESPONSE: See Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's interrogatory number 22(C).

23. Identify every exhibit you expect to offer into evidence at trial. Please produce same for inspection and copying or attached a copy thereof to these answers.

RESPONSE: Discovery in this case is ongoing. Exhibits will be identified as they are determined.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. If any photographs, films, videotapes or audio tapes have been taken by you or any of your agents of representatives, or by any other person, relating to any of the facts alleged in the Amended and Supplemental Complaint, please produce them for inspection and copying.

RESPONSE:  An audio tape of Plaintiff Harry Curtis'statement to Dan Rottmiller, Cincinnati Fire Investigator, regarding the fire set to 1966 Fairfax is available for copying at the Law Office of William H. Blessing.  A transcript of that audiotape is produced and marked as "Bryant 712-716."

2. Please produce copies of all documents containing information relating to the facts alleged in the Amended and Supplemental Complaint.

RESPONSE:  Documents marked as "Bryant 692-707" are attached

3. Produce all documents which refer to relate to Defendants Bigelow, Christian, John Marfisi and John Meckstroth.

RESPONSE:  Documents marked as "Bryant 692-707" are attached

4. Produce all exhibits to be offered at trial.

RESPONSE:  Exhibits have not been identified.  Exhibits will be produced when they are determined.

5. Produce all documents that relate to or support your claim for damages.

RESPONSE:  Plaintiff has attached a partial list of items which were in the Curtis' home at 1966 Fairfax and which were not returned by Bigelow (marked as Bryant 708-711). Plaintiff will supplement this response as facts are determined.  Plaintiff also relies upon documents produced by Defendant Bigelow and Walter Ellis relating to property at 1966 Fairfax Avenue.  Plaintiff has enclosed a CD produced by Walter Ellis pursuant to subpoena duces tecum.

Respectfully submitted,

William H. Blessing (#0006848)
James E. Schwantes (#0068771)
119 East Court Street, Suite 500
Cincinnati, OH  45202
Telephone:  (513) 621-9191
Telecopier:  (513) 621-7086

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by hand delivery upon:

Gary R. Lewis, Attorney
Cincinnati Club Building, Suite 915
30 Garfield Place
Cincinnati, OH  45205

on this 2nd day of July, 2003.

## VERIFICATION

The foregoing answers to interrogatories are true and correct to the best of my knowledge, information, and belief.

_____
Harry Curtis


STATE OF OHIO            )
                         )   SS:
COUNTY OF HAMILTON   )

Signed and sworn to before me this __14th__ day of August, 2003.

_____
Notary Public

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **SHIRDENIA BRYANT** | : | Civil Action No. C-1-02-006 |
| | | (Judge Spiegel) |
| **Plaintiff,** | : | (Magistrate Judge Sherman) |
| **vs.** | : | |
| **PRESCOTT BIGELOW, IV, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

## PLAINTIFF HARRY CURTIS' RESPONSE TO DEFENDANT ROSEANNE CHRISTIAN'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

## INTERROGATORIES

1. State the full name and address of every individual who assisted in any manner in the answering of these Interrogatories and/or Request for Production of Documents.

RESPONSE:  Harry Curtis
3913 Vine Street, Apt. 2
Cincinnati, OH 45217

James E. Schwantes, Attorney
Angela Vaught, Legal Assistant
119 East Court Street, Suite 500
Cincinnati, OH 45202

2. Identify all individuals with knowledge of the transactions with Defendant Bigelow alleged in the Amended and Supplemental Complaint.

RESPONSE:  In addition to Plaintiffs Harry Curtis and Shirdenia Bryant and Defendants Roseanne Christian, and Prescott Bigelow, IV, persons with knowledge include John Meckstroth, Walter Ellis, Patricia Curtis, and Dan Rottmiller of the Cincinnati Fire Division.



DEFENDANT'S
EXHIBIT NO. 3
FOR IDENTIFICATION
DATE 8-29-03    RPTR: TKM
PENGAD-Bayonne, N.J.

3. For each person identified in interrogatory number 2 state the facts of which they have knowledge.

RESPONSE: See Plaintiff Harry Curtis' response to Defendant Prescott Bigelow IV's Interrogatory number 3.

4. Identify all individuals with knowledge of any misrepresentation of material fact by Defendant Christian as alleged in the Amended and Supplemental Complaint.

RESPONSE: Patricia Curtis and Harry Curtis.

5. For each person identified in interrogatory number 4 state the facts of which they have knowledge.

RESPONSE: For Patricia Curtis, see Plaintiff Harry Curtis' response to Defendant Prescott Bigelow IV's Interrogatory number 3.

Harry Curtis was told by Roseanne Christian on at least three occasions at his home in August 1999 that he Roseanne Christian's plan to "help" Harry Curtis keep his home did not involve selling his home. Roseanne Christian told Harry Curtis in person and by telephone in August 1999 that she could help him keep his home and pay his back taxes. She told him that he had to act quickly on her proposal or else he would lose his home.

6. Identify all of the other victims referred to in paragraph 29 of the Amended and Supplemental Complaint.

RESPONSE: See Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's Interrogatory number 6.

7. Identify every misrepresentation of material fact, with specificity, which you allege was made by Defendant Christian.

RESPONSE: See answer to Interrogatory number 5, above, and Interrogatory number 9, below.

8. Identify each fact upon which your rely in support of the allegation that Defendant Christian engaged in a pattern of racketeering activity as alleged in paragraph 39 of the Amended and Supplemental Complaint.

RESPONSE: See Plaintiff's RICO case statement at §§ 2(b), 5(f), and 6(b).

9. Identify every false statement, misinformation and material omission referenced in paragraph 38 of the Amended and Supplemental Complaint.

RESPONSE: See Plaintiff's response to Interrogatory number 5, above. In addition, Roseanne Christian deceived Harry Curtis by assuring him that he was not selling his home to Prescott Bigelow and that he was retaining the rights to ownership of the home. She falsely represented to him that she was from a helping organization and that she was a friend who could help him save his home. She misled Harry Curtis into believing that he was entering into a deal under which Prescott Bigelow and Harry Curtis would enter into a land contract. Defendant Christian failed to disclose that she had targeted Harry Curtis for this real estate transaction because Harry Curtis' home had a large amount of equity in it. She failed to disclose that she was paid $4,000.00 by Bigelow after the closing on August 25, 1999.

10. For each false statement, misinformation and material omission identified in the answer to interrogatory number 9, identify the specific manner in which said statements, misinformation or material omission deceived you into parting with your property.

RESPONSE: Each of Christian's misrepresentations and material omissions induced Harry Curtis to sign over ownership of his property to Prescott Bigelow, IV.

11. Identify all damages which you claim in this action, and identify the precise manner in which said damages were calculated.

RESPONSE: See Plaintiff Harry Curtis' response to Defendant Prescott Bigelow IV's Interrogatory number 15.

12. Identify each fact upon which you rely in support of the allegation that you have been injured in your business and property as alleged in paragraph 40 of the Amended and Supplemental Complaint.

RESPONSE: See responses to interrogatories numbers 5 and 9 above, and Plaintiff's RICO case statement at § 4(b).

13. Identify, with specificity, the manner in which you have suffered damage to your personal and financial reputation, suffered financial loss and emotional distress, as alleged in paragraph 48 of the Amended and Supplemental Complaint. For each alleged item of damage in paragraph 48, identify the amount of damages you claim.

RESPONSE: See Plaintiff Harry Curtis' response to Defendant Prescott Bigelow IV's Interrogatory numbers 15 and 17.

14. State the name and location of every person, other than experts, who may be called by you as a witness.

RESPONSE: See Plaintiff's response to interrogatory number 2 above. Additional witnesses will be identified as they are discovered.

15. For each person identified in interrogatory number 14, state the substance of their expected testimony.

RESPONSE: See Plaintiff's response to interrogatory number 3 above. Plaintiff will supplement this response as witnesses are identified.

16. State the name and address of every expert witness whom you expect to call as a witness at trial.

RESPONSE: See Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's Interrogatory number 21.

17. For each expert identified in interrogatory number 16,

    A.    State the qualifications of such expert;

    RESPONSE: See Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's interrogatory number 22(A).

    B.    subject matter on which said expert will testify;

    RESPONSE: See Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's interrogatory number 22(B).

    C.    the facts known and opinions held by each expert related to this civil action.

    RESPONSE: See Plaintiff Shirdenia Bryant's response to Defendant Prescott Bigelow IV's Interrogatory number 22(C).

18. Identify every exhibit you plan to offer into evidence at trial. Please produce same for inspection and copying or attach a copy thereof to these answers.

RESPONSE: Discovery is ongoing. Exhibits will be identified as determined.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. If any photographs, films, videotapes or audio tapes have been taken by you or any of your agents of representatives, or by any other person, relating to any of the facts alleged in the Amended and Supplemental Complaint, please produce them for inspection and copying.

RESPONSE:   An audiotape statement to Dan Rottmiller, Cincinnati Fire Investigator, regarding the fire set to 1966 Fairfax is available for copying at the Law Offices of William H. Blessing.  A transcript of that audiotape is produced and marked as "Bryant 712-716."

     2.  Please produce copies of all documents containing information relating to the facts alleged in the Amended and Supplemental Complaint.

RESPONSE:   Documents marked as "Bryant 692-707" are attached.

     3.  Produce all documents which refer or relate to Defendants Bigelow, Christian, John Marfisi and John Meckstroth.

RESPONSE:   Documents marked as "Bryant 692-707" are attached

     4.   Produce all exhibits to be offered at trial.

RESPONSE:   Exhibits have not been identified.  Exhibits will be produced when they are determined.

     5.   Produce all documents that relate to or support your claim for damages.

RESPONSE:   A list of the Curtis' personal property that was in the home at 1966 Fairfax and removed by Defendant Bigelow is attached (marked as Bryant 708-711).  In addition to the documents produced in response to document request number 2, Plaintiff relies upon financial documents produced in this litigation by Defendant Bigelow and Walter Ellis.


                        Respectfully submitted,


                        William H. Blessing (#0006848)
                        James E. Schwantes (#0068771)
                        119 East Court Street, Suite 500
                        Cincinnati, OH  45202
                        Telephone:  (513) 621-9191
                        Telecopier:  (513) 621-7086

## VERIFICATION

The foregoing answers to interrogatories are true and correct to the best of my knowledge, information, and belief.

_____
Harry Curtis

STATE OF OHIO        )
                            )   SS:
COUNTY OF HAMILTON  )

Signed and sworn to before me this _____ day of _____, 2003.

_____
Notary Public

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by hand delivery upon:

Gary R. Lewis, Attorney
Cincinnati Club Building, Suite 915
30 Garfield Place
Cincinnati, OH  45205

on this 22nd day of July, 2003.

## VERIFICATION

The foregoing answers to interrogatories are true and correct to the best of my knowledge, information, and belief.

_____
Harry Curtis

STATE OF OHIO         )
                        )   SS:
COUNTY OF HAMILTON  )

Signed and sworn to before me this _14th_ day of August, 2003.

_____
Notary Public

THIS IS A LEGALLY BINDING CONTRACT.
IF NOT UNDERSTOOD, SEEK LEGAL ADVICE.

## CONTRACT TO PURCHASE

Cincinnati, Ohio

_8/21_ 19 _99_

1. The undersigned Purchaser hereby offers to purchase, the following described property to-wit, property located at:
_1866 Fairfax Avenue_
_Cincinnati, O.H. 45207_

2. The purchase price is to be $ _0_ _____ payable as follows:
$ _____ as earnest money to apply toward purchase price.
_Seller to receive $10,000 on cash at closing._
_Buyer to repair roof and porch after closing. Buyer to pay all Co-_
_____ cost and Attorney fees. Buyer to satisfy back taxes._ R.C.
_Seller to lease option property for 2 years to repair_
_____ $10,000.00 at end of 2 years FLO_

3. The above described real estate shall include all land and appurtenant rights; also all electrical, plumbing, heating and air conditioning equipment, including window units, bathroom fixtures, shades, venetian blinds, awnings; curtain rods; window/door screens, storm windows/doors; landscaping and shrubbery; wall-to-wall/stair carpeting; built-in kitchen appliances; attached radios and/or television aerials; all affixed/built-in furniture fixtures; and utility/storage buildings or sheds; except: _____
_None, Anything used in Construction_
_None_

4. The following personal property shall be included in the sale: _____

5. Title to the above described real estate is to be conveyed by Warranty Deed with release of dower, on or before _Time of Closing_ 19 __; said title to be free, clear, and unencumbered, free of building orders, subject to zoning regulations of record, and except assessments, easements and restrictions of record, and EXCEPT _____

6. Seller certifies to Purchaser that: there is no termite damage to the real estate or active infestation; electrical, plumbing, heating, air conditioning equipment and systems, fireplaces, chimneys and other items included herein will be operational on possession except _Unknown_ . Seller agrees that at the time of transfer of title, the above described real estate, and all items thereof, will be in the same condition as on the date of this offer, reasonable wear and tear excepted.

7. The following items shall be prorated between seller and purchaser as of closing: - real estate taxes, assessment installments of record, rents, operating expenses and interest on encumbrances. Security and/or damage deposits held by Seller will be transferred to Purchaser at closing without proration.

8. Seller will maintain, until closing, hazard insurance in the amount of the above stated purchase price. If any building or other improvements are damaged or destroyed prior to closing, purchaser shall have the option to receive the proceeds of any insurance payable or to cancel this agreement and be refunded all consideration therefore paid.

9. Possession shall be given on or before _____ , subject to tenant's rights.
Any lease or tenant agreement will be supplied to Purchaser prior to closing.

10. This agreement is subject to the arranging of financing within _0_ banking days, at any terms acceptable to Purchaser. Seller held mortgages, if any, shall be subordinate and inferior to any new, additional, or refinancing of existing mortgages. Purchaser's liabilities are limited to the securing property itself and shall not extend beyond. Financing will, at Purchaser's option, additionally or entirely be secured by subject or other similar real property.

11. This contract is contingent on an inspection of the above real estate by Purchaser, which is satisfactory without limitations to said Purchaser.

12. This agreement survives closing and pertinent language contained herein becomes part of any deeds, notes, mortgages, and documents pertinent to this transaction and shall take precedence in the event of any conflicting provisions of terms.

13. This offer, when accepted, comprises the entire agreement of Purchaser and Seller, and it is agreed that no other representation or agreements have been made or relied upon.

14. This offer, when accepted, shall constitute a binding contract to be binding upon the parties, their heirs, personal representatives, executors, administrators and assigns.

15. Offer void if not accepted by _6:00 pm 8/3/99_    Date _8/21/99_

_Christian_

_Rob E. Trustee_
Purchaser

_____
Purchaser

I/We as Sellers accept the above offer and earnest money submitted to us.

Date _____

_____
Seller

_Patricia Custer_
Seller

DEFENDANT'S
EXHIBIT NO. 4
FOR IDENTIFICATION
DATE: 8-29-03  RPTR: TAM

## JOHN R. MECKSTROTH, JR.

### ATTORNEY AT LAW

22 WEST NINTH STREET
CINCINNATI, OHIO 45202

WESTWOOD-CHEVIOT

PHONE (513) 721-8808
FACSIMILE (513) 721-1178

August 25, 1999

3646 GLENMORE AVENUE
CINCINNATI, OHIO 45211

Mr. and Mrs. Harry Curtis
1966 Fairfax Avenue
Cincinnati, Ohio   45207

RE: 1966 Fairfax Avenue
Cincinnati, Ohio   45207

---

FOR PROFESSIONAL SERVICES RENDERED:

Preparation of Land Installment Contract                $   295.00

BALANCE DUE:                                            $   295.00

*Paid in Full*
8/25/99

**EXHIBIT**
ALL-STATE LEGAL®
_____

BRYANT -693

```
PROC: FDSTAT          CITY OF CINCINNATI                    PAGE: 1
DATE:  2/10/00  11:39:54      INCIDENT DETAIL REPORT      USER: ROTTMUDA
```

A   FDID: 31015  Incident: 00-040041  Exposure: 00  Date:  2/09/00 DOW: Wednesday
    Alarm Time:  8:01  Arrival Time:  8:04  Time in Service: 11:12

B   Type of Situation:      11   STRUCTURE FIRE
    Type of Action Taken: 1    EXTINGUISHMENT
    Mutual Aid:             3    NOT APPLICABLE

C   Fixed Property Use:    411 1 FAMILY DWELLING-YEAR ROUND USE
    Ignition Factor:       00   UNDETERMINED OR NOT REPORTED

D   Correct Address:        1966 FAIRFAX AV
                            CINCINNATI          OH 45207
    Census Tract:

E   Occupant Name:         UNKNOWN
    Telephone:             (000)000-000     Room or Apt:

F   Owner Name:            UNKNOWN
    Owner Address:

    Owner Telephone:       (    )    -

G   Method of Alarm:       7    911 - TELEPHONE TIE-LINE TO FIRE DEPARTMENT
    District:              Shift:      No. Alarms: 0

H   Number Fire Service Personnel:      26  Number of Engines:           3
    Number of Aerial Apparatus:          2  Number of Other Vehicles:    5

I   Number of Injuries - Fire Service:   0  Number of Injuries - Other:   0
    Number of Fatalities - Fire Service: 0  Number of Fatalities - Other: 0

J   Complex:               98   NO COMPLEX
    Mobile Property Type: 08   MOBILE PROPERTY TYPE NOT APPLICABLE

K   Area of Fire Origin:            49   STORAGE AREA - NOT CLASSIFIED
    Equipment Involved in Ignition: 00   EQUIPMENT INVOLVED - UNDETERMINED OR NOT

L   Form of Heat of Ignition:       00   FORM OF HEAT/IGNITION - UNDETERMINED/NOT
    Type of Material Ignited:       00   TYPE OF MATERIAL - UNDETERMINED OR NOT R
    Form of Material Ignited:       00   FORM OF MATERIAL IGNITED -UNDETER/NOT RE

M   Method of Extinguishment:       6    PRECONNECT HOSE/WATER FROM HYDRANT,DRAFT
    Level of Fire Origin:           8    BELOW GRADE LEVEL OR WATER LEVEL
    Estimated Loss (Dollars):            20,000

N   Number of Stories:              2    2 STORIES
    Construction Type:              7    PROTECTED WOOD FRAME

BRYANT -694



Auditor's Parcel No. 54-2-53

REBECCA PREM GROPPE
HAMILTON COUNTY RECORDER
Doc #r99 - 171745  Type: WE
Filed:08/26/1999  2:49:40 PM  $ 14.00
Off.Rec.: 8052 2954 F  M27  1  AA5

## GENERAL WARRANTY DEED

**HARRY CURTIS AND PATRICIA CURTIS, husband and wife,** hereinafter referred to as

Grantor(s), of Hamilton County, Ohio for valuable consideration paid, grant(s), with general

warranty covenants to: **PRESCOTT BIGELOW, IV, TRUSTEE,** whose tax-mailing address is

P.O. Box 30404, Cincinnati, Ohio 45230. The following REAL PROPERTY:

Situate, lying and being in the City of Cincinnati, County of Hamilton and State of Ohio, and being
the east forty and one half (40 ½) feet of Lot number forty (40) of the First Subdivision of The
Walnut Hills Land Association, as per plat of said Subdivision recorded in Plat Book 7, Page 97, in
the office of the Recorder of Hamilton County, Ohio, and being more particularly described as
follows:

Beginning at a point on the northerly line of Fairfax Avenue nine and one-half (9 ½ ) feet east of the
westerly line of said Lot number forty (40); thence running eastwardly along said northerly line of
Fairfax Avenue, forty and one-half (40 ½) feet to the easterly line of said Lot number forty (40);
thence running northwardly along said easterly line of said Lot number forty (40), one hundred and
forty (140) feet to the northerly line of said Lot number forty (40); thence running westwardly along
said northerly line of said Lot Number forty (40); forty and one-half (40 ½) feet to a point; thence
running southwardly along a line parallel with the westerly line of said Lot number forty (40) a
distance of one hundred and forty (140) feet to the north line of said Fairfax Avenue and the place
of beginning.

Subject to easements and restrictions of record and taxes and assessments due and payable in
December, 1999 and thereafter which the Grantees assume and agree to pay.

Being the property conveyed to the Grantor(s) herein by instrument recorded in Official Record
8052, Page 2952 of the Deed Records of Hamilton County, Ohio.

Grantor(s) releases any right of dower therein. Witness his hand this 25th day of August, 1999.

Signed and acknowledged in the presence of:

WITNESS

WITNESS

Harry Curtis

Patricia Curtis

STATE OF OHIO, COUNTY OF HAMILTON, ss:          013731

  BE IT REMEMBERED, That on the 25th day of August, 1999, before me, the subscriber, a
Notary Public in and for said County and State, personally came, **HARRY CURTIS, AND
PATRICIA CURTIS,** Grantor(s) in the foregoing Deed, known to me and whose identify was
proven by satisfactory evidence, and acknowledged the signing thereof to be their voluntary act and
deed.

  IN TESTIMONY THEREOF, I have hereunto subscribed my name and affixed my seal on
this day and year aforesaid.

Notary Public

Prepared by:
John R. Meckstroth, Jr.
Attorney at Law
22 West Ninth Street
Cincinnati, Ohio 45202
(513) 721-8808

8052  2954

DUSTY RHODES
HAMILTON COUNTY, OHIO

DUSTY RHODES
HAMILTON COUNTY, OHIO

TAX  15.50

DESCRIPTION ACCEPTABLE
HAMILTON COUNTY ENGINEER
08-26-99

Tax Map -
CAGIS -

BRYANT -695

This loan amortization is for illustration only.  All values displayed are
rounded to the nearest dollar.  All information contained herein is believed
to be accurate but is not guaranteed.

***** SEE YOUR BANKING REPRESENTATIVE FOR MORE EXACT LOAN INFORMATION *****
    ***** SEE YOUR FINANCIAL ADVISOR FOR INVESTMENT AND TAX ADVICE. *****

```
Loan Amount...................$ 35703.00    Paid Over 15 Years
Interest Rate.................     14.00%

Monthly Loan Payment..........$    475.47
Monthly Extra Payment.........$      0.00
Monthly Property Tax Payment..$     75.00
Monthly Insurance Payment.....$     25.00
                              =========
TOTAL MONTHLY PAYMENT.........$    575.47
```

### * * TAX PLANNING – DEDUCTIBLE INTEREST * *

| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|--------|--------|--------|--------|--------|--------|
| 2075.72 | 4906.18 | 4786.78 | 4649.56 | 4491.84 | 4310.56 |

_Robert Goering – 4,275.96_

_10% fee, Attorney Fees, Yclose cost 2,227.60_

_Cash to Seller – 10,000_

_Roof Buyer – 5,200_

_Fee 14,000_

_321-4764  Pete Bugalou_

_858-1635  Roseanne Christian_

---

_Lease option payment , $350.00_

_Save: 225.00_

_792-7943_

# SETTLEMENT STATEMENT

1966 Fairfax Avenue
Cincinnati, Ohio 45207
August 25, 1999

## SELLER(S)

| | | |
|---|---|---|
| Sales Price | | $15,432.24 |
| Deductions | | |
| - Delinquent real estate taxes-Hamilton County Treasurer | ($4,527.00) | |
| - Tax foreclosure court costs-Clerk of Courts | ( 206.00) | |
| - Recording costs(certificate of transfer and affidavit) - Hamilton County Recorder | ( 28.50) | |
| - Attorney fees (Estate of Betty Lou Pringle) - Stephen Kurlansky | ( 15.18) | |
| - Real estate tax proration(1/1/99-8/25/99) - Purchaser(s) | ( 595.49) | |
| - Transfer tax-Hamilton County Auditor | ( 38.75) | |
| - Deed and Affidavit Preparation - John R. Meckstroth, Jr. | ( 150.00) | |
| Total Deductions | ($5,560.92) | |
| Balance Due to Seller(s) | | $ 9,871.32 |

## PURCHASER(S)

| | | |
|---|---|---|
| Purchase Price | | $15,432.24 |
| Deductions and Credits | | |
| - Real estate tax proration(1/1/99-8/25/99) - Seller(s) | ($ 595.49) | |
| Charges and Expenses | | |
| - Attorney Fees - John R. Meckstroth, Jr. | 295.00 | |
| - Recording costs - Hamilton County Recorder | 14.50 | |
| Total Charges and Expenses | $ 309.50 | |
| Balance Due from Purchaser(s) | | $15,146.25 |


EXHIBIT

## SETTLEMENT STATEMENT
Page 2

## SUBSTITUTE FORM 1099 SELLER STATEMENT

The information contained on Page 1 of this Closing Statement is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

## SELLER INSTRUCTIONS

If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

The undersigned acknowledge receipt of a copy of this Closing Statement and agree to the correctness thereof. The parties further acknowledge that the real estate taxes have been prorated and the Seller shall be entitled to the amount held in escrow by the lender upon the final payoff of the mortgage.

SELLER(S):

Harry Curtis

Patricia Curtis

PURCHASER(S):

Prescott Bigelow, IV, Trustee

Prepared by:
John R. Meckstroth, Jr.
Attorney at Law
22 West Ninth Street
Cincinnati, Ohio 45202
(513) 721-8808

BRYANT -698

# LAND INSTALLMENT CONTRACT

This LAND INSTALLMENT CONTRACT entered into by and between **PRESCOTT BIGELOW, IV, TRUSTEE** whose mailing address is P.O. Box 30404, Cincinnati, Ohio 45230, hereinafter referred to as the "Vendor", and **HARRY CURTIS AND PATRICIA CURTIS, husband and wife**, whose tax mailing address is 1966 Fairfax Avenue, Cincinnati, Ohio 45207, hereinafter referred to as the "Vendee", witnesseth:

That in consideration of the mutual promises of the parties herein contained, the vendor agrees to sell and convey, and the vendee agrees to purchase and pay for, the real estate commonly known as 1966 Fairfax Avenue, Cincinnati, Ohio 45207 and more fully described below, together with all the appurtenances and hereditaments thereto, but subject to all conditions, easements and restrictions of record.

Situate, lying and being in the City of Cincinnati, County of Hamilton and State of Ohio, and being the east forty and one half (40 ½) feet of Lot number forty (40) of the First Subdivision of The Walnut Hills Land Association, as per plat of said Subdivision recorded in Plat Book 7, Page 97, in the office of the Recorder of Hamilton County, Ohio, and being more particularly described as follows:

Beginning at a point on the northerly line of Fairfax Avenue nine and one-half (9 ½) feet east of the westerly line of said Lot number forty (40); thence running eastwardly along said northerly line of Fairfax Avenue, forty and one-half (40 ½) feet to the easterly line of said Lot number forty (40); thence running northwardly along said easterly line of said Lot number forty (40), one hundred and forty (140) feet to the northerly line of said Lot number forty (40); thence running westwardly along said northerly line of said Lot Number forty (40); forty and one-half (40 ½) feet to a point; thence running southwardly along a line parallel with the westerly line of said Lot number forty (40) a distance of one hundred and forty (140) feet to the north line of said Fairfax Avenue and the place of beginning.

1. PURCHASE PRICE AND TERMS: The vendee agrees to pay for said property the sum of Thirty-Seven Thousand and 00/100 ($37,000.00) Dollars, payable with interest on the unpaid balance from the date herein until paid at the rate of Eleven and 00/100 (11.0%) per annum.   Payments shall be paid in advance in consecutive monthly installments of Three Hundred Fifty and 00/100 ($350.00) Dollars on the first day of each month beginning September 1, 1999.   Such monthly installments shall continue until September 1, 2001 at which time any remaining indebtedness shall be paid to vendor.

All payments shall be delivered to vendor at P.O. Box 30404, Cincinnati, Ohio 45230 or such other place as designated by the vendor in writing to the vendee. Privilege is reserved to prepay the entire indebtedness or any part thereof at any time without penalty.

2. POSSESSION AND CONVEYANCE: The vendee shall continue in possession of the property upon the execution of this contract and upon the payment by vendee of the full sum of Thirty-Seven Thousand and 00/100 ($37,000.00) Dollars as hereinbefore

provided, the vendor will convey marketable title to said premises to vendee by good and sufficient deed of general warranty, free and clear from all encumbrances excepting taxes and assessments then due and payable, easements and restrictions of record, and excepting such as may be caused by the acts or defaults of the vendee.

3. TAXES AND ASSESSMENTS: Vendor shall be liable for the taxes and assessments due after the execution of this agreement. Taxes and assessments shall be prorated based on the most recent tax duplicate upon the completion of this contract.

4. INSURANCE: The vendor agrees to maintain and pay for hazard insurance in an amount of not less than the purchase price. The vendor shall cause the vendee to be included as "an insured" on said policy.

The vendee shall be responsible for loss or damage to the contents of the premises.

The vendee shall save and keep harmless and indemnify the vendor from and against all loss, damage, or injury, to the extent the same is not covered by insurance, to any person or property while on the property arising out of the use of occupancy of the property by the vendee or the vendee's employees, guests, licensees, or invitees, or which shall be occasioned by any nuisance made or suffered on the property.

5. ABSTRACT: In compliance of O.R.C. 5313.02 (A) (12) vendee has obtained an Attorney's Title Opinion at their expense in accordance with the prevailing custom in which the property is located.

6. UTILITIES AND REPAIRS: The vendee agrees to pay all electric, gas, water and the storm water management charges and to keep all said property in good condition, and further agrees to make all necessary inside and outside repairs to said property at vendee's own expense. However, the vendee further agrees not to make any material alterations or additions in or to said premises without submitting the plans and specifications to the vendor for approval, and further not to permit or suffer any waste herein.

7. LAWS AND ORDINANCES: The vendee agrees to conform to, obey and comply with all the present and future laws, ordinances, rules, regulations, requirements and orders of the United States of America, State of Ohio, County of Hamilton and all of the departments, bureaus, boards and officials of said County respecting said premises and the use and occupation thereof.

8. INSPECTION OF PREMISES: The vendee agrees to permit the vendor and the vendor's agents and representatives, to enter upon said property upon reasonable notice to examine the condition of the same and to make necessary repairs if vendor should decide to do so, but this paragraph shall not in any way relieve the vendee to make repairs as provided in Item 6 herein.

BRYANT -700

9. RECORDING: Within, twenty (20) days of the execution of the within contract and agreement, vendor shall cause a copy of the same to be recorded in the Hamilton County Recorder's Office at vendee's expense.

10. BUILDING ORDERS: Vendor warrants to having no knowledge of existing or pending building orders on the property.

Vendee further agrees to keep the property free from any county and city building orders. Should vendee fail to do so, the vendors shall have the right to remove said and cause said costs to become an addition to the payment of principal immediately due and payable by the vendee.

11. ENCUMBRANCES: Vendor states that there are no mortgages or liens on this property:

12. DEFAULT: The parties hereto mutually agree that if the vendor defaults on any mortgage on the property, the vendee may pay on said mortgage and credit said payments against the monthly installment payments provided for herein.

The parties hereto further agree that if the vendee shall fail or neglect to pay any one of the said installments of the purchase money or costs called for in Item 6 when the same becomes due, and such default is not cured within thirty (30) days, as provided by law, or shall fail to keep, to observe and perform all of the covenants and conditions of this contract, then, at the vendor's option, all the installments and the amounts remaining unpaid shall immediately become due and payable and the vendor may terminate this agreement by giving ten (10) days written notice in accordance with O.R.C. 5313.06 to vendee, and in the event of such termination:

a. All payments made by the vendee hereunder may be retained by the vendor not at liquidated damages but for damages caused by nonperformance by the vendee of this agreement and/or

b. Vendor shall have all other rights as provided by law to forfeit the hereunder rights of the vendee and specifically the rights as set forth in O.R.C. 5313.01 to 5313.10;

c. Vendor shall be entitled to have a receiver appointed by a court to enter upon, take possession of and manage the property and to collect the rents of the property including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the property and collection of rents, including, but not limited to receiver's bonds and reasonable attorney's fees, and then to the sum secured by this contract. The receiver shall be liable to account only for those rents actually received.

- 3 -

BRYANT -701

The failure of the vendor to exercise the option to enforce its rights for any default of the vendee, shall not constitute a waiver of the above provisions.

13. **CONDEMNATION:** It is agreed that should the property herein be subject to any eminent domain or condemnation proceedings covering part or all of the property, that the vendor shall be entitled to any compensation paid as a result of such taking which shall be applied to the principal balance. Any excess amount shall be paid to the vendee.

14. **TIME OF THE ESSENCE:** Time is of the essence in the doing, performing, and observing of each and every term, covenant, or condition of this agreement by both vendors and vendee unless specifically excluded above.

15. **JOINT AND SINGULAR OBLIGATIONS:** As used herein, "vendor" shall include vendors, "vendee" shall include vendees, and the obligations and duties of the vendors and the vendee, respectively, if more than one, shall be joint and several.

16. **LATE CHARGE:** Vendee shall be subject to a late charge of Five (5%) percent of the amount due after Ten (10) days from the due date.

17. **BINDING EFFECT:** This agreement shall be binding on and inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto.

18. **CAPTIONS:** The captions of the several items of this agreement are not a part of the context hereof and shall be ignored in construing this agreement. They are intended only as aids in locating and reading the various provisions hereof.

IN WITNESS WHEREOF, The undersigned have set their hands to duplicate copies on the  day of _____ day of _____, 1999.

SIGNED IN THE PRESENCE OF:

Vendor:

_____
Prescott Bigelow, IV, Trustee

_____
WITNESS AS TO VENDOR

_____
WITNESS AS TO VENDOR

Vendee:

_____
WITNESS AS TO VENDEES

_____
Harry Curtis

_____
WITNESS AS TO VENDEES

_____
Patricia Curtis

- 4 -

BRYANT -702

STATE OF OHIO, COUNTY OF HAMILTON, SS:

BE IT REMEMBERED, That on the _____ day of _____, 1999, before me, the subscriber, a Notary Public, in and for said County and State, personally came vendees **HARRY CURTIS AND PATRICIA CURTIS**, in the foregoing Land Contract, and acknowledge the signing thereof to be their and its voluntary act and deed.

IT TESTIMONY THEREOF, I have hereunto subscribed my name and affixed my seal on this day and year aforesaid.

_____
Notary Public

STATE OF OHIO, COUNTY OF HAMILTON, SS:

BE IT REMEMBERED, That on the _____ day of _____, 1999, before me, the subscriber, a Notary Public, in and for said County and State, personally came vendor, **PRESCOTT BIGELOW, IV, TRUSTEE**, in the foregoing Land Contract, and acknowledge the signing thereof to be their and its voluntary act and deed.

IT TESTIMONY THEREOF, I have hereunto subscribed my name and affixed my seal on this day and year aforesaid.

_____
Notary Public

Prepared by:
John R. Meckstroth, Jr.
Attorney at Law
22 West Ninth Street
Cincinnati, Ohio 45202

- 5 -

BRYANT -703





BRYANT -704

Request No. M2505102896001 Account No.





BRYANT -705

Request No. M2505102896001   Account No. ████████████





BRYANT -706