Page 89

1   A -- because it was still hot outside, so --
2   Q If I asked you whether it was June, July,
3 or August, would you be able to differentiate?
4   A I would say, between one of those three.
5 It was in that time period.
6   Q But you can't be more specific?
7   A I can't be sure, no.
8   Q So, Roseanne talked to you about the
9 foreclosure?
10   A Well, she said that the property was going
11 into fore -- would be going into foreclosure. And
12 she said that -- she showed me the amount of taxes
13 that were due on it. And she said it was
14 probably -- she probably could have somebody -- she
15 knew somebody that could probably help me out with
16 it.
17   Q These papers that -- she showed you
18 papers?
19   A No, not at that time, she didn't show me
20 any papers.
21   Q That's what I want to know.
22   A She just talked to me about it --
23   Q All right.
24   A -- and wanted to know if I would be
25 interested. Well, I told her, at that time, that I

Page 90

1 wouldn't be interested in selling the property, but
2 I would be interested in finding some kind of
3 resolution to the problem, if it were possible.
4   Q Did she give you any papers that day, the
5 first day that she was there?
6   A Maybe one of her cards. Maybe a card.
7 Whether I -- or she said --
8   Q Are we in the maybe/probably?
9   A Well, I'm saying, I think she gave me one
10 of her cards --
11   Q Other --
12   A -- and --
13   Q I'm sorry.
14   A -- and then she said that she would be
15 contacting me later. She got -- she took our
16 number. And then she said that we -- you know, she
17 would be contacting me later.
18   Q So, you believe she gave you a card?
19   A Um-hmm.
20   Q Yes?
21   A Yes.
22   Q Did she give you any other papers that
23 first day?
24   A No.
25   Q No?

Page 91

1   A No, not that I can recall.
2   Q How many times -- between that day and the
3 time that you closed at John Meckstroth's office on
4 the sale, how many times did you meet Roseanne
5 Christian?
6   A She came there several times. Several
7 times. More than -- more than -- more than three.
8 More than three, I know.
9   Q The times that she came back --
10   A Um-hmm.
11   Q -- did she call you ahead of time?
12   A Sometimes, sometimes not.
13   Q Did she come in your house uninvited
14 another time?
15   A No. I mean, she usually rang the doorbell
16 after that point.
17   Q At any point, did she give you any papers
18 other than a card?
19   A Yes.
20   Q Tell me about that. What did she give
21 you?
22   A Well, first -- I think, at first she gave
23 me a -- information on who, you know -- who may be
24 involved with what's going on. She gave me
25 information on Mr. Bigelow.

Page 92

1   Q I'm talking about papers she gave you.
2 What did she give you?
3   A She gave me some estimates on what -- you
4 know, the amount of money I could get -- or she gave
5 me some information on what I might have to pay, I
6 think. And then she said that Mr. --
7   Q Can I --
8   A I mean, I don't know --
9   Q Just answer the question. I don't want to
10 interrupt you.
11   A She gave me -- she gave me certain papers.
12 I don't know exactly what they were. Okay?
13 Because, after that time, I was given other papers.
14 After I met Mr. Bigelow, I was given other papers.
15 Now, I don't know what the papers were that she gave
16 me and what the papers were that Mr. Bigelow talked
17 to -- me and Mr. Bigelow discussed.
18   Q Do you still have any of these papers?
19   A No. They were given to my lawyer.
20   Q So they've all -- you don't have anything
21 that hasn't been given to your attorney, in terms of
22 papers?
23   A Not that I can recall. If I do, you know,
24 he -- he would let he know.
25   Q Did Ms. Christian make any specific

Page 93

1 proposals to you about what you could do to get out
2 of this problem?
3    A  She talked about a friend.  And she
4 brought a proposal from him to me.  That being that
5 I would enter into a land contract and then pay that
6 land contract back --
7    Q  This was in writing?
8    A  -- at the end of the two years.
9    Q  This was in writing, what you're talking
10 about?
11    A  Well, that was a proposal, not only with
12 Roseanne, but also with Mr. Bigelow.
13          (Defendants' Exhibit 11 marked
14          for identification.)
15 BY MR. LEWIS:
16    Q  Mr. Curtis, I want to show you what's been
17 marked for identification as Exhibit 11.  Do you see
18 that?
19    A  Uh-huh.
20    Q  Is that your signature down there at the
21 bottom?
22    A  Yes, it is.
23    Q  Did you sign this document?
24    A  Yes, it is.  Yes, I did.
25    Q  Now, where were you when you signed this?

Page 94

1    A  I'm pretty sure that I -- I was at my
2 dining room table.
3    Q  Okay.  So, you were at home?
4    A  Yes.
5    Q  Was it signed by you on August 2nd of
6 1999?
7    A  I don't know.  I know I was -- I signed
8 it.  Because we didn't put a date there, I don't
9 know when we signed it.
10    Q  Well, how -- tell me approximately how
11 long it was between the time that Roseanne Christian
12 was first at your house --
13    A  Um-hmm.
14    Q  -- you with me -- until the time that
15 Exhibit 11 was signed by you?
16    A  I can't say, because it was several times.
17 So I can't say --
18    Q  Uh-huh.
19    A  -- when it was.  I know it was signed, but
20 I can't say how long that was because it was -- it
21 was a period of time, and a lot of things transpired
22 within that time.
23    Q  Are you able to approximate it, at all, in
24 terms of the time frame?
25    A  No, I wouldn't do that.  I'm not sure.

Page 95

1 I'm not sure.
2    Q  Do you believe it was more than six
3 months?
4    A  No, I don't think it was that long.  I
5 don't think it was that long.
6    Q  Do you believe it was more than a month?
7    A  I'm not sure.  I'm not sure.
8    Q  In terms of where you were when this
9 contract was signed, do you remember being asked
10 about that when you gave your prior deposition?
11    A  Yeah.
12    Q  If you would, turn to page 44.  At line 6,
13 a question is asked:  Is that a document that you
14 signed on, what is it, August 2nd or 3rd of 1999?
15       Do you see that question?
16    A  Um-hmm.
17    Q  You were asked that question?
18    A  Yes.
19    Q  You were being asked about this contract,
20 weren't you?
21    A  I guess.  I guess.  I'm not sure.  I guess
22 it was.
23    Q  Was there some other document you signed
24 on August 2nd or 3rd, 1999, sir?
25    A  No.  No --

Page 96

1    Q  All right.
2    A  -- not that I know of.
3    Q  So, you believe you were talking -- you
4 were being asked about this document, Exhibit 11?
5       MR. BLESSING:  Well, I mean, you've marked
6 this one.  This is Exhibit 1, looks like it.
7 the Curtis deposition.  And on the previous
8 page, and going over to page 44, the reference
9 is to Exhibit 1.  So, it --
10       MR. LEWIS:  Okay.
11       MR. BLESSING:  -- we won't have to guess
12 about what was being talked about.
13       MR. LEWIS:  Thank you.  I appreciate that.
14 BY MR. LEWIS:
15    Q  So, we've established that you were being
16 asked about Exhibit 1; right?
17    A  Right.
18    Q  Then, do you remember being asked, at line
19 10:  Would that have been signed at your home?
20       Do you see that question?
21    A  Um-hmm.
22    Q  Yes?
23    A  Um-hmm.
24    Q  It's -- I'm having -- the uh-huh doesn't
25 translate.

## Page 97

1  A  Yes.  Yes.

2  Q  Your answer was:  I don't know.  I don't

3  know if it was signed at my home or was it signed

4  down there with the other things that were signed.

5  I'm not sure.  It could have all been signed

6  together.  I'm not sure.

7  A  Um-hmm.

8  Q  Right?  That was your testimony then?

9  A  Right.

10  Q  Then the question was:  So it could have

11  been signed at the closing is what you're saying?

12      And then your answer was:  It could have

13  been.

14  A  Um-hmm.

15  Q  That was your testimony then, wasn't it?

16  A  Um-hmm.

17  Q  Yes?

18  A  Yes.

19  Q  Now, who prepared this document,

20  Exhibit 11?

21  A  Well, I don't know who prepared it.  It

22  was already pretty well put together when I got it,

23  that -- as far as I know of.  We -- I think certain

24  things were put on there afterwards.  I'm not sure

25  about that.  But I know, you know, it was -- most --

## Page 98

1  some of these things were already written in.

2  Q  Are you claiming that things were added to

3  this contract after you signed it?

4  A  Oh, no.  I don't know.  I don't mean that.

5  I don't know if it was, or not.  I don't -- I can't

6  say that or say it -- no.

7      But what I'm saying is, as far as I know,

8  certain things were there -- were already -- you

9  know, when I got the contract, certain things were

10  already on it.  That's what I'm saying.  When I --

11  when I received the contract, like, certain things

12  were already on it, certain things were already

13  filled in.

14  Q  When you signed the contract on

15  August 2nd of 1999, this is how it was -- all --

16  this is how the contract was, all of these terms

17  were in there; is that correct, sir?

18  A  I'm not sure.  I'm not sure.  I'm not

19  sure.

20  Q  But you're not claiming anything was added

21  after you signed this, are you, sir?

22  A  I'm not saying anything.  I'm not sure all

23  these things were there.  I'm not sure.

24  Q  Well, what do you think wasn't there?

25  A  That's what I'm saying.  I'm not sure.

## Page 99

1  Q  Did you read the contract before you

2  signed it?

3  A  Yes.  But that was then.  And I don't

4  remember if all these things were there.

5  Q  Who was in the room with you when this

6  contract was signed?

7  A  My wife and -- I can't remember -- I don't

8  know if Roseanne was there, or not.  I'm -- I think

9  she was.  I'm not sure.  I'm not sure of all the

10  people that were there.

11  Q  Was Mr. Bigelow in the room when you

12  signed this contract?

13  A  I don't think so.  I'm not sure.

14  Q  Had you met Mr. Bigelow, before this

15  contract was signed?

16  A  Yes.

17  Q  How many times had you met him?

18  A  At least once.  At least once.  I'm not

19  sure how many more times.  But I met him in walking

20  around the property.  And, at that time, I told him

21  I wasn't interested in selling the property.  In

22  fact, we shook hands on that, as agreement.

23  Q  So, you told Mr. Bigelow, before

24  August 2nd of 1999, that you didn't want to sell the

25  property?

## Page 100

1  A  Right.

2  Q  Then, you understand, don't you, sir, that

3  on August 2nd, 1999, you signed a contract to sell

4  the property?

5  A  Well, that --

6      MR. BLESSING:  Objection.

7      MR. LEWIS:  I'm asking for his

8  understanding.

9      MR. BLESSING:  Objection to the form and

10  to the characterization of his testimony that

11  he signed this document on August 2nd, 1999.

12      MR. LEWIS:  Okay.  Let me rephrase it.

13  BY MR. LEWIS:

14  Q  When you signed this contract to purchase,

15  Exhibit 11 --

16  A  Right.

17  Q  -- did you understand that you were

18  selling the property?

19  A  Well, what I understood, that it was a

20  formality that had to be done so he could get the

21  taxes and all those things done.  But as far as me

22  actually losing the property, no, I did not have

23  that understanding.

24  Q  Did you understand, when you signed this

25  contract to purchase, that you were selling the

Page 101

1 property to Mr. Bigelow?
2   A  What I understood is that this was a
3 formality for him to go ahead and get the taxes paid
4 and do the work so I could get the money for the
5 property, but I would be able to continue to have
6 the property and re -- and get the property
7 reinstated to me. That was my understanding.
8   Q  So, what you understood was that you were
9 selling the property to him, but that you could
10 continue to live there, and then later you could get
11 the property reinstated to you; is that accurate?
12   A  Yes. In other words, I would not lose the
13 property.
14   Q  But you did understand, when you signed
15 this contract, that at that time you were selling
16 the property to him; correct?
17   A  Well, what I -- just like I said --
18   Q  Could you answer the question? Then you
19 can explain.
20     MR. BLESSING: Excuse me. Excuse me. I
21     think he is answering the question. Please
22     don't interrupt.
23   A  What I was saying to you is that I was
24 under -- my understanding to this was that it was a
25 transfer, okay, of the property from myself to him,

Page 102

1 for the purpose of taxes and repairs and the other
2 things, not for anything else other than to go ahead
3 and allow him to pay these things, because,
4 therefore, the property would be in his name. And
5 after I have fulfilled the contract, the property
6 would be reinstated to me. So, it wasn't about --
7 it really wasn't about me becoming a tenant or
8 anything else. I was supposed to be continually
9 having the right to purchase and own this property.
10   Q  This transfer that you just referred to,
11 to Mr. Bigelow, you understood that to be a sale,
12 and then --
13   A  No, I --
14   Q  -- let me finish -- you understood that to
15 be a sale, and then you understood, later on, you'd
16 be able to repurchase it from him; is that accurate?
17   A  Well, no. What I knew -- what it was, is
18 for me to transfer this property to his name, okay,
19 and to -- at the end of this time, when he got the
20 taxes and everything straight, that I would be able
21 to, at a particular price, have this property
22 transferred back into my name.
23     THE REPORTER: May I have a moment to
24     change paper, please?
25       (Brief recess taken.)

Page 103

1     MR. LEWIS: Back on the record.
2 BY MR. LEWIS:
3   Q  Mr. Curtis, back to Exhibit 11, which you
4 have in front of you. You can't recall who wrote --
5 who filled those contract terms in; is that
6 accurate?
7   A  That's correct.
8   Q  Now, there are some initials up toward the
9 top of the document.
10   A  Yes.
11   Q  Do you see?
12   A  Yes.
13   Q  Do your initials appear there?
14   A  Yes, they do.
15   Q  So, why did you put your initials on this,
16 in addition to signing it, the contract?
17   A  I can't recall whether it was for the
18 information put in above here or whether it was for
19 the information below here. I can't remember
20 which -- which it was for.
21   Q  Right. This provision here, where it
22 says, Seller to lease option property for 2 years to
23 repurchase for 37,000 at end of 2 years from this
24 date of closing, do you see that language?
25   A  Yes, I do.

Page 104

1   Q  Do you know who requested that that
2 language be put in there?
3   A  No, I can't recall.
4   Q  You don't know if that was your request,
5 your idea, or someone else's?
6   A  I can't recall.
7   Q  You had -- before you signed this contract
8 to purchase, you had signed leases before, hadn't
9 you --
10   A  Yes.
11   Q  -- at other properties where you rented
12 properties?
13   A  No, I -- yes, I had.
14   Q  You knew what the difference -- you knew
15 there was a difference between a lease and a
16 contract to purchase, didn't you?
17   A  At the time, I didn't know exactly -- I'm
18 not sure about this. Because, like I said, I don't
19 know if I initialed the thing at top or to -- for --
20 whether I initialed the thing for that (indicating).
21   Q  That wasn't the question. At the time
22 that you signed this, did you know that there was a
23 difference between a lease and a contract to
24 purchase?
25   A  Oh. Well, I don't know whether I put this

## Page 105

1 in or if I was initialling this. I don't know this
2 particular thing -- about this particular stuff
3 here. So, I -- I can't -- what I'm saying is, as
4 far as a lease and a contract to purchase, I knew
5 the difference, but it didn't have anything to do
6 with this.
7 Q Answer my question.
8 A Yeah.
9 Q Try to listen to my question.
10 A Yeah, it didn't have anything to do with
11 this.
12 Q At the time that you signed this document,
13 you knew there was a difference between a lease and
14 a contract to purchase --
15 A Yes, but it --
16 Q -- correct?
17 A It didn't have anything to do with this.
18 Q All right.
19 A That's what I'm saying.
20 Q You knew there was a difference, didn't
21 you, between a lease and a land contract?
22 A I'm not sure. Yes -- I mean, because
23 basically, I was involving myself in a land
24 contract. That's what the agreement was.
25 Q So, at the time that you signed this

## Page 106

1 contract to purchase, did you understand that a
2 lease was different than a land contract?
3 A I can't say. I don't -- what I'm saying
4 is, is that this, what I understood, had nothing to
5 do with what I was supposed to be doing with
6 Mr. Bigelow.
7 Q I'm not asking that. I'm asking you what
8 you understood at the time. At the time you signed
9 this, was it your understanding that a lease was
10 different than a land contract?
11 A Okay. What I'm saying to you is that,
12 even though I knew the difference --
13 Q That's what I'm asking you. Can you --
14 A It had -- it had nothing to do with what I
15 was actually supposed to be going into with
16 Mr. Bigelow.
17 Q But you knew there was a difference
18 between a lease and a land contract; correct?
19 A I knew that there was a difference, but it
20 had --
21 Q Thank you.
22 A -- no bearing on what I was supposed to be
23 doing with Mr. Bigelow.
24 Q All right. We'll get to that. Okay.
25 Now, if you take a look at Exhibit 11

## Page 107

1 here, is it your understanding that you were to
2 receive $10,000 cash at closing?
3 A Yes.
4 MR. BLESSING: Are you asking, when, was
5 it his understanding? When he signed it?
6 MR. LEWIS: Yeah, as of -- yeah, as of,
7 you know, when you signed the contract, okay,
8 your understanding of the transaction, then,
9 August 2nd, 1999. Okay?
10 THE WITNESS: Um-hmm.
11 BY MR. LEWIS:
12 Q Was that your agreement, that you were to
13 receive 10,000 as cash at closing?
14 A Yes.
15 Q Yes? And buyer -- and you knew
16 Mr. Bigelow was the buyer; right?
17 A Well, yes.
18 Q Buyer to repair roof and porch after
19 closing. Buyer to pay all costs. Was that your
20 agreement?
21 A That was my -- what I understood.
22 Q Also cost and attorney fees.
23 A That's correct.
24 Q That was your agreement?
25 A That was my agreement.

## Page 108

1 Q Buyer to satisfy back taxes.
2 A Yes.
3 Q That was your part of the agreement;
4 right?
5 A Right.
6 Q Then, Seller to lease option property for
7 2 years to repurchase for 37,000 at end of 2 years
8 from this date of closing. Was that part of your
9 agreement?
10 A Well, my agreement -- see, that's what I'm
11 saying. I initialed this here, up here. So, I
12 can't remember if I -- that was the agreement here,
13 or when this agreement was. I initialed it. But I
14 didn't know whether I initialed it above here, to
15 agree to the seller/buyer situation, or this other
16 stuff. That's what I'm saying.
17 Q When you signed Exhibit 11 --
18 A Yes.
19 Q -- was the sentence in there that I just
20 read to you, seller to lease option --
21 A I can't --
22 Q Let me finish, okay?
23 MR. BLESSING: You've asked that question
24 twice already --
25 MR. LEWIS: Well --

Bryant, et al. v. Bigelow, et al.          Condenselt!          Depo of Harry Curtis

Case 1:02-cv-00006-SAS     Document 42-5     Filed 10/01/2003     Page 6 of 33

Page 109

1    MR. BLESSING: -- and he answered.
2    MR. LEWIS: He's talking about initials
3  now. Is that correct?
4    MR. BLESSING: Excuse me. He answered
5  both times that he is not certain.
6    MR. LEWIS: Okay.
7    MR. BLESSING: It's the previous question
8  asked, same answer given both times.
9    MR. LEWIS: Could you just please make an
10   objection and not be -- I got chastised for
11   coaching a couple times the other day, so --
12 BY MR. LEWIS:
13   Q Is it your testimony that you don't know
14 whether that sentence was in this contract at the
15 time that you signed it?
16   A I do not remember. That's what I'm
17 saying.
18   Q Was that your understanding of the
19 transaction, that you were going to have an option
20 to lease for two years and then you could repurchase
21 for 37,000 at the end of two years?
22   A My understanding was that I was supposed
23 to be entering into a land contract. That was my
24 understanding.
25   Q Then, that was your understanding before

Page 110

1  you signed this contract on August 2nd?
2    A That was my understanding.
3    Q Why didn't you request that language be in
4  that contract, saying that a land contract would be
5  prepared?
6    A Well, because that was my understanding,
7  that a land contract would be prepared.
8    Q So, why didn't you request that that
9  language be inserted in this contract?
10   A Because that was my assumption, that the
11 land contract would be done.
12   Q Did you request, before you signed this
13 contract, that language about a land contract be
14 included in the contract?
15   A Well, that was my understanding.
16   MR. BLESSING: That's not his question.
17   MR. LEWIS: Listen to my question.
18   MR. BLESSING: He said, did you request
19   inclusion of that language?
20   A Oh, not on here --
21   Q All right.
22   A -- no, because that was my
23 understanding --
24   Q So, you had --
25   A -- that that would be prepared at closing.

Page 111

1    Q So you had an understanding, in your mind,
2  that that was going to be a separate document, that
3  a land contract would be signed --
4    A Yes.
5    Q -- later --
6    A Yes.
7    Q -- is that right?
8    A Yes. That was -- that was the agreement,
9  for me to go ahead and transfer the property and
10 everything at this time. That was the agreement.
11   Q According to you, that was a verbal
12 agreement between you and Mr. Bigelow, that a land
13 contract would be signed later; right?
14   A That was at -- before -- yes, at the
15 closing, that was the agreement.
16   Q Okay. That was a verbal agreement between
17 you and Mr. Bigelow; right?
18   A Well, that was the understanding. And
19 that was the reason why I even got involved with
20 this. Because I had no intention of relinquishing
21 my property. So, this was supposed to be a paper
22 thing to go ahead and transfer the property into
23 Mr. Bigelow's name so I could go ahead and get the
24 taxes and everything paid on it, so that I would
25 still remain in the property and be able to go ahead

Page 112

1  and keep the property. That was the understanding.
2    Q You had, according to you, a verbal
3  agreement -- you know what verbal means, don't
4  you --
5    A Yes.
6    Q -- not written, verbal agreement with
7  Mr. Bigelow --
8    MR. BLESSING: Objection.
9    Q -- that a land contract would be signed
10 later?
11   A Well, we -- we shook hands on it.
12   Q Okay. Could you --
13   A That was -- that was the agreement.
14   Q Mr. Curtis --
15   A Okay, that --
16   Q -- try and listen to my question and
17 answer it. You can explain, if you want. But it's
18 a simple question.
19     Did you have a verbal agreement with
20 Mr. --
21   A Yes.
22   Q -- Bigelow that a land contract would be
23 signed later?
24   A Yes --
25   Q All right.

Page 113

1  A -- at the closing. That was the
2 agreement.
3  Q  Was it your understanding that this land
4 contract would allow you to stay in the premises?
5  A  That's correct.
6  Q  Right? And that you were going to pay
7 $350 a month; was that your agreement?
8  A  That was agreed.
9  Q  Okay. And that, according to you, this
10 was -- was the land contract going to say that at
11 the end of two years, you could repurchase the
12 property for $37,000? Was that your agreement?
13  A  That's what -- that's what was my
14 understanding.
15  Q  All right. So, you're saying, that's what
16 the land contract was supposed to say?
17  A  Absolutely.
18  Q  All right. But it's the same thing that
19 this contract to purchase says.
20  A  Okay. But I -- like I'm saying, I don't
21 remember these things. I don't know what -- whether
22 I signed my signature, the initials, to the above or
23 the below.
24  Q  But that provision, that's what you agreed
25 to and that's what you thought was going to be in

Page 114

1 the land contract, that you could lease it for two
2 years and then you would have the option to
3 repurchase for 37,000 at the end of two years? Was
4 that your agreement?
5  A  Well, I'm not sure about this. My
6 agreement was that the property be transferred into
7 his name; then we would have a land contract so that
8 he couldn't sell any -- sell the property. Okay?
9 Therefore, I could go ahead and retain the property
10 until the agreement of the land contract was filled.
11  Q  Then, when that land contract was
12 prepared, did you understand that it would include
13 the provision that you could repurchase the property
14 for $37,000 at the end of two years?
15  A  That was the agreement.
16  Q  You're saying that was supposed to be in
17 the land contract?
18  A  That -- those things were in the land
19 contract.
20    MR. BLESSING: Gary, when you get to an
21 appropriate --
22    MR. LEWIS: This is a good time.
23    MR. BLESSING: It is?
24    MR. LEWIS: Absolutely.
25    (Lunch recess taken from

Page 115

1      12:21 to 1:28 p.m.)
2 BY MR. LEWIS:
3  Q  Mr. Curtis, back on the record. Do you
4 still have Exhibit 11 in front of you, sir?
5  A  Yes.
6  Q  The $10,000 that's referred to, seller to
7 receive $10,000 --
8  A  Um-hmm.
9  Q  -- how was that number arrived at?
10  A  Well --
11    MR. BLESSING: Excuse me. Are you asking
12 him how did the writer arrive at it, or was it
13 discussed beforehand?
14    MR. LEWIS: That's -- option B is what I'm
15 asking him.
16    MR. BLESSING: Okay.
17  A  Well, it was a matter of information that
18 was given to me from Mr. Bigelow as to that would be
19 the amount that he would be able to give me.
20  Q  Tell me about that conversation. What did
21 he say to you?
22  A  Well, he told me that, in getting the
23 transfer of this property and stuff, that he would
24 give me the $10,000 at closing so -- as a securing
25 of this property for the amount of tax that he was

Page 116

1 supposed to have for, I guess, the two-year period.
2  Q  So, your recollection is that Mr. Bigelow
3 suggested the $10,000 first? He is the one that
4 brought that number up?
5  A  I -- we discussed a sum that would be
6 good --
7  Q  All right. Well --
8  A  -- and that was the sum that he said he
9 could give me. And I agreed to it.
10  Q  Right. Did he initiate the proposal that
11 you would get $10,000?
12  A  Well, we discussed a money figure, and
13 then we negotiated that.
14  Q  My question is, who first suggested that
15 $10,000 would be the number that you would receive?
16 Was it you or him?
17  A  Well, it was something we came to. It
18 wasn't a suggestion. He was talking -- you know, we
19 were -- he was throwing around figures, and that was
20 the one that we decided would be a good one.
21  Q  Who first came up with the number,
22 $10,000?
23  A  Well, that's what I'm saying. It
24 wasn't -- it was just negotiated between us. It
25 was -- you know, he offered me some other figures.

## Page 117

1 And then I said, well, I need more than that, things
2 like that. And we discussed that, and that was the
3 figure that we came up with.
4    Q   Okay. I understand you came up with --
5 I'm not trying to belabor the point. But somebody
6 had to say, $10,000 is the number.
7    A   Well, okay. I don't know. I can't
8 remember.
9    Q   All right, you don't know. It says, Buyer
10 to repair roof and porch. Whose suggestion was
11 that?
12    A   Okay. That was Mr. Bigelow's. He said he
13 would do that, right. Right.
14    Q   You didn't request that? He initiated
15 that suggestion?
16    A   Well, these were certain terms. You know,
17 he said the house needed repair. He said, I'll go
18 ahead, I will put on a roof, I'll do the repairs on
19 the house. So, I would assume it was he.
20    Q   We don't want you to assume. We don't
21 want you to guess. Here's my question. Who --
22    A   To my best recollection, that was the
23 case.
24    Q   Your best recollection is that Mr. Bigelow
25 is the one that first suggested that the roof and

## Page 118

1 the porch be repaired?
2    A   We talked about it, yes. He said he would
3 do that.
4    Q   Is it your recollection that he was the
5 one who first suggested that?
6    A   Well, I can't say who was first. Okay?
7    Q   All right. You can't recall?
8    A   I can't recall.
9    Q   Also, we talked about this lease option
10 property for two years to repurchase for 37,000.
11 Same question, who first suggested the number of
12 $37,000 at the end of two years?
13    A   Well, that's what I was told by
14 Mr. Bigelow that I would have to settle with -- I
15 mean, have to do to get my property --
16    Q   So, your recollection is --
17    A   -- to get the property back to my name.
18    Q   So, your recollection is that Mr. Bigelow
19 was the one that initiated that number, the $37,000?
20    A   To my best of my knowledge, yes.
21    Q   Was it also Mr. Bigelow that was the one
22 that initiated this concept of there would be a
23 two-year term?
24    A   Yes.
25    Q   Was it your understanding that the $10,000

## Page 119

1 and the $37,000 corresponded to some other number or
2 that there was some relationship between those two
3 numbers?
4    A   Well, I don't remember about that. I
5 don't remember about that.
6    Q   Do you recall Mr. Bigelow explaining to
7 you why he thought $37,000 would be an appropriate
8 number?
9    A   No, I don't remember that.
10    Q   Did you ever ask him --
11    A   I can't remember.
12    Q   -- about that?
13    A   I can't remember if we -- you know, I
14 can't remember whether or not we --
15    Q   Now, we discussed earlier that this issue
16 about the land contract -- and I'm not going to go
17 back through what the discussions were. Why was it
18 that a land contract was important to you?
19    A   Well, from what my understanding of what
20 Mr. Bigelow told me is that this would assure the
21 property being returned to me.
22    Q   Did you understand that you could not be
23 evicted if you failed to make monthly payments under
24 a land contract?
25    A   That was my understanding. But that's

## Page 120

1 what my understanding was.
2    Q   Who told you that you could not be evicted
3 for failure to make --
4    A   No one.
5    Q   Now, wait, wait. Let me finish. Who told
6 you that you could not be evicted for failure to
7 make monthly payments under a land contract?
8    A   Nobody told me that.
9    Q   But that was your understanding?
10    A   That was my understanding.
11    Q   Now, what did you believe the fair market
12 value of Fairfax Avenue was as of 1999?
13    A   I didn't know.
14    Q   Do you have Exhibit 2 in front of you,
15 sir?
16    A   Yes.
17    Q   If you would, please, turn to
18 Interrogatory No. 15. The pages aren't numbered,
19 but it's the fifth page in. You with me?
20    A   Um-hmm.
21    Q   Actually, the prior page. Interrogatory
22 15 says: Identify all damages which you claim in
23 this action and identify the precise manner when
24 which said damages were calculated.
25    Do you see that? No. 15, just the page

Page 121

1 before it.
2    A  Oh, I'm sorry.
3    Q  Got it?
4    A  Okay.
5    Q  Down at the bottom.
6    A  Okay.
7    Q  Okay?  These are the interrogatories we
8 talked about before, you signed these, that
9 verification page.  Remember?
10    A  Um-hmm.
11    Q  Your response is:  Curtis lost 92,473 in
12 equity in the home at 1966 Fairfax.  This figure is
13 arrived at by taking the value of the home, 97,000,
14 minus the amount paid by Bigelow for delinquent real
15 estate taxes.
16       Do you see that?
17    A  Um-hmm.
18    Q  Yes?
19    A  Yes.
20    Q  How did you arrive at that -- at the
21 number of the value of the home, 97,000?
22    A  I'm not sure.  I'm not sure.  I'm not
23 sure.
24    Q  Do you know what the --
25    A  I think it was at the -- I'm not sure.  I

Page 122

1 think it's from -- I think -- I'm not sure, but I
2 think it's from the actual sale price of the house.
3    Q  The actual sale price by who?
4    A  Of Mr. Bigelow.
5    Q  At the time that you transferred title to
6 Mr. Bigelow --
7    A  Um-hmm.
8    Q  -- in 1999 --
9    A  Um-hmm.
10    Q  -- what is your understanding of what the
11 fair market value of the property was?
12    A  I have no idea.  I have no idea.
13    Q  Do you know what the Hamilton County
14 Auditor -- what the tax valuation was?
15    A  No.
16       (Defendants' Exhibit 12 marked
17       for identification.)
18 BY MR. LEWIS:
19    Q  Mr. Curtis, I want to show you what's been
20 marked for identification as Exhibit 12.  I'm going
21 to represent to you, this is a document I obtained
22 off the Hamilton County Auditor's website.
23    A  Um-hmm.
24    Q  Do you see 1966 Fairfax Avenue --
25    A  Um-hmm.

Page 123

1    Q  -- there?  If you look down toward the
2 right, for 1998 --
3    A  Um-hmm.
4    Q  -- you see that --
5    A  Um-hmm.
6    Q  -- it says, 100 percent total 1998,
7 46,400.
8    A  Um-hmm.
9    Q  All right?  Do you see that?
10    A  Um-hmm.
11    Q  You don't have any reason to doubt that
12 that's how the Hamilton County Auditor valued the
13 property as of 1998, do you?
14       MR. BLESSING:  Objection.  You may answer.
15    A  Yeah.  I have no idea.  You know.  I don't
16 even know how they came to that figure.  It looks
17 like they got it from the taxes, though.
18    Q  At any time before you transferred --
19 before you signed the deed transferring the property
20 to Mr. Bigelow, did you request that someone do an
21 appraisal of the home?
22    A  No.  Because -- because of what
23 Mr. Bigelow told me, the property was still going to
24 be mine.  So, you know, I -- no.
25    Q  Now, after this purchase contract was

Page 124

1 signed, Exhibit 11, there was a closing schedule,
2 wasn't there?
3    A  Yes, there was.
4    Q  You became aware, at some point, that
5 Attorney John Meckstroth was going to do the
6 closing?
7    A  Yes, I was.
8    Q  Did you have any contact with
9 Mr. Meckstroth, before the closing on this
10 transaction?
11    A  Yes.
12    Q  Tell me about that.
13    A  He --
14    Q  Tell me about that.
15    A  He was calling to get a transfer of title
16 or find out how to get one, or find out -- do a
17 title search, or something like that.  But I also
18 called to find out when the closing was.
19    Q  What's your recollection of when the
20 closing was, in relation to when the contract of
21 purchase was signed?
22    A  Oh, I can't remember that.  I can't -- I
23 can't remember.
24    Q  Do you have any ballpark, at all?
25    A  Huh-uh, no.  I can't even remember.  I

Page 125

1 just can't -- went down when they asked me to come
2 down.
3    Q  Between the time that the contract of
4 purchase was signed and the time of the closing, did
5 you receive any documents from Mr. Meckstroth?
6    A  Not that I can remember, no.
7              (Defendants' Exhibit 13 marked
8              for identification.)
9 BY MR. LEWIS:
10    Q  Mr. Curtis, you have in front of you
11 Exhibit No. 13.  This is a phone slip dated
12 August 18th, and it's got, Harry Curtis, Buyer, up
13 there.  Do you see that?
14    A  Um-hmm.
15    Q  Yes?
16    A  Um-hmm.
17    Q  You can't --
18    A  Yes.
19    Q  We're having problems --
20    A  Yes.
21    Q  Oh, there you go.  That phone number.
22 861-3927, was that your phone number?
23    A  Yes, it was.
24    Q  Did you call Mr. Meckstroth on
25 August 18th of 1999?

Page 126

1    A  Yes.
2    Q  Did you leave a message for him about land
3 contract closing, when is it closing?
4    A  Well, I wanted to know when was it
5 closing.
6         MR. BLESSING:  Excuse me.  He just asked
7      you a question.
8    A  Oh.  Yes.
9    Q  Okay.  Thank you.  So, this Exhibit 13,
10 that's an accurate recitation of the date that you
11 called and the message that you left for
12 Mr. Meckstroth?
13         MR. BLESSING:  He wants to know whether
14      you remember it from here.
15    A  I don't remember the date, but I remember
16 calling him.
17    Q  Okay.  Then, when you did call, do you
18 believe that you left a message, land contract
19 closing, when is it closing?
20    A  Oh, I don't know about that.  I don't
21 remember the message.  But I remember calling him.
22    Q  You're not saying you didn't make this
23 call and leave this message, you're just saying you
24 can't remember exactly what you said; is that
25 correct?

Page 127

1    A  Yes, it was just something about the
2 closing.
3    Q  Sir, if you would, I'm going to be
4 referring you to some documents in Exhibit 4.  Could
5 you get that, please?  Do you have it in front of
6 you?
7    A  Yes, I do.
8    Q  If you would, these are all -- the pages
9 are numbered down at the bottom.
10    A  Um-hmm.
11    Q  See?  Go to page number 697, if you would.
12 You there?
13    A  Yes.
14    Q  Can you identify that document?  That's
15 the settlement statement, isn't it, from your
16 closing at Fairfax?
17    A  I -- that's what it says.  I -- that's
18 what it says.
19    Q  Okay.  Page 2 of that document.
20    A  Um-hmm.
21    Q  Would you turn the page, please?  Is that
22 your signature?
23    A  Yes.
24    Q  Did you sign this settlement statement?
25    A  Assuming that's what it was, yes.

Page 128

1    Q  Well, I mean, did you or didn't you?
2    A  Yeah, I signed it.  Yes, I did.
3    Q  Does this accurately reflect the
4 transaction that occurred at the closing of this
5 sale?
6    A  I don't know if it does, or not.  I know
7 it was supposed to have, yes.  It was supposed to
8 have.
9    Q  Well, can you --
10    A  I don't know, because I don't know
11 exactly -- you know, I took their word for it.  So,
12 I don't know -- you know, I took their word for it.
13    Q  Well, is there anything on here -- and
14 take your time, if you need to look through it.  But
15 is there anything on here that you believe is
16 inaccurate?
17    A  Well, like I said, certain things I don't
18 know about.  I don't know what these -- yeah, these
19 attorney's fees or -- I don't know about this here.
20    Q  What don't you know about?
21    A  About the -- these attorney's fees.
22 Because I ended up paying Mr. Meckstroth for the --
23 the -- what do you call it -- the land contract, for
24 doing the land contract.  So, I don't know if that's
25 correct, or not.

Bryant, et al. v. Bigelow, et al.          Condenseit!          Depo of Harry Curtis

Case 1:02-cv-00006-SAS     Document 42-5     Filed 10/01/2003     Page 11 of 23

Page 129

1    Q  Anything else here, that you don't know
2  whether or not it's correct?
3    A  Not that I know of.  But I don't know if
4  that's correct, or not, because I paid him for that.
5    Q  Separately, you mean?
6    A  Yeah, I wrote a check.  It came out of the
7  money that I was supposed to be given.
8    Q  All right.  Well, were the delinquent real
9  estate taxes paid after the closing?
10    A  Yes -- no, they were paid before.
11    Q  Well, were the delinquent real estate
12  taxes of $4,527 -- were they paid?
13    A  Yes.
14    Q  It says, balance due to seller, here,
15  $9,871.32.  Do you see that?
16    A  Um-hmm.
17    Q  Yes?
18    A  Yes, I do.
19    Q  The reason I'm asking you to say yes is,
20  you keep giving --
21    A  Yes, I do.
22    Q  -- saying uh-huh.
23    A  Yes, I do.
24    Q  Did you receive $9,871.32 after the
25  closing?

Page 130

1    A  I don't remember an exact amount.  I don't
2  know if I -- I don't remember the exact amount.
3    Q  Was it approximately $9,871 you received?
4    A  I think it was a little less.
5    Q  What do you think it was?
6    A  I think it was -- I'm not sure.  I'm not
7  sure.  But it was around that figure.
8    Q  So, you received around $9,871.32?
9    A  Yes.
10    Q  If you look at page 695 of this exhibit
11  that you have there -- you got it?
12    A  Um-hmm.
13    Q  Yes?
14    A  Yes, I do.
15    Q  That's a general warranty deed.  Is that
16  your signature?
17    A  Yes, it is.
18    Q  Did you sign that on August 25th, 1999?
19    A  I think I did, yes.
20    Q  That settlement statement that we just
21  looked at, number 697, that's got a date up there of
22  August 25th, 1999.
23    A  Um-hmm.
24    Q  Do you see that?  Yes?
25    A  Yes.

Page 131

1    Q  Does that refresh your recollection about
2  when the closing was?
3    A  I assume the August 25th -- I'm pretty
4  sure that's when it was.  That's when we -- I know
5  that I went down there.  Now, if that's the date
6  that they had on here, that's the date -- I assume
7  that's when we --
8    Q  Did you have some discussions with John
9  Meckstroth about who he was representing in this
10  transaction?
11    A  No, I didn't.  I assumed -- I assumed that
12  he was Mr. Bigelow's attorney.  That's what I
13  assumed.  I didn't think -- but once I started
14  paying -- once I paid for something, then I assumed
15  he had a representation of me, if he was charging
16  me.  Because Mr. Bigelow told me he would -- he
17  would take care of all the attorney's fees.  I mean,
18  that was part of the agreement in the initial
19  statement.
20    Q  Did Mr. Meckstroth ever tell you that he
21  was representing you?
22    A  No, he never said anything to -- not that
23  I can recall.
24    Q  Until you paid Mr. Meckstroth, you
25  understood that he was Mr. Bigelow's lawyer?

Page 132

1    A  Right --
2    Q  But what you're saying --
3    A  -- from what I gathered.  I mean,
4  that's -- that was my understanding, that we were
5  going to the closing.  I thought Mr. Bigelow was
6  going ahead and doing all this paperwork, and that
7  the attorney fees would be covered by Mr. Bigelow.
8    Q  Between the time you signed the contract
9  to purchase and the time of the closing, did you
10  contact the lawyer about this transaction, to get
11  some legal advice?
12        MR. BLESSING:  Other than what he's
13  testified to?
14        MR. LEWIS:  If you already did testify to
15  it, I apologize.  Go ahead.
16    A  Yeah, I don't -- you know, basically what
17  I involved myself with was in a trust, on account
18  of --
19    Q  No.  Listen to my question.
20    A  Okay.
21    Q  Between the time you signed the contract
22  to purchase and the closing, did you call a lawyer
23  to get some legal advice for you about this
24  transaction?
25    A  No, not -- not that I can recall, no.

Page 133

1 Because I -- I believed him. So, I trusted him and
2 I thought everything that he told me was the truth.
3 So --
4            (Mr. Bigelow arriving.)
5 BY MR. LEWIS:
6    Q  At this closing, was a land contract
7 discussed?
8    A  Well, the land contract was there, yes.
9 Yes. And it was in the paperwork with everything
10 else, yes.
11   Q  Take a look at this exhibit you have in
12 front of you --
13   A  Um-hmm.
14   Q  -- page 699. Do you have it?
15   A  Yes.
16   Q  Can you identify that?
17   A  Yes.
18   Q  Is that the land contract that you just
19 described?
20   A  Yeah. I think it was, yes.
21   Q  So, you're saying this document was at the
22 closing?
23   A  Yes.
24   Q  Had you seen this land installment
25 contract before the date of the closing?

Page 134

1    A  No.
2    Q  Who prepared this land installment
3 contract?
4    A  It was there with Mr. -- the attorney that
5 was there. So, he prepared it, I guess. I mean --
6    Q  That guessing stuff --
7    A  Well, he prepared it. I mean, I was
8 charged for it. So, he prepared it.
9    Q  Do you know who prepared it?
10   A  He prepared it, I assume. I assume. I
11 mean, he prepared all the other documents, so I
12 would have said he prepared it.
13   Q  Tell me what was discussed about this land
14 installment contract at the closing.
15   A  Well, really, nothing was discussed. I
16 was -- it is my assumption that all these things
17 were taken care of. Nothing was discussed there.
18   Q  So, are you telling me the land
19 installment contract was not discussed at the
20 closing?
21   A  Oh, all of them were discussed, yes. I
22 mean, he went through it. He went through it.
23   Q  Okay. Try to --
24   A  What I'm saying is, he went through the
25 contract, just like he went through all the other

Page 135

1 paperwork.
2    Q  So, are you saying that -- when you say --
3 who -- he, Mr. Meckstroth?
4    A  Right.
5    Q  So, Mr. Meckstroth went through this land
6 installment contract at the closing?
7    A  I'm pretty sure he went through
8 everything. He was just --
9    Q  I'm just asking -- try to -- Mr. Curtis,
10 try to focus on my question, please.
11   A  Okay. What I'm saying to you is that a
12 number of papers were discussed.
13   Q  I'm asking about this one right now.
14 Okay?
15   A  Oh, I'm pretty -- I'm sure that all
16 things -- all the things were discussed.
17      MR. BLESSING: Can we take just a break?
18      MR. LEWIS: Sure.
19         (Brief recess taken.)
20      MR. LEWIS: Back on the record.
21 BY MR. LEWIS:
22   Q  We're back to the land installment
23 contract.
24   A  Um-hmm.
25   Q  Was the land installment contract

Page 136

1 discussed at the closing?
2    A  Okay. Basically, what was involved was
3 that all the paperwork was there. I can't really
4 remember whether this was discussed with all the
5 others, or not. I assumed that when all the papers
6 were presented to me, that I was signing everything
7 that needed to be signed.
8    Q  So, you can't recall whether the land
9 installment contract was discussed at the closing;
10 is that correct?
11   A  That is correct.
12   Q  At any time prior to you signing the deed
13 transferring title to Mr. Bigelow --
14   A  Um-hmm.
15   Q  -- did you request that the land
16 installment contract be signed by everybody?
17   A  No, I assumed it would be at the closing.
18   Q  But you didn't make that request before
19 you signed the deed?
20   A  No, because all the things were supposed
21 to be signed together.
22   Q  You thought everything was supposed to be
23 signed together, when you came to the closing;
24 right?
25   A  That is correct.

Page 137

1  Q  So, why didn't you request, at the
2  closing, that the land installment contract be
3  signed?
4  A  Well, I assumed, with everything else, it
5  was being signed.  I mean, they -- what I did --
6  what was going on is that a lot of things were being
7  presented to me and I was signing a lot of things.
8  So, I assumed this was one of those things that I
9  was signing.
10  Q  That was a really important issue to you,
11  though, as part of this transaction, wasn't it, the
12  land installment contract?
13  A  Well, I mean, all these things were given
14  to me.  So, when I was signing, it was my assumption
15  that everything was being signed.
16  Q  But, getting back to the question, wasn't
17  this land installment contract an important issue to
18  you when you came to that closing?
19  A  Well, all the things were.  All -- I mean,
20  not -- I wasn't picking any particular thing.  When
21  we went to the signing, I assumed all these things
22  were being signed.
23  Q  Was the land installment contract an
24  important issue to you, when you came to that
25  closing?

Page 138

1        MR. BLESSING:  I believe he answered
2  earlier, saying all the things were important.
3  Q  Okay.  Well, can you just confine your
4  answer to my question, please?
5  A  Well, I can't -- I can't just say that one
6  thing was more important --
7  Q  I'm not asking you that.  Was the land --
8  A  -- than the other.  It was important.
9  Q  Okay.
10  A  All things were.
11  Q  The land installment contract was an
12  important issue to you when you came to the closing;
13  right?
14  A  All the things were.  All the things were.
15  All the contracts --
16  Q  Okay.
17  A  -- were.
18  Q  Including the land installment contract?
19  A  Yes.  Yes.
20  Q  All right.  But you didn't discuss the
21  land installment contract at the closing; correct?
22  A  I can't remember.
23  Q  I forgot to ask you earlier, when you were
24  getting these letters from Hamilton County, at least
25  one letter, about the tax delinquency in 1999 --

Page 139

1  A  Um-hmm.
2  Q  -- yes --
3  A  Yes.
4  Q  -- did you talk to your wife, Patricia,
5  about this, about the problem?
6  A  We talked about owing the taxes, and we
7  tried to figure out how we were going to pay them.
8  Q  How were you going to pay them?
9  A  We had no idea.
10  Q  All right.  You didn't -- did you have an
11  option, any options?
12  A  We didn't know of any options.  We didn't
13  never -- we never owned -- I had never owned
14  property before, so I didn't know what my options
15  were.
16  Q  Now, after the closing, did you have any
17  discussions with Mr. Bigelow about the land
18  installment contract?
19  A  No, I did not.
20  Q  After the closing, did you have any
21  discussions with Mr. Meckstroth about the land
22  installment contract?
23  A  Not that I recall.
24  Q  Now let's talk about the rent payments or
25  the payments.  You made payments to Mr. Bigelow of

Page 140

1  $350 a month; right?
2  A  That was correct.
3  Q  You made an payment in September?
4  A  That is correct.
5  Q  You made one in October; right?
6  A  That was correct.
7  Q  Did you mail those payments to
8  Mr. Bigelow, or did he -- how'd you get those to
9  him?
10  A  I mailed them to him.
11  Q  Mailed them to him?
12  A  Um-hmm.
13  Q  Did Mr. Bigelow ever ask you that you
14  should mail the rent payments to him?
15  A  Yes.  Yes.
16  Q  Tell me about that.  What did he say?
17  A  Well, it was sent to -- he gave me this
18  address, and that's where I mailed them to.  He gave
19  me a card with the address on it, and that's where I
20  mailed them to.
21  Q  Was the roof on Fairfax repaired after the
22  closing?
23  A  I can't remember if it was before or
24  after, but it was repaired.
25  Q  Who did the work; do you remember?

Bryant, et al. v. Bigelow, et al.
Case 1:02-cv-00006-SAS    Document 42-5    Filed 10/01/2003    Page 14 of 23
Condenselt!™    Depo of Harry Curtis

Page 141

1    A There were some gentlemen there. I
2 didn't -- I don't know who they were.
3    Q Do you remember an individual by the name
4 of Paul Bigelow?
5    A I assume that's what his name was. I
6 didn't really ask him his name.
7    Q Somebody named Paul?
8    A Yeah, I think so. Um-hmm.
9    Q Somebody named Paul was out there working
10 on the roof; right?
11    A Right, he and some other guys.
12    Q Then, do you remember Pete Bigelow being
13 out there working on the roof?
14    A No.
15    Q No? Tell me what you remember about what
16 exactly was done to the roof.
17    A They pulled the old roof off and put a new
18 roof on.
19    Q It was a slate roof, wasn't it?
20    A Yes. Yes.
21    Q So, all the slate was removed?
22    A Um-hmm.
23    Q Yes?
24    A Yes.
25    Q It was taken down to the rafters; right?

Page 142

1    A Yes, um-hmm. Yes.
2    Q Then there was felt paper put on; right?
3    A I think so, yes.
4    Q I mean, you were home all the time this
5 work was going on; right?
6    A Yes. Yes.
7    Q You were coming out and you'd periodically
8 talk to these guys; right?
9    A That is true.
10    Q You remember thanking them and telling
11 them what a great job they were doing?
12    A Yes, they did a decent job.
13    Q You were happy with the job, weren't you?
14    A Well, yes. But the problem wasn't with
15 the roof.
16    Q We'll get to that. I'm talking about the
17 roof.
18    A Yes.
19    Q You were happy with the work they did on
20 the roof; right?
21    A Right.
22    Q So, they put the felt paper down; right?
23    A Yes.
24    Q And then asphalt shingles --
25    A Yes.

Page 143

1    Q -- right?
2    A Um-hmm.
3    Q And, also, there was work done on the
4 porch --
5    A Yes.
6    Q -- right?
7    A Um-hmm.
8    Q That was another company that did that;
9 right?
10    A I didn't know if it was another company,
11 or not. I didn't know if they were all associated
12 or what was going on with that.
13    Q But there was some vinyl material put on
14 the -- I don't know what you call it -- the roof of
15 the porch --
16    A Right.
17    Q -- right?
18    A Right.
19    Q Were you happy with that?
20    A Well, the problem with that is, that they
21 were supposed to do another part of it and they
22 didn't complete it.
23    Q Okay. The part --
24    A And, so that --
25    Q We'll get to --

Page 144

1    A See, I was looking at -- and then, one
2 time, they put some pieces on that were uneven. So
3 they had to take those off and, you know, even them
4 up and stuff. But, for what they did, I was okay
5 with, yes.
6    Q Now, at some point you had some
7 discussions with Mr. Bigelow about there is a
8 problem with the roof --
9    A Yes.
10    Q -- correct?
11    A Yes.
12    Q Tell me about that. What --
13    A Well, I -- I don't really remember
14 discussing it with him. I remember leaving messages
15 on his answering service.
16    Q What was the problem?
17    A That part of the roof wasn't finished. I
18 mean, part of the under -- not the roof, but the
19 undersection wasn't finished. It's the part that's
20 not on that picture.
21    Q That figures.
22    A Yeah.
23    Q Okay.
24    A It's on the other side of the house.
25    Q Can you just describe --

## Page 145

1    A  Yes.  It was -- it was right up underneath
2  the roof, itself.  There are some boards that
3  weren't there and replaced.  It's not on that side
4  of the house.  It's on the other side.
5        MR. BIGELOW:  Underneath here.
6        MR. LEWIS:  Okay.
7    A  And there were -- there was still a hole
8  there.
9    Q  Was it in the back of the house?
10    A  No, it was in the front.  It was in the
11  front, right in the -- right on the other side of
12  the house.
13    Q  Are you sure it doesn't appear there?
14    A  No.  It's all the way over here, on the
15  other side of the tree.
16    Q  Oh, all right.
17    A  On that side of the house.
18        MR. BIGELOW:  It was on the other side.
19    A  It was on the other side of the house.
20    Q  Well, maybe we could still use this.  On
21  Exhibit 7, does the other side of the house -- does
22  it have a similar construction as this?
23    A  No, it's a different construction.
24    Q  So, tell me exactly what wasn't finished.
25  What was the problem?

## Page 146

1    A  Underneath the roof on the other side,
2  there were boards that were not replaced and it was
3  a hole there.
4    Q  How big a hole?
5    A  Oh, I'd say, large enough for an animal to
6  get in there.
7    Q  Was there some discussion -- did you think
8  a squirrel got in there?
9    A  Well, there was a squirrel or raccoon,
10  because I hear them in the ceiling.
11    Q  So, you did hear some -- at some point you
12  heard an animal --
13    A  Right.
14    Q  -- in the ceiling?
15    A  Right.
16    Q  Is that when you called Mr. Bigelow?
17    A  Yes.
18    Q  So, this hole was approximately --
19    A  Large -- it was large enough for a
20  squirrel or a raccoon to get in.
21    Q  Did you ever actually have conversation
22  with Mr. Bigelow about --
23    A  Well --
24    Q  -- wait, wait --
25    A  Okay.

## Page 147

1    Q  -- you know, about fixing this problem?
2    A  Well, I talked with -- I called his
3  office.  And I really never talked with him.  I
4  talked on -- I left an answering -- an answer --
5  answers on his answering machine.  Okay?  I never
6  got a reply from Mr. Bigelow.
7    Q  All right.
8    A  What happened was, after so long, I left
9  another message on there and I held the rent up.
10    Q  We'll get to that.  How many messages did
11  you leave for Mr. --
12    A  Several.
13    Q  You need to let me finish my question.
14    A  Oh, I'm sorry.
15    Q  How many messages did you leave for
16  Mr. Bigelow about this problem?
17    A  Several.  I can't say how many, but it was
18  more than one.
19    Q  Was it more than three?
20    A  It was more than two.  I can't say if it
21  was more than three or four, but it was more than
22  one or two.
23    Q  You believe it's somewhere in the two to
24  four range?  Would that be your best recollection?
25    A  As far as I can remember.

## Page 148

1    Q  Over what period of time were you
2  leaving -- did you leave these messages?
3    A  Well, this is over about a two-month
4  period.
5    Q  Are you saying you never got a phone call
6  back from Mr. Bigelow?
7    A  No, I never talked to Mr. Bigelow.
8    Q  So, in terms of this problem, this hole
9  where the animal had gotten in your home --
10    A  Right.
11    Q  -- you never discussed that with
12  Mr. Bigelow?
13    A  Not at all.
14    Q  So, the two of you never had any words
15  about whether he was going to fix it or whether he
16  wasn't going to fix it?
17    A  No.
18    Q  So, then you decided to hold your rent?
19    A  Correct.
20    Q  That's the reason you didn't make the rent
21  payments for November and December of 1999; is that
22  correct?
23    A  That is correct.  That is correct.
24    Q  Now, did you let Mr. Bigelow know -- did
25  you leave him a message to that effect, that unless

Page 149

1 he fixed this, that you're going to withhold rent?
2    A  Oh, I can't remember if I did, or not.
3    Q  Did you talk to a lawyer, before you made
4 the decision to withhold rent for November and
5 December of '99?
6    A  No, I can't recall about that.  No, I
7 don't think I did.
8         (Defendants' Exhibit 14 marked
9              for identification.)
10 BY MR. LEWIS:
11    Q  Mr. Curtis, you have Exhibit 14 in front
12 of you --
13    A  Um-hmm.
14    Q  -- correct?
15    A  Um-hmm.
16    Q  Yes?
17    A  Yes.
18    Q  This is a notice to leave the premises.
19 Did you receive this?
20    A  It was on my door.
21    Q  This is dated -- if you look down on the
22 left side, about three-quarters of the way down,
23 it's dated December 20th, 1999.  Do you see that?
24    A  Um-hmm.  Yes, I do.
25    Q  Does that sound like the date that you --

Page 150

1 this would have been left on your door?
2    A  I don't know.  I don't know about that.
3    Q  You have no reason to quarrel with that
4 date, do you?
5    A  Well, I don't know.  I -- I -- I don't
6 know.
7    Q  After you got that 3-day notice to leave
8 the premises, did you contact an attorney about your
9 rights?
10    A  No, I did not.
11         (Defendants' Exhibit 15 marked
12              for identification.)
13 BY MR. LEWIS:
14    Q  Before we get to 15, after you got the
15 3-day notice --
16    A  Um-hmm.
17    Q  -- Exhibit 14 --
18    A  Yes.
19    Q  -- did you call Mr. Bigelow to talk to him
20 about the problem?
21    A  No.  Because, at that time, I was pretty,
22 you know, unraveled about the whole situation,
23 because I didn't even have an idea that I could be
24 evicted.
25    Q  So, the answer to my question is, no, you

Page 151

1 didn't call Mr. Bigelow?
2    A  No.
3    Q  You had the money to pay the two months
4 rent, didn't you --
5    A  Yes, I did.
6    Q  -- because you had gotten approximately
7 $9,700 at the closing of the property?
8    A  Well, I -- I brought the money with me to
9 court.
10    Q  We'll get to that.  The question is, at
11 the time you got the notice to leave the premises,
12 you had plenty of money --
13    A  I had the money --
14    Q  -- to pay the rent?
15    A  -- to pay it.  Yes.
16    Q  Right?
17    A  Yes.
18    Q  Now, let's get to Exhibit 15.  Do you have
19 that in front of you?
20    A  Yes.
21    Q  Have you seen this document before?
22    A  No, I had not.
23    Q  Well, you understand, you were -- a
24 complaint was filed against you for eviction and for
25 money damages?  You understand that, don't you?

Page 152

1    A  I understand that.
2    Q  Right.  Wasn't a complaint served on you
3 at your home?
4    A  It was on my door.
5    Q  Right.
6    A  Yeah.
7    Q  The complaint?
8    A  Not that I know of.  I mean, not this
9 complaint.  Only thing I got was -- I don't know if
10 this is it, or not.  I can't recall if this was it,
11 or not.
12    Q  Well, at some point, you understand that
13 Mr. Bigelow was suing you and requesting eviction
14 and money damages; correct?
15    A  Yes.
16    Q  You just don't know whether or not there
17 is the -- Exhibit 15 is the legal document that you
18 got?
19    A  Right.
20    Q  You got something from the Hamilton County
21 Municipal Court --
22    A  Yes.
23    Q  -- didn't you?
24    A  It was on my door, yes.
25    Q  Do you recall -- this is -- this document,

Page 153

1  Exhibit 15, has got a file stamp on it. Down at the
2  bottom, it's upside down, but it shows
3  December 27th, 1999. Do you see that?
4     A  Yes.
5     Q  Do you believe you received something from
6  the court around the end of December of 1999?
7     A  I can't remember. I -- I think I did.
8     Q  Yeah. You wouldn't quarrel with that time
9  frame, would you, sir?
10    A  Not really. I don't think so.
11    Q  Then, the document that you got from the
12  court, did you read it after you got it?
13    A  Yes.
14    Q  So, then you had an understanding you were
15  being sued for eviction and past rent?
16    A  I knew I had to go to court and I knew he
17  was saying I owed him $700, which I had --
18    Q  And --
19    A  -- right.
20    Q  -- you knew he was suing you for eviction,
21  to get you out of the premises; right?
22    A  Well, I didn't know that he could get me
23  out of the premises. That's what I'm saying.
24    Q  That's a different issue, though.
25    A  Okay.

Page 154

1     Q  You knew, after you got the court
2  document, that he was requesting that you be removed
3  from the premises?
4     A  That's what -- yes, that's what he was
5  talking about. Right.
6     Q  You knew that?
7     A  I knew that that's what he wanted. I
8  didn't know if that was possible.
9           (Defendants' Exhibit 16 marked
10          for identification.)
11 BY MR. LEWIS:
12    Q  Sir, I want to show you what's been marked
13 as Exhibit 16. Have you seen this document before?
14    A  Not that I recall, no.
15    Q  Do you know what a summons is?
16    A  Oh, yes. Yes.
17    Q  So, now do you recognize this document?
18    A  That's what I think I received to go to
19 court.
20    Q  Right.
21    A  Okay.
22    Q  So, you recognize this as the notice that
23 a complaint's been filed. And then this describes,
24 doesn't it, when the court hearing's going to be?
25    A  Right.

Page 155

1     Q  January 18th of 2000; right?
2     A  Right. Right.
3     Q  This was served on you at your residence,
4  wasn't it?
5     A  It was in my mailbox. Okay.
6     Q  Did you read this document when you got
7  it?
8     A  I just knew I had to appear in court.
9     Q  But did you read the document, though,
10 sir, Exhibit 16, when you got it?
11    A  I can't say that I did, or not. I just
12 knew that I had to go to court and he was trying to
13 evict me out of the house.
14    Q  Sir, turn to your prior deposition
15 testimony, would you, page 56. Are you with me
16 there?
17    A  Um-hmm.
18    Q  At line 3, do you remember being asked --
19 this is Mr. Laber questioning you -- Did the
20 magistrate explain to you the escrow procedure in
21 municipal where you pay the money into the court as
22 a bond during the time that you argue your case?
23       Do you remember being asked that question?
24    A  Um-hmm.
25    Q  Yes?

Page 156

1     A  Yes.
2     Q  Then, your answer was: I was not sent
3  that at all. I was sent a letter which I didn't
4  read.
5     A  Right.
6     Q  You gave that answer in your prior
7  testimony?
8     A  Right.
9     Q  That letter which you didn't read, are you
10 referring to Exhibit 16?
11    A  I might have been. I don't know if I was,
12 or not.
13    Q  Because --
14    A  But I knew -- you know, what I was saying
15 is that I knew that I owed him the money, and that
16 any time I went to the court I would have the money
17 with me. So, no, I didn't know that I could -- I
18 needed to do this, or else I wouldn't have brought
19 the money with me.
20    Q  Okay. You did say, in your prior
21 testimony, that you were sent a letter that you
22 didn't read?
23    A  Yes.
24    Q  That was your -- you were referring to a
25 letter from the court; right?

Page 157

1   A  Yes. Yes.
2   Q  That letter that you were referring to in
3  your prior testimony was talking about the escrow
4  procedure in municipal where you pay the money into
5  the court; right?
6   A  Right. Right.
7   Q  If you look at Exhibit 16 --
8   A  Yes.
9   Q  -- at line 2, it says:  If you are
10  depositing rent with the Clerk of Court, you shall
11  continue to deposit such rent until the time of the
12  Court hearing. Do you see that?
13   A  Yes.
14   Q  So, based on this, do you believe that
15  this is the letter you were referring to?
16   A  Yes.
17   Q  This is the letter you said you didn't
18  read?
19   A  More than likely, yes.
20   Q  Right.
21   A  I knew I had to go -- I just paid
22  attention to the court date and stuff.
23   Q  So, Exhibit 16 --
24   A  So, I just assumed it was an eviction
25  thing. And I was just trying to get the court date.

Page 158

1  And I knew I was going to have the money with me.
2   Q  But Exhibit 16 is the letter you were
3  referring to that you didn't read; correct?
4   A  I can't recall. But I'm assuming that's
5  what it is.
6   Q  Now, after you received Exhibit 16 --
7   A  Yes.
8   Q  -- did you contact an attorney?
9   A  No, I did not.
10   Q  Exhibit 16 also says -- in addition to
11  this issue about depositing rent, it says:  You may
12  request a trial by jury. Do you see that, at line
13  4?
14   A  Yes.
15   Q  Did you do that?
16   A  I didn't know I could. I didn't read the
17  letter.
18   Q  Did you request a trial by jury?
19   A  Well, I didn't read the letters. I didn't
20  know I could.
21   Q  Could we get back to the question, please?
22  Did you request a trial by jury?
23   A  I didn't know I could.
24   Q  So, is your answer --
25   A  No, I didn't. No.

Page 159

1   Q  So your answer is no?
2   A  No, because I didn't know I could.
3   Q  It also says:  If you cannot afford a
4  lawyer, you may contact your local Legal Aid or
5  Legal Service office. Do you see that, at line 5?
6   A  Yes.
7   Q  At that point, you had enough money to
8  hire a lawyer, didn't you?
9   A  Well, I didn't read the letter, so I
10  didn't know these things were available to me.
11  That's why I didn't do them.
12   Q  I understand that you're explaining that.
13  My question is, did you have enough money to hire a
14  lawyer, at the time, sir?
15   A  Well, I had money. I -- I -- I didn't --
16  basically, because I didn't know I could be evicted
17  and I thought this was just about the rent -- which
18  I had the money -- so I didn't pay attention to any
19  of these things.
20   Q  Right. Did you have enough money to hire
21  a lawyer at that time?
22      MR. BLESSING:  Go ahead and tell him how
23    much money that is.
24      MR. LEWIS:  Well, that varies.
25      MR. BIGELOW:  Holy cow.

Page 160

1  BY MR. LEWIS:
2   Q  Did you feel that you had enough money to
3  hire a lawyer at that time?
4   A  Well, I wasn't considering hiring a
5  lawyer, so I don't know. You know, I --
6      MR. BLESSING:  The question is, how he
7    felt at the time. And he's --
8      MR. LEWIS:  I just asked him that.
9      MR. BLESSING:  -- excuse me -- how he felt
10    at the time. And he's saying he didn't feel
11    anything about that because he didn't consider
12    it.
13      MR. LEWIS:  Okay. Well, we're -- you
14    know, we're going to be here all afternoon.
15   A  I know. But, basically, that was my
16  feeling. I wasn't trying to hire an attorney. I
17  wasn't trying to -- you know, I didn't read the
18  letter, so certain things I didn't realize were my
19  option.
20   Q  So, it didn't even occur to you to hire a
21  lawyer; is that what you're saying?
22   A  No. That's what I'm saying.
23   Q  After you got this notice, did you call
24  the Municipal Court Clerk about what your options
25  were?

Page 161

1   A  No.
2   Q  This summons also refers to -- if you look
3 down at the -- basically, the last full paragraph of
4 text, it says:  You must serve an answer upon the
5 Plaintiff's Attorney, if any attorney, or upon the
6 Plaintiff within 28 days after the service is made
7 upon you.  Do you see that?
8   A  I see it.
9   Q  Did you serve an answer on Mr. Bigelow?
10   A  No.  I didn't read the letter.  I just --
11 my concern was just about the court date.  You know,
12 that's what my concern was.  So -- because I had the
13 money.  You know, the problem was with the roof.
14 And --
15   Q  Throughout this eviction proceeding, did
16 you file any documents with the court?
17   A  No.
18   Q  Now --
19   A  Except -- well, I don't know.  During this
20 proceeding, I took down -- I took the land contract
21 down there.  And that was the reason we got a
22 continuance for the third time.
23   Q  All right.  We'll talk about that.
24   A  But --
25   Q  You know what filing a document with the

Page 162

1 court means, don't you?
2   A  No, I don't know, other than what you're
3 speaking of right now.
4   Q  You present it to the clerk, and they
5 file-stamp it.
6   A  Oh, no.
7   Q  Did you do -- you didn't file any
8 documents with the court, did you?
9   A  No.
10   Q  Now, this says that the first hearing was
11 set for January 18th of 2000 --
12   A  Right.
13   Q  -- right?  Did you go to court on that
14 day?
15   A  Yes, I did.
16   Q  Did you go with anyone?
17   A  No.
18   Q  Who was there on the 18th?
19   A  Myself and Mr. Bigelow.
20   Q  Was Mr. Meckstroth there?
21   A  No.
22   Q  Was the case called by the magistrate?
23   A  Yes, it was.
24   Q  Describe that to me.  What happened?
25   A  Well, we were called.  I said that I

Page 163

1 hadn't had any legal counsel, or anything, or hadn't
2 talked to anybody and I didn't know, you know,
3 exactly what was going on, because I -- I assumed
4 that I had a land contract, so I didn't know that I
5 could be evicted under that particular document.
6 So, I -- you know, I asked for a continuance.
7   Q  When you first appeared, on
8 January 18th --
9   A  Yes.
10   Q  -- did you bring the land contract with
11 you?
12   A  Yes, I did.
13   Q  Did you show that to the magistrate?
14   A  I think I did.
15   Q  Did you talk to the magistrate about it?
16   A  Yes.  I think I did -- not at that time.
17 They told me -- they continued it because I didn't
18 have any legal counselor or anything.  The second
19 time, I talked to her --
20   Q  About the land contract?
21   A  -- talked about -- yes.
22   Q  But you remember, the first time you went,
23 you at least had the land installment contract with
24 you?
25   A  I think I did.  I'm not sure about that.

Page 164

1 I know the second time I did.
2   Q  But you just don't remember whether you
3 told the magistrate, at the first appearance, that
4 you didn't think you should be evicted because of
5 the land contract?
6   A  Yeah.  But I don't know if I had it with
7 me, or not.  I don't even know if we discussed it.
8 I don't --
9   Q  The first time?
10   A  Yeah.
11   Q  Then you requested a continuance --
12   A  Right.
13   Q  -- on the 18th?
14   A  Right.
15   Q  Why'd you tell the magistrate you wanted a
16 continuance?
17   A  Well, I wanted to try to get some kind of
18 legal assistance or try to figure out what I was
19 supposed to be doing.
20   Q  What did you tell the magistrate about why
21 you wanted a continuance?
22   A  Because I didn't have any -- I hadn't
23 talked to anybody or had any kind of legal counsel.
24   Q  Did you tell the magistrate you wanted to
25 talk to legal counsel?

Page 165

1   A  Well, I wanted to try to get some kind of
2  legal counsel.
3   Q  Did you tell the magistrate that you
4  wanted to talk to a lawyer?
5   A  Yes, I think I did.
6   Q  After the 18th, did you contact a lawyer?
7   A  Well, I talked with, basically, just a --
8  you know, a -- I just discussed some things with a
9  lawyer.  I never actually tried to contract a
10  lawyer, or anything like that.
11   Q  So, after January 18th, did you contact a
12  lawyer to ask for representation in this eviction
13  proceeding?
14   A  No.
15   Q  After January 18th, did you contact
16  Mr. Bigelow to talk about this rent dispute?
17   A  No, I just waited until our next court
18  date.
19   Q  So, the next court date, then, was when,
20  approximately?
21   A  I don't know exactly when it was.  But
22  whenever it was, that's when I brought the land
23  contract, copy of the land contract.
24          (Defendants' Exhibit 17 marked
25          for identification.)

Page 166

1  BY MR. LEWIS:
2   Q  Mr. Curtis, you have Exhibit 17 in front
3  of you, do you?
4   A  Yes.
5   Q  That is an order for forcible entry and
6  detainer.  If you look down at the bottom, it's
7  dated February 1, 2000.  Do you see that?
8   A  Um-hmm.
9   Q  Yes?
10   A  Yes.
11   Q  Does that refresh your recollection, in
12  terms of when you were in court next?
13   A  Not really.  But I understand this -- I
14  understand the document.  I don't understand --
15   Q  I mean, that would have been about two
16  weeks after January 18th --
17   A  Okay.
18   Q  -- right?  Does that sound about right to
19  you, that the case was continued for a couple of
20  weeks, approximately?
21   A  I think so.
22   Q  So this is your second -- February 1 is
23  your -- is the second appearance on the eviction;
24  correct?
25   A  That's correct.

Page 167

1   Q  This is the time you're talking about you
2  remember talking to the magistrate about the land
3  installment contract?
4   A  That is correct.
5   Q  You're sure you had the contract with you
6  on February 1?
7   A  Yes.
8   Q  Now, it says up there -- see that top
9  column, where it's checked, EO23?
10   A  Um-hmm.
11   Q  Yes?
12   A  Yes.
13   Q  It says, Case called:  Trial had.
14   A  Yes.
15   Q  Do you see that?  Now, was there -- well,
16  first of all, who was there?  Who do you remember
17  being there on February 1?
18   A  Mr. Bigelow and myself.
19   Q  What about Mr. Meckstroth, was he there?
20   A  No.
21   Q  Was it the same magistrate as you had the
22  first time?
23   A  No.
24   Q  Different magistrate?
25   A  Yes.

Page 168

1   Q  Was there testimony taken?
2   A  Yes, there was.
3   Q  So, Mr. Bigelow testified?
4   A  Yes.
5   Q  And you testified?
6   A  Yes.
7   Q  Both of you were put under oath; right?
8   A  Yes.
9   Q  Did anybody else testify other than the
10  two of you?
11   A  Not that I know of.
12   Q  You explained to the magistrate that you
13  had this land installment contract --
14   A  Correct.
15   Q  -- right --
16   A  Correct.
17   Q  -- and that you didn't feel you should be
18  evicted --
19   A  That is correct.
20   Q  -- because of that?
21   A  Correct.
22   Q  Did you also talk about the animals in
23  your home and the roof hadn't been fixed?
24   A  I'm pretty sure, yes, I did.
25   Q  So, all the issues -- the issues that you

Page 169

1 had with Mr. Bigelow --
2     A   Yes.
3     Q   -- the problems that you had with him --
4     A   Yes.
5     Q   -- you raised those at that hearing,
6 didn't you?
7     A   Pretty -- I think so.  I think so.
8 Um-hmm.
9     Q   Well, were there any issues or problems
10 that you had with Mr. Bigelow that you didn't tell
11 the magistrate about at that hearing?
12     A   I can't remember.  I -- basically, I
13 was -- my whole thing was that I assumed -- my
14 assumption was with the land contract.  And that --
15 I'm pretty sure I told her that I had the money with
16 me, you know, and what the problems were.
17     Q   Right.  You knew that was your day in
18 court, right, that was the time that you were going
19 to tell the court what the dispute was about --
20     A   Pretty much so, yes.
21     Q   -- right?  As you sit here today, can you
22 think of any problems or issues that you had with
23 Mr. Bigelow, that you didn't tell the magistrate
24 about on February 1?
25     A   I can't remember by -- I mean, at that

Page 170

1 time.  I mean, basically what I stated were the
2 things that I thought, you know, were true.
3     Q   Right.  The land contract; right?
4     A   Right.
5     Q   You shouldn't be evicted?
6     A   Right.
7     Q   And he didn't do the work on the roof that
8 he was supposed to do?
9     A   Yeah, that's why I withheld the money.
10     Q   On Exhibit 17 --
11     A   Yes.
12     Q   -- that -- you signed that, didn't you?
13     A   Yes.
14     Q   That's your signature down there, at the
15 bottom?
16     A   Yes.
17     Q   What do you remember the magistrate saying
18 after the parties testified?
19     A   That there was a question about the --
20 well, first of all, I said there was a land
21 contract.  Mr. Bigelow said there wasn't.  The
22 magistrate questioned who Mr. Bigelow, the Fourth,
23 or whoever it was on the contract.  Then the
24 magistrate said that -- she asked some questions
25 about this, and that he should bring an attorney the

Page 171

1 next time that we were going to go to court, because
2 she had questions about whether or not this land
3 contract was valid.
4     Q   All right.  Well, was it your
5 understanding, as of February 1 -- if you look at
6 that first paragraph there --
7     A   Um-hmm.
8     Q   -- it says:  Defendant found guilty as
9 charged.  It's considered the Plaintiff have
10 restitution of the premises as described in the
11 statement of claim.  Do you see that?
12     A   Oh, I didn't pay any attention to that.  I
13 don't know if I paid any attention to this, or not.
14     Q   Well --
15     A   This was the last -- I think this was the
16 last one.  I don't know if this was the one before
17 that, or not.
18     Q   Well, was it your understanding, as of
19 February 1, that the magistrate granted the eviction
20 and that you were being --
21     A   Well, this is --
22     Q   Wait, let me finish.
23     A   What I'm trying to say is, this is not the
24 one for the second hearing.
25     Q   What do you mean, it's not the one for the

Page 172

1 second hearing?
2     A   I don't think so.  I don't think so.  I
3 think this is the one for the third hearing.  This
4 is not the one for the second hearing.
5     Q   How many hearings did you go to?
6     A   Three.
7     Q   Okay.  Well, we know the first one was set
8 for January 18th --
9     A   Um-hmm.
10     Q   -- right?
11     A   Right.
12     Q   And this is dated February 1?
13     A   Okay.  Then we had another one after that.
14     Q   Okay.  Well, we'll get to that.  We're on
15 number two right now.  Okay?
16     A   Oh, okay.
17     Q   So, Exhibit 17 here, was it your
18 understanding that the magistrate granted the
19 eviction and ordered you out?
20     A   No --
21     Q   No?
22     A   -- because we had a third hearing.
23     Q   Okay.  So, what did the magistrate do on
24 February 1?
25     A   I -- he can -- at the second hearing, they

Page 173

1 continued it for the third hearing.
2   Q  So, it's your understanding, the
3 magistrate didn't do anything on February 1?
4   A  That was my understanding.  I was -- I
5 was -- it was continued to the third hearing.
6     MR. BLESSING:  Excuse me, Gary.  I
7   think -- I don't know, intentionally or
8   unintentionally, you're assuming that the
9   second hearing was on February 1.
10    MR. LEWIS:  Well, I think that's what he
11  said.
12    MR. BLESSING:  If you could ask him that
13  question, just to clear things up, that might
14  shed some light if he is testifying it was on
15  February 1, or not.
16  A  Yeah.  I don't know if the second hearing
17 was.  But I know that we had three hearings.
18  Q  All right.
19  A  At the third hearing, that's when
20 something like this happened --
21  Q  Something like?
22  A  -- not the second -- not the second
23 hearing.
24  Q  Are you saying that there was a hearing
25 between January 18th and February 1?

Page 174

1   A  I assume it was.  I don't know.
2   Q  Do you know?
3   A  No, I -- I can't remember.  I know we had
4 three hearings.
5   Q  At the third hearing, did the magistrate
6 order the eviction and order you out of the
7 premises?
8   A  Yes.
9   Q  You've already said, at the second hearing
10 you talked about the land installment contract.  Is
11 that still accurate?
12  A  That is correct.
13  Q  Did you talk about the land contract at
14 the third hearing, too?
15  A  Yes.
16  Q  Do you know what day it was that the
17 magistrate granted the writ and ordered you out?
18  A  No, I do not.
19  Q  Did you have the money -- at some point,
20 did you have the money in court with you?
21  A  Yes, I did.
22  Q  Was that hearing two, or three, or what?
23  A  I had the money there at all three.
24  Q  Um-hmm.
25  A  At the third one, I told the judge that I

Page 175

1 had the money there with me and that I was willing
2 to pay the money.  Mr. Bigelow refused the money.
3   Q  Did you tell the magistrate, at hearing
4 two, that you had the money with you?
5   A  I think so.  I had the money.
6   Q  How much money did you have with you?
7   A  I had the $700 that I owed for the rent.
8   Q  Well, by now we're into February of 2000.
9   A  Well, what I'm saying is, the original
10 thing was for $700.
11  Q  Right.
12  A  That was the money that I was bringing to
13 him for that amount of money that I owed.
14  Q  Right.  So you had the rent for November
15 and December of 1999 --
16  A  Right.  That was --
17  Q  -- with you; right?
18  A  That was the money that I had been
19 holding.
20  Q  Yeah.  Had you made any payments for
21 January and February?
22  A  Well, I --
23  Q  Let me finish now.  Had you made rent
24 payments to Mr. Bigelow for January and February of
25 2000?

Page 176

1   A  I hadn't made any payments to him, at all.
2   Q  So, the money that you brought with you
3 was for November and December?
4   A  The money that I was being --
5   Q  November and December of '99?
6   A  Yes.  The money that I was being evicted
7 for, that's the money I kept with me.
8     (Defendants' Exhibit 18 marked
9     for identification.)
10 BY MR. LEWIS:
11  Q  Sir, you're being shown Exhibit 18.  Do
12 you see that?
13  A  Um-hmm.
14  Q  In bold type down there, it says:
15 Judgment was rendered on February 1, 2000 that the
16 plaintiff have restitution of said premises.
17    Do you see that?
18  A  Um-hmm.
19  Q  Yes?
20  A  Yes.
21  Q  Then, the next paragraph:  You are
22 therefore hereby commanded to cause the defendant to
23 be removed from said premises, et cetera.
24    Does this refresh your recollection about
25 when the order went on that you were to be removed

Page 177

1 from the premises?
2   A  Yes.
3   Q  According to this, it was February 1;
4 correct?
5   A  Okay.  Okay.  But I'm saying, I went -- I
6 went -- what was happening is that I had three court
7 dates.
8   Q  I understand.
9   A  Okay.
10  Q  You believe that between -- you didn't
11 have one -- you didn't have another court date after
12 February 1, did you, when --
13  A  I'm not --
14  Q  -- when you were ordered out?
15  A  No.  I don't know whether it was after --
16 I don't think so.
17  Q  Right.  You think there was one between
18 January 18th and February 1?
19  A  I'm pretty sure, yes.
20  Q  All right.  But it's clear from this
21 that -- and this is signed by Judge Kenney -- that
22 you were ordered out of the premises.  And he signed
23 this on February 1, 2000; right?
24  A  Well, the -- the lady who -- it was a lady
25 judge who ordered the eviction.  It wasn't a man.

Page 178

1 So I don't know -- so, James Kenney, I don't know
2 anything about that.
3   Q  Ellen Wolf?  Ellen Wolf, does that name
4 ring a bell with you?
5   A  That's probably who it was.
6   Q  You believe that on February 1, Ellen Wolf
7 made the determination that you were going to be
8 evicted?
9   A  I don't know if it was February 1, or not.
10 I know she made the determination.
11  Q  Okay.  Was it on or about February 1?
12  A  I assume.  I don't know.  See, I don't
13 know -- what I'm saying is, I don't know about the
14 James Patrick.  I know about the -- I know the lady
15 who --
16  Q  Right.
17  A  -- it was a female judge, and -- so, I
18 don't know anything about James Patrick.
19  Q  Ellen was her first name, was it?
20  A  I think.  I don't know what her name was.
21 I know she was a lady.  I know, probably her name
22 wasn't James.
23  Q  Right, it wasn't.
24  A  Okay.
25  Q  Now, when the eviction was ordered, did

Page 179

1 you understand that it was scheduled for
2 February 9th of 2000?
3   A  I think so, yes.
4   Q  So, when you left the last court hearing,
5 whatever date that was --
6   A  Um-hmm.
7   Q  -- you knew that you were scheduled to be
8 evicted on February 9th of 2000?
9   A  Yes.
10  Q  Now, did you contact a lawyer between --
11 before February 9th of 2000?
12  A  No.  No.
13  Q  Did you contact Mr. Bigelow before
14 February 9th?
15  A  Well, I --
16  Q  Listen now.  Did you contact Mr. Bigelow
17 before February 9th of 2000?
18  A  No.  But I had already talked to him at
19 the court, and he refused the money.
20  Q  He refused the $700?
21  A  He refused any money.
22  Q  Well, how much were you offering him at
23 the time?
24  A  I was offering -- I said that I had the
25 money for the past due rent.

Page 180

1   Q  The 700?
2   A  Right.  He refused any money.  He also
3 said there was no land contract.
4   Q  Just so we're clear, there never was a
5 land contract that was signed by you, was there,
6 sir?
7   A  I assumed that there was.  I assumed that
8 all those things were signed.
9   Q  Did you ever sign a land installment
10 contract?
11  A  I signed everything that was put before
12 me.  I assumed that was one of the documents.
13  Q  All right.  Can you show me a land
14 installment contract that bears your signature?
15  A  Well, I'm saying, that was the one that --
16 that was the land contract.  When I received a copy
17 of it, that's what I got.
18  Q  I know you got it.
19  A  And, so, I don't know -- you know, it was
20 my assumption that all those things were signed.
21  Q  Right.  So, you assumed you signed a land
22 contract; is that your testimony?
23  A  Yes.  Yes.  I also signed something else.
24 I also signed some -- probably some other papers,
25 other than the ones that were in there.