Page 181

1    Q  Now, February 9th comes along and the
2  eviction is scheduled.  You were -- did you stay at
3  Fairfax between that last court appearance and
4  February 9th?
5    A  Yes.
6    Q  Did you do anything to prepare for the
7  eviction, in terms of getting your stuff out?
8    A  Well, we couldn't get a truck.  We were
9  trying to get a truck.  And it was quite a bit of
10  stuff.  I just didn't think there was any way
11  possible to get all that kind of stuff out of there.
12  I mean, I had had the house since '60 -- I mean, my
13  family had had the house since '63.  So there were
14  numerous amount of items, including antique chest
15  and all kinds of stuff, antique silverware.  It was
16  just a bunch of stuff there.
17    Q  Did you take any of your property out of
18  Fairfax, between the last court appearance and
19  February 1?
20    A  No.
21    Q  Now, you were at the premises on the
22  morning of February 9th, weren't you?
23    A  Yes.
24    Q  You started a fire?
25    A  Yes.

Page 182

1    Q  Tell me what you did and when.
2    A  I think it was sometime that morning, and
3  stuff, I was -- I went down to light the furnace.
4  And there were some boxes sitting next to the
5  furnace.  What happened was that I lit the furnace,
6  I still had the lit match, and I tossed it toward
7  the boxes.
8    Q  With the intention to start a fire?
9    A  I had no idea whether it started, or not.
10    Q  Why did you toss a lit match toward boxes?
11    A  Because I was pretty upset about having to
12  leave the property that I had had since '63,
13  especially when I thought that I didn't -- I had
14  gone through procedures that wouldn't have allowed
15  that.
16    Q  So you were upset --
17    A  Yes.
18    Q  -- that you were being evicted --
19    A  Yes.
20    Q  -- right?  And you started the fire at
21  Fairfax because you were upset; isn't that accurate?
22    A  That's correct.
23    Q  This was no accident?
24    A  No, it was an accident.  I mean, it
25  wasn't -- in other words, I didn't -- there was no

Page 183

1  forethought behind it.
2    Q  All right.
3    A  It happened in an instant.  I didn't plan
4  to start a fire.
5    Q  But, in that instant when you had the lit
6  match, you threw that match with the intention,
7  then, to start a fire?
8    A  Well, I didn't know whether it would start
9  it, or not.  I threw it toward the boxes and I left.
10    Q  And you threw it toward the boxes, as you
11  told me, because you were upset; right?
12    A  Right.
13    Q  What did you think was going to happen?
14    A  I had no idea.  I didn't know if it would
15  start, or not.  I had no idea.
16    Q  Well, why did you take your dog out of the
17  house before you tossed that match?
18    A  Well, I was leaving the house anyway, to
19  go look for a truck.
20    Q  Didn't you take the dog out of the
21  premises because you didn't want the dog to get
22  burned in the fire?
23    A  No.  I took it out because we were going
24  to my uncle's to look for a truck.
25    Q  You were interviewed by the fire

Page 184

1  investigators for the City of Cincinnati, weren't
2  you, sir?
3    A  Yes.
4    Q  Did you tell the fire investigator the
5  truth when you spoke to him?
6    A  Yes.
7    Q  Before you started this fire, you didn't
8  take any of your personal property out of the
9  premises, did you?
10    A  No.
11    Q  Now, approximately what time was this,
12  when you started this fire in the basement?
13    A  It was sometime that morning.
14    Q  Can you ballpark it for me?
15    A  No.  No, it was just that morning.
16    Q  Then, what, did you take your dog
17  somewhere?
18    A  We went to my uncle's.
19    Q  How long did you stay at your uncle's?
20    A  Well, we went over there to try to see if
21  I could get any kind of truck, or anything like
22  that.  And -- and I wasn't successful, so we walked
23  back to the house.
24    Q  So, you came back to the house.  What time
25  did you get back to the house?

Page 185

1  A  We got back at that afternoon or
2 evening -- that afternoon.
3  Q  About what time; do you remember?
4  A  No, I don't.
5  Q  Now, when you got back, tell me what you
6 saw.  Was the fire department still there?
7  A  No.  No.  I was walking down the street,
8 and a lady said, you need to get down there.  I saw
9 the mail lady.
10  Q  So, the fire was put out by the time you
11 came back?
12  A  Yes.
13  Q  Was Mr. Bigelow there when you got back?
14  A  Yes, he was.
15  Q  Did you talk to Mr. Bigelow about what had
16 happened?
17  A  No.  He -- I asked him -- I started inside
18 the gate, and he told me I couldn't come in there.
19  Q  Did you tell Mr. Bigelow that you had
20 started the fire?
21  A  No --
22  Q  Isn't it true --
23  A  -- I asked him what happened.
24  Q  Right.  You said, what happened --
25  A  Right.

Page 186

1  Q  -- pretending that you didn't know what
2 happened?
3  A  Because I really didn't.  I didn't know if
4 those things had started the fire, or not.  I just
5 threw the match towards the boxes.
6  Q  If you look at -- look at Exhibit 4 again,
7 would you, please, sir.  You have your hand on it.
8 Page 713.
9  A  Um-hmm.
10  Q  This is the statement that you gave to the
11 fire investigator for the City of Cincinnati; isn't
12 that right?
13  A  Yes.
14  Q  This is a tape-recorded statement, too;
15 right?
16  A  Yes.
17  Q  Your lawyer's got a copy of this tape;
18 correct?
19  A  Yes.
20  Q  You said to the investigator, about the
21 middle of the page:  There was stuff there that was
22 already stocked for storage and everything.  And I
23 just put a couple of the matches close to the boxes.
24  A  Right.
25  Q  Do you see that?

Page 187

1  A  Right.
2  Q  Is that what you told them?
3  A  Right.  I didn't put it.  I threw it
4 toward a couple of the boxes.
5  Q  Well, did you say to him, sir, I just put
6 a couple of the matches close to the boxes?
7  A  No, I actually told him that I just tossed
8 the matches over there toward the boxes.  I didn't
9 put them there.
10  Q  Oh, so this is inaccurate, this
11 transcript?
12  A  That's correct.
13  Q  You didn't say this?
14  A  Well, I actually -- not put them, but I
15 tossed them.  That's what I meant.
16  Q  Did you say to the investigator, I just --
17  A  I can't remember whether I said that.
18  Q  Let me finish my question.  Did you say to
19 the investigator, I just put a couple of the matches
20 close to the boxes?
21  A  That's what I meant.  That's what I meant.
22 I had tossed them over there, not put them there.  I
23 mean, I didn't sit them there.  What I was saying is
24 that I had tossed them there, not put -- not laid
25 them there.

Page 188

1  Q  Try to listen to my question.  Did you say
2 to the investigator, as this transcript indicates,
3 page 713:  I just put a couple of the matches close
4 to the boxes.  Did you say that to him?
5  A  Well, I assumed that's what I told him.
6 But that's not what I meant.  I didn't put it there.
7 I tossed it there.
8  Q  Then, page -- look at page 714, would you,
9 please, sir --
10  A  Yes.
11  Q  -- about two-thirds of the way down.
12  A  Um-hmm.
13  Q  Did you say to him:  No, it was a total
14 spontaneous thing, you know I was there, I looked
15 and I just did it, I was just that mad.
16     Did you say that to him?
17  A  Yes.
18  Q  Then, down at the end of that page, the
19 last line -- actually, the last two lines:  Well,
20 I'm just trying to tell, there was a reason behind
21 it, I wouldn't have done it, I've never done it
22 before, there was a real reason behind it just
23 taking me over.
24     Did you say that to him?
25  A  Um-hmm.

Bryant, et al. v. Bigelow, et al.    CondenseIt!    Depo of Harry Curtis

Case 1:02-cv-00006-SAS    Document 42-6    Filed 10/01/2003    Page 3 of 61

Page 189

1  Q  Yes?
2  A  I was angry.  Yes.
3  Q  Then, down at page -- down at 715, the
4  second to last paragraph, did you tell him:  No, the
5  house was totally empty, you know, I even took the
6  dog, so just in case, I didn't know, but I thought
7  Lord that's a dog.
8     Did you say that to him?
9  A  Yes.  Yeah, because I didn't know whether
10  it was going to catch a fire, or not.  My dog, I
11  wouldn't leave in there.
12  Q  Right.  So, just in case, you didn't want
13  the dog to get hurt by the fire; right?
14  A  I didn't want anybody to get hurt.
15  Q  Right.  But you didn't want your dog to be
16  hurt; right?
17  A  Well, I was going to take my dog.
18  Q  You didn't want your dog to get hurt;
19  right?
20  A  Right.
21  Q  That's why you took the dog?
22  A  No.  I wanted to take the dog, anyway.
23  Q  Now, sir, you've made a claim in this case
24  that your personal property was damaged, you've got
25  a loss of personal property.

Page 190

1  A  Yes.
2  Q  What's the value of that personal
3  property?
4  A  I don't know the actual value.  I know it
5  was quite a bit.  I have no idea what -- there were
6  quite a few things.
7  Q  Right.  If you look at -- and you've
8  presented us with a list, haven't you, if you look
9  at page 708 in Exhibit 4?
10  A  Um-hmm.
11  Q  Yes?
12  A  Yes.
13  Q  Is that the list of property that you
14  claim was lost?
15  A  As best as I can remember, yes.
16  Q  Was any of that property burned up in the
17  fire?
18  A  No.
19  Q  None of it was?
20  A  No.  No.  I was in the house, and the
21  first and second floors were not damaged.  No.
22  Q  So, what happened to all this property?
23  A  I have no idea.
24  Q  Well, why are you blaming my client for
25  the loss of this property?

Page 191

1  A  Because it was never outside.
2  Q  None of this property was outside?  All
3  this property was in the house when you started the
4  fire?
5  A  Yes.
6  Q  It was?
7  A  Yes.
8  Q  Then, you never got it back?
9  A  No.
10  Q  So, why are you claiming my client's
11  responsible for it?
12  A  Because it was never outside.
13  Q  Well, you're not claiming my client took
14  any of this property, are you?
15  A  The neighbors next door watched my
16  property, and these weren't put outside.  I
17  don't know where it went.
18  Q  Are you claiming that my client took any
19  of these items of property that you've got itemized
20  beginning on page 708?
21  A  Well, I don't know where the property
22  went.  I was never given the property.  I was never
23  allowed to get the property.  The property was never
24  set outside.
25  Q  When you went back to the property --

Page 192

1  A  Yes.
2  Q  -- you indicated before, the fire
3  department was gone; right?
4  A  Yes.
5  Q  You're saying that there was no -- there
6  weren't any items of your property out on the
7  street, sidewalk, or front yard?
8  A  There was no property on the street.
9  Mr. Bigelow was still there.  And the property that
10  was set out was in the yard.
11  Q  You're saying none of the items that
12  appear on this itemization were out in the yard?
13  A  That is correct.
14  Q  So, what did you do with the property that
15  was out in the yard?  Did you retrieve that?
16  A  The property that was out in the yard, I
17  retrieved.
18  Q  What was that?  Tell me about that.
19  A  That was a bedroom set, a couch, some
20  clothes, some lamps -- a couple of lamps, and a
21  dresser -- no, that was -- that was set outside the
22  day I went to pick up my -- see, my table -- see, my
23  table, cocktail -- I mean, my dining room table and
24  my microwave, and everything, were still inside the
25  house when we went there.  A friend of mine and I

Page 193

1 went there a couple weeks later, several weeks, and
2 these things were still inside the house. We were
3 allowed to get them by the cleanup crew. There were
4 several things still there inside the house,
5 curtains -- in fact, we took the curtains from the
6 windows and washed them and used them in our
7 apartment.
8      So, I was actually allowed to go inside
9 the house and see what was in the house and the
10 damage that was done there. And there was no damage
11 done to the first and second floor, because I walked
12 up the steps to go to the second floor. There was a
13 chest there and there were some other things there.
14 And I picked up my dining room table, which was
15 still inside the house, and also my microwave and
16 stand, which was still inside the house.
17      Q  So, you looked at the property, then, a
18 couple weeks later?
19      A  That is correct.
20      Q  You're saying that there was no damage to
21 the first and second floor?
22      A  It was minimum damage to the first and
23 second floor.
24      Q  Well, tell me what you mean by minimum.
25      A  In other words, there were -- none of the

Page 194

1 property that was in those areas would have been
2 burned, because the rooms themselves were not
3 burned.
4      Q  So, there was no -- for example, was there
5 smoke damage on the first floor?
6      A  There was smoke damage, um-hmm.
7      Q  What about the condition of the plaster on
8 the walls? These were plaster walls, weren't they?
9      A  Oh, yes. They were -- I mean, they were
10 still the -- the -- they was just smoke damage. I
11 mean, there -- the -- the walls still had the paper
12 on them. I went upstairs. And I had wedding gifts
13 in the closet. And the paper for the wedding gifts
14 were laying on the floor. So, somebody had opened
15 the gifts and the gifts were not there. The wedding
16 paper from the gifts were still on the floor.
17      Q  All the windows were still intact in the
18 house?
19      A  Some of the windows were broken.
20      Q  How many windows were broken?
21      A  I didn't count.
22      Q  Were any windows boarded up?
23      A  When I went in there, I can't remember
24 that part, or not.
25      Q  So, you remember some windows being

Page 195

1 broken, but you don't remember how many?
2      A  No.
3      Q  How'd you get in the house again, a couple
4 weeks later? Who let you in?
5      A  I went over there -- I went over there to
6 see if any of my property was there. Because,
7 before that time, the place was boarded up. When I
8 went over there, there were gentlemen working on the
9 house. When I went inside to find out if there was
10 any property there, there were people there. I told
11 them the situation. They said there was still some
12 things inside the house.
13      Q  Okay. You don't have any idea, this
14 itemization that's in here -- you don't have any
15 idea what the total value of these items is;
16 correct?
17      A  I'm not sure. It was quite a bit.
18      Q  Well, what do you mean by quite a bit?
19      A  Well, just quite a bit. I mean, I
20 couldn't get a ballpark figure. I mean, like the
21 silverware set was over a hundred years old. I
22 would have no idea of what that was worth.
23      Q  Okay.
24      A  There were more than one silverware set
25 there. I had wedding -- like these glasses, these

Page 196

1 Indian glasses, they were antique. I had no idea as
2 far as dishes. There -- I had a whole set of dishes
3 there that was never used, from my wedding. They
4 were $195 a set. I had a set of 8 there. The only
5 thing that was there was one salt and pepper shaker.
6 I never used them.
7      I had the tape things -- over a hundred
8 tapes. I had tower speakers. Each one of them held
9 close to a hundred tapes. We had a weight set, all
10 these things.
11      And from the condition of the house, they
12 weren't destroyed by fire, because the house itself
13 wasn't destroyed by fire. So, I have no idea where
14 any of this property was --
15      Q  So, you really --
16      A  -- or where it went.
17      Q  After the fire, you really have no idea
18 what happened to the property or who took it; right?
19      A  I know I wasn't able to get it.
20      Q  But you have no idea what happened to it
21 or who took it?
22      A  Well, I know it wasn't set outside and I
23 wasn't able to get it. That's what I know.
24      Q  You don't know anything more than that?
25      A  I know that.

Page 197

1  Q  Right. But you don't know any more than
2  that?
3  A  Yeah. I know it wasn't set outside and I
4  wasn't able to get it.
5  Q  When you went back in a couple weeks
6  later, did you take any photographs of the inside of
7  the property?
8  A  No. But I wasn't there alone. I mean,
9  I --
10  Q  I'm just asking you if you took
11  photographs.
12  A  No. But I was able to walk up and down
13  the steps.
14  Q  So, if somebody did take photographs right
15  after the fire, that would show the fire damage,
16  wouldn't it?
17  A  Well, I -- I would assume. I wouldn't
18  know. It would show the smoke damage.
19  MR. LEWIS: Give me about five. I'm
20  almost done.
21  (Brief recess taken.)
22  MR. LEWIS: Back on the record.
23  BY MR. LEWIS:
24  Q  Mr. Curtis, just -- one question on this
25  roof area that wasn't repaired, we talked about

Page 198

1  earlier.
2  A  Yes.
3  Q  You know what I'm talking about? Do you
4  know what a soffit is?
5  A  I have no idea.
6  Q  But the area that you're talking about was
7  like an eave that was under the roof, wasn't it?
8  A  It was a section that was under the roof.
9  Q  It wasn't part of what had been replaced
10  earlier with the felt paper and the asphalt
11  shingles?
12  A  No.
13  Q  It really wasn't part of the roof, it was
14  under the roof, wasn't it?
15  A  It was under the roof. It was part of the
16  house that was supposed to be repaired. That's all,
17  as far as I know.
18  Q  As a result of the fire, you were
19  indicted, weren't you?
20  A  I admitted to the fire.
21  Q  You were indicted?
22  A  Yes.
23  Q  You were indicted for aggravated arson?
24  Does that sound familiar to you?
25  A  Attempted aggravated arson, I think.

Page 199

1  Q  You were indicted for aggravated arson --
2  A  Okay.
3  Q  -- right?
4  A  I think, yes.
5  Q  Then you entered a guilty plea later on?
6  A  To attempted aggravated arson, right.
7  (Defendants' Exhibit 19 marked
8  for identification.)
9  BY MR. LEWIS:
10  Q  You have in front of you Exhibit No. 19.
11  Your judge was Judge Dinkelacker.
12  A  Yes.
13  Q  Does that sound familiar to you?
14  A  Yes.
15  Q  Right?
16  A  Um-hmm.
17  Q  Do you remember being in court on May
18  26th -- May 22nd of 2000, for sentencing?
19  A  Yes.
20  Q  You had pled guilty to attempted
21  aggravated arson; correct?
22  A  Correct.
23  Q  When you pled guilty, you had legal
24  counsel; correct?
25  A  I had a court-appointed attorney, yes.

Page 200

1  Q  Right. But you had the benefit -- you had
2  the advice of legal counsel --
3  A  Yes.
4  Q  -- and representation of legal counsel,
5  when you entered your guilty plea; correct?
6  A  Correct.
7  Q  Now, this says that -- in the second
8  paragraph -- that the court's sentence was
9  confinement six months in the Hamilton County
10  Justice Center.
11  A  Um-hmm.
12  Q  Do you see that?
13  A  Yes.
14  Q  Did you serve that six months?
15  A  I don't know if I did, or not. I think I
16  served four of it, or something like that. I don't
17  know if I served all six or -- I think -- yes, I
18  did. I'm not sure. I think I was allowed to get
19  out because I was work -- you know, if -- I got
20  work, or something like that.
21  Q  Well, do you know whether you did six
22  months, or not?
23  A  I'm not sure if it was six or four. I'm
24  not sure.
25  Q  Did your lawyer file something with the

Page 201

1 court to reduce your sentence?
2    A  Yes, I think so.  He did.
3    Q  He did?
4    A  Yeah.
5    Q  Did you get a work release, or something
6 to that effect?
7    A  Something to that effect, yes.
8    Q  But you believe you served four months?
9    A  I think so.
10    Q  You're still on probation, aren't you?
11    A  Yes, I am.
12    Q  This document, 19, also indicates that
13 you're to make restitution as determined by the
14 probation department --
15    A  Right.
16    Q  -- right, and defendant not to have
17 contact with prosecuting witness?  Do you see that?
18    A  Yes.
19    Q  Who'd you understand the prosecuting
20 witness to be?
21    A  Oh, I guess, Mr. Bigelow.
22    Q  So, the court's ordered you not to have
23 contact with him?
24    A  Right.
25    Q  Now, restitution was determined by the

Page 202

1 probation department, wasn't it, sir?
2    A  Well, restitution was initially, because
3 of the suit, determined to be $15 a month.  And
4 that's what I was paying at one time, plus the
5 costs.
6    Q  What did the probation department
7 determine your restitution to be?
8    A  Well, at the time, it was $15 a month,
9 pending the outcome of this, because there was a
10 question about that other money.  So, you know --
11 that's what I was paying.  I was paying the $15 a
12 month.
13    Q  I'm not asking what you were paying per
14 month.  What did the probation department determine
15 your total restitution amount to be?
16    A  They determined it to be $68,000, I think,
17 or something like that.
18    Q  Actually, it's $67,420; isn't that right?
19    A  Okay.
20    Q  Does that sound right?
21    A  Approximately that, yes.  I mean, I --
22 approximately $68,000.
23    Q  Okay.  You were fined $100 --
24    A  Um-hmm.
25    Q  -- right?

Page 203

1    A  Yes.
2    Q  The court costs in the criminal proceeding
3 were $413.90.
4    A  Um-hmm.
5    Q  Does that sound right to you?
6    A  Yes.
7    Q  Then you were also required, as part of
8 the terms and conditions of probation, to pay
9 $2,849.75 a month for 24 months; right?
10    A  That didn't start until -- that didn't
11 start at the time of the trial, itself.  That was
12 reinstituted almost a year-and-a-half after I was on
13 probation.  I was paying $15 a month.
14    Q  All right.  Well -- so you started out
15 paying $15 a month?
16    A  Right.
17    Q  At some point, the restitution order and
18 the terms of the restitution were that you would pay
19 2,849.75 per month for 24 months; right?
20    A  No, that -- that was the -- that's what
21 was said.  But I was -- the agreement was that I pay
22 $100 a month.
23       (Defendants' Exhibit 20 marked
24       for identification.)
25 BY MR. LEWIS:

Page 204

1    Q  Sir, do you have Exhibit 20 in front of
2 you?
3    A  Surely I do.
4    Q  Now, when you were sentenced -- when you
5 entered your guilty plea, you were referred down to
6 the probation department, weren't you --
7    A  Correct.
8    Q  -- for a pre-sentence investigation?
9    A  Correct.
10    Q  You were interviewed by the probation
11 department?
12    A  Correct.
13    Q  Anne Valerius is your probation officer?
14    A  No, she was not my original probation
15 officer.
16    Q  Is she your probation officer now?
17    A  Yes.
18    Q  You were asked -- well, you were presented
19 with rules of probation; correct?
20    A  For the second time, yes.
21    Q  Okay.  You signed rules of probation
22 agreeing to certain conditions, didn't you?
23    A  Yes.
24    Q  Was one of those rules -- do you see --
25 you have Exhibit 20 in front of you --

Page 205

1    A   Um-hmm.
2    Q   -- those rules that you signed as
3  conditions of probation?  Do you see Rule 10 there?
4    A   Yes.
5    Q   That says:  I will make regular payments
6  as instructed.  Estimated total amount owed
7  $68,393.90.  Probation fees 600.  Restitution
8  67,420 --
9    A   Right.
10   Q   -- et cetera, et cetera.
11   A   Right.
12   Q   Did you sign that rule, sir, with the
13 probation department?
14   A   I don't think -- I don't think I signed it
15 with her.  No, I signed a previous -- I don't know
16 if I signed this, or not.
17   Q   You don't know whether you signed this, or
18 not?
19   A   No.  I signed a previous thing for $15 a
20 month.
21   Q   Right.  So, you just don't know whether
22 you signed this one, or not --
23   A   That's correct.
24   Q   -- from the 10th?
25   A   That is correct.

Page 206

1    Q   It says, in this next paragraph:
2  Mr. Curtis has paid only $630 toward his court debt
3  and his balance remains 67,983.90.
4    A   Yes.
5    Q   Is that accurate, you've only paid $630?
6    A   Yes.  For the first year or so, I was only
7  paying $15 a month.  Yes, that's correct.  And then
8  I was only asked to pay $100 a month after that.
9  That is correct.
10   Q   There is a probation violation pending
11 against you right now, isn't there?
12   A   Yes, there is.
13   Q   You were supposed to be in court on
14 July 3rd of 2003, were you?
15   A   Yes.
16   Q   You didn't show up, did you?
17   A   No.
18   Q   There was a capias issued for your arrest,
19 wasn't there?
20   A   I don't think so.
21   Q   Okay.  Well, do you know what happened on
22 July 3rd, 2003?
23   A   I have no idea.
24   Q   But you failed to appear, didn't you?
25   A   Right.

Page 207

1    Q   Your lawyer -- you had a court-appointed
2  lawyer on the probation violation, didn't you?
3    A   No, I didn't have anything.
4    Q   You ever heard of Kenneth Creahan?
5    A   I never saw him.  No, I never saw him.
6    Q   Never heard of Kenneth Creahan?
7    A   No.
8    Q   So, when you failed to appear on July 3rd,
9  then were you notified to be back in court?
10   A   No.  No.
11   Q   Well, you've been back to court, haven't
12 you --
13   A   Yes, I have.
14   Q   -- since July 3rd?
15   A   Yes, I have.
16   Q   Are you saying you went back to court and
17 you hadn't been notified to be there?
18   A   I'm trying to think.  What happened is
19 that we went to see if any type of warrant or
20 anything had been issued.  There was no warrant
21 issued.  So, a new court date was reset.
22   Q   All right.  So, you went back to court?
23   A   That is correct.
24   Q   That was about July 20th, wasn't it,
25 ballpark?

Page 208

1    A   Yes.
2    Q   Who represented you on July 20th?
3    A   Mr. Blessing and Mr. -- and his associate.
4    Q   Mr. Schwantes?
5    A   Yes.
6    Q   Is Mr. Schwantes your attorney of record
7  now, on this probation violation?
8    A   He was, at that particular time.
9    Q   Who is it now?
10   A   I have no idea, besides those two.
11   Q   All right.  You pled guilty, didn't you,
12 to the probation violation?
13   A   No, we pled no contest.
14   Q   Were you found guilty of the probation
15 violation on July 20th?
16   A   Yes.
17   Q   You're scheduled to be sentenced on that
18 November 20th, 2003, before Judge Dinkelacker;
19 right?
20   A   That is correct.
21   Q   Sir, in your mind, if this land
22 installment contract had been signed, what
23 difference would it have made in terms of the
24 outcome as to you and your property?
25   A   Well, basically, it was my understanding

Page 209

1 that -- from what I was told by Mr. Bigelow -- that
2 it would be basically a term contract so that it
3 would insure me not losing my property.
4      MR. LEWIS: Can you give me just a minute?
5 I'm almost done.
6          (Brief recess taken.)
7      MR. LEWIS: Back on the record. There are
8 two additional pages that didn't get copied as
9 part of Exhibit No. 1, pages 68 and 69, which
10 I'm giving to counsel and the witness right
11 now. Page 69 has got the signature line for
12 Mr. Curtis.
13 BY MR. LEWIS:
14   Q  Do you understand what's happening here,
15 Mr. Curtis? Those are just the last two pages of
16 Exhibit 1 that didn't get included as part of the
17 copy.
18   A  Um-hmm.
19   Q  Do you remember -- look at page 67, would
20 you, which -- on Exhibit 1. You with me?
21   A  Yes.
22   Q  Do you remember being asked by Mr. Laber:
23 So you think that at the point in time where you
24 were being evicted, if it had been a land contract
25 as opposed to a lease or a renter's agreement, there

Page 210

1 would have been a different consequence other than
2 the eviction?
3          Do you remember being asked that?
4   A  Where are you seeing this on?
5   Q  Page 67.
6   A  Line what?
7   Q  Line 20.
8   A  Oh, okay.
9   Q  You there?
10   A  Yes.
11   Q  Do you remember being asked that question?
12   A  Not now, no.
13   Q  Well, do you remember answering -- this is
14 page 68, line 1 --
15   A  Um-hmm.
16   Q  -- I don't know, I'm not sure. I'm not
17 sure --
18   A  Um-hmm.
19   Q  -- but it was my assumption that in
20 either, I'm not sure about this, but I assume that
21 in either, you were supposed to get your property
22 which I did not get. Was that your answer?
23   A  Right. Right.
24      MR. LEWIS: Give me just a minute. I want
25 to talk to my client and I may be done.

Page 211

1          (Brief recess taken.)
2      MR. LEWIS: No more questions. Thank you.
3      MR. BLESSING: I have one question.
4          EXAMINATION
5 BY MR. BLESSING:
6   Q  Mr. Curtis, Mr. Lewis asked you several
7 questions about what had happened to the property
8 inside the house after the eviction. Do you
9 remember those questions?
10   A  Yes, I do.
11   Q  When you answered those questions, were
12 you testifying truthfully based upon your personal
13 knowledge and what you saw?
14   A  Well, yes.
15      MR. BLESSING: No further questions.
16      (Deposition concluded at 3:25 p.m.)
17
18
19
20 Harry Curtis                    DATE
21
22
23
24
25

Page 212

1          CERTIFICATE
2 )
3 )STATE OF OHIO
4 )
5      I, Teresa A. Moore, Notary Public for the
6 State of Ohio, do hereby certify:
7      That the witness named in the deposition,
8 prior to being examined, was by me duly sworn;
9      That said deposition was taken before me
10 at the time and place therein set forth and was
11 taken down by me in shorthand and thereafter
12 transcribed into typewriting under my direction and
13 supervision;
14      That said deposition is a true record of
15 the testimony given by the witness and of all
16 objections made at the time of the examination.
17      I further certify that I am neither
18 counsel for nor related to any party to said action,
19 nor in any way interested in the outcome thereof.
20      IN WITNESS WHEREOF I have subscribed my
21 name and affixed my seal this 9th day of September,
22 2003.
23      TERESA A. MOORE
24          Notary Public
25 My Commission expires: 6/19/2006

## AFFIDAVIT

STATE OF OHIO                     :
                                 :     SS
STATE AT LARGE                    :

       I, Teresa A. Moore, Notary Public, for the State of Ohio, do hereby state that the

transcript of the deposition of Harry Curtis, deponent herein having been submitted

said deposition for review and signature, has not been signed within the seven day period

allowed under the Ohio Rules of Civil Procedure; said deposition to now have the same

force and effect as though signed.

                           _Teresa A. Moore_
                           Teresa A. Moore
                           Court Reporter

    Sworn to before me this 26th day of September, 2003.

                           Tina M. Barlow
                           Notary Public - State of Ohio

Commission Expires: May 17, 2004

1              COMMON PLEAS COURT OF

2              HAMILTON COUNTY, OHIO

3    _____

4    PETE BIGELOW                 :

5              Plaintiff         :

6         -vs-                    :

7                                 : CASE NO. A0005052

8    MARK W. BURBRINK, ET AL.    :

9              Defendants        :

10   _____

11

12              Deposition of HARRY CURTIS, a

13   witness herein, taken by the Plaintiff as upon

14   cross examination and pursuant to the Ohio

15   Rules of Civil Procedure as to the time and

16   place and stipulations hereinafter set forth,

17   at the offices of William H. Blessing, 119 E.

18   Court Street, Suite 500, Cincinnati, Ohio at

19   5:30 p.m. on Tuesday, December 18, 2001, before

20   Paula A. Blosser, a Registered Professional

21   Reporter and notary public within and for the

22   State of Ohio.

23

24                    *  *  *  *  *  *

25

DEFENDANT'S
EXHIBIT NO. 1
FOR IDENTIFICATION
DATE 8-29-03    RPTR: IAM

1                    <u>QUICK REFERENCE INDEX</u>

2              WITNESS: HARRY CURTIS

3              APPEARANCES: PAGE 3

4

5                              DX     CX    RDX    RCX

6      BY: MR. LABER           -      4     -      -

7      BY: MR. SCHWANTES       -      -     -      -

8

9

10                      <u>EXHIBITS</u>

11             MARKED                          PAGE

12     PLF'S:      1                            43

13     PLF'S:      2                            45

14

15              <u>INFORMATION REQUESTED</u>

16              NOT APPLICABLE

17

18                 *  *  *  *  *

19

20

21

22

23

24

25

1    APPEARANCES:

2

3    ON BEHALF OF PLAINTIFF

4         Mr. Christopher Laber
          Attorney at Law
5         22 W. Ninth Street
          Cincinnati, Ohio  45202
6
     ON BEHALF OF DEFENDANTS
7
          Mr. James E. Schwantes
8         Attorney at Law
          Law Offices of William H. Blessing
9         119 E. Court Street, Suite 500
          Cincinnati, Ohio  45202
10
     ALSO PRESENT:
11
          Mr. Pete Bigelow
12

13

14

15                    *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

1    <u>WHEREUPON</u>:

2                              <u>HARRY CURTIS</u>,

3    of lawful age, a witness herein, being first

4    duly sworn as hereinafter certified, was

5    examined and deposed as follows:

6                    <u>CROSS EXAMINATION</u>

7    BY MR. LABER:

8        Q.    Please tell the court reporter your

9    name and address.

10       A.    My name is Harry Curtis.  I live at

11   3913 Vine Street, Apartment 2.

12       Q.    And, Mr. Curtis, you are going to

13   have to speak up a little bit more.  I'm having

14   trouble hearing you over here.  My name is

15   Chris Laber, I represent Mr. Bigelow in a

16   lawsuit between him and the Burbrinks.  Have

17   you ever had your deposition taken before?

18       A.    No, I haven't.

19       Q.    All I'm going to do is just ask you

20   some questions.  You are under oath and you

21   need to answer the questions.  If you don't

22   understand the question that I ask of you, need

23   me to repeat it or you don't understand what

24   I'm trying to get at, let me know and I'll

25   repeat the question.

1              The court reporter takes down

2      verbal answers so a nod of the head, shake of

3      the head doesn't really work.  You need to

4      answer yes or no, because uh-huh and huh-uh are

5      difficult for her to spell or at least for me

6      to interpret correctly.  I know it's late in

7      the evening, I appreciate you coming in here.

8      I'll try to get through this as quick as I

9      can.  If you need a break at any time while

10     going through for whatever reason, we'll stop,

11     just let me know, all right?

12             A.    All right.

13             Q.    You are married?

14             A.    Yes, I am.

15             Q.    And it's Patricia?

16             A.    Patricia Curtis, yes.

17             Q.    How long have you been married to

18     Patricia?

19             A.    16 years.

20             Q.    Do the two of you have children that

21     live with you now?

22             A.    No.

23             Q.    Do you have any children that lived

24     with you?

25             A.    One daughter that stayed with us and

1    a granddaughter.

2         Q.    When is the last time that you had

3    children living in your home?

4         A.    I would say --

5         Q.    More than ten years ago?

6         A.    No, no.  Maybe eight years ago,

7    maybe eight or nine.  Between seven and eight.

8         Q.    Are you working right now?

9         A.    No, I'm not.

10        Q.    When is the last time that you

11   worked?

12        A.    I worked about two months ago.

13        Q.    And where was that?

14        A.    That was with Mike Albert Leasing.

15   I was a contract driver.

16        Q.    You take cars from auction to,

17   leasing to auction?

18        A.    I drive cars from the company to

19   clients or pick up cars.

20        Q.    How long did you work for Mr.

21   Albert?

22        A.    I worked with him from, I guess it

23   would have been April.

24        Q.    Until about October of this year?

25        A.    Yes.

```
 1            Q.    And why was that job terminated?

 2            A.    Well, basically what happened at the

 3      end of the two month period, just around, I

 4      guess around the end of September or during

 5      September, September 11, right after that area

 6      of time, the delivery slowed down and I was the

 7      youngest member of the crew so therefore I

 8      wasn't getting any work.

 9            Q.    Pretty much just laid off then?

10            A.    Basically.

11            Q.    What's your normal occupation?

12            A.    I'm a chemical operator.  I'm also a

13      fork, I'm certified as a metallurgical

14      technician.  I'm a chemical operator.  Also

15      been a, how can I say it, a chemical

16      technician, and I'm certified forklift

17      operator.

18            Q.    Do you have any formal education

19      past high school?

20            A.    Yes.

21            Q.    What would that be?

22            A.    I went to Xavier University.

23            Q.    What was that?

24            A.    I guess that was at the end of

25      around, right after I came out of the service,
```

1    around '71, right in there.

2            Q.    Did you get a degree?

3            A.    No, I did not.

4            Q.    How long did you attend Xavier?

5            A.    I attended Xavier approximately one

6    year for accounting.

7            Q.    Do you have any other formal

8    education after high school?

9            A.    Yes, I attended Southern Ohio

10   College working on a double degree in

11   accounting and computer sciences.

12           Q.    When was that, sir?

13           A.    That was right after I went to

14   Xavier, I guess, the next year, following.

15           Q.    '72?

16           A.    '72.

17           Q.    How long were you there?

18           A.    I was there approximately about a

19   year.

20           Q.    Any other education after that?

21           A.    I was going to say that I have a

22   certification from the Institute of Engineering

23   in metallurgical technology, marketing and

24   management and metals forming.

25           Q.    Where are those certifications

1    from?

2        A.    They were from the Institute of

3    Engineering, American Institute of

4    Engineering.

5        Q.    I'm not familiar with that.  Where

6    is that located?

7        A.    From what I gather it's from, it's

8    some part of Ohio.  I got that while working at

9    Metcut research, metallurgical firm.

10        Q.    Spell that.

11        A.    M-E-T-C-U-T.

12        Q.    How long did you work with Metcut?

13        A.    I worked with them approximately

14    four years.

15        Q.    Is that the longest period that you

16    ever spent for one employer?

17        A.    No, not really.  I worked with a

18    company called --

19        Q.    What was it?

20        A.    It was another chemical company, I

21    worked for them about six years.

22        Q.    What were your responsibilities at

23    those two companies?

24        A.    I was a chemical operator.

25        Q.    I'm sorry, I'm not familiar with

1    that.

2          A.    Chemical operator, basically I took

3    chemicals and formulated them and took them

4    from the raw product and made it into the

5    product that it was supposed to be sold by the

6    company.

7          Q.    Is this a lab job, research job

8    or --

9          A.    Well, at that particular company it

10   was more so an operator's job that was out

11   within the plant.  I had to, I was given a

12   formula, I weighed out the chemicals, I worked

13   on the wet press.  That means these chemicals

14   were put into a press and pressed together at a

15   certain temperature and water was run through

16   them and the raw product came out in a paste

17   form.

18                That paste form was scraped off

19   of plates, put in a dryer and then centrifuged

20   into a powder and sold to a company.

21         Q.    Where did you work immediately

22   before Mike Albert Leasing?

23         A.    I worked at Goodwill as a forklift

24   operator.

25         Q.    How long did you do that?

1        A.    I did that about, I guess, six or
2    eight months.  We were working with a company
3    which stored pallets within the storage area
4    and our responsibility where I was was to have
5    a man on a particular machine --
6        Q.    I was curious, how long were you on
7    that job?
8        A.    I was there until they lost the
9    contract.
10        Q.    Okay.  Was that through a temp
11    service then?
12        A.    No, I was hired there.
13        Q.    By Goodwill?
14        A.    By Goodwill.
15        Q.    Do you know Roseann Christian?
16        A.    Yes, but I knew her as Roseann
17    Craig.
18        Q.    How long have you known Roseann
19    Christian?
20        A.    I knew Roseann Christian for quite a
21    while.  I knew her through her mother and
22    through church.
23        Q.    So you knew her for five years, ten
24    years, 20 years?
25        A.    About 20 years, I would say, at

1    least.

2         Q.    Were you involved in a foreclosure

3    action in 1999?

4         A.    Yes.

5         Q.    And were you involved with Ms.

6    Christian as a consequence of that foreclosure

7    action?

8         A.    Not really.  I met Roseann, I came

9    downstairs one day and she was standing in my

10   house.

11        Q.    Talking to your wife?

12        A.    No, she hadn't talked to anyone.

13   She was just inside of my house.

14        Q.    That house would be what address?

15        A.    1966 Fairfax.

16        Q.    Do you remember when that was?

17        A.    Not really, I can't remember.

18        Q.    Would it have been in '99?

19        A.    I would assume that is, or close to

20   it, I'm not sure.

21        Q.    How long had you been living in the

22   house at that time?

23        A.    My wife and I had been living in the

24   house for, I guess, six or seven years, about

25   six years.

1          Q.    And how did you, were you an owner

2     of that house?

3          A.    Yes, I owned the house since '75

4     since my mother passed.

5          Q.    And your grandmother had a life

6     estate in that house during her lifetime?

7          A.    Yes, that's correct.

8          Q.    When did your grandmother pass?

9          A.    I guess she had passed, oh, I

10    guess -- I'm not quite sure with these dates, I

11    think about five years earlier, I think, five

12    or six years earlier just before we moved into

13    the house.

14         Q.    Did your grandmother live in the

15    house by herself?

16         A.    Yes, she did.  She lived with my

17    aunt.  My aunt lived with her in the house for,

18    oh, I guess --

19         Q.    But you didn't live in the house --

20         A.    No.

21         Q.    -- during the time that your

22    grandmother was alive?

23         A.    No, not actually.

24         Q.    So you and your wife moved in there

25    shortly after your grandmother died?

1          A.    Yes.

2          Q.    There was a mortgage on the house

3    when you moved into it?

4          A.    No.

5          Q.    Did you borrow money against the

6    house after you moved into it?

7          A.    No, I did not.

8          Q.    There is a foreclosure action filed

9    in 1999, was that for taxes then?

10         A.    That was for taxes.

11         Q.    How long had it been since you paid

12   taxes on the home?

13         A.    Well, there was taxes on the

14   property and I paid, I guess, maybe two or

15   three years earlier, I paid a lump sum of

16   about, I guess, about $4,000 on the taxes so

17   there was a lump sum owed on the taxes.

18         Q.    In '99 were there still additional

19   taxes owed on the house?

20         A.    Yes.

21         Q.    Had you paid taxes since that lump

22   sum that you said you paid a few years

23   earlier?

24         A.    I don't know if, I don't think I

25   had.  I don't think I had because we were --

1       Q.   I'm sorry?

2       A.   Go ahead.

3       Q.   The lump sum that you paid two or

4   three years earlier, did that get the property

5   taxes caught up?

6       A.   No, no.

7       Q.   Now, you say Ms. Christian, you came

8   downstairs and Ms. Christian was in your

9   kitchen, living room, or what?

10      A.   She was standing in the kitchen.

11      Q.   Did you have a conversation with

12   her?

13      A.   Yes, I did.

14      Q.   And what was that conversation

15   about?

16      A.   Well, she was, she first said that

17   she didn't know that anyone was living in the

18   house.  Well, that was kind of odd since there

19   were clothes hanging on the line and, you know,

20   it was obvious somebody lived in the house; and

21   so she started talking to me about the

22   foreclosure.

23      Q.   Okay.

24      A.   And she said that she might know

25   someone that might be able to help me.  Well, I

16

1    told her that I wasn't interested in selling

2    the property at all.  And she said, okay, that

3    was fine, that wouldn't be one of the things

4    that would be going on with this.

5         Q.    Who lives at 732 North Crescent,

6    Apartment 5, Cincinnati, Ohio 45229?

7         A.    732?

8         Q.    Yes, sir.

9         A.    I don't know about that, I don't

10   know.  That's been a while.  I don't know about

11   that.

12        Q.    Is that an old address for you?

13        A.    It may be, I'm not sure.

14        Q.    That's the address that's listed on

15   the foreclosure complaint that was filed

16   against you in '99.  It's not the address that

17   you were living at in '99?

18        A.    I'm not sure.  No, I wasn't living

19   there in '99.

20        Q.    You didn't receive certified and

21   ordinary mailed addressed to you at that

22   address on the foreclosure suit?

23        A.    Yeah, I'm not sure.  I'm not sure.

24   I'm not sure about that.

25        Q.    Did you ever receive a copy of the

1    foreclosure suit?

2          A.    The foreclosure suit that we

3    received was received at 1966 Fairfax.

4          Q.    So how long had it been, how long

5    has it been since you lived on North

6    Crescent?

7          A.    At North Crescent?   My God, I've

8    never lived on North Crescent, I've never lived

9    on North Crescent except, North Crescent?

10   That's been when I was with my first wife.

11         Q.    Yes, sir, when was that?

12         A.    That was years ago, long, long,

13   long, long time ago.   Long time ago.   That was

14   before I married my wife.   That was over 16

15   years ago.

16         Q.    '77?

17         A.    Yeah, that was over 16 years ago.

18         Q.    Is that when you divorced your first

19   wife?

20         A.    That's when I divorced my second

21   wife around '77, I think, depending on who it

22   was.   I'm not sure, but I haven't lived on

23   North Crescent, years, years, years ago.   That

24   was a long time ago.

25         Q.    You say '77 was your second wife?

1          A.    I'm pretty sure.  I'm pretty sure.

2          Q.    Then you had a third divorce in '91

3    then?

4          A.    No, that wasn't, well, '77 was my --

5    no, no, '91, no.  I've been with my wife 16

6    years.  I've been married to her since '85,

7    September 28, 1985.

8          Q.    Maybe that says '81 then.  So you

9    were divorced in '77, then again in '81?

10         A.    That is correct, I think so, I think

11   so.  I'm not sure.  That's way too long for me

12   to remember.  I remember this one, the one I've

13   been with for 16 years.

14         Q.    All right.  So Ms. Christian is

15   talking to you about helping you out of the tax

16   foreclosure?

17         A.    Well, she talked to me about knowing

18   someone who might be able to help me out of the

19   tax foreclosure.

20         Q.    And did you pursue that with her?

21         A.    Well, I asked her exactly what she

22   was talking about and she explained to me that

23   she had a friend that might be able to assist

24   me.  At that time I told her, well, if it

25   involved losing my property, I wouldn't be

1    interested.

2           Q.    Yes, sir, go on.

3           A.    So she told me that would be the

4    case.  So she involved me with Mr. Bigelow.

5           Q.    When did you first meet Mr.

6    Bigelow?

7           A.    After I had given him attorney so he

8    could go ahead and file the taxes, pay for the

9    taxes on the property.

10          Q.    I'm sorry, I didn't understand your

11   terminology.  After I'd given him --

12          A.    They asked me to sign over power of

13   attorney so he could go ahead and get these

14   taxes paid.

15          Q.    So the first time you met Mr.

16   Bigelow you signed a power of attorney to allow

17   him to pay your tax?

18          A.    Pay my taxes, yeah.

19          Q.    Wasn't there some sort of discussion

20   before that as to what was going on?

21          A.    Well, what happened is that he came

22   over and this is, yeah, this is basically after

23   that.  He showed me what he was going to do to

24   the house.  I said I need other things done to

25   the house, some roofing done basically and the

1    taxes paid.

2          Q.    This is all in the first meeting

3    with Mr. Bigelow?

4          A.    This is the first or the second, I'm

5    not quite sure.  I'm not sure.

6          Q.    Well, I'm confused about the

7    context.  Mr. Bigelow comes over to your house

8    and talks to you about he's going to fix your

9    house up for you and pay off your taxes?

10         A.    Right, I talk to Roseann up to that

11    point.

12         Q.    And what's Mr. Bigelow get out of

13    this fixing up your house and paying off your

14    taxes?

15         A.    Well, that's what I'm saying.  He

16    was supposed to go ahead and put the property

17    under a land contract with me for two years.

18         Q.    So he was going to purchase the

19    property from you and sell it back to you under

20    a land contract?

21         A.    That's basically what was supposed

22    to be going on.

23         Q.    And in that period of time or in

24    that transaction you needed some repairs done

25    to your home also?

1          A.   That was including it.

2          Q.   In the land contract?

3          A.   Right.

4          Q.   So he would buy the property from

5    you and sell it back to you under land

6    contract, pay off the taxes that were due.  He

7    would pay for some repairs to the home and then

8    the land contract you would purchase the

9    property back from him at a specified price and

10   time?

11         A.   No, this is supposed to be the

12   payments that I was making to him were supposed

13   to be on the land contract.

14         Q.   Yes.

15         A.   Yeah.  Well, that's what I was

16   supposed to do.  He was supposed to go ahead

17   and repair the roof, the undergirding, and he

18   said he was going to give me a certain amount

19   of money, that being $10,000.

20         Q.   He would give you that money to

21   repair the home or --

22         A.   No, he was supposed to give me that

23   money with, for the sale of the property.

24         Q.   Did you enter into a purchase

25   contract with Mr. Bigelow where you sold him

1    the house?

2         A.    No, I don't think I did.  I'm not

3    sure about that.

4         Q.    How was he --

5         A.    I think all of that was done, I

6    think all of that was done in the land contract

7    itself.

8         Q.    Was there a piece of paper that you

9    and Mr. Bigelow signed at any of your meetings

10   where he set forth what he was going to do and

11   where you set forth what you were going to

12   do?

13        A.    No, I don't think so.  No, just, the

14   only thing that I ever signed was a renter's

15   agreement, if I'm correct.  I'm not sure about

16   the other.

17        Q.    A renter's agreement or land

18   installment contract?

19        A.    No, I ended up signing a renter's

20   agreement.

21        Q.    Just to back track a little bit.

22   The first meeting you had with Mr. Bigelow, you

23   and Mr. Bigelow agreed to him purchasing the

24   property from you and you buying it back under

25   a land contract?

1        A.    That was correct.

2        Q.    And you were fine with that idea?

3        A.    I was fine with that idea.

4        Q.    And what was the purchase price?

5        A.    I'm not quite sure.  It was like I

6    said, it, it entailed the money, the $10,000

7    plus the work that was supposed to be done on

8    the property.

9        Q.    Plus the taxes?

10        A.    Plus the taxes.

11        Q.    And what was the price you were

12    purchasing the property back from him for?

13        A.    I think it was, I'm not sure, I

14    think it was like $38,000, I think.

15        Q.    Do you recall if this was put to

16    writing during your meeting?

17        A.    Yes, it was put to writing.

18        Q.    At that meeting?

19        A.    No, not at that meeting.

20        Q.    That was the question.

21        A.    It was contained in, not at that

22    meeting, no, but it was put into -- most of

23    these things were put into the contract, the

24    land contract itself.

25        Q.    So you and your wife made this

1  contract with Mr. Bigelow and then you had a

2  closing on this contract?

3          A.    Well, we never saw the contract

4  until the closing and when we got to the

5  closing, we were presented first with a

6  renter's agreement and then with this other

7  contract that was already filled out and

8  everything and we had no, you know, actually no

9  parts in the making of this contract or

10  anything else.

11         Q.    So you went to a closing at an

12  attorney's office?

13         A.    Yes.

14         Q.    Would this be Mr. Meckstroth?

15         A.    I'm pretty sure that's what his name

16  was.

17         Q.    Down on West Ninth Street?

18         A.    I'm not certain, but I think that's

19  who it was.

20         Q.    Between the time of that closing and

21  the time of that first meeting with Mr.

22  Bigelow, did you have any other meeting with

23  Mr. Bigelow about this transaction?

24         A.    Not after, basically not after the

25  property.  We walked around the property

1    several times and I explained to him exactly,

2    this is before any contract was set up, this is

3    before anything was set up, I walked around and

4    showed him what work needed to be done on the

5    house, and he agreed with this.

6                    And then I told him the same

7    thing that I told Roseann, that I had no

8    interest in the actual selling of my property

9    without any intent of getting my property back,

10   you know, that was my whole thing, how can I

11   get this done without losing my property.

12           Q.    Do you have an attorney right now,

13   sir?

14           A.    Yes, I do.

15           Q.    Who would that be?

16           A.    That would be Mr. Blessing.

17           Q.    And how did you first come into

18   contact with Mr. Blessing?

19           A.    Well, we just ended up finding each

20   other, I guess, you might say.

21           Q.    Finding each other?

22           A.    Yeah, it just happened that way, I

23   mean --

24           Q.    Did you pull his name out of the

25   yellow pages, see him on the street and ask him

1    if he was a lawyer, how did you connect up?

2         A.    No, no, we just -- we ran into each

3    other with an involvement with something else.

4         Q.    What was that?

5              MR. SCHWANTES:    I'm going to

6    object.   When you get into the substance of

7    things between you and Mr. Blessing, that's

8    privileged information and you don't have to

9    get into that.   When you meet and things like

10   that are not getting into the substance, but

11   anything getting into the substance I would

12   object.

13             MR. LABER:   I'm not asking

14   anything about that.   I'm asking him to explain

15   his answer just how they just met.

16             THE WITNESS:   Well, basically

17   that involves something which was another case

18   or something like that and I don't want to get

19   into that.

20   BY MR. LABER:

21        Q.    What does he represent you on?

22        A.    That's client, that, again, is

23   client/attorney information and I don't want to

24   get into that.

25        Q.    Did you receive a letter in the mail

1     from Mr. Blessing soliciting your client,

2     soliciting representation?

3         A.   Well, no.  I don't want to get into

4     that.

5         Q.   No, you did not receive a letter?

6         A.   No, I did not.

7         Q.   So I'll ask you again, how did you

8     learn of Mr. Blessing?

9         A.   Well, I met Mr. Blessing involving

10    another case and that case I don't want to

11    really get into.

12        Q.   So it has nothing to do with Mr.

13    Bigelow?

14        A.   No, it did not, I don't think so.

15    It doesn't have anything to do with this

16    particular case.

17        Q.   With Mr. Burbrink?

18        A.   Right.

19        Q.   So you know Mr. Burbrink?

20        A.   Not really.

21        Q.   Have you ever met Mr. Burbrink?

22        A.   No, I haven't.

23        Q.   Have you ever discussed Mr.

24    Burbrink's case with Mr. Blessing?

25            MR. SCHWANTES:  I object to what

1    he discussed with Mr. Blessing.

2                    MR. LABER:  He said his

3    representation had nothing to do with Mr.

4    Bigelow or Mr. Burbrink.  I don't think that

5    would be privileged communication.

6                    MR. SCHWANTES:  I object to any

7    discussions that he had with Mr. Blessing.  He

8    acknowledged that Mr. Blessing represents him

9    and any discussions that he has with Mr.

10   Blessing, who is his attorney, I'm going to

11   object to inquiry into those.

12                   MR. LABER:  With respect to his

13   representation with Mr. Blessing?

14                   MR. SCHWANTES:  With --

15                   MR. LABER:  With other matters,

16   you've listed him as a witness.  I'm entitled

17   to inquire as to where he get hits information.

18                   MR. SCHWANTES:  If we want to

19   take this one before the judge as to what

20   discussion he had with Mr. Blessing, that's

21   fine.  I'm going to stand on our objection that

22   privileged information, Mr. Curtis' discussion,

23   the subject of those with Mr. Blessing.

24   BY MR. LABER:

25        Q.   When did you first meet Mr.

1    Blessing?

2         A.    Let me see, let me think.   I guess

3    several months ago.   I guess several months ago

4    or something like that.

5         Q.    Well, was it in the first six months

6    of this year?

7         A.    No, no, it wasn't.

8         Q.    So it's been within the last six

9    months?

10        A.    Within the last six months or so.

11        Q.    That you first met Mr. Blessing?

12        A.    I think so.

13        Q.    Do you know an attorney by the name

14   of Hopkins?

15        A.    Not that I know of.

16        Q.    When was the first time that you

17   ever spoke with anybody from Mr. Blessing's

18   office over the phone or otherwise?

19        A.    Sometime within the last six months,

20   I can't say for sure.   I can't say for sure

21   exactly when it was.

22        Q.    And did somebody from Mr. Blessing's

23   office call you or did you call them for the

24   initial contact?

25        A.    I can't really say, I don't know if

1   it was me or them, I can't really say.  I don't

2   know because it's been, a lot has transpired

3   these last couple of months.  So I can't really

4   say.  I don't know if they contacted me or I

5   contacted them.  I know we were in contact one

6   way or the other.  So I can't really say.

7          Q.   So how did you come up with Mr.

8   Blessing's name?

9          A.   Well, it just, I mean, I've been

10  going through some referrals but --

11         Q.   Referrals from who?

12         A.   Well, basically just people that I

13  knew that has had some problems with, just in

14  different areas.  So then I was, how do I say

15  this?  Anyway, I came home one day and I

16  received a call.  I received a call.

17         Q.   From who?

18         A.   From the office.

19         Q.   From Mr. Blessing's office?

20         A.   Yes.

21         Q.   And what was the substance of that

22  call.

23         A.   I'm not going to go into that.

24         Q.   Yes, you are.  It's before the

25  representation, sir.  What was the substance of

1    that call?

2        A.    They wanted to get a, get some

3    information on me.  They heard some things that

4    were going on and they had done some research,

5    I think it was, for some other matter and my

6    name had come up; and that case, you know,

7    evidently there was some familiarity and they

8    came to ask me about it.

9        Q.    So they called you and told you

10    about something going on with Mr. Bigelow?

11        A.    Not necessarily.  They told me about

12    some information about another client they were

13    working with and they saw some familiarity in

14    the case that they were working on and the

15    things that had happened to me.

16        Q.    And what were these similarities?

17        A.    I'd rather not go into that.

18        Q.    Yes, sir, I'd appreciate that, but

19    I'm going to ask the question.  What were these

20    similarities?

21        A.    I don't want to go into that.

22        Q.    I don't think you have a choice,

23    sir.

24            MR. SCHWANTES:  You have to

25    answer to what you remember before Mr. Blessing

1    became your attorney and I think he's talking

2    about the time frame of when you first were

3    contacted.

4                    THE WITNESS:   Okay.

5                    MR. SCHWANTES:   Is that a

6    correct characterization?

7    BY MR. LABER:

8         Q.    Prior to retaining Mr. Blessing as

9    to your lawyer --

10         A.    Well, what happened?

11         Q.    Excuse me, what did Blessing's

12    office tell you about the similarities?

13         A.    Well, basically that they had had

14    some clients that dealt with Mr. Bigelow that

15    ended up in the same situation that I did

16    without their property and had similar

17    backgrounds with meeting Roseann and that type

18    of situation.

19         Q.    Did they tell you that they could

20    get some money for you?

21         A.    No, they didn't.

22         Q.    They didn't?

23         A.    No.

24         Q.    These similar circumstances

25    involving people burning their houses down?

1          A.   I didn't burn my house down, and --

2          Q.   After you received this phone call

3      from Mr. Blessing's office, what did you do?

4          A.   I let them come out.

5          Q.   They came to your house?

6          A.   Yes, they did.

7          Q.   Did Mr. Blessing come to your

8      house?

9          A.   The associate, his associate came

10     out.   (Indicating.)

11         Q.   Mr. Schwantes?

12         A.   Yes.

13         Q.   Did anyone come with him?

14         A.   What was her name?   I've forgotten

15     the other person's name.

16         Q.   Someone came with him?

17         A.   Yes.

18         Q.   It was a man or woman?

19         A.   Woman.

20         Q.   Do you have copies of your paperwork

21     from your transaction with Mr. Bigelow?

22         A.   My lawyer has them.

23         Q.   Do you know Shirdenia Bryant?

24         A.   No.

25         Q.   Have you ever met her?

1        A.    No, I'd never met her.   Not before

2    today, I saw her out in the hall.   Before that

3    time, I'd never met her.

4        Q.    How did you know it was her out in

5    the hall then?

6        A.    I saw her in here.

7        Q.    Yes, sir.

8        A.    That was it.

9        Q.    Had you ever heard her name

10    before?

11        A.    I heard her name.

12        Q.    In what context?

13            MR. SCHWANTES:   I'm going to

14    object if that gets into anything as far as

15    attorney/client depending on the context in

16    your answer.   I'm going to advise you that any

17    discussions that you may have had with Mr.

18    Blessing, your lawyer, are privileged but you

19    can answer to the extent that you heard her

20    name outside of that context.

21            THE WITNESS:   Well, I just

22    heard, you know, that basically -- well, that's

23    all attorney/client stuff that I heard with,

24    that I heard her name mentioned, so

25    therefore --

1    BY MR. LABER:

2         Q.   So you are suggesting that was from

3    Mr. Blessing and you don't want to talk about

4    it?

5         A.   That's correct.

6         Q.   So when you met Mr. Bigelow and you

7    entered into this arrangement where he would

8    buy the property and sell it back to you under

9    a land contract, was that arrangement written

10   down at that meeting?

11        A.   Not down at that meeting, no.  Well,

12   I can say that there were several different

13   types of plans that were offered to me on just

14   regular pieces of paper.

15        Q.   By Mr. Bigelow?

16        A.   No, not by Mr. Bigelow, by Roseann

17   who evidently was supposed to be representing

18   him.

19        Q.   So this meeting that you had with

20   Roseann, she presented things to you on

21   paper?

22        A.   Yes.

23        Q.   Do you have those papers?

24        A.   Some of them I do.

25        Q.   And where are those papers now?

1          A.    I think they are with my attorney, I

2    think, or else they are with my other lawyer.

3    The lawyer that represented me with the case.

4          Q.    What case?

5          A.    The arson case.

6          Q.    Who was that?

7          A.    I've forgot his name.  It's a matter

8    of record downtown.

9          Q.    Was he a retained lawyer?

10         A.    No, he was a public defender.

11         Q.    So Mr. Bigelow never gave you any

12   piece of paper at this meeting that set forth

13   the terms of your deal?

14         A.    Yes, when we went to the attorney's

15   office.

16         Q.    I'm talking about the meeting when,

17   where you first met what you needed to done

18   with the house, you talked about the $10,000

19   and the repairs to the home and paying the back

20   taxes?

21         A.    Yeah --

22         Q.    And you buy it back for $38,000?

23         A.    First and for most, Roseann was

24   acting as a representative for Mr. Bigelow.

25         Q.    I appreciate your conclusions on

1    that, sir, that's not the question.  The

2    question is, did Mr. Bigelow present you with a

3    piece of paper talking about the terms of the

4    deal?

5         A.   I assume that through Roseann that's

6    what was being done.

7         Q.   The question is did Bigelow present

8    you with a piece of paper in a meeting

9    describing the terms of your deal?

10        A.   What I'm saying is, I assumed

11    through Roseann he was being represented.  So I

12    would have to say that through her I'd say yes,

13    because that's what I assumed was being done.

14        Q.   You assumed this because she said

15    she had a friend who might be willing to help

16    you out on this?

17        A.   She came and told me, she went back

18    to Mr. Bigelow and she came forth to me, these

19    are the things that were being offered to me by

20    him.

21        Q.   Well, which meeting with Ms.

22    Christian would that have been, sir?

23        A.   I had several meetings with Ms.

24    Christian before I met Mr. Bigelow.

25        Q.   You did?

1          A.    Yes, I did.

2          Q.    Was your wife present at these

3    meetings?

4          A.    No, my wife was at work.

5          Q.    Every time?

6          A.    No, she was there at one or two of

7    them.

8          Q.    One or two.

9          A.    She also called me on the phone

10   several times.  She was witness to that.

11         Q.    Witness to calling you on the phone?

12         A.    Yes, because she was answering the

13   phone.

14         Q.    So you went to a closing?

15         A.    Went to a closing.

16         Q.    And what happened at the closing?

17         A.    At the closing I was presented with

18   a renter's form.

19         Q.    What's a renter's form?

20         A.    I had never seen it before.  I never

21   knew it was part of what we were supposed to be

22   doing.

23         Q.    Does it say renter's form across the

24   top?

25         A.    That's what it says, renter's

1    contract or something along those lines.

2          Q.    Renter's contract, and do you still

3    have that paper?

4          A.    I'm quite sure my other lawyer has

5    it or if my attorney now may have it.

6          Q.    So you went to this closing at Mr.

7    Meckstroth's office?

8          A.    That is correct.

9          Q.    And Mr. Meckstroth sat down at a

10   conference with you and Mr. Bigelow and your

11   wife and who else was there?    Roseann

12   Christian?

13         A.    Was.

14         Q.    Was that everybody that was there?

15         A.    As far as I can remember, it was.

16         Q.    Mr. Meckstroth handed you pieces of

17   paper and explained what each piece of paper

18   was?

19         A.    He handed me each piece of paper and

20   explained to me that I had to sign them.  He

21   didn't necessarily explain to me in full

22   exactly what was going on with all of them.

23         Q.    He told you --

24         A.    In fact, he told me, he told me that

25   he had to protect both sides.  He told me that

1    he had to protect both sides of the agreement.

2    Now, I didn't understand that at all but I went

3    along with it because everything else is

4    basically done.

5        Q.    The question was, did Mr. Meckstroth

6    present to you several pieces of paper and

7    explain to you what each piece of paper was?

8    And you are saying yes, he did?

9        A.    What I'm saying is he didn't explain

10   to me exactly what the content of each one of

11   them was.  He was explaining to me that I had

12   to do, that I had to sign these things to

13   protect everybody involved in the signing.

14   That's what he did.

15       Q.    Well, did he, how did he force you

16   to sign these papers?

17       A.    He didn't force me but what I'm

18   saying is, that these things had to be signed

19   to protect everybody involved in the signing.

20   That's what he said.

21       Q.    So what pieces of paper do you

22   remember being handed by Mr. Meckstroth?

23       A.    He handed me the renter's contract.

24       Q.    Did you ask him about the renter's

25   contract?

1          A.   I asked him about the contract.

2          Q.   Did you read it?

3          A.   No, I didn't read all the way

4    through the renter's contract.

5          Q.   Did you have the opportunity to read

6    all the way through it?

7          A.   Not necessarily, no.  It was

8    presented to me at the closing.

9          Q.   Did you ask for the opportunity to

10   read through it?

11         A.   No, I did not, not at that

12   particular time, no.

13         Q.   Did you ask to postpone the closing

14   to take it to one or more of the lawyers?

15         A.   No, he also handed me a piece of

16   paper saying that paying, that I paid him for

17   these services.  So I assumed that all of these

18   things, if he was protecting both sides, they

19   was also protecting me.  I was paying for him.

20         Q.   Paying for preparation of the land

21   contract?

22         A.   That is correct.

23         Q.   And then there was a land

24   contract?

25         A.   Yes.  I paid for the preparation of

1      it, the preparing of it.  I have a receipt for

2      that.

3          Q.    So you signed a land contract?

4          A.    No, I did not.

5          Q.    Ever?

6          A.    No, I did not.

7          Q.    So you never signed a land contract

8      although you paid for having one drawn?

9          A.    That is correct.

10          Q.    You say you signed something called

11     a renter's agreement?

12          A.    That is correct.  But I have

13     paperwork showing that I paid for the

14     preparation of a land contract, and I have a

15     copy of that land contract.

16          Q.    You have a copy of the land

17     contract?

18          A.    Yes, I do.

19          Q.    Where is that?

20          A.    It was being held, it's either with

21     my lawyer now or it's with my other lawyer.  I

22     have a copy with both names on it, the

23     agreement of it, all of it, I have it.

24               MR. LABER:  I guess I'm going to

25     need copies.  Will you make copies of that for

1    me?

2                     MR. SCHWANTES:   Let's take a

3    break.

4                     (WHEREUPON, a recess was taken.)

5    BY MR. LABER:

6         Q.    You have a copy of the land

7    contract?

8         A.    Yes, I do have a copy of it.

9         Q.    And do you have that at home or have

10   you presented that to Mr. Blessing?

11        A.    I presented it to my other attorney

12   which in turn Mr. Blessing got from him.

13        Q.    In turn, what?

14        A.    To the other attorney.

15        Q.    Yes, sir.

16        A.    The attorney that was representing

17   me in my arson, on my arson case, I gave it to

18   him.

19        Q.    Does he still have it?

20        A.    I assume he or Mr. Blessing has it,

21   one of the two.

22                     (WHEREUPON, Plaintiff's Exhibit

23   1 was marked for identification.)

24   BY MR. LABER:

25        Q.    Showing you what's marked as Exhibit

1      1.   Do you recognize that document, sir?

2           A.    I didn't recognize it.

3           Q.    I'm sorry, I didn't hear you?

4           A.    I didn't recognize it but I do now,

5      yes.

6           Q.    Is that a document that you signed

7      on, what is it, August 2 or 3 of 1999?

8           A.    That's what is stated here.  So I

9      assume that I did it.

10          Q.    Would that have been signed at your

11     home?

12          A.    I don't know.  I don't know if it

13     was signed at my home or was it signed down

14     there with the other things that were signed.

15     I'm not sure.  It could have all been signed

16     together, I'm not sure.

17          Q.    So it could have been signed at the

18     closing is what you are saying?

19          A.    It could have been.

20          Q.    It talks about --

21          A.    I'm not sure.

22          Q.    It talks in the handwritten part

23     there in paragraph number two about seller to

24     lease option property for two years?

25          A.    That would entail the land

1    contract.  That's what that was supposed to be

2    about.

3          Q.    That's what you think that

4    references, the lease option for two years?

5          A.    That is what I believe.

6                (WHEREUPON, Plaintiff's Exhibit

7    2 was marked for identification.)

8    BY MR. LABER:

9          Q.    In showing you what is marked as

10   Exhibit No. 2, sir, can you identify that?

11         A.    Yes, but I don't believe these

12   things were done together.

13         Q.    No, sir.

14         A.    Okay, well, I'm not sure.  I think I

15   was presented with this first copy here and

16   then when I went down to the closing, I signed

17   this other thing here.

18         Q.    So the first copy you are referring

19   to is Exhibit No. 1 --

20         A.    No, no, I'm talking about the

21   Exhibit No. 6.  I'm talking about this seller's

22   statement here.  Now, I'm not sure that I did

23   this then or did I sign it when I signed these

24   things.  That's what I'm saying, I don't

25   remember.

1          Q.    Now, what the record is going to

2     reflect is nothing with respect to what you are

3     pointing to.

4          A.    I'm talking about --

5          Q.    Just hold on.   It's marked as

6     Exhibit No. 6.   That's the number it was used

7     in Ms. Christian's deposition.

8          A.    I'm sorry.

9          Q.    Your attorney presented it in Ms.

10    Christian's deposition.   Do you know where your

11    attorney received that from?

12         A.    No.

13         Q.    You have no idea where your attorney

14    received that from?

15         A.    No, I don't.

16         Q.    You didn't give that to your

17    attorney?

18         A.    I don't remember if I did or not.   I

19    don't think so.

20         Q.    It has a yellow sticker that is

21    marked as Exhibit 2 for your deposition.

22         A.    Okay.

23         Q.    The other document is marked as

24    Exhibit No. 1.

25         A.    Okay.

1          Q.    If you could, refer to them as

2     Exhibit No. 1 and No. 2, the record will be

3     able to reflect which one we are talking

4     about.

5          A.    Okay.  Is that okay?

6               MR. SCHWANTES:  That's exactly

7     what you are supposed to do.

8               THE WITNESS:  In other words,

9     Exhibit No. 1 and Exhibit No. 2, the first

10    sheet I remember.

11    BY MR. LABER:

12         Q.    You are looking at Exhibit 2,

13    right?

14         A.    I'm looking at Exhibit No. 2, the

15    first sheet of Exhibit No. 2, I remember but I

16    don't remember seeing this until, I'm not sure

17    whether I can say that I saw this on the 25th

18    of August or if I saw this on the 21st, okay,

19    yes, that's what I'm saying.

20               This was August 21st.  No, yeah,

21    this is August 21st, 22nd, and this is the 25th

22    so this was actually at the closing.  I never

23    saw this before the closing, I don't think.

24         Q.    Exhibit No. 2 you saw for the first

25    time at the closing?

48

1      A.    That's what I'm saying.    I'm almost

2   sure that I did.

3      Q.    That would make sense, sir.    Exhibit

4   1, do you recall when you first saw that?

5      A.    No, I do not.

6      Q.    That is your signature on it?

7      A.    Yes, it is.

8      Q.    And you would have signed that prior

9   to the closing?

10      A.    I don't know whether I did or not.

11   That's what I'm saying.

12      Q.    Mr. Meckstroth hand you Exhibit No.

13   2 at the closing and explain to you what it

14   was?

15      A.    I don't know if he did or not.    I

16   think he handed it to me and then, he didn't

17   actually explain it to me, he just told me that

18   I needed to sign it and I read through it and I

19   assumed that I probably knew what it was

20   about.    That's all.

21      Q.    Did you have any questions of Mr.

22   Meckstroth regarding Exhibit 2?

23      A.    I didn't ask him any questions of

24   anything because there were things coming at me

25   so fast that I didn't think I was supposed to

1     be signing that I can't really say whether I

2     asked him questions about these things or not.

3           Q.    Did you have any contact with Mr.

4     Bigelow after the closing?

5           A.    I contacted his office, yes.

6           Q.    With respect to what, sir?

7           A.    With respect to there being some

8     other work on the house that needed to be done.

9           Q.    In addition to that which you agreed

10    to?

11          A.    No, that where it was supposed to be

12    included in the things that I agreed to.

13          Q.    And was there some sort of writing

14    that contained these things?

15          A.    Only the things, I mean, there was a

16    verbal, there was verbal agreement between Mr.

17    Bigelow and I, and I assumed that he was an

18    honorable man and assess those verbal

19    agreements that he made.  I mean, before I went

20    into anything written, I had a verbal agreement

21    with him and I assumed that verbal agreement

22    would be transacted into the same written

23    agreement.

24                That's why I dealt with Mr.

25    Bigelow.  Now, these are the things that he

1      told me and these are the things that I

2      believed that he would do.  Consequently,

3      otherwise, I would never have entered into a

4      written agreement with Mr. Bigelow.

5           Q.    Looking into Exhibit 1 and paragraph

6      two does it refer to certain things that are

7      going to be done?

8           A.    Okay, I don't, I can't really say

9      that because I don't know what these last

10     words, it says for two years.  To be, I don't

11     understand what are the last words over here.

12          Q.    Sir, I have great difficulty reading

13     handwriting.

14          A.    I can't --

15          Q.    I can suggest to you that Mr.

16     Schwantes had made reference to make repair to

17     roof and porch.  Do you see that?

18          A.    Yes.

19          Q.    Do you see any reference to any

20     other repairs that were agreed to be made?

21          A.    Not really, no.

22          Q.    Were there any other repairs that

23     were agreed to be made?

24          A.    He didn't finish repairing the roof

25     and the porch, there was still a hole on the

1    side of the roof.

2        Q.    We are back at the other question,

3    were there any other repairs that were agreed

4    to be made?

5        A.    No, not really.  He did not fulfill

6    those repairs, that's what I'm saying.

7        Q.    So roof and porch were the only two

8    repairs that were agreed?

9        A.    He did not, yes, but he did not

10   finish the roof.

11       Q.    Did he do some work on the porch?

12       A.    He did work on the porch, yes, he

13   did.

14       Q.    Did he do work on the roof?

15       A.    He did not finish the repairs on the

16   roof.

17       Q.    Did he do work on the roof?

18       A.    He did work on the roof but he did

19   not finish the repairs on my roof.  Those were

20   my, our agreement, to finish, repair the roof

21   and the underseeding of the porch, those two

22   things were not finished.

23       Q.    Did you communicate this to Mr.

24   Bigelow?

25       A.    I left messages with Mr. Bigelow.  I

1    told him there was a hole in the side of the

2    roof and it was still there.  It wasn't when we

3    left, the hole was still there on the side of

4    the roof.

5        Q.    You left messages with Mr. Bigelow?

6        A.    I left messages with Mr. Bigelow at

7    his office.

8        Q.    A message?

9        A.    I think it was a message, it might

10   have been more.

11       Q.    When was that you left this one

12   message?

13       A.    I don't know.

14       Q.    Was it shortly after closing?

15       A.    No, it was after these repairs had

16   been done and at least two months into the

17   contract.

18       Q.    The initial repairs were done

19   immediately?

20       A.    None of these, these repairs were

21   not done.  Those were part of the initial

22   repairs.

23       Q.    I'm sorry, sir, the work that was

24   done on the porch and roof, the work that was

25   done, was that done shortly after the