UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHIRDENIA BRYANT, et al., | : | Case No. 1:02cv006 |
| | : | (Judge Spiegel) |
| Plaintiffs, | : | |
| | : | |
| -vs- | : | |
| | : | PLAINTIFFS' MEMORANDUM IN |
| PRESCOTT BIGELOW, IV, et al., | : | OPPOSITION TO DEFENDANTS' |
| | : | CONSOLIDATED MOTION FOR |
| Defendants. | : | SUMMARY JUDGMENT |
| _____ | : | |

This memorandum responds to the "Consolidated Motion of Defendants Prescott Bigelow IV and Roseanne Christian for Summary Judgment" (Doc. 40), filed October 1, 2003.[1] By that motion Defendants seek summary judgment on nine grounds:

(1) on all of Curtis' claims based on *res judicata* (Defendants' Memo, at 14-24);

(2) on the RICO and pendent fraud claims based on the assertion that the "defendants have committed no predicate acts of fraud under RICO, nor any acts of common law fraud" (Defendants' Memo, at 24-27);

(3) on all RICO claims because the plaintiffs "have failed to produce evidence" of a pattern of racketeering activity (Defendants' Memo, at 27-28);

(4) on the RICO claims because plaintiffs "have failed to establish the existence of an 'enterprise,'" as defined by the statute (Defendants' Memo, at 28-29);

---

[1] Defendants' motion deviates from Local Rule 7.2(a)(3), because, as a filing exceeding 20 pages, it does not have a summary, as prescribed by the rule.

1

(5) on all claims, because required proof violates Ohio's statute of frauds, R.C. §1335.05 (Defendants' Memo, at 29-31);

(6) on all claims, because proof the "parol evidence rule" makes proof of Plaintiffs' claims impossible (Defendants' Memo, at 32-33);

(7) on all of Curtis' claims, because the land contract prepared for him by alleged co-conspirator Meckstroth "was not signed" (Defendants' Memo, at 34-35);

(8) on all of Bryant's claims, because she is "bound by the terms of" a signed release (Defendants' Memo, at 35-36); and

(9) on all breach-of-fiduciary-duty claims, because "Bigelow owed no fiduciary duty to the plaintiffs" as a matter of law. (Defendants' Memo, at 36).

These arguments rest on a 13-page recitation of purported "facts" that is a set of disjointed, out-of-context snippets of testimony, wholly inconsistent with Civil Rule 56. None of the purported grounds for the motion has any merit, and this Court should deny the motion for the reasons stated below.

**Plaintiffs' Statement of Facts**

The relevant facts - particularly those material facts that are disputed - are set forth in the declarations of Shirdenia Bryant, Harry Curtis, Mark Burbrink ("Burbrink"), and Russell Paige ("Paige"), filed separately. Those facts are too extensive to repeat in detail in this memorandum, but they may be summarized as follows. In 1997, the plaintiffs, Burbrink, and Paige lived in family homes, which they had inherited. These homes were worth between $40,000 and $100,000 each, and they had either no mortgage liens encumbering them or very small mortgage loans outstanding. Shirdenia Bryant's

2

mortgage loan was just over $10,000, and Harry Curtis' home was not mortgage-encumbered at all but rather had a $4,500 delinquent real estate tax lien against it.

During 1997, 1998, or 1999, each of these homeowners at one time or another had fallen behind on tax or mortgage payment obligations, and foreclosure suits had been instituted in Hamilton County. The Hamilton County Treasurer, represented by the Hamilton County Prosecutor's Office, was a party to each of the lawsuits. Attorney John Meckstroth was then and is now a lawyer with the Civil Division of the Prosecutor's Office.

A short time after the Hamilton County Prosecutor or a mortgage company had filed the foreclosure lawsuit, Defendant Roseanne Christian ("Christian") suddenly appeared at the homeowner's door.[2] Harry Curtis, for instance, found her roaming around the first floor of his home, she having entered unannounced just hours after the Prosecutor's Office filed the foreclosure against him and before Curtis knew anything about the foreclosure.

Roseanne Christian's (and Johnny Marfisi's) routine opening line was that she or they were from an organization involved in "helping" people save their homes. Indeed, she advised Mark Burbrink and Russell Paige that she worked with Tri-State Mortgage Assistance, an eleemosynary organization that helped people in financial trouble protect their homes. According to Defendant Christian, the organization or her "friend," for a

---

[2] Defendant Christian has been identified as the door-knocker by Bryant, Curtis, and Burbrink. Paige does not recall the name but will be able to testify at trial, when he sees her, whether or not she was the door-knocker that accompanied Johnny Marfisi to the Paige home.

small fee, could deal with these homeowners' respective foreclosure problems and give them a new start. Each, as it turned out, became interested.

After the initial communications with Christian, either Prescott Bigelow IV or his "partner," Johnny Marfisi, appeared to look over each of the homes and to write up an agreement to "save" the homes. Although there were some minor variations in approach, the proposals were quite similar and were structured as follows:

1. Each homeowner would continue to live in his/her home, while the "organization" or Bigelow would take care of resolving the foreclosure lawsuit.

2. Each homeowner would be induced to deed to the property over to Bigelow.

3. Bigelow would pay the homeowner a sum (very small when compared to the property's value) at the time the deed was transferred.

4. Papers would be signed (sometimes the term "land contract" was used) giving the homeowner the right to reacquire the property, usually a year or so after the initial transaction. Bigelow advertised his mortgage company ownership and promised to arrange 100% financing for the repurchase.

5. Until the formal reacquisition, the homeowner would make monthly payments to Bigelow. Sometimes a lease, specifying these payments, was signed. For some properties the arrangement called for Bigelow to make repairs to the home.

During the next step of the process, Bigelow introduced the homeowners to attorney John Meckstroth of the Hamilton County Prosecutor's Office. In reality, Meckstroth worked not only for the government but also had a private practice,

representing Bigelow, among others. But Bigelow and Meckstroth intimated to these homeowners that lawyer Meckstroth also was going to represent them and take care of their interests.

Meckstroth prepared all of the papers for the closing.[3] He charged legal fees to both Bigelow and the homeowners. In the case of Harry Curtis, Meckstroth undertook to represent Mr. Curtis by preparing the land contract to which Curtis and Bigelow had agreed.[4] At the closings, the homeowners – quite unsophisticated in real estate transactions and ignorant of lawyer parlance – were given papers to sign, and they signed them. The homeowners assumed that Mr. Meckstroth had protected them.

However, invariably, unusual things took place at the closing. At the Bryant closing, for example, Shirdenia Bryant arrived with the expectation that she was carrying out a transaction with Marfisi and would receive $20,000. To her surprise, Defendant Bigelow appeared at the closing in place of Marfisi, whom she had expected, and the $20,000 payment to her did not materialize. Bigelow (via Meckstroth) gave Bryant a check for $1,000, along with a $19,000 no-interest promissory note, which Bigelow promised to pay her within 60 days. At the Burbrink closing, crucial papers (which were supposed to protect the Burbrinks' interest in the property) disappeared, as Mr. Meckstroth's photocopy machine purportedly stopped working. Mr. Meckstroth promised to send copies of the papers to the Burbrinks later, but those papers never arrived. At the Harry Curtis closing, the land contract (the centerpiece document that

---

[3] An exception appears to have been Russell Paige, who did not encounter Meckstroth. All of the Paige-related papers were signed at 422 Glenwood in Avondale, Russell Paige's home.
[4] Meckstroth also provided legal services to Shirdenia Bryant (real estate-related probate court services).

Curtis paid Meckstroth to prepare and close) was supposed to have been signed, but Meckstroth only gave Curtis an unsigned version, purporting to keep the signed version. Russell Paige was not even aware that he had signed a deed. Marfisi and Christian assured him that he would be making his mortgage payments to the "helping" organization to which they belonged.[5]

To be sure, these homeowners came away from the closings with some money: Shirdenia Bryant received a $1,000 check; the Burbrinks received $2,000; and Harry Curtis received $9400 after paying Meckstroth's legal fees. After the closings, these homeowners began to make monthly payments to Bigelow.

Invariably, a dispute arose between each of these homeowners and Bigelow. The disputes themselves were varied: late or unpaid rent; unfinished repairs that Bigelow had promised; Bigelow's failure to pay a promissory note per its terms. In every case, however, the representations and promises that had been made to these homeowners were either denied or forgotten. For instance, Bigelow commenced eviction proceedings against Harry Curtis. When Curtis protested that he had a land contract on the property, Bigelow enlisted attorney Meckstroth, whom Curtis had paid for the land contract, to have Curtis evicted. Meckstroth and Bigelow denied in open court that a land contract had ever been signed. Curtis was evicted.

---

[5] Years later, when Paige learned that he did not own the property, he demanded to speak with Marfisi, who he believed had swindled him out of his home. Bigelow, however, warned Paige that Johnny Marfisi was with the Mafia and he shouldn't be messed with.

The Burbrinks asked Bigelow to follow through on his promise to provide the 100% financing for the reacquisition. Bigelow responded that his "partner" (*i.e.,* Marfisi) said "no." Then Bigelow had the Burbrinks evicted.

Russell Paige ran into the same problem. When Paige demanded compliance with the promises that Bigelow had made, Bigelow twice warned Paige that his "partner" (Marfisi) was a part of the Mafia and that Paige shouldn't mess with him.

Shirdenia Bryant was exceptional in one respect. Bigelow did allow her to reacquire the property. When Shirdenia Bryant first met Bigelow, her outstanding mortgage was just over $10,000. She received $1,000 at the closing, made a net total of $10,900 in payments to Bigelow. As soon as Bigelow acquired the property, he encumbered the property with a $56,000 second mortgage (Bigelow Dep. Exh. 79) and later "allowed" Shirdenia Bryant to repurchase it for $64,000. Plaintiff Bryant, unsophisticated as she was, soon defaulted on her new mortgage and lost the home in foreclosure.

The financial results of Bigelow's contacts with these homeowners were:

| Homeowner | Home Value | Mortgage or Tax Lien Amount | Amt Bigelow Paid to Homeowner | Amt Homeowner Paid to Bigelow | Sale Price by Bigelow |
|---|---|---|---|---|---|
| Bryant | $66,000 | $10,945.16 | $2,400 | $13,301 | $64,000 |
| Curtis | $90,000 | $4,500 | $9,800 | $700 | $97,000 |
| Burbrink | $85,000 | $22,500 | $2,000 | $4,700 | $126,000 |
| Paige | $42,000[6] | $19,000 | $2,000 | $8,200 + | ? |

---

[6] This was the Hamilton County Auditor's appraised value in 1997.

### B.    Plaintiffs' Responses to Defendants' Arguments.

1.    **Argument:  That *Res* Judicata Bars Any Recovery by Curtis.**

On pages 7-14 of their motion papers, Defendants repeat – essentially verbatim – the arguments previously asserted in their motion to dismiss for lack of subject matter jurisdiction (Doc.35).  The arguments have no more merit on summary judgment than they do under an ersatz "lack of subject matter jurisdiction" label, heretofore presented via motion to dismiss.  Plaintiffs incorporate by reference their memorandum of law (Doc.36), filed in response to the Defendants' previous motion.

2.    **Argument:  That Plaintiffs Have Failed to Prove that RICO Predicate Acts Were Committed or That Defendants Made Any Fraudulent Representations.**

(a)  **False Representations and Deceptive Conduct.**  This Court need not look far to find the myriad of misleading and false statements of material fact made by Bigelow, Christian, Meckstroth, and Marfisi.  Defendants' intimation that the false statements are no more than Bryant's generalized claim that she was "hoodwinked" completely misses the mark.  First of all, during the initial contacts, Christian misrepresented who she was and what she was doing.  She falsely pretended that she was involved in a "helping" or charitable vocation and that Tri-State Mortgage Assistance was an organization that "helped" people save their homes.  The truth couldn't be further from those words.  Christian was the initial door-knocker, Bigelow's first contact with his prospective victims.  The evidence will show that Christian's job was to lend an air of confidence that would be very difficult to inculcate if the initial door-knocker had been a

8

white male of Bigelow's ilk. Indeed, Marfisi and Christian advertised to Paige their mission of protecting black families from losing homes that had been in the family a long time. *See* Paige Declaration at ¶ 5.

Second, both Christian and Bigelow falsely represented that their aim was to help financially stressed homeowners to "save" their homes. The evidence will show that their intent was to "take," not save the home. Strong circumstantial evidence of this intent comes from the very compensation structure between Bigelow and Christian. Christian was paid based on how well Bigelow did at the closing, *i.e.,* how much equity he acquired in the property. For instance, where Bigelow acquired a home with a large amount of equity (such as with Curtis or the Burbrinks), Christian would be paid upwards of $3,000. In contrast, where Bigelow acquired a home with far lesser equity in it, Christian's payment at the closing would be only a fraction of the $3,000. If Bigelow had intended to follow through with the promises that he made to the homeowners, there would have been no funds generated to pay the fees to Christian. The representations about Bigelow's plan to charge the homeowners merely a "small fee" were false. Not only Shirdenia Bryant but also Bigelow himself dispute Roseanne Christian's affidavit, *i.e.*, her statement that Bigelow did not pay her anything on the Bryant deal. For instance, in examining Plaintiff's Exh. 73 to Mr. Bigelow's deposition, Defendant Bigelow gave the following testimony:

> Q. [BY MR. BLESSING]  Okay.  And then next you have something to Roseanne.  You indicated earlier that you didn't know Roseanne at this time.
>
> A.  I didn't think I did.

9

>Q. A thousand dollar check to Roseanne. Does this ring a bell that you did know her and he -- she was part of this arrangement?
>
>A. No. I -- I don't know -- I don't think I knew her then.
>
>Q. Do you know anyone named Roseanne other than Roseanne Christian?
>
>A. No, no. That would be her.
>
>Q. Okay.
>
>A. She -- she worked with John Marfisi.
>
>Q. When did you learn that?
>
>A. I don't know. I don't know when I learned it.
>
>Q. But why were you paying her in addition to payments to Marfisi?
>
>A. I don't know why I paid her $1,000.

Bigelow Dep., at 105.

Third, one of Bigelow's crucial false representations, made to Harry Curtis as well as to the Burbrink brothers, was that papers would be signed protecting the homeowners' rights to reacquire the property. This was the essence of the deal. Those papers were prepared – indeed, in the case of Harry Curtis, a copy was given to him – and purportedly signed at the Meckstroth-orchestrated closing, but the signed copies never materialized. One of the major acts of fraud in this scheme was to create a shell game with the land contract documents, inducing Curtis and the Burbrinks to believe that those closing documents had been signed. Crucial to this ruse was the participation of lawyer Meckstroth.

There were other acts and words of fraud. One was the pretense by Bigelow and Meckstroth to Bryant that Bigelow had "assigned" his obligation to pay the $19,000 promissory note to Johnny Marfisi. Shirdenia Bryant was not sophisticated enough to understand that a promissory note maker may not "assign" away an payment obligation. But Bryant was induced to believe that was the case. Another fraudulent act was to create a "Paid in Full" endorsement on the promissory note from Bigelow to Bryant. Bryant testified that the document bears her signature but that the "Paid in Full" legend was not on the document when she signed it.

Indeed, Bigelow was deeply involved in document falsification. When he was trying to arrange for Bryant to repurchase the then mortgage-ridden home that she had delivered to him for $1,000, Bigelow falsified a land contract, purporting that a land contract had been signed between Bryant and him. He presented this to a financial institution to induce the financial institution (First Franklin) to make a mortgage loan to Bryant. (During his sworn deposition testimony, Bigelow flatly denied ever entering into a land contract with Bryant. However, third-party discovery of a financial organization revealed that land contract, on which Shirdenia Bryant states that her signature is forged.)

In sum, the Plaintiffs have identified and will prove that the Defendants made numerous false statements of material fact as well engaged in fraudulent conduct.

**(b) RICO Predicate Acts.** On page 25 of their motion papers, Defendants declare that they "have committed no predicate acts of fraud under RICO." This assertion, according to Defendants, merits summary judgment. Defendants are mistaken on the law and overlook the facts. First, Defendants confuse proof of predicate acts

11

under RICO with the elements of common law fraud. While this case features ample instances of common law fraud, they are not one in the same with RICO predicate acts. Second, Defendants' argument is little more than mere repetition of their motion-to-dismiss arguments that this Court has already rejected.[7] In the face of Defendants' unsworn assertion, Plaintiffs have submitted affidavits, attached, which demonstrate that the U.S. mails and interstate wire were used to facilitate the Defendants' scheme.

    C.    **Argument: That Plaintiffs Have Failed to Produce Evidence Of a Pattern of Racketeering Activity.**

Defendants again lift arguments directly from their motion to dismiss (Doc.35), contending that the Plaintiffs have failed to prove that any predicate acts caused them injury. Strangely, Defendants state on page 28 of their papers:

> Further, there is no proof of a pattern of racketeering activity, involving isolated transactions over a short period of time.

On the latter point, Plaintiffs heartily agree with Defendants. Plaintiffs do not focus on "isolated transactions over a short period of time." Instead, as indicated in the affidavits, attached, there were multiple transactions extending over several years. The affidavits indicate that the predicate acts caused injury to the Plaintiffs.

---

[7] On pages 7-12 of their motion to dismiss (Doc. 35), filed March 12, 2002, Defendants made the same arguments of law and cite essentially the same cases.

**D.    Argument:  That Plaintiffs Have Failed to Produce Evidence
                Of a RICO Enterprise Separate and Distinct from
                The RICO Defendants.**

This is another cut-and-past selection from the Defendant's motion to dismiss (Doc. 35).  Again, the argument ignores the allegations and the evidence.  First, Paragraph 33 of the amended complaint (Doc. 14) identifies the enterprises, *i.e.*, Bigelow Properties, Tri-State Mortgage Services, Tri-State Mortgage Assistance, and the association-in-fact among Bigelow, Christian, Marfisi, and Meckstroth.  Second, a good portion of the deposition of Defendant Prescott Bigelow IV focused on his operation of these enterprises.  *See* Defendant Bigelow's Deposition Transcript, at 15-19, 43-44, 49-56, 130.

**E.    Argument:  That Ohio's Statute of Frauds Defeats Plaintiffs' Claims.**

Defendants commence this argument with out-of-context and misleading references to Harry Curtis' deposition and conclude by asserting that the "verbal agreement upon which Curtis relies is barred by the statutes of frauds."  Defendants' Memo, at 29.[8]  First, in contrast to the Defendants' portrayal, the agreement between Harry Curtis and Defendant Bigelow was embodied in a writing, signed by both parties.  Curtis Dep. Exh. 4.  Although that particular document does not contain the phrase "land contract," the concepts described are certainly those of a land contract, *i.e.*, Mr. Curtis' right to acquire the property at the end of two years for $37,000.  *Id.*  As an integral part of that arrangement, Defendant Bigelow had lawyer Meckstroth prepare a land contract.

13

Bigelow Dep. Exh. 121. Each of Curtis' payment checks to Bigelow referenced "Land Contract." Bigelow Dep. Exh. 111, 112.

Plaintiffs have no quarrel with Ohio's statute of frauds. But that statute has no application to this proceeding.

**F.     Argument: That the Parol Evidence Rule "Bars" Plaintiffs' Claims.**

The "parol evidence rule" section (pp. 32-33) of Defendants' motion papers is unclear. First, Defendants contend that Defendant Christian was not a party to any contract or lease.[9] Second, Defendants contend that the only Bryant-related documents signed by Bigelow are the settlement statement and a January 6, 1999 lease. That is not correct. Bigelow signed a $19,000 promissory note in favor of Shirdenia Bryant. He and Meckstroth then induced Bryant to believe that he had a right to "assign" that note obligation to Marfisi. Under threats of forcing her out of her home, Bigelow and Meckstroth then had Bryant sign a "Release" document, which Bigelow also signed. Finally, Bigelow manufactured a land contract, forged Shirdenia Bryant's name on it, and signed that document.

Third, Defendants assert that "Bryant cannot modify or contradict the terms of these agreements." Defendants' Memo, at 32. If Defendants are asserting that the parol evidence rule defeats all claims of fraud-in-the-inducement or RICO §1962(c) or (d) claims, they are wrong. *See, e.g., Coal Resources, Inc. v. Gulf & W. Indus., Inc.*, 756 F.2d 443, 446 n.2 (6th Cir. 1985); *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 27, 734 N.E.2d

---

8 Plaintiffs will assume that, when Defendants use the term "verbal" agreement, they mean "oral" agreement, given that both written and oral agreements are "verbal."

782, 788-89 (2000); *Williams v. Edwards*, 129 Ohio App. 3d 116, 124, 717 N.E.2d 368, 374 (1997) (permitting claims of fraud despite the parol evidence rule when the promisor had no intention of honoring his promise and thus had actual fraudulent intent).

Finally, Defendants assert that "Curtis cannot rely on an alleged verbal (*sic*) agreement to contradict the terms of the purchase contract." Defendants' Memo, at 32. As indicated above, the signed writings support Curtis' claims in this action. Defendants' reliance on the parol evidence rule is misplaced.

**G.     Argument:   That the Unsigned Land Contract Precludes Curtis' Claims.**

Plaintiff Curtis asserts that Defendants Bigelow and lawyer Meckstroth led him to believe that the land contract (Bigelow Dep. Exh. 121) was signed at the August 25, 1999 closing. At that closing Curtis paid Meckstroth $295 for the services. Bigelow Dep. Exh. 109-110. Not knowing the extent to which Meckstroth was in league with Bigelow and believing that Meckstroth (who he had paid for land contract legal services) would protect his interests, Curtis believed that the land contract had been signed along with the remainder of the closing documents. Curtis Dep., at 180.

The Defendants argue that Ohio law permits Bigelow and Meckstroth to carry out this scheme against the Curtis family. Defendants' Memo, at 34. According to the Defendants, the land contract was irrelevant and Bigelow would have had the right to take the Curtis home even if a land contract had been signed. Defendants rely on R.C. §5313.07 as the source of this right. Plaintiffs, in contrast, assert that neither Ohio nor federal law supports

---

9 That is correct as to the Plaintiffs, but it is not correct as to Defendant Bigelow. Christian had an agreement with Bigelow under which he paid her depending on how much equity was in the properties.

the notion that a fraud scheme such as was perpetrated against the Curtis family is insulated from liability.

> H.    Argument:    A Release Bryant Was Induced to Sign in Favor of Bigelow Extinguishes Her Rights to Bring Claims Against Bigelow.

Defendants argue that on January 6, 1999, Plaintiff Bryant signed a "Release of All Claims" against Bigelow.  Plaintiff Bryant's affidavit and her deposition testimony describe exactly what she signed and why.  Bryant indeed signed a "Release," which on its face released Bigelow from responsibility on a $19,000 promissory note that he had signed.  She never signed a document entitled "Release of All Claims," as Defendants' motion papers suggest.

She signed the release for two reasons:  (1) Bigelow and Meckstroth represented to her that the obligation had been "transferred" to Johnny Marfisi and that Bigelow had no more responsibility to pay; and (2) if she did not sign, Bigelow would evict her from her home, putting her out on the street.  Bryant testified to the choice she faced at the time:

> But if you had a choice of being put out in the street or signing a promissory note, what would you take?  The release.

Bryant Dep., at 158.  Defendants' recitation of well-established law is notable for its omission of *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 27, 734 N.E.2d 782, 788-89 (2000), and *Williams v. Edwards*, 129 Ohio App. 3d 116, 124, 717 N.E.2d 368, 374 (1997).  "A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract:  examples include a party to a release misrepresenting the economic value of the released claim, or one party employing coercion or duress to cause the other party to sign an agreement."  *ABM Farms v. Woods* (1998), 81 Ohio St.3d 498, 503, 692 N.E.2d 574, 578, *citing Haller v. Borror Corp.*

16

(1990), 50 Ohio St. 3d 10, 552 N.E.2d 207.  We submit that Shirdenia Bryant was deceived the compelled to sign the release.  Nonetheless, regardless of whether the release is valid or invalid, its presence does not prevent Shirdenia Bryant from prosecuting her fraud and RICO claims against the Defendants.

## CONCLUSION

Defendants have failed to meet the standards required for a summary judgment under Civil Rule 56.  Given the deposition transcripts and the sworn statements, attached, a trial is necessary to resolve the genuine issues of material fact in this case.  Defendants' motion should be denied.

Respectfully submitted,

**s/ William H. Blessing**
William H. Blessing (#0006848)
Attorney for Plaintiffs
119 East Court Street, Suite 500
Cincinnati, Ohio  45202
Telephone: (513) 621-9191
Telecopier: (513) 621-7086
E-mail: billblessing@cinci.rr.com

## CERTIFICATE OF SERVICE

  I hereby certify that on October 27, 2003, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed the document by United States Postal Service to the following:

Gary R. Lewis, Attorney
Gary R. Lewis Co. LPA
Cincinnati Club Building, Suite 915
30 Garfield Place
Cincinnati, OH  45202.

                **s/ William H. Blessing**
                William H. Blessing (#0006848)
                Attorney for Plaintiffs
                119 East Court Street, Suite 500
                Cincinnati, Ohio  45202
                Telephone: (513) 621-9191
                Telecopier: (513) 621-7086
                E-mail: billblessing@cinci.rr.com