**FILED**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

OCT 2 7 2003

KENNETH J. MURPHY, Clerk
CINCINNATI, OHIO

| | |
|---|---|
| **SHIRDENIA BRYANT**, *et al.*, | : |
| | :     (Judge Spiegel) |
|     Plaintiffs, | : |
| | : |
| -vs- | : |
| | :     **DECLARATION OF HARRY** |
| **PRESCOTT BIGELOW IV**, *et al.*, | :     **HARRY CURTIS IN OPPOSITION** |
| | :     **TO DEFENDANTS' MOTION FOR** |
|     Defendants. | :     **SUMMARY JUDGMENT** |

I, HARRY CURTIS, make this Declaration on my own free will, without duress or compulsion, and under penalty of perjury.

1. I am one of the Plaintiffs in this lawsuit. I am making this declaration in opposition to the Defendants' Consolidated Motion for Summary Judgment. I am making this declaration based on my personal knowledge, and I am able to testify to the facts here stated.

2. In July 1998 I was the owner of a home at 1966 Fairfax in Cincinnati. I had inherited this home, and it did not have any mortgage loan against it. By mid-1999, however, it did have about $4,500 of back taxes against it. I was then living in that home with my wife. The home was worth $80-95,000 at the time. I also owned family heirlooms and other personal property inside of that home that were worth many thousands of dollars.

3. On a Saturday morning in about July of 1999, my wife and I were on the second floor of our home when I heard noises coming from the first floor. I descended the stairs and found a woman roaming through the first floor of my home. I asked her

what she was doing there. She told me that she thought the home was empty and had entered through the back door. (I wondered at the time how she came to that conclusion, because there was laundry hanging on the line in the back yard.) The woman introduced herself as "Roseanne Christian." She had some papers in her hand, and she told me that those papers showed that the property was under a foreclosure lawsuit. That was a surprise to me.

4. I recognized the woman as a person with whom I had attended church as a child. She told me that she had a friend in the business of "helping" people in financial distress to save their homes. She said her friend could "help" me with my tax foreclosure problem. That friend, according to the woman, was a Mr. Bigelow, who I'd never heard of before. I told her I wasn't interested in selling my house, and she responded that a sale wouldn't be necessary. We talked for awhile, and she told me that she would ask Mr. Bigelow to stop at my home.

5. Within a short time a white man who identified himself as "Pete Bigelow" stopped by my home. He looked over the property, and we spoke a few words. During that conversation I told him I didn't want to sell my home. He talked about an arrangement where I would remain the owner of my home while the foreclosure problems would be taken care of.

6. Within a few days Roseanne Christian again appeared at my home, and she brought with her a contract, which has been marked as Exhibit 100 to Mr. Bigelow's deposition in this case. She left the contract at my home. My wife and I signed the contract and Roseanne Christian came by to pick it up. Mr. Bigelow made the terms of the arrangement fairly clear. I would temporarily transfer my property to him, and we

2

would immediately sign a land contract under which I would be buying the property back. I would receive $10,000 at the closing and make $350 per month land contract payments to Mr. Bigelow. He would clear up the $4,500 tax foreclosure lawsuit and make some specified improvements to the property. He told me that he owned a mortgage company and, after a few months, he would arrange for financing to pay off the land contract price, which was $37,000.

7. Mr. Bigelow referred me to a lawyer named John Meckstroth. Mr. Meckstroth was supposed to represent me in preparing the land contract and handling the signing of the papers. During August 1999, I called Mr. Meckstroth's office about the land contract and was assured that everything was moving along without a hitch.

8. I attended the signing of the papers in downtown Cincinnati at Mr. Meckstroth's office on August 25, 1999. Mr. Meckstroth had prepared the land contract for everyone's signature, and I relied on him. My wife and I signed the deed to the property over to Mr. Bigelow, and we received about $9,400. I signed several papers, one of which – I thought – was the land contract. At the end of the meeting, Mr. Meckstroth gave me unsigned copies of all the papers that had been signed. Included in those documents was the land contract. My wife and I left the meeting with the impression that the land contract was among the documents that were signed. Mr. Meckstroth deducted his legal fee (for doing the land contract work) from the amount that was to be paid to me at that meeting.

9. Three days later I did as I had been instructed: I used the U.S. mails to send Mr. Bigelow the first land contract payment. Exhibit 111 to Mr. Bigelow's deposition is a copy of that check, which contains the description: "land contract."

3

10. I made the second land contract payment at the end of September, again mailing it to Mr. Bigelow per his instructions. Exhibit 112 to Mr. Bigelow's deposition is a copy of that check.

11. According to the contract I had with Mr. Bigelow, he was supposed to complete some roof-related repairs on my home. As the weather started to get cooler, in October, Mr. Bigelow had not completed the work. I tried again and again to call him, but he did not return my calls. I was only able to reach Roseanne Christian at his office.

12. I did not make the November 1999 land contract payment to Mr. Bigelow, because he had failed to abide by his contract with me. I tried to contact him, but he didn't return my calls. I also did not make the December land contract payment for the same reason.

13. In late December of 1999, Mr. Bigelow started eviction proceedings against me in Hamilton County Municipal Court. I received papers from the Court in early 2000, and on about January 18, 2000 I attended an eviction hearing at Municipal Court before a magistrate, taking with me the money I had withheld because Mr. Bigelow had failed to honor our contract. During that hearing, I told the magistrate that I had a land contract with Mr. Bigelow but I didn't have a lawyer. I didn't think I could be evicted under the circumstances of my land contract, and the hearing was reset for a few days later.

14. I attended a second hearing before a different magistrate, who I told I had a land contract with Mr. Bigelow. I showed him my copy of the land contract, and the magistrate reset the hearing.

15. On the 1st of February 2000, I attended a third hearing with the magistrate of the Municipal Court. My Bigelow attended that hearing, and he showed up with John Meckstroth (who had been my lawyer) representing him. Both Mr. Bigelow and John Meckstroth denied that there was a land contract, and John Meckstroth acted to have me evicted. Because the copy I had was not signed, the magistrate ordered me evicted. I couldn't believe it was happening to me.

16. Within a few days the eviction took place. On the morning of the actual eviction, February 9, I flipped out. I went to the basement of my home, struck a match, and through the lit match toward some corrugated board boxes. Then I left the premises. I came back in the afternoon. The fire department had been at the house, but the firemen were gone when I returned. I tried to go into the house to retrieve my property, but Mr. Bigelow wouldn't let me in. Some days later I was able to gain access to the house; there was some smoke damage but no real fire damage. However, almost all of my personal property had been taken. I admitted what I had done and was arrested, charged with arson.

17. I pled to the arson charge and was sentenced to a jail and ordered to pay almost $68,000 in restitution to the insurance company that had paid Mr. Bigelow. Mr. Bigelow received the nearly $68,000. He spent a few thousand dollars cleaning the place, and then sold the property for $97,000.

18. As a result of my transactions with Mr. Bigelow, I received $9,400. I paid Mr. Bigelow $700, and he received $67,420 from the insurance company and $97,000 in sale proceeds from the house.

19.    I have read the affidavits of Roseanne Christian and Prescott Bigelow IV, which have been filed in support of the Defendants' summary judgment motion. Paragraph 2 of Roseanne Christian's affidavit is not consistent with her involvement with my property. I dispute the statements in Paragraph 8 of Roseanne Christian's affidavit.

_____
Harry Curtis

_____
Date  10/27/03