**FILED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

OCT 2 7 2003

KENNETH J. MURPHY, Clerk
CINCINNATI, OHIO

| | | |
|---|---|---|
| **SHIRDENIA BRYANT,** *et al.,* | : | |
| | : | (Judge Spiegel) |
| **Plaintiffs,** | : | |
| | : | |
| -vs- | : | |
| | : | **DECLARATION OF** |
| **PRESCOTT BIGELOW IV,** *et al.,* | : | **RUSSELL PAIGE** |
| | : | |
| **Defendants.** | : | |

I, RUSSELL PAIGE, make this Declaration on my own free will, without duress or compulsion, and under penalty of perjury.

1. I am a resident of Hamilton County, Ohio, competent to testify before this Court, and I am making this Declaration based on my personal knowledge.

2. In 1997, I was living at 422 Glenwood Avenue, in the Avondale community of Cincinnati, Ohio. I am a high school graduate and, at that time, knew nothing about real estate. I had received ownership of the Avondale home in the late 1980s from my mother, who had received it from my grandmother. The home had been in my family since the early 1950s. When I received the 422 Glenwood property, it was free and clear of any mortgages.

3. In early 1997 I took out a mortgage loan on the property of $19,000. The property was worth $40-50,000 at the time. Unfortunately, soon after I took that loan, I was laid off from my job. After the layoff, I missed several mortgage payments, and the mortgage holder brought a foreclosure lawsuit against me.

4. That lawsuit was going forward during the Fall of 1997 when, one day, I received a knock on my door. Two people were at the door – a white male (Italian or southern European in appearance) and a black female. The man introduced himself as Johnny Marfisi. I do not remember the name of the woman. I let them in. I don't remember the date of the visit, but I do remember it was football season and I think it was on a Saturday.

5. Mr. Marfisi and the woman told me that the court records showed that my house was being foreclosed upon. They told me they worked with an organization – I recall them using the name of "Tri-State Mortgage Assistance" or something like that. They said it was a helping organization whose purpose was to help people in financial stress to save their houses. I was told that they had helped a lot of people in this way. Mr. Marfisi told me that one of his major concerns was that he didn't like to see black families lose their homes, especially when the homes had been in the family for a long time.

6. Mr. Marfisi and the woman explained how their organization helped people. They explained that, instead of making my mortgage payments to the mortgage company, I would make the payments to them. They would take care of resolving the mortgage foreclosure lawsuit. After making the payments to them for about a year, they would then get a replacement mortgage loan for me.

7. I was very interested in what they had to say. They spent about an hour at my home. At the end of the session, they told me to think about it and we would be in contact later. Mr. Marfisi left his telephone number with me.

8. About the middle of the following week, telephone contact between me and Mr. Marfisi took place. I don't remember whether he called me or I called him. During that conversation, we made arrangements for Mr. Marfisi to come by my house again. The following Saturday he and the woman again showed up at my house. During that meeting, Mr. Marfisi brought up how much I could pay per month. He suggested $500 per month. I told him that, although I had gone back to work, I couldn't do $500 per month (my mortgage payment obligation under the mortgage had been $243 per month), but I would be able to pay $350 per month as I had been called back to work. Mr. Marfisi said he would have to discuss the $350 per month with his superior but thought that it shouldn't be a problem. He and the woman then left.

9. A few days later I received a call from the woman who had accompanied Mr. Marfisi. She said that her superior had "approved" the $350 per month and she wanted to set up a day for them to come back. We arranged for them to come on the following Saturday. When they arrived on a Saturday, Mr. Marfisi had some papers for me to sign. One of those papers was a three-layered set of papers (with white, yellow, and pink copy pages). It was almost the same as the attached document, and it was filled out when he came by. He asked me to sign these papers and left me with the pink copy. He also gave me a check for $2,000 for what he said was "good faith." I believe my former wife (at that time I was married) was there and may have signed something. Mr. Marfisi told me that I would have a month's "grace period," before my payments would begin. He told me I would receive the name and address where I should send the payments.

3

10. A few days later I received something in the mail, telling me I should make the $350-per-month payments to a Mr. Bigelow at a post office box address. The letter also contained Mr. Bigelow's business card which referred to "Bigelow Properties." That was the first I had ever heard of Mr. Bigelow or Bigelow Properties.

11. As I recall, I followed the instructions received by mail and made the $350 per month payments for about a year, using the U.S. mails to send the money to Mr. Bigelow. In the beginning of the year 1999, I was laid off again – this time permanently. I telephoned Mr. Bigelow and told him that I would probably have some difficulty making the $350 per month payments on time. He told me it would be OK if I made the $350 per month payments by the 20th of each month. I later missed some payments, then paid $175 per week to make up the payments missed. All of the payments to Mr. Bigelow were sent via the U.S. mails.

12. At some time during 1999 Mr. Bigelow contacted me and introduced me to his brother, Paul. He told me that Paul would be making some improvements on the house, for example, new siding and some landscaping work. I didn't understand why but I didn't object.

13. At some point in 1999, Mr. Bigelow appeared at my home with a lease for a one-year period, saying he wanted me to sign it. I asked him why I should be signing a lease, when I already owned my home and I had been making the mortgage payments to him. He told me I didn't own it – that he owned it and the payments were rent, not mortgage payments. I was very upset and asked him how I could contact Johnny Marfisi. Mr. Bigelow told me that Mr. Marfisi was not in charge anymore – that he was. Mr.

Bigelow also told me that Johnny Marfisi was with the Mafia and "they don't mess around."

14.   The lease that Mr. Bigelow presented me was for $350 per month, the same amount I had been paying. He told me I would be out on the street if I didn't sign it. I felt I had no choice, so I signed it. He said he would help me get financing to buy it back, because he knew someone at a mortgage company.

15.   I was later laid off again and was unable to make the $350 payment for September. I telephoned Mr. Bigelow to discuss my financial problems. Bigelow said I had better do something or he would file eviction charges. I made the payments for October, November and December but still owed for September. Mr. Bigelow contacted me and told me that, if he didn't have the September rent by December 7, he would have me evicted. He again mentioned that Johnny Marfisi was involved in this situation, that Marfisi was with the Mafia, and that you never know what he might do. I paid him the money by December 7.

16.   In early 2000, I paid the $350 for January, but was only able to make half payments for February and March. I entered into an agreement to pay Mr. Bigelow, paid him, and then took a trip out of town with my wife. When I returned to Cincinnati, I found the eviction papers on my door, and my family was forced out of the home within a few days.

17.   The results of my dealings with Tri-State Mortgage Assistance, Mr. Bigelow, Mr. Marfisi, and the woman who accompanied him were as follows:

a. I lost my home, which was worth over $40,000 and received only $2,000 in return (which Mr. Marfisi called "good faith money"); when I first met Mr. Marfisi, I owed about $20,000 on this $40,000 house;

b. I paid Bigelow properties well over $8,000, with the impression that these were mortgage payments.

c. I had no intent to or any idea that I was selling my house. No one ever identified a deed and presented it as such. If I signed a deed, it was completely without knowledge of what I was signing. I never went to any lawyer's office for witnessing or notarization.

_____
Russell Paige

10-27-03
_____
Date

Buyer - 3030627

THIS IS A LEGALLY BINDING CONTRACT
IF NOT UNDERSTOOD, SEEK LEGAL ADVICE.

## CONTRACT TO PURCHASE

Cincinnati, Ohio
JAN 7 19 98

1. The undersigned Purchaser hereby offers to purchase, the following described property to-wit, property located at: **1107 LAIDLAW AVE CINCINNATI OHIO 45237**

2. The purchase price is to be $ **See below** payable as follows: $ **—0—** as earnest money to apply toward purchase price.
**$20,000.00 CASH TO Seller, Buyer will SATISFY LIEN WITH NATIONSBANC MORTGAGE CORP. Plus Buyer will Pay Attorney's Fee's, Court cost, TAxes .ect. Seller will Lease option property for $200.00 A month for one year. Buyer will help Seller to Purchase property AT 100% Financing.**

3. The above described real estate shall include all land and appurtenant rights; also all electrical, plumbing, heating and air conditioning equipment, including window units, bathroom fixtures; shades, venetian blinds; awnings; curtain rods; window/door screens, storm windows/doors; landscaping and shrubbery; wall-to-wall/stair carpeting; built-in kitchen appliances; attached radios and/or television aerials; all affixed/built-in furniture fixtures; and utility/storage buildings or sheds; except: **NONE**

4. The following personal property shall be included in the sale: **NONE**
**NONE**

5. Title to the above described real estate is to be conveyed by Warranty Deed with release of dower, on or before **JAN 28** 19 **98**; said title to be free, clear, and unencumbered, free of building orders, subject to zoning regulations of record, and except assessments, easements and restrictions of record, and EXCEPT **NONE**

6. Seller certifies to Purchaser that: there is no termite damage to the real estate or active infestation; electrical, plumbing, heating, air conditioning equipment and systems, fireplaces, chimneys and other items included herein will be operational on possession except **NONE**. Seller agrees that at the time of transfer of title, the above described real estate, and all items thereof, will be in the same condition as on the date of this offer, reasonable wear and tear excepted.

7. The following items shall be prorated between seller and purchaser as of closing: real estate taxes, assessment installments of record, rents, operating expenses and interest on encumbrances. Security and/or damage deposits held by Seller will be transferred to Purchaser at closing without proration.

8. Seller will maintain, until closing, hazard insurance in the amount of the above stated purchase price. If any building or other improvements are damaged or destroyed prior to closing, purchaser shall have the option to receive the proceeds of any insurance payable or to cancel this agreement and be refunded all consideration therefore paid.

9. Possession shall be given on or before **DAY OF CLOSING**, subject to tenant's rights. Any lease or tenant agreement will be supplied to Purchaser prior to closing.

10. This agreement is subject to the arranging of financing within **—0—** banking days, at any terms acceptable to Purchaser. Seller held mortgages, if any, shall be subordinate and inferior to any new, additional, or refinancing of existing mortgages. Purchaser's liabilities are limited to the securing property itself and shall not extend beyond. Financing will, at Purchaser's option, additionally or entirely be secured by subject or other similar real property.

11. This contract is contingent on an inspection of the above real estate by Purchaser, which is satisfactory without limitations to said Purchaser.

12. This agreement survives closing and pertinent language contained herein becomes part of any deeds, notes, mortgages, and documents pertinent to this transaction and shall take precedence in the event of any conflicting provisions of terms.

13. This offer, when accepted, comprises the entire agreement of Purchaser and Seller, and it is agreed that no other representation or agreements have been made or relied upon.

14. This offer, when accepted, shall constitute a binding contract to be binding upon the parties, their heirs, personal representatives, executors, administrators and assigns.

15. Offer void if not accepted by _____

Date **JAN 7 1997**

_____
Purchaser

_____
Purchaser

I/We as Sellers accept the above offer and earnest money submitted to us.

Date **Jan 7, 1998**

_____
Seller

_____
Seller

PLAINTIFF'S EXHIBIT

B -0030