FILED
KENNETH J. MURPHY
CLERK

03 OCT 27 PM 4:48

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHIRDENIA BRYANT, *et al.*, | : | Case No. 1:02cv006 |
| | : | (Judge Spiegel) |
| Plaintiffs, | : | |
| | : | |
| -vs- | : | |
| | : | DECLARATION OF SHIRDENIA |
| PRESCOTT BIGELOW, IV, *et al.*, | : | BRYANT IN OPPOSITION TO |
| | : | DEFENDANTS' MOTION FOR |
| Defendants. | : | SUMMARY JUDGMENT |

SHIRDENIA BRYANT, after being duly cautioned and sworn, states:

1.   I am one of the plaintiffs in this lawsuit. I am making this declaration in opposition to the Defendants' Consolidated Motion for Summary Judgment, filed in this case. My statements in this declaration are made on personal knowledge, and I am capable of testifying to the facts here stated.

2.   On April 6 1987, my parents, Charles and Johnie Worthy, bought a home at 1107 Laidlaw, Cincinnati. The purchase price was $42,000.00. When they bought the home, they took out a mortgage loan with AmeriTrust Co for $18,000.00. The note was payable over 20 years at a fixed rate of 9.125%, creating monthly payment obligations of $163.40. Nationsbanc Mortgage later received the rights to that mortgage loan.

3.   Within a six-month period from late 1995 to mid 1996, both of my parents became ill. I cared for both of my parents during their last illnesses, and I paid many of their medical expenses from my own pocket.

4. After my mother, Johnie Worthy died, I became the sole owner of the family home on Laidlaw, and I assumed the obligation to make the mortgage payments. In the first part of 1997 I was still having financial trouble from the deaths of my parents (as neither parent had life insurance), and I got behind on my mortgage payments. I did not make a mortgage payment from January to July 1997. On July 9, 1997, Nationsbanc Mortgage Co. started a foreclosure lawsuit against me in Hamilton County (Case No. A9704941). The balance owed on the note at the time the suit was filed was $10,945.16. In October 1997 a judgment for money and foreclosure was entered. On December 23, 1997, my home was appraised at $66,000.00 and the sheriff's sale was set for January 29, 1998.

5. Sometime in the late summer of 1997, after the foreclosure case had been filed, a woman named Rose Christian contacted me by knocking on my door. She told me about the foreclosure case and said that she could help me keep my home. She told me that she had a friend who would buy my home, clear up the foreclosure problems, rent it to me for a year at about $200.00 per month, and then re-sell the property back to me at the end of that time. At first I said "no" to her, because I had planned on getting enough money together to pay off the mortgage company.

6. About a month or two after her first door-knocking visit, Rose Christian again appeared uninvited at my home. She seemed to be a nice lady and I was more interested in her proposal. So she arranged for me to meet with John Marfisi.

7. Rose Christian and Mr. Marfisi came to my home sometime in the fall of 1997. Marfisi proposed an arrangement that involved several steps. He told me that he would pay off the mortgage, receive title to the home, and that I would receive

2

$20,000.00 at the closing. Second, he told me that I would then live in the home as a tenant for 12 months, paying him $200 per month in rent. With the $20,000, he said I could pay off bills, make my rent payments, and then put the rest of the money toward a down payment when I bought the house back. We did not talk about the exact buy-back price, but it was supposed to be around $20,000, plus what Marfisi would have to pay to take care of the mortgage foreclosure. He said he could get me 100% financing on the repurchase. I was interested in Marfisi's proposal and he wrote out an agreement, which he and I signed. He told me he would have an attorney draw up the papers.

8. In late January 1998, Mr. Marfisi picked me up and took me to attorney John Meckstroth's office. There I was first introduced to Defendant Prescott ("Pete") Bigelow, a man I had never met or talked to before. Mr. Bigelow announced that he – not Marfisi - would be buying my home. Up until that time, I had assumed that I would be doing business with John Marfisi.

9. Those present at Mr. Meckstroth's office on that day were Mr. Marfisi, Mr. Bigelow, and me, as well as Mr. Meckstroth. Mr. Meckstroth had prepared several papers to be signed. Mr. Meckstroth told me that I would not be receiving the $20,000 that should have been given to me at the closing. He prepared a promissory note from Mr. Bigelow to me and also told me that I would only get $1,000 on that day and the additional $19,000 in 60 days. That surprised me, because I had expected all of the $20,000 to be paid on that day, but I went along with it. Mr. Bigelow signed the promissory note for $19,000 and a lease, and I signed the deed and a lease. The lease

3

called for me to pay him $200 per month for a year. After that, I was to buy the property back and Mr. Bigelow was to provide the 100% financing.

10.  I waited the 60 days for Mr. Bigelow to pay off the promissory note, but he didn't pay. So I started making telephone calls – to Mr. Bigelow himself and to Rose Christian to find out when I was going to get my $19,000. I had real problems reaching Mr. Bigelow. I left messages, but he did not return my calls. I don't think I was ever able to talk to him. But when I called Mr. Bigelow's offices, I did speak to Rose Christian about the $19,000, as the Bigelow office was the best place to contact her. Rose Christian told me that Johnny Marfisi, not Bigelow, had the money and that I should contact him. I had Mr. Marfisi's phone number and I reached him. He promised to get some money to me. At least two times Mr. Marfisi told me he would meet me at a bank, but, when I went there, he never showed up.

11.  I continued to live in the Laidlaw home, mailing the agreed-on $200 per month to Mr. Bigelow. By the end of the year 1998, I was behind about three months on the rent payments to Bigelow. Rose Christian called me to arrange a meeting with Mr. Bigelow.

12.  In January 1999, I went to John Meckstroth's office to meet with Mr. Bigelow and Mr. Meckstroth. At that meeting, Bigelow told me that he was losing money on the house by only renting it for $200.00 a month and he was going to put me out on the street and get someone else in the house unless I started paying him $500.00 per month. During that meeting I asked about the $19,000 that he owed me on the promissory note. He told me he had "transferred" the promissory note to Marfisi and that it was Marfisi's responsibility to pay it. I remember that lawyer Meckstroth and Mr.

4

Bigelow showed me a document they said I had signed and which proved that Marfisi was responsible for paying the $19,000. That document is the same as Exhibit 85 to Mr. Bigelow's deposition in this case. The document has my signature, but I do not know how it got there. I never signed any document under a "Paid in Full" statement. I was not given a copy of the document.

13. During the same meeting, lawyer Meckstroth told me that, since the note was already transferred to Marfisi, Bigelow was not responsible for paying it. He told me that I would not be giving up anything by releasing Bigelow from his obligation to pay me the $19,000. Meckstroth then showed me a release document (the same one as Exhibit 75 to Mr. Bigelow's deposition) that he had prepared.

14. The release document that Mr. Meckstroth showed me said exactly what Mr. Meckstroth told me – that Bigelow's responsibility under the promissory note had been transferred to Marfisi. He said that I would not be giving up any thing by signing it. The release document also indicated that Mr. Bigelow would pay me $2,000 in exchange for signing the release and would forgive the $600 that I owed him for back rent. Mr. Meckstroth had also prepared a lease, requiring me to pay $500 per month to stay in the family home. Mr. Bigelow told me that, if I didn't sign the "Release" and the new lease and start paying Mr. Bigelow the $500 per month, I would be evicted. I had no choice but to sign.

15. Mr. Bigelow paid $2,000, but he reneged on his agreement to forgive the $600 in back rent, and he forced me to pay him that $600. Meckstroth prepared a new twelve-month lease agreement, which is copied as Plaintiff's Exh. 86 to Mr. Bigelow's deposition, and I signed it.

16. I recently learned about the existence of a January 1, 1999 land contract supposedly between Prescott Bigelow and me. That document is attached. The document does contain my signature, but I never signed it. I never entered into a land contract with Mr. Bigelow at all.

17. I continued to lease the home under the January 6, 1999 lease terms until the middle part of the year 2000. At that time, Mr. Bigelow told me to go to McKinley Mortgage and obtain financing to buy the house.

18. In the late spring or early summer of 2000, I went McKinley Mortgage's office at 9469 Kenwood Road and met with a man named Nathan Gieske. I filled out a loan application. Within a few days, I was told that I was approved for a $64,000.00 loan. On June 9, 2000, she went to McKinley Mortgage for the closing and again met with Nathan Gieske. Vintage Title prepared the paperwork and a representative from Vintage was at the closing. Mr. Bigelow was not there.

19. The June 9, 2000 settlement statement shows the $64,000 arrangement with McKinley Mortgage as a "refinancing." At that time I did not know what a "refinancing" was, so I did not say anything. On that day I signed the mortgage papers and also signed a second mortgage in favor of Mr. Bigelow for $1,600.00. Only Nate Gieske of McKinley Mortgage witnessed the second mortgage but it was not notarized. Mr. Bigelow personally received a payoff of $4,657.24 at that closing. I paid $5,099.35 in settlement charges out of my proceeds.

18. I was unable to make the mortgage payments on my home and lost it in a foreclosure. I am now homeless.

19. Before I met Mr. Bigelow, I owned my home. It was worth $65,000-$70,000, and it had a mortgage loan against it of $10,945.16. Mr. Bigelow led me to believe that, if I did the transaction with him, I would be paid $20,000 and would be able to repurchase my home (with Mr. Bigelow providing 100% financing) for the $20,000 plus the amount it took him to take care of the mortgage foreclosure. He paid me only $1,000 of the $20,000, and he later paid me a $2,000 less the $600 that I gave him back: the total amount he paid me was $2,400. I paid him a total of $13,301. I did not know it at the time, but he put a $56,000 mortgage against the home. When I bought the home back, the total loan to pay Mr. Bigelow and others was $64,000.

20. Mr. Bigelow has made a number of statements in his testimony that are untrue. First, he testified in his deposition that, at the January 27, 1998 closing, I either told him or agreed that the $19,000 promissory note proceeds should be paid to Mr. Marfisi. That is not true. I never told anyone to pay the proceeds of the promissory note to Mr. Marfisi. Second, he has testified that, at some time after the January 27 closing, he called me and asked for instructions on what to do with the $19,000. That is not true. In fact, I repeatedly called his office, trying to get him to pay the $19,000, but he never would return my call. Third, he testified that I instructed him by phone to "give" the $19,000 to Mr. Marfisi. That is untrue.

10-27-03
Date

Shirdenia Bryant

# **LAND CONTRACT**

This Agreement/Contract to purchase/sell real property is entered into by and between Shirdenia Bryant; Hereinafter Referred to as purchaser; and Prescott Bigelow, hereinafter referred to as seller.

<u>WITNESSETH:</u>

That the Seller, in consideration of the promises and agreements made by the Purchasers, hereinafter set forth, does hereby promise, sell and convey by method of Land Contract to the Purchaser, their heirs, devisees, and assigns the following real estate:

1107 Laidlaw Avenue

Cincinnati, Ohio 45237


(Hamilton County)

1. The Purchasers agree and promise to pay Seller, the total sum of Sixty-One thousand dollars (61,000.00), to be paid in the following manner;

    (a) The balance of Sixty-one thousand dollars (61,000.00) is to be paid, with interest accruing thereon at 9.2 % per year on the unpaid balance, at the rate of Five hundred - dollars (500.00) per month with the first monthly payment due on, Jan. 1st, 1999 and the same amount due on or before the 1st day of each and every month thereafter until the entire principal balance is paid in full in accordance with the attached amortization schedule marked EXHIBIT A and incorporated herein by reference as if fully set out.

    (c) Said monthly payment shall be made payable to Seller and be made according to the Sellers' direction.

2. Purchaser reserves their right to pay the entire principal balance due at any time during the existence of this contract, without any pre-payment penalty, having the right to obtain a first mortgage and pay off this land contract in full. Seller agrees to execute any and all necessary documents required therefore, if any.

    (a) Purchaser expressly agrees to keep said property in as good a condition as it presently is and to make any and all necessary repairs thereto and to maintain same and to comply with any law, ordinance and/or statute concerning the use and/or occupancy of said premises. Purchaser agrees not to do or cause to be done anything to said property which would diminish the value

of the residence and/or the Sellers' security interest therein. Purchaser agrees that the Sellers shall have a reasonable right to inspect the subject real estate upon two days notice in order to determine compliance with this provision and all other terms of this Contract.

    3. Purchaser agrees that this residence is sold in an "AS IS" condition with no express or implied warranties.

    4. Purchaser agrees that they may not assign this contract to anyone else without the written consent of Seller.

    5. Seller agrees not to encumber or attempt to sell said premises as long as Purchaser good and faithfully shall perform the terms of this contract.

    6. It is agreed that if Purchaser, their heirs, devisees, executor and/or assigns should fail or neglect to make any one of the monthly installments due and payable hereunder, or the balloon payment, if applicable, within thirty (30) days after same shall become due and payable, or if the Purchaser fails to reasonably and materially comply with any and/or all of the covenants, agreements, conditions and/or provisions of this contract, Seller may consider this agreement terminated and all remaining amounts unpaid shall immediately become due and payable. In the event of such termination, the Purchaser shall not remove any fixtures, improvements or dwellings erected on said property and Seller shall be entitled to all of his remedies allowed by law, including but not limited thereto, all right to foreclosure, eviction and enforcement of lien rights and Purchaser shall be liable for all costs incurred in enforcing and/or terminating this contract, including but not limited thereto, all court costs and attorney fees.

    7. Failure of delay on the part of the Seller to take any action provided for herein or by law because of any default by Purchaser shall not operate as a waiver by Seller of any of their legal rights and/or remedies.

    8. Purchaser shall have possession of said premises upon the execution of this contract or as the parties agree.

    9. If Purchaser, their heirs, executors, devisees or assigns shall completely comply with the terms of this land contract and fully pay all the amounts due hereunder in a due and timely fashion, then, upon receipt of the full amount due, Seller, his heirs, devisees, executor or assigns shall execute and deliver to Purchaser a Warranty Deed for the subject real estate, subject to any liens or encumbrances caused by the acts and/or omissions of the Purchaser, free and clear and

with good marketable title.

10. It is agreed the term Sellers and the term Purchaser, shall include and legally bind their heirs, devisees, executors, administrators and assigns hereto.

11. This document contains the entire agreement between the parties hereto and no statement, representation, inducement, warranty, promise or conduct whatsoever (oral or written) not expressly contained herein shall be binding upon parties hereto.

12. Any modification hereto must be agreed to by both parties, be in writing and be signed by both parties.

13. Purchaser hereby acknowledges that they have not requested nor have the attorneys who have prepared this document performed a title examination of said real estate.

IN WITNESS WHEREOF, the parties hereto have set their signatures this the 1st day of January 1999.

Purchasers:

_____    _____
Shirdenia Bryant

Seller
_____
Prescott Bigelow

STATE OF OHIO        )
                     ) ss:
COUNTY OF HAMILTON ) 

On October 27, 2003, Shirdenia Bryant appeared before me, in my presence signing her name and attesting to the statements in this document under penalty of perjury.

_____
Notary Public

KATHERINE M. O'HEARN
NOTARY PUBLIC, STATE OF OHIO
My Commission Expires 10-13-08