FILED
KENNETH J. MURPHY
CLERK

03 OCT 27 PM 4:48

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| SHIRDENIA BRYANT, *et al.*, | Case No. C-1-02-006 |
| Plaintiffs, | (Judge Spiegel) |
| -vs- | |
| PRESCOTT BIGELOW IV, *et al.*, | DECLARATION OF MARK BURBRINK |
| Defendants. | |

I, MARK BURBRINK, make this Declaration on my own free will, without duress or compulsion, and under penalty of perjury.

1. I am making this affidavit on personal knowledge, and I am competent to testify to the facts here stated.

2. I am the brother of Michael Burbrink. In 1985, my brother and I inherited the family home at 8670 Darnell Avenue in Deer Park. From 1985 until 1997, we lived there, and the property did not have any mortgages against it.

3. I am a high school graduate, and my brother did not finish high school. Neither of us has ever known anything about real estate. In 1997, my brother and I took out a mortgage loan for about $23,000 on the property. In late 1998, we had fallen behind in our mortgage payments, and the mortgage company brought a foreclosure suit against us. At that time our home was worth $80-90,000 and the unpaid mortgage was about $22,500.

4. On the morning of February 22, 1999, I was at home when a knock came at my door. The doorknocker was a woman I didn't know; she introduced

1

herself as "Roseanne Christian." She told me that day that she worked for "Tri-State Mortgage Assistance," an organization which was set up to help people in foreclosure to get back on their feet without losing their homes. I was interested in what she had to say, because I knew about the foreclosure lawsuit. Roseanne Christian stayed at my home for about half an hour that morning. She talked about the home her organization, and a plan to help us to avoid losing the home. She told me that a scheduled foreclosure sale on the property was set for the following week (which was news to me) and that, unless I acted quickly, my brother and I would lose everything.

5. I told her that I didn't know anything about a sale the following week was interested in working with her and her boss to avoid losing the home. Roseanne Christian identified Mr. Bigelow and Bigelow Properties. And she described a plan where, for a small fee, Tri-State Mortgage Assistance could save the home from foreclosure. Before she left the house that morning, she told me that she and her boss, Mr. Bigelow, would return later.

6. A few hours later that day, Roseanne Christian and Mr. Bigelow came to my home, and I let them in. Mr. Bigelow, IV took charge of the meeting. He described the "program" that would allow me to keep the home. I emphasized to Mr. Bigelow that I was not interested in selling the property.

7. The plan that Mr. Bigelow described to Mark Burbrink was as follows:

    a. Mr. Bigelow would "assume" and pay off the existing mortgage loan. That payoff and all related costs would run to about $30,000.

    b. We would transfer the property to Mr. Bigelow, but other papers would be signed, giving the us the ownership rights in the real estate. I understand today that this is known as a "land contract".

    c. My brother and I would continue to live in the home and would pay $470 per month in "rent" to Mr. Bigelow.

2

d. At the end of 12 months, the organization, through Mr. Bigelow, would arrange for $30,000 in new bank financing (Mr. Bigelow said he had mortgage company connections), and my brother and I would use that money to pay off Mr. Bigelow and his organization. From that point forward, my brother and I would be on our own with a fresh start from a new bank.

8. Mr. Bigelow's presentation impressed me, as I saw it as a way he could keep my home. So I agreed to the proposal.

9. That afternoon, Mr. Bigelow sat down at our kitchen table and wrote up a contract on his own form. The contract that Mr. Bigelow prepared really was not a *sale* of the property, because the listed sale price was "$0." The contract recited the $470 per month, and it also recited that Mr. Bigelow, the "Buyer" would obtain the financing that he had described.

10. Mr. Bigelow and I signed the contract that afternoon, and Roseanne Christian witnessed both signatures. At that point, Mr. Bigelow and Ms. Christian left my home, leaving behind the contract for my brother, Michael, to sign. Later in the day, Michael Burbrink returned home, and, after I explained what had happened, he signed the contract.

11. Roseanne Christian stopped by the next day and picked up the contract.

12. My brother and I didn't have a car, so several days later Roseanne Christian stopped by our home, picked us up, and took us to a meeting in downtown Cincinnati at the office of a lawyer named John Meckstroth. I was led to believe that attorney Meckstroth was representing my brother and me as well as Mr. Bigelow. Mr. Meckstroth gave us a large stack documents to be signed.

13. One of those documents was the agreement that protected my brother and me in our ownership of the property. During the closing, I looked at it and pointed it out to my brother, and we signed it.

14. My brother and I received a check for $2,000 at the meeting. We signed a deed to Mr. Bigelow. We were supposed to receive copies of all of the documents, but Mr. Meckstroth entered the room and told us that his copy machine was broken. He promised to send us copies in the mail.

15. As Roseanne Christian drove us home that day, we believed that we still owned the family home; that Mr. Bigelow or his organization had paid off the mortgage; and that Mr. Bigelow would arrange the $30,000 in bank financing so he could be paid off at the end of a year. Roseanne Christian told us that our worries were over.

16. A couple of months later, we started making the $470 per month rent payments to Mr. Bigelow. By October of 1999, we were behind on their rent. In late October, Mr. Bigelow filed am eviction proceeding against us to evict us from our home. During the eviction hearing, I spoke with Mr. Bigelow and told him that we would pay him $2,000. I later paid him that $2,000, putting us ahead on rent.

17. At that point, I didn't trust Mr. Bigelow, and my brother and I decided that we wanted to just pay off the rest of the rent due Mr. Bigelow stop our business relationship with him. I had $1300 to pay the rest of the rent due for the year. So I telephoned Mr. Bigelow and told him we wanted to stop our dealings with him and asked him to arrange the $30,000 in bank financing as was in our contract. Mr. Bigelow put me off and told me that he would call back later. He didn't call back, and I called his office again and again.

18. I finally was able to speak to Mr. Bigelow and his tone was totally changed. There would be no bank loan. He told me that his "partner" did not want any further dealings with us; that the property at 8760 Darnell didn't

belong to us; and that he wanted us out. He said he would bring another eviction lawsuit to force us out.

19.   Mr. Bigelow filed additional proceedings and successfully put us out of our family home. The results of our dealings with Mr. Bigelow were:

    a.      We lost our house;

    b.      We paid Mr. Bigelow $4,700 in "rent:"

    c.      Mr. Bigelow, after acquiring our home for $2,000, sold it for $126,000.

10-27-03
Date

Mark Burbrink

STATE OF OHIO )
) ss:
COUNTY OF HAMILTON )

On October 27, 2003, Mark Burbrink appeared before me, in my presence signing his name and attesting to the statements in this document under penalty of perjury.

_Katherine M. O'Hearn_
Notary Public

KATHERINE M. O'HEARN
NOTARY PUBLIC, STATE OF OHIO
My Commission Expires 10-13-08