APPENDIX A

LAW OFFICES OF
**William H. Blessing**
**119 East Court Street**
**Suite 500**
**Cincinnati, Ohio 45202**

E-Mail: jimschwantes@cinci.rr.com

Telephone: 513-621-9191
Telecopier: 513-621-7086

September 16, 2002

Gary R. Lewis, Attorney
Cincinnati Club Building, Suite 915
30 Garfield Place
Cincinnati, OH 45202



RECEIVED
SEP 1 7 2002
By_____

        *Re: Bryant v. Bigelow, et al.*

Dear Gary:

        Enclosed please find a copy of the deposition of Don Lerner taken in Hamilton County case number A0005052, *Bigelow v. Burbrink.* Plaintiffs submit this deposition in lieu of an expert witness report. The opinions of Mr. Lerner for the above referenced case will be consistent with his opinions for *Bigelow v. Burbrink.*

                                        Sincerely,

                                        *James E. Schwantes /alv*

                                        James E. Schwantes

JES/alv
Enclosure

APPENDIX B                                    1

COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO

– – –

1

2

3

4    PETE BIGELOW,                    :

5       Plaintiff,                   :

6       vs.                          :CASE NO. A0005052

7    MARK W. BURBRINK, et al.,:

8       Defendants.                  :

9                                    – – –

10          Deposition of DONALD LERNER, ESQ., a

11   witness herein, taken by the plaintiff as upon

12   cross-examination, pursuant to the Ohio Rules

13   of Civil Procedure and pursuant to agreement by

14   counsel as to the time and place and

15   stipulations hereinafter set forth, at the

16   offices of Lerner, Sampson & Rothfuss, 120 E.

17   Fourth Street, 800 Mercantile Center,

18   Cincinnati, Ohio, at 10:00 A.M. on Tuesday,

19   January 8, 2002, before Darlene Anthony, RPR, a

20   Registered Professional Reporter and Notary

21   Public within and for the State of Ohio.

22                                    – – –

23

24                                    **COPY**

25

APPENDIX B                                    2

1   APPEARANCES:

2           On behalf of the Plaintiff:

3               CHRISTOPHER T. LABER, ESQ.
                Attorney at Law

4               22 W. Ninth Street
                Cincinnati, Ohio  45202

5

6           On behalf of the Defendants:

7               JAMES E. SCHWANTES, ESQ.
                   of

8               Law Offices of William H. Blessing
                119 E. Court Street

9               Suite 500
                Cincinnati, Ohio  45202

10                      - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPENDIX B                                              3

## S T I P U L A T I O N S

It is stipulated by counsel for the
respective parties that the deposition of
DONALD LERNER, ESQ., a witness herein, may be
taken at this time by the plaintiff as upon
cross-examination and pursuant to the Ohio
Rules of Civil Procedure, all other legal
formalities being waived by agreement; that the
deposition may be taken in stenotypy by the
Notary Public-Court Reporter and transcribed by
her out of the presence of the witness; and
that examination and signature to the
transcribed deposition is expressly waived.

- - -

APPENDIX B

4

# I N D E X

PAGE

BY MR. LABER:

  Cross                              5

# E X H I B I T S

PAGE

Plaintiff's Exhibit 1              7

Plaintiff's Exhibit 2              8

Plaintiff's Exhibit 3             10

Plaintiff's Exhibit 4             10

APPENDIX B

5

DONALD LERNER, ESQ.

1

2    of lawful age, a witness herein, being first

3    duly sworn, as hereinafter certified, was

4    examined and deposed as follows:

5                    CROSS-EXAMINATION

6    BY MR. LABER:

7            Q.    Please tell the court reporter

8    your name and your office address, please.

9            A.    Donald Lerner, 120 East Fourth

10   Street, Cincinnati, Ohio.

11           Q.    And you're an attorney?

12           A.    I am.

13           Q.    And you've been practicing since

14   when?

15           A.    1960.

16           Q.    And you're still full-time

17   engaged --

18           A.    I am.

19           Q.    -- in your practice of law?

20           A.    Yeah.

21           Q.    What's your area of practice?

22           A.    Commercial litigation.

23           Q.    Do you have any certifications in

24   any specialty from any bar or other

25   association?

APPENDIX B

6

```
1          A.    No.

2          Q.    Do you do work in real estate?

3          A.    Yes.

4          Q.    Do you do foreclosure work?

5          A.    Yes.

6          Q.    Do you currently have any

7    foreclosures in which you're counsel of record?

8          A.    I don't think so.

9          Q.    Would it be fair to state in the

10   last three years there's maybe been one -- no

11   more than one foreclosure that you've been

12   counsel of record?

13         A.    I'm sure that's true.  Actually,

14   maybe several, but a small number.

15         Q.    Do you know attorney William

16   Blessing?

17         A.    I do.

18         Q.    And how do you know Mr. Blessing?

19         A.    He's a member of the bar.  I know

20   lots of members of the bar.

21         Q.    In just that capacity?

22         A.    We have no professional

23   relationship.

24         Q.    Have you ever worked with him

25   before, co-counseled on a case?
```

APPENDIX B                                                    7

1          A.    No.

2          Q.    Has he ever retained you as an

3    expert witness before?

4          A.    No.

5          Q.    Has he ever communicated with you

6    about any legal matters outside of this

7    litigation?

8          A.    I conferred with him some time ago

9    on a legal matter.  It was a casual

10   communication.

11         Q.    You approached him as opposed to

12   him approaching you?

13         A.    That's correct.

14         Q.    Mr. Blessing has designated you as

15   an expert witness in some litigation involving

16   my client, Mr. Bigelow, and his clients, Mark

17   and Michael Burbrink.  Are you aware of that

18   designation?

19         A.    Yes.

20         Q.    Showing you what's been marked as

21   Exhibit Number 1.  That's a letter that was

22   sent to me by Mr. Blessing indicating that you

23   were going to be testifying as an expert

24   witness in this matter, describing the subject

25   of your testimony and the basis of your

APPENDIX B

8

1   opinions.  If you would, please, would you take

2   a moment to read through that letter?

3          A.    Alright.

4          Q.    You've had a chance to read that?

5          A.    I have.

6          Q.    Does that accurately reflect your

7   involvement in this litigation?

8          A.    Yes.  He's spelled the name of my

9   law firm incorrectly, but otherwise it seems

10  accurate.

11         Q.    Short of that, the statements in

12  there you believe to be accurate.

13         A.    Yes.

14         Q.    I believe in there towards the

15  bottom he indicates that you received several

16  documents, and he numbers them one, two, three,

17  five.  I'm assuming that's a typo, but he

18  refers to a purchase contract dated

19  February 22nd of 1999?

20         A.    I recall a purchase contract dated

21  in 1999.  I don't recall the date.

22         Q.    I'm showing you what's been marked

23  as Exhibit 2.  Does that appear to be the

24  purchase contract that is referred to in the

25  letter?

APPENDIX B                                          9

1          A.    Yes.

2          Q.    Does that appear to be the

3    contract that you received from Mr. Blessing?

4          A.    It appears to be a copy of it.  I

5    received a different copy of it.  Mine was

6    almost equally illegible.  It was slightly more

7    legible along the right margin.

8          Q.    There's some writing that goes,

9    oh, what is that, vertical along the right

10   margin of the page?

11         A.    Yeah.

12         Q.    It doesn't really come out on the

13   copy that I've handed you, but you're

14   indicating that on the copy that Mr. Blessing

15   gave you, that that writing was more apparent?

16         A.    Slightly, yeah.  I also don't

17   recall one way or the other that the recorder's

18   stamp was on the copy I observed.

19         Q.    And the copy that I've given to

20   you as Exhibit Number 2 has a recorder's stamp

21   on it?

22         A.    Yes.

23         Q.    And the date of that recorder's

24   stamp?

25         A.    Filed February 24, '99.

APPENDIX B                                          10

1          Q.    Which would indicate to you what,

2    sir?

3          A.    That somebody filed this with the

4    Hamilton County Recorder on that date.

5          Q.    It's also indicated that you were

6    given a copy of a settlement statement dated

7    March of 1999.  I'm showing you what's been

8    marked as Exhibit Number 3.  Does that appear

9    to be the settlement statement that was

10   provided to you by Mr. Blessing?

11         A.    Yes, it does.

12         Q.    And I believe, also, that he

13   refers to a lease agreement.  If you would,

14   please, sir, take a look at Exhibit Number 4,

15   and can you tell me, does that appear to be the

16   lease agreement that Mr. Blessing gave you?

17         A.    It appears to be a copy of the

18   same lease agreement with which Mr. Blessing

19   furnished me a copy.

20         Q.    He also indicates that he gave you

21   a copy of a registered land certificate.  I

22   don't have a copy of that to present to you but

23   do you recall receiving that?

24         A.    I do.  I think that he's omitted

25   number four.  I think that there was a number

APPENDIX B                                              11

1   four.

2          Q.    What would that number four have

3   been?

4          A.    I think it was what is referred to

5   as a grantee statement, but I think we referred

6   to it as a conveyance statement.

7          Q.    I don't do real estate law so I'm

8   not familiar with either term.  Can you explain

9   to me what that is?

10         A.    It's a single page document by

11  which -- it's actually a tax return.  It's a

12  document by which the purchaser asserts the

13  purchase price to the auditor for purposes of

14  establishing the appropriate transfer tax.

15         Q.    I understand.  I know what

16  document you're referring to then.  Thank you.

17  And lastly, although it's not numbered,

18  Mr. Blessing indicates that he gave you a

19  written narrative of the factual background as

20  alleged in the complaint.  I don't have a copy

21  of that, sir.  Do you have a copy of that?

22         A.    I have it but I don't have it

23  immediately available.

24         Q.    Would you be able to make that

25  available to me after the deposition?

APPENDIX B                                          12

1        A.    Sure.

2        Q.    Thanks.  I appreciate that.  Do

3   you recall what the written narrative statement

4   was?

5        A.    I recall that it was excerpts from

6   a pleading in a different case involving the

7   general background.

8        Q.    Excerpt of a different pleading --

9        A.    That's my best recollection.

10        Q.    -- than in this case?

11        A.    Yes.

12        Q.    In another case?

13        A.    Yes.

14        Q.    Do you recall what the caption on

15   that case was?

16        A.    I didn't have a caption.  It was

17   represented to me to be a portion of a -- I

18   think a complaint from a different case, but I

19   don't recall that I had the entire pleading or

20   the caption.

21        Q.    Did it make reference to

22   Mr. Bigelow and Mark and Michael Burbrink in

23   the factual narrative?

24        A.    I think not.

25        Q.    Do you recall who the parties were

APPENDIX B                                    13

1  │ that were represented?

2  │        A.   I don't recall, and I'm not sure

3  │ they were even mentioned in the portion that I

4  │ had by name.

5  │        Q.   Just referred to as plaintiff and

6  │ defendant?

7  │        A.   I just don't recall.  As I said,

8  │ I'd be glad to provide you with a copy.

9  │        Q.   I'd appreciate that.  Did you

10 │ author a report for Mr. Blessing?

11 │        A.   I did not.

12 │        Q.   Did you make any written

13 │ communications or correspondence to

14 │ Mr. Blessing regarding your involvement?

15 │        A.   No.

16 │        Q.   Did you make any verbal

17 │ communications to Mr. Blessing about --

18 │        A.   We had several discussions.

19 │        Q.   Several being how many?

20 │        A.   To my best memory is two.

21 │        Q.   Were these discussions related to

22 │ what Mr. Blessing has raised in his letter to

23 │ me of December 10, which is marked as

24 │ Exhibit 1?

25 │        A.   Would you rephrase your question?

APPENDIX B                                                        14

1    I don't understand it.

2            Q.   The discussions that you had with

3    Mr. Blessing, were they by telephone?

4            A.   I had one telephone conversation

5    with Mr. Blessing -- as I recall, I had one by

6    telephone and one in person.

7            Q.   He came to your office?

8            A.   He did.

9            Q.   And the gist of those discussions,

10   is that reflected in Exhibit Number 1?

11           A.   Yes.

12           Q.   Exhibit Number 1 indicates that

13   you're familiar with the standards of --

14           A.   I can read it to you, "The

15   standards of disclosure requirements and

16   practices involving real estate sales and

17   purchases."

18           Q.   Can you explain to me what that

19   means?

20           A.   You're asking me to explain to you

21   what Mr. Blessing means, and I'm not qualified

22   to do that.  I can explain to you what I think

23   it is.

24           Q.   Thank you.  I'd appreciate that.

25           A.   I think it's the standard of care

1    involved locally in real estate transactions.

2             Q.    There's a period there, as opposed

3    to a comma?  I was waiting for more.

4             A.    That's my understanding.

5             Q.    The standard of care involved in

6    real estate transactions.  And what would that

7    standard of care be?

8             A.    That's like asking what is the

9    standard of care in a tort environment.  It's

10   too broad.  I can't answer it.

11            Q.    Is there any published standard of

12   care that you're referring to?

13            A.    I'm not referring to a published

14   standard of care, no.

15            Q.    Is there a published standard of

16   care that you're aware of?

17            A.    I suspect that there is but I'm

18   not -- I suspect that there is in a real estate

19   practice, and by that I mean people who

20   identify themselves as relators, not lawyers,

21   but I'm not familiar with it.

22            Q.    And how are you familiar with the

23   standards of disclosure requirements and the

24   standards involving real estate sales and

25   purchases?

APPENDIX B                                      16

1          A.    Well, I've been active in this

2    field for 40 plus years.

3          Q.    In the field of commercial

4    litigation?

5          A.    Well, most of my -- much of my

6    commercial litigation involves the purchase and

7    sale of real estate, a lot of which is

8    residential.

9          Q.    Mr. Blessing also indicates that

10   you will describe in your testimony the

11   transaction in this case.  Can you do that for

12   me?

13         A.    My total familiarity with the

14   transaction in this litigation is represented

15   by the four documents that we've discussed,

16   plus the grantee statement that I mentioned

17   that's absent from these discussions, plus what

18   Mr. Blessing has told me about the transaction

19   that's outside of these documents.

20         Q.    So any description that you would

21   have of the transaction is based upon those

22   five documents that were given to you by

23   Mr. Blessing, plus the narrative report -- or

24   the narrative pleading that Mr. Blessing gave

25   to you?

APPENDIX B                                                    17

1          A.    Plus the discussions that I've had

2    with Mr. Blessing and his associate.

3          Q.    And his associate would be --

4          A.    Jim.

5          Q.    Mr. Schwantes?

6          A.    Yes.

7          Q.    Have they given you additional

8    information in those discussions that's not

9    contained in that narrative?

10         A.    I think the answer is yes, but I

11   don't have the narrative in front of me nor do

12   I have a photographic memory about what was

13   involved in our discussion, but I think the

14   answer is yes.

15         Q.    Did you make notes from your

16   discussion?

17         A.    Yes.

18         Q.    Do you still have a copy of those

19   notes?

20         A.    Yes.

21         Q.    Would you be willing to provide me

22   with a copy of your notes from those

23   discussions?

24         A.    I don't have a problem with giving

25   you a copy.

APPENDIX B                                                    18

1        Q.    Thank you.  So based upon the

2   discussions that you've had with Mr. Blessing

3   and Mr. Schwantes and the documents that

4   they've provided to you that we've discussed,

5   can you describe for me the transaction in this

6   case?

7        A.    My understanding of the

8   transaction is that on or about February 22nd

9   or perhaps shortly before that time, there was

10  a foreclosure pending against the real estate

11  which is the subject of this contract, this

12  litigation, which was at the time owned by Mark

13  and Michael Burbrink.  The fair market value of

14  the property was something in the order and

15  magniture of $100,000.  That it was in

16  foreclosure.  It was roughly six months in

17  arrears.  It had not yet been advertised for

18  sale by the sheriff but that was imminent.

19  That the owners, Mark and Michael Burbrink,

20  were approached by a -- I'm trying to read her

21  name.  Rosanne Christian, I think --

22        Q.    Yes, sir.

23        A.    -- who was an associate of

24  Mr. Bigelow, and she suggested that Mr. Bigelow

25  could -- that she had a friend, Mr. Bigelow,

APPENDIX B                                    19

1    who could resolve their problem by taking the

2    matter to foreclosure and getting them back in

3    their house.  They would never lose possession

4    of their house under the arrangement that she

5    was proposing.  That Mr. Bigelow would arrange

6    to get the house back to them on land contract

7    for a year, and at the conclusion of the year

8    would arrange further financing -- new

9    financing so they could continuously have

10   possession and ownership of the property.

11              That they signed this contract,

12   which is your Exhibit 2, I assume on or about

13   February 22, 1999.  The contract is vague in

14   some respects to me.  It talks about the buyer

15   will pay -- buyer being Mr. Bigelow -- will pay

16   the closing costs and all attorneys fees

17   associated with the foreclosure.  That the

18   purchase price will be zero.  That the seller

19   will receive -- seller being Messrs.

20   Burbrink -- will receive 100 percent financing,

21   and that is somewhat consistent with the

22   settlement statement, which is your Exhibit 3,

23   which appears about three weeks later on

24   March 12th.

25              There are significant

APPENDIX B                                    20

1   inconsistencies in my view with regard as

2   between the purchase contract and the

3   settlement statement.  The purchase contract

4   describes the purchase price to be zero.  The

5   settlement statement discloses the sales price,

6   which I interpret to be the same as the

7   purchase price, and identified as both the

8   purchase price and the sales price on the

9   settlement statement, to be $31,397.48.  The

10  closing statement discloses deductions to the

11  seller of $22,000 -- around these numbers, I'm

12  rounding them off -- $22,000 is the mortgage

13  assumed by the purchaser.

14        Q.   Sure.

15        A.   A charge to the seller of $900 for

16  real estate tax proration, a charge of $15 for

17  lost registered land certificate affidavit, a

18  reinstatement charge of roughly $6,000,

19  transfer tax $78 and change, and a charge of

20  $50 for deed preparation.  It also discloses

21  certain obligations and charges of the

22  purchaser, which are generally associated with

23  paying Mr. Meckstroth $50 and recording the

24  deed.

25             I find that the purchase price or

APPENDIX B

21

1    the sales price of 31,000 and roughly $400 to

2    be inconsistent with the purchase price of zero

3    that the contract calls for.  The deduction for

4    the mortgage -- assuming a purchase price of

5    $31,000 and change -- a deduction which to my

6    mind is inconsistent with a property which has

7    a fair market value of roughly $100,000, but it

8    is consistent with property being in

9    foreclosure and being six or eight months

10   delinquent.  The $22,000 being the mortgage

11   balance.  Reinstatement charges would include

12   whatever number of delinquent monthly

13   installments are due, which would probably

14   include principle and interest, and escrow for

15   taxes and insurance.  If so, then the $900

16   prorated for taxes seems duplicative of what's

17   in the reinstatement charges, but I can't, from

18   what I have, I can't absolutely determine that.

19            The grantee statements, which we

20   don't have before me, disclosed a purchase

21   price of roughly $53,000, which was the sum of

22   the $31,000 purchase price as disclosed by this

23   statement and the principle balance of the

24   mortgage of roughly $22,000.  The transfer tax

25   which was charged to the quote "seller" in this

APPENDIX B                                                          22

1  | instance is consistent with the $31,400

2  | purchase price disclosed by this statement but

3  | inconsistent with the purchase contract

4  | disclosure of zero.

5  |            There is a suggestion in this

6  | purchase contract that the seller is going to

7  | be refinanced, and that's consistent with

8  | Mr. Blessing's narrative description to me of

9  | the transaction.  I was led to believe that the

10 | transaction contemplated a land installment

11 | sales contract by which the Burbrinks would

12 | reacquire title to the property immediately at

13 | the closing from Mr. Bigelow, and that they

14 | would gain legal title at the end of the year.

15 | The lease agreement doesn't disclose any of

16 | that.  The lease agreement suggests that it's a

17 | one year lease at roughly $500 a month, the

18 | first two payments of which are waived,

19 | according to the purchase contract.

20 |            Based on my experience, it strikes

21 | me that most owners of distressed property

22 | that's worth something in the order of

23 | $100,000, even though they're in foreclosure,

24 | would be unwilling to sell the property on

25 | these terms, for $2,000 and a one year lease.

APPENDIX B                                          23

1  My understanding is that the $470 monthly rent

2  in the lease might be slightly below market but

3  not enough to justify that discrepancy.

4          Q.    Just to see if I understand you,

5  it's your belief from reading the narrative

6  that's provided to you and these documents that

7  Mr. Bigelow was to purchase the property from

8  the Burbrinks and immediately sell it back to

9  them under a land contract at the same closing?

10         A.    Yes.

11         Q.    And you get that from the

12  paperwork where?

13         A.    Well, I get it from three sources.

14  I get it from the suggestion in the purchase

15  contract that the seller is to receive 100

16  percent financing.  No other scenario that

17  occurs to me is consistent with that statement.

18  I get it from the economics of the transaction;

19  no reasonable seller would sell $100,000

20  property for zero or $2,000 or $30,000 or even

21  $50,000, even in the distressed environment of

22  a foreclosure, when too many other alternatives

23  are available.  For instance, you know, any

24  foreclosure of sale is subject to two separate

25  equities of redemption:  The statutorial equity

APPENDIX B                                          24

1   of redemption and the judicial equity of

2   redemption, so that that affords, by statutory

3   design and by judicial discretion, the owner of

4   a distressed property to sell a property,

5   refinance which is unlikely, or sell the

6   property for something perhaps less but

7   modestly less than the real value of the

8   property and redeem the property even after the

9   decree and foreclosure, which currently had not

10  yet occurred in this case.  In fact, even after

11  a sheriff's sale, which definitely had not

12  occurred in this case.  And no other scenario

13  that occurs to me is consistent with the facts

14  as I understand them.

15          So the sourses from which I

16  perceive that there's to be a land contract are

17  Mr. Blessing advised me that that's what his

18  clients understood, this document is consistent

19  with that, and the economics is consistent with

20  that.

21          Q.  So your description is based upon

22  an assumption that the Burbrinks understood

23  that this was going to be a land contract, that

24  the Burbrinks understood that they had a right

25  of redemption, and that the Burbrinks

1   understood that their property was worth

2   $100,000 or in excess thereof.

3          A.    It wouldn't be all those elements;

4   you need some of those elements.  All of those

5   elements are supporting of my thesis, but based

6   on my experience, I think owners of distressed

7   property have multiple opportunities when

8   there's substantial equity.  Wouldn't need to

9   be $100,000.  Fifty thousand would have

10  produced the same result.  I understand this

11  property was worth significantly more.  The

12  criteria is whether there's equity.  I can't

13  tell from these documents what was the purchase

14  price.  I have three inconsistent statements of

15  purchase price.  I have zero, I have $30,000

16  and I have $50,000.  My understanding is that

17  the property was worth more than zero, more

18  than 30, and more than 50.  Therefore, there

19  was quote "equity" in the property.  In my

20  experience when there is equity in the property,

21  in this community, that is in Hamilton County,

22  the sellers of distressed property that's in

23  foreclosure are inundated with solicitations

24  from various real estate speculators to acquire

25  the property.

APPENDIX B                                    26

1       My experience suggests that the
2   homeowners generally have a sense of what their
3   property is worth.  Not necessarily totally
4   accurate, but they have a significant sense of
5   what it's worth, and they know that they can
6   sell it even in foreclosure because they are
7   typically afforded multiple opportunities when
8   there's substantial equity -- even minimal
9   equity in the property.  So I think it's
10  unlikely that -- I've never met these people,
11  I've never talked to them, I don't know what
12  they know, but based on my experience it seems
13  unlikely that they would not know that their
14  property is worth substantially more than zero,
15  or even substantially more than the $20,000 or
16  so they owed on the mortgage.  Therefore, it
17  seems, based on my experience, substantially
18  unlikely that they would sell it for zero or
19  sell it for the $30,000 that's suggested on the
20  closing statement when the property is worth in
21  the order or magnitude of three times that
22  amount.
23       So their suggestion through
24  Mr. Blessing that they understood that this was
25  a financing transaction, they were going to

1    maintain the property on land contract, is

2    consistent with my observation of the

3    documents.

4              Q.    Let me back up a second.  Did you

5    do any other investigation, other than what

6    Mr. Blessing gave to you?  Did you look at any

7    other records or talk to any other people?

8              A.    No.

9              Q.    And you indicated that you had at

10   least two communications with Mr. Blessing to

11   discuss this matter.  Did he give you any facts

12   that aren't contained in the written narrative?

13             A.    I've already told you, I don't

14   remember precisely what the narrative says.

15   Between Mr. Blessing and the written narrative,

16   I perceive the facts which I've just described

17   to you.  I should say, between all the

18   documents that we've discussed plus my

19   discussions with Mr. Blessing, I understood

20   those to be the facts.

21             Q.    Mr. Blessing says that you will

22   opine the transaction in this case did not

23   accurately reflect the real estate contract,

24   and I think you just discussed that.  We just

25   talked about that.

APPENDIX B                                    28

1        A.    I did.

2        Q.    It appears that the closing on the

3   purchase contract was orchestrated by Attorney

4   John Meckstroth; is that correct?

5        A.    I'm told that.  I have no

6   independent knowledge of that.

7        Q.    Does the settlement statement

8   indicate that it was prepared by John R.

9   Meckstroth, Junior?

10       A.    Yeah, the second page of the

11  document.  I assume that's part of the

12  document.

13       Q.    Are you familiar with

14  Mr. Meckstroth?

15       A.    Not really.  I'm familiar with his

16  father.  I know his father but I don't

17  really -- I know who he is and I'm sure we've

18  said hello, but I don't know him.

19       Q.    Familiar that he's also a member

20  of the Civil Division of the Hamilton County

21  Prosecutor's Office dealing in their real

22  estate matters?

23       A.    I didn't know that, no.

24       Q.    Mr. Blessing also says that you

25  will opine that this transaction falls far

APPENDIX B

29

1    short of that necessary to effect a real estate

2    sale with integrity and honesty.  Would you

3    believe integrity and honesty to be a subject

4    for your expert opinion?

5            A.    I can tell you my experience, I

6    can tell you my exposure, but I can't opine on

7    my qualifications as an expert on that subject.

8            Q.    So you wouldn't be able to tell

9    the court that you're an expert in integrity

10   and honesty?

11           A.    It wouldn't be my function to tell

12   the court that.  I can tell the court my

13   experiences and the court could make that

14   determination.  I couldn't make it for the

15   court.

16           Q.    I guess what I'm trying to do is

17   pin you down.  Are you an expert in integrity

18   and honesty?

19           A.    I feel like my experience

20   qualifies me as an expert in real estate

21   transactions such as this, and I feel like

22   integrity -- I wouldn't describe myself as an

23   expert in integrity but I would say that I have

24   enough experience to qualify me as an expert in

25   real estate transactions such as this.

APPENDIX B                                    30

1         Q.    Thanks.  Mr. Blessing also says

2    that you may testify concerning pattern,

3    motive, absence of mistake relating to the

4    scheme alleged.  Start with the scheme alleged.

5    Can you tell me what this scheme alleged is

6    that you're going to testify to?

7         A.    If you'll ask me a question, I'll

8    be glad to answer it.  I have an understanding

9    of a fact pattern.  I have an understanding

10   from Mr. Blessing through the written documents

11   that we've talked about and the verbal

12   communications that we've talked about that

13   this was one of a series of transactions of

14   similar import.  I can describe for you, I can

15   answer your questions, but I can't tell you

16   what's in Mr. Blessing's head.

17        Q.    I appreciate that, and what I'm

18   trying to get at is is there some sort of

19   scheme alleged in the complaint that you're

20   going to testify about?

21        A.    I've never read the complaint.  I

22   couldn't answer that.

23        Q.    Is there some sort of scheme

24   involving Mr. Bigelow that you're going to

25   testify about?

APPENDIX B                                          31

1          A.    I'm going to respond to questions.

2     If you're asking me am I acquainted with a

3     scheme, my answer is as I've explained to you.

4     I know only what Mr. Blessing has enlightened

5     me about both by the verbal discussions and by

6     the documents that we've discussed, and

7     Mr. Blessing has informed me that, as I've

8     said, that this is one in a series of similar

9     transactions.

10         Q.    Similar in what way, sir?

11         A.    Similar in that Mr. Bigelow,

12    through his acquaintance or agent -- I don't

13    know the exact relationship, that Miss

14    Christian would approach owners of distressed

15    property -- by that I mean property in

16    foreclosure, but restricted to properties where

17    there is substantial equity, in an attempt to

18    acquire those properties without a concomitant

19    equity participation.  That is, to take over --

20    I'm using the words carefully in explaining

21    that to you -- to take over the mortgage and

22    sell or rent the property as profitable without

23    making a commitment to the equity of the

24    property.  I say take over because the seller

25    statement here talks about a mortgage assumed,

APPENDIX B                                          32

1    but the deed which I've been furnished

2    doesn't -- did I look at the deed?

3             Q.    No, sir, I didn't have a copy of

4    that.

5             A.    I'm told that the deed does not

6    have assumption language in it.

7             Q.    I know you set it forth in plain

8    language but I really didn't understand you,

9    Mr. Lerner.  The scheme is that Mr. Bigelow,

10   through Miss Christian, approaches people whose

11   property is in foreclosure.  There's equity in

12   the property, and then I lost you.

13            A.    Well, as I said earlier, it's

14   inconceivable to me that people who have

15   property worth two or three times or more the

16   mortgage balance are going to let somebody take

17   over this property without indemnifying their

18   equity, unless they are somehow misled about

19   where that's going.  In this case, my

20   understanding, based on what we've talked

21   about, is that they thought they were entering

22   into a land installment, land contract, whereby

23   they were going to maintain full possession and

24   ultimate ownership of the property.

25                  I don't think that people with

APPENDIX B                                            33

1    houses that are worth 75 or 100 or 150 thousand

2    dollars, I don't think those people sell those

3    houses outright for a small fraction of the

4    value of the property without somehow being

5    misled.  And in this case, the explanation that

6    they were offered, they thought they were

7    entering into a land contract transaction, is

8    completely consistent with the economics and

9    the documents, except that there is no land

10   contract.  At least I haven't seen it.

11           Q.  So your testimony concerning

12   pattern, motive, and absence of mistake

13   relating to the scheme that you've just

14   mentioned, what will that testimony be?

15           A.  If you could tell me what the

16   question will be, I can tell you how I can

17   answer it, but I thought I answered the

18   question.

19           Q.  Yes, sir.  What I'm doing is

20   referring to Mr. Blessing's letter of

21   December 10, 2001 to me, which is marked as

22   Exhibit Number 1.  That refers to what you will

23   testify to.

24           A.  Well, sir, it says, "He may also

25   testify concerning," and I will answer any

APPENDIX B                                                    34

1    questions that are postulated to me.  I don't

2    know what those questions will be.

3              Q.    Have you discussed those potential

4    questions with Mr. Blessing?

5              A.    No.

6              Q.    Have you discussed this particular

7    topic with Mr. Blessing?

8              A.    Yes, as I responded to your

9    earlier questions.

10             Q.    And with respect to the particular

11   topic, I'm referring to pattern, motive and

12   absence of mistake.

13             A.    Mr. Blessing, as I said twice

14   already, Mr. Blessing told me that this was one

15   of a series of transactions that had the common

16   features which I've described.  In that sense

17   we talked about pattern.  I don't know

18   particularly what you mean by motive or

19   mistake.

20             Q.    When I asked you to read through

21   this letter before and if it accurately

22   reflected your discussions with Mr. Blessing,

23   you indicated it did, and I'm just trying to

24   understand what he means or what you mean --

25             A.    Well first of all, I don't mean

APPENDIX B

35

1    anything.  It's not my statement, okay?  He

2    says, "He may also testify concerning pattern,

3    motive and absence of mistake."  If I'm asked

4    about those subjects, I will tell you -- by you

5    or by him or anyone else, I will respond as

6    best I can.  Mr. Blessing and I have not

7    discussed those issues no more than I've

8    related to you and I'm, therefore, unable to

9    tell you what's in his head.

10          Q.    Just to make sure I'm on the same

11   page, you've not discussed with Mr. Blessing

12   any testimony regarding pattern, motive or

13   mistake?

14          A.    No.  I've related to you our

15   discussions, and other than those discussions I

16   haven't discussed those issues.

17          Q.    You have a fee agreement with

18   Mr. Blessing for your services?

19          A.    No.

20          Q.    Are you charging Mr. Blessing or

21   his client for your services?

22          A.    We've never discussed the issue.

23          Q.    Have you had separate

24   conversations with Mr. Blessing's associate,

25   Mr. Schwantes?

APPENDIX B                                                     36

1          A.    I don't recall ever having a
2    discussion that didn't involve Mr. Blessing.
3          Q.    Did you ever have any separate
4    discussions with an attorney by the name of
5    Rick Hopkins?
6          A.    No, that I can recall.  I don't
7    know that name.
8          Q.    You don't know Mr. Hopkins?
9          A.    No.
10         Q.    Mr. Lerner, I appreciate your
11   time.  If you would, please, get me a copy of
12   the narrative that Mr. Blessing sent you and
13   the notes that you have, I'd appreciate it.
14
15

              (Signature Waived)
16            DONALD LERNER, ESQ.
        (DEPOSITION CONCLUDED AT 10:42 A.M.)
17                  -  -  -
18
19
20
21
22
23
24
25

APPENDIX B                                                    37

C E R T I F I C A T E

STATE   OF   OHIO    :

                    :  SS

COUNTY OF HAMILTON :

1

2

3          I, Darlene Anthony, RPR, the under-
4    signed, a duly qualified notary public within
5    and for the State of Ohio, do hereby certify
6    that DONALD LERNER, ESQ. Was by me first duly
7    sworn to depose the truth, the whole truth, and
8    nothing but the truth; the foregoing is the
9    deposition given at said time and place by said
10   witness; that said deposition was taken
11   pursuant to stipulations hereinbefore set forth;
12   that said deposition was taken by me in stenotypy
13   and transcribed by means of computer; and that
14   examination and signature to the transcribed
15   deposition is expressly waived; that I am
16   neither a relative of any of the parties or any
17   of their counsel; and I am not, nor is the
18   court reporting firm with which I am
19   affiliated, under a contract as defined in
20   Civil Rule 28(D), and have no interest in the
21   result of this action.
22          IN WITNESS WHEREOF, I hereunto set my
     hand and official seal of office at Cincinnati,
23   Ohio, this 16th day of January, 2002.

                        _____
24   My Commission expires: Darlene Anthony
     May 10, 2006          Notary Public-State of Ohio

25

APPENDIX C

# HARDIN, LEFTON, LAZARUS & MARKS, LLC

### ATTORNEYS AND COUNSELORS AT LAW

DONALD E. HARDIN
DAVID H. LEFTON
STEPHEN S. LAZARUS*
EDWARD G. MARKS**
DAVID E. HARDIN

*ALSO ADMITTED IN D.C.
**ALSO ADMITTED IN KENTUCKY

CINCINNATI OFFICE:

915 CINCINNATI CLUB BUILDING
30 GARFIELD PLACE
CINCINNATI, OHIO 45202-4322
TELEPHONE: (513) 721-7300
FACSIMILE: (513) 721-7008

OF COUNSEL:
GARY R. LEWIS
GARY R. LEWIS CO., LPA
(513) 665-9222

TRICOUNTY OFFICE:
29 NORTH D STREET
HAMILTON, OHIO 45013-3128
(513) 382-1894

February 20, 2003

James Schwantes, Esq.
119 East Court Street
Suite 500
Cincinnati, Ohio 45202

*Via Facsimile Transmission and U.S. Mail*

Re: Bryant v. Bigelow, et al.
    Case Number: C-1-02-006

Dear Jim:

This is in response to your e-mail of February 19, 2003. Regarding the files that were subpoenaed by you from John Meckstroth's Office, I did pick them up on February 18, 2003. This was the first day that John was available to meet with me and to make the files available for my review. As we have discussed previously, I need to review these files to determine if any documents are subject to attorney-client privilege. I also need to determine if my client will object to production for any other reason. We are in the process of reviewing the files for that purpose, however it is going to take a few more days. Until I picked them up, I had no idea that your subpoena covers a significant number of documents and files. There are approximately 68 files in Mr. Meckstroth's possession that are described in the subpoena. I fully expect that our review will be completed by next Wednesday, February 26, 2003. If I determine that there are any documents that I feel are subject to the attorney client privilege or that we are otherwise objecting to their production, I will let you know by then. Also, as you know, part of the delay in my review of these documents was occasioned by service of your subpoena to Mr. Meckstroth on December 23, 2002, without notifying me that the subpoena had been served on him. I first found out that these documents had been subpoenaed on January 10, 2003, when John Meckstroth called me and advised me that one had been issued.

Regarding the Interrogatories and Requests for Production of Documents, I advised you last week that I expected to have the completed responses to you this week. In light of the amount of time that the review of the Meckstroth files is requiring, we will need an additional week to complete the responses to the Interrogatories and Requests for Production. There is no need to file a Motion to Compel. As I told you, I believe that nearly all of the documents in my client's possession which are relevant to the claims in this case were previously produced in our

APPENDIX C

James Schwantes, Esq.
Page Two
February 20, 2003

Initial Disclosure of Documents.  I will have the written responses to these Interrogatories and Requests for Production of Documents to you by February 28. 2003.  If for some reason there is a specific problem in this regard, please advise.

On another discovery issue, on September 16, 2002, you sent me a deposition transcript of Donald Lerner as a disclosure of an expert witness.  As you know the transcript was deposition testimony offered by Mr. Lerner in the Hamilton County Common Pleas case, which involves different parties.  I do not believe your identification of this expert witness complies with the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure concerning experts.  Please identify any experts who you intend to use in this case in accordance with Rule 26.   Also, you statement that Mr. Lerner's expert testimony in this case will be "consistent" with the deposition testimony is vague and does not identify the opinions he will offer.

Sincerely,

Gary R. Lewis

GRL/ds
cc: Prescott Bigelow
    Roseanne Christian

# HARDIN, LEFTON, LAZARUS & MARKS, LLC

### ATTORNEYS AND COUNSELORS AT LAW

DONALD E. HARDIN
DAVID H. LEFTON
STEPHEN S. LAZARUS*
EDWARD G. MARKS**
DAVID E. HARDIN

*ALSO ADMITTED IN D.C.
**ALSO ADMITTED IN KENTUCKY

CINCINNATI OFFICE:

915 CINCINNATI CLUB BUILDING
30 GARFIELD PLACE
CINCINNATI, OHIO 45202-4322
TELEPHONE: (513) 721-7300
FACSIMILE: (513) 721-7008

OF COUNSEL:
GARY R. LEWIS
GARY R. LEWIS CO., LPA
(513) 665-9222

TRICOUNTY OFFICE:
29 NORTH D STREET
HAMILTON, OHIO 45013-3128
(513) 382-1894

March 6, 2003

William H. Blessing, Esq.
119 East Court Street
Suite 500
Cincinnati, Ohio 45202

  Re: Bryant v. Bigelow, et al.
   Case Number: C-1-02-006

Dear Bill:

  This will follow my previous correspondence and our recent discussion concerning the Plaintiff's Identification of Mr. Lerner as an expert witness. As I stated in my letter to your co-counsel, James Schwantes of February 20, 2003, I do not believe that providing me with a deposition transcript of Mr. Lerner's testimony in the Common Pleas action of <u>Bigelow v. Burbrink. et al.</u>, along with a statement that his expert testimony in this case will be "consistent" with the opinions he rendered in the Burbrink case is sufficient. I do not believe that the manner in which you have identified this expert complies with Rule 26 of the Federal Rules of Civil Procedure for identification of experts, nor have I been furnished with a report concerning the expert. I have also not been furnished with the information regarding the expert's testimony in other cases and the other information required in Rule 26.

  You and I discussed this issue on March 3, 2003. You advised me at that time you believed the manner in which this expert has been identified and the information submitted complies with Rule 26. I asked you to confirm that position in a letter to me, which I have not received.

APPENDIX D

William Blessing, Esq.
Page Two
March 6, 2003


     I am requesting that you follow through and provide me with the letter setting forth your position on this issue. My client has until April 1, 2003, in which to identify experts and furnish reports. Based on this I need a response from you on this issue right away. Please respond by March 12, 2003.

                    Sincerely,



                    Gary R. Lewis

GRL/ds
cc: Prescott Bigelow
    Roseanne Christian

**LAW OFFICES OF**
**William H. Blessing**
**119 East Court Street**
**Suite 500**
**Cincinnati, Ohio 45202**

E-Mail: jimschwantes@cinci.rr.com

Telephone: 513-621-9191
Telecopier: 513-621-7086

March 27, 2003

**VIA TELECOPIER (513-721-7008)**

Gary R. Lewis, Attorney
Cincinnati Club Building, Suite 915
30 Garfield Place
Cincinnati, OH 45202

*Re: Bryant v. Bigelow, et al.*

Dear Gary:

In previous letters you have stated your dissatisfaction with Plaintiffs' identification of Donald Lerner as an expert in this case. In December 2002, Plaintiffs identified Mr. Lerner as an expert and provided you with Mr. Lerner's deposition – taken by Prescott Bigelow's attorney – in the case of *Bigelow v. Burbrink,* Hamilton County Court of Common Pleas, Case No. A0005052. Mr. Lerner's opinions regarding Prescott Bigelow's real estate transactions with Shirdenia Bryant and Harry Curtis will be consistent with the opinions he expressed about the Burbrink transaction.

At this time, Mr. Lerner will rely upon documents produced by Prescott Bigelow, IV in this litigation, particularly, the purchase contracts and settlement statements for the Bryant and Curtis transactions, the land contract prepared by John Meckstroth for Harry Curtis, the billing statement from Mr. Meckstroth to Harry Curtis, the promissory notes and release in the Bryant transaction, and the settlement statement from McKinley Mortgage in the Bryant transaction. Your client should have each of these documents in his possession.

As you know, discovery is ongoing and Plaintiffs have requested a significant number of documents from Mr. Bigelow that have yet to be produced. If Mr. Lerner reviews and relies upon any further documents, Plaintiffs will inform you. Additionally, Plaintiffs may seek the Court's approval for Mr. Lerner to review the documents recently produced by John Meckstroth. If approval is given, and Mr. Lerner reviews and relies upon any of Mr. Meckstroth's documents, Plaintiffs will supplement their expert disclosure as required by Federal Rule 26.

Case 1:02-cv-00006-SAS    Document 54-2    Filed 12/05/2003    Page 44 of 52

APPENDIX E

Gary R. Lewis, Attorney
March 27, 2003
Page Two


If there is any additional information that you believe you do not have and are entitled to under Federal Rule 26(B), please send me a letter specifying such material.


Sincerely yours,

James E. Schwantes


JES/
copy:  Ms. Shirdenia Bryant
       Mr. Harry Curtis

APPENDIX F

**Gary R Lewi**

| | |
|---|---|
| **From:** | "Jim Schwantes" <jimschwantes@cinci.rr.com> |
| **To:** | <grlewis@fuse.net> |
| **Sent:** | Thursday, March 27, 2003 2:59 PM |
| **Subject:** | Bryant v. Bigelow - Re: Donald Lerner |

Gary:
Donald Lerner's services as an expert in the Bryant v. Bigelow case are being provided at $225.00 per hour.


JES

3/28/03

17. Identify, with specificity, the manner in which you have suffered damage to your personal and financial reputation, suffered financial loss and emotional distress, as alleged in paragraph 48 of the Amended and Supplemental Complaint. For each alleged item of damages in paragraph 48, identify the amount of damages you claim.

RESPONSE: In addition to the financial losses identified in response to Interrogatory No. 15, Shirdenia Bryant has lost her family home that she inherited from her mother and father. Her financial reputation has been damaged by the foreclosure that resulted from her inability to pay the $64,000.00 mortgage note that encumbered the property after she bought it back from Defendant Bigelow on June 9, 2000. She has suffered emotional distress as a result of losing her family home.

18. Identify every fact upon which you rely support of the allegation that Defendant Bigelow entered into a relationship of trust and confidence with you, and assumed fiduciary duties with respect to you, as alleged in paragraph 50 of the Amended and Supplemental Complaint.

RESPONSE: Discovery is ongoing. Facts will be identified as discovered.

19. State the name and location of every person, other than experts, who may be called by you as a witness at trial.

RESPONSE: Plaintiff will supplement her witness list as witnesses become known. In addition to her own testimony and the expert testimony of Donald Lerner, Plaintiff expects to call Harry Curtis, Mark and Michael Burbrink, Walter Ellis, John Meckstroth, and Rula Bryant.

20. For each person identified in interrogatory number 19, state the substance of their expected testimony.

RESPONSE: Harry Curtis will testify to his transactions with Defendant Bigelow and Bigelow's eviction of him from his family home at 1966 Fairfax Avenue. Harry Curtis will testify to the damages that Defendant Bigelow has caused to him. See specifically, Plaintiff's RICO Statement at §§ 4(b) and 5(f)(v).

Mark and Michael Burbrink will testify to their transactions with Defendant Bigelow and Bigelow's eviction of them from their family home at 8670 Darnell Avenue. They will testify to the damages that Defendant Bigelow has caused to them.

Walter Ellis will testify to his knowledge of Defendant Bigelow's financial records and business entities.

John Meckstroth will testify to his knowledge of Defendant Bigelow's real estate transactions in which he was involved.

LEXSEE

**JEFFREY BOWE, Plaintiff-Appellant, v. CONSOLIDATED RAIL CORPORATION, Defendant-Appellee.**

No. 99-4091

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*2000 U.S. App. LEXIS 24866*

September 19, 2000, Filed

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *2000 U.S. App. LEXIS 30741.*

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO. 97-02916. Gaughan. 8-31-99.

**DISPOSITION:** AFFIRMED in part, REVERSED in part, and case REMANDED.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For JEFFREY BOWE, Plaintiff - Appellant: Howard Michael Hackman, Worthington, OH.

For CONSOLIDATED RAIL CORPORATION, Defendant - Appellee: David A. Damico, Kendra L. Fredericks-Smith, Burns, White & Hickton, Pittsburgh, PA.

**JUDGES:** BEFORE: MOORE and CLAY, Circuit Judges; RICE, District Judge. *

\* The Honorable Walter Herbert Rice, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

**OPINIONBY:** CLAY

**OPINION:**

**CLAY, Circuit Judge.** Plaintiff, Jeffrey Bowe, appeals from the district court's order granting summary judgment to Defendant, Consolidated Rail Corporation ("Conrail"), in this Federal Employers' Liability Act case alleging that [*2] Plaintiff, a railroad employee, suffered multiple physical injuries as a result of chemical exposure during his employment. For the following reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** to the district court for proceedings consistent with this opinion.

I.

Plaintiff began working for Conrail in May of 1978. He worked on the rail gang, as a repairman helper, repairman painter, repairman, and parts runner during his nearly twenty years with Conrail. He was exposed to various chemicals while performing these jobs, including Penta; Creosote; diesel fuel; gasoline; mineral spirits; paint and paint remover; and chemicals in floor cleaner, stripper, and floor wax.

Bowe took a sick leave from Conrail and consulted with his family physician in February of 1996. Bowe's physician referred him to Dr. Gunnar Heuser, a neurotoxicologist in California. Dr. Heuser's report concluded that Bowe suffered from sensory polyneuropathy, dry eye syndrome, chronic rhinitis and laryngitis, low oxygen saturation, irritable bowel syndrome, and abnormal sperm morphology. Dr. Heuser

concluded that Bowe's multi-system complaints were due to toxic chemical exposure at his workplace. [*3]

Bowe filed this lawsuit under the Federal Employers' Liability Act, *45 U.S.C. § 51 et seq.*, ("FELA"), alleging that Conrail's negligence in exposing him to dangerous chemicals caused him to develop severe physical disorders. Following Bowe's filing of this lawsuit, the district court established a case management plan which required the parties to serve each other with the reports of their expert witnesses by May 13, 1998. Bowe timely produced the reports of one of his expert witnesses.

In June of 1998, Bowe requested Conrail's cooperation in setting a date for a site inspection. Conrail refused to grant Bowe permission to conduct a site inspection until the district court had ruled on its motion for summary judgment. Conrail sought and received an extension of time to file expert reports on August 18, 1998, on the grounds that it had had a motion for summary judgment pending since June of 1998. Bowe did not request an extension; however, the district court permitted Bowe to supplement his expert reports with an additional untimely filing, though the court admonished Bowe's counsel for its tardiness in filing, stating that it "strongly disapproved of Plaintiff's [*4] Counsel's disregard of the expert report deadline and his presumptuousness in submitting the tardy report without seeking leave to do so. Nonetheless, in the interest of justice, this Court will allow the case to proceed on the merits and consider the July 1998 report." (J. A. 75).

Bowe filed a motion to compel site inspection in December of 1998. In January of 1999, the district court granted Bowe's motion to compel the site inspection. Bowe's proposed expert witness Rick Smith reviewed Conrail's facility in March of 1999, and thereafter completed his report.

In April of 1999, Conrail filed motions in limine to exclude the testimony of Plaintiff's expert witness Rick Smith on the grounds that Bowe had failed to identify Smith as an expert and serve Defendant with Smith's report prior to the court-imposed deadline of May 13, 1998, and alternately, on the grounds that Smith's testimony was unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* Conrail also filed motions for summary judgment, arguing that Bowe's failure to identify an expert by the court-imposed deadline caused the absence of any genuine [*5] issue of material fact as Bowe was unable to show negligence without expert testimony.

The district court granted Conrail's motions in limine and its motion for summary judgment. Bowe filed a motion to alter or amend the judgment under Federal

Rule of Civil Procedure 59(e) which the court denied, and Bowe timely appealed to this Court.

**II.**

We first address Bowe's contention that the district court erred by granting Conrail's motion in limine to exclude the testimony and report of Bowe's expert, Rick Smith, on the ground that the expert report was filed subsequent to the court-imposed deadline for filing expert reports.

This Court reviews a district court's decision to invoke discovery sanctions pursuant to Federal Rule of Civil Procedure 37(c)(1) for an abuse of discretion. *See Beil v. Lakewood Eng'g & Mfg. Co., 15 F.3d 546, 551 (6th Cir. 1994).* An abuse of discretion occurs only when "(1) the district court's decision is based on an erroneous conclusion of law, (2) the district court's findings are clearly erroneous, or (3) the district court's decision is clearly unreasonable, arbitrary or fanciful." *Id.; accord Romstadt v. Allstate Ins. Co., 59 F.3d 608, 615 (6th Cir. 1995).* [*6]

Federal Rule 26(a)(2) requires parties to disclose written reports for all of their expert witnesses "at the times and in the sequence directed by the court." Fed. R. Civ. P. 26(a)(2)(c). Parties who do not comply with Rule 26(a) may be sanctioned by the district court under Rule 37(c). "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1).

It is well-established by this Court and others that Rule 37(c)(1) mandates that a trial court shall sanction a party for discovery violations in connection with Rule 26 unless the violations were harmless or were substantially justified. *See Salgado v. General Motors Corp., 150 F.3d 735, 742 n.6 (7th Cir.1998)* (holding that Rule 37(c)(1) puts teeth into Rule 26 and that "the district court acted well within its discretion when it decided to impose the sanction of precluding the witnesses from testifying" since "the sanction of exclusion is automatic and mandatory unless the sanctioned party [*7] can show that its violation of Rule 26(a) was either justified or harmless"); *Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir.1996)* (same); *Ames v. Van Dyne, 1996 U.S. App. LEXIS 29700, No. 95-3376, 1996 WL 662899 at *4 (6th Cir. Nov. 13, 1996)* (unpublished) ("Rule 37 is written in mandatory terms and is designed to provide a strong inducement for disclosure of Rule 26(a) material.") (quoting *Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir.1995)); cf. King v. Ford Motor Co., 209 F.3d 886 (6th Cir. 2000)* (affirming the district

2000 U.S. App. LEXIS 24866, *

court's exclusion of expert testimony under Rule 37(c)(1)).

In *National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976) (per curiam)*, the Supreme Court stressed the policy reasons for enforcing the discovery rules. The most severe sanctions provided by the rules, the Court explained, "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id. at 643.* **[*8]** While a warning alone might have made the plaintiffs in that case comply with all future discovery orders, "other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts." *Id.*

In this case, counsel for both parties attended the February 13, 1998, Case Management Conference wherein the district court set a discovery deadline of May 13, 1998, for the exchange of expert reports. Prior to the May 13, 1998, deadline, Bowe submitted one medical expert report but no liability expert report. Conrail responded to this by filing a motion for summary judgment based on the insufficiency of Bowe's medical expert and also filed for permission to extend its deadline to submit defense expert witness reports. Bowe filed a new medical expert report, without leave of court, which diagnosed Bowe with a specific disease process. The district court issued a marginal order which granted Conrail an additional thirty days to submit its expert reports after receiving the district court's ruling on its summary judgment motion. On January 20, 1999, the district court permitted Bowe to use the second medical expert **[*9]** report although it warned Bowe that it "strongly disapproved of Plaintiff's Counsel's disregard of the expert report deadline." (J. A. 75). Despite this warning, Bowe submitted the liability expert report of Rick Smith on April 12, 1999, without first receiving an extension or permission from the court.

Bowe argues that his delay in producing the liability expert report was substantially justified under Rule 37(c) because Conrail failed to agree to a site inspection prior to the expert deadline. Bowe also argues that his failure to timely disclose the report is harmless. We are not persuaded by Bowe's argument.

Counsel for both parties attended the Case Management Conference and agreed to the discovery deadlines imposed at that time. Bowe made no efforts to ask for an extension of the deadline, even after being warned by the district court that submitting a report after the deadline had passed showed his "presumptuousness." (J. A. 75). Bowe shows no justification whatsoever for

failure to petition the district court for an extension of the deadline, even after Conrail notified Bowe that no site inspection would take place prior to the court's ruling on summary judgment. n1 At the **[*10]** very least, Bowe should have requested that the court grant him an extension to submit expert reports after the site inspection. Moreover, although Bowe argues that he could not submit Smith's report because he was not certain that Smith would be an expert until after the site inspection, this argument does nothing to excuse Bowe's failure to be aware of the discovery rules.

n1 We note that Bowe has presented no evidence that he asked for a site inspection prior to the expert witness deadline. The Joint Appendix contains only a letter dated June 19, 1998, from Howard M. Hackman, counsel for Jeffrey Bowe, to Kendra Smith, counsel for Conrail, requesting a site inspection. (J. A. 71).

Bowe also asserts that his violation of the discovery deadline is excused because no prejudice arose from the untimely submission of Smith's report as Conrail had an opportunity to depose Smith prior to the scheduled trial date. We do not agree. Had Smith been permitted to testify, he would have asserted that Conrail was negligent **[*11]** because it had inadequate ventilation systems in the area where Bowe worked. Conrail was not previously informed that the basis of Bowe's case would be a claim of poor ventilation; Conrail had prepared a defense based on the testimony of an industrial hygienist. Although Conrail had the opportunity to depose Smith, Conrail did not have adequate time to respond, nor could Conrail retain its own expert to rebut Smith's testimony at trial absent a grant of a second extension of the expert deadline.

There is simply no evidence that the district court's exclusion of Smith's report and testimony was based on an erroneous conclusion of law, was clearly erroneous, or clearly unreasonable, arbitrary or fanciful. Rather, the district court's action came after Bowe had been fully informed of the discovery deadlines, had received unambiguous warnings considering the importance of adhering to those deadlines, and despite this, had failed to comply with the deadlines, and had failed to petition the court for excuse of the failure or to show that his failure was either justified or constituted harmless error. The district court's action complied with the requirements of the Federal Rules of Civil **[*12]** Procedure, and we affirm its exclusion of the Bowe's report.

Although our above finding renders analysis of the district court's exclusion of Bowe's witness Rick Smith

under *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, moot, we note that in any event, Bowe has conceded this issue.

This Court reviews a district court's evidentiary rulings for an abuse of discretion. *See Morales v. American Honda Motor Co., 151 F.3d 500, 515 (6th Cir. 1998)*. This Court "may not categorically distinguish between rulings allowing expert testimony and rulings which disallow it," and must bear in mind "the 'gatekeeper' role of the district court in screening such evidence." *General Elec. Co. v. Joiner, 522 U.S. 136, 142, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)*. Moreover, when reviewing for an abuse of discretion, this Court may not reverse unless the ruling of the district court was "manifestly erroneous." *Id.*

Rule 702 of the Federal Rules of Evidence states that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine [*13] a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. In *Daubert*, the Supreme Court held that when faced with a proffer of expert scientific testimony, Rule 702 requires a district court to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *509 U.S. at 597*. As part of that review, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue," taking into consideration factors such as testing, peer review, error rates, and acceptability in the relevant scientific community. *Id. at 592-94*. *Daubert* thereby sets forth a general "gatekeeping" obligation for trial courts. *See id. at 597*.

The Supreme Court more recently clarified *Daubert*, holding that the district court's gatekeeper function applies to all experts: specialized, technical or scientific. *See Kumho Tire v. Carmichael, 526 U.S. 137, 147-48, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. [*14] n2

n2 This Court has drawn such distinctions as well. *See Berry v. City of Detroit, 25 F.3d 1342 (6th Cir. 1994)*. In *Berry*, this Court observed that "if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee." *Id.* On the other hand, "if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness . . . . In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have." *Id. at 1350*. Despite this distinction in the kinds of acceptable expert testimony, we concluded in *Berry* that *Daubert* applies to all expert testimony offered under Rule 702, not just scientific expert testimony. *See id.*

Plaintiff asserts that [*15] the district court misunderstood his argument concerning Smith's ability to be a fact witness instead of an expert witness, and further argues that the district court did not actually determine that Smith's testimony did not withstand the scrutiny of *Daubert*. Specifically, Plaintiff asserts that the district court misunderstood the argument of trial counsel when the counsel stated that "the standard set forth in *Daubert* is simply irrelevant to Mr. Smith since Plaintiff intends to use Mr. Smith as a fact witness only." (J. A. 325-26). Plaintiff now says that this statement was meant to indicate only an alternative grounds for permitting Smith's testimony at trial.

The district court found that "Smith is not a fact witness. Smith's report opines as to the adequacy of the ventilation in the area where Plaintiff worked as well as the probability that Plaintiff experiences elevated levels of some chemicals while performing his duties due to the lack of fresh air ventilation." (J. A. 21). We agree. Plaintiff's proposed Witness List attached to his trial brief lists as Witness G, "Rick A. Smith: Professional Engineer. Will testify to the relationship between Plaintiff's work and [*16] his condition." (J. A. 103). Furthermore, Smith's report indicates that it is Smith's "professional opinion that the upper office area of the Con-Rail [sic] shop . . . lacks proper ventilation." (J. A. 313). Smith also concludes that "it is probable that Mr. Bowe did experience elevated levels of some chemicals while he was performing his floor maintenance duties." (J. A. 314). We find such statements indicative of a professional or expert opinion, and not of a fact witness.

The district court concluded that Plaintiff had conceded that Smith's report does not pass the *Daubert* requirement by arguing that he was a fact witness instead of an expert witness. We are similarly persuaded; despite Bowe's protestations to the contrary, Plaintiff clearly stated that *Daubert* is irrelevant. There is simply no indication that Plaintiff was intending to make that an alternative argument. Given the plain language of Plaintiff's statement, we do not see how the district court abused its discretion, and therefore agree that Bowe has conceded this issue.

2000 U.S. App. LEXIS 24866, *

We note finally that the district court did not err by failing to rule on Bowe's motion to exclude prior to granting Conrail's motion in [*17] limine to exclude the report and testimony of Smith, as Conrail's motions in limine were properly filed and promptly served on Bowe. This court reviews a district court's judgment denying a motion in limine for abuse of discretion. *See Zamlen v. City of Cleveland, 906 F.2d 209, 215 (6th Cir.1990).*

The Civil Trial Order in this Case requires that all motions in limine shall be filed with the court no later than seven days prior to the final pre-trial. The pretrial conference was scheduled for April 26, 1999. Plaintiff concedes that the parties were required to file their trial briefs and motions in limine by April 19, 1999. Conrail filed its pre-trial motions on April 19, 1999. Plaintiff asserts that Conrail did not mail its motions in limine until April 19, 1999, and therefore prejudiced Bowe by "untimely service of the motions in limine." Brief of Appellant at 41-42. Plaintiff concedes that Defendant's motions are post-marked with a date of April 19, 1999. *See id.* at 41. We find that such a concession amounts to making this a frivolous issue, as this Court will not entertain the argument that Defendant was required to serve Plaintiff with the motions prior to [*18] the date it was obligated to file them with the court.

### III.

We next turn to Bowe's contention that the district court erred by granting Conrail's motion for summary judgment. This Court reviews the decision of the district judge to grant summary judgment *de novo. See Mounts v. Grand Trunk W. R.R., 198 F.3d 578, 580 (6th Cir. 2000); Babbitt v. Norfolk & W. Ry. Co., 104 F.3d 89, 90 (6th Cir.1997).* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding the motion, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* [*19] If the moving party shows this absence, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita, 475 U.S. at 587.* To meet this burden, the nonmoving party may not rest on the mere allegations in the pleadings. *See* Fed.R.Civ.P. 56(e); *Celotex, 477 U.S. at 324.*

The FELA provides that:

Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in [interstate] commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

*45 U.S.C. § 51.* FELA is "a remedial and humanitarian statute . . . enacted by Congress to afford relief to employees from injury incurred in the railway industry." *Mounts, 198 F.3d at 580* (quoting *Edsall v. Penn Cent. Transp. Co., 479 F.2d 33, 35 (6th Cir.1973)).* [*20] A FELA claim requires proof of "the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Adams v. CSX Transp., Inc., 899 F.2d 536, 539 (6th Cir.1990).* To recover damages pursuant to the FELA, a plaintiff must show that he was injured while in the scope of his employment; that his employment was in furtherance of his employer's interstate business; that his employer was negligent; and that the employer's negligence played some part in causing the injury for which he seeks compensation. *See Green v. River Terminal Ry., 763 F.2d 805, 808 (6th Cir.1985).* Under FELA, an employer has the duty to provide its employees with a reasonably safe workplace. *See Adams, 899 F.2d at 539.* An employer breaches this duty "if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." *Peyton v. St. Louis Southwestern Ry., 962 F.2d 832, 833 (8th Cir.1992); accord Urie v. Thompson, 337 U.S. 163, 178, 93 L. Ed. 1282, 69 S. Ct. 1018 (1949).*

FELA has a relaxed standard of proof regarding causation. [*21] A plaintiff must offer "more than a scintilla of evidence in order to create a jury question on the issue of employer liability, but not much more." *Aparicio v. Norfolk & Western Ry. Co., 84 F.3d 803 (6th Cir.1996).* The test is whether "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury." *Rogers v. Missouri Pacific R.R. Co., 352 U.S. 500, 506, 1 L. Ed. 2d 493, 77 S. Ct. 443 (1957); Gallick v. Baltimore & Ohio R.R., 372 U.S. 108, 116, 9 L. Ed. 2d 618, 83 S. Ct. 659 (1963).*

Plaintiff asserts that the district court erred because it failed to consider the negligence of Conrail in using products that were not properly approved by Conrail's

internal Technical Services Laboratory, and that the district court improperly assumed that the testimony of an expert witness as to liability was necessary. Plaintiff argued in opposition to Conrail's motion for summary judgment that he had identified an expert who could testify that Conrail was negligent with respect to Bowe, and that the question of negligence under FELA is one that should be tried to a jury.

We note **[*22]** first of all that Bowe's counsel has done his client a disservice by failing to state in his opposition to the motion for summary judgment the specific facts upon which Bowe's theory of negligence is based. Reliance by counsel upon the improperly filed report of Smith to the detriment of the types of specific claims raised in Bowe's brief on appeal constitutes at the very least, sloppy representation. n3 However, we hesitate to penalize Bowe for his counsel's inartful presentation of Bowe's negligence claims against his employer. Under the relaxed FELA standard, Bowe need show only that Conrail's negligence showed some part, however small, in producing his injury and illness. We read the evidence to so demonstrate. Certainly a jury could find from the medical report on Bowe's condition in context with his own testimony about the chemicals he was exposed to in the workplace that Conrail's use of toxic chemicals contributed to his illness. Further, Dr.

Heuser concluded that Bowe's multi-system complaints were due to toxic chemical exposure at his workplace. Although slim, we find such evidence sufficient to permit Bowe's case to survive summary judgment. We reverse the district court's **[*23]** grant of summary judgment and remand.

n3 We note that Bowe clearly did not argue these claims to the trial court and therefore, as a party may not raise a claim for the first time on appeal, we will not consider them here. *See Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc., 176 F.3d 315, 326 (6th Cir. 1999); Enertech Elec., Inc. v. County Comm'rs, 85 F.3d 257, 261 (6th Cir. 1996).*

We therefore conclude that the district court did not abuse its discretion in excluding the report and testimony of Bowe's expert due to the failure to meet discovery deadlines, but find that because of the disputed issues of fact apparent on the trial court record, the district court erred in granting summary judgment in favor of Conrail. We **AFFIRM** in part, **REVERSE** in part, and **REMAND** this case to the district court.