UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
CASE NO.: C-1-02-006


SHIRDENIA BRYANT, et al.                    PLAINTIFFS

              vs.

PRESCOTT BIGELOW IV, et al.                 DEFENDANTS



*  *  *  *  *  *  *  *  *  *  *  *  *

DEPONENT:                DONALD M. LERNER, ESQ.

DATE:                    JANUARY 30, 2004

*  *  *  *  *  *  *  *  *  *  *  *  *




ANNA I. CROUCH
REPORTER






BARLOW REPORTING AND VIDEO SERVICES, LLC
1010 Russell Street, Suite 202
Covington, Kentucky  41011
(859) 261-8440

1                              INDEX

2   Cross-Examination by Mr. Lewis            Pages  4 - 144

3

4

5

6                            EXHIBITS

7   Defendants'                Description              Page No.

8       A          A Series of E-mail                    24
                   Communications
9

10      B          Deposition Transcript                 91
                   of Donald M. Lerner, Esq.
11                 of 1/8/02

12

13      C          Contract to Purchase                  97
                   dated 8/21/99
14

15      D          Notebook                             104

16

17      E          Settlement Statement                 105
                   dated 8/25/99
18

19      F          Handwritten Time Records             113
                   as Recorded by Mr. Lerner
20

21

22

23

24

1       The deposition of DONALD M. LERNER, ESQ., taken

2  for the purpose of discovery and/or use as evidence

3  in the within action, pursuant to Notice, heretofore

4  filed at the law offices of William H. Blessing, Esq.,

5  119 East Court Street, Suite 500, Cincinnati, Ohio

6  45202, on Friday, January 30, 2004, at 9:02 a.m., upon

7  oral examination and to be used in accordance with the

8  Ohio Rules of Civil Procedure.

9

10

11                    *   *   *   *   *   *

12                       APPEARANCES

13  FOR THE PLAINTIFFS:          WILLIAM H. BLESSING, ESQ.

14  FOR THE DEFENDANTS:          GARY R. LEWIS, ESQ.
                                 TIMOTHY E. MCKAY, ESQ.
15
16  ALSO PRESENT:                PRESCOTT BIGELOW IV

17                    *   *   *   *   *   *

18

19

20    DONALD M. LERNER, ESQ., called on behalf of the

21  Defendants, after having been first duly sworn,

22  was examined and deposed as follows:

23

24

<pre>
 1                    CROSS-EXAMINATION

 2   BY MR. LEWIS:

 3             Q.    Sir, would you state your name,

 4   please?

 5             A.    Donald M. Lerner, L-E-R-N-E-R.

 6             Q.    And what is your professional

 7   address?

 8             A.    It is 120 East Fourth Street,

 9   Cincinnati.

10             Q.    Sir, my name is Gary Lewis and I

11   represent the defendants in this case, and we're going

12   to be talking to you this morning about the claims

13   of Mr. Curtis.  Now, you understand that Shirdenia

14   Bryant's claims have been settled?

15             A.    I have learned that, yes.

16             Q.    All right.  So, today we're going

17   to be discussing Mr. Curtis.  You're an attorney,

18   aren't you?

19             A.    I am.

20             Q.    Okay.  And what is your firm

21   affiliation?

22             A.    Lerner Sampson and Rothfuss.

23             Q.    How long have you been with that

24   firm?
</pre>

1          A.   I formed the firm on July 1st, 1975.

2    At that time, it was just Donald M. Lerner Co., LPA --

3          Q.   Okay.

4          A.   -- and the present firm has succeeded

5    from that.

6          Q.   You've been identified as an expert

7    witness for Mr. Curtis, correct?

8          A.   I probably have.

9          Q.   Well --

10          A.   Yes.

11          Q.   -- do you know whether you have or

12    not?

13          A.   It's my understanding that I have.

14          Q.   Mine, too.

15          A.   I don't have -- I've been told that.

16    I don't have any firsthand knowledge of it.

17          Q.   All right.  Are you going to testify

18    at trial as an expert on behalf of Mr. Curtis?

19          A.   If called, I will do so.

20    My understanding, sir -- and I'm not trying to confuse

21    you -- but my understanding is that I will be called,

22    and that I will testify.

23          Q.   All right.  Then, that's my

24    understanding, also.  And when were you hired as an

1  expert for Mr. Curtis in this case?

2          A.   I'm trying to recall.  I think I was

3  first consulted of Mr. Curtis's matter early this

4  month.  That's my best memory.  I'm not a hundred

5  percent sure of that.

6          Q.   And before early this month, then,

7  you weren't asked to review any information concerning

8  Mr. Curtis's claims; is that correct?

9          A.   That is correct.

10         Q.   All right.  Now, in terms of the case

11 -- the entire case when Ms. Bryant was a plaintiff --

12 do you remember when you were first contacted by

13 Mr. Blessing?

14         A.   No.

15         Q.   Okay.  Approximately, do you remember

16 at all?

17         A.   I really don't.  Several years ago.

18         Q.   Now, at the point that you agreed to

19 be an expert witness on behalf of Mr. Curtis, had you

20 reviewed any documents at that point?

21         A.   Yes.

22         Q.   And what had you reviewed at the time

23 that you agreed to be an expert for Mr. Curtis?

24         A.   I reviewed certain documents

1   pertinent to Mr. Curtis's transaction and other

2   documents related to one other transaction; one you've

3   recently settled.  At that time, my engagement was to

4   contemplate both --

5           Q.   Right.

6           A.   -- plaintiffs, and I understand that

7   you have since settled with --

8           Q.   I understand.  So, let's focus on

9   Mr. Curtis for purposes of these questions, all right?

10          A.   (Nods head.)

11          Q.   So you said certain documents in

12   answer to my last question.  Specifically, what

13   documents did you review reference Curtis before

14   you agreed to be an expert witness on his behalf?

15          A.   I reviewed a purchase contract,

16   a settlement statement, various disbursement checks,

17   an unsigned land contract, but specifically with

18   regard to Curtis, I don't recall that there were

19   others.

20          Q.   So what you've just told me,

21   the purchase contract, the settlement statement,

22   disbursement checks, and the land contract --

23   the unsigned land contract?

24          A.   Correct.

1          Q.    -- and those are the documents

2    that you recall reviewing before you agreed to be an

3    expert?

4          A.    That's correct.

5          Q.    And the disbursement checks, were

6    those disbursement checks that were reflected on the

7    settlement statement?

8          A.    Most of them were.

9          Q.    Did you review any disbursement

10   checks that weren't reflected --

11         A.    Yes.

12         Q.    -- on the settlement statement?

13         A.    Excuse me.

14         Q.    You did?

15         A.    Yes.

16         Q.    And what were those?

17         A.    As I recall, there was one check in

18   the amount of $295 payable to Mr. Meckstroth and dated

19   the same date as the closing.

20         Q.    Actually, that check was made payable

21   to Mr. Curtis, and then it was endorsed by Mr. Curtis,

22   to Mr. Meckstroth, wasn't it?

23         A.    I don't recall.

24         Q.    Any other disbursement checks that

1  you reviewed, other than what we just talked about?

2          A.    Other than -- no, I told you that

3  I reviewed checks that were reflected on the closing

4  statement.

5          Q.    Right, and we talked about that.

6          A.    And now, as I think about it, I'm not

7  sure that I saw the $295 check about which we just

8  spoke.

9          Q.    Oh.

10         A.    I saw another document that I didn't

11 mention, which was a receipt from Mr. Meckstroth,

12 for that amount.  I don't recall whether I saw such

13 a check.

14         Q.    Okay.  Have we talked about all the

15 documents that you reviewed before you agreed to be an

16 expert for Mr. Curtis?

17         A.    To the best of my present

18 recollection.

19         Q.    Okay.  Are you familiar with the term

20 "conflict search" --

21         A.    Yes.

22         Q.    -- as a lawyer, and --

23         A.    Yes.

24         Q.    -- in the context of your law firm --

1           A.    Yes.

2           Q.    -- being hired, et cetera?

3           A.    (Nods head.)

4           Q.    Just for the record, tell me what it

5    is.

6           A.    Well, it varies from office to

7    office, but its function is to determine whether there

8    is within a law office a conflict before undertaking

9    an engagement; a legal conflict of interest.

10          Q.    All right.  And does Lerner Sampson

11   -- is it Lerner Sampson and Rothfuss?

12          A.    That's correct.

13          Q.    Does your firm do a conflict search

14   before you accept an engagement?

15          A.    Typically, but I'm not a participant

16   in the firm.  I'm of counsel to the firm.

17          Q.    You are?

18          A.    Yes.

19          Q.    All right.  So, do you have your own

20   practice?  Is that what that means?

21          A.    Yes.

22          Q.    Do you, as attorney-at-law, do a

23   conflict search --

24          A.    Not --

1          Q.    -- before you accept employment?

2          A.    -- yes, but not in -- not the same

3    kind of search that one would expect to do in a larger

4    law firm.

5          Q.    All right.  Well, tell me what kind

6    of conflict search you would --

7          A.    Well --

8          Q.    -- well, you need to let me finish my

9    questions.

10          A.    Sorry.

11          Q.    Okay.  Tell me what kind of conflict

12    search that you do before you accept employment.

13          A.    My practice is sufficiently limited

14    that I can -- I have a present recollection of --

15    a sufficient present recollection of previous cases

16    to recall whether or not I have a conflict, and

17    then --

18          Q.    Do you -- well, I'm sorry.

19          A.    No; I'm finished.

20          Q.    I had just lectured you, and then I

21    interrupted you.

22          A.    And I did it to you, and so a

23    turnabout's fair play.

24          Q.    All right.  Okay.  Well, how long

1    have you been of counsel to the Lerner firm?

2            A.    Approximately four years -- well,

3    maybe three.

4            Q.    When you do your conflict search,

5    do you also search for clients of the firm, when you

6    were a principal with that firm?

7            A.    Well, I did for a period of time, but

8    I no longer do that.

9            Q.    All right.  Do you know if

10   Mr. Bigelow was ever a client of Lerner Sampson and

11   Rothfuss?

12           A.    I do not.

13           Q.    Did you check that information before

14   you agreed to be an expert witness in this case?

15           A.    No.

16           Q.    And you didn't check it, either, for

17   the Lerner firm, or yourself, right?

18           A.    Well, I know that I never personally

19   represented Mr. Bigelow.

20           Q.    Okay.  But you didn't check it for

21   the Lerner firm?

22           A.    No.

23           Q.    But you've got that ability if you

24   wanted to do it, right?

1          A.    I would have -- yes, I have access

2    to a computer.  I don't have the skills to use it.

3    I would have somebody to do that for me.

4          Q.    Right.  But, I mean, if you needed to

5    do it, you could get access to the information, right?

6          A.    (Nods head.)

7          Q.    Do you know who the defendants are in

8    this case?

9          A.    Well, I understand that there is

10   Mr. Bigelow and Christine -- and I don't recall the

11   last name.

12         Q.    Okay.  Well, how many defendants do

13   you think there are in this case?

14         A.    I don't know how many there are.  I'm

15   informed of two.

16         Q.    All right.  And you know Mr. Bigelow

17   is one, right?

18         A.    That's correct.

19         Q.    Who's the other defendant?

20         A.    The woman, whose first name is

21   Christine, and the last name escapes me.

22         Q.    All right.  So, you understand that

23   it's Christine-somebody as the other defendant?

24         A.    Correct.

1            Q.   Did you do a conflict search for that

2  Christine, the other defendant?

3            A.   I've never represented her.

4            Q.   All right.  What about the Lerner

5  firm?  Did you do a conflict --

6            A.   No.

7            Q.   -- search, reference her?

8            A.   No.

9            Q.   Do you know Mr. Bigelow?

10           A.   I do not.

11           Q.   Do you know if Mr. Bigelow ever made

12 payments to Lerner Sampson and Rothfuss for attorneys'

13 fees?

14           A.   Would you like me to speculate, or --

15           Q.   No, I don't want you to speculate.

16           A.   Then, I don't know.

17           Q.   All right.  Do you know if the Lerner

18 firm was involved in any transactions, real estate

19 transactions, involving Shirdenia Bryant or Harry

20 Curtis?

21           A.   Do I have actual knowledge?  No.

22           Q.   Do you know?

23           A.   No.

24           Q.   And I don't want you to speculate,

1    please, and I'm sure Mr. Blessing doesn't, either.

2            A.    That's why I asked you.

3            Q.    Right.  Please do not speculate.

4    Okay.  So, you don't know whether the Lerner firm

5    was involved in any real estate transactions involving

6    Shirdenia Bryant or Harry Curtis, correct?

7            A.    That's correct.

8            Q.    Do you have a fee agreement in this

9    case?

10           A.    No.

11           Q.    You do not?

12           A.    No.

13           Q.    Are you charging an hourly rate?

14           A.    Mr. Blessing and I have never

15    discussed that.

16           Q.    Are you charging Mr. Blessing for

17    your services?

18           A.    We haven't -- we have no agreement.

19           Q.    Have you charged Mr. Blessing for any

20    services to date?

21           A.    No.  In this matter?

22           Q.    Yes.

23           A.    No.

24           Q.    Did you agree to do it for free?

1              A.    No.

2              Q.    So you've just never discussed with

3    Mr. Blessing what your compensation's going to be?

4              A.    That's correct.

5              Q.    Or, if you're going to be

6    compensated?

7              A.    That's correct.

8              Q.    Did you ever discuss a compensation

9    arrangement with James Schwantes?

10             A.    No.

11             Q.    And you know who James Schwantes is,

12   right?

13             A.    I had to pause for a moment, but the

14   answer's yes.

15             Q.    Right.  He used to work for

16   Mr. Blessing?

17             A.    Yes.

18             Q.    Did you have any contact with

19   Mr. Schwantes?

20             A.    In the context of a different case,

21   yes.

22             Q.    In the context of the Harry Curtis --

23             A.    No.

24             Q.    -- Shirdenia Bryant case, did you

17

1    have any contact or discussions with Mr. Schwantes?

2              A.    No.

3              Q.    So you never discussed your fee

4    arrangement with Mr. Schwantes, either, about this

5    case?

6              A.    That's correct -- or about any case.

7              Q.    Okay.  And I don't want to ask you a

8    lot of questions along this line, but your license is

9    currently in good standing as attorney-at-law?

10             A.    Yes, it is.

11             Q.    All right.  Have you ever testified

12   as an expert before?

13             A.    Yes.

14             Q.    And when was that?

15             A.    The most recent one that I recall

16   was in a deposition for Mr. Blessing in a previous

17   matter about a year ago.

18             Q.    Oh, the Burbrink case?

19             A.    Yeah.

20             Q.    Other than -- and we'll talk about

21   that a little bit -- but other than the Burbrink case,

22   have you ever testified as an expert?

23             A.    I have, but not recently, and I don't

24   recall any details.

```
1              Q.   How many times have you testified --

2              A.   A small number.  It's a small number.

3              Q.   Okay.  Well, let's start with trial

4    testimony.  Have you ever actually testified in either

5    state or federal court as an expert; trial testimony?

6              A.   I think I have, but not recently, and

7    I don't have any specific recollection.  It would have

8    been years ago.

9              Q.   How many years ago?

10             A.   A long time.

11             Q.   You think you have, but you just

12   don't remember?

13             A.   That's right.  I think I have on

14   a small number of occasions.

15             Q.   And the occasions at which -- and

16   we're talking about trial testimony now --

17             A.   That's right.

18             Q.   -- but the occasions at which you

19   testified at trial as an expert, what subject did you

20   testify on?

21             A.   You know, you asked me not to

22   speculate, and I really don't remember, but to ignore

23   your admonition and my vague memory is that it had to

24   do with attorney fees and the -- somebody else's
```

1   attorney's fees, and the reasonableness.

2              Q.    The reasonableness of attorney's

3   fees?

4              A.    Yes.  But I really don't recall that,

5   specifically.

6              Q.    Was that for Mr. Jones?  Don Jones?

7              A.    Who?

8              Q.    Don Jones.

9              A.    I don't think I know Mr. Jones.

10             Q.    Okay.  All right.  Have you ever

11  testified as an expert at trial on issues involving

12  real estate transactions?

13             A.    I don't want to say no, because I

14  suspect that I have, but I don't have any present

15  recollection.

16             Q.    All right.

17             A.    It would have not been recently.

18             Q.    As you sit here today, can you tell

19  me you have, or have not?

20             A.    No.  I think I have, but I'm not

21  positive.

22             Q.    Now, it's my understanding that you

23  have not written a report referencing your opinions in

24  this case; is that correct?

1          A.   I haven't written a report.  I did

2     some calculations, which I faxed to Mr. Blessing,

3     one page, but I didn't write a report.

4          Q.   And you have those with you today,

5     do you?

6          A.   I think so.

7          Q.   All right.  But in terms of a

8     comprehensive report outlining the documents that

9     you've reviewed and your opinions, you haven't written

10    such a report, correct?

11         A.   That is correct.

12         Q.   Were you asked to write a report?

13         A.   No.

14         Q.   Were you asked not to write a report?

15         A.   No.

16         Q.   Have you had any correspondence with

17    Mr. Blessing referenced Curtis?

18         A.   My best memory is that we've only had

19    e-mail correspondence, and that's been limited to the

20    subject of scheduling.

21         Q.   All right.  So in terms of written

22    exchange of information between you and Mr. Blessing,

23    you've just told me about e-mails about scheduling;

24    what, deposition and court appearance, et cetera?

1    Yes?

2              A.    By "written," you're excluding

3    e-mail?

4              Q.    No, no, I'm not excluding e-mail.

5              A.    Well, including e-mail, the only

6    correspondence that I've had with Mr. Blessing has

7    been on the subject of scheduling this deposition,

8    and trial.

9              Q.    So, Mr. Blessing didn't put any

10   information down on paper and send it over to you

11   about the facts of the case, correct?

12             A.    He may have given me one short

13   paragraph by e-mail, very generally describing the

14   case, and I'm not certain of that.

15             Q.    Did you keep that e-mail?

16             A.    It would be in my computer.

17             Q.    Did you bring it with you today?

18             A.    No.

19             Q.    Now, you understand that you were

20   asked to bring your file with you today?

21             A.    No.

22             Q.    You weren't told that?

23             A.    No.    But I have most of it.    I didn't

24   bring my computer.

1          Q.   Did you print the e-mail out?

2          A.   I don't have it with me.

3          Q.   Okay.  So you didn't bring the e-mail

4  from Mr. Blessing that we just talked about?

5          A.   I would be glad to provide you a

6  copy, but I didn't --

7          Q.   Okay.  Well, today's the day,

8  you know?

9          A.   Yeah, I understand.

10         Q.   All right.

11         A.   Do you have e-mail?  I can forward it

12  to you.

13         Q.   Absolutely.  But I don't have my

14  computer with me here right now, either.

15         A.   Right.  I wasn't asked to bring that.

16         Q.   Okay.  So you were not asked to bring

17  your file?

18         A.   That's correct.

19         Q.   Okay.  And were you asked to bring

20  these documents -- well, we talked about documents

21  that you reviewed.  Were you asked to bring the

22  documents you reviewed?

23         A.   I was asked to, but I did bring them.

24         Q.   All right.  Good.

1              MR. LEWIS:  Just for the record, I'm going

2 to reserve the right, if we choose to, to continue

3 this deposition in progress, so that Mr. Lerner can

4 bring that e-mail, or provide it, and if I want to ask

5 him any questions about it, I want to continue this

6 in progress, because I did send a letter to Counsel,

7 asking him to advise his expert to bring his file

8 and all documents he reviewed.

9              MR. BLESSING:  Well, why don't we take a

10 break?  If I've sent him e-mail -- and I don't know

11 whether I did -- but it's going to be in my records,

12 and I can go in and print it out.  Does that make

13 sense?

14              MR. LEWIS:  Yeah, that would be good.

15 That would be good.  Thank you.

16              MR. BLESSING:  Yeah, let me check.

17                 (Brief break was taken.)

18                 (Off-the-record discussion.)

19 BY MR. LEWIS:

20        Q.    Okay, go ahead now.

21        A.    Well, you just asked me if I have

22 it --

23        Q.    Right.

24        A.    -- and my response was that

1  Mr. Blessing has handed me a series of pages,

2  which appear to be printouts of our series of e-mail

3  correspondence, and I have those here, and I'm now

4  handing them to you.

5         Q.  Okay.  Thank you.

6         MR. LEWIS:  Could you mark that, please.

7    (Defendants' Exhibit A was marked for

8  identification.)

9         Q.  Mr. Lerner, I want to show you what's

10  been marked for identification as Defendants' Exhibit

11  A.  Could you identify that, please?

12         A.  Defendants' Exhibit A appears to be a

13  series of e-mail correspondence between Mr. Blessing

14  and myself concerning Bryant versus Bigelow.

15         Q.  All right.  And I just reviewed that

16  quickly, and I didn't see anything in those e-mails

17  that recite any facts involving the Harry Curtis case.

18  Do you agree?

19         A.  Yes.

20         Q.  All of those e-mails have to do with

21  scheduling, right?

22         A.  That was my best memory.

23         Q.  All right.  And, you know, it's not

24  here, but do you believe you have an e-mail on your

1  computer -- in addition to these e-mails -- that

2  contains facts about the Curtis case?

3          A.   If I do, I'll be glad to furnish it

4  to you --

5          Q.   All right.

6          A.   -- but I don't think so.  And the

7  reason I don't think so is because Mr. Blessing has

8  suggested that this is our complete correspondence.

9          Q.   Okay.

10         A.   And I told you earlier that I might

11 have.

12         Q.   Right.

13         A.   I didn't recall that, one way or the

14 other.

15         Q.   But will you check for me?

16         A.   Sure, I'll be glad to check, but

17 let me conclude that subject by saying that if I

18 have something, it wasn't a series of documents, or

19 anything substantive.  I thought I might have had a

20 one- or two-sentence --

21         Q.   Right.

22         A.   -- general description of what the

23 case is about, but apparently I didn't --

24         Q.   Okay.

1          A.    -- because this appears to be a

2    complete series of e-mail correspondence.

3          Q.    All right.  Well, I'm just trying

4    to be thorough, and even if it's only a couple

5    sentences --

6          A.    If I have it, I'll --

7          Q.    -- if you have it, I --

8          A.    -- if I have it, I'm glad to provide

9    it to you.

10          Q.    All right.  Just provide it to

11    Mr. Blessing, please --

12          A.    Sure.

13          Q.    -- and could you do it as soon as

14    possible --

15          A.    I'll do it today.

16          Q.    -- since we've got trial coming up?

17          A.    I'll do it today --

18          Q.    All right.

19          A.    -- and he can forward it directly to

20    you.

21          Q.    Okay.  Thank you.  Now, there's

22    an e-mail reference in here, January 29th, from

23    Mr. Blessing to you, and it says, "It's on for

24    tomorrow at my office, 1:30 p.m."  Now, did you meet

1    with Mr. Blessing before this deposition?

2            A.    No.

3            Q.    Okay.

4            A.    Well, yes, I met with him this

5    morning, but we didn't have any discussion --

6    substantive discussion about this.

7            Let me clear that up.  I sent him an

8    e-mail suggesting that 1:30 a.m., meaning January 30,

9    was suitable for me.  That's an earlier e-mail in

10   that series, and he interpreted that as -- and when

11   I re-read it, I also interpreted it as 1:30 p.m. --

12           Q.    That's okay.

13           A.    -- on the -- today.

14           Q.    And then in terms of meeting with

15   Mr. Blessing, how many meetings have you had with

16   Mr. Blessing where you discussed the facts of the

17   Harry Curtis case?

18           A.    Two.

19           Q.    And when were those?

20           A.    They were both in January; this

21   month.

22           Q.    All right.  Can you tell me what

23   dates they were?

24           A.    I was -- well, let me -- before I

1  answer that question, let me go back to a previous

2  question.  I do have an e-mail with me that I didn't

3  -- I thought that we had -- this was earlier in the

4  series that you have.  I thought that I had some kind

5  an e-mail concerning the substance of this case, and I

6  do.

7           MR. BLESSING:  It was sent from home.

8           THE WITNESS:  Oh, okay.  All right.

9           Q.   Now, you've got a notebook in front

10  of you, correct?

11           A.   Correct.

12           Q.   And it's got some documents in it?

13           A.   That's correct.

14           Q.   Those all have to do with the Harry

15  Curtis matter, do they?

16           A.   No.

17           Q.   They don't?

18           A.   No.

19           Q.   What else do they have to do with?

20           A.   They have to do with the other matter

21  that Mr. Blessing and I first discussed.

22           Q.   Bryant or Burbrink?

23           A.   Yes.  Both.

24           Q.   Both?

1          A.    (Nods head.)

2          Q.    All right.  Can I see that, please?

3          A.    Sure.  Well, let me tell you what I'm

4    handing you.

5          Q.    Well, I just want you to hand me the

6    whole notebook, and then we'll talk about what's in

7    there.

8          A.    All right.  I thought you wanted this

9    document.

10         Q.    I do, but I want the rest of them.

11         A.    Okay.  (Hands the notebook to the

12   Mr. Lewis.)

13               (Off-the-record discussion.)

14         Q.    Mr. Lerner, I'm just going to put

15   in the record here the documents that are in here that

16   reference Curtis, and I'm just going to read these

17   into the record.

18         A.    Okay.

19         Q.    The cover sheet has got Casemaker Web

20   Library and it's got a sticky tab on it that says --

21         A.    ORC.

22         Q.    -- M. Lerner, ORC, and what is that?

23         A.    I printed out some pertinent -- what

24   I perceived to be pertinent provisions of the Ohio

```
1   Revised Code.

2              Q.    And the next page is 5313.01 of the

3   Ohio Revised Code?

4              A.    Yeah; if you say so.  You have the

5   book in front of you.

6              Q.    I know.  Here it is.  Right?

7              A.    Yeah, I believe you.

8              Q.    And you printed that out?

9              A.    Correct.

10             Q.    And then 5313.02 of the Ohio Revised

11  Code, you printed that out, right?

12             A.    Yes.  Well, I printed all the

13  Casemaker stuff there.

14             Q.    All right.  So, I'm just going

15  to read these: 5313.03, 5313.06, 5313.07, 5313.08,

16  5302.30, and then there is an e-mail here from

17  Bill Blessing to you, dated January 9th, 2004, right?

18             A.    Correct.

19             Q.    And then there are notes attached to

20  that e-mail.  Whose notes are these?

21             A.    Those are my notes.  They're dated,

22  if you want to read it into the record.

23             Q.    Thank you.  1/13/03?

24             A.    That sounds correct.
```