1          Q.    And then you have a handwritten note,

2    1/19/04, Bill Blessing.   Is that your handwriting?

3          A.    That is.

4          Q.    And then there's a -- it looks like

5    a transmission report, 1/14/04 it starts, and is this

6    your writing; these notes?

7          A.    Yes.

8          Q.    And that has to do with Laidlaw;

9    is that right?

10         A.    Sir, I -- you have it in front of

11   me --

12         Q.    Okay.

13         A.    -- I mean in front of you.   That's

14   correct.

15         Q.    The Bryant property was Laidlaw.

16   Does this have anything to do with Harry Curtis?

17         A.    No.   This -- well, I can't answer

18   that.   It has to do specifically with 1107 Laidlaw.

19         Q.    And then there are notes --

20         A.    That's the same document.

21         Q.    The same document?   All right.

22   That's the original.   And then there are notes,

23   S. Bryant -- 1107 Laidlaw, dated January 7th, '98.

24   Is that your writing?

1          A.    That is.

2          Q.    Does that have to do with Laidlaw?

3          A.    Correct.

4          Q.    Does that have anything to do with

5    Curtis, as far as you remember?

6          A.    It specifically has to do with

7    Laidlaw, but in the sense that there's commonality

8    between the two, it has to do with Curtis as well.

9          Q.    All right.  We'll talk about that.

10   And then there's an e-mail, January 23rd, from Bill

11   Blessing to you, right?

12         A.    (Nods head.)

13         Q.    Contract to purchase 1107 Laidlaw?

14         A.    Well, let me interrupt you for a

15   second.  All of the documents before this tab have to

16   do with Laidlaw.

17         Q.    Oh.  Okay.  So there's a sticky tab

18   in this notebook.  Is this what -- oh.  It says 1966

19   Fairfax, right?

20         A.    There is a document there, right.

21         Q.    Okay.  So everything in this document

22   before that sticky tab has to do with Laidlaw, and

23   not Fairfax, except to the extent that there's

24   commonality?

1              A.    Well, and the statute has to do with

2    whatever.

3              Q.    All right.  And then there are notes

4    dated 8/2/99.  Are these your notes?

5              A.    They are.

6              Q.    And then you have the contract to

7    purchase that's at issue in this case, right?

8              A.    Correct.

9              Q.    A check to Harry and Patricia Curtis

10   for 9,576.32, and then you've got -- who wrote that

11   245 down there?

12             A.    I did.

13             Q.    Or is that 295?

14             A.    295.

15             Q.    Is that the 295 that we talked about

16   before?

17             A.    Yes.

18             Q.    And then you have checks to Stephen

19   Kurlansky, Hamilton County Treasurer.  You have a

20   Meckstroth receipt, and we talked about that, right?

21             A.    Correct.

22             Q.    You have the settlement statement.

23             A.    It's the one we talked about.

24             Q.    All right.  You have a check from

1    Curtis, to Bigelow Properties, dated 8/28/99, right?

2                    A.    Correct.   That's a check to

3    Curtis -- Bigelow Properties.

4                    Q.    Yeah, is that -- did I misspeak?

5                    A.    I didn't hear you.

6                    Q.    Okay.   And then you have another

7    check dated 9/28/99 to Bigelow Properties, from

8    Curtis, correct?

9                    A.    Correct.

10                   Q.    You have the forcible entry and

11    detainer order, right?

12                   A.    Correct.

13                   Q.    All right.   You have the land

14    installment contract.

15                   A.    That's all that -- that says land

16    contract.

17                   Q.    That says land -- what does it say

18    above that on the sticky tab?

19                   A.    Well, it's an old sticky, and it says

20    Mr. Lerner.

21                   Q.    Oh, Mr. Lerner land contract.

22                   A.    No, it's Mr. Lerner -- somebody had

23    sent something to me, and I had re-used the sticky.

24                   Q.    Okay.   And then we have a copy of

1    your deposition transcript in the Bigelow versus

2    Burbrink case, right?

3              A.    Correct.

4              Q.    And you've got a sticky tab here with

5    page 22, where somebody highlighted a paragraph in

6    red.  Was that you?

7              A.    It was.

8              Q.    Okay.  Is this the extent of the

9    documents that you've reviewed reference Harry Curtis?

10             A.    Yes.

11             Q.    This binder?

12             A.    Yes.

13             Q.    And the e-mail that we were talking

14   about earlier is in that binder?

15             A.    Correct; the one that I vaguely

16   remembered, and, as I reviewed it, it didn't have

17   anything substantive in it, anyway.  It was basically

18   scheduling.

19             Q.    Have you conducted real estate

20   closings as a closing attorney?

21             A.    Many times.

22             Q.    Ballpark it for me.

23             A.    Thousands.  I can't --

24             Q.    Thousands?

1          A.    -- I can't answer that.

2          Q.    And so you consider yourself an

3    expert in real estate transactions, do you?

4          A.    I do.

5          Q.    Now, I read in the testimony you gave

6    in the Burbrink case that the field of litigation that

7    you're primarily involved in is commercial litigation?

8          A.    That's correct.

9          Q.    Are you distinguishing that from real

10   estate litigation?

11         A.    Most of the commercial litigation

12   involves real estate or real estate mortgages or

13   leases.  That's mostly what I do.

14         Q.    What percentage of your practice do

15   you think involves real estate litigation?

16         A.    Eighty/ninety.

17         Q.    How many lawsuits do you have

18   currently pending; real estate litigation lawsuits?

19         A.    A half a dozen, personally.

20         Q.    Yeah, that's what I mean, personally.

21   Has that number over the last -- since you've been of

22   counsel -- and how many years was that; five or six

23   years?

24         A.    I went of counsel as of July 1, 19 --

1    let's see; 2000.

2                  Q.    2000?

3                  A.    2000.  And I have attempted to wind

4    my practice down gradually from that point, so that's

5    a smaller number than it would have been --

6                  Q.    Yeah, that was my next question.

7    Okay.  Now, you reviewed your deposition transcript

8    from the Burbrink case, right?

9                  A.    I read it.

10                 Q.    Have you reviewed any deposition

11   transcripts that were taken in this case?

12                 A.    No.

13                 Q.    None?

14                 A.    Correct.

15                 Q.    Have you reviewed the pleadings?

16                 A.    No.

17                 Q.    Have you reviewed any photographs of

18   1966 Fairfax?

19                 A.    I have reviewed no documents, other

20   than the ones we've discussed.

21                 Q.    All right.  Other than those Ohio

22   Revised Code sections that are included in that binder

23   that you have in front of you, have you done any

24   research?

1          A.    No.

2          Q.    Have you made any notes that aren't

3    produced in that binder?

4          A.    Not that I can recall.

5          Q.    All right.  Have you kept time

6    records referencing your involvement in this case?

7          A.    Yes.

8          Q.    Where are those?

9          A.    In my computer.

10         Q.    How much time have you spent on this

11   case?

12         A.    I don't know.

13         Q.    Can you approximate it for me?

14         A.    Five or six hours; maybe less, maybe

15   more.  I really don't know.

16         Q.    Okay.  Again, I'm going to -- well,

17   you can retrieve those time records, can't you?

18         A.    Sure.

19         Q.    Will you produce those to

20   Mr. Blessing?

21         THE WITNESS:  (To Mr. Blessing)

22   Mr. Blessing, is that agreeable?

23         MR. BLESSING:  Certainly.  We cooperate.

24         A.    Sure.

1          Q.   Now, you indicated that you believed

2    that you had two meetings with Mr. Blessing about the

3    case?

4          A.   Other than a brief social meeting

5    this morning, where we didn't have any substantive

6    discussion, I had exactly two meetings.

7          Q.   All right.  And I'm not trying to

8    ask you a question that I already asked you, but

9    Mr. Schwantes...

10         A.   ...was present at neither one.

11         Q.   All right.  And did you ever meet

12   with him individually --

13         A.   Not about this specific --

14         Q.   -- Mr. Schwantes?

15         A.   -- not about this case.

16         Q.   What opinions are you going to offer

17   at trial?

18         A.   It depends on what questions I'm

19   asked.

20         Q.   Okay.  Well, have you been asked to

21   offer opinions at trial?

22         A.   Mr. Blessing and I have discussed

23   a series of transactions of which the Curtis matter

24   was one, and I have given him certain opinions with

1  respect to that series of transactions that relate to

2  the Curtis matter.

3          Q.    All right.   So I want to be clear

4  on this.  As we sit here right now, are you telling

5  me that you don't know what opinions you're going to

6  offer at trial?

7          A.    I don't know exactly what questions

8  I'll be asked.  I know generally the subject matter,

9  and I know what my opinions are.

10         Q.    Okay.  So you have formed some

11  opinions in this case?

12         A.    Yes.

13         Q.    Okay.  I want you to tell me all the

14  opinions you've formed in this case.

15         A.    Well, I'll do my best.  Based on my

16  understanding of the facts, Mr. Bigelow and several

17  of his colleagues were involved in a series of

18  transactions of which the Curtis transaction was

19  one.  In that series of transactions, an emissary of

20  Mr. Bigelow contacted the owner of distressed real

21  estate -- and, by distressed, I mean property that was

22  either a mortgage foreclosure or a tax foreclosure or

23  some similar configuration -- and with respect to the

24  transactions, of which I'm aware, there was relatively

```
 1   a small amount of debt liability, which was a lien

 2   on the property compared to the total value of the

 3   property, and, as a consequence, there was substantial

 4   equity in each of these transactions.

 5          It's my understanding that Mr. Bigelow's

 6   colleagues offered help to the property owner who was

 7   in distress as a result of the potential loss of the

 8   property by virtue of foreclose, mortgage, or tax.

 9   In this case it's tax, and in most -- in this case

10   it's a tax foreclosure --

11          Q.   Right.

12          A.   -- and in most cases it's a mortgage

13   foreclosure.  The theme that I observed in the three

14   transactions that I looked at -- which is consistent

15   with what Mr. Blessing has described to me in other

16   transactions -- is that there was a relatively small

17   payment made to the property owner -- small relative

18   to the value of the property -- in consideration for

19   which the property owner conveyed the property to

20   Mr. Bigelow, or agreed to convey the property to

21   Mr. Bigelow, or one of his colleagues -- perhaps

22   always Mr. Bigelow; I don't recall.

23          In the Curtis case, it was Bigelow

24   Trustee, which may or may not be Mr. Bigelow --
```

1    I can't speak to that -- with the understanding that

2    there would be some arrangement, or the reacquisition

3    of the property by the property owner for a price for

4    value that was still considerably less than the full

5    fair market value of the property.

6              I interpret these transactions to be

7    essentially financing transactions which I've seen

8    many times to bail out a property owner who's in a

9    distressed foreclosure situation, and afford him a

10   window of relief to maintain possession and reacquire

11   title of the property over a relatively brief period

12   of time -- a year or two -- in the Curtis case, two

13   years.  Unfortunately, in the case as I've observed,

14   that didn't happen.

15             Q.   What didn't happen?

16             A.   The property owner was not able

17   to reacquire the property, but, in fact, lost the

18   property to Mr. Curtis for a relatively nominal --

19   excuse me -- to Mr. Bigelow --

20             Q.   Right.

21             A.   -- for a relatively nominal amount

22   compared to the value of the property, and Mr. Bigelow

23   and his colleagues were able to achieve substantial

24   profits from these transactions at the expense of

1  these owners, excluding Mr. and Mrs. Curtis. Those

2  are my opinions.

3           Q.   All right. Are those all your

4  opinions?

5           A.   Those are all that occur to me in

6  response to your question.

7           Q.   All right. Well, now is the time.

8  I get one chance.

9           A.   I understand, and, as I said earlier,

10 I'll respond to the questions that I'm asked, and

11 those are the -- that's the subject matter that we've

12 discussed.

13          Q.   Okay. I want to be clear on this.

14 I'm asking you today to tell me all the opinions that

15 you've formed in this case. Did you just do that?

16          A.   I believe I have.

17          Q.   All right. As you sit here today,

18 can you think of any other opinions that you've got,

19 other than what you just related?

20          A.   Well, I can -- I mean, there is some

21 finite details that lead up to those conclusions, but

22 those are my conclusions.

23          Q.   Right. A lot of these -- a lot

24 of what you just related to me were facts and your

1  understandings --

2                A.    That's correct.

3                Q.    -- which is fine.  That's the basis

4  for expert opinion, frequently, all right?  I'll talk

5  to you about the facts underlying your opinion, but I

6  want to focus now on what opinions that you've formed.

7                A.    And I've just given you that, to the

8  best of my ability.

9                Q.    All right.  And the best, as you sit

10  here today, you've given me all your opinions?

11               A.    The summation is that as I observed

12  these transactions as the documents were presented

13  to me and as Mr. Blessing has described them to me,

14  there's a series of transactions which are intended

15  to capture the equity or substantial value from a

16  property owner by deceiving him, or her, or them into

17  believing that they were being helped with a temporary

18  refinance-type of transaction.  That's the essence of

19  my opinion.

20               Q.    I'm sorry.  I don't want to ask you

21  to restate it.

22               MR. LEWIS:  Could you just read that

23  answer back?

24         (The court reporter reads back the answer.)

1   BY MR. LEWIS:

2           Q.    Now, these colleagues that you talked

3   about, who are these colleagues of Mr. Bigelow?

4           A.    There were two that I can recall.

5   One is Christine -- well, help me with the last name.

6           Q.    So, the Christine that you talked

7   about earlier?

8           A.    Correct.

9           Q.    Okay.

10          A.    And the other is a gentleman, whose

11  last name I don't recall.  Is it Menafee (phonetic)?

12          Q.    Marfisi.

13          A.    Marfisi?  Thank you.

14          Q.    Was Marfisi involved in the Curtis

15  transaction?

16          A.    I don't believe so.

17          Q.    So in terms of the colleagues that

18  you referred to reference the Curtis transaction, it

19  was Christine?

20          A.    Well, I might refer to Mr. Meckstroth

21  as well.

22          Q.    Okay.  And are you critical of

23  Mr. Meckstroth's role in this?

24          A.    Define critical.

1           Q.    Do you find anything -- well, let's

2    start with this:    Did Mr. Meckstroth do anything

3    unlawful?

4           A.    I don't know.

5           Q.    So you have no opinion on that?

6           A.    Well, I don't know -- I do have an

7    opinion.    I don't know -- well, when you use the word

8    "unlawful", I think he did some things that were very

9    questionable.    I think he facilitated -- in a number

10   of ways, he facilitated the scheme that I just

11   described.

12          Q.    Did Mr. Meckstroth, in your opinion,

13   violate any state or federal statute with his conduct?

14          A.    I don't know.

15          Q.    Did Mr. Meckstroth violate any

16   provision of the Ohio common law?

17          A.    I don't know the answer to that.

18   I think -- what I said before was, I think -- I can

19   tell you what I think he did that facilitated the

20   scheme.

21          Q.    We'll get that to.

22          A.    All right.    But as I sit here, it

23   does not occur to me that he violated any specific

24   common law -- that occurs to me.

1          Q.    All right.

2          A.    He violated some statutory law.

3          Q.    He did?

4          A.    Yeah.

5          Q.    Well, I thought I just asked you

6    that.

7          A.    No, you asked me if he committed a

8    crime, and I don't --

9          Q.    No, no, no.  No, I didn't say that.

10   In your opinion, did Mr. Meckstroth violate any state

11   or federal statute?

12         A.    Yes.

13         Q.    What?

14         A.    He violated the sections of the Ohio

15   Revised Code, that I printed out.

16         Q.    Those land installment contract

17   statutes?

18         A.    Right.

19         Q.    Which one, and how did he violate it?

20         A.    He drafted, and on the date of the

21   closing on August 25th, if I recall correctly, he

22   charged the Curtises $295 for a land contract.  The

23   statute requires that -- and I'm referring now to

24   5313.02(A) -- Every installment contract shall be

1  executed in duplicate, and a copy of the contract

2  shall be provided to the vendor and the vendee, and

3  the contract shall contain at least the following

4  provisions.

5          The contract that he drafted -- and for

6  which he charged Mr. and Mrs. Curtis -- contains

7  those provisions, but it wasn't executed by either

8  the vendor or the vendee, and it's required to be

9  recorded, and it wasn't recorded.

10          Based on what I've observed, it's my

11  opinion that Meckstroth intentionally did not

12  facilitate that contract being executed, but based

13  on what I understand to be the facts, I think the

14  Curtises thought that they had achieved the land

15  contract, and I think that's consistent with their

16  purchase contract.

17          Q.   Are you saying that Mr. Meckstroth

18  prevented the execution of that land contract?

19          A.   I'm saying that I think that based

20  on what I understand to be the facts, he had a

21  professional duty and a statutory duty to see that

22  it was executed.

23          Q.   All right.  Have you looked at

24  Mr. Meckstroth's file?

1          A.    No.

2          Q.    Are you aware of what discussions

3   took place at the closing about when and if the land

4   contract was going to be executed?

5          A.    No.

6          Q.    And are you aware of whether anybody

7   told Mr. Meckstroth that the land contract was going

8   to be executed and recorded later?

9          A.    No.

10         Q.    Are you aware of the term "second

11  position" -- reference banks, financing companies,

12  liens, mortgages?

13         A.    Are you talking about junior lien

14  holder?

15         Q.    In the context of -- right; financing

16  and filing mortgages.

17         A.    Sure.

18         Q.    You know what second position does.

19         A.    Sure.

20         Q.    Okay.  You know what that means,

21  don't you?

22         A.    I know what a junior lien holder is.

23         Q.    All right.  I want you to assume for

24  me that this land contract would have been signed at

1   the closing and recorded either that day or the day

2   after.

3                   A.    Or within 20 days.  That's what the

4   statute requires.

5                   Q.    Twenty days?

6                   A.    Yeah.

7                   Q.    Okay.  Well, let's say that happened.

8   Let's say it happened -- just assume for me that it

9   would have happened before Mr. Bigelow would have

10  financed the transaction by which the Curtises got

11  paid.  Are you with me?

12                  A.    Yes.

13                  Q.    And you know that Mr. Bigelow did

14  obtain financing, right?

15                  A.    Yes.  I was told that, yes.

16                  Q.    Right.  That's your understanding,

17  right?

18                  A.    Right.

19                  Q.    If the land contract would have been

20  signed and recorded before Mr. Bigelow went to the

21  bank for financing -- are you with me?

22                  A.    Yes.

23                  Q.    -- would that have affected, in your

24  opinion, the bank's willingness to make the loan to

51

1  Mr. Bigelow?

2              A.   Not if it were done properly.

3              Q.   And what would have needed to

4  happen?

5              A.   A subordination.

6              Q.   A subordination?

7              A.   Right.

8              Q.   And who has to do that?

9              A.   Well, I would assume that Meckstroth

10  would have done that since he seemed to be attempting

11  to represent both parties in this transaction.

12              Q.   Uh-huh.  And describe subordination

13  for me.  How does that come about?

14              A.   Well, it can come about in a variety

15  of ways, but in this context, it would have been

16  appropriate, in my opinion, to have drawn a

17  subordination document, or to have inserted within

18  the land contract itself a subordination feature,

19  a very -- a simple paragraph would have done it.

20              Q.   All right.  And then who has to agree

21  to subordination?

22              A.   The equitable owner, which in that

23  case would have been Mr. and Mrs. Curtis.  What

24  happened at this closing, which, in my opinion,

1    should not have happened, but what happened at this

2    closing --

3                    Q.    We'll get to that, what happened at

4    the closing.   I want to talk about subordination right

5    now.

6                    A.    Well, I'm trying to respond to your

7    question.

8                    Q.    Who has to agree to subordination?

9                    MR. BLESSING:   Didn't he answer that?

10                   THE WITNESS:   I did answer that.

11                   Q.    Did anybody else, other than the

12   Curtises?

13                   A.    No.

14                   Q.    All right.   And then in terms of

15   putting that mechanism in place and arranging the

16   subordination, you would expect that Mr. Meckstroth

17   should have done that?

18                   A.    Absolutely.

19                   Q.    Okay.   That's not something you would

20   expect a client to understand, would you?

21                   A.    It depends on the client.   I've had

22   unsophisticated clients, and I've had sophisticated

23   clients.

24                   Q.    All right.   You think that that's

1  the attorney's obligation, though; Meckstroth's

2  obligation?

3          A.    Yes.  And the reason I think that

4  is because the difference between executing that

5  land contract at the closing and not executing it,

6  is that going into the closing the Curtises owned

7  the property and they had an expectation that they

8  would still have some ownership coming out of the

9  closing -- an equitable ownership, but an ownership

10 -- and they didn't, because they transferred title

11 without obtaining any interest.  The land contract

12 was the vehicle that was -- the function of that

13 vehicle was for the Curtises to retain an equity in

14 a property.

15         Q.    And why do you think Mr. Meckstroth

16 didn't get those signatures on the land contract and

17 make arrangements to record it?  What motive did he

18 have to do that?

19         A.    Now you're asking me to speculate,

20 and I'm glad to do that if you wish, but you earlier

21 instructed me not to.

22         Q.    What's your understanding of why he

23 didn't do that?

24         A.    I have formed a speculation about why

1   he wouldn't have done that, but I don't have a factual

2   understanding.

3           Q.   And you don't -- well, have you read

4   Mr. Curtis's deposition testimony about what happened

5   at the closing?

6           A.   You asked me earlier --

7           Q.   Right.

8           A.   -- and I answered in the negative.

9           Q.   Do you know whether Mr. Curtis ever

10  asked that the land contract be signed?

11          A.   No.

12          Q.   Do you know whether Mr. Curtis ever

13  asked that the land contract be recorded?

14          A.   No.

15          Q.   Do you know whether Mr. Curtis

16  brought the subject of the land contract up at the

17  closing?

18          A.   No.

19          Q.   Do you know who requested that a land

20  contract be prepared?

21          A.   No.

22          Q.   You understand, don't you, that the

23  contract to purchase in this case talks about a lease

24  option to buy?

1      A.    I understand -- I read that.

2      Q.    A lease option?

3      A.    I read that.

4      Q.    All right.  And a lease with an

5  option to buy is different than a land contract, isn't

6  it?

7      A.    Yes.

8      Q.    Do you have an understanding as to

9  why the parties started talking about a land contract

10 as opposed to a lease option?

11     A.    I assume that Mr. and Mrs. Curtis are

12 not sophisticated people, which is partly why I assume

13 that Mr. Meckstroth had an obligation to see to their

14 interest.  The other reason why I assume that is

15 because he charged them $295, so he was representing

16 both of them.

17     Q.    All right.  Is it your opinion that

18 by Meckstroth charging the Curtises $295, that he

19 became their attorney?

20     A.    To some extent, yes.

21     Q.    To what extent?

22     A.    I think that he had an obligation

23 to see to it that their interest was protected,

24 consistent with the purchase agreement.  They walked

56

1   away from that closing with neither -- apparently

2   with neither an executed land contract nor an executed

3   lease option, either one of which would to some

4   extent, protected their equity.

5           Q.   Okay.  They did walk away from the

6   closing, we can agree, with an executed purchase

7   contract, correct?

8           MR. BLESSING:  From the closing?

9           A.   They walked into the closing with an

10  executed purchase contract.

11          Q.   Right.  And after they walked out

12  of the closing, they still had an executed purchase

13  contract, didn't they?

14          A.   There is a survival feature in the

15  purchase contract.

16          Q.   Right.  Yeah, and that survival

17  feature, even though there wouldn't be lease option

18  language in the deed, the survival feature means

19  that that would be enforceable against Mr. Bigelow,

20  correct?

21          A.   That's a gray area.  I think --

22  in theory, I think you're correct --

23          Q.   Right.

24          A.   -- but in practice, I think it's

1    iffy.

2             Q.    All right.  Well, let's talk about

3    the law, the legal theory.  In your opinion, is that

4    provision in the purchase contract enforceable that

5    the language in the purchase contract would survive

6    the closing and be applicable to Mr. Bigelow in terms

7    of lease option to buy?

8             A.    If this would be Curtis and Bigelow

9    Trustee, the answer is yes.

10            Q.    All right.

11            A.    Vis-a-vis third parties, the answer

12   is no.

13            Q.    All right.  So irrespective of this

14   land contract issue, Mr. Curtis, pursuant to the

15   purchase contract, had an enforceable option to

16   purchase, didn't he?

17            A.    I told you that I think that's iffy.

18   In legal theory, he did.  But he walked out of that

19   closing with a lot of things that the contract

20   provided that he didn't get.

21            Q.    Well, why are you telling me it's

22   iffy?

23            A.    Because, my experience suggests that

24   he wouldn't be able to enforce it -- clearly, he

1  wouldn't be able to enforce that against any third

2  party, and as soon as Mr. Bigelow financed the

3  property, there was an encumbrance on it that exceeded

4  the purchase -- I assume it exceeded the purchase

5  price, I don't know.  Part of the re-purchase

6  agreement was, what, $37,000?

7           Q.    Uh-huh.

8           A.    And as a practical matter, he

9  wouldn't have been able to achieve -- he wouldn't have

10 been able to maintain his equity.

11          Q.    Okay.  Would he have been able to

12 enforce the option to buy against Mr. Bigelow?

13          A.    Only if Mr. Bigelow -- by Mr.

14 Bigelow, are you talking about Mr. Bigelow Trustee?

15          Q.    Yeah.

16          A.    Only if Mr. Bigelow still retained

17 the property.

18          Q.    Okay.  Assuming that he still

19 retained the property, would he have been able to

20 enforce the option to buy against Mr. Bigelow?

21          A.    If Mr. Bigelow had financed

22 the property in the meantime, it would have been

23 problematic whether Mr. Bigelow could have satisfied

24 that obligation.

```
1              Q.    Would Mr. Curtis have been able to
2    enforce his option to buy against Mr. Bigelow?
3              A.    In legal theory, I've answered yes.
4              Q.    Thank you.
5              A.    And I also told you that, based on
6    my experience and practicality, it's very iffy.
7              Q.    Now, you also mentioned in your
8    opinions that Mr. Curtis --
9              A.    By the way, your concern was that the
10   fact that a would-be lender would be in a secondary
11   position would have prevented secondary financing --
12   would have prevented primary financing.  That's true
13   on your theory of an enforceable option to -- a lease
14   option as well.
15             Q.    Well, I thought you told me that
16   wasn't a problem.  It could be subordinated?
17             A.    No.  I say based upon your hypothesis
18   that Mr. Curtis could enforce the contract, lease
19   option provision, the fact that legally he could would
20   have put the -- it would be the mortgage lender in a
21   secondary position as well.
22             Q.    Uh-huh.
23             A.    The only way that you could acquire
24   mortgage financing would have been to conceal from the
```

1    lender the existence of the outstanding equity of the

2    Curtises.

3            Q.    Well, that would be Mr. Bigelow's

4    problem, though.  Let's assume that Mr. Curtis wanted

5    to exercise his option to buy for 37,000, all right,

6    and Bigelow had refinanced the property, right?

7            A.    Yeah.

8            Q.    If Curtis exercises his option to

9    purchase, isn't Bigelow obligated to sell to Curtis,

10   and Bigelow's obligated to satisfy the mortgage?

11           A.    Absolutely, legally.

12           Q.    Okay.  So if that scenario occurs,

13   then Mr. Curtis has got a legally enforceable option

14   to buy, and Bigelow has the problem, correct?

15           A.    No.  Mr. Curtis has the problem,

16   because, based on my experience, I think it's unlikely

17   that that could be achieved.

18           Q.    Why?

19           A.    Because I think -- well, I think

20   that, first of all, I don't know who Bigelow Trustee

21   is.  I don't know whether he has any assets.  He would

22   need sufficient assets to retire the prior mortgage.

23   He would have needed to have deceived the mortgage

24   lender in the first place in concealing the existence