1    of the outstanding equity to achieve a first mortgage

2    without a subordination, and that's a red flag in my

3    mind.  That causes me concern about his ability, and

4    we're talking about Bigelow Trustee's --

5                    Q.   Right.

6                    A.   -- ability to comply with that.

7    Second, I think there's a very serious question,

8    even though in my opinion, the contract provision's

9    enforceable, based upon my experience I think it's

10   very iffy whether or not that would have legally been

11   enforced.

12                   Q.   Right.  You don't know anything

13   about the details when Mr. Bigelow financed this

14   transaction, do you?

15                   A.   No.

16                   Q.   You don't know anything about that?

17                   A.   Very little.

18                   Q.   What do you know about it?

19                   A.   Well, I was told that he financed it

20   subsequently for a sum of money -- I have some notes

21   on it -- but the exact amount escapes me.

22                   Q.   Uh-huh.  Do you know whether

23   Mr. Bigelow provided the contract to purchase to the

24   lending institution?

1           A.    No.

2           Q.    You don't think he concealed that

3  from them, do you?

4           A.    I don't --

5           Q.    You just referenced something about

6  concealing.

7           A.    -- I don't know.

8           Q.    All right.  And you don't know

9  anything about Mr. Bigelow's ability at the time to

10 respond if Curtis would have exercised his option.

11 You don't know anything about Bigelow's finances at

12 that time, do you?

13          A.    I told you everything I knew.

14          Q.    Okay.  But you don't know anything

15 about Bigelow's finances at the time, do you?

16          A.    No.  And by "Bigelow," you're talking

17 Bigelow Trustee?

18          Q.    I'm talking about Bigelow Trustee,

19 and Pete Bigelow, individually.

20          A.    I don't think Pete Bigelow,

21 individually, is relevant.

22          Q.    Okay, fine, so let's talk about

23 Bigelow Trustee.  You don't know anything about his

24 financial ability to respond if Curtis wanted to

1    exercise his option?

2                    A.    No.

3                    Q.    So isn't it fair to say that all this

4    discussion about a potential problem if Curtis would

5    have exercised the option and it might be iffy --

6    that's all speculation on your part, isn't it?

7                    A.    It's more than speculation.    It's

8    based on my experience.

9                    Q.    But you don't know anything about

10   the facts of the parties to this transaction, do you,

11   in that context?

12                   A.    Only what my experiences teaches me.

13                   Q.    Right.    Your experience in other

14   situations?

15                   A.    Correct.

16                   Q.    Not this one?

17                   A.    That's correct.

18                   Q.    All right.    Now, you also talked

19   about, in your opinion, that the Curtises were

20   deceived?

21                   A.    That's my conclusion.

22                   Q.    Well, I wrote that in my notes;

23   deceiving him?

24                   A.    That's my -- I just said, that's my

1  conclusion.

2          Q.    Yeah.  Who deceived him?

3          A.    I think Bigelow and/or Meckstroth

4  and/or Christine.

5          Q.    Okay.  Let's start with Christine.

6  How did she deceive Mr. Curtis?

7          A.    Well, based upon my -- I assume that

8  she drew the purchase agreement, but I don't know

9  that.  And I assume that she selected the language,

10 and based upon what I know about the series of

11 transactions, I assume that she created an expectation

12 on the part of Mr. and Mrs. Curtis that they would

13 maintain their equity in the property, and be able to

14 reacquire title within two years.

15         Q.    Okay.  Do you have any information to

16 indicate that Christine drafted that contract?

17         A.    No.

18         Q.    Okay.  So that assumption's not based

19 on any facts that you have.  That's an assumption?

20         A.    Well, it's based upon some facts

21 I have.  I have in front of me a document that's

22 captioned contract to purchase, dated August 21, 1999,

23 and it appears to be a printed form.  I make the

24 assumption that Mr. and Mrs. Curtis are relatively

1    unsophisticated, and that they didn't happen to have

2    this form in their possession on August 21 of 1999.

3                And based upon my understanding of the

4    facts from Counsel, I understand that she presented

5    this contract to them and selected the language.

6    I see that she signed as a witness -- and, forgive me.

7    I've been assuming that Christine was her first name,

8    and it looks like her name is Roseanne --

9                Q.    Roseanne --

10               A.    Yeah, Roseanne.

11               Q.    -- Christian.

12               A.    Roseanne Christian.  Thank you.

13               Q.    Sure.

14               A.    And I assume, based on the series of

15   transactions that I've observed, that the Curtises had

16   an expectation that was a temporary financing device,

17   and that expectation was created by the only person

18   that could have created it, because she was the only

19   one there, to my knowledge.

20               Q.    Right.  So are you saying that

21   Roseanne Christian said something to them that created

22   this expectation?

23               A.    I am told that she identified herself

24   as being with an eleemosynary institution there to

1  help.

2              Q.   Can you define eleemosynary for me?

3              A.   Okay. Well, in a non-tax sense,

4  eleemosynary --

5              Q.   Yeah, I don't want to talk about

6  taxes.

7              A.   Yeah, and neither do I, and so for

8  purposes of this discussion, I think that -- well,

9  let's suffice it to say that she identified her

10 representation as being somebody there to help, and --

11             Q.   Right.

12             A.   -- to preserve their property, and

13 that they get past this tax foreclosure hurdle that

14 they were facing.

15             Q.   And what about those statements do

16 you believe weren't true?

17             A.   Well, based upon what I observe,

18 I think that they never intended that they --

19 they, being Bigelow Trustee and Roseanne Christian

20 -- I don't think they ever intended that the Curtises

21 would reacquire this property.

22             Q.   All right. So, are you saying that

23 when Ms. Christian presented this contract to the

24 Curtises, that she intended to deprive them of the

```
 1   equity in their property?

 2               A.    That's my conclusion, yes.

 3               Q.    And you're basing that conclusion on

 4   what information?

 5               A.    The documents that we have before us,

 6   together with the fact that it's been represented to

 7   me that the property, at the time, had a fair market

 8   value of something in the order of magnitude of 75 to

 9   a hundred thousand dollars.

10               Q.    All right.  Do you know what

11   Ms. Christian said to the Curtises when she presented

12   that contract to them?

13               A.    No.

14               Q.    And do you know of any of

15   Ms. Christian's writings on that contract, other than

16   her signature?

17               A.    No.

18               Q.    Do you know how many times

19   Ms. Christian met with the Curtises?

20               A.    No.

21               Q.    Do you know whether or not

22   Ms. Christian was a family friend of the Curtises?

23               A.    My understanding, from Mr. Blessing,

24   was that she was somebody that they knew casually from
```

1  church.

2          Q.    And in terms of what statements were

3  made by Ms. Christian to the Curtises, you don't have

4  any information about that, do you?

5          A.    I do.  Mr. Blessing has informed

6  me, as I've just described to you, that she identified

7  herself as somebody associated with an institution

8  whose purpose it was to help people in distress

9  situations such as this.

10          Q.    All right.  Did the Curtises need

11  some help?

12          A.    Well, they were facing -- they

13  couldn't handle the tax foreclosure for about $15,000

14  or less.

15          Q.    Is that what you think the tax

16  foreclosure was; 15,000?

17          A.    Well, I think there was something in

18  the order of $10,000 due in taxes, past due taxes at

19  the time, and there were associated costs of a couple

20  thousand --

21          Q.    Uh-huh.

22          A.    -- or less than a couple thousand.

23          Q.    Now, Mr. Blessing's helping you out

24  there a little bit.

1          A.    Yeah.  Actually, I didn't need the

2    help, but I see from the closing statement that I was

3    confused.  They were supposed to get $10,000 out of

4    this.  They were only facing a $4500 tax foreclosure.

5    There would have been another 4 or $500 of costs on

6    top of that, so they were looking at something in the

7    order of magnitude of $5,000 of crisis --

8          Q.    All right.

9          A.    -- and they probably had -- and I'm

10   just speculating now -- but they probably had some

11   need for some other cash for other purposes, because

12   they were supposed to get $10,000 in cash out of this

13   property.  But they were also supposed to have the

14   property repaired with regard to the porch and the

15   roof --

16         Q.    We'll get to that.

17         A.    -- and that, in my mind, suggests

18   an expectation on their part that they were going to

19   retain the property, because they wouldn't have cared

20   whether the porch and the roof were repaired if they

21   were going to be kicked out.

22         Q.    Okay.  Do you know whether or not the

23   Curtises were presented at the time this contract was

24   signed, or before it was signed, with various options

1  about whether they could do a lease option or just a

2  straight lease --

3          A.  No.

4          Q.  -- or a land contract?  You don't

5  know about that, do you?

6          A.  No.

7          Q.  And you've told me everything that

8  you know about what Ms. Christian allegedly said to

9  the Curtises?

10          A.  Everything that's been represented to

11  me, yes.

12          Q.  Everything you know?

13          A.  I don't know, anything.  I'm assuming

14  those facts.

15          Q.  Right.

16          A.  I don't know those facts.

17          Q.  Okay. The information that you have

18  about what Ms. Christian said to the Curtises, you've

19  told me everything you know?

20          A.  Everything I've been told.

21          Q.  All right.  Who else, in your

22  opinion, deceived the Curtises?

23          A.  I have no knowledge, other than what

24  I've related to you.

1     Q.   All right.  Well, do you believe that

2  Mr. Meckstroth deceived the Curtises?

3     A.   Yes.

4     Q.   And in what regard?

5     A.   There's a pattern here.  He conducted

6  a closing a few days -- just four days after this

7  purchase contract, when the Curtises were supposed to

8  get some kind of document representing their rights

9  of possession.  They were supposed to get $10,000 in

10  cash.  They got neither.  He charged them $295 to

11  draw a land contract, and it's an artfully drawn land

12  contract, but he didn't bother to get it signed.

13     And I've heard your explanation that

14  that would have interfered with subsequent mortgage

15  financing, but that doesn't compute in my mind, or

16  based on my experience.

17     I think that -- I've seen Meckstroth

18  involved in three transactions -- I think three

19  transactions, several transactions -- and if they

20  hadn't been conducted the way they were conducted,

21  what happened here wouldn't have happened.

22     Q.   All right.  Deception, to me, means

23  a misrepresentation of fact.  Right?  Do you agree

24  with that?

1          A.    I think that fraud connotes

2    misrepresentation of a material fact made by somebody

3    intending reliance, which, in fact, resulting in

4    damage to the representee.

5               Q.    All right.  That's a -- let's use

6    your definition.  That's better than mine.  Okay?

7               A.    It's not mine.  It's the Ohio Supreme

8    Court's.

9               Q.    All right.  So, what material

10   misrepresentations of fact did Mr. Meckstroth make to

11   the Curtises?

12              A.    You understand that it can be

13   a representation or a failure to disclose when

14   disclosure is required by the circumstances, either

15   one results in fraud --

16              Q.    All right, okay.

17              A.    -- and I think that based on my

18   understanding of the facts -- first of all, they,

19   the Curtises, were supposed to have walked away from

20   that closing with $10,000, and they walked away with

21   something about 9,5.

22              Q.    All right.  That's because

23   Mr. Meckstroth charged them for the land contract?

24              A.    No, that's because he closed the

1  transaction inconsistent with the contract to

2  purchase.

3          Q.   All right.  Okay.  So that's one

4  thing that -- that's one deception of Meckstroth?

5          A.   Yeah, but much more important --

6          Q.   All right.

7          A.   -- was the fact that they walked out

8  of there without a signed -- I think it should have

9  been a land contract, because that's what he drew

10 and that's what they paid for, and that would have,

11 in my mind, satisfied the requirements of the purchase

12 contract, even though the purchase contract calls for

13 a lease option.

14         But, a lease option, you know -- but

15 I would have no quarrel in that regard with

16 Mr. Meckstroth if he had seen to it that there was

17 a lease option.  There wasn't that, either.

18         Q.   Right, right.  Okay.

19         A.   At least a recordable lease option.

20         Q.   Okay.  So you blame Mr. Meckstroth

21 for not making sure there was either an executed lease

22 option, or an executed land contract?

23         A.   Correct.  They wouldn't have gotten

24 themselves into the trouble that they did had they had

1  an executed and recorded document.

2             Q.   But you think that was Meckstroth's

3  obligation to make sure that happened?

4             A.   Correct.

5             Q.   All right.  And did Meckstroth

6  deceive the Curtises in any other regard, other than

7  what we've talked about?

8             A.   Not to my knowledge.

9             Q.   Okay.  Let's talk about Bigelow now.

10 How did Bigelow deceive the Curtises?

11            A.   Well, I surmise, based on the facts

12 as presented to me, that Roseanne Christian and

13 Bigelow together intended to approach borrowers who

14 were vulnerable, who had -- excuse me -- property

15 owners who had substantial equity and who were in

16 distress situations and who were vulnerable, into

17 acquiring title to their property -- a series of

18 transactions by which they acquired title to the

19 owners' property for substantially less than fair

20 consideration -- or substantially less than full

21 and adequate consideration -- intending that at least

22 in the vast majority of them that they would wind

23 up with the former owners' equity in the property.

24            Q.   Okay.  I want to talk about the

1  Curtises now.  Okay.  You just said "vast majority."

2  How did Bigelow deceive the Curtises?

3           A.   Well, I think that based on the facts

4  as represented to me, Christian was Bigelow's agent,

5  and through Ms. Christian, he acquired title to this

6  property for far less than fair value.  He got into

7  this thing for about $15,000 and acquired a fee simple

8  absolute ownership and property for $15,432.24, when

9  the property was worth something in the order of 75

10 to a hundred thousand dollars -- free of a pragmatic

11 equity on the part of the Curtises in the property.

12          Q.   Pragmatic; what's the pragmatic

13 equity?

14          A.   Well, you have a theory that they

15 could have enforced this contract provision for a

16 lease option, but my experience teaches me that that

17 would have been a long shot.  That, as a practical

18 matter, that wouldn't have happened.  As soon as he

19 transferred title to the property with third party,

20 he, as Trustee, transferred title of the property to

21 third party or mortgaged the property, that would have

22 been the pragmatic impossibility.

23          Q.   Uh-huh.  We can agree, though, can't

24 we, that if Bigelow Trustee hadn't transferred --

1  well, we already talked about that.

2          Now, have you told me everything that

3  you're going to say about Bigelow deceiving the

4  Curtises, that it was through Roseanne Christian?

5          A.   I -- if you ask me other questions,

6  I'll try to respond, but I don't have any --

7          Q.   All right.  Let me -- that was a

8  bad question.  We've already talked about Roseanne

9  Christian, and your opinions about her.

10         Other than your opinions about

11 Ms. Christian deceiving the Curtises, do you have

12 any opinions about Mr. Bigelow deceiving the Curtises,

13 separate and apart from what Ms. Christian did, or did

14 not do?

15         A.   I have no knowledge of any direct

16 communications between Mr. Bigelow and the Curtises,

17 but I presume -- but do not know -- but presume that

18 he was present at the closing, and somehow he walked

19 away from the closing with the title to a hundred

20 thousand dollar property for $15,000 cash, and no

21 executed land contract.

22         Now, how he got to that point, I can only

23 speculate, and my speculation is that he encouraged

24 the Christians (sic) to proceed with the transaction

1  with the expectation that they would somehow reacquire

2  the property, knowing that that expectation was

3  unrealistic.

4           If they couldn't handle a $5,000 tax

5  problem, they couldn't reacquire -- they couldn't come

6  up with $37,000 to reacquire the property.

7           I was also told that subsequent to the

8  closing, he spent only $3,000 on repairing -- or

9  a small sum, such as that, repairing the roof and

10 porch, which is relevant to this discussion, because

11 I surmise from the purchase contract that the Curtises

12 had an expectation that most of the difference between

13 the $5,000 paid to third parties at the closing and

14 the $9500 they received at the closing -- roughly

15 $15,000 -- most of the difference between that number

16 and 37,000, or at least a substantial part of that,

17 say, something at least $20,000 -- would have been

18 used to repair the roof and the porch.

19           Q.    But you're assuming that, right?

20           A.    I am assuming that for a variety

21 of reasons.  One is, is that it's consistent with my

22 experience, and another is that it explains to me

23 where the $37,000 comes from.  It certainly doesn't

24 come from the value of the property.

1      Q.   Because in your opinion, the fair

2   market value of the property was a hundred thousand?

3      A.   I'm told -- let me say two things:

4   Number 1, I'm told that it was between 75,000 and a

5   hundred thousand, and, Number 2, I generally know that

6   neighborhood.

7      Q.   And Mr. Blessing told you that it was

8   between 75 and a hundred?

9      A.   Correct.  But that's consistent with

10  my personal knowledge.  For a number of years I lived

11  on Wold Avenue, which is just several blocks away.

12     Q.   Okay.  In terms of representations or

13  statements --

14          MR. BLESSING:  Gary, did you see that

15  note?

16          MR. LEWIS:  Oh, no, I didn't.  I'm sorry.

17          MR. BLESSING:  Do you want to take a

18  break?

19          MR. LEWIS:  Yes.  I've got to make a phone

20  call.

21               (Brief break was taken.)

22  BY MR. LEWIS:

23     Q.   All right.  Mr. Lerner, just a couple

24  more questions about this e-mail dated, what is it --

1          A.     January 9.

2               Q.     -- that's in your binder.  There's a

3  sentence in there where Mr. Blessing is telling you

4  that your testimony in this case will be consistent

5  with the opinions you expressed in the Burbrink case.

6  Do you see that in there?

7               A.     It says, and I quote, "I sent your

8  deposition (taken in the previous state court case)

9  to Gary Lewis, current lawyer for Bigelow, and I told

10  him your testimony would be consistent with what is

11  stated in that deposition."

12              Q.     All right.  And did Mr. Blessing get

13  that information from you?  Did you tell him that your

14  testimony would be consistent in this case with the

15  testimony you gave in Burbrink?

16              A.     No.  This is on January 9, when I was

17  not then familiar with this case.

18              Q.     Right.  So as of then, you didn't

19  have any idea what your testimony was going to be in

20  this case, did you?

21              A.     Right.  At that point in time,

22  I don't know that I knew -- ever heard of Curtis.

23              Q.     All right.  And you reviewed your

24  deposition transcript, didn't you, on the Burbrink

1  matter?

2            A.   Subsequent to January 9.

3            Q.   And you didn't even talk about the

4  Harry Curtis transaction in that transcript, did you?

5            A.   No, but I did talk about a scheme,

6  a pattern, which is consistent with the Curtis case.

7            Q.   Okay.  And we've already discussed

8  that pattern.  We've talked about that, haven't we?

9            A.   We have discussed it.

10           Q.   What's your understanding of when

11 Mr. Curtis acquired title to the property?

12           A.   I have no understanding except that

13 he owned it in August of '99.

14           Q.   Right.  But you don't have any idea

15 when he took title?

16           A.   Well, no, I do have an idea that

17 it wasn't long before that, but that idea is a

18 speculation on my part, based on one notation in the

19 closing statement.

20           Q.   Okay.  So what's your definition

21 of not long before that?  Ballpark that for me.

22           A.   I'm speculating --

23           Q.   All right.

24           A.   -- that he acquired it by

1  inheritance, because there's a -- he's charged $28.50

2  for recording a certificate of transfer and affidavit.

3  I don't know the details behind that, but you

4  understand, I understand, a certificate of transfer

5  is a document, the function of which is to advise

6  the county auditor to transfer the records on the

7  tax records.  It does not relate to when the title

8  transfers.

9            Q.   Right.  But you believe he acquired

10  legal title to the property shortly before he sold it?

11            A.   No, I don't have that understanding.

12  I understand that he owned it in August of '99.

13            Q.   You don't have any idea when he

14  acquired title, do you?

15            A.   That's what I told you before.

16            Q.   And at that time when Mr. Curtis

17  acquired title to the property, do you know what the

18  fair market value of the property was?

19            A.   Well, since I don't know when he

20  acquired it, no, but I know the neighborhood, and I

21  can't imagine that it wasn't in the magnitude that

22  we've talked about earlier.

23            Q.   Okay.  It makes a difference in terms

24  of fair market value.  I'm asking you at the time that

1   he acquired title to the property, do you know what

2   the fair market value was?

3               A.    No.

4               Q.    And do you know whether or not

5   between the time that he acquired title to the

6   property and the time that he sold it to Mr. Bigelow,

7   whether there were any judgments taken against

8   Mr. or Mrs. Curtis?

9               A.    No.

10              Q.    Was Curtis married at the time he

11  acquired the property?

12              A.    It would appear so from the purchase

13  contract, but that's speculation on my part.

14              Q.    Okay.  So at the time that

15  Mr. Curtis acquired the property, do you know how much

16  equity was in the property?

17              A.    My understanding is substantial.

18              Q.    How much?

19              A.    Well, if I assume that the property's

20  worth a hundred thousand dollars, there's something in

21  the order of $90,000 of equity in the property.

22              Q.    So, it's your understanding that at

23  the time Harry Curtis acquired this property, he had

24  $90,000 worth of equity in it?  Is that what you're

1   saying?

2              A.    I'm saying that -- no.   I'm saying

3   that in August of '99, it would appear that he had

4   that much equity in it.

5              Q.    All right.  So it's your opinion,

6   then, that in August of '99, Mr. Curtis had $90,000,

7   approximately, equity in the property?

8              A.    That is not my opinion.  I am saying

9   that it would appear that.  I told you that I didn't

10  know whether there were other encumbrances against the

11  property.  My understanding -- my assumption is that

12  there were not.

13             Q.    All right.  Do you have an

14  understanding as to how much equity Mr. Curtis had in

15  the property as of 1999?

16             A.    My understanding -- yes.  My

17  understanding is that he had substantial equity in the

18  property, the exact magnitude of which I do not know.

19             Q.    All right.  Approximate it for me,

20  please.

21             A.    Fifty to 75,000 -- 50 to 90,000.

22             Q.    And how did you arrive at that?

23             A.    I deducted 5,000 in taxes from a

24  presumed fair market value of 75 to a hundred thousand

1    dollars.

2           Q.    And that 75 to a hundred is what

3    Mr. Blessing told you, right?

4           A.    It is what Mr. Blessing told me, but

5    it's also consistent with my personal observation.

6           Now, understand I'm not an expert on real

7    estate values, but I did live in the neighborhood

8    and I've closed a lot of transactions, and I know the

9    values, generally.

10          Q.    All right.  The Hamilton County

11   auditor does appraisals of real estate in Hamilton

12   County, don't they?

13          A.    In my opinion, not very well.

14          Q.    Okay.  Well, are you aware of what

15   the Hamilton County auditor's appraisal was for this

16   property in 19 --

17          A.    No.

18          Q.    Well, let me finish.  -- in 1999?

19          A.    No, but I wouldn't give it much

20   credence, anyway.

21          Q.    Okay.  Are you aware -- you're not

22   aware of what the auditor's appraisal was for '99,

23   correct?

24          A.    That's correct.

1     Q.    All right.  And so you didn't check

2  it as part of your job in this case?

3         A.    That's correct.

4         Q.    When Mr. Bigelow financed this

5  transaction, were you aware that there was an

6  appraisal done at that time?

7         A.    Was I aware?  No.  Did I assume?

8  Yes.

9         Q.    Okay.  So you were aware that there

10  was an appraisal out there that was done at that time?

11         MR. BLESSING:  Excuse me?

12         Q.    I'm sorry; I -- I'm sorry.  I wasn't

13  trying to mischaracterize.  You assumed there was?

14         A.    My information is that Mr. Bigelow

15  Trustee sold the property for $95,000.  I'm not even

16  sure that I have actual knowledge of -- that he

17  mortgaged the property.  He may have.  I don't know

18  that.

19         Q.    All right.  So now I'm confused.

20  Did you assume there was an appraisal done when

21  Bigelow financed the purchase or not?

22         A.    I'm not even sure that he did finance

23  it.

24         Q.    All right.

1    A.    But if he financed it, there would

2 have been an appraisal.  If he mortgaged the property

3 -- I didn't search the title -- if he mortgaged the

4 property conventionally, lenders traditionally would

5 require an appraisal.  Those appraisals aren't too

6 impressive, either.

7    Q.    Okay.  So you don't think the

8 auditor's appraisal's reliable, and you don't think

9 that an appraiser's appraisal would be reliable in

10 this situation either, right?

11    A.    Well, it depends on who the appraiser

12 is.

13    Q.    Okay.  And you have elected to rely

14 on what Mr. Blessing's told you?

15    A.    Well, it was consistent.  First of

16 all, it's consistent with my personal observation,

17 and, second of all, I was told that he resold the

18 property a year or two later for $95,000, and it's

19 consistent with that.

20    Q.    Was there any material change in the

21 property between the time Mr. Bigelow took title and

22 the time that Mr. Bigelow sold it?

23    A.    I was told that there was a fire

24 and that Mr. Bigelow recovered $65,000 in fire

1  insurance proceeds, and spent $33,000 to repair the

2  property, and spent another $3,000 in October of '99

3  to repair the roof and the porch.

4          Q.    Did you take that into consideration

5  in determining the fair market value of the property?

6          A.    I didn't determine fair market value.

7  I assumed an order of magnitude.

8          Q.    What's that mean that you assumed an

9  order of magnitude?

10          A.    As I've told you three or four times

11  today, I assumed that the property was worth something

12  in the order of 75 to a hundred thousand dollars.

13          Q.    Okay.  Do you know that Mr. Curtis

14  testified in his deposition about what he thought the

15  fair market value was?

16          A.    No.

17          MR. BLESSING:  Did you ask him previously

18  if he had seen the deposition, or read it?

19          THE WITNESS:  Yeah, he did ask me that.

20  BY MR. LEWIS:

21          Q.    Did Mrs. Curtis have some sort of

22  ownership interest in this property?

23          A.    I don't know, but I assume not.

24          Q.    And why are you making that

88

1  assumption?

2            A.   Well, because it appears from the

3  closing statement -- which I've marked with this

4  marker -- that the property was acquired by intestate

5  succession --

6            Q.   Inheritance.

7            A.   Inheritance.  -- and it would be

8  based on my experience, uncommon that he might have

9  succeeded to this property by inheritance and his wife

10 participated in that succession.

11            Q.   Okay.  Let's assume she didn't

12 inherit an interest in the property.

13            A.   I would assume that one or the other

14 of them -- based on the facts that I do have available

15 to me -- I would assume that one or the other of them

16 owned it entirely.

17            Q.   All right.  Let's assume that he

18 inherited it and she didn't --  Are you with me?

19            A.   Sure.

20            Q.   -- at the time he inherited the

21 property.

22            A.   Sure.

23            Q.   Now, if the property appreciates in

24 value from the time that he inherits it and they're

1    married during that time, does she have an ownership

2    interest in the property by virtue of the marital

3    relationship?

4                A.    She has a statutory right in lieu of

5    dower.

6                Q.    All right.  Other than dower, does

7    she have any other right?

8                A.    It's not dower.  It's a statutory

9    right in lieu of dower.

10               Q.    All right.  Can we just call it

11    dower?

12               A.    If you call it dower, I won't --

13               Q.    Let's just call it dower.

14               A.    Fine, fine.  I'm not -- I don't do

15    domestic relations work, but my understanding of

16    the law is that she wouldn't have something in that

17    context that would result from his inheritance, but my

18    understanding, pragmatically is, is that's often not

19    the case.

20               Q.    Right.  And I'm talking about the

21    appreciation in value now.

22               A.    I'm talking -- yeah.  My

23    understanding, depending on a lot of factors not known

24    to me at this time, my understanding is that if one

```
 1    spouse inherits property and that property remains

 2    titled in that one spouse, that the other spouse does

 3    not participate in the appreciation.  But if they live

 4    together as a marital community in that property, then

 5    I believe that domestic relations courts would take

 6    that appreciation into account --

 7                    Q.    All right.

 8                    A.    -- notwithstanding my opinion of the

 9    law.

10                    Q.    You testified in the Burbrink case

11    that before foreclosure suits -- and I can get you

12    a page reference if you need it -- that before a

13    foreclosure suit would be filed based on unpaid taxes,

14    that a number of letters would be sent to the

15    homeowner by the county; is that --

16                    A.    I don't recall that testimony.

17                    Q.    Maybe this is just my question.

18    Okay, strike that.  I'm sorry.

19                    Is it your experience that before the

20    county files foreclosure for unpaid taxes, that they'd

21    send a number of deficiency letters to the homeowner

22    and ask them to remedy the deficiency?

23                    A.    I don't have experience in that

24    subject.
```