1          Q.    All right.  So you don't know?

2          A.    I don't know.

3          Q.    You've got your deposition transcript

4    in front of you, don't you; it's part of that binder?

5          A.    I do.

6          Q.    I'm going to have the transcript

7    marked as an exhibit.

8          (Defendants' Exhibit B was marked for

9    identification.)

10          Q.    Sir, if you would -- just the

11    transcript, not the letter -- can you identify

12    Defendants' Exhibit B?

13          A.    It appears to be a photocopy of a

14    copy of my deposition taken in the matter of Bigelow

15    versus Burbrink in my office on January 8th, 2002.

16          Q.    All right.  And that testimony was

17    truthful, based upon the best of your knowledge?

18          A.    To the best of my knowledge,

19    information, and belief.

20          Q.    Okay.  And look at page 25 for me,

21    would you?  I want to direct your attention to Line

22    19.  You say, "In my experience when there is equity

23    in the property in this community, that is in Hamilton

24    County, the sellers of distressed property that's in

1   foreclosure are inundated with solicitations from

2   various real estate speculators to acquire the

3   property."  Do you see that language?

4          A.   I see it.

5          Q.   Now, was Mr. Curtis inundated with

6   solicitations as you've described there?

7          MR. BLESSING:  Now, give him a time

8   line and don't -- give him a true time line of the

9   foreclosure.

10         A.   Well, it doesn't matter, 'cause

11  I don't have any knowledge of what -- and he's

12  suggesting your question's objectionable, because he

13  doesn't know the time line.

14         Q.   Well, then, let him object to it.

15         A.   But I -- pardon me?

16         Q.   Let him object to it.

17         A.   All right.  I'm suggesting that --

18         Q.   I'm talking about at the time --

19         A.   I have no knowledge.

20         Q.   So you don't know whether that

21  statement that you've made there applies to Mr. and

22  Mrs. Curtis or not, correct?

23         A.   My experience is correctly stated

24  here.  Whether or not that experience applies to

1  Mr. Curtis or not is not known to me.  But I do know

2  that this transaction is typically -- excuse me --

3  the approach in this transaction by somebody

4  interested in acquiring a property is not uncommon.

5  What happened here is uncommon.

6            Q.    When Ms. Christian went to the Curtis

7  residence with this contract, do you know whether or

8  not the sheriff's sale was scheduled?

9            A.    No.

10           Q.    And do you know whether or not

11  Mr. Curtis was presented with any other options to

12  avoid a sheriff's sale, other than the option that

13  was presented to him by Ms. Christian?

14           A.    Let me retreat from that last answer.

15  I don't know -- the answer is correct, but it needs

16  amplification.  The fact that the court costs were

17  only $206 -- according to the closing statement --

18  suggests to me that the sheriff's sale was not yet

19  scheduled, and the reason I say that is because the

20  cost would have been higher.  There would have been

21  an appraisal cost, a publication cost.  It would have

22  been higher than $206.

23           Q.    Okay.

24           A.    Now, the answer to your next question

1    is no.

2            Q.    All right.  Now, you also talked

3    in the Burbrink deposition about the equities of

4    redemption?

5            A.    I talked about two equities of --

6            Q.    Yeah.  Judicial and statutory, right?

7            A.    Correct.

8            Q.    So assuming that the sheriff's sale

9    hadn't occurred in the Curtis -- or hadn't been

10   scheduled -- let's just assume that in the Curtis

11   situation -- so which of those equities of redemption

12   would apply in that situation?

13           A.    Both.

14           Q.    All right.

15           A.    It wouldn't have mattered whether the

16   sheriff's sale was scheduled or not.

17           Q.    Okay.

18           A.    You know, the criteria would have

19   been the confirmation of the sheriff's sale, not the

20   scheduling.

21           Q.    Okay.  But in order to exercise an

22   equity of redemption, the rights of the homeowner,

23   what do they have to do?

24           A.    Which equity are you referring to?

1          Q.    You pick.

2          A.    Well, in order to exercise the

3    statutory right, they have to pay the amount of

4    judgment and court costs in full to the sheriff.

5          Q.    Okay.  That would be after the

6    judgment?

7          A.    It would be after the judgment and

8    through -- up until, but not through the confirmation

9    of the sheriff's sale.

10         Q.    All right.  And then prior to

11   judgment, which statutory -- which equity of

12   redemption applies?

13         A.    Actually, there's a third equity of

14   redemption that applies.  They can -- most of my

15   experience is in the context of mortgages.  The

16   statute provides for a slightly dissimilar procedure

17   with regard to a tax sale.

18         Q.    All right.

19         A.    But in any event, with regard to --

20   do you want me to expand on tax sales, or do you want

21   me to --

22         Q.    Not really.  Let me see if I

23   can save us some time.  Whatever the equities of

24   redemption, if there are three, do they involve

```
 1  payment of money --

 2              A.   Yes.

 3              Q.   -- by the homeowner?

 4              A.   Yes.

 5              Q.   And did the Curtises have the ability

 6  to pay that money?

 7              A.   Yes.

 8              Q.   They did?

 9              A.   Yes.

10              Q.   And what are you basing that

11  information on?

12              A.   My experience.  They could have --

13  as I say in this deposition, they could have mortgaged

14  the property or sold the property, and typically

15  that's how -- typically, a mortgage borrower, or for

16  that matter a taxpayer who can't pay the taxes or the

17  mortgage, as the case may be -- can't write a check to

18  redeem, any more than I assume the Curtises could, or

19  any more than I assume the Curtises could have paid

20  -- written a check for $37,000, but they can preserve

21  their equity or substantially all of their equity by

22  refinancing or selling the property for fair value,

23  and that's what they typically do.

24              Q.   All right.  Well, in the Curtis's
```

1  financial situation, did they have the ability at

2  the time they signed that contract, did they have

3  the ability to satisfy -- to exercise the equity of

4  redemption without getting some sort of third-party

5  financing?

6         A.   I don't know.

7         Q.   Okay.  You don't know anything about

8  their financial situation, do you?

9         A.   That's correct.  I can make some

10 assumptions, based on the fact that they're in a tax

11 foreclosure, and based on the fact that they entered

12 into this transaction.

13        Q.   Right.  Doesn't that lead you to

14 believe that their finances were limited?

15        A.   No matter how limited, my experience

16 suggests that you don't sell -- even people in

17 distress situations don't sell a 75 or a hundred

18 thousand dollar property for $15,000 without an

19 expectation of something else.

20    (Defendants' Exhibit C was marked for

21 identification.)

22        Q.   Sir, I want to show you what's been

23 marked for identification as Exhibit C.  Can you

24 identify that, please?

1          A.   It appears to be a copy of a contract

2   to purchase dated August 2 or 21.

3          Q.   Two.

4          A.   I can't tell which; 1999 -- similar

5   to the copy which I examined.

6          Q.   Well, is there any difference between

7   the copy that you got and this?

8          A.   No substantial difference, no.

9   I mean, one's a little lighter than the other, but

10  they appear to be copies of the same contract.

11         Q.   Was it your understanding that the

12  Curtises agreed to pay $350 a month to Mr. Bigelow?

13         A.   Yes.

14         Q.   And did the Curtises comply with that

15  contract term?

16         A.   My information is that they only did

17  for two months.

18         Q.   So your answer would be that the

19  Curtises did not comply with the terms of that

20  contract, correct?

21         A.   I don't know what happened after the

22  two months -- or what didn't happen.

23         Q.   Well, it doesn't say, "Pay $350 a

24  month for only two months," does it?

1              A.    I only know -- I've seen two checks,

2    so my supposition is that they paid two months.

3    I have not seen more checks, so I make no supposition.

4              Q.    All right.  So it's your

5    understanding that they only paid for two months?

6              A.    I only know about -- I only have

7    information that they paid for two months.

8              Q.    And did Mr. Bigelow comply with the

9    terms of this contract?

10             A.    I didn't see a lease option or the

11   functional equivalent being a land contract executed

12   by Mr. Bigelow, so I didn't see $10,000 in cash going

13   to the buyer at the closing, so in those two respects,

14   I know he did not.

15             With respect to the repairs of the porch

16   and roof, I'm told that he made limited repairs, but

17   that's all my information.

18             Q.    All right.  And that seller to lease

19   option property, that's something that's supposed

20   to happen after the contract to purchase was executed?

21             A.    I would assume -- no, I would assume

22   that, yes, but I would assume that it would happen at

23   the closing.  That would be the normal situation.

24             Q.    All right.  We've already discussed

1  what you know about why or why not a lease wasn't

2  entered into.  We've talked about that, haven't we;

3  everything you know about it?

4              A.   Well, I told you earlier, I would --

5  notwithstanding what you suggested, it would have been

6  my expectation that there would have been a signed

7  document -- in this case a land contract -- because

8  that's what Mr. and Mrs. Curtis paid for, but -- some

9  signed document, a land contract, or lease option, or

10 something to suggest their equity in it is preserved.

11             Q.   Uh-huh.  You're familiar, aren't you,

12 with forcible entry and detainer law in Ohio?

13             A.   Generally.

14             Q.   And are you familiar with the options

15 available to tenants that are named in eviction suits?

16             A.   I think so.

17             Q.   All right.  A tenant who is named in

18 an eviction suit has an option to deposit rent with

19 the Court, don't they?

20             A.   I think they do.

21             Q.   Right.  And they're advised of that

22 by the Court, aren't they, in a notice that's sent to

23 them?

24             A.   That, I don't know.

1          Q.    Okay, in the summons and documents

2    that are sent along with the complaint?

3          A.    I can't answer that question.

4          Q.    Okay.  But you understand they do

5    have an option to deposit rent with the Court?

6          A.    Yes, I do understand that.

7          Q.    And isn't it your understanding that

8    if a tenant does deposit rent with the Court, that it

9    prevents an eviction during the pendency of the case?

10         A.    It may or may not, depending on what

11   is the issue in the case.

12         Q.    I'm talking about an eviction.

13         A.    Yeah, but evictions aren't all for

14   money.  I can evict you for other reasons -- if you're

15   my tenant -- for other reasons than money, and you're

16   paying -- and I can decline to accept rent and you can

17   pay the money to the Court, and I'll still recover the

18   property, if I have other reasons for the eviction.

19         Let me give you a simple example,

20   all right?  We enter into -- you rent an apartment

21   or a house from me on a month-to-month basis with no

22   written documents, and I decide that I want the --

23   arbitrarily that I want the property for $500 a month,

24   let's say, and I decide that I want the property --

1  the house or the apartment back, all right?

2              And so I serve you with an appropriate

3  eviction notice, a three-day notice, and I say,

4  "Owner desires possession of property," and you say,

5  "Well, here's my rent for next month," and I say,

6  "I don't want your rent for next month," and three

7  days later, or four days later, I file an eviction --

8              Q.   Okay.

9              A.   -- and the sheriff serves you,

10  and you tender the $500 into court, you'll still be

11  evicted.  That will not be a defense.

12              Q.   So are you telling me that a tenant

13  who's named as a defendant -- let's just say it's an

14  eviction suit, no other claims --

15              A.   That's what I'm talking about.  You

16  postulated a forcible entry and detainer.

17              Q.   Right.

18              A.   It's a statutory procedure.

19              Q.   Right.  Are you telling me that a

20  tenant who's named as a defendant in an eviction suit

21  doesn't have the option to deposit their rent in court

22  to avoid being evicted?

23              A.   Well, I said, depending on the facts,

24  yes.

1              Q.   All right.  Well, let's talk

2   about Mr. Curtis's case.  Mr. Curtis was named as

3   a defendant in an eviction case.

4              A.   Right.

5              Q.   You understand that, right?

6              A.   Right.  I've been told that.

7              Q.   Okay.  If Mr. Curtis would have

8   tendered and deposited his $350 per month into court,

9   could he have prevented being evicted?

10             A.   I don't know.  I haven't seen the

11  pleading.

12             MR. BLESSING:  Gary -- off the record.

13                  (Off-the-record discussion.)

14                  (Lunch break was taken.)

15     [Reporter's Note:  Mr. McKay was not present for

16  the conclusion of the deposition.]

17  BY MR. LEWIS:

18             Q.   I would like to mark your binder as

19  an exhibit.

20             MR. BLESSING:  Can we go make a copy,

21  or --

22             MR. LEWIS:  We'll substitute a copy,

23  absolutely.

24             Q.   You don't mind if we put an exhibit

1  sticker on this, do you?

2         A.   That's fine.

3      (Defendants' Exhibit D was marked for

4  identification.)

5         Q.   Okay, Mr. Lerner, I've shown you

6  what's been marked as Exhibit D, and, for the record,

7  tell us what that is.

8         A.   This is a notebook.

9         Q.   And that's the notebook that we've

10 previously discussed, right?

11        A.   Correct.

12        Q.   And that's the binder where I went

13 through and we talked about all the documents that are

14 in there?

15        A.   Correct.  I think we did, too.

16        THE WITNESS:  On the record:  Can you

17 gentlemen agree to substitute a photocopy for this

18 Exhibit D, and let me keep the original?

19        MR. LEWIS:  Yes.

20        THE WITNESS:  Thank you.

21        MR. LEWIS:  Absolutely.

22        THE WITNESS:  Thank you.

23        MR. LEWIS:  We'll just have to work out

24 the mechanics of doing that.

```
 1              THE WITNESS:  I don't need it right now.

 2              MR. LEWIS:  Yeah.  We can give the

 3   court reporter the original, and then we'll have a

 4   photocopy made, and the original will go back to

 5   Mr. Blessing to be returned to you, and the substitute

 6   photocopy.  Okay?

 7              THE WITNESS:  Thank you.

 8              MR. LEWIS:  All right.

 9       (Defendants' Exhibit E was marked for

10   identification.)

11   BY MR. LEWIS:

12              Q.  Sir, and if you would, please,

13   identify Exhibit E.

14              A.  Exhibit E appears to be a settlement

15   statement for the property at 1966 Fairfax dated

16   August 25, 1999.

17              Q.  Okay.  And that's the settlement

18   statement that you've alluded to before in your

19   testimony today, right?

20              A.  It appears to be a copy of the same

21   document, which I examined a copy.

22              Q.  We've already discussed the issue

23   of Meckstroth charging the Curtises for preparation

24   of the land contract, so we don't need to talk about
```

1    that.  Are there any other charges to the Curtises on

2    here that you feel are inappropriate?

3            A.    I can't speak with certainty

4    about that, because I don't know the circumstance,

5    but charging $150 for a deed and an affidavit --

6    I haven't seen the affidavit, so I'm reluctant to

7    express a definitive opinion on that -- but it seems

8    -- but nothing material.  There's an issue about

9    charging $595 and change for a tax proration under

10   the circumstances of this case, but, again, I'm not

11   prepared to say that that's inappropriate, and I can't

12   verify.  The other numbers appear to be in line, but

13   I can't verify them.  I do observe that the net, as

14   it appears on this statement, is $98,171 and change --

15           Q.    Right.

16           A.    -- but based on other documents,

17   which I have looked at and we've discussed, I've

18   learned that the buyers actually -- excuse me --

19   the Curtises, the sellers, actually got $295 less

20   than that amount, because, in addition to the $295,

21   which appears on this statement, is a charge for

22   attorney fees by Mr. Meckstroth, to the purchaser,

23   which is identified on the next page as Mr. Bigelow

24   Trustee.  In addition to that $295, there was

1    an additional $295 charged to the sellers, the

2    Curtises --

3                    Q.    Right.

4                    A.    -- so they received about $9500

5    instead of $10,000.

6                    Q.    So they've received the 98,171

7    less the 295 for preparation of the land contract,

8    right?

9                    A.    That's correct.  Mr. Meckstroth

10   collected $295, according to this statement, from

11   Mr. Bigelow, and another $295 -- not according to this

12   statement --

13                   Q.    Uh-huh.

14                   A.    -- but according to other documents

15   that I've seen from Mr. and Mrs. Curtis.

16                   Q.    Well, do you think the $295 charge to

17   Bigelow is inappropriate?

18                   A.    Well, I think that that's not

19   inappropriate.

20                   Q.    It's not?

21                   A.    I think it's not.  Neither one of

22   those charges alone is not inappropriate, but in the

23   context, it appears there's a dual representation,

24   and we could have a discussion about that.

1                    Q.    Right, right, right.  I think we

2    already did.

3                    A.    Perhaps.  I don't think we've had a

4    complete discussion on that.  I don't think -- I don't

5    think a dual representation is appropriate without

6    some disclosures, and, under the circumstances,

7    I would have had something in writing.  I have no

8    reason to believe that the Curtises understood the

9    issue.

10                   Q.    All right.  In your opinion, did the

11   charging by Meckstroth for the land contract, did that

12   in and of itself create a dual representation?

13                   A.    Under these circumstances, yes.

14   Let me amplify that.  Under the circumstances of an

15   attorney conducting a real estate closing, almost --

16   but it would be clear to point out not quite -- has

17   a fudiciary relationship to the parties, because it

18   is perceived, in my experience by unsophisticated

19   parties, that the attorney is a neutral party, who

20   is representing all the parties.  That's not correct.

21                   Q.    I'm sorry.  Say that again.

22                   A.    My experience suggests that an

23   attorney conducting a real estate closing is perceived

24   by the parties to be representing everybody and be

1  kind of a neutral third party, and therefore, it is

2  appropriate, in my opinion, for such an attorney to

3  make a disclosure if that's not the case.

4          If no disclosure is made, then I think

5  there's an issue, but in this case it goes beyond

6  that.  In this case we've got charges to both the

7  buyer and the seller, and nothing -- at least that

8  I know about, and certainly nothing in writing that

9  I know about -- that suggests to anybody, including

10 the Curtises, that there isn't a conflict of interest,

11 and that, in my mind, is a problem.

12         Q.   All right.  And that problem,

13 though, that's a problem that was created, in your

14 mind, by Mr. Meckstroth, correct?

15         A.   Correct, correct.  And, you know,

16 it's part of the same problem that I suggested when

17 I talked about it before --

18         Q.   Right.

19         A.   -- about the land contract not

20 getting executed and recorded.

21         Q.   Okay.  And so in your view, did

22 Mr. Meckstroth have any interest in this transaction,

23 other than the fees that are reflected on this

24 settlement statement, and the $295 that he got from

1  the Curtises?

2          A.    Yes.

3          Q.    What was his interest?

4          A.    I think there's a course of dealing

5  with Mr. Bigelow and his associates, and I think

6  Meckstroth had a vested interest in having these

7  transactions conclude in the manner, which I perceive

8  to be inappropriate, that they did conclude.

9          Q.    And the vested interest was a

10  continuing relationship with Bigelow?

11          A.    I have no -- yes, I know of no other.

12  There may have been some other, but I don't know of

13  it.

14          Q.    All right.  In your view, based on

15  your understanding, was the relationship between

16  Bigelow and Meckstroth, was there anything more than

17  an attorney/client relationship there?

18          A.    Based on the information that I have

19  directly, I can't say that with certainty, but to be

20  this far off, on a series of transactions, creates a

21  concern on my part.

22          Q.    Okay.  It creates a concern, but

23  do you have any information to indicate that the

24  relationship between Meckstroth and Bigelow, on any

1  transaction that you've looked at, was anything more

2  than attorney/client?

3              A.    Well, I think that I have this

4  concern, because it's so far off the mark.  I mean,

5  as I said earlier, the contract says they get $10,000,

6  and they got 9500, and the contract says that they're

7  going to -- it would lead somebody, such as the

8  Curtises, and perhaps even myself, to believe that

9  they were going to get some kind of a documentable

10 interest in this property; that they're going to

11 retain -- this is in my view of financing transactions

12 -- that they're going to retain the equity in a

13 property, and that, in my mind, mandates that the land

14 contract be executed and recorded, or some functional

15 equivalent, and I don't perceive that the survival of

16 the purchase contract to be a functional equivalent.

17             Q.    Okay.

18             A.    If it were, then it would need to be

19 recorded --

20             Q.    All right.

21             A.    -- and Meckstroth should have

22 apprised the Curtises of that.  All of that is so far

23 off the mark of what I think should have happened,

24 and it happens with regularity, that it suggests

1  Meckstroth's an interested party, to me.

2          Q.    Meckstroth is an interested party --

3          A.    Beyond --

4          Q.    -- in the transactions?

5          A.    Well, no, that he has -- that he has

6  a strong interest, at a minimum, in perpetuating this

7  relationship.

8          Q.    And the relationship is an

9  attorney/client relationship, isn't it?

10          A.    I told you before, I don't know of

11  any more.

12          Q.    Okay, that's what I'm asking you.

13  Do you know of anything more than the attorney/client

14  relationship?

15          A.    It's a red flag.  I don't know any

16  more, but my antenna's up.

17          Q.    All right.  Anything else about this

18  settlement statement that's irregular to you?

19          A.    The form is unusual, but there's

20  nothing really wrong with it.  It's just not --

21  typically, lawyers these days use the HUD-1 form, and

22  this is a different form.  I think it's bad practice

23  not to identify the parties on the first page rather,

24  but I can't say, definitively, that something's wrong,

1  or I can suggest that it's not good, but, you know,

2  it's not -- I wouldn't put it off.

3          Q.   How come it's not good?

4          A.   Because without identifying --

5  you know, without having some identification of the

6  parties on the first page, it's so easy to substitute

7  pages.

8          Q.   Well, you're not suggesting that the

9  pages --

10          A.   No, no.

11          Q.   -- were substituted, are you?

12          A.   Like I said, I think it's bad

13  practice, but it's adequate.

14          Q.   Okay.

15          A.   I have no reason to believe that this

16  doesn't reflect the economics of what happened that

17  day.

18          Q.   All right.   It identifies the

19  property on the top --

20          A.   Correct.

21          Q.   -- so it would be tough to substitute

22  pages.

23      (Defendants' Exhibit F was marked for

24  identification.)

1          Q.    Mr. Lerner, if you would, please,

2   look at Exhibit -- what do you have in front of you?

3   Is that F?

4          A.    Yes.  It's Defendants' F.

5          Q.    Would you identify those for the

6   record?

7          A.    This is a record of the time

8   that I've devoted to this enterprise on behalf of

9   Mr. Blessing.

10         Q.    All right.  And does this reflect all

11  of the time you spent on this case, prior to today?

12         A.    Substantially all.  I may have --

13  you know, I didn't record nominal things, like

14  e-mails.

15         Q.    Uh-huh.  Now, were these time entries

16  made contemporaneously, or after the fact?

17         A.    They were made contemporaneously, but

18  recorded on this piece of paper from earlier records.

19         Q.    I see.  What is it you have; time

20  sheets or something that you --

21         A.    Yeah.

22         Q.    Okay.

23         A.    This isn't the original record, but

24  it's an accurate --

```
 1              Q.    I understand.  You took this

 2   information off your time sheets?

 3              A.    Correct.

 4              Q.    It would have other clients reflected

 5   on --

 6              A.    This sheet, no, but --

 7              Q.    Well, that's what I mean; your time

 8   sheets.

 9              A.    The time sheet, no.  There's a

10   separate time sheet, but I don't have it here.

11              Q.    Okay.  This is an accurate reflection

12   of --

13              A.    This is accurate --

14              Q.    Thank you.

15              A.    -- except, you know, I probably never

16   intended to include nominal engagements that aren't

17   reflected here.

18              Q.    All right.  Can you tell me, under

19   Ohio law, what type of property interest a buyer

20   acquires under a land contract?

21              A.    Yes.

22              Q.    Please do.

23              A.    A buyer acquires an equitable

24   interest in the property -- well, a land contract
```

116

1  vendee has an equitable interest in the property.

2  It's the same as from a legal interest.

3             Q.   Okay.  And what do you mean by

4  equitable interest?

5             MR. BLESSING:  Equity 101.

6             A.   Yeah.  I could give you a book.

7             Q.   I don't want a book.  Can't you

8  just --

9             A.   The equitable interest is a real

10 interest in the property as distinguished from a

11 legal interest in the property.  He doesn't hold

12 legal title --

13            Q.   All right.

14            A.   -- but he has some viable claim

15 against the property --

16            Q.   Okay.

17            A.   -- he or she, or both.

18            Q.   And this equitable interest, is it

19 -- at some point does it become important when that

20 -- well, strike that.  Can a buyer forfeit the

21 equitable interest that they have under a land

22 contract?

23            A.   Under some circumstances, certainly.

24            Q.   Okay.  And please tell me under what

1  circumstances.

2           A.   Well, there are a number of ways --

3  well, first of all, a land contract is one of many

4  ways in which one acquires an equitable interest in

5  property, so we're -- I'm going to just focus on a

6  land contract.

7           Q.   A land contract?

8           A.   Right.  And by -- Step 1:  A default

9  by the buyer under the terms of the land contract,

10 which may or may not be of monetary default.

11          Q.   All right.

12          A.   Step 2:  It depends upon the equities

13 in the property and the age of the contract.

14          Q.   All right.

15          A.   If the contract is -- if there's

16 very limited equity in the property and if the

17 contract is young, then there is a summary procedure

18 under the Ohio statutory scheme, which, incidentally,

19 I drafted --

20          Q.   You did?

21          A.   Yeah.  Not the current version;

22 the original version.

23          Q.   Okay.

24          A.   -- that permits the land contract

1    vendor to obtain a forfeiture of the equitable

2    interest in municipal court --

3              Q.    Right.

4              A.    -- and the proceedings much akin to a

5    forcible entry and detainer.

6              Q.    Okay.  And it's my understanding

7    -- and you've got the statutes in your binder, I saw

8    them --

9              A.    Right.

10             Q.    -- it's my understanding that this

11   time period that you were talking about is five

12   years --

13             A.    Correct.

14             Q.    -- is that correct?

15             A.    Correct.

16             Q.    And equity interest that you were

17   talking about was 20 percent?

18             A.    Correct.

19             Q.    So is it accurate that until a buyer

20   under a land contract either has made payments for

21   five years or has paid 20 percent of the purchase

22   price, that this equity interest you were talking

23   about could be forfeited if they defaulted?

24             A.    Yeah, that's what the statute says,

```
 1   but I -- that's not the way it would be interpreted in

 2   this case because of the discrepancy -- because this

 3   is a financing transaction.  The discrepancy between

 4   the purchase price and the real value, according

 5   to my information, is so great, that it is a

 6   transparent financing device, and therefore I believe

 7   that a court would conclude -- and you're correct in

 8   the statute -- but I believe that a court would

 9   conclude that this contract was not amenable to the

10   summary forfeiture provisions of the statute.

11              Q.   You're talking about the land

12   contract that was never signed?

13              A.   Correct.  We were talking about a

14   hypothetical land contract.

15              Q.   Well, actually, we're talking

16   about the law, having to do with land contract, and

17   that's what I --

18              A.   Well, yeah, but we have to relate

19   it to a land contract, and according to your view,

20   there wasn't any land contract here.  There was a

21   piece of paper that was never signed.

22              Q.   Say that according to my view again,

23   would you?

24              A.   According to your view, there was
```

```
 1   never a contract.  There was a piece of paper, which

 2   was not a contract because it was not executed.

 3   Your view, as I understand it, is there was never --

 4   there was no land contract.  There was discussion of

 5   a land contract, there was a draft of a land contract,

 6   but in order to have a contract, you have to have a

 7   meeting of minds, and, in this case, because it's real

 8   estate and for some other reasons --

 9              Q.   Right.

10              A.   -- you have to have a piece of paper

11   that's signed by both parties.

12              Q.   So that's your view too, isn't it,

13   that a land contract wasn't signed?

14              A.   Yeah, that's why I described it as a

15   hypothetical.

16              Q.   All right.

17              A.   We're talking about this

18   hypothetical.  We're not talking about -- we're not

19   talking about these facts.

20              Q.   All right.  Let's just talk about

21   Ohio law for a minute --

22              A.   Sure.

23              Q.   -- okay?  I want to get back to --

24   so, we're in agreement that under Ohio law, if a buyer
```