1    under a land contract defaults under the terms of

2    the contract and they haven't made payments for five

3    years, or they haven't paid 20 percent of the purchase

4    price, their equitable interest is subject to

5    forfeiture.

6              A.    Can you --

7              Q.    Is that the law or not?

8              A.    I earlier agreed with you that the

9    statute said that, but I amplified that answer to

10   suggest to you that under the circumstances of this

11   case, that I was doubtful that a court would permit

12   forfeiture.  There's a maximum law that says equity

13   abhors a forfeiture, and I really think the courts

14   are very -- bend over backwards to preclude under

15   circumstances such as this -- and by that I mean

16   substantial equity in the property.  Even though

17   the purchase price is described as $37,000 --

18             Q.    Right.

19             A.    -- and 20 percent of that number has

20   not been paid to the vendor.

21             Q.    Right.

22             A.    Under the circumstances in this case,

23   I do not think that a court would have permitted a

24   summary forfeiture of the equity.

1          Q.    All right.  And --

2          A.    Let me describe to you; even before

3  the statute --

4          Q.    Can we -- I don't want to --

5  I mean --

6          A.    It's germane to this issue.

7          Q.    Are we talking about history now

8  before the statute?

9          A.    No, we're talking about law.

10         Q.    Well, I want to talk about the law

11  that's in effect now, okay?

12         A.    And I'm telling you that my view --

13  a summary procedure would not have been obtained in

14  this circumstance.

15         Q.    That would have been up to a judge or

16  jury, right?

17         A.    Judge.

18         Q.    A judge?

19         A.    (Nods head.)

20         Q.    And are you saying that a default

21  action -- breach of the land contract would have been

22  an equitable proceeding?

23         A.    No.  I'm saying that a municipal

24  court judge, sitting in a forcible entry and detainer

1    procedure as in this case, a statutory procedure would

2    not have caused there to be a forfeiture, and beyond

3    that, according to what Mr. Blessing has told me, in

4    this case the judge when told that there was a land

5    -- erroneously apparently told that there was a land

6    contract says much; said that he wouldn't -- but the

7    problem was that the Curtises couldn't produce an

8    executed land contract.

9           This judge, according to my understanding,

10   would not have granted the forcible entry and detainer

11   if there had been a signed contract.

12          Q.    Now, who told you that?

13          A.    Mr. Blessing.

14          Q.    And did Mr. Blessing make you aware

15   that there was testimony presented in the municipal

16   court?

17          A.    My understanding is that the Curtises

18   said they had a land contract, and it turned out that

19   they were talking about this unsigned document; that

20   the Curtises thought they had a viable land contract,

21   but they only had this unsigned document.

22          Had they, according to my understanding,

23   had a signed land contract, the forcible entry and

24   detainer writ would not -- the writ of possession --

1    writ of restitution would not have been granted.

2                Q.    And did Mr. Blessing tell you that

3    that's what the judge said to the Curtises?

4                A.    That was my understanding.

5                Q.    Did Mr. Blessing tell you that?

6                A.    I believe he did.

7                Q.    And he told you that the judge said,

8    "Well, if you had a signed land contract, I wouldn't

9    be ordering this eviction"?

10               A.    Well, I think you've asked me that

11   three times now, and I think my answer's always been

12   yes.  And that would have been the result, as I said

13   earlier, that I would have predicted, anyway.

14               Q.    Right.  And so you're predicting

15   what, in your opinion, a judge would have done had

16   the issue come before him in the Hamilton County --

17   or her -- in the Hamilton County Municipal Court?

18               A.    Had there been a signed land

19   contract, I think the judge would not have granted a

20   writ of restitution.

21               Q.    Okay.  And you're basing that, if I

22   understand, on the discrepancy -- are we back to this

23   equity issue again, that the Curtises had so much

24   equity in the property that it just would have been

1    not equitable to forfeit their equitable interest?

2                A.    That's correct.

3                Q.    Okay.

4                A.    On the same -- basically, on the

5    statutory theory, you see, the statute presupposes

6    -- and I can speak with certainty to this, 'cause I

7    drafted it -- but the statute presupposes that the

8    purchase price reflects all or virtually all --

9    the land contract balance at inception is all, or

10   substantially all of the purchase price; therefore --

11               Q.    Right.

12               A.    -- ergo, there's no equity until

13   20 percent has been paid in, or in five years, enough

14   payments have been made, but in this case if the value

15   is even $50,000, then there is more than 20 percent

16   equity, and the theory of the statute is that if

17   there is substantial -- in a 20 percent equity in

18   the property, then there's no separate proceeding.

19   Now, that's not to say that you can't have a

20   non-summary proceeding.

21               Q.    At the time that Mr. Curtis stopped

22   making his payments to Mr. Bigelow, have you

23   calculated how much equity he had in the property,

24   in your opinion?

126

1     A.  Based -- in a casual way, yes.

2     Q.  Have you calculated the amount of

3 equity that Curtis had in the property, at that time?

4     A.  In a casual way, yes.

5     Q.  Okay.  Well, what's your casual way?

6     A.  Well, I've told you, maybe 20 times

7 in this discussion, that my information and consistent

8 with my knowledge is, is that the property was worth

9 two to three times the land contract price, and I

10 knew about the taxes, which are extinguished on the

11 closing, so he had a substantial equity in there.

12     Q.  How much?

13     A.  Well, you asked me that earlier, and

14 I told you it was the difference between whatever the

15 value was, I presupposed 90,000 at one point --

16     Q.  All right.

17     A.  -- because there was a subsequent

18 sale for 95,000, but based on that, it's the

19 difference between 90,000 and 37,000, and there would

20 be a little interest on top due, but I've already

21 knocked 5,000 off the top.

22     Q.  All right.  So, in your opinion, the

23 amount of equity that Curtis had in the property at

24 the time he stopped making the payments was 90,000,

1  less the 37?

2            A.    Plus interest that was due -- that

3  would have been due at 11 percent from the due date of

4  the first missed installment.

5            Q.    You need to help me with that last

6  part.

7            A.    It's non-material.  It doesn't change

8  very much, but I'm glad to share it with you, if you'd

9  like.

10           Q.    Well, I'm asking you to, yeah.

11           A.    All right.  Curtis would have owed --

12  the payoff would not have been $37,000.  It would have

13  been $37,000 plus --

14           Q.    Right.

15           A.    -- the interest for the period of

16  time that he didn't pay, and I don't recall offhand,

17  but he probably should have gotten credit for the

18  principal component of the monthly payments, if any,

19  and minus that number.  Those numbers are not going to

20  be substantial --

21           Q.    Okay.

22           A.    -- but you would add, you know --

23  to his burden you would add the interest, and subtract

24  the principal component.

1        Q.    All right.   And the major numbers

2   here are the $90,000 --

3             A.    Or 95,000, based on the --

4        Q.    -- 90 to 95,000 --

5             A.    -- Yeah.

6        Q.    -- less the 37,000?

7             A.    And your question was, did I

8   calculate it, and yes, I did, and my calculation

9   wasn't based on 90,000.  It was based on 75 to a

10  hundred thousand, and I didn't -- I told you I did

11  it casually, I didn't do it precisely, but what I

12  concluded was, that there was -- you know, that the

13  equity in the land contract far exceeded the balance

14  of the purchase price.

15            Q.    All right, based on your assumptions

16  again about fair market value --

17            A.    Correct.

18            Q.    -- and the information that was given

19  to you by Mr. Blessing?

20            A.    Well, no, partly based on the

21  information.  The rest of the information was my

22  personal knowledge of the neighborhood.

23            Q.    Right, and we've already talked about

24  that.

1               A.    Right.

2               Q.    But homes and neighborhoods, we can

3    agree, can vary greatly in fair market value, right?

4               A.    Wouldn't be anything in that

5    neighborhood worth less than $50,000.

6               Q.    Really?

7               A.    I don't think so.  And, like I told

8    you earlier, I'm not an expert on real estate

9    valuation.

10              Q.    If property's not maintained, that

11   can decrease the fair market value, can't it?

12              A.    Absolutely, but I don't think it

13   would take it below that number.

14              Q.    Okay.  And you don't have any

15   information at all about how Curtis maintained this

16   property, do you?

17              A.    You're absolutely right.

18              Q.    All right.

19              A.    You know, I have some other

20   information, though.  I know that not long after

21   the closing, according to the information that

22   Mr. Blessing supplied me, that it was mortgaged for,

23   if I recall, 65,000.  Am I correct in that?

24              Q.    Well, keep going.  Tell me what your

1    information is.

2              A.    Well, I would have to look at my

3    notes, but it was mortgaged for a number larger than

4    $50,000.  And according to my information, only $3,000

5    was spent to fix it up; namely, the roof and the

6    porch.  And based on my experience, I don't think

7    institutional lenders would have loaned 65,000 or

8    anything like that if the property weren't worth at

9    least that much, or, more likely, a little more,

10   like, 75 or $80,000.  So, that's all consistent with

11   my conclusion.

12             Q.    Do you know who did the work on --

13   who put the roof on?

14             A.    No.

15             Q.    And what's your understanding of how

16   much it cost to put that roof on?

17             A.    Again, the third time, $3,000 --

18             Q.    All right.

19             A.    -- for the roof and the porch.

20   It strikes me very low.

21             Q.    You're aware, aren't you, that there

22   was a fire at the property on February 9th of 2000?

23             A.    Mr. Blessing told me there was a

24   fire.  I don't think he told me when.

131

1          Q.    Okay.  Well, I'm telling you -- I'll

2    represent to you that it was February 9th, and the

3    fire was set by Mr. Curtis.  I represent that to you.

4          A.    All right.

5          Q.    Do you have an opinion as to what the

6    fair market value of the property was after that fire

7    was extinguished?

8          A.    Well, it probably would be very

9    little, but I understand that there was fire

10   insurance.  So the owner of the property would be

11   entitled to the proceeds -- not only to the residue

12   of the property, but the proceeds of the insurance.

13         Q.    Okay.  Well, that's a separate issue,

14   the insurance.  I'm talking to you about the fair

15   market value of the property now.

16         A.    And I just got done saying that it

17   would not be very much, but I don't know how much.

18         Q.    Okay, well, you didn't say that

19   before.  You didn't know how much.  That's what I was

20   asking you.

21         MR. BLESSING:  Hey; you don't have to

22   tell him what he said.  Just go ahead and ask him

23   questions.

24         MR. LEWIS:  Well, he's telling me he

132

```
 1   already said it, and --
 2              MR. BLESSING:  And she can read it back,
 3   you know?
 4   BY MR. LEWIS:
 5        Q.   And you're aware that there was a
 6   renovation of the property after the fire?
 7        A.   I was told that.
 8        Q.   Okay.  And do you have an opinion
 9   as to what the fair market value of the property was
10   after the renovation?
11        A.   No.
12        Q.   Do you believe the renovation
13   increased the fair market value of the property?
14        A.   From where it was immediately before
15   the renovation?
16        Q.   Uh-huh.
17        A.   I was told -- I was told that about
18   $30,000 was spent on the renovation, and I assume that
19   that would have increased its value.
20        Q.   All right.  Do you have an opinion as
21   to how much the property appreciated in value as a
22   result of the renovation?
23        A.   No.
24        Q.   Have you calculated the net profit
```

1    that Mr. Bigelow made on this transaction, in your

2    opinion?

3                    A.    Yes.

4                    Q.    How much?

5                    A.    My memory is $109,000.

6                    Q.    Okay.  Can you explain to me how you

7    calculated that?

8                    A.    Based on information supplied to me

9    and on the records that I was furnished, Mr. Bigelow

10   paid the following sums -- and I'm reading from a memo

11   in this --

12                   Q.    The binder, right.

13                   A.    -- binder, Exhibit D, and it's dated

14   January 19 of '04 --

15                   Q.    Right.

16                   A.    -- all right?  It starts out with

17   Bill Blessing, but that's in reference to when

18   the trial is to occur, and Mr. Blessing did not

19   participate in these calculations.

20                   Q.    These are your notes?

21                   A.    Yeah; other than I've already --

22   in fact, I don't think I even shared these with

23   Mr. Blessing.

24                   According to what I observed -- and

1    these are round numbers -- Bigelow paid $15,000

2    to the property, and I got that information from

3    the settlement statement.  He paid 9500 and

4    4500-something, so roughly about $15,000.  According

5    to the information supplied by Mr. Blessing, he spent

6    $3,000 in October of '99 for the roof and the porch,

7    and subsequent of that -- but I don't have the date,

8    you just supplied one -- he spent $33,000 of the

9    insurance proceeds to renovate it.

10             Q.    All right.  And Mr. Blessing told you

11   that?

12             A.    Yeah.

13             Q.    Okay.

14             A.    And that's a total of $51,000.

15             Q.    Okay.

16             A.    He received when he sold the

17   property, according to the information Mr. Blessing

18   supplied me in the year 2000 or '01, $95,000.

19   He received from fire insurance proceeds $65,000.

20   That's a total of $160,000.  I subtracted the 51,000

21   from $160,000, resulting in $109,000, and then I

22   learned from Mr. Blessing that he gave Roseanne

23   Christian, his colleague, $3500 -- and I don't

24   know when -- which reduced the 109,000 to 105,5.

1    So according to my information, I concluded and

2    calculated that Mr. Blessing (sic) made a little

3    over $100,000 on the deal.

4                Q.    And you understand, don't you, that

5    the reason he got that $65,000 that you have in the

6    income category is because Mr. Curtis set the fire?

7    Is that your understanding?

8                A.    I understand there was a fire, and I

9    understand there was fire insurance, and I understand

10   that as a result of fire insurance, he received fire

11   insurance proceeds of $65,000.

12               Q.    All right.  Now, are you factoring

13   in -- Bigelow refinanced -- when he bought the

14   property from Curtis, he took out a mortgage, right?

15               A.    It would net out when he sold it.

16               Q.    He what?

17               A.    I said it would net out when he sold

18   it.

19               Q.    What do you mean it would net out

20   when he sold it?

21               A.    If he -- I don't know those facts,

22   but hypothetically, if he refinanced it -- well, he

23   didn't refinance it -- if he financed it for $65,000

24   shortly after he acquired title from Curtis --

136

1          Q.    Right.

2          A.    -- he would have received the bulk

3   of the $65,000.  When he sold the property sometime

4   later, he would have received that much less out of

5   the sale proceeds because there was a mortgage, so the

6   net would be zero.  The net -- the refinancing would

7   not alter the numbers, the numbers that I just gave

8   you.  He got -- he would have just gotten the 65,000

9   in my hypothetical earlier, rather than later.  If he

10  just disregards that mortgage, he gets the same amount

11  of money.  It's just a timing difference.

12         Q.    Did Bigelow have to pay a mortgage --

13  at the time that he sold the property after the fire,

14  did he have to pay a mortgage lender?

15         A.    I'm sure he did, if he had a

16  mortgage.

17         Q.    All right.

18         A.    But if he had a mortgage, he got the

19  mortgage proceeds earlier.

20         Q.    All right.

21         A.    So, it's a net zero.

22         THE WITNESS:  And let the record show

23  that Counsel's nodding in agreement.

24         MR. LEWIS:  I'm nodding, 'cause I'm trying

1    to understand.

2              THE WITNESS:  Fair enough.

3    BY MR. LEWIS:

4              Q.    So you're saying it's a zero-out

5    transaction, that aspect, because when he financed it

6    initially, he would have gotten that money, right?

7              A.    He would have just -- correct.

8    He would have just anticipated that much of the

9    purchase price.

10             Q.    All right.

11             A.    It's just a timing difference.

12   He got it earlier.

13             Q.    And then paid it back later?

14             A.    Right.  And it's not an exact

15   indubitable equivalent, but it's close.

16             Q.    A what?

17             A.    Indubitable equivalent.  That's a

18   word of art.

19             Q.    Okay.  Can I look at that?

20             A.    Sure.  (Hands notebook to Mr. Lewis.)

21   If you're having any trouble reading that, just let

22   me know.  I didn't make those records for you; I made

23   them for myself.

24             Q.    I understand.  (Confers with

1   Mr. Bigelow.)  Now, Mr. Lerner, the sales price you

2   have on this, 95,200.  Do you see that?

3           A.   Yeah, I do.

4           Q.   That was the sales price to the

5   Cures.  That's the buyer's name, the Cures, okay?

6           A.   Okay.

7           Q.   You're assuming that Bigelow got all

8   that money, aren't you?

9           A.   Yes.

10          Q.   And if he would have taken a second

11  mortgage?

12          A.   Wouldn't have mattered; for the same

13  reason, the first didn't matter.  He would have gotten

14  -- just anticipated part of the price earlier -- oh,

15  if he had taken it back?

16          Q.   Right.

17          A.   Well, if he had taken it back, it's

18  something of value.  You still had -- it doesn't

19  matter.

20          Q.   Okay.

21          A.   He still has -- instead of cash,

22  you've got a piece of paper, but it has the same

23  value.

24          Q.   Okay.  So let's assume he's got a

1  piece of paper and hasn't collected on it, okay?

2          A.    That's still something of value, and

3  you pay taxes on it, anyway.

4          Q.    All right.  But this 95,2 assumes

5  that --

6          A.    It assumes that that's the purchase

7  price.  That's all it assumes.

8          Q.    Right, right, right.

9          A.    And it doesn't matter if he took it

10  in bananas, or cash, or a mortgage.

11          Q.    And if the Cures haven't paid him,

12  and --

13          A.    It doesn't matter.  It still --

14  it doesn't matter.  You can elect an installment of

15  treatment under certain circumstances, but they're

16  probably not present here.

17          Q.    All right.

18          A.    They're not present here, unless

19  it was a huge mortgage.

20          Q.    So you're saying if he's got a

21  promissory note and a mortgage from the Cures, it's

22  worth just as much as cash in hand?  Is that what

23  you're saying?

24          A.    Substantially, yeah.

1       Q.   And the 65 here that you've got

2  written, "insurance" -- is that what this is in

3  Bigelow's column?

4       A.   Correct.

5       Q.   160,000, and then --

6       A.   161; isn't it?  Well --

7       Q.   And then you're taking off --

8       A.   -- I rounded it -- actually, I think

9  that's 95, not 95,2 -- but I can't read it, either.

10       Q.   All right.  And then you're taking

11  the 51 off that you've -- well, that you originally

12  calculated were his costs, right --

13       A.   Right, right.

14       Q.   -- to 109, less what he paid

15  Ms. Christian, so you're saying that he netted

16  $105,500 on this property?

17       A.   That's what I said.

18       Q.   Okay.  Now, have we discussed all the

19  opinions that you've formed in this case?

20       A.   I thought we had a long time ago.

21       Q.   We haven't talked about this.

22       A.   Well, you asked me if I did a

23  calculation, and I told you, yes.

24       Q.   Okay.  Have you discussed all the

141

1    opinions that you've formed in this case?

2            A.    Well, as I said before, I thought we

3    had a long time ago, and if you ask me questions, I'll

4    be glad to share my opinions with you.

5            Q.    Do you have any other opinions, other

6    than what we've talked about?

7            A.    None that currently occur to me.

8            Q.    If any occur to you later, will you

9    let Mr. Blessing know --

10           A.    Sure.

11           Q.    -- so that he'll let me know?

12           A.    Sure.

13           Q.    Okay.

14           MR. LEWIS:   Give me a minute.  I think I'm

15    finished.

16                (Off-the-record discussion.)

17           MR. LEWIS:   Mr. Lerner, just a couple more

18    questions.

19    BY MR. LEWIS:

20           Q.    At the closing when Mr. Bigelow sold

21    the property to the Cures, he would have had seller's

22    expenses incident to that closing, right?

23           A.    Of course.

24           Q.    And have you taken that into

1    consideration in calculating the amount of money

2    that Mr. Bigelow netted on this transaction?

3              A.    Yes, in the sense that my purpose

4    in doing this was to come to an approximate number

5    -- it wasn't an exact science.

6              Q.    Right.

7              A.    I understand that the purchase price

8    was a little higher than the 95,000 I use, and I'm

9    not, you know, he may have had more than a couple

10   thousand dollars of expenses, but it wouldn't have

11   materially changed the result.

12             Q.    But the answer to my question is, no,

13   you haven't taken those expenses into consideration in

14   calculating Bigelow's net profit, correct?

15             A.    That's not correct.    I would have

16   assumed the result was a few thousand dollars off,

17   but because -- but I would have assumed all the

18   numbers had that much flexibility in them.

19             Q.    All right.    Well, do you know what

20   his expenses were incident to that transaction with

21   the Cures?

22             A.    No.    I just today learned that --

23   I assume it was -- because he's talking about land

24   contract -- that it was a private transaction as

1    distinguished from a buyer being financed with

2    an institutional mortgage, and his expenses probably

3    would have been lower.

4              Q.    You thought the Cures had a land

5    contract with Bigelow?

6              A.    No, had a mortgage back, but

7    apparently from what he just said a moment ago,

8    apparently he financed the buyers.

9              Q.    He took a second mortgage.

10             A.    Oh, I didn't know that.  Okay.  These

11   numbers would be off by his expenses, and that would

12   have amounted to several thousand dollars, but it

13   wouldn't materially changed the result.

14             Q.    All right.  So what do you mean by

15   several thousand dollars?

16             A.    It could vary by as much as 4 or

17   5,000.  More likely a couple thousand/2.

18             Q.    So in terms of calculating net

19   profit --

20             A.    It could be --

21             Q.    -- we should subtract 2 to 5,000;

22   is that right?

23             A.    Yeah, you could add a couple thousand

24   back in, because I've understated the purchase price

1    by that amount.

2                Q.    Well, you'd need the exact numbers to

3    do an exact calculation --

4                A.    I wasn't trying to do an exact

5    calculation.

6                Q.    Oh.

7                A.    I was trying to do something

8    approximate.

9                Q.    But you'd need the numbers to do an

10   exact calculation?

11               A.    That is correct.

12               Q.    And you ballparked the purchase price

13   -- you approximated the purchase price?  Is that what

14   you said?

15               A.    I think Mr. Blessing had told me that

16   it was about 95,000.  He just now, a moment ago, told

17   me it was 97-something.

18               Q.    Okay.

19               MR. LEWIS:  Thank you.

20               THE WITNESS:  Thank you.

21                       (Witness waived signature.)

22

23        (The deposition of DONALD M. LERNER, ESQ.,

24   was adjourned at 1:41 p.m.)

```
1              )
   STATE OF OHIO  )   SS
2              )
```

3           I, ANNA I. CROUCH, a Notary Public within

4    and for the State at Large, do hereby certify that

5    the foregoing deposition of:

6                  DONALD M. LERNER, ESQ.

7    was taken before me at the time and place and for

8    the purpose in the caption stated; that the witness

9    was first duly sworn to tell the truth, the whole

10   truth and nothing but the truth; that the deposition

11   was reduced to stenotype writing by me in the presence

12   of the witness; that the foregoing is a full, true

13   and correct transcript so given; that there was

14   no request that the witness read and sign his

15   deposition; that the appearances were as stated in

16   the caption.

17

18   WITNESS MY SIGNATURE THIS 3rd DAY OF FEBRUARY, 2004.

19   My Commission Expires:  October 17, 2004.

20

21   _____
                            Anna I. Crouch
22                          Notary Public
                            State at Large, Ohio

23

24