

LAW OFFICES OF
**William H. Blessing**
119 East Court Street
Suite 500
Cincinnati, Ohio  45202

E-Mail:  jimschwantes@cinci.rr.com

Telephone:  513-621-9191
Telecopier:  513-621-7086

September 16, 2002

Gary R. Lewis, Attorney
Cincinnati Club Building, Suite 915
30 Garfield Place
Cincinnati, OH  45202



　　　　*Re:  Bryant v. Bigelow, et al.*

Dear Gary:

　　　　Enclosed please find a copy of the deposition of Don Lerner taken in Hamilton County case number A0005052, *Bigelow v. Burbrink*.  Plaintiffs submit this deposition in lieu of an expert witness report.  The opinions of Mr. Lerner for the above referenced case will be consistent with his opinions for *Bigelow v. Burbrink*.

　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　*James E. Schwantes /alv*

　　　　　　　　　　　　James E. Schwantes

JES/alv
Enclosure

1

1        COURT OF COMMON PLEAS

2        HAMILTON COUNTY, OHIO

3              - - -

4  PETE BIGELOW,              :

5     Plaintiff,             :

6     vs.                    :CASE NO. A0005052

7  MARK W. BURBRINK, et al.,:

8     Defendants.            :

9              - - -

10        Deposition of DONALD LERNER, ESQ., a

11  witness herein, taken by the plaintiff as upon

12  cross-examination, pursuant to the Ohio Rules

13  of Civil Procedure and pursuant to agreement by

14  counsel as to the time and place and

15  stipulations hereinafter set forth, at the

16  offices of Lerner, Sampson & Rothfuss, 120 E.

17  Fourth Street, 800 Mercantile Center,

18  Cincinnati, Ohio, at 10:00 A.M. on Tuesday,

19  January 8, 2002, before Darlene Anthony, RPR, a

20  Registered Professional Reporter and Notary

21  Public within and for the State of Ohio.

22              - - -

23

24                            **COPY**

25

2

```
 1    APPEARANCES:
 2           On behalf of the Plaintiff:
 3               CHRISTOPHER T. LABER, ESQ.
                 Attorney at Law
 4               22 W. Ninth Street
                 Cincinnati, Ohio  45202
 5
 6           On behalf of the Defendants:
 7               JAMES E. SCHWANTES, ESQ.
                    of
 8               Law Offices of William H. Blessing
                 119 E. Court Street
 9               Suite 500
                 Cincinnati, Ohio  45202
10
                        - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                S T I P U L A T I O N S

 2           It is stipulated by counsel for the

 3     respective parties that the deposition of

 4     DONALD LERNER, ESQ., a witness herein, may be

 5     taken at this time by the plaintiff as upon

 6     cross-examination and pursuant to the Ohio

 7     Rules of Civil Procedure, all other legal

 8     formalities being waived by agreement; that the

 9     deposition may be taken in stenotypy by the

10     Notary Public-Court Reporter and transcribed by

11     her out of the presence of the witness; and

12     that examination and signature to the

13     transcribed deposition is expressly waived.

14                        -  -  -

15

16

17

18

19

20

21

22

23

24

25
```

4

1                        I N D E X

2                                       PAGE

3    BY MR. LABER:

4       Cross                            5

5

6                      E X H I B I T S

7                                       PAGE

8    Plaintiff's Exhibit 1              7

9    Plaintiff's Exhibit 2              8

10   Plaintiff's Exhibit 3             10

11   Plaintiff's Exhibit 4             10

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1              DONALD LERNER, ESQ.

2    of lawful age, a witness herein, being first

3    duly sworn, as hereinafter certified, was

4    examined and deposed as follows:

5              CROSS-EXAMINATION

6    BY MR. LABER:

7         Q.    Please tell the court reporter

8    your name and your office address, please.

9         A.    Donald Lerner, 120 East Fourth

10   Street, Cincinnati, Ohio.

11        Q.    And you're an attorney?

12        A.    I am.

13        Q.    And you've been practicing since

14   when?

15        A.    1960.

16        Q.    And you're still full-time

17   engaged --

18        A.    I am.

19        Q.    -- in your practice of law?

20        A.    Yeah.

21        Q.    What's your area of practice?

22        A.    Commercial litigation.

23        Q.    Do you have any certifications in

24   any specialty from any bar or other

25   association?

6

1      A.    No.

2      Q.    Do you do work in real estate?

3      A.    Yes.

4      Q.    Do you do foreclosure work?

5      A.    Yes.

6      Q.    Do you currently have any

7   foreclosures in which you're counsel of record?

8      A.    I don't think so.

9      Q.    Would it be fair to state in the

10   last three years there's maybe been one -- no

11   more than one foreclosure that you've been

12   counsel of record?

13      A.    I'm sure that's true.  Actually,

14   maybe several, but a small number.

15      Q.    Do you know attorney William

16   Blessing?

17      A.    I do.

18      Q.    And how do you know Mr. Blessing?

19      A.    He's a member of the bar.  I know

20   lots of members of the bar.

21      Q.    In just that capacity?

22      A.    We have no professional

23   relationship.

24      Q.    Have you ever worked with him

25   before, co-counseled on a case?

7

1          A.    No.

2          Q.    Has he ever retained you as an

3     expert witness before?

4          A.    No.

5          Q.    Has he ever communicated with you

6     about any legal matters outside of this

7     litigation?

8          A.    I conferred with him some time ago

9     on a legal matter.  It was a casual

10    communication.

11         Q.    You approached him as opposed to

12    him approaching you?

13         A.    That's correct.

14         Q.    Mr. Blessing has designated you as

15    an expert witness in some litigation involving

16    my client, Mr. Bigelow, and his clients, Mark

17    and Michael Burbrink.  Are you aware of that

18    designation?

19         A.    Yes.

20         Q.    Showing you what's been marked as

21    Exhibit Number 1.  That's a letter that was

22    sent to me by Mr. Blessing indicating that you

23    were going to be testifying as an expert

24    witness in this matter, describing the subject

25    of your testimony and the basis of your

8

1    opinions.  If you would, please, would you take

2    a moment to read through that letter?

3              A.    Alright.

4              Q.    You've had a chance to read that?

5              A.    I have.

6              Q.    Does that accurately reflect your

7    involvement in this litigation?

8              A.    Yes.  He's spelled the name of my

9    law firm incorrectly, but otherwise it seems

10   accurate.

11             Q.    Short of that, the statements in

12   there you believe to be accurate.

13             A.    Yes.

14             Q.    I believe in there towards the

15   bottom he indicates that you received several

16   documents, and he numbers them one, two, three,

17   five.  I'm assuming that's a typo, but he

18   refers to a purchase contract dated

19   February 22nd of 1999?

20             A.    I recall a purchase contract dated

21   in 1999.  I don't recall the date.

22             Q.    I'm showing you what's been marked

23   as Exhibit 2.  Does that appear to be the

24   purchase contract that is referred to in the

25   letter?

9

1          A.    Yes.

2          Q.    Does that appear to be the

3    contract that you received from Mr. Blessing?

4          A.    It appears to be a copy of it.  I

5    received a different copy of it.  Mine was

6    almost equally illegible.  It was slightly more

7    legible along the right margin.

8          Q.    There's some writing that goes,

9    oh, what is that, vertical along the right

10   margin of the page?

11         A.    Yeah.

12         Q.    It doesn't really come out on the

13   copy that I've handed you, but you're

14   indicating that on the copy that Mr. Blessing

15   gave you, that that writing was more apparent?

16         A.    Slightly, yeah.  I also don't

17   recall one way or the other that the recorder's

18   stamp was on the copy I observed.

19         Q.    And the copy that I've given to

20   you as Exhibit Number 2 has a recorder's stamp

21   on it?

22         A.    Yes.

23         Q.    And the date of that recorder's

24   stamp?

25         A.    Filed February 24, '99.

10

1    Q.    Which would indicate to you what,
2    sir?
3    A.    That somebody filed this with the
4    Hamilton County Recorder on that date.
5    Q.    It's also indicated that you were
6    given a copy of a settlement statement dated
7    March of 1999.  I'm showing you what's been
8    marked as Exhibit Number 3.  Does that appear
9    to be the settlement statement that was
10   provided to you by Mr. Blessing?
11   A.    Yes, it does.
12   Q.    And I believe, also, that he
13   refers to a lease agreement.  If you would,
14   please, sir, take a look at Exhibit Number 4,
15   and can you tell me, does that appear to be the
16   lease agreement that Mr. Blessing gave you?
17   A.    It appears to be a copy of the
18   same lease agreement with which Mr. Blessing
19   furnished me a copy.
20   Q.    He also indicates that he gave you
21   a copy of a registered land certificate.  I
22   don't have a copy of that to present to you but
23   do you recall receiving that?
24   A.    I do.  I think that he's omitted
25   number four.  I think that there was a number

11

1  four.

2        Q.    What would that number four have

3  been?

4        A.    I think it was what is referred to

5  as a grantee statement, but I think we referred

6  to it as a conveyance statement.

7        Q.    I don't do real estate law so I'm

8  not familiar with either term.  Can you explain

9  to me what that is?

10        A.    It's a single page document by

11  which -- it's actually a tax return.  It's a

12  document by which the purchaser asserts the

13  purchase price to the auditor for purposes of

14  establishing the appropriate transfer tax.

15        Q.    I understand.  I know what

16  document you're referring to then.  Thank you.

17  And lastly, although it's not numbered,

18  Mr. Blessing indicates that he gave you a

19  written narrative of the factual background as

20  alleged in the complaint.  I don't have a copy

21  of that, sir.  Do you have a copy of that?

22        A.    I have it but I don't have it

23  immediately available.

24        Q.    Would you be able to make that

25  available to me after the deposition?

12

1    A.    Sure.

2    Q.    Thanks.  I appreciate that.  Do

3  you recall what the written narrative statement

4  was?

5    A.    I recall that it was excerpts from

6  a pleading in a different case involving the

7  general background.

8    Q.    Excerpt of a different pleading --

9    A.    That's my best recollection.

10    Q.    -- than in this case?

11    A.    Yes.

12    Q.    In another case?

13    A.    Yes.

14    Q.    Do you recall what the caption on

15  that case was?

16    A.    I didn't have a caption.  It was

17  represented to me to be a portion of a -- I

18  think a complaint from a different case, but I

19  don't recall that I had the entire pleading or

20  the caption.

21    Q.    Did it make reference to

22  Mr. Bigelow and Mark and Michael Burbrink in

23  the factual narrative?

24    A.    I think not.

25    Q.    Do you recall who the parties were

13

1    that were represented?

2         A.    I don't recall, and I'm not sure

3    they were even mentioned in the portion that I

4    had by name.

5         Q.    Just referred to as plaintiff and

6    defendant?

7         A.    I just don't recall.  As I said,

8    I'd be glad to provide you with a copy.

9         Q.    I'd appreciate that.  Did you

10   author a report for Mr. Blessing?

11        A.    I did not.

12        Q.    Did you make any written

13   communications or correspondence to

14   Mr. Blessing regarding your involvement?

15        A.    No.

16        Q.    Did you make any verbal

17   communications to Mr. Blessing about --

18        A.    We had several discussions.

19        Q.    Several being how many?

20        A.    To my best memory is two.

21        Q.    Were these discussions related to

22   what Mr. Blessing has raised in his letter to

23   me of December 10, which is marked as

24   Exhibit 1?

25        A.    Would you rephrase your question?

14

1    I don't understand it.

2        Q.    The discussions that you had with

3    Mr. Blessing, were they by telephone?

4        A.    I had one telephone conversation

5    with Mr. Blessing -- as I recall, I had one by

6    telephone and one in person.

7        Q.    He came to your office?

8        A.    He did.

9        Q.    And the gist of those discussions,

10   is that reflected in Exhibit Number 1?

11       A.    Yes.

12       Q.    Exhibit Number 1 indicates that

13   you're familiar with the standards of --

14       A.    I can read it to you, "The

15   standards of disclosure requirements and

16   practices involving real estate sales and

17   purchases."

18       Q.    Can you explain to me what that

19   means?

20       A.    You're asking me to explain to you

21   what Mr. Blessing means, and I'm not qualified

22   to do that.  I can explain to you what I think

23   it is.

24       Q.    Thank you.  I'd appreciate that.

25       A.    I think it's the standard of care

15

1    involved locally in real estate transactions.

2         Q.    There's a period there, as opposed

3    to a comma?  I was waiting for more.

4         A.    That's my understanding.

5         Q.    The standard of care involved in

6    real estate transactions.  And what would that

7    standard of care be?

8         A.    That's like asking what is the

9    standard of care in a tort environment.  It's

10   too broad.  I can't answer it.

11        Q.    Is there any published standard of

12   care that you're referring to?

13        A.    I'm not referring to a published

14   standard of care, no.

15        Q.    Is there a published standard of

16   care that you're aware of?

17        A.    I suspect that there is but I'm

18   not -- I suspect that there is in a real estate

19   practice, and by that I mean people who

20   identify themselves as relators, not lawyers,

21   but I'm not familiar with it.

22        Q.    And how are you familiar with the

23   standards of disclosure requirements and the

24   standards involving real estate sales and

25   purchases?

16

1          A.    Well, I've been active in this

2    field for 40 plus years.

3          Q.    In the field of commercial

4    litigation?

5          A.    Well, most of my -- much of my

6    commercial litigation involves the purchase and

7    sale of real estate, a lot of which is

8    residential.

9          Q.    Mr. Blessing also indicates that

10   you will describe in your testimony the

11   transaction in this case.  Can you do that for

12   me?

13         A.    My total familiarity with the

14   transaction in this litigation is represented

15   by the four documents that we've discussed,

16   plus the grantee statement that I mentioned

17   that's absent from these discussions, plus what

18   Mr. Blessing has told me about the transaction

19   that's outside of these documents.

20         Q.    So any description that you would

21   have of the transaction is based upon those

22   five documents that were given to you by

23   Mr. Blessing, plus the narrative report -- or

24   the narrative pleading that Mr. Blessing gave

25   to you?

17

1    A.    Plus the discussions that I've had
2  with Mr. Blessing and his associate.
3    Q.    And his associate would be --
4    A.    Jim.
5    Q.    Mr. Schwantes?
6    A.    Yes.
7    Q.    Have they given you additional
8  information in those discussions that's not
9  contained in that narrative?
10    A.    I think the answer is yes, but I
11  don't have the narrative in front of me nor do
12  I have a photographic memory about what was
13  involved in our discussion, but I think the
14  answer is yes.
15    Q.    Did you make notes from your
16  discussion?
17    A.    Yes.
18    Q.    Do you still have a copy of those
19  notes?
20    A.    Yes.
21    Q.    Would you be willing to provide me
22  with a copy of your notes from those
23  discussions?
24    A.    I don't have a problem with giving
25  you a copy.

18

1  Q.   Thank you.  So based upon the
2  discussions that you've had with Mr. Blessing
3  and Mr. Schwantes and the documents that
4  they've provided to you that we've discussed,
5  can you describe for me the transaction in this
6  case?
7  A.   My understanding of the
8  transaction is that on or about February 22nd
9  or perhaps shortly before that time, there was
10 a foreclosure pending against the real estate
11 which is the subject of this contract, this
12 litigation, which was at the time owned by Mark
13 and Michael Burbrink.  The fair market value of
14 the property was something in the order and
15 magniture of $100,000.  That it was in
16 foreclosure.  It was roughly six months in
17 arrears.  It had not yet been advertised for
18 sale by the sheriff but that was imminent.
19 That the owners, Mark and Michael Burbrink,
20 were approached by a -- I'm trying to read her
21 name.  Rosanne Christian, I think --
22 Q.   Yes, sir.
23 A.   -- who was an associate of
24 Mr. Bigelow, and she suggested that Mr. Bigelow
25 could -- that she had a friend, Mr. Bigelow,

19

1   who could resolve their problem by taking the

2   matter to foreclosure and getting them back in

3   their house.  They would never lose possession

4   of their house under the arrangement that she

5   was proposing.  That Mr. Bigelow would arrange

6   to get the house back to them on land contract

7   for a year, and at the conclusion of the year

8   would arrange further financing -- new

9   financing so they could continuously have

10   possession and ownership of the property.

11         That they signed this contract,

12   which is your Exhibit 2, I assume on or about

13   February 22, 1999.  The contract is vague in

14   some respects to me.  It talks about the buyer

15   will pay -- buyer being Mr. Bigelow -- will pay

16   the closing costs and all attorneys fees

17   associated with the foreclosure.  That the

18   purchase price will be zero.  That the seller

19   will receive -- seller being Messrs.

20   Burbrink -- will receive 100 percent financing,

21   and that is somewhat consistent with the

22   settlement statement, which is your Exhibit 3,

23   which appears about three weeks later on

24   March 12th.

25         There are significant

20

1  inconsistencies in my view with regard as

2  between the purchase contract and the

3  settlement statement.  The purchase contract

4  describes the purchase price to be zero.  The

5  settlement statement discloses the sales price,

6  which I interpret to be the same as the

7  purchase price, and identified as both the

8  purchase price and the sales price on the

9  settlement statement, to be $31,397.48.  The

10  closing statement discloses deductions to the

11  seller of $22,000 -- around these numbers, I'm

12  rounding them off -- $22,000 is the mortgage

13  assumed by the purchaser.

14       Q.    Sure.

15       A.    A charge to the seller of $900 for

16  real estate tax proration, a charge of $15 for

17  lost registered land certificate affidavit, a

18  reinstatement charge of roughly $6,000,

19  transfer tax $78 and change, and a charge of

20  $50 for deed preparation.  It also discloses

21  certain obligations and charges of the

22  purchaser, which are generally associated with

23  paying Mr. Meckstroth $50 and recording the

24  deed.

25            I find that the purchase price or

21

1  the sales price of 31,000 and roughly $400 to

2  be inconsistent with the purchase price of zero

3  that the contract calls for.  The deduction for

4  the mortgage -- assuming a purchase price of

5  $31,000 and change -- a deduction which to my

6  mind is inconsistent with a property which has

7  a fair market value of roughly $100,000, but it

8  is consistent with property being in

9  foreclosure and being six or eight months

10  delinquent.  The $22,000 being the mortgage

11  balance.  Reinstatement charges would include

12  whatever number of delinquent monthly

13  installments are due, which would probably

14  include principle and interest, and escrow for

15  taxes and insurance.  If so, then the $900

16  prorated for taxes seems duplicative of what's

17  in the reinstatement charges, but I can't, from

18  what I have, I can't absolutely determine that.

19          The grantee statements, which we

20  don't have before me, disclosed a purchase

21  price of roughly $53,000, which was the sum of

22  the $31,000 purchase price as disclosed by this

23  statement and the principle balance of the

24  mortgage of roughly $22,000.  The transfer tax

25  which was charged to the quote "seller" in this

22

1  instance is consistent with the $31,400

2  purchase price disclosed by this statement but

3  inconsistent with the purchase contract

4  disclosure of zero.

5           There is a suggestion in this

6  purchase contract that the seller is going to

7  be refinanced, and that's consistent with

8  Mr. Blessing's narrative description to me of

9  the transaction.  I was led to believe that the

10 transaction contemplated a land installment

11 sales contract by which the Burbrinks would

12 reacquire title to the property immediately at

13 the closing from Mr. Bigelow, and that they

14 would gain legal title at the end of the year.

15 The lease agreement doesn't disclose any of

16 that.  The lease agreement suggests that it's a

17 one year lease at roughly $500 a month, the

18 first two payments of which are waived,

19 according to the purchase contract.

20           Based on my experience, it strikes

21 me that most owners of distressed property

22 that's worth something in the order of

23 $100,000, even though they're in foreclosure,

24 would be unwilling to sell the property on

25 these terms, for $2,000 and a one year lease.

23

1   My understanding is that the $470 monthly rent
2   in the lease might be slightly below market but
3   not enough to justify that discrepancy.
4           Q.    Just to see if I understand you,
5   it's your belief from reading the narrative
6   that's provided to you and these documents that
7   Mr. Bigelow was to purchase the property from
8   the Burbrinks and immediately sell it back to
9   them under a land contract at the same closing?
10          A.    Yes.
11          Q.    And you get that from the
12  paperwork where?
13          A.    Well, I get it from three sources.
14  I get it from the suggestion in the purchase
15  contract that the seller is to receive 100
16  percent financing.  No other scenario that
17  occurs to me is consistent with that statement.
18  I get it from the economics of the transaction;
19  no reasonable seller would sell $100,000
20  property for zero or $2,000 or $30,000 or even
21  $50,000, even in the distressed environment of
22  a foreclosure, when too many other alternatives
23  are available.  For instance, you know, any
24  foreclosure of sale is subject to two separate
25  equities of redemption:  The statutorial equity

24

1  of redemption and the judicial equity of

2  redemption, so that that affords, by statutory

3  design and by judicial discretion, the owner of

4  a distressed property to sell a property,

5  refinance which is unlikely, or sell the

6  property for something perhaps less but

7  modestly less than the real value of the

8  property and redeem the property even after the

9  decree and foreclosure, which currently had not

10  yet occurred in this case.  In fact, even after

11  a sheriff's sale, which definitely had not

12  occurred in this case.  And no other scenario

13  that occurs to me is consistent with the facts

14  as I understand them.

15           So the sourses from which I

16  perceive that there's to be a land contract are

17  Mr. Blessing advised me that that's what his

18  clients understood, this document is consistent

19  with that, and the economics is consistent with

20  that.

21           Q.   So your description is based upon

22  an assumption that the Burbrinks understood

23  that this was going to be a land contract, that

24  the Burbrinks understood that they had a right

25  of redemption, and that the Burbrinks

25

1  understood that their property was worth

2  $100,000 or in excess thereof.

3          A.    It wouldn't be all those elements;

4  you need some of those elements.  All of those

5  elements are supporting of my thesis, but based

6  on my experience, I think owners of distressed

7  property have multiple opportunities when

8  there's substantial equity.  Wouldn't need to

9  be $100,000.  Fifty thousand would have

10  produced the same result.  I understand this

11  property was worth significantly more.  The

12  criteria is whether there's equity.  I can't

13  tell from these documents what was the purchase

14  price.  I have three inconsistent statements of

15  purchase price.  I have zero, I have $30,000

16  and I have $50,000.  My understanding is that

17  the property was worth more than zero, more

18  than 30, and more than 50.  Therefore, there

19  was quote "equity" in the property.  In my

20  experience when there is equity in the property

21  in this community, that is in Hamilton County,

22  the sellers of distressed property that's in

23  foreclosure are inundated with solicitations

24  from various real estate speculators to acquire

25  the property.

1          My experience suggests that the
2    homeowners generally have a sense of what their
3    property is worth.  Not necessarily totally
4    accurate, but they have a significant sense of
5    what it's worth, and they know that they can
6    sell it even in foreclosure because they are
7    typically afforded multiple opportunities when
8    there's substantial equity -- even minimal
9    equity in the property.  So I think it's
10   unlikely that -- I've never met these people,
11   I've never talked to them, I don't know what
12   they know, but based on my experience it seems
13   unlikely that they would not know that their
14   property is worth substantially more than zero,
15   or even substantially more than the $20,000 or
16   so they owed on the mortgage.  Therefore, it
17   seems, based on my experience, substantially
18   unlikely that they would sell it for zero or
19   sell it for the $30,000 that's suggested on the
20   closing statement when the property is worth in
21   the order or magnitude of three times that
22   amount.
23          So their suggestion through
24   Mr. Blessing that they understood that this was
25   a financing transaction, they were going to

27

1  maintain the property on land contract, is
2  consistent with my observation of the
3  documents.
4          Q.    Let me back up a second.  Did you
5  do any other investigation, other than what
6  Mr. Blessing gave to you?  Did you look at any
7  other records or talk to any other people?
8          A.    No.
9          Q.    And you indicated that you had at
10  least two communications with Mr. Blessing to
11  discuss this matter.  Did he give you any facts
12  that aren't contained in the written narrative?
13          A.    I've already told you, I don't
14  remember precisely what the narrative says.
15  Between Mr. Blessing and the written narrative,
16  I perceive the facts which I've just described
17  to you.  I should say, between all the
18  documents that we've discussed plus my
19  discussions with Mr. Blessing, I understood
20  those to be the facts.
21          Q.    Mr. Blessing says that you will
22  opine the transaction in this case did not
23  accurately reflect the real estate contract,
24  and I think you just discussed that.  We just
25  talked about that.

28

1          A.    I did.

2          Q.    It appears that the closing on the

3    purchase contract was orchestrated by Attorney

4    John Meckstroth; is that correct?

5          A.    I'm told that.  I have no

6    independent knowledge of that.

7          Q.    Does the settlement statement

8    indicate that it was prepared by John R.

9    Meckstroth, Junior?

10         A.    Yeah, the second page of the

11   document.  I assume that's part of the

12   document.

13         Q.    Are you familiar with

14   Mr. Meckstroth?

15         A.    Not really.  I'm familiar with his

16   father.  I know his father but I don't

17   really -- I know who he is and I'm sure we've

18   said hello, but I don't know him.

19         Q.    Familiar that he's also a member

20   of the Civil Division of the Hamilton County

21   Prosecutor's Office dealing in their real

22   estate matters?

23         A.    I didn't know that, no.

24         Q.    Mr. Blessing also says that you

25   will opine that this transaction falls far

29

1    short of that necessary to effect a real estate

2    sale with integrity and honesty.  Would you

3    believe integrity and honesty to be a subject

4    for your expert opinion?

5         A.    I can tell you my experience, I

6    can tell you my exposure, but I can't opine on

7    my qualifications as an expert on that subject.

8         Q.    So you wouldn't be able to tell

9    the court that you're an expert in integrity

10   and honesty?

11        A.    It wouldn't be my function to tell

12   the court that.  I can tell the court my

13   experiences and the court could make that

14   determination.  I couldn't make it for the

15   court.

16        Q.    I guess what I'm trying to do is

17   pin you down.  Are you an expert in integrity

18   and honesty?

19        A.    I feel like my experience

20   qualifies me as an expert in real estate

21   transactions such as this, and I feel like

22   integrity -- I wouldn't describe myself as an

23   expert in integrity but I would say that I have

24   enough experience to qualify me as an expert in

25   real estate transactions such as this.

30

1       Q.    Thanks.  Mr. Blessing also says

2  that you may testify concerning pattern,

3  motive, absence of mistake relating to the

4  scheme alleged.  Start with the scheme alleged.

5  Can you tell me what this scheme alleged is

6  that you're going to testify to?

7       A.    If you'll ask me a question, I'll

8  be glad to answer it.  I have an understanding

9  of a fact pattern.  I have an understanding

10  from Mr. Blessing through the written documents

11  that we've talked about and the verbal

12  communications that we've talked about that

13  this was one of a series of transactions of

14  similar import.  I can describe for you, I can

15  answer your questions, but I can't tell you

16  what's in Mr. Blessing's head.

17       Q.    I appreciate that, and what I'm

18  trying to get at is is there some sort of

19  scheme alleged in the complaint that you're

20  going to testify about?

21       A.    I've never read the complaint.  I

22  couldn't answer that.

23       Q.    Is there some sort of scheme

24  involving Mr. Bigelow that you're going to

25  testify about?

31

1       A.    I'm going to respond to questions.
2  If you're asking me am I acquainted with a
3  scheme, my answer is as I've explained to you.
4  I know only what Mr. Blessing has enlightened
5  me about both by the verbal discussions and by
6  the documents that we've discussed, and
7  Mr. Blessing has informed me that, as I've
8  said, that this is one in a series of similar
9  transactions.
10      Q.    Similar in what way, sir?
11      A.    Similar in that Mr. Bigelow,
12 through his acquaintance or agent -- I don't
13 know the exact relationship, that Miss
14 Christian would approach owners of distressed
15 property -- by that I mean property in
16 foreclosure, but restricted to properties where
17 there is substantial equity, in an attempt to
18 acquire those properties without a concomitant
19 equity participation.  That is, to take over --
20 I'm using the words carefully in explaining
21 that to you -- to take over the mortgage and
22 sell or rent the property as profitable without
23 making a commitment to the equity of the
24 property.  I say take over because the seller
25 statement here talks about a mortgage assumed,

32

1  but the deed which I've been furnished

2  doesn't -- did I look at the deed?

3      Q.    No, sir, I didn't have a copy of

4  that.

5      A.    I'm told that the deed does not

6  have assumption language in it.

7      Q.    I know you set it forth in plain

8  language but I really didn't understand you,

9  Mr. Lerner.   The scheme is that Mr. Bigelow,

10 through Miss Christian, approaches people whose

11 property is in foreclosure.   There's equity in

12 the property, and then I lost you.

13     A.    Well, as I said earlier, it's

14 inconceivable to me that people who have

15 property worth two or three times or more the

16 mortgage balance are going to let somebody take

17 over this property without indemnifying their

18 equity, unless they are somehow misled about

19 where that's going.   In this case, my

20 understanding, based on what we've talked

21 about, is that they thought they were entering

22 into a land installment, land contract, whereby

23 they were going to maintain full possession and

24 ultimate ownership of the property.

25          I don't think that people with

1    houses that are worth 75 or 100 or 150 thousand

2    dollars, I don't think those people sell those

3    houses outright for a small fraction of the

4    value of the property without somehow being

5    misled.  And in this case, the explanation that

6    they were offered, they thought they were

7    entering into a land contract transaction, is

8    completely consistent with the economics and

9    the documents, except that there is no land

10   contract.  At least I haven't seen it.

11        Q.   So your testimony concerning

12   pattern, motive, and absence of mistake

13   relating to the scheme that you've just

14   mentioned, what will that testimony be?

15        A.   If you could tell me what the

16   question will be, I can tell you how I can

17   answer it, but I thought I answered the

18   question.

19        Q.   Yes, sir.  What I'm doing is

20   referring to Mr. Blessing's letter of

21   December 10, 2001 to me, which is marked as

22   Exhibit Number 1.  That refers to what you will

23   testify to.

24        A.   Well, sir, it says, "He may also

25   testify concerning," and I will answer any

34

1    questions that are postulated to me.  I don't

2    know what those questions will be.

3         Q.   Have you discussed those potential

4    questions with Mr. Blessing?

5         A.   No.

6         Q.   Have you discussed this particular

7    topic with Mr. Blessing?

8         A.   Yes, as I responded to your

9    earlier questions.

10        Q.   And with respect to the particular

11   topic, I'm referring to pattern, motive and

12   absence of mistake.

13        A.   Mr. Blessing, as I said twice

14   already, Mr. Blessing told me that this was one

15   of a series of transactions that had the common

16   features which I've described.  In that sense

17   we talked about pattern.  I don't know

18   particularly what you mean by motive or

19   mistake.

20        Q.   When I asked you to read through

21   this letter before and if it accurately

22   reflected your discussions with Mr. Blessing,

23   you indicated it did, and I'm just trying to

24   understand what he means or what you mean --

25        A.   Well first of all, I don't mean

35

1    anything.  It's not my statement, okay?  He

2    says, "He may also testify concerning pattern,

3    motive and absence of mistake."  If I'm asked

4    about those subjects, I will tell you -- by you

5    or by him or anyone else, I will respond as

6    best I can.  Mr. Blessing and I have not

7    discussed those issues no more than I've

8    related to you and I'm, therefore, unable to

9    tell you what's in his head.

10          Q.    Just to make sure I'm on the same

11   page, you've not discussed with Mr. Blessing

12   any testimony regarding pattern, motive or

13   mistake?

14          A.    No.  I've related to you our

15   discussions, and other than those discussions I

16   haven't discussed those issues.

17          Q.    You have a fee agreement with

18   Mr. Blessing for your services?

19          A.    No.

20          Q.    Are you charging Mr. Blessing or

21   his client for your services?

22          A.    We've never discussed the issue.

23          Q.    Have you had separate

24   conversations with Mr. Blessing's associate,

25   Mr. Schwantes?

36

1        A.    I don't recall ever having a
2    discussion that didn't involve Mr. Blessing.
3        Q.    Did you ever have any separate
4    discussions with an attorney by the name of
5    Rick Hopkins?
6        A.    No, that I can recall.  I don't
7    know that name.
8        Q.    You don't know Mr. Hopkins?
9        A.    No.
10       Q.    Mr. Lerner, I appreciate your
11   time.  If you would, please, get me a copy of
12   the narrative that Mr. Blessing sent you and
13   the notes that you have, I'd appreciate it.
14
15

            (Signature Waived)
16          DONALD LERNER, ESQ.
       (DEPOSITION CONCLUDED AT 10:42 A.M.)
17              -  -  -
18
19
20
21
22
23
24
25

37

1                    C E R T I F I C A T E

STATE   OF   OHIO   :

2                           :   SS

COUNTY OF HAMILTON :

3            I, Darlene Anthony, RPR, the under-
4    signed, a duly qualified notary public within
5    and for the State of Ohio, do hereby certify
6    that DONALD LERNER, ESQ. Was by me first duly
7    sworn to depose the truth, the whole truth, and
8    nothing but the truth; the foregoing is the
9    deposition given at said time and place by said
10   witness; that said deposition was taken
11   pursuant to stipulations hereinbefore set forth;
12   that said deposition was taken by me in stenotypy
13   and transcribed by means of computer; and that
14   examination and signature to the transcribed
15   deposition is expressly waived; that I am
16   neither a relative of any of the parties or any
17   of their counsel; and I am not, nor is the
18   court reporting firm with which I am
19   affiliated, under a contract as defined in
20   Civil Rule 28(D), and have no interest in the
21   result of this action.

22           IN WITNESS WHEREOF, I hereunto set my
hand and official seal of office at Cincinnati,
23   Ohio, this 16th day of January, 2002.


24   My Commission expires: Darlene Anthony
     May 10, 2006                Notary Public-State of Ohio
25